Ira M. Press (IP 5313)
Roger W. Kirby (RWK 4503)
David Bishop
KIRBY McINERNEY, LLP
825 Third Avenue, 16th floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Co-lead counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re MOODY'S CORPORATION SECURITIES LITIGATION | No. 1:07-cv-8375-SWK<br><br>CONSOLIDATED AMENDED COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................... 1

JURISDICTION AND VENUE ......................................................... 3

PARTIES ........................................................................ 3

I.   BACKGROUND: BASIC TERMS, FACTS, ENTITIES AND CONCEPTS ......... 8

     A.   Credit Ratings, Credit Rating Agencies and the Credit Rating Industry ........ 8

          1.   Credit Ratings ................................................. 8

          2.   Moody's Credit Rating Scale ................................... 9

          3.   The Unlimited Demand for Credit Ratings and the Limited Supply
               of Nationally Recognized Statistical Rating Organizations
               Authorized to Provide Them ................................... 10

     B.   A Structured Finance Bestiary ..................................... 11

     C.   Independence is the Single *Sine Qua Non* of Credit Rating Agencies' Business,
          the Guarantor of their Objectivity, and an Integral Part of their Reputation ..... 13

     D.   The "Issuer Pays" Business Model Threatens Independence – and, in
          Structured Finance – Destroyed It ................................. 16

          1.   Generally ..................................................... 16

          2.   Specifically, in Structured Finance ........................... 17

          3.   The Consequence: Everything Depends on the "Expected Loss"
               Determined by the Credit Rating Agency ....................... 19

II.  MOODY'S MATERIAL MISREPRESENTATIONS AND OMISSIONS
     CONCERNING ITS BUSINESS AND ITS CONDUCT OF THAT BUSINESS ..... 21

     A.   Misrepresentations and Omissions Concerning Moody's Business
          and Business Conduct ............................................. 21

          1.   Moody's Code of Conduct for its Ratings Business and Operations .... 24

i

|     |     | a. | Root .................................................... 24 |
|     |     | b. | The International Organization of Securities Commissions' ("IOSCO") Credit Rating Agency Principles and Credit Rating Agency Code of Conduct – and Moody's Misrepresentations Concerning Those Principles and that Code . 24 |
|     |     | c. | Moody's Code of Conduct ............................... 31 |

|     | 2. | Moody's Further Misrepresentations Concerning Its Business ........ 37 |
|     |     | a. | Moody's Annual Report for 2005 ........................ 37 |
|     |     | b. | Moody's Form 10-K for 2005 ........................... 43 |
|     |     | c. | Moody's Report on the Implementation of its Code of Conduct ............................................. 46 |
|     |     | d. | Moody's Form 10-K for 2006 ........................... 53 |
|     |     | e. | Moody's Annual Report for 2006 ........................ 54 |
|     |     | f. | Moody's Form NRSRO ................................ 57 |

B. Misrepresentations Concerning the *Meaning* of Moody's Credit Ratings for Structured Finance Securities ..................................... 61

C. Misrepresentations Concerning the *Method* of Moody's Credit Ratings for Structured Finance Securities: Moody's Ratings Blinked Plain View Realities . 65

|     | 1. | A Badge That Moody's Claims of Independence and Objectivity Were False & Misleading Is Moody's Systematic Refusal To Fulfill Its Representation that it Closely Assessed Mortgage Originator Standards and Practices and Accounted for Such Standards and Practices in its Credit Ratings ..................... 67 |

|     | 2. | Moody's Awareness of The Shockingly Frail Mortgages Produced by "Aggressive Underwriting" and a "Deterioration in Origination Standards", and of Those Mortgages' Risks, Mark Material Misrepresentations of Moody's Independence and Adherence to Ratings Principles ........................... 76 |
|     |     | a. | Moody's Looked at (and Over-Looked) Extensive Data on Each and Every Mortgage Underlying Each and Every Subprime RMBS Security it Rated ...................... 77 |
|     |     | b. | The Mortgages Moody's Blamed for Subprime Losses Greater than Moody's "Expected Losses" ................. 81 |
|     |     | c. | Moody's Highly Rated "Loans made for the full (or close to |

           the full) purchase price of the home, allowing borrowers to
           have no equity in the home" Mark Misrepresentations of
           Moody's Claims of Independence & Adherence to Ratings
           Principles ........................................ 83

    d.   Moody's Highly Rated "Loans with less rigorous documentation
         such as stated documentation loans, where borrowers state
         their income and asset information instead of providing
         documented proof" Marks Misrepresentations of
         Moody's Independence and Adherence to Ratings Principles . . . 90

    e.   Moody's Highly Rated "Loans that expose borrowers
         to sudden payment increases", Mark Misrepresentations
         of Moody's Independence and Adherence to Ratings Principles . 97

3.   A Badge That Moody's Claims of Independence and Objectivity
    Were False & Misleading Is Moody's Systematic Refusal To
    Fulfill Its Representation that it Conducted "Stress Testing"
    in Determining its Credit Ratings ........................... 106

    a.   The Housing Price Assumptions Moody's Used in
         Determining its Credit Ratings Were Neither
         Conservative Nor Grounded in Reality Nor in Expert Opinion . 107

    b.   Moody's Declined to Factor Into its Stress Testing the
         Boom/Bust Cycle, Despite Convention and Moody's Long
         Awareness That the Cycle Was Turning to Bust ............ 110

    c.   Moody's Declined to Perform "Worst Case" Scenario
         Modeling in Determining its Credit Ratings, and
         Misrepresented the Reasons for and Effects of
         This Modeling Practice ............................... 112

4.   Moody's Collateralized Debt Obligation (CDO) Models
    Mark Misrepresentations of Moody's Independence and
    Adherence to Ratings Principles ........................... 113

    a.   Over-Rating Subordinate RMBS Thin Tranches With
         Their Predictable Effects on CDO Creditworthiness Marks
         Lack of Independence and Failure to Adhere to Ratings
         Principles ........................................ 114

    b.   Moody's Low CDO Asset Correlations Mark Its

Misrepresentations of Independence and Adherence
to Ratings Principles ................................. 118

D.   The Result of Moody's Misrepresentations ........................... 123

1.   An Unprecedented Boom in Ratings Work ..................... 123

2.   An Unprecedented Boom in Downgrades ....................... 125

a.   Downgrades: 2006 Subprime RMBS .................... 126
b.   Downgrades: Subrime Second-Lien (CES) Securitizations .... 128
c.   Downgrades: First-Half 2007 Subprime RMBS ............ 130
d.   Downgrades: Alt-A RMBS, 2005-2007 ................... 132
e.   Downgrades: Collateralized Debt Obligations ............. 135
f.   Downgrades: Structured Investment Vehicles (SIVs) ........ 137
g.   The Downgrades Moody's Actually Made Are Only A
     Fraction of the Downgrades Merited: Moody's Unique
     Failure to Downgrade Subprime Securities Granted
     Triple-A Ratings is Without Basis ...................... 137

E.   Moody's Materially Misrepresented and Omitted to Disclose the Manner
     in Which it Had Generated the Financial Results and Growth it Reported ... 140

III.   UNIQUE CHARACTERISTICS OF THE STRUCTURED FINANCE MARKET
       INTENSIFIED CONFLICT OF INTEREST PRESSURES AND
       UNDERMINED MOODY'S INDEPENDENCE ........................... 145

A.   The Structured Finance Market Trifecta: Moody's Largest Source of
     Revenue, Moody's Fastest Growing Source of Revenue; and Most
     Profitable Line of Business ..................................... 145

B.   The Structured Finance Market and Rating Process Reverse Normal
     Understanding of the Rating Process ................................ 147

1.   Structured Finance Issuance, Unlike All Other Ratings Segments,
     Was Highly Concentrated Among a Small Number of Repeat Issuers . 148

2.   The Unique Degree to Which Structured Finance Securities
     Depended on Credit Ratings – "You Start With a Rating and
     Build a Deal Around a Rating" ............................... 149

3.   Rather Than a Credit Rating Agency Determining a Credit Rating.
     an *Ex-Ante* Credit Rating Determines a Credit Rating Agency ...... 151

iv

C.   Moody's Independence, Methods/Models, and Ratings Were Systematically
     Debased in Structured Finance ..................................... 154

     1.   Ratings Shopping ........................................... 154

     2.   Gaming the System ......................................... 155

     3.   Moody's "Inside" Role Decreases Moody's Objectivity and
          Heightens Moody's Conflict of Interest ........................ 157

D.   Evidence ...................................................... 162

     1.   Insiders Admit Ratings Shopping is "Rampant" and "Happens
          all the Time" ............................................ 162

     2.   Principles Cost Principal: Moody's Own Experience in the
          Commercial Mortgage-Backed Securities (CMBS) Market Confirms
          the Real Financial Consequence of Trying to Resolve the Conflict
          on a Principled Basis ..................................... 164

     3.   Grade Inflation: A Simple Empirical Test ...................... 167

     4.   Ratings Shopping Drives Market Share: Moody's Gained Market
          Share .................................................. 169

     5.   Exposé: Moody's Unmasked ................................. 170

     6.   Specific Examples of the General Principle .................... 174

     7.   To Retain Ratings Assignments, Moody's Re-Assigned Credit
          Rating Analysts Who Were Too Independent for Issuers'
          (and Moody's) Liking ..................................... 175

IV.  LOSS AND LOSS CAUSATION ....................................... 176

A.   Overview ..................................................... 179

B.   Loss of Reputational Capital ................................... 179

C.   Loss of Reputational Capital Translates to Business Losses ............. 182

     1.   Damage All the Greater Because the Structured Finance

Market Was Moody's Largest Source of Revenue and Growth  ...... 182

2. Damage All the Greater Because of the Leveraged Nature of the
Structured Finance Market .................................. 182

3. Damages All the Greater Because the Destruction of the Credibility
of Structured Finance Credit Ratings Resulted in Demolishing Large
Parts of the Structured Finance Market and, with it, Rating and Revenue
Opportunities ............................................. 184

D. Regulatory Impact and Other Liabilities .............................. 194

E. Moody's Share Price Declines ...................................... 197

MATERIALITY ............................................................ 201

ADDITIONAL SCIENTER ALLEGATIONS .................................... 204

CLASS ACTION ALLEGATIONS ............................................ 209

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE ........................................ 211

NO SAFE HARBOR ........................................................ 212

FIRST CLAIM FOR RELIEF ................................................ 213

SECOND CLAIM FOR RELIEF .............................................. 214

Lead Plaintiffs Teamsters Local 282 Pension Trust Fund ("Local 282"), Charles W. McCurley, Jr. and Lewis Wetstein ("Lead Plaintiffs"), by their undersigned counsel, allege the following upon personal knowledge as to Lead Plaintiffs and their own acts, and upon information and belief based upon the investigation of Lead Plaintiffs' attorneys as to all other matters.

Lead Plaintiffs' information and belief are based on their investigation (made by and through their attorneys), which investigation included, *inter alia*, a review and analysis of: (1) public documents pertaining to Moody's Corporation ("Moody's" or the "Company") and the Individual Defendants (defined *infra*); (2) Moody's filings with the Securities and Exchange Commission ("SEC"); (3) press releases, earnings releases and public statements published by Moody's; (4) Moody's press conferences, analyst conference calls, and the Company's website; (5) analyst reports concerning the Company; (6) newspaper and magazine articles (and other media coverage) regarding Moody's, its business or the Individual Defendants; and (7) confidential sources comprised of former employees of the Company and/or its subsidiaries.

Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## INTRODUCTION

1.  Court-appointed Lead Plaintiffs, individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Moody's Corporation ("Moody's" or the "Company") from February 3, 2006 to October 24, 2007, inclusive (the "Class Period"), by their undersigned counsel, allege the following upon personal knowledge as to themselves and their

1

own acts, and upon information and belief as to all other matters.

2.  Moody's artificially inflated its stock price by misrepresentations concerning its business and financial state of affairs that differed in material ways from the truth. Disclosure of the truth caused Moody's stock price to be cut in half, where it still remains.

3.  During the class period, Moody's principal source of and prospects for revenue and growth derived from its ratings of a variety of structured finance vehicles. All of this will be alleged in greater detail in this complaint, but for now suffice that Moody's garnered its business because of its reputation and its repeated, explicit representations that it warranted a reputation for independence from its clients, and that its ratings were achieved by integrity of process. Moody's has readily, frequently, acknowledged that its business depended upon and is driven by its "reputational capital". The truth is that Moody's was not independent and that its ratings process in the area of structured finance lacked integrity. The truth is that Moody's was captivated by its client base, and was earning its money by the illicit practice of rating to the satisfaction of its clients, not as the instruments themselves warranted. Disclosure of the truth destroyed Moody's reputational capital, and along with it. Moody's revenues, income, and prospects.

4.  "Prospects" merits provision of an additional reality. Moody's itself was largely responsible for the expansion of the structured finance markets. The instruments themselves could not have been sold without earning a certain rating level from Moody's, or one of the handful of lesser other ratings agencies. By corrupting itself by moving, unbeknownst to the investing public, into the "ratings inflation for sale" trade, Moody's opened the floodgates to the creation and marketing of untotalled billions of dollars in unworthy instruments. Thus, Moody's misrepresentations at once artificially inflated both the market for its business and the revenues from

2

that artificial market. As a result, when its corruption became known to the public, Moody's revenues not only shrunk but also the destruction of trust in its ratings all but vaporized the very market from which those revenues were obtained. There is no prospect for recovery in the foreseeable future. All of this is undisputed. The upshot of Moody's misconduct therefore may be without precedent in this country's economic annals.

## JURISDICTION AND VENUE

5. This court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

6. This action arises under and pursuant to: (a) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (h) Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (c) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

7. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Defendant Moody's is headquartered in this district.

8. In furtherance of and in connection with the acts alleged herein, defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, the Internet, and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

## PARTIES

9. Lead Plaintiffs Teamsters Local 282 Pension Trust Fund, Charles W. McCurley, Jr. and Lewis Wetstein purchased Moody's Corporation securities during the class period, as set forth in certifications previously filed in these proceedings, and were damaged thereby.

10. Defendant Moody's is headquartered in New York City. Moody's is a provider of

3

credit ratings, research and analysis covering fixed-income securities, other debt instruments, and the entities that issues such instruments in the global capital markets. During the class period, the Company operated in two segments: Moody's Investors Service and Moody's KMV (later renamed Moody's Analytics). Moody's Investors Service publishes rating opinions on a broad range of credit obligations issued on domestic and international markets, including various corporate and governmental obligations and structured finance securities. Throughout the class period, Moody's Investors Service's credit ratings provided Moody's with nearly all its reported revenue (approximately 90%) and income. Moody's KMV develops and distributes quantitative credit risk assessment products and services for banks, corporations and investors in credit-sensitive assets. In August 2007 Moody's announced, and in January 2008 effected, a business reorganization that removed certain sales and marketing operations from Moody's Investors' Service so as to make ratings provisioning its only business:

> Under our new structure, we will achieve better integration across our credit ratings business, while reinforcing the separation of the rating agency from other, increasingly significant, commercial activities of the corporation. In this respect, our reorganization reaffirms Moody's commitment to providing objective, independent and rigorous ratings opinions while responding to ever-growing demand for complementary information and analysis services (Moody's August 7, 2007 press release)
> *****
>
> As a result of the reorganization, the rating agency remains in the Moody's Investors Service ("MIS") operating company and several ratings business lines have been realigned. All of Moody's other commercial activities, including Moody's KMV and sales of MIS research, are now combined under a new operating company known as Moody's Analytics... (Moody's February 7, 2008 press release)

11.     Moody's, as a credit rating agency and Nationally-Recognized Statistical Rating Organization ("NRSRO", as defined *infra* at ¶¶ 23-24), opines on the creditworthiness of debt

4

instruments and is paid billions of dollars for doing so. It is one of two larger providers of such opinions: roughly speaking, Moody's enjoys approximately 40% of the credit rating opinion market, while Moody's largest competitor Standard & Poors ("S&P") enjoys a like share. Fitch comes in a distant third with an approximate 15% market share.

12.     While Moody's has been in business for a century, Moody's business and its share price have been transformed by two primary phenomena. First, Moody's switch from an "investor pays" to an "issuer pays" business model. Moody's is no longer paid by the investors who use its credit ratings, but rather by the very entities that its ratings assess. The fees Moody's charges to debt instrument issuers are based on the total size (dollar value) of the debt security issuance. Moody's revenues, income, growth and prospects are therefore a function of the amounts of debt securities being issued. Second, while the Company has long been known for its corporate debt ratings, in recent years the Company's rating business has been increasingly driven by structured finance ratings. In the last three decades, the structured finance security issuance has grown from $0 to more than $3 trillion per year. In recent years, the structured finance market has become the single largest, the single most lucrative, and the fastest growing source of credit ratings assignments and credit rating revenue and income for Moody's and its competitors. Since 2004, structured finance has provided Moody's with more rating revenue and income than all other product ratings combined (corporate and financial institution debt, sovereign debt, municipal bonds).

13.     Moody's share price, buoyed primarily by the tremendous growth and profitability of Moody's structured finance ratings, more than sextupled between 2000 and early 2007 until developing market awareness of Moody's misrepresentations and omissions began to drain the inflation from its prices. Between 2000 and 2003, at a time when stock markets were broadly

5

declining and when financial institution share prices were essentially flat, Moody's share price tripled from $10 to $30 per share. As structured finance issuance experienced its greatest growth, between 2004 and early 2007, Moody's shares more than doubled in value, rising from approximately $30 per share in early 2004 to more than $70 per share in early 2007.

14. Defendant Raymond W. McDaniel, Jr. ("McDaniel") has served as Moody's chief executive officer and as chairman of Moody's board of directors since April 2005. Mr McDaniel started his career at Moody's as a senior analyst in Moody's Mortgage Securitization Group in 1988-1989, continued as an associated director of Moody's Structured Finance Group until 1993, became senior managing director for Global Ratings and Research in 2000-2001, and thereafter held a series of executive positions in Moody's and Moody's Investors Service, including senior vice president (2000-2003), executive vice president (2003-2004), president (2004-2005), and chief operating officer (2004-2005).

15. Defendant Brian M. Clarkson ("Clarkson"), under a variety of official titles, prior to and throughout the class period, headed Moody's Investors' Service and Moody's structured finance ratings groups, and possessed overall responsibility for leading Moody's ratings and research business. In August 2007, Mr Clarkson was promoted to president and chief operating officer of Moody's Investors Service, and served in that capacity until his resignation was announced on May 7, 2008. Between 2004 and August 2007, Mr Clarkson served as an executive vice president and co-chief operating officer of Moody's Investors Service, with special responsibility for global structured finance ratings and U.S. public finance ratings. Mr. Clarkson served as senior managing director of Moody's Investors Service and as head of Moody's structured finance group for the Americas (responsible for all structured finance ratings and research activities in the US, Canada and

6

Latin America). Mr Clarkson previously served as senior managing director of the asset backed finance group (2002 through 2003), group managing director of the global asset finance group (1997 to 2001), group managing director of the mortgage finance group (1996 through 1997), managing director of the asset-backed securities group (1994 to 1996), and associate director in Moody's mortgage-backed finance group (1993 through 1994).

16.     Defendant Michael Kanef ("Kanef") served since June 2004 and throughout the class period as the Group Managing Director of the Moody's U.S. Asset Finance Group, responsible *inter alia* for ratings of residential mortgage-backed securities. Mr Kanef's responsibilities within the U.S. Asset Finance Group included participation in meetings with Congressional staffs and appearing before committees of both the U.S. Senate and House of Representatives on September 26 and 27, 2007. After the class period, beginning in December 2007, Mr Kanef assumed the role of chief regulatory and compliance officer for Moody's Investors Service, responsible for Moody's global, regulatory outreach and compliance efforts.

17.     By reason of their positions as officers and senior executives of Moody's, defendants McDaniel, Clarkson and Kanef (collectively, the "Individual Defendants") were at all relevant times controlling persons of Moody's within the meaning of Section 20(a) of the Exchange Act. Because of their executive, managerial, and/or directorial positions with Moody's, the Individual Defendants had access to adverse, non-public information about the operations and prospects of Moody's as particularized herein, and acted to conceal the same. Any acts attributed to Moody's were caused and/or influenced by the Individual Defendants by virtue of their domination and control thereof,

7

# I.  BACKGROUND: BASIC TERMS, FACTS, ENTITIES AND CONCEPTS

## A.  Credit Ratings, Credit Rating Agencies and the Credit Rating Industry

### 1.  Credit Ratings

18.    The lion's share of Moody's business is the provision of credit ratings through its credit rating division, Moody's Investors Service. Of Moody's $2.04 billion in 2006 revenues, $1.89 billion (i.e., 92.5%) derived from Moody's Investors Service. Credit ratings are essentially risk evaluations. As Moody's stated in its March 2007 publication titled *Moody's Rating Symbols and Definitions*, "Moody's credit ratings are opinions of the credit quality of individual obligations or of an issuer's general creditworthiness". And with respect to its credit ratings of structured finance securities specifically, in the same document Moody's informed that "Moody's ratings on long-term structured finance obligations primarily address the expected credit loss an investor might incur on or before the legal final maturity of such obligations vis-à-vis a defined promise. As such, these ratings incorporate Moody's assessment of the default probability and loss severity of the obligations."

19.    A more descriptive account of credit ratings is provided by the International Organization of Securities Commissions ("IOSCO"), in its May 2008 report titled *The Role of Credit Rating Agencies in Structured Finance Markets:*

> THE ROLE OF CRAS [Credit Rating Agencies]
>
> Credit rating agencies play an important role in most modern capital markets. The IOSCO Report on the Activities of Credit Rating Agencies notes that CRAs assess the credit risk of corporate and government borrowers and issuers of fixed-income securities by analyzing relevant information available regarding the issuer or borrower, its market, and its economic circumstances. The information processed by the CRA, while generally available to the

8

> public where the security is publicly traded, may be costly and time-consuming to collect and analyze. Some CRAs also may obtain non-public information from borrowers and issuers as part of the rating process. The conclusion derived from this analysis is reflected in a credit rating. This rating represents an opinion as to the likelihood that the borrower or issuer will meet its contractual, financial obligations as they become due...

## 2.    Moody's Credit Rating Scale

20.    Moody's expresses its credit rating evaluations by use of a famous categorical scale that runs from Aaa ("triple-A") at the top ("Obligations rated Aaa are judged to be of the highest quality, with minimal credit risk" – *Moody's Rating Symbols and Definitions*, March 2007) down through progressively riskier categories: Aa or "double-A" ("Obligations rated Aa are judged to be of high quality and are subject to very low credit risk" - *id.*), A or "single A" ("Obligations rated A are considered upper-medium grade and are subject to low credit risk"), Baa ("Obligations rated Baa are subject to moderate credit risk. They are considered medium-grade and as such may possess certain speculative characteristics"), Ba, B, Caa, Ca ("Obligations rated Ca are highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest"), and C ("...the lowest rated class of bonds and are typically in default, with little prospect for recovery of principal or interest"). Furthermore, within each of the above rating categories between Aa and Caa, Moody's ratings scale provides finer gradations known as "notches" and symbolized by the numbers 1, 2 and 3; an Aa1 rating, for example, "indicates that the obligation ranks in the higher end of its generic rating category", Aa2 indicates middle range, Aa3 the "lower end".

21.    As a result of tradition and regulation, securities bearing ratings of Baa and above are referred to as "investment grade".

9

22. Moody's referred to the above scale as "Moody's Global Scale": "global" because, purportedly, Moody's ratings conveyed identical meanings as to risk across multiple classes of securities. As Moody's consistently represented, a triple-A rating assigned to a structured finance security was consistent with and identical to the triple-A rating assigned to a corporate bond:

> Moody's Global Scale — applies to ratings assigned to nonfinancial and financial institutions, sovereigns and subsovereign issuers outside the United States, and structured finance obligations. The Global Scale is a mapping between rating categories and relative expected loss rates across multiple horizons. Expected loss comprises an assessment of probability of default as well as expectation of loss in the event of default. It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale. Moody's rating methodologies, rating practices and performance monitoring systems are each designed to ensure a consistency of meaning. (*Moody's Rating Symbols and Definitions*, March 2007)

### 3. The Unlimited Demand for Credit Ratings and the Limited Supply of Nationally Recognized Statistical Rating Organizations Authorized to Provide Them

23. Prior to and during the class period, fewer than ten credit rating agencies were recognized by U.S. regulators as "Nationally-Recognized Statistical Rating Organizations" ("NRSROs").[1]

24. NRSROs are the only credit rating agencies whose credit ratings "count" for regulatory purposes. Those purposes are numerous, and effectively create a *de jure* requirement for securities to bear NRSRO ratings. Many regulated financial institutions can invest only in securities bearing certain minimum credit ratings (typically, "investment grade"). Similarly, regulated financial institutions such as banks and broker dealers are required to maintain certain minimum levels of capital against risk, based on the ratings of the securities they hold. Put simply and

10

conversely, securities cannot effectively be marketed and sold – and thus issued – without credit ratings. Moody's occupies a gate-keeping role with respect to the public securities markets by opining as to the relative creditworthiness of trillions of dollars of debt instruments issued and sold into those markets.

25.     Moody's was highly motivated to make the misrepresentations complained of. Its misrepresentations (Sections II.A-C, *infra*) (a) were instrumental in preserving Moody's exclusive access to and capture of the ratings market, (b) actually expanded the market for the instruments that Moody's then blessed in exchange for revenues, (c) were the direct nexus to Moody's dramatically-increased class period revenue growth; and (d) thus drove Moody's ever greater stock prices.

**B.     A Structured Finance Bestiary**

26.     At their most general level, structured finance securities are all Asset-Backed Securities ("ABS"). All sorts of assets can and have formed the basis for structured finance ABS: the ones most at issue here are securities backed by subprime and "Alt-A" mortgages, meaning, as per below, primarily residential mortgage-backed securities (RMBS) and collateralized debt obligations (CDOs).

27.     The largest class of structured finance securities consists of those securities backed by residential mortgages: Residential Mortgage-Backed Securities or ("RMBS"). To give a sense of the size: during 2006, approximately $2.5 trillion of mortgages were originated in the U.S., of which $1.9 trillion (i.e., 80% of all mortgages) were securitized into RMBS. Approximately $520 billion of the RMBS (i.e., 25% of all RMBS) were backed by subprime mortgages. RMBS are often categorized by the nature of the mortgages backing them: (1) "Agency RMBS" issued by government-sponsored agencies such as Fannie Mae, who are limited to investing only in

11

"conforming" mortgages (43% of 2006 issuance); (2) "Jumbo RMBS", backed by prime loans that are conforming in every respect except that they exceed the maximum loan balance for conforming loans (11% of all non-Agency RMBS issuance); (3) "Alt-A RMBS", backed by nonconforming mortgages (41% of all non-Agency RMBS issuance); and (4) "Subprime RMBS", backed by nonconforming mortgages to subprime borrowers (48% of all non-Agency RMBS issuance) (Moody's Investors Service March 7, 2007 special report, titled *Challenging Times for the US Subprime Mortgage Market*).

28.    Numerous other structured finance securities are backed by other types of assets, including, in descending order by size of issuance, commercial mortgages ("CMBS"); student loans; credit card balances; automobile, aircraft and office equipment leases; and more "esoteric" payment streams, such mutual fund 12b-1 fees, tobacco-litigation payments, etc.

29.    Furthermore, collections of asset-backed securities such as RMBS can themselves serve as the basis for "second order" structured finance securities that gather together an asset pool of various ABS securities and issue a further round of securities.

30.    Most prominent of such second-order structured finance securities are "collateralized debt obligations" (CDOs). According to the Securities Industry and Financial Markets Association (SIFMA), CDO issuance (i.e., specifically, CDOs backed by first-order structured finance securities such as RMBS) during 2005 was $177 billion, during 2006 $314 billion, and during 2007 $263 billion. Additionally, there were further hundreds of billions of dollars of CDOs backed by bonds (collateralized bond obligations, or CBOs) and by high-yield loans (collateralized loan obligations, or CLOs).

31.    Finally, somewhat akin to CDOs are "structured investment vehicles" ("SIVs"),

12

which borrow funds on a short-term basis while investing in longer-term securities (such as RMBS, CDOs, etc.). By 2007, there were approximately $400 billion of SIV-related securities.

### C. Independence is the Single *Sine Qua Non* of Credit Rating Agencies' Business, the Guarantor of their Objectivity, and an Integral Part of their Reputation

32. As repeatedly represented by Moody's, credit ratings are worthless unless the credit rating agency is *trusted* to provide credit ratings that accurately reflect credit realities. Independence underwrites objectivity -- the ability to consider the creditworthiness or its lack *free of extraneous considerations or influences*. This freedom is the single distinguishing aspect of credit rating agencies and the ultimate source of their "added value".

33. Credit rating agencies are "gatekeeper" firms that provide a layer of verification or certification above and beyond a primary entity's own claims about itself. In this regard, they resemble auditors. The need for such secondary verification or certification arises in significant part from the recognition that the primary entity may find it in its interest to misrepresent itself. Put simply, although no one may have better *expertise* to opine on the creditworthiness of Corporation "X" than the corporation itself, it is the *independence* of an external credit rating agency from Corporation X that makes *its* opinion the more trustworthy.

34. As Professor John C. Coffee explains:

> [G]atekeepers are reputational intermediaries who provide verification and certification services to investors. These services can consist of verifying a company's financial statements (as the independent auditor does), evaluating the creditworthiness of the company (as the debt rating agency does), assessing the company's business and financial prospects vis-a-vis its rivals (as the securities analyst does), or appraising the fairness of a specific transaction (as the investment banker does in delivering a fairness opinion)... **Characteristically, the professional gatekeeper essentially assesses or vouches for the corporate client's own statements about itself**

13

or a specific transaction. This duplication is necessary because the market recognizes that the gatekeeper has a lesser incentive to lie than does its client and thus regards the gatekeeper's assurance or evaluation as more credible. (John C. Coffee, Jr., *Understanding Enron: "It's About the Gatekeepers, Stupid"*, Business Lawyer, August 2002)

35.    Moody's existence as just such a gatekeeper firm was thus predicated on maintaining

its independence and objectivity. No one has stated this more clearly than Moody's did itself:

> Moody's is one of the world's most respected sources of independent opinion and analysis about credit risk, helping set a common global standard for comparing debt instruments.
>
> The above statement should be familiar to Moody's long-term stakeholders and other regular readers of our Annual Reports. The words bear repeating, however, because they speak to the fundamental ideas driving our strategy, key business initiatives and future direction.
>
> It is appropriate to start with the concept of "independent opinion and analysis." In recent years, legislative and regulatory scrutiny of financial services firms has focused on whether investment analysis is truly independent or whether its integrity is tainted by conflicts of interest or otherwise compromised. With respect to credit rating agencies, and Moody's in particular, the examinations have been reassuring. Nonetheless, the growing reliance on our opinions and analyses highlights the importance of assuring integrity into the future. Moody's must be increasingly rigorous and transparent in demonstrating our independence and managing potential conflicts. (Moody's Annual Report to Shareholders for 2005)

36.    More, therefore, than most commercial enterprises, Moody's trades on its reputation.

While some of that reputation stems from expertise, again, what singularly distinguishes Moody's

and other gatekeeper firms is *independence* and the objectivity it affords. The sum store of

accumulated reputation is known as "reputational capital". As Moody's itself put it:

> If one considers the "raw materials" that support our business,

14

two stand out: the proliferation of credit risk-sensitive instruments in the global marketplace, and the market's trust in and reliance upon Moody's. ... That leaves trust. Moody's is committed to reinforcing among all relevant stakeholders—debt issuers, the investment community, employees, governmental authorities and shareholders—a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business... Our operating, financial and regulatory strategies must, in essence, be strategies of trust.

\*\*\*\*\*

## OUR COMMITMENTS TO CUSTOMERS, SHAREHOLDERS AND OTHER STAKEHOLDERS

My earlier comments about preserving trust while pursuing innovation address basic building blocks for meeting the expectations of Moody's stakeholders worldwide. In doing so, our goal is to remain the leading authority on credit risk in the global capital markets. In so far as we meet those expectations, Moody's stands very well positioned to continue to reward the faith—the trust—that our shareholders have placed in us.

In closing, and in reflecting on my first year as Moody's Chief Executive Officer, I can do no better than to repeat the commitment in our shareholder letter of last year: most importantly, we remain committed to upholding the independence and integrity of our business. We will preserve what Moody's has built over the last hundred years and we will prepare for what must be built in the years to come for Moody's to continue its track record of professional and financial success.

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer
(Moody's Annual Report to Shareholders for 2005)

37. Throughout the class period, Moody's consistently and frequently represented (as per the above quotation and as detailed in Section II.A, *infra*) that its independence was both paramount and maintained, that the conflicts of interest posed by its Issuer Pays business model (as detailed next) had been fully disclosed and fully defused, and that its credit ratings were arrived at by exercise of Moody's independence. These representations were all false. But while they remained at large,

15

the misrepresentations underwrote (1) both Moody's lucrative ratings during the class period as well as (2) a massive boom in the issuance of structured finance securities, with its ratings opportunities and revenues made possible only by the sorts of ratings Moody's provided. As the truth emerged, structured finance issuance, which was wholly ratings dependent, collapsed, deflating — as defendants concede — Moody's seemingly-unstoppable growth and a substantial part of what had previously appeared to be Moody's "revenue base". Predictably, Moody's share price declined in tandem.

D.     The "Issuer Pays" Business Model Threatens Independence — and, in Structured Finance — Destroyed It

1.     Generally

38.     Moody's is paid for its credit rating opinions by the very entities to be assessed (*i.e.*, the issuers of debt instruments). This manner of doing business is commonly referred to as the "Issuer Pays" business model.

39.     The Issuer Pays model is a relatively new way of doing business as a credit rating agency. It is neither "how it has to be" nor "how it used to be". Until the 1970s, Moody's made its money (as did its competitors) by charging subscription fees to investors rather than ratings fees to issuers. After Moody's became one of a small number of NRSRO's (*i.e.*, those credit rating agencies whose credit rating opinions officially "count" in the regulatory scheme), it and other NRSROs for the most part abandoned their long-standing subscription fees and began charging fees to issuers based on the size of the issuance.

40.     The Issuer Pays business model presents Moody's with a conflict of interest. It degraded credit rating agency independence by reintroducing "extraneous considerations and

16

influences" in the form of wariness to bite the hand that feeds. Should Moody's not deliver a rating to the issuer's liking, the issuer may refuse to retain Moody's in the future.

41.     In all spheres of Moody's rating business *except structured finance*, this potential conflict of interest was a non-issue. First, in those other spheres, compromising standards and independence by writing a credit rating opinion reflecting issuer desires rather than credit realities was not worth the risk of reputational capital. Risking reputational capital (which, if impaired, could cause Moody's to lose thousands of ratings assignments) to retain the business of one among thousands of corporations, municipalities, states and countries was nowhere close to a good trade-off. Second, in those other spheres, the manner in which Moody's was retained, performed its analysis, delivered its rating, and was paid was straightforward – precluding the sorts of pressures, "ratings shopping" and grade inflation generated in structured finance.

2.     **Specifically, in Structured Finance**

42.     In structured finance the situation was reversed (as is fully detailed in Section III, *infra*).

43.     First, the amounts at issue were larger because the volume of issuance was larger: structured finance was Moody's single largest and single fastest growing line of ratings business (e.g., of Moody's total 2006 ratings revenue of $1.64 billion, $887 million (i.e., 54.2%) derived from structured finance ratings). More important, and wholly unlike Moody's other rating markets, control over structured finance ratings assignments was dominated by a small number of repeat issuers (essentially, investment banks such as Lehman Brothers, Bear Stearns, etc.). The consequences of client displeasure were thus qualitatively and quantitatively different in structured finance. Losing one client could result, for example, in losing 10% of the market or more – a blow

17

all the larger given the size of the market (e.g., Moody's 2006 structured finance rating revenues were $887 million).

44.     Second, the manner of operation of the Issuer Pays model was different in structured finance than in all other ratings spheres because of structured finance's uniquely bifurcated evaluation, retention and compensation structure. In structured finance, rating agencies were paid *de minimis* amounts for an initial pre-evaluation of ratings, but received the much larger full payment only were the issuer to choose to officially use (or "publish") the ratings indicated by the credit rating agency in its pre-evaluation. Put bluntly, the payment was for delivering a rating to the issuer's liking, rather than for doing the work. (With corporate debt, on the other hand, there was no such bifurcation of evaluation, rating and payment: credit rating agencies were retained, did their work, delivered their ratings, and were paid). Moreover, because of pre-evaluations, structured finance ratings had a decidedly *ex ante* character to them, and issuers were able to select rating agencies on the very basis of the *ex ante* ratings ("ratings shopping"). In structured finance, rather than a credit rating agency determining a credit rating, a credit rating determined the credit rating agency.

45.     Third, and finally, structured finance securities differed fundamentally from other securities. A corporation fundamentally is what it is, and cannot change itself much to change it credit ratings. Its existence is wholly independent from its credit ratings. Structured finance securities were exactly the opposite. They were infinitely malleable combinations of collected assets assembled by the issuer. Those assets were collected, and a security structure was determined, on the basis of credit rating agency models (as is explained in the "Structured Finance Primer" provided in this endnote[2], and again briefly at Section III.B, *infra*). Issuers were familiar with those models, and paid Moody's further fees for consulting and for software tools so as to better understand how

18

Moody's evaluations worked. Issuers would pre-structure their structured finance securities on the basis of that knowledge. As defendant Clarkson explained, "You start with a rating and build a deal [i.e., structured finance security] around a rating".

46.     The essential alchemy of structured finance arises from the structure of distinct security "tranches" constructed over the underlying assets, with senior tranches having first claim to the cash generated by the underlying asset pool and more junior tranches standing first in line for any losses. *With sufficient tranching credit protection*, a pool of risky subprime mortgages can serve as the basis for triple-A structured finance tranches (accompanied by a host of lower-rated tranches to protect against expected losses). The key question, of course, is *how much* credit protection is needed? And that is where the credit rating agencies come in.

### 3.     The Consequence: Everything Depends on the "Expected Loss" Determined by the Credit Rating Agency

47.     There are far-reaching consequences of the fact that the structure of a structured finance security is, essentially, an expression of the expected loss determined by the rating agency.

48.     If the rating agency determines an expected loss of $15 million from a $300 million pool of subprime mortgages, that results in the creation of $255 million of Aaa-rated tranches (with $45 million of junior-tranche "credit protection" constituting three times the $15 million expected loss), $15 million in Aa-rated tranches (having $30 million of junior tranche credit protection, or two times expected losses), etc. Were a rating agency to deliver a lower expected loss, e.g., $10 million, then the structure would change: $270 million in Aaa-rated tranches (having credit protection of $30 million, or three times expected losses), $10 million in Aa-rated tranches (having credit protection of $20 million, or two times expected losses), etc.

19

49.    It is axiomatic that issuers would prefer the latter credit rating agency assessment, as it makes the securitization more profitable for the issuer. Were an issuer presented in the above-mentioned pre-evaluations with these two differing scenarios by two different credit raters, it would retain the provider of the more favorable scenario for the official "published" rating, while the less favorable analysis would neither see the light of day nor garner the lucrative fees consequent upon delivering published ratings. This imposes tremendous pressure for a credit rating agency to deliver a lower expected loss than its competitors. And, because of issuer familiarity with credit rating agencies models, it presents tremendous pressures to maintain models that deliver such lower expected losses.

50.    One measure of Moody's misrepresentations of independence and integrity of its processes may be taken from the fact that, during the class period, Moody's average expected losses for pools of subprime assets were on the order of 5%. Moody's current models generate expected losses three times greater on average (i.e., 14%-18%) and as much as seven times greater (i.e., 35%).

51.    The particularly acute conflict of interest pressures in structured finance, as summarized above, placed pressure *on the underlying, fundamental models used by Moody's to determine tens of thousands of ratings on tens of thousands of securities*. It was not, as it would be with respect to a corporate bond, a question of making an exception to the model to please an individual client, *but of debasing the model itself*. The results are detailed in Section II.D (approximately 10,000 credit rating downgrades, often severe, with more to come), and the evidence in Sections II.C (model failures so glaring that they can only be explained by lack of independence rather than lack of expertise).

52.    What Moody's really was doing was thoroughly misrepresented by defendants, who

20

represented throughout the class period that the conflicts of interest posed by its Issuer Pays business model had been fully disclosed and fully defused. In fact, they had been neither disclosed nor defused. Defendants represented that Moody's independence was both paramount and maintained, and that its credit ratings were objective, reliable assessments of credit realities. In fact, as a result of the pressures brought to bear by operation of the Issuer Pays model in structured finance, Moody's credit ratings had been inexorably bent to orbit issuer desires.

53.     Misrepresenting the independence and integrity of its ratings process proved a lucrative way of doing business for Moody's. Moody's revenues more than tripled between 2000 and 2006, its operating earnings more than quadrupled, and Moody's share price more than sextupled, rising from approximately $10 per share to more than $70 per share.

## II.     MOODY'S MATERIAL MISREPRESENTATIONS AND OMISSIONS CONCERNING ITS BUSINESS AND ITS CONDUCT OF THAT BUSINESS

### A.     Misrepresentations and Omissions Concerning Moody's Business and Business Conduct

54.     At all times during the class period, Moody's described and represented in filings with the SEC, in its Code of Conduct, in the Annual Reports it distributed to Moody's shareholders, in a variety of Moody's Investors Service publications concerning Moody's ratings, and in statements to the financial press, *inter alia* that: (1) Moody's was an "independent" and "objective" provider of credit ratings; (2) Moody's had adequately disclosed, managed and/or eliminated, as per, *inter alia*, Moody's own stated Code of Conduct, the potential conflicts of interest in its (Issuer Pays) business model; (3) Moody's did not structure the structured finance securities that it rated; (4) the credit ratings Moody's bestowed on structured finance securities were consistent with, and

21

calibrated to correspond to, Moody's "Global Scale" derived from and applicable to corporate bonds; (5) Moody's credit ratings reflected all information known and believed to be relevant; (6) any additional material information that may bear on its ratings would have required due diligence, which Moody's was not obliged to do, and which it did not do: (7) Moody's credit ratings were influenced *only* by factors relevant to the credit assessment and were *not* affected by the existence of, or potential for, a business relationship between Moody's and the entities that paid Moody's to provide credit ratings; and (8) Moody's responses to regulators' concerns over Moody's independence had been adequate and had sufficed to allay those concerns.

55. None of those representations was true and together they created an impression of a state of affairs at Moody's that differed materially from the one that actually existed. In truth: (1) Moody's was not operating as an "independent" and "objective" provider of credit ratings; rather, Moody's independence had been systematically compromised (Section III, *infra*) to the point that its credit rating methodologies were systematically debased to produce credit ratings that did not reflect objective credit realities (Section II.C, *infra*); (2) Moody's had declined to manage let alone eliminate its conflicts of interest (Section III, *infra*) and had declined to disclose them (Section II, *infra*); (3) Moody's did structure the structured finance securities that it rated (Section III, *infra*); (4) the credit ratings Moody's bestowed on structured finance securities (*e.g.*, Aaa, Aa, A, Baa, Ba, etc.) were not consistent with Moody's "Global Scale" derived from and applicable to corporate bonds (Section II.B, *infra*); (5) Moody's credit ratings failed to reflect all information known and believed to be relevant, including information in plain view (Section II.C, *infra*);(6) Moody's credit rating failures were the result of Moody's failures to consider information in plain view rather than information that would have required due diligence (Section II.C, *infra*); and (7) Moody's credit

22

ratings were *not* influenced only by factors relevant to the credit assessment and *were* affected by the existence of, or potential for, a business relationship between Moody's and the entities that paid Moody's to provide credit ratings (Sections II.C and III, *infra*). Furthermore (8) Moody's undisclosed failures with respect to independence and the resulting misconduct of its subprime structured finance credit ratings were exposing Moody's to significant regulatory scrutiny and punishment, now being realized (Section IV, *infra*) after Moody's misconduct came to light and Moody's misrepresentations and omissions were revealed as such.

56.     The importance of this information to investors in Moody's stock is clear. Investors in Moody's stock are in effect purchasing shares of Moody's ratings business. It is vitally important to investors' assessment of the value of that business to learn any information that materially impacts that business going forward and the exposure that Moody's might face for misconduct. Investors' evaluation of Moody's stock will be (or would have been) altered by information suggesting that Moody's fastest growing and most lucrative business segment was operating in contravention of defendants' representations. It is not surprising that, as defendants began to reveal the extent to which Moody's structured finance ratings were issued in contravention of prior representations, that lucrative business segment began to erode predictably, and Moody's stock price began to decline materially, falling from a high of $73.71 in February 2007 to $43.39 on October 26, 2007. Post-class period disclosures on May 21, 2008, further evidencing the falsity of defendants' class period representations, caused Moody's shares a further decline from $43.90 on May 20, 2008 to $34.51 on May 22, 2008.

23

1. **Moody's Code of Conduct for its Ratings Business and Operations**

   a. **Root**

57.    The Enron and Worldcom debacles of 2001 resulted in regulatory overhauls of the accounting profession, but also turned regulatory attention to the credit rating agencies (who, like the accountants, were perceived as having failed to spot the true nature of these entities). The chief concern of regulators was whether the credit rating agencies were maintaining their independence and objectivity despite the conflict of interest presented by the fact that they were being paid for their credit ratings by the very entities they were rating. On November 15 and 21, 2002, Raymond W. McDaniel, then Moody's president and now its chief executive officer and chairman, submitted a written statement[5] in connection with SEC hearings that declared:

> **Objectivity and independence.** Moody's internal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business model. As such, our rating opinions are the product of analysis that is unbiased and trustworthy.

   b. **The International Organization of Securities Commissions' ("IOSCO") Credit Rating Agency Principles and Credit Rating Agency Code of Conduct – and Moody's Misrepresentations Concerning Those Principles and that Code**

58.    The first fruition of this renewed regulatory concern landed in December 2004, when the International Organization of Securities Commissions ("IOSCO", of which the SEC is a member), published a model code of conduct for credit rating agencies, titled The IOSCO Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code"). The IOSCO Code was the outcome of "two years of collaborative effort by global regulatory authorities, the credit rating industry and credit market participants".

59.     As part of the process leading to what became the IOSCO Code, IOSCO surveyed / consulted with credit rating agencies and issued a preliminary technical report on its findings in September 2003. The IOSCO September 2003 Technical report stated:

> Perhaps the single greatest concern facing CRAs [Credit Rating Agencies] is identifying and addressing potential and actual conflicts of interest that may inappropriately influence the rating process.

60.     Connectedly and simultaneously, IOSCO and the IOSCO Technical Committee developed and published a "Statement of Principles Regarding the Activities of Credit Rating Agencies" (the "IOSCO Principles"). The IOSCO Principles were the generative matrix of what became the final IOSCO Code. The IOSCO Principles put the issue of independence front and center, and stated in relevant part (emphasis in original):

## PRINCIPLES FOR THE ACTIVITIES OF CREDIT RATING AGENCIES

**Quality and Integrity of the Rating Process**

**1. CRAs should endeavor to issue opinions that help reduce the asymmetry of information among borrowers, lenders and other market participants.**

1.1. CRAs should adopt and implement written procedures and methodologies to ensure that the opinions they issue are based on a fair and thorough analysis of all relevant information available to the CRA, and that CRA analysts perform their duties with integrity. CRA rating methodologies should be rigorous, systematic, and CRA ratings should be subject to some form of validation based on historical experience.

*****

**Independence and Conflicts of Interest**

**2. CRA ratings decisions should be independent and free from political or economic pressures and from conflicts of interest**

arising due to the CRA's ownership structure, business or financial activities, or the financial interests of the CRA's employees. CRAs should, as far as possible, avoid activities, procedures or relationships that may compromise or appear to compromise the independence and objectivity of the credit rating operations.

2.1. CRAs should adopt written internal procedures and mechanisms to (1) identify, and (2) eliminate, or manage and disclose, as appropriate, any actual or potential conflicts of interest that may influence the opinions and analyses CRAs make or the judgment and analyses of the individuals the CRAs employ who have an influence on ratings decisions. CRAs are encouraged to disclose such conflict avoidance and management measures.

2.2. The credit rating a CRA assigns to an issuer should not be affected by the existence of or potential for a business relationship between the CRA (or its affiliates) and the issuer or any other party.

61.     Throughout the class period, Moody's represented that it was operating in accordance with these IOSCO Principles. For example, in a report Moody's published on April 12, 2006 on its own code of conduct, Moody's stated that "Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code..." (¶ 76). Moody's made similar misrepresentations in, inter alia, Moody's Forms 10-K for 2005 and 2006 (¶¶ 73, 80-81), Moody's annual reports for 2005 and 2006 (¶¶ 71, 83), and in Moody's own Code of Conduct (¶ 68). These representations were materially false and misleading:

(a)     Moody's structured finance credit ratings were not independent and not free from conflict of interest (as alleged in Section III, *infra* and further evidenced in Section II.C, *infra*).

(b)     Moody's neither eliminated nor managed its conflicts (*Id.*), nor disclosed them (Section II, *infra*).

(c)     The credit ratings Moody's assigned in structured finance *were* affected by the

26

existence of or potential for a business relationship between Moody's and issuers (Sections II.C and III, *infra*).

(d)  Moody's credit ratings were *not* based on a fair and thorough analysis of all relevant information available to Moody's (*Id.*).

62.  Between September 2003 and December 2004, the IOSCO Principles, "not intended to be all-inclusive," were transformed with the input of credit rating agencies, including Moody's, into a code of conduct that would function as a "more specific and detailed code of conduct giving guidance on how the Principles could be implemented in practice", as the IOSCO Code explained in its introductory sections.

63.  The first section of the IOSCO Code was devoted to principles and standards of business conduct intended to enforce "The Quality and Integrity of the Rating Process". To that end, the IOSCO Code stated that credit rating agencies:

> should adopt, implement and enforce written procedures to ensure
> that the opinions it disseminates are based on a thorough analysis of
> all information known to the CRA that is relevant to its analysis
> according to the CRA's published rating methodology.

64.  The second section of the IOSCO Code was devoted to principles and standards of business conduct intended to enforce "CRA [Credit Rating Agency] Independence and the Avoidance of Conflicts of Interest". As the IOSCO Code explained, maintaining independence from the issuers (who paid the credit rating agencies for their ratings) was "vital" to ensuring "the integrity of the rating process":

> the essential purpose of the Code Fundamentals is to promote
> investor protection by safeguarding the integrity of the rating process.
> IOSCO members recognize that credit ratings, despite their numerous
> other uses, exist primarily to help investors assess the credit risks they

27

face when making certain kinds of investments. **Maintaining the independence of CRAs vis-à-vis the issuers they rate is vital to achieving this goal.**

65. Such "Quality/Integrity" and "Independence" principles, as the IOSCO Code stated,

would serve to underwrite credit rating opinions that would be of use to investors:

> Rating analyses of low quality or produced through a process of questionable integrity are of little use to market participants. Stale ratings that fail to reflect changes to an issuer's financial condition or prospects may mislead market participants. Likewise, **conflicts of interest or other undue factors – internal and external – that might, or even appear to, impinge upon the independence of a rating decision can seriously undermine a CRA's credibility.** Where conflicts of interest or a lack of independence is common at a CRA and hidden from investors, overall investor confidence in the transparency and integrity of a market can be harmed.

66. Specifically, the IOSCO Code stated, in relevant part:

### 1. QUALITY AND INTEGRITY OF THE RATING PROCESS

A. Quality of the Rating Process

1.1 The CRA should adopt, implement and enforce written procedures to ensure that the opinions it disseminates are based on a thorough analysis of all information known to the CRA that is relevant to its analysis according to the CRA's published rating methodology.

*****

1.4 Credit ratings ... should reflect all information known, and believed to be relevant, to the CRA, consistent with its published methodology...

*****

1.6 The CRA and its analysts should take steps to avoid issuing any credit analyses or reports that contain misrepresentations or are otherwise misleading as to the general creditworthiness of an issuer or obligation.

28

## 2. CRA INDEPENDENCE AND AVOIDANCE OF CONFLICTS OF INTEREST

A. General

2.1 The CRA should not forbear or refrain from taking a rating action based on the potential effect (economic, political, or otherwise) of the action on the CRA, an issuer, an investor, or other market participant.

2.2 The CRA and its analysts should use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3 The determination of a credit rating should be influenced only by factors relevant to the credit assessment.

2.4 The credit rating a CRA assigns to an issuer or security should not be affected by the existence of or potential for a business relationship between the CRA (or its affiliates) and the issuer (or its affiliates) or any other party, or the non-existence of such a relationship.

*****

B. CRA Procedures and Policies

2.6 The CRA should adopt written internal procedures and mechanisms to (1) identify, and (2) eliminate, or manage and disclose, as appropriate, any actual or potential conflicts of interest that may influence the opinions and analyses the CRA makes or the judgment and analyses of the individuals the CRA employs who have an influence on ratings decisions. The CRA's code of conduct should also state that the CRA will disclose such conflict avoidance and management measures.

2.7 The CRA's disclosures of actual and potential conflicts of interest should be complete, timely, clear, concise, specific and prominent.

*****

67. Moody's misrepresented at all times during the class period that it was operating in compliance with the IOSCO Principles and the IOSCO Code. For example, in a report Moody's published on April 12, 2006 on its own code of conduct, Moody's stated that "Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code... Moody's Code is consistent with, and achieves the objectives of, the IOSCO Code." (¶ 76). Moody's made similar misrepresentations in, *inter alia*, Moody's Forms 10-K for 2005 and 2006 (¶¶ 73, 80-81), Moody's annual reports for 2005 and 2006 (¶¶ 71, 83), and in Moody's own Code of Conduct (¶ 68). These representations were false and misleading:

(a) Contrary to IOSCO Code sections 1.1 and 1.4, Moody's structured finance ratings were not based on a thorough analysis of all information known or believed relevant by Moody's (Section II.C, *infra*), but in fact were materially debased by extraneous considerations and influences (Section III, *infra*) and failed to consider or reflect relevant information in plain view (Section II.C, *infra*).

(b) Contrary to IOSCO Code section 1.6, Moody's, far from avoiding issuing any credit opinions that contain misrepresentations or are otherwise misleading as to the general creditworthiness of an issuer or obligation, flooded the market credit opinions that misrepresented the creditworthiness of subprime structured finance securities (Sections II.C and II.D.2, *infra*).

(c) Contrary to IOSCO Code sections 2.1, 2.3 and 2.4, Moody's credit rating actions in structured finance were were *not* influenced only by factors relevant to the credit assessment itself (Section III, *infra*); Moody's credit ratings *were* based on the potential effect of those ratings on Moody's (*Id.*); and Moody's credit ratings *were* affected by the existence of or potential for a

30

business relationship between Moody's and structured finance securitizers (*Id.*).

(d)     Contrary to IOSCO Code section 2.2, Moody's maintained only the appearance of independence and objectivity (Sections II.A-B, *infra*), not the substance (Sections II.C and III, *infra*).

(e)     Contrary to IOSCO Code sections 2.6 and 2.7, Moody's neither eliminated nor managed its conflicts (as detailed in Section III, *infra*), nor disclosed them (Section II, *infra*).

(f)     Contrary to IOSCO Code section 4.1, Moody's represented that Moody's code of conduct fully implemented the provisions of the IOSCO Principles and the IOSCO Code when, in fact, Moody's actual conduct (as per Sections II.C and III, *infra*) belied the provisions of the IOSCO Principles and the IOSCO Code.

c.     Moody's Code of Conduct

68.     In June 2005, in response to the ongoing regulatory concerns with credit rating agencies, Moody's purported to adopt and did publish its "Code of Professional Conduct", reproduced in relevant part below (the "Code"). Moody's Code purportedly described and governed Moody's conduct of its credit rating operations. Moody's Code states, in relevant part:

> In order to enhance market understanding and confidence in Moody's credit ratings, Moody's has adopted this Code of Professional Conduct (the "Moody's Code" or "Code"). Through this Code, Moody's seeks to protect the integrity of the rating process...

> II.     What Are Credit Ratings?

> *****

> In the rating process, Moody's maintains independence in its relationships with Issuers and other interested entities... Nor does Moody's act as an advisor to the Issuers it rates. Moody's may comment on the potential credit implications of proposed structural elements of a security, but Moody's does not participate in the actual structuring of any security under consideration for a

31

Credit Rating.

As a matter of policy, and in keeping with its role as an independent and objective publisher of opinions, Moody's retains complete editorial control over the content of its Credit Ratings, credit opinions, commentary, and all related publications.

III.    The Provisions

1.    Quality and Integrity of the Rating Process

As described in the IOSCO Principles, Moody's will endeavor to provide forward-looking opinions on the relative creditworthiness of Issuers of debt and debt-like instruments in order to help reduce the information asymmetry that exists between those Issuers and potential purchasers of their debt.

A.    Quality of the Rating Process

*****

1.4    ... Credit Ratings will reflect consideration of all information known, and believed to be relevant, by the applicable Moody's Analyst and rating committee, in a manner generally consistent with Moody's published methodologies.

*****

1.6    Moody's and its Analysts will take steps to avoid issuing any credit analyses, ratings or reports that knowingly contain misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation.

*****

C.    Integrity of the Rating Process

1.12    Moody's and its Employees will deal fairly and honestly with Issuers, investors, other market participants, and the public.

*****

1.14    Moody's and its Analysts will not, either implicitly or

32

explicitly, give any assurance or guarantee of a particular Credit Rating prior to a rating committee. This does not preclude Moody's from developing provisional assessments used in structured financings or similar transactions.

1.15    The Office of Compliance will be responsible for assessing adherence to the various procedural provisions of this Code...

\*\*\*\*\*

2.  Independence and Management of Conflicts of Interest

A. General

2.1    Moody's will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political, or otherwise) of the action on Moody's, an Issuer, an investor, or other market participant.

2.2    Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3    The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.

2.4    The Credit Rating Moody's assigns to an Issuer, debt or debt-like obligation will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship.

\*\*\*\*\*

B.    Procedures and Policies

2.6    Moody's will adopt written internal procedures and mechanisms to:

   2.6.1  identify; and

   2.6.2  eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses Moody's

33

makes or the judgment and analyses of Moody's Employees who have an influence on Credit Rating decisions.

2.7   Moody's disclosures of known actual and potential conflicts of interest will be complete, timely, clear, concise, specific and prominent. Such disclosures will be made through moodys.com.

\*\*\*\*\*

4.   **Enforcement and Disclosure of the Code of Conduct and Communication with Market Participants**

4.1   Moody's Management will be responsible for the implementation and the enforcement of the Moody's Code. The Office of Compliance will annually review and assess the efficacy of such implementation and enforcement.

4.2   The provisions of this Code are derived from the IOSCO Principles and the IOSCO Code. However, Moody's made certain modifications to more closely correspond with Moody's business mode and practices. Such modifications will be specifically identified and explained in a report that Moody's will publish annually outlining compliance with the Moody's Code and explaining any deviations that may exist between the Moody's Code and the IOSCO Code.

4.3   With respect to the subjective standards that are incorporated in this Code, Moody's will use its good faith efforts in implementing such standards.

69.   None of the above-quoted portions of Moody's Code representations was true, and

together the misrepresentations created an impression of a state of affairs at Moody's that differed

materially from the one that actually existed. In truth:

(a)   Contrary to the representations made at Moody's Code section 1.1, Moody's

structured finance ratings did not reflect "all information known and believed to be relevant", but

in fact were materially debased by extraneous considerations and influences introduced by operation

34

of the Issuer Pays business model in structured finance (Section III, *infra*) so that Moody's ratings failed to consider or reflect relevant information actually known or in plain view to Moody's Section II.C, *infra*) and were thus illegitimately inflated (Sections II.C, II.D.2 and III, *infra*).

(b) Contrary to the representations made at Moody's Code section 1.6, Moody's, far from avoiding issuing any credit opinions that "contain misrepresentations or are otherwise misleading as to the general creditworthiness of an issuer or obligation", flooded the market with just such credit opinions that misrepresented the creditworthiness of subprime structured finance securities (Sections II.C and II.D.2, *infra*).

(c) Contrary to the representations made at Moody's Code section 1.9 (and many like representations made at other times in other documents during the class period), Moody's was failing to comply with "applicable laws and regulations", including the IOSCO Code and the Credit Rating Agency Reform Act of 2006.

(d) Contrary to the representations made at Moody's Code section 1.12, Moody's had, as a result of the extraneous considerations and influences introduced by operation of the Issuer Pays business model in structured finance (Section III, *infra*), compromised its independence and capitulated to issuer interests, thus causing Moody's to fail to "deal fairly and honestly with .. investors, other market participants, and the public" by distributing to them inflated and deficient credit ratings (Section II.D.2, *infra*) that failed to consider or reflect relevant information actually known to Moody's or in plain view to Moody's (Section II.C, *infra*).

(e) Contrary to the representations made at Moody's Code sections 2.1, 2.3 and 2.4, Moody's credit rating actions in structured finance were were *not* influenced only by factors relevant to the credit assessment itself but also by the extraneous considerations and influences introduced

by operation of the Issuer Pays business model in structured finance (Section III, *infra*); Moody's credit ratings *were* based on the potential effect of those ratings on Moody's itself given operative conditions under the Issuer Pays business model in structured finance (*Id.*); and Moody's credit ratings *were* affected by the existence of or potential for a business relationship between Moody's and structured finance securitizers (*Id.*). For these reasons, the representations made at Moody's preamble to its Code that Moody's "maintains independence in its relationships with Issuers" and that Moody's operated "as an independent and objective publisher of opinions" were also materially false and misleading.

(f)     Contrary to the representations made at Moody's Code section 2.2, Moody's maintained – in part through the false representations made in Moody's Code – only the appearance of independence and objectivity (Section II.A-B, *infra*) without the substance of the same (Sections II.C and III, *infra*).

(g)     Contrary to the representations made at Moody's Code sections 2.6 and 2.7, Moody's neither eliminated nor managed its conflicts, which continued unabated (Section III, *infra*) and which had material effects on Moody's credit ratings (as detailed in II.C and II.D.2, *infra*), nor disclosed them (Section II.A-B, *infra*).

(h)     Contrary to the representations made at Moody's Code sections 1.15 and 4.1, neither Moody's "Office of Compliance" nor "Moody's Management" implemented the above-detailed elements of Moody's Code into Moody's actual business conduct, which, as detailed above in (a)-(g) above, differed materially from Code representations.

(i)     Contrary to the representations made at Moody's Code section 4.3, Moody's declined to "use its good faith efforts" in implementing Code standards into Moody's actual business conduct,

36

which, as detailed above in (a)-(g), differed materially from Code representations.

(j) Contrary to the representations made at Moody's preamble to its Code, Moody's did not seek through the Code "to protect the integrity of the rating process", but rather, given the above-alleged material disparity between Code representations and Moody's actual business conduct, only the appearance of such integrity (Section II.A-B, *infra*) without the substance of the same (Sections II.C and III, *infra*).

(k) Contrary to the representations made at Moody's Code section 1.14 and in the preamble to Moody's Code, Moody's did participate in structuring the subprime structured finance securities for which it provided credit ratings, and did give assurances of particular credit ratings to Issuers (Section III, *infra*).

## 2. Moody's Further Misrepresentations Concerning Its Business

70. As detailed in subsections II.A.2.a-f below, Moody's issued a variety of documents during the class period that contained numerous representations as to, *inter alia*, Moody's independence, objectivity, trustworthiness, high standards, high-quality credit ratings, reputation, code of conduct, adherence to its code of conduct and to the IOSCO Code and IOSCO Principles – and concerning the purported *importance* to Moody's of all of the above qualities.

### a. Moody's Annual Report for 2005

71. On or about March 23, 2006, Moody's published and distributed to Moody's investors Moody's Annual Report to Shareholders for 2005 (the "2005 Annual Report"). The 2005 Annual Report stated, in relevant part:

Dear Shareholders:

*****

37

## PRESERVING TRUST AND PURSUING INNOVATION FOR CONTINUED GROWTH

First, however, I wish to address these important questions briefly at a more fundamental level.

If one considers the "raw materials" that support our business, two stand out: the proliferation of credit risk-sensitive instruments in the global marketplace, and the market's trust in and reliance upon Moody's. It is not venturesome to predict that forces such as the globalization and disintermediation of financial markets, together with advances in information and financial technology, will drive continued growth in the supply and diversity of credit instruments.

That leaves trust. Moody's is committed to reinforcing among all relevant stakeholders—debt issuers, the investment community, employees, governmental authorities and shareholders—a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business...

Our operating, financial and regulatory strategies must, in essence, be strategies of trust that flow from the talent of our employees and the culture of our company. Talent in analyzing credit risk is the essential ingredient for competing in our industry, serving markets, and developing products and services that meet the ever-increasing expectations for our business. When combined with our commitment to transparency in what we do and how we do it, talent and culture form a basis for trust in Moody's that will be deserved and durable.

Operating Strategy. Our core operating strategy is to position Moody's to take advantage of growth in credit markets driven by globalization, disintermediation and financial technology.

• Globalization and disintermediation of financial markets introduce new borrowers and investors to each other. Moody's independent and authoritative credit opinions, research and analytical tools serve as important catalysts for creating efficiency in this capital formation process.

• The adoption of structured finance technology in credit markets

38

globally increases the range of financial options for debt issuers, permitting less creditworthy borrowers to issue high-quality securities. Moody's plays an essential role in assessing the risks and protections associated with these complex transactions and communicating this information to the investment community.

\*\*\*\*\*

Regulatory Strategy. ... The principal concerns of both U.S. and international authorities are the levels of independence, transparency and compliance with regulatory expectations practiced by major rating agencies. In June 2005, Moody's adopted its Code of Professional Conduct in response to the model international code. We also announced our intention to report annually on our implementation of our Code of Professional Conduct for review by relevant authorities and market participants. When combined with Moody's ongoing efforts to enhance the transparency of our rating practices through broader publication of analytical methodologies and measurements of our performance, we believe that Moody's has responded appropriately to regulatory interests and concerns. We continue to seek mechanisms and opportunities to enhance our communications with regulators, and to satisfy authorities that the position of trust occupied by Moody's and the industry is well placed and well serves global capital markets.

## OUR COMMITMENTS TO CUSTOMERS, SHAREHOLDERS AND OTHER STAKEHOLDERS

My earlier comments about preserving trust while pursuing innovation address basic building blocks for meeting the expectations of Moody's stakeholders worldwide. In doing so, our goal is to remain the leading authority on credit risk in the global capital markets. In so far as we meet those expectations, Moody's stands very well positioned to continue to reward the faith – the trust – that our shareholders have placed in us.

In closing, and in reflecting on my first year as Moody's Chief Executive Officer, I can do no better than to repeat the commitment in our shareholder letter of last year: most importantly, we remain committed to upholding the independence and integrity of our business. We will preserve what Moody's has built over the last hundred years and we will

prepare for what must be built in the years to come for Moody's to continue its track record of professional and financial success.

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer

*****

## Moody's is one of the world's most respected sources of independent opinion and analysis about credit risk, helping set a common global standard for comparing debt instruments.

The above statement should be familiar to Moody's long-term stakeholders and other regular readers of our Annual Reports. The words bear repeating, however, because they speak to the fundamental ideas driving our strategy, key business initiatives and future direction.

It is appropriate to start with the concept of "independent opinion and analysis." In recent years, legislative and regulatory scrutiny of financial services firms has focused on whether investment analysis is truly independent or whether its integrity is tainted by conflicts of interest or otherwise compromised. With respect to credit rating agencies, and Moody's in particular, the examinations have been reassuring. Nonetheless, the growing reliance on our opinions and analyses highlights the importance of assuring integrity into the future. Moody's must be increasingly rigorous and transparent in demonstrating our independence and managing potential conflicts. We have responded with a variety of actions, including adopting a Code of Professional Conduct for all rating agency employees (in addition to the corporation's existing Business Code of Conduct), establishing an office of Ratings Compliance, strengthening our credit policy function, and publishing more comprehensive and transparent rating methodologies so that users of our ratings can better understand the basis of our opinions.

*****

*Independence. Performance. Transparency. Innovation. Global Coverage.* These are the watchwords by which stakeholders judge Moody's.

40

*****

*Globalization and Integration of Financial Markets...*

*Disintermediation...*

*Increased Adoption of Structured Finance*

In the last 20 years, structured finance has grown from a relatively narrow niche to become a prominent fixture of many fixed-income markets. It has become both a key source of financial innovation and one of the fastest-growing segments of the global capital markets. Structured finance is Moody's largest ratings business and has been the fastest-growing over the last five years.

*****

...[D]uring 2005, Moody's enacted several significant rating compliance policies and published these for public review. Moody's Code of Professional Conduct, modeled after a code of conduct designed by international regulatory authorities, was published in June 2005. It seeks to enhance market understanding and confidence in our credit ratings by setting out:

• Moody's commitment to maintaining the quality and integrity of the rating process;

• The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest; and

• Moody's responsibilities to investors and issuers.

Moody's Code of Professional Conduct, as well as our corporate Code of Business Conduct, is available for review on Moody's website www.moodys.com.

72.     The 2005 Annual Report was materially false and misleading in creating an impression of a state of affairs at Moody's – including Moody's fundamental business conduct and business strategies – that differed materially from the one that actually existed. In truth:

41

(a)     Contrary to the representations concerning Moody's devotion to "preserving", "reinforcing" and "upholding" the public's trust in Moody's, as a result of the extraneous considerations and influences introduced by operation of the Issuer Pays business model in structured finance (Section III, *infra*), Moody's was systematically undermining the trust by distributing to the market credit ratings dominated by conflicts (Sections II.B and II.D.2, *infra*) and that stemmed from debased rating methodologies that declined to consider or reflect relevant information actually known to Moody's, in plain view to Moody's or without conducting due diligence was available to Moody's (Section II.C, *infra*). When revealed, these practices caused the public's sum store of trust in Moody's – Moody's reputational capital – and its stock price to be materially diminished to the damage of Moody's shareholders (Section IV, *infra*).

(b)     Contrary to the representations concerning the fundamental importance of "independence" in Moody's business conduct, business strategy and regulatory affairs, Moody's independence, as a result of the extraneous considerations and influences introduced by operation of the Issuer Pays business model in structured finance (Section III, *infra*), was systematically undermined and its rating methodologies systemically debased (*Id.*) so as to fail to consider or reflect relevant information actually known to Moody's, in plain view to Moody's (Section II.C, *infra*), or without conducting due diligence was available to Moody's resulting in credit rating opinions that did not reflect credit realities (*Id.*) and that ultimately caused the public's sum store of trust in Moody's – Moody's reputational capital – and its stock price to be materially diminished to the damage of Moody's shareholders (Section IV, *infra*).

(c)     Contrary to the representations concerning the adequacy of the steps that Moody's was taking to respond to regulator concerns over Moody's independence, such as the formulation

42

and purported implementation of Moody's Code, its steps were inadequate and themselves false and misleading because, as detailed at ¶ 69 above, Moody's actual business conduct differed materially from Code representations describing how Moody's would conduct itself. Moody's failures with respect to independence (and with respect to regulators concerned with independence) were undisclosed and misrepresented throughout the class period. When they became evident in 2007, they resulted in severe regulatory scrutiny of Moody's and consequent diminishment of Moody's share price (Section IV, *infra*).

(d)    Furthermore, although the 2005 Annual Report attributed Moody's successful performance during 2005, as well as Moody's future prospects, to structured finance ratings, it omitted to disclose the material fact that Moody's conduct in respect of those very structured finance ratings (as detailed in Sections II.C and III, *infra*) was neither independent nor compliant with any of the codes with which Moody's claimed compliance. When the ever-widening gap between Moody's debased credit ratings and objective credit realities became evident in 2007, Moody's structured finance ratings business collapsed, taking down with it Moody's revenues, earnings, margins, growth, future prospects for all the foregoing, and Moody's share price (Section IV, *infra*).

b.    Moody's Form 10-K for 2005

73.    On March 1, 2006, Moody's filed with the SEC its Form 10-K for 2005 (the "2005 Form 10-K"). The 2005 Form 10-K stated, in relevant part:

### The Company

Moody's Investors Service publishes rating opinions on a broad range of credit obligors and credit obligations issued in domestic and international markets, including various corporate and governmental obligations, structured finance securities and commercial paper programs. It also publishes investor-oriented credit research,

43

including in-depth research on major debt issuers, industry studies, special comments and credit opinion handbooks. Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities. **Such independent credit ratings and research** also contribute to efficiencies in markets for other obligations, such as insurance policies and derivative transactions, by providing credible and independent assessments of credit risk...

\*\*\*\*\*

## Prospects for Growth

...the securities being issued in the global fixed-income markets are becoming more complex. Moody's expects that these trends will provide continued long-term demand for **high-quality, independent credit opinions.**

\*\*\*\*\*

The complexity of capital market instruments is also growing. Consequently, assessing the credit risk of such instruments becomes more of a challenge for financial intermediaries and asset managers. In the credit markets, **reliable third-party ratings and research** increasingly supplement or substitute for traditional in-house research as the scale, geographic scope and complexity of financial markets grow.

Growth in issuance of structured finance securities has generally been stronger than growth in corporate and financial institutions issuance, and Moody's expects that trend to continue. Growth in structured finance has reflected increased adoption of structured finance as an acceptable financing mechanism...

\*\*\*\*\*

## Regulation

...Internationally, several regulatory developments have occurred:
IOSCO — In December 2004, the Technical Committee of the International Organization of Securities Commissions ("IOSCO") published the Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code"). The IOSCO Code is the product of approximately two years of collaboration among IOSCO, rating agencies and market participants, and incorporates provisions that

address three broad areas:

- the quality and integrity of the rating process;

- credit rating agency independence and the avoidance of conflicts of interest; and

- credit rating agency responsibilities to the investing public and issuers.

The IOSCO Code is not binding on credit rating agencies. It relies on voluntary compliance and public disclosure of areas of non-compliance by credit rating agencies so that users of credit ratings can better assess rating agency behavior and performance. **Moody's endorsed the IOSCO Code and in June 2005 published its Code of Professional Conduct (the "Moody's Code") pursuant to the IOSCO Code.**

74.     The 2005 10-K was materially false and misleading in the same ways and for the same reasons as the 2005 Annual Report detailed above. Specifically:

(a)     representations characterizing Moody's credit ratings as "independent" and "high-quality, independent", "credible, independent assessments of credit risk", and "reliable third party ratings" were false and misleading, for reasons stated at ¶ 69 *supra*. In truth, Moody's structured finance credit ratings were none of these things.

(b)     representations concerning the steps that Moody's was taking to respond to regulator concerns over Moody's independence, such as the formulation and purported implementation of Moody's Code, were false and misleading, for the reasons stated at ¶ 69 *supra*.

(c)     representations attributing Moody's current success and future strong growth prospects to structured finance ratings, were misleading and omitted material information, for the reasons stated at ¶ 69 *supra*, but the more so. Moody's representations acknowledged the nexus between structured finance and independent credit ratings: *e.g.*, that the very complexity of structured

45

finance instruments made "assessing the credit risk of such instruments... more of a challenge", thus increasing the need for "reliable third party ratings", and thus providing "continued long-term demand for high-quality, independent credit ratings".

75.    To acknowledge, as Moody's did here and elsewhere as illustrated by other specific allegations herein, that perceived independence as a principal and necessary driver of Moody's fastest growing, most lucrative line of work, acknowledges the material, adverse harm to the company's business and stock prices when the veneer of independence has been peeled away.

    c.    Moody's Report on the Implementation of its Code of Conduct

76.    On or about April 12, 2006, Moody's published and made available on its website the annual report, required by Section 4.2 of Moody's Code, on Moody's implementation of Moody's Code (the "Code Implementation Report"). The Code Implementation Report stated, in relevant part:

    I.    Introduction and Background

    A.    Introduction

    Moody's Investors Service ("MIS" or "Moody's") adopted the Code of Professional Conduct (the "Code" or "Moody's Code") in June 2005. Moody's Code sets forth the overall policies through which we seek to further our objective to protect the integrity, objectivity and transparency of our credit rating process. The Code reflects the guidance provided in the International Organization of Securities Commissions' ("IOSCO") Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code").

    *****

    Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code. Our support for the IOSCO Code stems, in large part, from our commitment to be a useful and responsible participant in the global capital markets and our belief that the IOSCO

46

principles represent sound business practices for the rating agency industry.

\*\*\*\*\*

## II. Implementation of Moody's Code

Through the implementation of the Moody's Code, we seek to protect the quality, integrity and independence of the rating process, to ensure that investors and Issuers are treated fairly.... We believe that this will enhance market understanding of and confidence in Moody's Credit Ratings.

\*\*\*\*\*

### A. Quality and Integrity of the Credit Rating Process

The quality and integrity of the processes by which we develop our Credit Ratings are of utmost importance to us. We have developed policies, practices and procedures over time to govern the rating process and promote quality and integrity in that process. We judge the quality of an individual rating based on whether it was formed pursuant to our established processes, rather than on the outcome of that rating, because it is inappropriate to judge any individual opinion on future creditworthiness as right or wrong since a rating is a probability-based assessment.

Below, we discuss important mechanisms we have in place to address the quality and integrity of our rating process and the aggregate performance of our Credit Ratings...

\*\*\*\*\*

#### 4. Rating Process

Moody's arrives at and maintains our published Credit Ratings through a process that involves robust analysis of the Issuer or obligation to be rated, followed by rating committee deliberation and voting. This ultimately results in a committee decision on a particular rating that is then disseminated to the market and is subsequently monitored, as necessary, to ensure that it continues to reflect Moody's opinion of the creditworthiness of the Issuer or obligation.

47

*****

a.    Rating Analysis and Recommendation

... If we believe we have inadequate information to provide an informed Credit Rating to the market, we will exercise our editorial discretion and will either refrain from publishing the opinion or withdraw an outstanding Credit Rating.

*****

b.    The Rating Committee

Once the Assigned Analyst has formulated his or her recommendation, it is presented to a rating committee. The rating committee is a critical mechanism in promoting the quality, consistency and integrity of our rating process...

*****

B.    Independence and Management of Conflicts of Interest

In 2005, Moody's derived approximately 87% of our revenue from Issuer payments for Credit Ratings, and virtually all of the remainder from sales of credit research and data products... we recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process, such as those that exist with financial news publications that accept advertising business from companies about which they report. We also recognize that potential conflicts of interest arising from other sources, such as securities ownership and business and personal relationships, could similarly impact our rating process. To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee, including those discussed in this section.

*****

... These restrictions further reinforce Moody's objective to avoid any actual or apparent conflicts of interest...

48

## III. Differences Between Moody's Code and the IOSCO Code

Moody's Code is consistent with, and achieves the objectives of, the IOSCO Code. We have structured the Code to track the IOSCO Code as closely as practicable, in order to demonstrate how we have addressed each IOSCO Code provision. There are, however, certain differences between Moody's Code and the IOSCO Code, some of which are textual in nature and some of which are more substantive. The latter are intended: (i) to include additional provisions to more fully describe our rating process or to address areas not reflected in the IOSCO Code; or (ii) to more closely correspond with our business environment and practices. In this section of the report, we explain those differences that may be viewed as substantive.

*****

### B. Differences to Reflect Moody's Business Environment and Practices

*****

#### 2. Fee Discussions with Issuers
*****

... Moody's nevertheless meets the IOSCO Code's objective of minimizing conflicts of interest that may impact a Credit Rating by prohibiting the Analysts with primary analytical responsibility (the Assigned Analysts, who prepare the initial Credit Rating recommendation for rating committee consideration) from participating in fee discussions with that Issuer or its designated agent.

77. The above-quoted/emphasized portions of Moody's Code Implementation Report were false and/or misleading, and together created an impression of a state of affairs at Moody's that differed materially from the one that actually existed. In essence, Moody's Code Implementation Report made the same representations as did Moody's Code (¶ 68, *supra*) and was false and misleading for the same reasons (¶ 69, *supra*). Specifically:

(a) Contrary to the representations in the Code Implementation Report Introduction,

49

Moody's "objective" was *not* "to protect the integrity, objectivity and transparency of our credit rating process" but rather to obtain and maintain lucrative structured finance ratings assignments controlled by a handful of structured finance issuers (Section III, *infra*). To secure that objective, Moody's abandoned integrity, objectivity, and transparency in its credit rating process (Section II.C, *infra*).

(b)     Contrary to the representations in the Code Implementation Report Introduction, Moody's Code did not "set[] forth the overall policies through which we seek to further our objective to protect the integrity, objectivity and transparency of our credit rating process", but rather set forth a false and misleading veneer that integrity *et al.* had been maintained (as per ¶ 69, *supra*).

(c)     Contrary to the representations in the Code Implementation Report Introduction, Moody's did not endorse in practice the IOSCO principles and did not implement those principles through Moody's own Code, which was belied by and misrepresented Moody's own actual conduct (as per ¶ 69, *supra*). Moody's "support" for the IOSCO Code did not stem from Moody's purported commitment "to be a useful and responsible participant in global capital markets", but rather from the false veneer of "sound business practices" that purported adherence to the IOSCO Code afforded.

(d)     Contrary to the representations in Section II of the Code Implementation Report, Moody's did not seek through the Code "to protect the quality, integrity and independence of the rating process" nor to ensure "that investors [] are treated fairly", but rather, given the above-alleged material disparity between Code representations and Moody's actual business conduct, only the appearance of such integrity and fair treatment (Section II.A-B, *infra*) without the substance of the same (Sections II.C and III, *infra*). This misleading appearance did indeed "enhance... confidence in Moody's Credit Ratings", but falsely so, and contrary to Moody's accompanying

misrepresentations, only by diminishing rather than enhancing "market understanding of[] Moody's Credit Ratings".

(e)   Contrary to the representations in Section II.A of the Code Implementation Report, the "quality and integrity of the processes by which we develop our Credit Ratings" were not of "utmost importance" to Moody's, but rather were secondary to and betrayed by Moody's desire to obtain and maintain lucrative structured finance rating assignments (Sections II.C and III, *infra*). Likewise, the "policies, practices and procedures" that Moody's referred to (i.e., Moody's Code)did not in fact "govern the rating process and promote quality and integrity in that process", but rather functioned to provide a false veneer of such governance, quality and integrity (as per ¶ 69 *supra*).

(f)   Contrary to the representations in Section II.A.4 of the Code Implementation Report concerning Moody's "monitor[ing]" of its ratings "to ensure that [they] continue[] to reflect Moody's opinion of the creditworthiness of the Issuer or obligation", Moody's declined to so monitor, and to a unique degree continued to maintain objectively invalid credit ratings (Section II.D.2.g, *infra*).

(g)   Section II.A.4.a of the Code Implementation Report represented that if Moody's believed that it had "inadequate information to provide an informed Credit Rating to the market, we will exercise our editorial discretion and will either refrain from publishing the opinion or withdraw an outstanding Credit Rating". This was false. As detailed in Section II.C.2.e *infra*, Moody's declined to consider basic, crucial, conventional and available information concerning three of every four mortgages it reviewed throughout the class period. Moody's so admitted in April 2007 (*id.*). However, Moody's neither refrained from publishing thousands of credit rating opinions based on just such "inadequate information" nor withdrew them (Section II.D.2, *infra*).

(h)   Contrary to the representations in Section II.B of the Code Implementation Report,

51

Moody's had not, in practice, adopted the "policies and procedures" (i.e., Moody's Code) in order to "maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process", and Moody's Code did not in practice function to maintain such objectivity, independence and integrity.

(i)     Contrary to the representations in Section III of the Code Implementation Report, Moody's Code did not "achieve[] the objectives of the IOSCO Code", but rather and merely functioned to present a false veneer of such achievement.

(j)     Contrary to the representations in Section III.B.2 of the Code Implementation Report, Moody's did not meet "the IOSCO Code's objective of minimizing conflicts of interest that may impact a Credit Rating". Moody's neither eliminated nor managed its conflicts, which continued unabated (Section III, *infra*) and which had material effects on Moody's credit ratings (as detailed in II.C and II.D.2, *infra*), nor disclosed them (Section II.A-B, *infra*). Moody's credit rating actions in structured finance were were *not* influenced only by factors relevant to the credit assessment itself but also by the extraneous considerations and influences introduced by operation of the Issuer Pays business model in structured finance (Section III, *infra*). Moody's credit ratings *were* based on the potential effect of those ratings on Moody's itself given operative conditions under the Issuer Pays business model in structured finance (*Id.*); and Moody's credit ratings *were* affected by the existence of or potential for a business relationship between Moody's and structured finance securitizers (*Id.*).

78.     Moody's stated in an April 12, 2006 press release announcing the release of its Code Implementation Report:

> **Moody's endorsed the principles expressed in the IOSCO Code, and its report reflects its commitment to implementing these principles.**

52

79. Moody's representation that it endorsed the IOSCO Principles was false and misleading for the reasons stated in ¶¶ 61 and 67, *supra*: in truth, Moody's actual but undisclosed business conduct was in material contravention of those Principles (as detailed in Sections II.C and III, *infra*).

### d. Moody's Form 10-K for 2006

80. On March 1, 2007, Moody's filed with the SEC its Form 10-K for 2006 (the "2006 Form 10-K"). The 2006 Form 10-K made representations identical in words and in substance to those made in the 2005 Form 10-K (¶ 73, *supra*) concerning *inter alia* (i) Moody's provision of purportedly "independent", "high-quality, independent", "credible, independent assessments of credit risk", and "reliable third party ratings"; (ii) the adequacy of Moody's responses to regulators' concerns over Moody's independence, such as the formulation and purported implementation of Moody's Code; and (iii) the sources of Moody's current success and future strong growth prospects as stemming from Moody's provision of structured finance ratings. These representations were materially false and misleading for the same reasons as in the 2005 Form 10-K (¶ 74, *supra*).

81. Additionally, the 2006 Form 10-K represented that:

> In April 2006, Moody's Investors Service published its first annual report on the implementation of Moody's Code. The report discusses policies, procedures and processes that implement the Moody's Code. The report also describes differences between the Moody's Code and the IOSCO Code and how Moody's believes that the objectives of the IOSCO Code are otherwise addressed.

82. That representation was materially false and misleading for the same reasons that the Code Implementation Report itself was false and misleading (¶ 77, *supra*). It created the false and misleading impression that Moody's had, through implementation of its Code and/or through other

53

means, addressed the objectives of the IOSCO Code, when the opposite was the truth.

      c.    **Moody's Annual Report for 2006**

83.    On or about March 22, 2007, Moody's published and distributed to Moody's

investors Moody's Annual Report to Shareholders for 2006 (the "2006 Annual Report"). The 2006

Annual Report stated, in relevant part:

> **ETHICS, ATTITUDE, INVESTMENT AND INNOVATION**
>
> **Last year I wrote that preserving and reinforcing the trust that stakeholders—debt issuers, the investment community, employees, governmental authorities and shareholders—have in Moody's is the foundation for our long-term success.**
>
> **Moody's is a "standards" business: public and private sector organizations worldwide rely on the accuracy, stability, consistency and independence of our opinions and services for the contribution they make to fair and efficient financial markets. For Moody's to continue to meet or exceed these expectations requires that we embrace the demand for trust from several perspectives:**
>
> **Ethics and Attitude.** Moody's must demonstrate expertise in developing its credit opinions, and must apply those opinions consistently, fairly and objectively. These attributes are points on the compass of ethics for this business and traits, I am proud to observe, that are comprehensively embodied by Moody's employees... [L]ong-term success must be built not only on a foundation of ethics, but also on an attitude of service: behaviors that constantly adjust and align Moody's independent, expert insights with changing market needs and expectations... some will not find independence and "customer focus" to be an intuitive pairing. The nature of an independent expert is to communicate information that will be influential and that, from time to time, recipients will not welcome. To do so with the highest degree of professionalism and with attention to and respect for the perspectives of stakeholders being served is, however, both intuitive and good business.

*****

### OUR COMMITMENTS TO CUSTOMERS, SHAREHOLDERS AND OTHER STAKEHOLDERS

I firmly believe that Moody's business stands on the "right side of history" in terms of the alignment of our role and function with advancements in global capital markets. The markets we serve should continue to grow and the demand for independent expertise in assessing credit and fostering consistent, comparative standards for credit should also grow accordingly.

In this paradigm, Moody's goal is to remain the leading authority on credit risk in the global capital markets. To do so, we must continue to differentiate ourselves according to the attributes and behaviors that are important to our stakeholders. For users of ratings, this means not only publishing independent, high-quality credit opinions and analytics...

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer

## MOODY'S IS AN ESSENTIAL COMPONENT OF GLOBAL CAPITAL MARKETS.

We provide opinions, research and analysis about the creditworthiness of bonds and other debt obligations issued by companies, financial institutions, governments and other borrowers worldwide. The commitment and expertise that Moody's brings to credit analysis contributes to stable, transparent and integrated financial markets. What we strive to accomplish is straight-forward: to protect the integrity of credit.

Moody's has benefitted and should continue to benefit from favorable long-term capital market trends, including... increased adoption of financial technology, primarily through asset securitization. These trends are not only propagating new credit markets, but also new classes of securities and new customer groups in both emerging and established markets. The result is increasing demand for accurate, comparable credit opinions, as well as for the tools, data, analysis and insight to understand fully the building blocks of those opinions. Through the expertise and efforts of Moody's employees, the company is well positioned to meet these ever-increasing demands, while ensuring long-term growth for shareholders.

*****

We are widely acknowledged by market participants as having a passion for getting to the truth, being committed to clear and transparent standards, illuminating what matters through our research and commentary, and ultimately helping facilitate the availability of credit worldwide.

... We anticipate that current and prospective investors in Moody's will use our performance against these expectations to judge Moody's continued prospects for long-term growth.

## STRATEGIES FOR GROWTH

Moody's is pursuing an integrated growth strategy that includes: expanding internationally, developing new products, entering market adjacencies and enhancing our communications with market participants.

International Expansion...

New Products...

## REGULATORY AND COMPLIANCE STRATEGY

In addition to communicating with regulatory authorities and policymakers, Moody's also must develop, implement and demonstrate appropriate policies and compliance standards to meet regulatory expectations. These challenges particularly affect our credit ratings business. Consequently, we are concentrating appropriate resources and effort on reinforcing our processes and infrastructure to respond to new reporting and compliance requirements associated with additional oversight.

*    *    *    *

Also during 2006, Moody's published our first annual report on the implementation of the Moody's Investors Service Code of Professional Conduct. The Code of Professional Conduct, which Moody's introduced in 2005 pursuant to the model international code, seeks to enhance market understanding and confidence in our credit ratings by setting out:

• Moody's commitment to maintaining the quality and integrity

56

of the rating process;

• The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest; and

• Moody's responsibilities to investors and issuers.

Moody's Code of Professional Conduct, as well as our compliance report and the Moody's Corporation Code of Business Conduct, is available for review on Moody's website, www.moodys.com.

84.     In substance, the 2006 Annual Report made the same representations as Moody's 2005 Annual Report (*see* ¶ 71), and was materially false and misleading for the same reasons (*see* ¶ 72).

### f.     Moody's Form NRSRO

85.     As earlier alleged, perceived failures with respect to Enron and Worldcom refocused regulatory attention on the credit rating agencies beginning in 2002, leading to the development of the IOSCO Code of Conduct between 2003 and 2005, and to Moody's Code in 2005. In the U.S., this regulatory attention resulted in the Credit Rating Agency Reform Act of 2006 ("CARA"). 15 U.S.C. § 78o-7, was enacted on or about September 29, 2006.

86.     CARA required credit rating agencies to register application materials with the SEC in order to be considered for designation as Nationally Recognized Statistical Ratings Organizations ("NRSROs") (15 U.S.C. § 78o-7(a)).  "Required Information" to be included "the procedures and methodologies that the applicant uses in determining credit ratings" (15 U.S.C. § 78o-7a(1)(B)(ii)), "whether or not the applicant has in effect a code of ethics, and if not, the reasons therefor" (15 U.S.C. § 78o-7a(1)(B)(v)), "any conflict of interest relating to the issuance of credit ratings by the applicant" (15 U.S.C. § 78o-7a(1)(B)(vi)), and, on a confidential basis, the agency's 20 largest

paying customers (15 U.S.C. § 78o-7a(1)(B)(viii).

87. The registration materials were required, of course, to be materially correct (15 U.S.C. § 78o-7(b)). Registrants also were required to submit annual certifications of the accuracy of their registration materials, and, should their registration materials become "materially inaccurate", registrants were required to amend their registrations so as to ensure continuing material accuracy. 15 U.S.C. § 78o-7(b).

88. CARA requires NRSROs to "establish, maintain and enforce written policies and procedures reasonably designed... to address and manage any conflicts of interest":

> (h) Management of conflicts of interest
>
> (1) Organization policies and procedures
>
> **Each nationally recognized statistical rating organization shall establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of the business of such nationally recognized statistical rating organization and affiliated persons and affiliated companies thereof, to address and manage any conflicts of interest that can arise from such business.**

89. On or about June 26, 2007, Moody's filed with the SEC, on Form NRSRO pursuant to the Credit Agency Reform Act, its Application for Registration as a Nationally Recognized Statistical Rating Organization (NRSRO) (the "NRSRO Application"). Moody's NRSRO Application stated, in relevant part:

> **Moody's Investors Service**
> **Exhibit 2**
> **Procedures and Methodologies Used to Determine Credit Ratings**
>
> 1. **Credit Rating Process**
>
> c. **Interacting with the Management of an Issuer**

... As discussed in Exhibits 6 and 7, MIS recognizes that the "Issuer pays" model creates a potential conflict of interest that must be effectively managed. One important measure we have adopted in this regard is to prohibit analysts without management responsibility from discussing fees or payment matters with issuers...

*****

## h. Withdrawal of Credit Ratings

If MIS believes we have inadequate information to provide an informed credit rating to the market, we will exercise our editorial discretion and will either refrain from publishing a rating or withdraw an outstanding rating...

*****

## Moody's Investors Service
## Exhibit 6
## Conflicts of Interest Related to the Issuance of Credit Ratings

MIS has identified the following types of conflicts of interest related to the issuance of credit ratings:

• MIS is paid by issuers or underwriters to determine credit ratings with respect to securities or money market instruments they issue or underwrite.

• MIS is paid by obligors to determine credit ratings of the obligors.

*****

## Moody's Investors Service
## Exhibit 6
## Conflicts of Interest Related to the Issuance of Credit Ratings

MIS has the following policies to address and manage conflicts of interest related to the issuance of credit ratings. These policies can be found on our website via the web addresses listed below.

• Moody's Corporation Code of Business Conduct

...

90.    The "policies to address and manage conflicts of interest" mentioned in Moody's Form NRSRO were none other than Moody's Code, which, as already alleged, was materially false and misleading (¶ 69, *supra*) and ineffective in managing Moody's conflicts of interest. Moody's NRSRO registration materials were materially inaccurate and misleading in at least the following ways: (a) Moody's failure to adequately disclose the extent and effects of its conflict of interest in structured finance ratings (Section III, *infra*), and (b) Moody's misleading account of the procedures and methodologies it used in determining credit ratings, which omitted mention of the actual effects that the Issuer Pays model had on the credit ratings it issued, and the actual link between ratings awarded and fees paid (*Id.*). Furthermore, (c) in contravention of 15 U.S.C. § 78o-7(h), the policies and procedures claimed by Moody's to "address and manage conflicts of interest" -- namely, Moody's Code of Conduct -- were not reasonably designed to address and manage the conflicts of interest that arose in its business. Moody's knew or recklessly disregarded this reality, and the conflicts continued wholly unabated in connection with Moody's structured finance ratings (Sections II.C and III, *infra*).

91.    17 C.F.R. § 240.17g1-6. Rule 17g-5, 240 CFR § 240.17g-5 (eff. about June 26, 2007), "requires an NRSRO to disclose and manage those conflicts of interest that arise in the normal course of engaging in the business of issuing credit ratings". *See* SEC Release No. 34-55857 ("Oversight of Credit Rating Agencies Registered as Nationally Recognized Statistical Rating Organizations"). Moody's conduct in rating structured finance securities, and its disclosures concerning the same, have placed Moody's in violation of Rule 17g-5, 240 CFR § 240.17g-5. It is

60

not however Moody's violations of these regulations that give rise to the instant cause. Rather, that Moody's made material misrepresentations regarding its adherence to them.

## B. Misrepresentations Concerning the *Meaning* of Moody's Credit Ratings for Structured Finance Securities

92. Moody's represented unambiguously that the credit ratings it attached to structured finance securities (e.g., Aaa, Aa, A, Baa, Ba, etc.) corresponded exactly, intentionally, and by design to the ratings Moody's attached to corporate bonds and to the credit risks associated with such corporate bond ratings (municipal bonds had a separate scale). In Moody's own words: "Structured Finance Credit Ratings use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss" (Code Implementation Report, fn. 4 – *see* ¶ 94, *infra*).

93. Moody's has published and makes available, *inter alia*, on its website a "reference guide which defines Moody's various symbols and rating scales". That document is titled "Moody's: Rating Symbols and Definitions" (hereinafter referred to as the "Ratings Guide"). The Ratings Guide states:

> Moody's maintains two separate bond rating systems, or scales. One mapping — Moody's Global Scale — applies to ratings assigned to nonfinancial and financial institutions, sovereigns and subsovereign issuers outside the United States, and structured finance obligations.[2] The Global Scale is a mapping between rating categories and relative expected loss rates across multiple horizons. Expected loss comprises an assessment of probability of default as well as expectation of loss in the event of default. It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale. Moody's rating methodologies, rating practices and performance monitoring systems are each designed to ensure a consistency of meaning.

61

[2] Moody's structured finance ratings are engineered to replicate the expected loss content of Moody's Global Scale. The trade-off between probability of default and severity of loss given default may vary within the structured finance sector depending on asset type.

\*\*\*\*\*

**Sector Specific**

**Structured Finance**

**Structured Finance Long-Term Ratings**
Moody's ratings on long-term structured finance obligations primarily address the expected credit loss an investor might incur on or before the legal final maturity of such obligations vis-à-vis a defined promise. As such, these ratings incorporate Moody's assessment of the default probability and loss severity of the obligations. They are calibrated to Moody's Global Scale...

94.    Moody's April 2006 Code Implementation Report stated the same:

Moody's Credit Ratings are opinions of the relative creditworthiness of debt issuers and of debt obligations, such as bonds, notes and commercial paper. We use globally consistent rating symbols and definitions to communicate our rating opinions, and we have implemented policies and procedures to promote broad consistency in our overall rating methodologies and practices as well as global comparability in our Credit Ratings.[4]

[4] Moody's global corporate, financial institutions, sovereign and non-U.S. sub-sovereign (collectively, "Fundamentals"), and Structured Finance Credit Ratings use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss. Moody's ratings on public finance securities issued in the US tax-exempt market use the same symbol system but are calibrated to less frequent historical default rates and thus are not intended to be compared directly to our other Credit Ratings...

\*\*\*\*\*

[Moody's Credit Policy Committee] also has standing committees that promote global consistency in Moody's approaches in a number of specialized areas.    The Ratings Symbols and Practices

> Committee ensures that Moody's rating system continues to
> represent a globally consistent framework for comparing the
> credit quality of debt securities.

95.    That definition quoted above is also the one stated on Moody's website in its "Ratings
Definitions" section.[4] Additionally, Moody's website, www.moodys.com , introduces Moody's
"Rating Approach" and certain of its "Basic Principles".[5] Among those principles is "Global
Consistency", which states that "Our approach incorporates several checks and balances designed
to promote the universal comparability of ratings opinions."

96.    These representations concerning the meaning of Moody's structured finance ratings
were important. Investors were very familiar with Moody's Global Scale as a result of decades of
its use and performance with respect to corporate bonds. Structured finance securities, however,
were particularly complex and opaque securities, making independent analysis of their
creditworthiness impossible for all but the most sophisticated investors, and fostering *de facto*
reliance on credit rating agencies' analyses. As Professor Coffee testified before the Senate:

> Structured finance particularly relies on the credit-rating agency
> because investors have no ability to evaluate on their own the
> securitized pools of financial assets that structured finance creates.
> That is, while a sophisticated debt purchaser might be able to evaluate
> the creditworthiness of the bonds of a major corporation by
> examining the corporation's financial statements, the debt purchaser
> has no corresponding ability to assess the risk level of a mortgage
> pool backing an issue ... and so must rely on a "gatekeeper"—here,
> the credit rating agency. The market for mortgage-backed securities
> is particularly dependent on gatekeepers. (Professor John C. Coffee,
> Jr., Congressional Hearing Testimony, September 26, 2007)

97.    Moody's itself so acknowledged in its Forms 10-K for 2005 and 2006, in the section
devoted to a discussion of Moody's "Prospects for Growth". Moody's there stated that the
increasing complexity of the securities being issued (read, structured finance securities) made

"assessing the credit risk of such instruments... more of a challenge" for investors and thus produced increased demand for and reliance upon Moody's "high-quality, independent credit opinions".

98.     In short, the only publicly available information for structured finance securities were the credit ratings they bore.

99.     Moody's representations concerning the meaning of the credit ratings it assigned to structured finance securities, however, were materially false. In direct contravention of Moody's class period representations, a structured finance triple-A did not mean the same thing as a corporate finance triple-A (and likewise at each other rating level). The credit ratings Moody's bestowed on structured finance securities (e.g., Aaa, Aa, A, Baa, Ba, etc.) were *not* consistent with Moody's "Global Scale" derived from and applicable to corporate bonds. In truth, they suffered from "grade inflation". As a result of the extraneous considerations and influences introduced by operation of the Issuer Pays business model in structured finance (Section III, *infra*), Moody's subprime structured finance ratings models were systematically debased (Sections II.C and III, *infra*) to permit and to produce inflated credit ratings (Section II.C and II.D.2, *infra*) that were unmoored from credit realities and that declined to consider or reflect relevant information actually known to Moody's or in plain view to Moody's (Section II.C, *infra*).

100.     This fact is now evident, given the unprecedented rate and severity of downgrades of Moody's structured finance ratings (Section II.D.2, *infra*), which far outmeasure the downgrade rates and severity of corporate bonds to which Moody's appended purportedly identical ratings.

101.     This fact has been conceded by Moody's, given Moody's February 2008 proposals to create a new ratings scale specific to structured finance or to append various suffixes and modifiers to structured finance letter ratings to distinguish them from corporate bond letter ratings

(Moody's Investors Service "Special Comment" publication, *Should Moody's Consider Differentiating Structured Finance and Corporate Ratings?*, February 2008).

102.    This fact has, furthermore, been established by regulators, who are now demanding that Moody's and other credit rating agencies clearly disclose the difference between structured finance ratings and other security ratings by either (a) providing detailed reports on how the ratings differ or (b) instituting a new, separate ratings scale specific to structured finance.[6]

## C.    Misrepresentations Concerning the *Method* of Moody's Credit Ratings for Structured Finance Securities: Moody's Ratings Blinked Plain View Realities

103.    Moody's various representations concerning independence, trustworthiness, objectivity and reliability may be boiled down to two essential principles, both of which were clearly stated in Moody's Code (¶ 68, *supra*).

104.    First, that "Credit Ratings will reflect consideration of all information known, and believed to relevant" (Moody's Code Section 1.4, *see* ¶ 68, *supra*): in short, that Moody's was taking into account everything it needed to in order to produce a credit rating that reflected or captured objective credit realities.

105.    Translated into practice, and as Moody's further explicitly represented, this meant that in determining its credit ratings, Moody's was purportedly doing three things: (a) assessing the relevant, salient characteristics of the mortgages underlying the security (by, as detailed below, requesting and receiving data on every single mortgage in the underlying mortgage pools of the RMBS it rated); (b) simulating and evaluating the performance of those mortgages in "stressful" macroeconomic conditions ("stress testing"); and (c) also taking into account the practices and standards of the loan originators responsible for the mortgages at issue. Moody's conduct of each

65

of these three endeavors is detailed in the three subsections below (Sections II.C.1-3).

106.     Using these three methods (looking at the mortgages themselves, stress testing, and evaluating loan originators), Moody's arrived at its determination of underlying asset pools' "expected loss".[7] As discussed earlier (see endnote 2 - "Structured Finance Primer"), the structure and ratings of the subprime RMBS securitization (and the rating agency paid to publish ratings for the subprime RMBS) are a direct function of the rating agency's expected loss determination. The higher the expected loss, the smaller the size of the Aaa-rated tranches that can be issued (and still merit Aaa ratings), the more tranche subordination or overcollateralization will be needed, and the less likely a rating agency is to secure lucrative published ratings fees.

107.     The second principle was that Moody's credit ratings were independent and unaffected by the Issuer Pays business model and its conflicts (Moody's Code Sections 2.1-2.7, see ¶ 68, supra) (e.g., "the determination of a credit rating will be influenced only by factors relevant to the credit assessment", "The Credit Rating Moody's assigns... will not be affected by the existence of, or potential for, a business relationship between Moody's [] and the Issuer"). This second principle was the guarantor of the fidelity with which Moody's implemented the first principle: that Moody's would indeed consider all relevant data, and do so in an objective rather than biased manner.

108.     Neither of these principles, and none of Moody's multitudinous representations embodying them, were true. Moody's below-detailed failures with respect to the first – Moody's credit ratings declined to reflect objective consideration of conventional, relevant, known, salient and available information – further evidences, and can only be explained by, Moody's failures with respect to the second. Moody's representations as to the second – i.e., independence – functioned

66

falsely to assure that Moody's was objectively taking into account everything it needed to in order to produce a credit rating that captured objective credit realities. In truth, Moody's was not: (1) Moody's was ignoring information actually in hand and known to be not merely relevant but crucial to credit risk evaluation; (2) Moody's was failing to consider conventional information that was easily available and likewise known to be relevant and crucial to credit risk evaluation (all of which was later confirmed by changes Moody's later made to its model to incorporate that very information); and (3) Moody's was representing that it was considering information that, in fact, it was not considering.

109.    That Moody's ignored what was conventional, apparent, in plain view and compelling tells us of the falsity of Moody's representations concerning its and its credit ratings' independence, objectivity, quality, trustworthiness and integrity. It is not merely the case, as subsequent events have made clear and as Moody's has admitted, that Moody's evaluation of numerous mortgage characteristics in its ratings models turned out to understate the actual risk presented by such characteristics. Rather, Moody's evaluations were so flagrantly wrong *ante* that they can be explained only by Moody's conflicts and revenue ambitions. Moody's evaluations resulted from (dis)"honest error".

> 1.    **A Badge That Moody's Claims of Independence and Objectivity Were False & Misleading Is Moody's Systematic Refusal To Fulfill Its Representation that it Closely Assessed Mortgage Originator Standards and Practices and Accounted for Such Standards and Practices in its Credit Ratings**

110.    The heart of Moody's determination of expected losses and thus credit ratings lay in (1) Moody's review and evaluation of the relevant, objective characteristics of the mortgages themselves (Section II.C.2, *infra*) and (2) Moody's modeling of the mortgage's performance in

67

economic conditions more "stressful" than those currently operative (Section II.C.2, *infra*).

111. However, in addition, Moody's represented that it (3) conducted further, independent and qualitative assessments of loan originator standards and practices, and took such standards and practices into account as an "integral part" of its credit ratings. For example, Moody's April 1, 2003 report detailing its Moody's Mortgage Metrics model stated:

> **Originator and Servicer Practices and Loan Programs Continue to be Captured**
>
> The predictive power of borrower quality measures and LTV depends in part on the accuracy of the information submitted. Therefore, it is important to examine the quality of originator practices, particularly efforts to verify data through appraisals, credit checks, and other means... One way to assess the quality of an originator's and servicer's practices is to monitor the past performance of its loans. Indeed, the high variability in historical loan performance across originators cannot be explained solely by differences in reported underlying loan characteristics... Moody's continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance. These assessments form an integral part of Moody's Mortgage Metrics credit support calculations.
>
> Moody's considers numerous factors when determining the quality and performance of the originator and servicer, including:
>
> - Past performance of an originator's loans;
> - Underwriting guidelines for the mortgage loans and adherence to them;
> - Loan marketing practices;
> - Credit checks made on borrowers;
> - Appraisal standards;
> - Experience in origination of mortgages...

(Moody's Investors Service, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003)

112. This description of Moody's model/efforts continued to be operative during the class

68

period; it was the foundational description of Moody's rating methods and was not modified by later methodological releases. Later class period reports released by Moody's disclosing methodological updates never disclosed any changes with respect to this aspect of Moody's ratings efforts. On the contrary, throughout the class period, Moody's made similar representations. For example:

> The variability [of mortgage performance] is not attributable solely to salient loan attributes. In addition to reported loan characteristics, **qualitative elements of the origination and servicing processes influence pool performance. Moody's considers a number of these elements, including mortgage loan underwriting quality, underwriting guidelines, appraisal standards and the quality assurance processes. Underwriting guidelines and exception practices in the sub-prime market can vary substantially across originators, as can servicer quality, with a significant impact on loan quality and performance.** Moody's operational and performance reviews of recent vintages and seasoned pools **enable us to incorporate these qualitative elements into our analysis of loan performance. Moody's view of the overall quality of origination, and servicing practices, as well as originators historical performance is applied to assess the pool loss estimates.** (Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology*, April 2, 2007)

\*\*\*\*\*

> ... the quality of a lender's loan origination and underwriting practices could ultimately explain significant differences in transaction performance. As part of the ratings process, Moody's reviews the underwriting guidelines, operations and loan performance history of originators and makes rating distinctions based on its assessment of origination quality. (Moody's Investors Service, *US Subprime Mortgage Market Update: September 2007*, October 3, 2007)

113. However, on almost every possible occasion during 2007, as the subprime crisis roared into public view, Moody's repeatedly blamed a deterioration in subprime mortgage origination standards for the fact that subprime expected losses are far worse than the predictions generated by the models Moody's employed.[8] There is certainly no dispute that loosened mortgage

69

origination standards have caused subprime mortgage performance to suffer.

114. Matters could not be more clear. Now, Moody's claims that subprime mortgage performance was worse than Moody's initially predicted because of a deterioration in mortgage origination/underwriting standards. But, throughout the class period, Moody's (mis)represented that it was keeping a close eye on those very standards and that Moody's "assessments [of those standards] form an integral part of Moody's Mortgage Metrics credit support calculations".

115. These representations were materially false and misleading. In truth, Moody's purported evaluations of originator practices and standards (misrepresented as detailed and comprehensive) were a sham, wholly devoid of substance. After "subprime" became publicly evident as an eponymous scandal, Moody's so admitted, as detailed below. During 2007, Moody's made methodological adjustments – with massive consequences for its expected loss determinations – to *begin* to take into account the most obvious measure of originator quality: the comparative actual performance of different originators' loans (which Moody's represented it had been taking into account all along). During 2008, Moody's revealed that it had yet to construct any substantial protocol (of the sort that, according to Moody's *representations*, it had had in place since at least 2003) for assessing originator quality.

116. One badge of the falsity of Moody's representations, and of Moody's failure to consider originator practices, quality, and standards, has been Moody's *post facto* methodology changes concerning originator quality.

117. On July 12, 2007, Moody's enacted its first large wave of downgrades on subprime first-lien securities issued and rated during 2006. Moody's provided a presentation titled *Moody's Structured Finance Teleconference and Webcast: RMBS and CDO Rating Actions* that it made

available in connection with a conference call it held to explain its actions. In that presentation, Moody's revealed that there had been "significant performance variance among originators" (graphs showed some originators' mortgages defaulting at twice the rate of others'). Moody's downgrades reflected such originator performance variations: "four issuers (Fremont Investment & Loan, Long Beach Mortgage Company, New Century Mortgage Corporation and WMC Mortgage Corp.) accounted for 31% of issuance volume but 63% of downgrade volume".

118.    In light of such originator performance variations, Moody's stated – in a slide titled "2007 Subprime Methodology Changes" – that it would *henceforwards* consider some originators' loans more risky than others (by as much as 20%) when estimating losses and determining credit ratings.

119.    But Moody's prior representations had led investors to believe that Moody's had already been doing so: the most obvious and concrete evidence of originator standards is the actual performance of the originator's loans. Had Moody's been doing so, the July 12, 2007 downgrades that focused particularly on four mortgage originators would not have been necessary: Moody's would already have discounted expected performance (and increased required credit enhancement) in advance. Such actual performance data did not have to be requested from the originators, but rather was already and had always been in Moody's grasp. Such data was obviously relevant (indeed, more relevant, if the goal is to measure the impact of originator practices and standards, than any other piece of information about the originator). Including such data in its credit ratings turned out to substantially alter the expected losses Moody's calculated and thus the credit ratings merited and assigned.

120.    In Moody's Investors' Service July 24, 2007 report titled *US Subprime Mortgage*

71

*Market Update: July 2007*, Moody's emphasized that "losses on the 2006 vintage will vary significantly across originators" and that downgrades had been particularly required for the same four specific originators. In light of the originator-specific performance variations, which investors assumed Moody's had already been accounting for, Moody's stated that:

> **Higher Originator-Specific Loss Coverage Adjustments**
> Based on the wide variations in recent performance across originators for otherwise similar subprime loans, Moody's will be increasing the distinctions it makes in loss expectations based on the originator of the loans. Our loss expectations for loan pools from originators that have performed poorly will now be as much as 20% higher than pools with similar credit attributes from originators that have performed well. (Moody's Investors' Service, *US Subprime Mortgage Market Update: July 2007*, July 24, 2007)

121. Moody's Investors Service August 2, 2007 report on its recent methodology changes, titled *US Subprime-Overview of Recent Refinements to Moody's Methodology: July 2007*, made similar reference to Moody's new adoption of originator-specific risk weightings.

122. Further badges of Moody's material misrepresentation by purposeful avoidance of conventional ratings methods, and failure to evaluate in its ratings process what it represented it had been evaluating, followed in the form of further and much more massive waves of downgrades. Moody's October 2007 downgrades of approximately 40% of all subprime RMBS tranches issued and rated during 2006 was significantly driven by originator-specific matters – e.g., loss expectations for certain originators nearly doubled.* In January 2008, Moody's revealed raised loss expectations a further 50% from the levels disclosed in October 2007.[10]

123. In truth, Moody's claims that it was keeping a close eye on mortgage originator standards, and taking into account those very standards in its credit ratings, were little more than empty verbiage, a fancy facade of "busy work" concealing what in truth was a complete absence of

72

analysis.

124. This was made evident only on March 26, 2008, when Moody's Investors Service issued a methodological update titled *Moody's Proposed Enhancements to U.S. Residential Mortgage Securitizations: Call for Comments*. In that update, Moody's disclosed two improvements to its own credit rating processes: (1) a vast expansion of the data fields it would request from issuers and consider in its ratings (quadrupling the original 48 fields into a proposed 192 fields); and (2) "more comprehensive originator assessments". As Moody's explained with respect to the latter:

> **More Comprehensive Originator Assessments**
> When rating RMBS, Moody's considers and incorporates into its ratings assessment the quality and capacity of the originator. As part of Moody's originator assessments, the originator's policies and procedures are reviewed, as well as the historical performance of its loans. Moody's has frequent dialogues with originators about origination trends and practices, and conducts on-site operations reviews. For each originator, Moody's reviews the strength of its origination channels, the robustness of its policies and procedures, including underwriting guidelines, and the quality of its risk management and internal audit procedures. Moody's focuses on the strength of the originator's management and staff, technology, disaster recovery, and regulatory and legal compliance.
>
> Going forward, Moody's will conduct a more comprehensive review of each originator and will report to the originator our opinion of its strengths and weaknesses as well as our view on its financial strength and stability. Even greater emphasis will be placed on the originator's track record - in particular, the performance of its loans across different business cycles.
>
> For originator assessments going forward, Moody's is considering loan level credit and compliance reviews. Emphasis will be placed on the procedures utilized to ascertain the willingness and ability of the borrower to repay the loan as well as procedures used to determine property values. The reviews will focus on specific criteria used by the lender to approve mortgage loans, such as borrower income, property appraisal value, debt-to-income ratio and occupancy status.

125. What is striking about this disclosure is the contrast between the largely vague and useless "busy work" described by Moody's in the initial paragraph (what Moody's had been doing) and the hard-headed analyses and assessments described in the latter two paragraphs (what Moody's was planning to do in the future). It is clear that Moody's former efforts in this vein were little more than (false) advertising.

126. On April 1, 2008, Moody's Investors Service issued another special report, titled *Updates to Moody's US Structured Finance Rating Methodologies*, summarizing Moody's methodological advances over a range of structured finance products. With respect to subprime RMBS, Moody's mentioned its efforts with respect to evaluating loan origination practices, and made yet more explicit admission that Moody's have previously lacked (and still did) any detailed protocol for conducting any real such assessment. As Moody's April 1, 2008 report stated:

> Evaluation of Loan Origination Practices
>
> Finally, we are increasing the depth and breadth of our operations reviews of loan originators. **We currently have a detailed protocol for assessing the capabilities and procedures of loan servicers. We plan to develop a similar approach for assessing the credit and quality control processes of loan originators.**

127. It is not merely the case, as subsequent events made clear and as Moody's has admitted, that Moody's evaluation of numerous mortgage characteristics in its ratings models understated the risks presented by such characteristics. Rather, Moody's evaluations (and, in this case, lack of evaluations) were so unreasonable *ex-ante* that they can only be explained by Moody's above-alleged conflicts. Moody's evaluations of originator standards and quality were not the result of "honest error", but were fundamentally devoid of basis. As Moody's subsequent methodological

74

releases make clear, Moody's prior purported efforts with respect to evaluating originator practices and standards were little more than a stage set, built to produce for an audience the appearance of the real thing. Underneath the verbiage, there was little or nothing. Moody's is currently engaged in the process of developing, for the first time, the sort of substantive assessment of originators that Moody's had claimed to be conducting all along.

128. Moody's post-scandal attempts to exculpate itself by blaming mortgage originators for originating riskier-than-ever-before mortgages are factually and fundamentally absurd. Factually, because those risks were in plain view to Moody's. Fundamentally, because it was the essence of Moody's job to assess those risks in plain view and take them into account in its credit ratings. No one disputes that 2005-2007 subprime mortgages were unprecedentedly risky and unwise. But, as detailed below, the risks were evident to Moody's, and, as detailed above, Moody's represented it was taking those risks into account.

129. Finally, Moody's sham originator assessments aside, Moody's was in fact aware but turned a blind eye to evidence in plain view concerning mortgage originator practices, quality, and standards. No one was better placed than Moody's to observe this deterioration in origination standards -- in full extent and detail, and in real time. Moody's was the pre-eminent provider of subprime structured finance credit ratings. Moody's rated close to every single subprime RMBS during 2006 and 2007; by Mr Clarkson's own admission, Moody's was presented with data for essentially every single subprime-backed security (as detailed in the next section).[11] No one had better or more comprehensive data than Moody's evidencing exactly how and to what extent mortgage origination standards were declining countrywide: Moody's saw the steady rise of "stated income" lending as it was occurring; Moody's saw the LTV/CLTV levels as they crept upward, etc.

75

In short, the products of those declining standards – riskier mortgages – were in plain view to Moody's, and should have demanded lesser ratings based on deteriorating origination standards they comprehensively evidenced. These phenomena, and the risks they presented, were not occurring behind Moody's back, but rather, as demonstrated below, were in plain view before Moody's. To paraphrase the cliche – it looked but elected not to see.

> 2. **Moody's Awareness of The Shockingly Frail Mortgages Produced by "Aggressive Underwriting" and a "Deterioration in Origination Standards", and of Those Mortgages' Risks, Mark Material Misrepresentations of Moody's Independence and Adherence to Ratings Principles**

130. It is elementary: in order to opine on the creditworthiness of subprime RMBS backed by subprime mortgages, Moody's must have a look at those subprime mortgages. Therefore, Moody's, when it is retained to provide credit ratings on subprime RMBS, requests from the securitizers the information necessary for Moody's to do its job. Relevant mortgage risk characteristics, and their relative degrees of risk, are well known to those involved in the mortgage industry: banks have based their loan-making decisions on them for decades. Moody's essential brief was to consider those risk characteristics for each and every one of the thousands of the subprime mortgages included in a given subprime RMBS asset pool, and Moody's represented it did so.

131. In truth, in various and consequential ways detailed below, it did not. Moody's turned a blind eye to mortgage data actually in its possession, to permit the issuance of inflated credit ratings unmoored from credit realities that, to Moody's, given the information it received, were obvious and in plain view. Furthermore, Moody's elected *not* to request from securitizers data concerning certain rudimentary and essential mortgage characteristics without which subprime

mortgage risk could not be accurately assessed. The data was readily available to Moody's without conduct of due diligence (the characteristics were defining features of the mortgages and driving determinants of their risks), and its relevance was evident *a priori* and clearly acknowledged by Moody's. After "subprime" became publicly evident as an eponymous scandal, Moody's conduct admitted that it had systematically disregarded what it should have considered and the ready availability to Moody's of the data. This occurred (1) when Moody's began regarding towards the end of the class period data it had always had, but previously disregarded, and (2) when Moody's announced in April 2007 that it would expand the data that it requested from securitizers, received such information promptly, and included such information in its credit rating determinations. But for its conflicts, but for the extraneous considerations and influences brought to bear by operation of the Issuer Pays business model in structured finance, Moody's would have considered this available, in-plain-view information in making its credit rating evaluations, and would have issued credit ratings accordingly.

### a. Moody's Looked at (and Over-Looked) Extensive Data on Each and Every Mortgage Underlying Each and Every Subprime RMBS Security it Rated

132.     Again, in order to provide a credit rating on a mortgage-backed security, Moody's had to assess the mortgages backing the security. To do so, Moody's demanded that security issuers provide Moody's with all data concerning those mortgages that Moody's deemed relevant to an assessment of their credit risk (i.e., their expected loss). That data, and its availability, were both matters of absolute convention. As banks have been originating mortgages for centuries and have accumulated detailed understanding of the factors that make mortgages more or less risky, the relevant risk information is rudimentary for industry insiders, though the relevant lexicon and factors

may seem complex to laypersons, and available upon request by Moody's. As Moody's controlled access to markets via its ratings, issuers needed to give Moody's what it was asking for.

133. Conventionally, these factors include: (1) relevant information about the borrower (e.g., credit history, FICO score, income, assets, job, etc.)[12]; (2) the property (appraisal value, residential or investment, etc.); and (3) the mortgage loan to be extended (interest rate, amortization term, loan-to-value ratio, debt-to-income ratio, etc.). As Moody's has to consider pools of loans made by various lenders in various regions, the factors considered by Moody's thus also include (4) the loan originator (origination standards, documentation practices -- as already alleged at Section II.C.1, *supra*) and (5) geographic factors.

134. At all times during the class period until April 2007, in order to determine the expected loss of a given asset pool (and thus the structure and rating of the security), Moody's demanded, received and employed 48 pieces of data (data "fields"), on each and every subprime mortgage contained in each and every asset pool underlying the subprime RMBS that Moody's was asked to assess. These were:

| Primary | Highly Desirable | Desirable |
| --- | --- | --- |

| | | | |
|---|---|---|---|
| Amortization Term | Loan ID | Cash Reserves | Appraisal Type |
| Borrower Paid MI | LTV | Disposable Income | Borrower Quality |
| Combined LTV | Mortgage Type | DTI | Lender |
| Current Loan Amount | | Escrow | Subpool ID |
| Current Rate | Occupancy | First Time Homebuyer | Updated Appraisal |
| Documentation | Original Loan Amount | Months from | Amount |
| FICO | Original Appraisal | Bankruptcy | |
| Gross Margin | Original Term | Months from | |
| HELOC | Origination Date | Foreclosure | |
| Initial CAP | Periodic Cap | Pay History Grade | |
| Insurance | Prepay Penalty Term | | |
| Interest Only Term | Prepay Penalty Type | | |
| Junior Balance | Property | | |
| Junior LTV | Purpose | | |
| Lender Paid MI | Remaining Term | | |
| Lifetime Cap | Senior Balance | | |
| Lifetime Floor | State | | |
| Lien Position | Zip Code | | |

(Moody's Investors Service, *Moody's Revised US Mortgage Loan-by-Loan Data Fields*, April 3, 2007)

135.    Moody's would receive from the issuer a data tape providing "key information for each loan" (Moody's Investors Service, *Moody's Revised US Mortgage Loan-by-Loan Data Fields*, April 3, 2007) – i.e., the 48 data fields requested by Moody's – and feed that data into Moody's evaluation model, named "Moody's Mortgage Metrics". As Moody's represents on its website: "Moody's Mortgage Metrics, a model developed and used by our [Moody's] RMBS analysts, is an analytic tool that brings new efficiency to the process of estimating pool-level risk and credit enhancement levels for residential mortgage loans".[13]

136.    To determine how much weight each of these pieces of data be accorded, Moody's and others usually study actual historical mortgage performance. By statistically scrutinizing how millions of mortgages have performed over time – including thousands of mortgages made to borrowers with FICO scores of 601, thousands more to borrowers with FICO scores of 602, etc. –

Moody's can extract from the historical record the precise extent of incremental risk. Moody's Mortgage Metrics Subprime module is based on the "Moody's Mortgage Credit Research Database" – a self-described "Large, High-Quality Data Set of Sub-Prime Loans" consisting of two million subprime loans performing since 1995.[14]

137. The focus below is on three pieces of data that Moody's was in fact collecting – LTV and CLTV (Section II.C.2.c), and documentation (Section II.C.2.d) – and on further available, conventional and relevant data concerning the most basic features of hybrid adjustable rate mortgages (which constituted approximately 75% of all subprime mortgages during the class period) that, until April 2007, Moody's declined to request or consider (Section II.C.2.e). Although the details are important, the essence is straightforward.

(a) As the subprime scandal roared into view, Moody's blamed (Section II.C.2.b) the above-mentioned mortgages – (1) high LTV/CLTV mortgages, (2) mortgages with low documentation, and (3) adjustable rate mortgages – for subprime losses far higher than Moody's original determinations of expected loss;

(b) The risks of high LTV/CLTV loans are sufficiently well understood to be axiomatic. Moody's was aware not merely of the principles, *but had the actual data – the exact LTV or CLTV of each and every loan in each and every subprime RMBS it evaluated and rated.* Moody's disregard of both the principles and the actual data in its ratings determinations cannot be a failure of expertise, but only of independence (Section II.C.2.c).

(c) The risks of low documentation loans are likewise well understood and axiomatic. Moody's was aware of the risk not merely in principle, but again had the actual data on documentation levels for each and every loan in each and every subprime RMBS it evaluated and

rated. Moody's disregard of principles and actual data likewise is explicable only by lack of independence (Section II.C.2.d);

(d)     The risks presented by hybrid adjustable rate mortgages are likewise well understood and axiomatic, and the data necessary to properly model for those risks was available and a matter of absolute convention. That Moody's declined to request and consider such data is explicable only by lack of independence – especially given that these very mortgages constituted three of every four subprime mortgages for which Moody's purported to determine an expected loss (Section II.C.2.e). In April 2007, Moody's admitted that its 48-field model was badly outdated and could not account for the performance and risks of mortgages that currently were (and had long been) on the market, and added 36 new fields, including the very fields known *a priori* to be necessary to model for hybrid ARM performance and risk. On March 26, 2008, Moody's proposed further revisions to its data requests that *quadrupled*, to 192 distinct fields, the 48 pieces of data that Moody's had requested during the class period.

## b.     The Mortgages Moody's Blamed for Subprime Losses Greater than Moody's "Expected Losses"

138.     Subprime mortgages originated in 2005, 2006 and 2007 violated to a never-before-seen degree the most basic and obvious tenets that had long-governed mortgage loan origination. A March 7, 2007 Moody's Investors Service report titled *Challenging Times for the US Subprime Mortgage Market* provides an excellent summary of the principal violations:

> Through 2005 and 2006, in an effort to maintain or increase loan volume, lenders introduced alternative mortgage loans that made it easier for borrowers to obtain a loan. Such loans include:
>
> • Loans made for the full (or close to the full) purchase price of

81

the home, allowing borrowers to have no equity in the home.

· **Loans with less rigorous documentation such as stated documentation loans, where borrowers state their income and asset information instead of providing documented proof.** Historically, these loans were primarily offered to self-employed borrowers who had difficulty documenting their income, but have increasingly been offered to wage earners as well.

· **Loans that expose borrowers to sudden payment increases, such as:**
— **Loans with low initial interest rates that increase, often dramatically, after the initial fixed period is over.**
— Interest only (IO) loans, which have lower initial monthly payments as no principal is repaid for an initial period.

· Longer tenor (40-year and longer) loans, which have lower monthly payments that are spread out over a longer period of time.

**Often, loans have a combination of these features. For instance, a borrower could get a low initial payment, without documenting their income or assets, and put no money down.** (Moody's Investors Service, *Challenging Times for the US Subprime Mortgage Market*, March 7, 2007)[15]

139.    To translate: "Loans made for the full (or close to the full) purchase price of the

home" are high LTV/CLTV mortgages. "Loans with less rigorous documentation such as stated

documentation loans, where borrowers state their income and asset information instead of

providing documented proof" are low documentation mortgages. "Loans that expose borrowers

to sudden payment increases, such as Loans with low initial interest rates that increase, often

dramatically, after the initial fixed period is over" are hybrid adjustable rate mortgages.

140.    The described instance was not a 2007 epiphany. It was fundamental, and critical to

loan decisions made by the least sophisticated bankers in the smallest villages of this country. None

of the loans were made without Moody's awareness. To the contrary. For each subprime

securitization it rated. Moody's requested from the securitizers *48 separate pieces of data* (as detailed at ¶ 134, *supra*) *on each subprime mortgage in the asset pool underlying the securitization*. The 48 data points on each subprime mortgage informed Moody's, for instance, of the loan-to-value ratio of each mortgage and the level of documentation used in originating each mortgage. Each and every time a mortgage "for the full (or close to the full) purchase price of the home" was included in a securitization pool, Moody's knew it and the exact ratio between loan value and home value. Each and every time a mortgage "with less rigorous documentation such as stated documentation loans, where borrowers state their income and asset information instead of providing documented proof" was included in a securitization pool, Moody's knew it.

        c.    **Moody's Highly Rated "Loans made for the full (or close to the full) purchase price of the home, allowing borrowers to have no equity in the home" Mark Misrepresentations of Moody's Claims of Independence & Adherence to Ratings Principles**

141.    One of the bedrock standards of mortgage origination (and mortgage risk assessment) is the consideration of loan-to-value ("LTV") ratios. Conforming loan standards often require that a borrower produce a 20% down payment so that the LTV ratio is no more than 80%. These standards work to minimize both risk of default and loss upon default. The former, because a borrower who already has deposited significant equity in the home is less likely to default and abandon that equity. The latter, because foreclosure costs are surprisingly expensive, so that even if a property is seized and sold, a sizeable portion of the sale proceeds first go to covering costs and are only then applied to the mortgage balance. The lower the mortgage balance, the greater the likelihood that the mortgage will be fully repaid by foreclosure sale.

142.    Mortgages during 2005 and 2006 obliterated these specific long-standing risk

83

considerations and barriers through originating two mortgages at once to the same borrower: a primary first-lien mortgage for approximately 80% of the property value together with a "simultaneous second" mortgage for the remainder.

143. The official term for such simultaneous second mortgages was "closed-end second-liens" (CES); the unofficial term was "piggyback" loans. Essentially, piggyback loans replaced the traditional down payment that first-lien mortgages required to bring LTV ratios in line (i.e. the first-lien mortgage was as ever for 80% of property value). But that piggyback-derived down payment did not produce homeowner equity of 20% (which would mitigate default and loss risks), but rather homeowner equity of 0% (because the down payment itself had been borrowed through the piggyback loan) and a *combined* loan-to-value ratio (CLTV) of 100%. The operative risk factor in mortgages paired with piggybacks was, as further explained below, CLTV rather than the traditional LTV.

144. In 2004, one in four subprime adjustable rate mortgages was originated together with a simultaneous second piggyack. In 2005, 31% of such mortgages came with piggybacks. In 2006, 39% of such mortgages came with piggybacks.[18]

145. CES securitization issuance rated by Moody's roughly doubled each year since 2003: $5 billion in 2003, $8 billion in 2004, $20 billion in 2005, and $35 billion in 2006.[17] This "substantial increase in issuance in non-prime CES", Moody's wrote on April 2, 2007, is "the result of the loosening of mortgage underwriting standards that has occurred over the past few years in the non-prime markets" (*Id.*). In 2007, as the subprime scandal heaved into view, piggyback origination shut down.

146. Taking two loans out where one for the same amount would never be countenanced

84

does nothing to decrease risk[18] but does everything to violate long-established risk standards. In a literal *post mortem*, Moody's Investors Service, in an October 3, 2007 report titled *US Subprime Mortgage Market Update: September 2007*, conducted an analysis of the worst- and best-performing subprime asset pools to see what most distinguished them. Unsurprisingly, it found piggyback lending and (as further detailed in the next section below) reduced documentation lending to be the most significant drivers of poor asset performance:

> To identify which mortgage loan credit characteristics had the greatest influence on the performance of 2006 subprime-backed transactions, we compared the loan characteristics of the strongest performing 20% and weakest performing 20% of transactions (Tables 2 and 3 below).
>
> The data show that, as we have noted in previous communications, **loan performance for the 2006 subprime vintage seems to be driven primarily by the proportions of stated documentation loans and high CLTV loans backing the transactions as well as the proportion of loans that combine (or "layer") these risk characteristics...** (Moody's Investors Service, *US Subprime Mortgage Market Update: September 2007*, October 3, 2007)

147. This conclusion should not have come as an *a posteriori* surprise; it was evident *a priori*, at the time of initial rating. It is self-evident that the presence of an associated piggyback renders a first lien loan far more risky than it would be by itself: the borrower has the added debt burden of piggyback loan payments and homeowner equity is in fact zero. It is also self-evident that piggyback loans themselves are incredibly risky assets: the borrower's debt burden is not merely the smaller piggyback but both loans; and the second-lien status of the piggyback (combined with the reality that CLTV is 100%) makes it highly likely that in case of default, the piggyback balance will be repaid only in minor part or not at all (because, after foreclosure costs and paying off the first-lien balance, little or nothing is left to satisfy the second lien). As Moody's explained:

85

**How are CES Different?**
With many second lien mortgage loans there is a small likelihood of recovering much of the loan balance after incurring the cost of foreclosure, liquidating the property and paying off the first lien in full. Therefore... [servicers] frequently will not initiate foreclosure proceedings and will instead simply write off the second lien as a bad debt. The write off typically occurs anywhere between 90 and 180 days of delinquency... **Severities on most second lien loan defaults are very high, typically approaching and sometimes exceeding 100% of the loan balance...** (Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology*, April 2, 2007)

148.    Moody's severely downgraded during 2007 essentially all of the CES securities that

it had rated in 2006, as well as many of the 2005 vintage.

149.    Moody's June 7, 2007 US Subprime Mortgage Market Update: June 2007 reported:

**Increased Rating Actions: Closed-End Second Liens Lead the Way**
Downgrade actions associated with 2006 closed-end second lien (CES) securitizations are almost five times higher than rating actions on the 2005 vintage. **Approximately 14% of all CES tranches rated in 2006 have been subject to one or more downgrade actions so far this year. In contrast, approximately 1.50% of all 2006 first lien rated tranches have been downgraded or placed on** review for possible downgrade during the same period.

While CES issuance has almost quadrupled since 2004, its recent performance has been extremely poor, leading to the disproportionate increase in CES rating actions. Relaxed underwriting standards primarily associated with combined first and second lien piggyback arrangements have led to the marked deterioration in performance. In response, Moody's has implemented a number of revisions to its CES rating approach that has generally resulted in an increase of approximately 20% to 30% in credit protection for Moody's-rated CES-backed bonds as compared to similarly-rated bonds issued in 2006.

Upgrade activity associated with subprime RMBS issued after the 2004 vintage has been non-existent...

150.    On June 15, 2007, Moody's downgraded 131 CES tranches from 2006 (keeping 111 of those tranches on review for further downgrade) and put an additional 136 CES tranches from 2006 on review for possible downgrade. By June 15, 2007, Moody's had downgraded or placed on review for downgrade a total of 304 CES tranches (31% of all issued in 2006) with a face value of $4 billion (8.3% of total dollar issuance of CES). On August 16, 2007, Moodys enacted wide and severe downgrades for 2006 CES securities, affecting 705 tranches having a face value of $19.7 billion.[19] The cumulative extent and severity of Moody's CES downgrades is detailed below (Section II.D.2.b, *infra*). By mid-August 2007, only 30% of the securities Moody's had rated Aaa in 2006 still retained those ratings, only 26% of Aa securities retained theirs, only 6% of the A's and Baa's, and only 2% of the Ba's (*Id.*).

151.    Once again, the extraordinary breadth and severity of the downgrades strongly indicate that Moody's modeling had been systematically debased and at odds with the misrepresentations and omissions at the center of this complaint.

152.    It is evident to the layperson and undisputed among the experts that, in analyzing the risks presented by piggybacks, neither the first-lien loan nor the second-lien piggyback can be adequately analyzed in isolation: the risk analysis for each must take into account the combined risks of both. Moody's knew the principle and had the data to apply it. But, unbeknownst to the class, Moody's ignored the data and declined to apply the principle, as detailed below.

153.    First, it is clear that the primary risk of default faced by the piggyback loan does not come from the piggyback's own characteristics, but rather is driven by the much larger first-lien loan on which it piggybacks. The primary stress on the borrower derives from the first lien loan, and that loan will go most of the way towards determining whether both loans default.

154.  Until its April 2007 modeling revisions, Moody's – in analyzing CES risks – *declined*

to take the risks posed by the associated first-lien loan into account. Moody's Investors Service July

24, 2007 report, titled *US Subprime Mortgage Market Update: July 2007*, stated:

> ### Ratings Initiatives Incorporate Recent Market Data, Resulting in Higher Loss Assumptions on New Pools
> ... In recent months Moody's has made several enhancements to its ratings analysis of transactions backed by first- and second-lien subprime mortgage loans, based on the need to incorporate market trends. Some of the recent ratings initiatives are discussed below.
>
> ### Increased Loss Expectation for Closed-End Second-Lien Securitizations
> In light of the poor performance of the 2006 securitizations backed exclusively by subprime closed-end second mortgages Moody's revised its analysis of transactions backed by closed-end second liens earlier this year. **Moody's has increased default rate assumptions for high CLTV loans and loans originated with less than full documentation. In addition, the analysis now explicitly takes into account the characteristics of the associated first-lien loans.** To the extent the first-lien information is not provided, stressed assumptions are made and loss expectations are adjusted accordingly. The net result has been an increase in average loss expectations of approximately 15-25% of previous levels.[29]

155.  Moody's declined to model for these obvious piggyback dynamics by retaining LTV

as a prime modeling variable even where it was obvious that CLTV (a different and scarier number

altogether) be used in LTV's place. In October 2007, Moody's study of the best- and worst-

performing subprime pools publicly acknowledged what Moody's – what any rater or lender –

privately had known all along. The worst pools and the best pools *were indistinguishable according*

*to LTV but primarily distinguished by CLTV.* (Moody's Investors Service, *US Subprime Mortgage*

*Market Update: September 2007*, October 3, 2007).

156.  Again, the data that Moody's received for each mortgage under review included

information on any additional loans for the same property, such as CLTV. That CLTV "has been a factor in Moody's rating approach for many years" is not disputed. The fact remains that Moody's model was invalid from the get-go, in modeling piggyback loan situations and their risks, by retaining LTV as a primary variable rather than replacing it wholesale with CLTV. For example, the average LTV of the 2006 subprime loans evaluated by Moody's was 79%.[21] However, the average CLTV was 87%. Given that 40% of the loans were accompanied by piggybacks, that suggests that *in the 40% subset accompanied by piggybacks, CLTV exceeded 95%.* Moody's model was invalid, and produced low-ball expected losses, because it used the LTV figure (79%) as a determinant of mortgage risk, thereby distorting and diluting the risks entailed by such 95% CLTV realities.

157.    The considerable risks of piggybacks discussed above were further magnified by the simultaneous presence of further "layered" risks in the same mortgages (as the above quotations from Moody's reports state explicitly). For instance, whereas in 2004 approximately half of subprime piggybacks were underwritten through traditional "full" documentation standards, less than one third of subprime piggybacks were underwritten to such standards by 2006 (*Id.*) (Section II.C.2.d). Were that not enough, most of the first-lien loans associated with piggybacks were hybrid and option ARMs that "expose borrowers to sudden payment increases" (Section II.C.2.e).[22]

158.    Had Moody's operated as it represented itself to be and according to principles it claimed to adopt, it could not have awarded the ratings it did. That it over-rated as it did tends to confirm the falsity of Moody's representations concerning itself and way of doing business. At all times, Moody's understood the principles making the data or their significance relevant – it is undisputed convention – and had the data in plain view prior to securitization rating and issuance. Moody's representations concerning its and its credit ratings' independence, objectivity, quality,

trustworthiness and integrity led the public to believe that Moody's was taking such risk information into account in its credit rating determinations. But these representations were false. Moody's was aware such mortgages were being made, was aware of their increased risks, but, driven by the heightened pressures operative in structured finance (Section III, *supra*) and by Moody's desire to retain and expand this line of lucrative ratings business, Moody's debased its models so as to turn a blind eye to these mortgages and their risks.

          d.    **Moody's Highly Rated "Loans with less rigorous documentation such as stated documentation loans, where borrowers state their income and asset information instead of providing documented proof" Marks Misrepresentations of Moody's Independence and Adherence to Ratings Principles**

159.    As FDIC Chairwoman Sheila C. Bair observed: "Financial innovation is great, but you have to have some basic rules. One of the most basic rules is that a borrower should have the ability to repay." The wholesale importation of "reduced documentation" mortgage loans – previously a fringe product for prime borrowers – to the subprime sector contravened this most obvious and basic of rules.

160.    Traditionally, ability to repay was a fact verified by documenting the borrower's income and assets. Absence of such verification therefore increased mortgage risks, and Moody's knew this to be so, as Moody's explained in its November 28, 2006 report titled *Moody's Approach to Coding Subprime Residential Mortgage Documentation Programs: Updated Methodology:*

### DOCUMENTATION AND CREDIT RISK

Mortgage lenders base their decisions to offer or deny a mortgage loan on the information provided in a borrower's loan application. **One of the most important questions lenders are faced with is: does the borrower have sufficient income and assets to afford the**

90

loan. Documentation is the process where lenders verify a borrower's reported income, or assets, or both. Possessing accurate information about the borrower's income and assets helps the lender to better understand the credit risk associated with the potential loan. Verifying this information through documentation not only reduces the possibility of outright fraud, but also discourages borrowers from making unreasonable assumptions about the discretionary portions of their income, such as their bonuses, commissions, investment income, or future pay raises. The amount of documentation required by mortgage lenders varies considerably, from full verification of income and assets (such as for lenders in the prime loan arena) to no verification of income and assets, and with numerous combinations in between. The credit risk of a loan increases, however, as the amount of documentation moves down the spectrum from full verification to partial verification and, finally, to no verification.

## REDUCED DOCUMENTATION MORE COMMON

In the past few years, we have witnessed a significant decrease in the amount of full income doc loans included in subprime mortgage securitizations...

*****

... reduced documentation adds risk to a loan for the simple reason that the lender is unable to get a complete and accurate picture of the borrower's financial capabilities and may, therefore, extend a loan that is beyond the borrower's means. Moody's analysts assess the nuances of each originator's underwriting guidelines including documentation programs when analyzing mortgage loan pools.

161. Yet, by 2006, however, *one of every two subprime ARM loans was made under reduced documentation standards.* Because subprime borrowers are typically wage earners, and relatively low wage earners at that, *there was no conceivable legitimate reason for such reduced documentation standards.* Their income was capable of direct verification (through employer or IRS wage statements) but the mortgage product by definition would not seek such verification. Mortgages of this variety were typically extended only at higher rates than comparable full-documentation mortgages. Subprime borrowers could provide an inflated income figure, guaranteed

91

not to be verified, and thereby qualify for a loan at onerous rates, because their real, verifiable income would not allow them to qualify for a loan featuring less onerous rates but demanding more documentation. These loans were ticking time bombs.

162. Objectively speaking, without verification of the borrower's actual ability to pay the loan, on what basis could an assessment of the loan's creditworthiness be made? Sticking to basic objective principle would have fulfilled its public representations but would have swiftly reduced Moody's ratings opportunities, revenues and income.[23]

163. Similarly, the only conceivable basis for making educated guesses would have been the historical performance of similar loans in the past. *But no such data was available. Subprime* reduced documentation loans were a relatively new phenomenon,[24] What data there was not reliable. Subprime mortgage performance during the most recent period was "masked" by unprecedented housing price appreciation, which allowed homeowners who would otherwise have defaulted merely to sell their houses at a profit and pay back the mortgages in full. To the extent that Moody's guesses were based on anything at all, they were based on historical data that Moody's knew to be biased so that such loans appeared more creditworthy than they in fact were. As former Moody's structured finance head Mark Adelson stated, in an exactly analogous context (Moody's use of invalid historical data as a purported basis for loss determinations), this was:

> like observing 100 years of weather in Antarctica to forecast the weather in Hawaii. (as quoted in New York Times, *Triple A Failure*, April 27, 2008)

164. As IOSCO concluded in its May 2008 report, this was to base ratings "on information that, on its face, appeared questionable", on information "that fails to pass even a basic 'sniff test'", and to "fundamentally undermine investor confidence in the rating process":

92

...certain members of the CRA Task Force believe that in some cases some CRAs relied on information that, on its face, appeared questionable or, in the broader context of rapid market changes, uncertain or of dubious quality. Although CRAs cannot be expected to uncover issuer fraud or conduct the level of confirmation expected of independent auditors, ratings based on information that fails to pass even a basic "sniff test," – or, more importantly, methodologies that fail to take into consideration market changes that may have an impact on the quality of the information upon which the ratings are based – fundamentally undermine investor confidence in the rating process. (May 2008 IOSCO report titled *The Role of the Credit Rating Agencies in Structured Finance Markets: Final Report*, p. 8)

165.   early all of the dozens of subprime-related reports issued by Moody's Investors service during 2007 observed/concluded that reduced documentation was one of the foremost factors responsible for the abominable performance of 2006/2007 subprime RMBS.

166.   Again, reduced documentation subprime mortgages were not occurring behind Moody's back but in Moody's plain view. One of the 48 pieces of data that Moody's received about each and every subprime mortgage in each and every asset pool underlying each and every subprime RMBS security for which Moody's provided credit ratings was the level of documentation used in originating the mortgage (*see* ¶ 134 *supra*). Neither the existence of nor the risks of such mortgages were in any way a surprise to Moody's.

167.   Moody's *post facto* methodology changes are a strong badge of the debasement and illegitimacy of Moody's class period ratings models, and a further indication that Moody's class period representations as to its and its credit ratings' independence, objectivity, quality, integrity and trustworthiness were false or misleading.  The methodology changes instituted after the fact what the public had been led to believe Moody's had been doing all along.  In April 2007, Moody's announced that it would request issuers to provide a new data field – "wage earner" – and advised

93

that it would crank up its original risk guesses by 40% for reduced documentation mortgages extended to wage earners (i.e., borrowers earning regular verifiable income but choosing not to have it verified – a red flag). In July 2007, Moody's revealed another round of increases – a further 20%-25% – to its loss assumptions for loans originated under "low" and "stated" documentation programs.[25] In October 2007, Moody's revealed another round of loss estimate increases for all 2006 subprime loans that increased loss estimates between 5% and 170%; and on January 30, 2008, it raised 2006 loss estimates a further 50%.

168.    Indeed, a closer look at the tiniest cogs and gears of Moody's model reveals that the entire documentation scale employed by Moody's was designed to over-report creditworthiness, and most of the categorical distinctions it made did not accurately reflect meaningful distinctions existing in real-world documentation practices.[26]

169.    On or about November 28, 2006, Moody's changed its coding designations from five categories (Full, Alt, Limited, Reduced, and No documentation) into a supposedly more advanced nine-category scale "in order to better rank the risks of different programs". This new scale suffered from exactly the same flaws as the old (the only major improvement being in fact a minor one: the disappearance of the "Alt" category from the new scale). The new scale created a matrix with asset verification levels on one axis and income verification levels on the other. Verification levels were designated as "Full", "Partial", "Stated" and "No" documentation. The result was a four-by-four matrix, which Moody's filled in with a nine-point scale ranking the possibilities from best to worst:

| Moody's Updated Documentation Program Codes | | | |
|---|---|---|---|
| | Full Asset | Partial Asset | Stated Assets | No Assets |
| Full Income | C1 | C1 | C2 | C3 |

94

| Partial Income | C2 | C2 | C4 | C5 |
|---|---|---|---|---|
| Stated Income | C4 | C5 | C6 | C7 |
| No Income | C5 | C6 | C7 | C8 |

170.    As in the old scale, there is no meaningful distinction between the "Stated" category (defined a "borrower states income on the application") and the "No" category (defines as "borrower does not provide income information") – *both lack income verification.* Therefore, assignment of the "Stated" label to a mortgage would make that loan appear more creditworthy than the "No" label despite the lack of any real difference between the two mortgages. Similarly, there is little meaningful distinction between the "Full" and "Partial" categories, as the various definitions make clear. The same consequences ensue.

171.    Most importantly, the real differences in the real world are between partial-or-better and everything worse than partial. Moody's scale was simply divorced from this reality: it reinforced Moody's misrepresentations concerning its methods and integrity by an appearance of sophistication through numerous intermediate – but ultimately meaningless – distinctions.

172.    To Moody's and the issuers who used Moody's models, these flaws were evident *a priori.* And, *a posteriori,* so it turned out. As Moody's observed in its August 2, 2007 report titled *US Subprime – Overview of Recent Refinements to Methodology: July 2007:*

> **JULY 12TH 2007 METHODOLOGY UPDATE**
> **Stated Income and No Documentation Loans:**
> *Increased risk assumptions for loans with low or no documentation*
>
> Loans where the borrower's income is not fully documented (especially where the borrower is a wage-earner rather than self-employed) have, in general, a higher probability of default than fully documented loans. Accordingly, in the past, our risk models made a significant distinction between full documentation loans and loans that are originated under stated income/stated assets ("SISA")

95

and no income/no asset ("NINA") programs. Given the performance of reduced documentation loans in the 2006 vintage, however, our risk assessment of stated income and no documentation loans has increased by 20% to 25%. **In addition, we have observed, and have reflected in our loss expectations, that there has been a minimal performance distinction between certain types of stated income loans and no documentation loans.**

173.    To make the above concrete. One. Moody's represented as to its and its' credit ratings' independence, objectivity, quality, reliability, integrity and trustworthiness. Two, deep within the black box of Moody's model, unbeknownst to the public, and contradicting the above representations, Moody's created a distinction between "stated income" mortgages and "no documentation" mortgages and calculated mortgage risks as if the former were safer than the latter. Three, it was evident on its face to insiders and cognoscenti (i.e., Moody's) that the distinction was one without a difference: both categories featured no verification whatsoever, but Moody's deemed one – for no objective reason – safer than the other. Four, a very large amount of subprime mortgages were made on a "stated income" basis, so Moody's judged those mortgages safer than "no documentation" mortgages even though there was no basis for doing so. Five, this led Moody's to produce lower expected losses and higher credit ratings, which better matched issuer interests than they did credit realities. Six, there is no explanation for the illegitimacy of Moody's categorizations and corresponding risk assessments – as per above, they are *a priori* debased – except for Moody's conflicts.

174.    In short, Moody's representations concerning its and its credit ratings' independence, objectivity, quality, trustworthiness and integrity led the public to believe that Moody's was taking such elemental risk information into account in these credit rating determinations. But these representations were false.

96

e. **Moody's Highly Rated "Loans that expose borrowers to sudden payment increases", Mark Misrepresentations of Moody's Independence and Adherence to Ratings Principles**

175.    Hybrid and option ARM subprime mortgages also were occurring in Moody's plain view. Moody's knew that these mortgages constituted in excess of 75% of the subprime assets underlying the subprime RMBS it rated, and was well aware of their risks and how to adequately model those risks. Moody's understood the principle making such data relevant and necessary; it is undisputed convention. Yet, Moody's declined to request or consider the obvious, available and relevant data necessary to provide any objective assessment of those risks in its credit ratings.

176.    This data was not of the sort characterized as "due diligence", but primary data concerning defining characteristics of the mortgages, that demanded no verification. Moody's representations concerning its and its credit ratings' independence, objectivity, quality, trustworthiness and integrity led the public to believe that Moody's was taking conventional, obvious, available and relevant data into account in its credit rating determinations. These representations were false. Driven by the heightened pressures operative in structured finance and by Moody's desire to retain and expand this line of lucrative ratings business, Moody's debased its models so as to turn a blind eye to these mortgages and their risks.

177.    Hybrid adjustable rate mortgages ("hybrid ARMs) offered a discounted fixed rate for a given initial period (between 1 and 10 years, most usually 2 or 3 years) and an adjustable rate thereafter. That adjustable rate would fluctuate (and typically would "re-set" on yearly basis) based on an"index" rate to which a premium was added (e.g., LIBOR +3 – three percentage points more than the LIBOR rate). This latter rate to which the loan would reset is the "Fully Indexed Rate".[27]

178.    Essentially, hybrid ARMs provide an initial discounted rate as a trade-off for later

97

inflated rates. The difference between the two can be substantial, as the term coined to describe it ("payment shock") indicates. The possibility of payment shock, in and of itself, makes hybrid ARMs more likely to default. This possibility is exponentially magnified depending on which scenario is used by the loan originator to "qualify" the borrower for the loan. If the borrower was qualified at the fully-indexed rate, the risk of default would be remote; if, however, the borrower was qualified for the mortgage on the basis on the discounted initial rate, the mortgage could be much more likely to fail, especially when initial rates re-set to higher rates for which the borrower was not qualified. It is precisely under this latter scenario that hybrid ARMs became known as a subprime "affordability" product.

179. Payment Option ARMs ("option ARMs") are hybrid ARMs with a deeply-discounted initial rate (the "teaser rate") and an even-more-deeply-discounted option to make "minimum payments" far below those called for under the initial rate, reset rate and fully indexed rate of the loan. The catch is that these minimum payments do not suffice to make full payment under actually operative rates. If a borrower chooses the minimum payment option, the amount left unpaid every month (the difference between the minimum payment and real monthly mortgage burden) is added to the loan balance. Borrowers who elect to make such minimum payments – and the vast majority of option ARM borrowers did so elect – thus undergo "negative amortization"; instead of paying down their loan, the loan balance actually increases. Negative amortization can corrode whatever equity the borrower has in the home (e.g., a borrower puts 10% down and gets a mortgage for 90%, but the mortgage balance grows back up to 100% of the house value), and can even result in negative equity. As in hybrid ARMs, varying rules govern the interest rate resets. The key difference is the "Recast Cap" of Option ARMs, pursuant to which option ARM rates reset (often to the fully-indexed

98

rate, though subject to initial rate adjustment caps, etc.) once negative amortization reaches certain levels (typically, 110% or 125% of the original mortgage balance).

180.    The result of the option ARM structure is that, even compared with an already risky hybrid ARM, payment shock can be even greater, default risk even higher, and loss severity also far higher. Payment shock can be much, much greater in an option ARM due to the wider gulf between (1) the initial teaser rates or minimum payments and (2) fully-indexed rates on a loan whose balance has actually increased. The increased likelihood and severity of payment shock consequently make default much, much more likely. All the more so, as with hybrid ARMs, depending on how the borrower was qualified: at the minimum payment rate, the initial teaser rate, a high reset rate, or the fully-indexed rate. Furthermore, loss upon default can be significantly more severe – because the balance of the loan can rise above its original amount to reduce equity or even create negative equity. For example, a person buys a $100 house with a 20% down payment of $20 and an $80 option ARM. After making minimum payments, the loan balance reaches its 125% Recast Cap of $100 (i.e., the original loan balance of $80 has grown by 25% to $100), at which point the rate resets to the fully-indexed rate on the swollen loan balance, and the borrower defaults. The outstanding loan balance has negatively amortized from $80 to $100, the full value of the house. Since foreclosure costs can be high (30% of the home value), even if the house is foreclosed and sold and used to pay off the mortgage, a 30% loss will ensue. As Moody's stated in a September 4, 2007 report:

> Moody's believes that this product is riskier than traditional fully-amortizing ARMs largely because they can negatively amortize increasing the frequency of default and, typically, also the severity of loss in the event of a default. Option ARM loans also offer opportunities for monthly payments to increase sharply. (Moody's Investors Service, *Rating US Option ARM RMBS – Moody's Updated Rating Approach*, September 4, 2007)

181.    As with piggybacks and reduced documentation loans, hybrid ARMs and option ARMs were seized by subprime mortgage originators, who, in the midst of the subprime mortgage securitization boom, used the low initial rates offered by hybrid and option ARMs to qualify borrowers for these mortgages. By 2006, these ARMS constituted more than 80% of the subprime mortgages underlying subprime RMBS[18], as originators extended these hybrid and option ARMS to subprime borrowers who qualified for them only under those low, temporary initial payments, and whose ability to pay the higher later rates was either not verified or was a verifiable inability. These loans were ticking time bombs, and Moody's knew or but for reckless disregard should have known it.

182.    ARM loans were made (and made, moreover, on a "stated" income basis) because mortgage originators were able to sell them quickly to securitizers to evade any ensuing losses. Mortgage originators were able to sell them to securitizers because Moody's, as their gate opener to subprime securitization, over-rated the mortgages.

183.    Moody's itself acknowledged in May 2005 that subprime hybrid ARM borrowers barely qualified "under even this lenient test" for their mortgages and only under the "start rate", and that the onset of the adjustable rate period creates a current credit concern.

> Lenders typically qualify hybrid ARM borrowers based on payment obligations calculated at the loan's start rate. Because many borrowers are at or near the debt-to-income (DTI) ratio limitation under even this lenient test, the borrower's ability to handle the increased payment once the loan enters the adjustable rate period is a credit concern. (Moody's Investors Service, *An Update to Moody's Analysis of Payment Shock Risk in Sub-Prime Hybrid ARM Products*, May 16, 2005)

184.    At the same time, Moody's acknowledged that income verification was "critical for

hybrid ARMs" given the borrower's exposures to payment increases upon rate resets (*Id.*).

185. Senators were outraged at Moody's credit ratings for ARM mortgages, because they

exposed so many to predictable foreclosures.

> MENENDEZ: Mr. Kanef, it doesn't take a rocket a scientist -- and I'll stop here, Mr. Chairman -- it doesn't take a rocket scientist to figure out that if I have no document loans, if I have down payments, if I have ARM's that clearly within the income scheme are not going to allow me to be able to meet the future, that that security-backed instrument is weak in its potential. And so I assume that's part of what you do with you analysis. And, yes, maybe your analysis changes over time, but it's the initial analysis that drives the marketplace, ... and then fuel the whole process, even though the instruments that were being used were clearly weak in terms of its security and its underpinnings. I just don't understand why we make it so complicated. It seems to me it's pretty simple. It just seems to me that some people missed along the way. And why they missed it is the heart of the problem.
>
> \*\*\*\*\*
>
> SHELBY: ...Did it bother you when you were looking at these structured mortgages, so to speak, so many subprime, that a lot of these mortgages rates would be reset in two years, more than likely in an upward, rather than downward. They generally always are. And the payments consequently to an individual borrower would go up. Now, having realized that a lot of people paid very little, if anything, down on these mortgages, having realized, or should have realized that the credit of a lot of these people was kind of spotty to begin with, doesn't it defy common sense to think that a lot of these mortgages wouldn't go into default, if not before they were reset, but certainly after they were reset, because a lot of these people are working folks all over American that I think people have taken advantage of.
>
> KANEF: Mr. Chairman...
>
> SHELBY: Does that bother you at all? I mean, did it bother you when you were rating these things? (Congressional Hearing transcript, September 26, 2007)

186. For the purposes of this action, however, Moody's over-rated loans to hybrid ARM

borrowers mark its the knowing misrepresentations of its independence and adherence to apposite

ratings principles.

187.   The principles for accurately modeling hybrid and option ARM performance risks always were readily apparent to Moody's ("It doesn't take a rocket scientist," as Sen. Menendez put it). Both require measurement of the degree of potential payment shock, which is a function of the difference between the initial rate (or, with option ARMs, the minimum payment) and the various rates to which the ARM will reset (as determined by the index rate and premium on the basis of which the loans will reset, as well as the various caps [initial, periodic and lifetime] that constrain such resets), and the relationship of all of those rates to borrower income.

188.   At all times until at least April 2007, Moody's badly-outdated models and modeling declined to take these factors into account, because Moody's was neither independent nor in compliance with ratings principles, notwithstanding its many (mis)representations *contra*.

189.   This became clear (to those scrutinizing Moody's Investors Service's occasional methodological releases) only on April 3, 2007, when Moody's Investors Service published a report titled *Moody's Revised US Mortgage Loan-by-Loan Data Fields*. The April 2007 report revealed that the data fields that Moody's had been using to collect and assess mortgage loan data simply did not capture the relevant and obvious features that drove hybrid and option ARM risks. Those relevant features were in plain view; were defining features of the mortgages, and either there or, as events confirmed, available for Moody's consideration. But during the class period, Moody's lack of independence and violation of ratings principles prompted Moody's to turn a blind eye to them.

190.   For option ARMs, the absence was effectively total. Moody's request for new data fields was divided into three sections: "primary", "highly desirable" and "desirable". The single new primary field listed was one that would identify the mortgage as an option ARM in the first place,

102

Incredibly, prior to April 2007, Moody's was not aware of whether a mortgage was an option ARM.[29] The "highly" desirable fields included six further data fields specific to option ARM analysis and modeling – e.g., minimum payment amount, minimum payment period, negative amortization limit, fully-indexed payment, etc. Just the fields obviously needed to accurately assess option ARM default and loss severity risks. Prior to April 2007, Moody's was not considering such data (as Moody's modeled option ARM loans that Moody's was not aware to be option ARM loans)[30] – even though Moody's represented that it considered all relevant and available data in determining its credit ratings.

191. The failures with respect to hybrid ARMs were similar. The data fields in Moody's class period model were, unbeknownst to the class, and in direct contravention of Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity and reliability, on their face inadequate to the task of evaluating hybrid ARM risks. The index rate on which the mortgage rate resets would be based (e.g., LIBOR) was not requested or considered, nor the premium on top of that index rate to which the mortgage's adjustable rate would reset, nor the timing of those resets – the date of the initial reset, and subsequent periodicity of the resets. These factors are *a priori* and obviously crucial in assessing hybrid ARM default risks. None was evaluated by Moody's in its assessments of ARM credit risks and creditworthiness. All were listed by Moody's in April 2007 as "highly desirable" new data fields that, as Moody's put it, "will enhance our ability to evaluate the nuances of risks present in the current mortgage market" (Moody's Investors Service, *Moody's Revised US Mortgage Loan-by-Loan Data Fields*, April 3, 2007). Moody's April 3, 2007 report concedes the tremendous failure of Moody's model to consider this most basic, readily available data.

103

192. Hybrid ARMs constituted, at all times during and since 2004, more than 75% of the entire subprime securitization market. Moody's models were therefore incapable of evaluating, in any meaningful sense, the risks of three out of every four subprime mortgages.

193. Again, Moody's *post facto* methodology concessions serve as a badge of its class period model debasement and concomitantly of its class period misrepresentations. Moody's *post facto* methodology modifications do no more than align Moody's actions with its class period representations of how it was going about its trade.

194. Once Moody's integrated the new data fields into its modeling, its loss projections for Alt-A (i.e., a step up from subprime) option ARMs increased by 50% and for hybrid ARMs by 30%.[31] The implications for Alt-A security structuring were even more profound: credit enhancement levels for Baa ratings increased by 65% and 40%, respectively; and credit enhancement levels at the Aaa level increased by 65% and 49% respectively (*Id.*). As Moody's August 15, 2007 presentation demonstrated, option ARM calculations using the new methodology would require, for Aaa tranches to merit Aaa ratings, that such tranches have credit protection of 11.6%, whereas the old model required only 7.05%. By failing to consider obvious, available, relevant and necessary data, Moody's class period models matched issuer interests – more higher-rated tranches, less credit protection and overcollateralization – rather than evident credit realities.

195. On September 4, 2007, Moody's published a report detailing its new model for assessing option ARM creditworthiness. The new model captured the obvious moving parts driving option ARM credit risk, resulting, as Moody's stated, in "credit enhancement levels [that] will be more closely linked to these features":

> This updated methodology increases the granularity in the rating of

securitizations backed by Option ARM loans. To determine the frequency and severity of default, Moody's continues to compare the possible amortization behavior of Option ARM loans to that of fully-amortizing loans. Moody's also considers the possible payment shock to borrowers at the loans' payment recast dates. Both of these elements in turn depend on the loans' features, including the degree to which the initial payment is discounted compared with the fully-indexed fully-amortizing payment, the payment used to evaluate the borrower's payment capacity, the negative amortization limit and the lifetime interest rate cap. Under the revised methodology, Moody's credit enhancement levels will be more closely linked to these features. (Moody's Investors Service, *Rating US Option ARM RMBS – Moody's Updated Rating Approach*, September 4, 2007)

196. There is nothing – nothing – in Moody's above-quoted September 2007 statement concerning adequate option ARM modeling that was not known to Moody's throughout the class period, or that was not apparent to Moody's from the face of the data it was and was not receiving.

197. On October 11, 2007, Moody's enacted a sweeping downgrade of 2006 subprime RMBS and increased previous loss projections by between 5% and 170% for different securitizations largely based on which exact quarter of 2006 they were issued in. These increased loss projections stemmed in part from issuer-specific factors, in part from new forecasts for home price depreciation, and also in part from further evidence of collateral weakness. Most of that collateral was composed of hybrid ARMs. On January 30, 2008, Moody's raised loss estimates a further 30% and warned of further large downgrades to come.

198. Although hybrid and Option ARMs, as Moody's increased loss expectations reveal, are risky, the matter is not as if their risks are impossible to measure or "off the charts", but rather and merely that Moody's declined to chart those risks. It could easily have done so, and that it did not is a further badge of its misrepresentations. As Moody's admitted on April 3, 2007, in an obscure methodological release titled *Moody's Revised US Mortgage Loan-by-Loan Data Fields*:

The data fields essential for running the model were established when the model was first introduced in 2002. Since then, the mortgage market has evolved considerably, with the introduction of many new products and an expansion of risks associated with them.

To allow for a more consistent process for assessing these risks, Moody's is expanding its loan level data request for all residential mortgage loans [to] enable us to perform a more granular credit analysis of the various loan attributes.

199. As the New York Times concluded in an April 27, 2008 article titled Triple-A Failure, this "was a stunning admission; its model had been based on a world that no longer existed".

3. A Badge That Moody's Claims of Independence and Objectivity Were False & Misleading Is Moody's Systematic Refusal To Fulfill Its Representation that it Conducted "Stress Testing" in Determining its Credit Ratings

200. Moody's represented that it performed "stress testing" as part of its expected loss determinations and credit ratings. In "stress" testing, asset performance is simulated or tested under more-than-currently-or-usually "stressful" economic scenarios, which builds into the ultimate credit rating a buffer for such possible stressful eventualities. This buffer is necessary and conventional: the long life of the assets (most mortgages run 30 years) ensures that they will experience a variety of economic conditions during their lifespan, some of which may increase the mortgages' risks of default and/or loss. Thus, the practice of "stress testing" is standard practice. The principle, as Moody's represented, is to be conservative: "Credit support levels... are determined with a view toward protecting investors against collateral losses beyond those that would result in an average economy" (Moody's Investors Service, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003). This representation continued to be operative throughout the class

period.

201.    Moody's representations concerning its stress testing and its credit ratings were false and misleading. The most consequential elements of such modeling or stress testing are: (1) the assumptions employed concerning housing price appreciation, and (2) the severity of the stress used in the testing. Although it is generally understood that Moody's modeling includes stress tests and assumptions concerning housing prices, Moody's did not disclose their exact details, thus rendering this part of its model a "black box". Moody's stress testing and housing price assumptions, hidden inside the black box, were biased towards leniency, ignored relevant information in plain view (including evident facts concerning housing prices uttered by Moody's own economists, no less), and thereby functioned to allow Moody's to maintain or increase its subprime structured finance ratings business by generating credit ratings opinions that were divorced from evident credit realities. Moody's actual stress testing violated common understandings and Moody's own representations of the process. Moody's stress tests were, instead, designed to relieve any stress its clients may otherwise have had that there would be clients for their paper. By, within the confines of its "black box", emptying its "stress" tests of stress, Moody's robbed its stress-testing representations of any substantial referent.

a.    The Housing Price Assumptions Moody's Used in Determining its Credit Ratings Were Neither Conservative Nor Grounded in Reality Nor in Expert Opinion

202.    Housing price assumptions are one of the most consequential variables in credit rating agency models that determine expected losses of mortgage pools (and, therefore, a prime ground for model debasement). Declining housing prices primarily function to increase loss severity upon default, for obvious reasons (the house is worth less money, so less is recovered through

107

foreclosure), but also can work to increase risk of default (where declines function to dissolve a borrower's invested equity or even to put the borrower "underwater" – owing more than the property is currently worth).

203.     That Moody's was using assumptions was known; but exactly *what* assumptions Moody's was using was not: the specific assumptions used by Moody's were part of the "black box" aspect of its rating model. There is no question that the common expectation is that credit rating agencies will use conservative and reasonable assumptions. As subsequent events made clear and as Moody's has admitted, the housing price assumptions Moody's used in its ratings models were *not* conservative (as the public assumed and as Moody's represented they would be) but were grossly unmoored from reality and consensus expert economic opinion, *including the opinions espoused by Moody's own economists*. The housing price assumptions used by Moody's were not the result of "honest error", but were fundamentally without basis, and were so unreasonable *ex-ante* that they can be explained only by Moody's conflicts.

204.     Unbeknownst to the public, in rating 2006 subprime RMBS, Moody's used the assumption that housing prices would appreciate 6%-8% per year – although many, *including Moody's own economist Mark Zandi*, were already forecasting housing price declines:

> At least one of the NRSROs[32] was using HPA assumptions of +6-8% for 2006, 2007 and 2008 in their models for securitizations underwritten in 2006 and in the first quarter of 2007. Sometime during the second quarter of 2007, referencing a detailed study of all major metropolitan statistical areas that they recently completed, they decided to dramatically reduce their HPA assumption and increase their Loss Severity assumption for the next few years. Therefore new securitizations were required to have much larger initial over-collateralization amounts. (Bass Written Testimony, House Hearing)

*****

BASS: ...The point I'm trying to make is whenever they rate a securitization, they have an HPA, home-price appreciation, assumption built in. OK? On October 4th of 2006, Moody's economy.com's chief economist, Mark Zandi, did a detailed report on every metropolitan statistical area in the country, on what he thought home prices were going to do. And it differed markedly from their expectation they were building into their models from securitization. It was significantly lower, and those models were saying, "significantly higher." And they started implementing his recommendations on where he thought home prices were going sometime in mid-2007. And, you know, they can speak to exactly when they implemented that... (Bass Oral Testimony)

My point being: If your home-price assumption goes from up six to down two, there's an exponential change that happens in the securitization. It's not a linear change. It's massively sensitive to that assumption. (Congressional Hearing Testimony of J. Kyle Bass, September 27, 2007)

205.    As Mr Bass testified, Moody's housing price assumptions were illegitimate and "massively" consequential for the securitization structures and ratings. Because those assumptions diminished expected losses, the entire securitization structure changed in ways advantageous to the issuers who retained Moody's – more Aaa-rated tranches, less over-collateralization, etc. In other words, the issuers got what they were paying for. Most important, however, from Moody's vantage, these grade inflations generated more subprime structured finance ratings assignments, revenues and income for Moody's.

206.    These failings cannot be explained as matters of expertise or its lack, and again this action does not rest on lack of expertise, but on lack of candor in describing the very essence of the manner in which Moody's conducted its business affairs. It is impossible to explain let alone justify on any objective grounds why, for example, Moody's was using optimistic housing price appreciation assumptions in its purported "stress" testing when those assumptions were contradicted

109

by evident reality and consensus expert opinions, including those of Moody's own economists. The only possible explanation for Moody's use of wholly-without-basis assumptions is independence or its lack. But for its conflicts, but for the extraneous considerations and influences brought to bear by operation of the Issuer Pays business model in structured finance, Moody's would have considered this in-plain-view information in making its credit rating evaluations, and would have issued credit ratings tethered to credit realities.

### b. Moody's Declined to Factor Into its Stress Testing the Boom/Bust Cycle, Despite Convention and Moody's Long Awareness That the Cycle Was Turning to Bust

207. Moody's modeling, including the above-detailed housing price assumptions, was done in disregard of convention. Convention would be to model for more-than-usually adverse conditions. Moody's did not do that. Instead, Moody's employed unwarranted assumptions based on asset performance during stress-free "boom" times. Moody's thus did not provide objective evaluations of asset creditworthiness, which would obviously require consideration of what asset performance might look like under "bust" times.

208. Moody's knew full well that booms lead to busts[11], and accordingly that its modeling avoided that conventional consideration:

> Many current sub-prime mortgage problems are classic end-of-the-cycle problems such as risk stacking and eased underwriting to maintain volumes by boosting so-called affordability to more would-be homeowners. We have been to this movie before in this cyclical real estate market. It usually doesn't turn out well for the heroine... (Moody's Investors Service, *Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect,* March 9, 2007)

209. But even if it were the convention to rate according to boom whilst diminishing bust,

110

it quickly became actually known to Moody's that bust actually was overtaking boom:

> during the period from 2002 – 2006, Moody's observed an increase in the risk profile of subprime mortgage portfolios that we were asked to review prior to assigning ratings... We provided early warnings to the market, commenting frequently and pointedly over an extended period on the deterioration in origination standards and inflated housing prices. We published frequent reports on these issues starting in July 2003 and throughout 2004, 2005 and 2006 (Kanef Prepared Testimony, Senate Hearings, pp. 16-17)

*****

> **Moody's has frequently communicated to the market about the steady increase in risk layering in sub-prime pools over the past few years as a number of collateral and origination trends continued to deteriorate...** (Moody's Investors Service, *Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect*, March 9, 2007)

210. The above-quoted Moody's statements demonstrate that Moody's had long been aware that the eternal housing cycle – with which Moody's was familiar ("We have been to this movie before in this cyclical real estate market. It usually doesn't turn out well...") – was turning inexorably towards bust. As Moody's itself described, the turn towards bust had been evident to Moody's throughout the class period ("through 2005 and 2006", as per below) and even prior to the class period (¶ 209, *supra*, noting Moody's purported awareness of origination standard declines as early as 2002):

> During periods of growth in the housing and mortgage markets, increased borrowing demand allows existing mortgage lenders to expand their business and new lenders to enter the market. Eventually, these trends create overcapacity in the mortgage lending market as borrowing demand slows or falls. As the lending market cools (e.g., when interest rates rise, home price increases abate, or the economy slows), competition among lenders for the reduced pool of borrowers heats up and lenders may lower credit standards (i.e., make riskier loans) in order to maintain origination volume. The riskier loans are more likely to become delinquent and default.

111

> Lending behavior in the subprime mortgage market over the past few years has, on average, followed this pattern. Through 2005 and 2006, in an effort to maintain or increase loan volume, lenders introduced alternative mortgage loans that made it easier for borrowers to obtain a loan... (Moody's Investors Service, *Challenging Times for the US Subprime Mortgage Market*, March 7, 2007)

### c. Moody's Declined to Perform "Worst Case" Scenario Modeling in Determining its Credit Ratings, and Misrepresented the Reasons for and Effects of This Modeling Practice

211. Stress testing often models a single "worst case" scenario (*e.g.*, simulating conditions experienced in an actual historical era, e.g., a regional or nationwide depression). Moody's did not employ such a "worst case" scenario:

> The economic scenarios used in our modeling represent a "universe" of potential scenarios. Moody's has long recognized the superiority of considering a distribution of future economic stresses rather than relying on a single historical economy as a presumed "worst case" scenario... (Moody's Investors Service, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003)

212. Moody's represented that its "universe of scenarios" model was superior and more closely approximated reality. This was misleading. Moody's "universe of scenarios" model, under its guise of fidelity, actually perverted the *raison d'etre* of stress testing, which is not to approximate reality but to guard against worse-than-expected realities.

213. In short, Moody's use of a "universe" of more or less probable scenarios in its stress testing worked to allow Moody's to avoid the "bad for business" consequences of straightforward "worst case" stress testing – namely, higher estimates of expected loss. Absent its conflicts, Moody's would have ignored such bad for business consequences and issued credit ratings based on conventional conservative application of modeling assumptions.

112

214.   Moody's *post-facto* changes to its methodology further evidence the mismatch between Moody's class period practice and its representations concerning its independence and adherence to principles-based ratings. As Moody's revealed on April 1, 2008, it had changed its fundamental model precisely to allow stress-testing under defined, worst-case "what if" scenarios:

> Loan Level Default Model. In analyzing pools of mortgage loans, Moody's employs a proprietary model, which is available to market participants. The model analyzes individual loan characteristics in a variety of macroeconomic scenarios to arrive at a statistically based estimate of probable defaults and losses on a particular mortgage pool. In addition, the model analyzes the amount of investor protection required to insulate investors against losses under adverse performance scenarios at various rating levels. One of the major initiatives currently underway will replace the current statistical analysis with a new, more detailed approach... It will [] allow Moody's analysts to more easily conduct 'what if' scenarios by inputting values for various economic variables. (Moody's Investors Service, *Updates to Moody's US Structured Finance Rating Methodologies*, April 1, 2008)

### 4.   Moody's Collateralized Debt Obligation (CDO) Models Mark Misrepresentations of Moody's Independence and Adherence to Ratings Principles

215.   CDOs are "second order" structured finance securities that are backed by asset pools whose assets include first-order structured finance securities such as subprime RMBS. Recently, CDO asset pools became highly concentrated in subprime RMBS, even though the initial *raison d'etre* of CDOs was asset diversification and consequent lessening of risk (the more diversified the assets, the less likely they all go bad at the same time).[14]

216.   CDO credit ratings are dependent on subprime RMBS ratings. The credit ratings Moody's assigned to the subprime RMBS held by CDOs are a primary input in Moody's models for evaluating the creditworthiness of CDO asset pools and thus determining the credit ratings of

113

CDO tranches.

217.  On September 21, 2007, Moody's also admitted, in words and substance, that it had been improperly providing debased CDO credit ratings as a result of its similarly improper work for subprime RMBS in a press release titled "Moody's Updates Assumptions for Structured Finance CDOs". That release advised investors that, to better to assess CDO credit risks and creditworthiness, they should downshift by up to six ratings categories the credit ratings that Moody's had conferred on the subprime RMBS tranches underlying CDOs[55].

218.  As one structured finance market participant put it in an article published on October 1, 2007 in the Asset Securitization Report:[56]

> It is really a shameful admission that all their ratings were
> wrong... They do not even trust their own ratings - for example,
> the fact that you need to assume that a Baa given in 2007 now, for
> analysis purposes, needs to be treated as being six notches below,
> it means this is really a disaster.

219.  Unbeknownst to the class, and contrary to Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity, quality and reliability, Moody's compounded its subprime RMBS misratings and misrepresentations detailed above by using them to generate another round of debased ratings for CDOs, and issued CDO credit ratings that better matched issuer interests than evident credit realities.

   a.  Over-Rating Subordinate RMBS Thin Tranches With Their
       Predictable Effects on CDO Creditworthiness Marks Lack of
       Independence and Failure to Adhere to Ratings Principles

220.  The "thickness" of a tranche in a securitization transaction is the ratio of the size of the tranche to the size of the underlying pool. In the subprime securitizations favored by issuers and ratified by Moody's, the Aaa tranches were by far the thickest, constituting roughly 70%-80% of the

114

securitization. The Baa tranches, by contrast, typically had a thickness in the range of 1.2% to 1.5%.[37]

221. Structuring the subprime securitizations to be top-heavy in this manner satisfied issuer interests to produce the maximum amount of highly-rated and highly-marketable securities, but resulted in magnifying the risks of the correspondingly-thin Baa tranches. It was not merely the case that those Baa tranches were much closer to the front of the line for losses. Over and above that, because of their very thin-ness, they tended to be "all or nothing" propositions. Even a small increase in the overall asset pool's expected losses (e.g., from 10% to 11.5%) could wipe out the entire value of a Baa tranche. The very securitization structure meant that, for such Baa tranches, there was no medium ground: they would either retain all their value, or none of it.

222. Moody's downgrades of initially-Baa-rated tranches currently stands at essentially 100% for 2006 subprime RMBS and CES, and exceeds 80% for 2007 subprime RMBS (i.e., those issued prior to Moody's July 13, 2007 model stiffening) and for 2006 and 2007 Alt-A RMBS.

223. Moody's was aware of the meaning of tranche "thin-ness" and of its relationship to risk. Yet, Moody's declined to account for the risks in rating the instruments. Moody's has since admitted as much. Its most recent word on its CDO rating model changes and improvements states that its modeling will better account for the effects of this specific factor.[38]

224. But for its conflicts, Moody's either would have rated such thin "Baa" tranches with other, lower ratings, or would have refused to endorse these issuer-friendly but investor-dangerous securitization structures altogether. Unbeknownst to the class, and contrary to Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity, quality and reliability, Moody's turned a blind eye to such evident security structure risks.

and issued CDO credit ratings that better matched issuer interests than evident credit realities.

225.    Moody's own analysis of CDOs showed that, on average, about 45% of the assets backing CDOs were subprime RMBS, and, on average, about half of those subprime RMBS assets were rated Baa or below – meaning that, on average, 22% of CDO assets were all-or-nothing subprime RMBS tranches rated Baa or below.[39]    These averages were deceiving, because they masked the bi-polar divergence between two very different kinds of CDOs: "High Grade" CDOs and "Mezzanine" CDOs. Both types of CDOs had similar exposure to subprime RMBS overall – about 45% – but High Grade CDOs made essentially no investment in Baa-and-lower tranches, while Mezzanine CDOs made essentially *all* their subprime RMBS investments in those Baa-and-lower tranches. We know this because, belatedly, Moody's has told us so:

> We see that although the average exposures to subprime RMBS are similar for the two CDO types (around 45%), the Baa exposures are dramatically different. For Mezzanine CDOs, the Baa exposures account for the vast majority (about 90%) of subprime RMBS collateral. By contrast, High-Grade transactions show no more than percent or two of exposure to these instruments (which may be a result of downgrades, rather than initial purchases of Baa securities). (Moody's Investors Service, *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*, March 23, 2007.)

226.    In short: *on average, 41% of the assets backing Mezzanine CDOs were thin, all-or-nothing subprime RMBS tranches rated Baa or below; in some Mezzanine CDOs, the Baa-and-below backing rose to as high as 88% of the entire asset base.*[40]    Because the Baa-and-below tranches are all-or-nothing bets that will perform similarly to each other. Mezzanine CDOs are effectively staring at and/or experiencing the destruction of 41% of their assets on average (and as high as 88%). Even the most highly-rated Aaa Mezzanine CDO tranches will suffer significant losses

116

(while most other CDO tranches will be entirely wiped out). As former Moody's managing director

Mark Adelson observed:

> That has made the CDO sector highly vulnerable to the "all or nothing" proposition embodied in many of the tranches. Even the triple-A-rated tranches of a typical "mezzanine" structured finance CDO could default if only 25% to 30% of the underlying triple-B tranches get wiped out. (Mark Adelson, Asset Securitization Report, *Subprime Mortgages - A Realistic Outlook*, August 20, 2007)

227.    This was plainly evident to Moody's yet it declined to account for it in its Mezzanine

CDO credit ratings. Among the consequences was further destruction of Moody's reputational

capital:

> BASS: I know I keep going back to this, but I think it's very important. When they talk about their credibility and the probability of default, the probability of default of a mezzanine-CDO AAA piece is exponentially higher – you probably can't even calculate how much higher it is in this structure than it is in a corporate structure. They haven't even told us yet that they've blown it. The fact that they allowed that structure to be rated the way it was rated, it doesn't matter what their surveillance teams are doing. The fact that they allowed a mezzanine-CDO structure to be launched is where they blew it. And they lost their credibility because those AAAs are going to be -- some of them will be fully impaired. And anything below AAA will be wiped out. And that's the loss of credibility from the beginning, not as we re-rate things. That's the structural problem. (Congressional Hearing Testimony transcript, September 27, 2007)

*****

> MARSHALL: Mr. Adelson, can you rate...
>
> ADELSON: ... more than anyone.
>
> MARSHALL: Mr. Adelson, can you rate something, or should you rate something AAA if there is a 5 percent chance you'll lose the entire investment? ... you were in Moody's for a long time. You've said so yourself; you've given ratings before. So how would you rate that? If you thought there was a 5 percent chance that the entire investment would be lost entirely, gone, can you

> say it's good for...
> ADELSON: Well, I would give that a very low rating.
> MARSHALL: Pardon me?
> ADELSON: 5 percent chance that you're going to have a 100 percent loss -- so 5 percent expected loss is going to be a low rating.
> MARSHALL: It wouldn't be investment-grade?
> ADELSON: That would be below investment-grade on a short-time horizon.
> (CROSSTALK)
> MARSHALL: Thank you.
> (Congressional Hearing Testimony transcript, September 27, 2007)

228.    The risks presented by these CDOs backed by levels of thin Baa-rated (and misrated) tranches were in plain view to Moody's. Yet, Moody's declined to account for that risk in rating them. But for its conflicts, Moody's would have either rated CDO tranches so dependent on such thin "Baa" tranches with other, lower ratings, or would have refused to endorse such issuer-friendly but investor-dangerous securitization structures altogether. Unbeknownst to the class, and contrary to Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity, quality and reliability, Moody's turned a blind eye to such evident risks, and issued CDO credit ratings that better matched issuer interests than evident credit realities.

### b.    Moody's Low CDO Asset Correlations Mark Its Misrepresentations of Independence and Adherence to Ratings Principles

229.    Another way to view the risk detailed above (i.e., high levels of similar and highly risky assets) is through the lens of asset correlation – the degree to which assets will behave similarly. Asset correlation measures are a key element in the rating agency models used to analyze CDO asset pools, create CDO structures, and assign CDO tranche ratings (and function analogously to housing price assumptions in subprime RMBS, as discussed above in Section II.C.3, *supra*). The basic principle is that: (1) the more highly correlated the assets, the more likely that they all go bad

at once, so (2) the more highly correlated the assets, the more credit enhancement will be required to protect against the risks posed by such asset correlation.

230. The asset correlation measures and assumptions that the rating agencies used in their models for rating (and thus for structuring) CDOs provided a significant opportunity for the ratings shopping and the "race to the bottom" dynamics. By using asset correlation methodologies and assumptions more lenient than the next rating agency (i.e., ones that resulted in calculating less risk, and thus allowed the issuer to garner higher ratings, or issue more highly-rated securities, or do so at a lower credit-enhancement cost), credit rating agencies could gain issuer business:

> Because correlation is such a critical component of structured finance credit ratings, the ratings agencies had a strong incentive to use relatively low correlation estimates in order to gain market share in the ratings-sensitive structured finance space. (Christian Stracke, The Banker (World Economic Forum 2008 Supplement), *CDO Ratings Hit Troubled Waters*, January 2, 2008)

231. Structured finance market participants are in broad agreement that the asset correlation figures used by Moody's in its CDO ratings were far too low, inexplicable until one became aware of Moody's lack of independence and consequent failure to adhere to conventional ratings principles. As Professor Coffee informed the Senate in his April 22, 2008 Congressional Hearing Testimony, the rating agencies' models' "blindness" to CDOs' highly-similar, highly-correlated assets was those models' "greatest deficiency".

232. Tellingly, Moody's later announced that it would henceforwards *double*[41] and *triple*[42] the asset correlation measures it had previously been using.

233. Indeed, as the SEC's recent rule-making release concerning credit rating agencies made clear, Moody's CDO rating methodology operated largely oblivious to the ultimate underlying

CDO assets.[43] Moody's latest word on CDO rating methodology: "SF CDO model parameters substantially revised and the entire methodology is under review" (Moody's Investors Service special report, *Global Structured Finance Recap: a Summary of 2007 Review and 2008 Outlooks Across Asset Classes with Methodological Updates*, June 4, 2008).

234. Specifically, it appears that Moody's used asset correlation figures completely disconnected from the evident realities of Mezzanine CDOs (backed by asset pools having on average 40%, and as much as 80%, of assets in the form of Baa-and-below ranked subprime RMBS tranches). These low asset correlation figures were antiquated holdovers from prior periods, when CDOs actually held – as per their original *raison d'etre* – truly diversified assets so as to minimize the risks posed by any one asset class. They were without any objective basis with respect to the current crop of CDOs.

235. Moody's further contrived to serve its issuer masters by lowering its asset correlation figures by the claim of a distinction between "subprime" assets and "midprime" assets, which created by declarative fiat two ostensibly different kinds of assets that ostensibly would perform in two different ways (thus lowering the correlation).

236. On September 21, 2007 Moody's withdrew its "midprime" category because, as it later admitted on October 12, 2007, of the "similarity" in performance between the midprime and subprime assets, collapsing the two categories back into one and thus increasing asset correlation figures.[44]

237. The risks presented by these CDOs backed by highly-correlated, highly-risky assets – and specifically, by thin Baa-rated (and misrated) tranches – were in plain view to Moody's. But for its conflicts, and refusal to adhere to ratings principles, Moody's would have either rated CDO

tranches backed by such large amounts of highly correlated thin "Baa" tranches with other, lower ratings, or would have refused to endorse these issuer-friendly but investor-dangerous securitization structures altogether. Unbeknownst to the class, and contrary to Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity, quality and reliability, Moody's turned a blind eye to the evident risks, and issued CDO credit ratings that better matched issuer interests than evident credit realities.

238.    Subprime RMBS issuance necessarily produced toxic, thin Baa-and-below tranches as a byproduct of the thick Aaa tranches whose production issuers (and ratings agencies) maximized. But investor demand for such Baa-and-below tranches was minimal, so issuers often had to retain them. *Mezzanine CDOs solved this problem, and served as a whole new round of ratings opportunities for the rating agencies.* Mezzanine CDOs bought all the Baa-and-below tranches and resecuritized them, using rating agency models that operated under the fiction that such assets were diversified and thus less risky rather than the reality that such assets were homogenous and highly risky. It was these very models that allowed Mezzanine CDOs to be born, issued and sold: these models allowed Mezzanine CDOs to generate thick tranches of new and marketable Aaa-rated securities. Had other models been used that recognized the true asset homogeneity, Mezzanine CDO structures would result in less Aaa-rated securities and more lower-rated securities, to the point that Mezzanine CDO issuance might not have been profitable for issuers (and thus to the point that Mezzanine CDO issuance would not have occurred). Indeed, now that Moody's misconduct of CDO ratings has come to light, Mezzanine CDO issuance is now wholly extinct, and structured finance CDO issuance has plummeted more than 90% during 2008.

239.    Mezzanine CDOs allowed subprime RMBS issuers and Moody's to continue

121

securitizing and rating deficiently-structured and inadequately-rated subprime RMBS by swallowing the toxic byproducts (the Baa tranches) and repackaging them to generate a new round of Aaa-rated CDO securities – and a new round of rating revenues for Moody's.

240. Asset homogeneity and ensuing asset correlation risk were plainly evident to Moody's, yet Moody's declined to account for them in its Mezzanine CDO credit ratings. But for its conflicts, Moody's would have adjusted its models to take into account the growing asset homogeneity of CDOs, which would have resulted in rating such Mezzanine CDOs with other, lower ratings, or in making such issuer-friendly but investor-dangerous securitization structures impossible to issue. Unbeknownst to the class, and contrary to Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity, quality and reliability, Moody's turned a blind eye to increasing asset homogeneity, and issued CDO credit ratings that better matched issuer interests than evident credit realities.

241. Moody's cannot claim that CDO assets or holdings were in any way misrepresented to Moody's or hidden from Moody's view. On the contrary, Moody's was better placed than anyone to understand exactly what the CDOs contained (as the facts and figures published by Moody's during 2007 and 2008 concerning CDO holdings demonstrate). The *only* surprise here is that Moody's, in fact, was ignoring (in its credit rating determinations) the objective, evident facts before its very eyes that it claimed to be taking into account. Moody's knew, based on the immense amounts of mortgage data it received, that 2006 and 2007 mortgages were riskier than ever before. Moody's knew that CDOs were loading up on immense amounts of deeply-subordinated securities backed by such mortgages. But Moody's CDO ratings continued to blithely use correlation assumptions that did not fit these evident facts, assumptions that were survivals from earlier times