when CDOs in fact held diversified assets rather than highly-correlated ones.[45]

242. Moody's persisted in issuing investment grade ratings for its clients' CDOs, despite awareness within Moody's of evidence calling those ratings into question, rather than risk losing lucrative ratings business. As the Wall Street Journal recently reported, in late 2006 and early 2007 Moody's analyst Eric Kolchinsky "was warning about the housing market and asking if ratings were too optimistic" (Wall Street Journal, *Credit Crunch: Ratings Raised a Red Flag – Moody's Analyst Aired Concerns on CDOs to No Avail*, June 7, 2008). As the Wall Street Journal concluded, "[h]ad Moody's officials agreed with the analyst's view sooner, some of the CDOs issued last year likely would have been assigned lower ratings, which might have prevented them from being sold." More than 75% of all structured-finance CDOs issued in 2007 have already had their ratings downgraded, causing their values to plummet.

## D. The Result of Moody's Misrepresentations

### 1. An Unprecedented Boom in Ratings Work

243. As publicly represented, Moody's seemed to be doing an impressive, thorough, conservative job of credit risk analysis.

244. As just detailed, in fact it was not. By emptying its stress testing of stress, and employing models that systematically disregarded objective, conventional and available mortgage risk data, Moody's generated "expected losses" lower than objectively merited and inconsistent with Moody's representations concerning the manner in which it conducted its business. Those lower expected losses fed directly into securitization structures and credit ratings. Those lower expected losses, and the securitization structures and ratings they made possible, fed directly into Moody's

123

market share: they were the basis on which Moody's was preferred by issuers to bless their securitizations with published ratings. In order to gain or merely maintain structured finance ratings work, Moody's made its models as "issuer friendly" as possible so as to induce retainment by issuers.

245.    Underwritten by Moody's friendly ratings, subprime RMBS, CDO and SIV issuance boomed. Subprime RMBS issuance quintupled between 2001 and 2005, rising from less than $100 billion per year to $536 billion during 2005 and $527 billion in 2006. Structured finance CDO issuance rose similarly – indeed, nearly doubling in 2006 alone (rising from $177 billion in 2005 to $314 billion in 2006). As Section III further demonstrates, the conflict of interest pressures operative in structured finance drove Moody's models down, and Moody's capitulation to those pressures drove its market share up: Moody's structured finance ratings revenues grew faster than structured finance issuance (Section III.D.4) and faster than Moody's credit rating agency competitors (id.).

246.    The models Moody's used during the class period at all times until at least April 2007 to rate subprime RMBS generated expected loss estimates for the underlying subprime asset pools of 5.5%-6%.[46] Moody's revised models for the same subprime instruments, as of January 2008, show expected losses of 14%-18% on average, and in some cases as high as 35%.[47] The trebling of expected losses without more at once tend to show how Moody's models permitted the grade inflation and belied its representations about independence and principles-based methods of operation.

247.    Hundreds of billions of dollars of RMBS (and CDOs) were (mis)structured and (over)rated on the basis of Moody's models – and have since been downgraded, often severely, as next detailed. Moody's distortion made these securities more profitable for issuers to issue, and thus

directly fed the boom in their issuance – and the directly corresponding boom in Moody's reported growth, revenues, earnings and share price. All was predicated on Moody's false representation of independence, which provided market participants with (mistaken) belief in the integrity of those ratings and those securities structured on their basis, and which provided Moody's investors with (mistaken) understanding of Moody's actual business operations and conduct.    Moody's was committing one of the more massive and pervasive frauds that any private institution has ever inflicted on a public community.  Along the way, and at the root of this cause, Moody's jacked up its stock price by countless, constant misrepresentations about how it garnered its revenues and earnings.

## 2.    An Unprecedented Boom in Downgrades

248.    It may have been the crisis that actuated the re-ratings, but it was the over-ratings that created the crisis.  For all intents and purposes, Moody's conduct has admitted its practice of grade inflation.  Beginning in April 2007, just as Moody's began to stiffen its models (as detailed above), Moody's downgraded more than 7,500 subprime structured finance securities that Moody's originally rated between 2005 and 2007 and whose initial value exceeded $200 billion.  A further $300 billion or so of these securities are currently on "ratings watch" for downgrade or further downgrade.  These numbers actually understate matters given (1) Moody's logically indefensible failure to apply now-stiffened ratings standards to previously-issued securities (Section II.D.2.g. *infra*), (2) the unique degree to which Moody's declined to downgrade triple-A securities despite facts demonstrating widespread downgrades are merited (*Id.*), as well as (3) Moody's January 30, April 7 and June 4, 2008 admissions that further large and sweeping waves of downgrades will be necessary.  The scale of the misrating is absolutely unprecedented.  But for Moody's conflicts, the

125

grade inflation would not have occurred, and Moody's repeated representations about the very essence of its business would not have been knowingly false when made. As detailed above, all information necessary Moody's to have rated such securities accurately at issuance was in plain view, or readily available to Moody's without due diligence.

249.   Moody's disputes that any *individual* credit rating can be judged on the outcome of that rating. Yet Moody's itself concedes that the quality of its ratings may be appropriately judged by their aggregate performance. As Moody's Code Implementation Report explains:

> We judge the quality of an individual rating based on whether it was formed pursuant to our established processes, rather than on the outcome of that rating, because it is inappropriate to judge any individual opinion on future creditworthiness as right or wrong since a rating is a probability-based assessment. However, the quality and performance of our ratings as predictors of relative creditworthiness can be judged in the aggregate.

250.   Again, for emphasis, this complaint does not challenge Moody's competence. Rather, it asserts that Moody's systematically misrepresented how it went about its business. Taking Moody's at its word, Moody's recent subprime structured finance securities ratings, in the aggregate, were grossly inflated. This is powerful indication, if not actual *quod erat facendum*, that Moody's evaluations at issuance had been systematically corrupted.

### a.   Downgrades: 2006 Subprime RMBS

251.   Moody's spent much of 2007 cutting the credit ratings it had issued to subprime RMBS securities during 2006 (as well as the latter portion of 2005 and the first half of 2007). Moody's last word on its subprime ratings revisions was provided in February 1, 2008 Moody's Investors Service special report titled *U.S. Subprime RMBS 2005-2007 Vintage Rating Actions Update: January 2008*. Essentially, that report demonstrates that almost every single tranche of

126

every single subprime RMBS security that Moody's conferred with a credit rating of "A" or lower in 2006 had been downgraded or placed on review for downgrade (i.e., 3,012 out of 3,535 tranches, or 85%). Nearly one of two subprime RMBS originally rated Aa (698 out of 1,441 tranches, or 48.4%) received like treatment. The average downgrade was substantial: 6.8 notches, enough to move an originally-Aaa security (the highest possible rating) to a Baa rating (the lowest level still considered "investment grade"), and to move an originally Baa-security (i.e., investment grade) into low single-B range (barely above default) or C range (default).

| Summary of Negative Rating Actions on 2006 Vintage Subprime Transactions (1st and 2nd Liens) | | | | | |
|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume (S mil) | | |
| | Tranches Rated | Downgrade/ On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 2,299 | 200 | 8.7% | $ 370,519 | $ 28,856 | 7.8% |
| Aa | 1,441 | 698 | 48.4% | $ 44,295 | $ 20,207 | 45.6% |
| A | 1,475 | 1,087 | 73.7% | $ 23,035 | $ 17,051 | 74.0% |
| Baa | 1,511 | 1,389 | 91.9% | $ 16,353 | $ 15,237 | 93.2% |
| Ba | 549 | 536 | 97.6% | $ 5,168 | $ 5,094 | 98.6% |
| Total | 7,275 | 3,910 | 53.7% | $ 459,370 | $ 86,446 | 18.8% |

252.    The numbers are understated, for two reasons. First, Moody's has continued to downgrade subprime RMBS tranches during 2008, as Moody's formally announced via April 7, 2008 press release titled "Moody's to Conduct Subprime RMBS Review". Since April 7, 2008, Moody's has downgraded dozens of asset-backed security tranches virtually, and possibly, every day (e.g., Moody's downgraded 2,076 ABS tranches in April 2008, as reported by Bloomberg on May 1, 2008), including subprime RMBS tranches, but has not reported those subprime downgrades in

127

any aggregated fashion. Second, as detailed below at Section II.D.2.g, *infra*, Moody's has -- to an extent unique among all credit rating agencies -- declined to downgrade tranches that originally received Moody's highest credit rating, Aaa, even where such downgrades are obviously merited.

      b.    **Downgrades: Subrime Second-Lien (CES) Securitizations**

253.    Closed-End Second-lien mortgages ("CES") are particularly risky loans (detailed below at Section II.C.2.e)[48] as they are secured by a second-priority mortgage lien on residential real estate already encumbered with a first-lien mortgage.[49] Moody's incomplete and contradictory data suggest that Moody's rated approximately $35 billion or $48 billion of 2006 RMBS backed by CES.[50] Moody's rating performance for CES securitizations has been even worse than its first-lien RMBS ratings. Almost everything backed by 2006 CES has been downgraded at every rating level, including Aaa, and often downgraded severely, as the tables below indicate[51]:

| Downgrades/Reviews by Rating Category | |
|---|---|
| Original Rating | % of CES Securities Downgraded and/or on Review for Possible Downgrade |
| Aaa | 71% |
| Aa | 88% |
| A | 96% |
| Baa | 98% |
| Ba | 100% |

| Rating Migration Table (by Broad Rating Category) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Current Rating Level | | | | | | | |
| Original Rating | Aaa | Aa | A | Baa | Ba | B | Caa | Ca | C |
| Aaa | 30% | 54% | 11% | 5% | | | | | |

| Aa | | 26% | 45% | 20% | 6% | 2% | 0% | 1% | |
| A | | | 6% | 34% | 38% | 10% | 0% | 6% | 6% |
| Baa | | | | 6% | 14% | 18% | 7% | 15% | 50% |
| Ba | | | | | 2% | 6% | 0% | 4% | 88% |

254.    Applying the above percentages to previous figures given by Moody's that detail CES

issuance by tranche numbers and dollar values, it is revealed that Moody's downgraded nearly 9 out

of every 10 CES tranches that it initially rated in 2006, accounting for 75% of the total dollar value

of 2006 CES issuance:[72]

| Summary of Cumulative Rating Actions on the 2006 Vintage for Second Lien Transactions | | | | | | |
|---|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume (S mil) | | |
| | Tranches Rated | Downgrade/ On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 289 | 205 | 71% | $40,432 | $28,707 | 71% |
| Aa | 186 | 164 | 88% | $ 3,541 | $ 3,116 | 88% |
| A | 190 | 182 | 96% | $ 1,878 | $ 1,803 | 96% |
| Baa | 217 | 213 | 98% | $ 1,485 | $ 1,455 | 98% |
| Ba | 99 | 99 | 100% | $   670 | $   670 | 100% |
| Total | 981 | 863 | 88% | $48,007 | $35,751 | 74% |

255.    Moody's latest word on subprime ratings[73] confirms the above analysis (although

presenting yet a third, different tally of the exact number of tranches and dollars at issue) with

numbers slightly more dire:

129

| Summary of Negative Rating Actions on 2006 Vintage Second Liens | | | | | |
|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume ($ mil) | | |
| | Tranches Rated | Downgrade/ On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 186 | 137 | 73.7% | $25,747 | $20,599 | 80.0% |
| Aa | 183 | 171 | 93.4% | $ 3,508 | $ 3,354 | 95.6% |
| A | 187 | 184 | 98.4% | $ 1,865 | $ 1,830 | 98.1% |
| Baa | 214 | 212 | 99.1% | $ 1,472 | $ 1,468 | 99.7% |
| Ba | 99 | 99 | 100% | $ 670 | $ 670 | 100% |
| Total | 869 | 803 | 92.4% | $33,263 | $27,921 | 83.9% |

256.    Downgrade severity, as Moody's reported in its February 1, 2008 report (at Figure 10b), for 2006 subprime second liens was severe:  9.7 notches, enough to move an originally-Aaa security (the highest possible rating) to a Ba rating (i.e., *below* "investment grade"), and to move an originally Baa-security (i.e., investment grade) deep into C range (default).

257.    Moody's has enacted less widespread and marginally less severe downgrades for second-lien securitizations originally rated in late 2005 and early 2007.[21] 2005 downgrade severity averaged 7 notches, 2007 downgrade severity averaged 7.8 notches.[22]

### c.    Downgrades: First-Half 2007 Subprime RMBS

258.    As it became apparent in 2007 that Moody's subprime RMBS credit ratings for 2006 were the result of debased credit rating models and standards, Moody's implemented changes to those models that became effective for all new securities/ratings after July 13, 2007. The ratings of the subprime RMBS securities issued and rated during 2007 *prior* to Moody's model changes – i.e., ratings made on the basis of the same debased models operative during 2006 – required downgrades

130

similar to 2006 vintage, as the table below indicates."[16]

259.    Remarkably, there was nothing novel in Moody's mid-2007 methodology changes.
They merely began the process of aligning Moody's ratings with the representations about them and,
concomitantly, about its independence that Moody's had been making, falsely, during the class
period.  What Moody's has begun to do is precisely what it could have, should have, and what it
misrepresented it had been doing all along.  Had Moody's conducted its business as it claimed,
neither its revenues nor stock prices would have inflated as they did.

| Summary of Negative Rating Actions on 2007 Vintage Subprime First Lien Transactions | | | | | |
|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume ($ mil) | |
| | Tranches Rated | Downgrade/ On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 1,006 | 28 | 2.8% | $137,826 | $ 4,790 | 3.5% |
| Aa | 607 | 190 | 31.3% | $ 17,241 | $ 5,374 | 31.2% |
| A | 588 | 365 | 62.1% | $ 8,409 | $ 5,494 | 65.3% |
| Baa | 557 | 449 | 80.6% | $ 6,140 | $ 5,185 | 84.5% |
| Ba | 120 | 101 | 84.2% | $ 1,208 | $ 1,085 | 89.8% |
| Total | 2,878 | 1,133 | 39.4% | $170,823 | $21,929 | 12.8% |

260.    The above figures understate downgrade frequency because, although Moody's
reviewed only 2007 securities that had been initially rated prior to ratings methodology changes that
went into effect on July 13, 2007, the "issuance figures used to compute the percentages include all
transactions rated during the first three quarters of 2007".[17]  In short,  apples are not matched with
apples: the numerator involves all pre-July 13, 2007 issuances, while the denominator, which should
be for the exact same time period (in order to measure true downgrade frequency), takes into account

all pre-October 1, 2007 issuances. The inclusion of a further 2.5 months of deals in the denominator thus increases the denominator and thus decreases the reported percentages.

### d.  Downgrades: Alt-A RMBS, 2005-2007

261.  By December 2007, Moody's also downgraded vast swathes of the RMBS, backed by "Alt-A"[58] rather than subprime mortgages, that were initially issued and rated during 2006 and the fourth quarter of 2005, as the table below indicates.[59]

| Summary of Negative Rating Actions on 2006 Vintage Alt-A Transactions As of 11/30/07 | | | | | |
|---|---|---|---|---|---|
| | **By Number of Tranches** | | | **By Dollar Volume ($ mil)** | |
| | Tranches Rated | Downgraded / On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 4,825 | 49 | 1.0% | $387,245 | $ 2,847 | 0.7%% |
| Aa | 1,311 | 290 | 22.1% | $ 15,909 | $ 3,042 | 19.1% |
| A | 875 | 388 | 44.3% | $   5,293 | $ 2,160 | 40.8% |
| Baa | 806 | 442 | 54.8% | $   3,862 | $ 1,837 | 47.6% |
| Ba | 143 | 74 | 51.7% | $     681 | $   319 | 46.8% |
| B | 13 | 4 | 30.8% | $      45 | $     2 | 5.0% |
| Total | 7,973 | 1,247 | 15.6% | $413,036 | $10,206 | 2.5% |

262.  Once again, the numbers understate matters.

263.  Although Moody's provided in December 2007 a similar table of ratings performance for 2005 Alt-A RMBS[60], that table is even more misleading and thus not reproduced here. The problem? Moody's reviewed for possible downgrade only Alt-A RMBS issued and rated during the fourth quarter of 2005, but expressed downgrade rates as a function of full-year 2005 issuance. Therefore, the downgrade rates in that table understate matters by, roughly, by a four-to-one ratio.

132

264. Not included in Moody's December 2007 analysis of Alt-A issuance were those Alt-A securities backed by Option ARMs – a particularly risky type of mortgage for which Moody's initial analyses were particularly deficient (Section II.C.2.e, *supra*). Only on February 1, 2008 did Moody's release the results of its review of Alt-A Option-ARM review: further downgrades to 278 tranches from 2006 (with a further 129 tranches placed on review for downgrade) and to 50 Alt-A tranches from 2005 (with a further 9 tranches on review). On June 19, 2008, Moody's Investors Service issued a press release announcing another round of Option ARM downgrades to come.

265. On February 1, 2008, Moody's revealed (in addition to the Option ARM downgrades) a review of *2007* Alt-A issuance that resulted in downgrading 760 tranches (and placing 423 tranches on review for downgrade).

266. Moody's most recent word on Alt-A RMBS ratings was issued June 4, 2008, after a two month review of "Alt-A transactions issued from late 2005 through 2007". The result: 3,077 further downgrades (on security tranches worth $27.2 billion at issuance) and an even greater number of tranches (4,228) with a far greater value (nearly $161 billion at issuance) on review for downgrade.[61] Thus, as of June 4, 2008, Moody's performance on Alt-A ratings was roughly equivalent to its performance with respect to subprime ratings (as comparison of the subprime tables above to the Alt-A tables[62] below demonstrates):

133

| Summary of Negative Rating Actions on 2006 Vintage Alt-A Transactions As of 6/2/08 | | | | | |
|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume (S mil) | |
| | Tranches Rated | Downgraded / On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 4,878 | 1,356 | 27.8% | $ 390,888 | $ 87,102 | 22.3% |
| Aa | 1,324 | 724 | 54.7% | $ 16,050 | $ 7,526 | 46.9% |
| A | 885 | 639 | 72.2% | $ 5,353 | $ 3,670 | 68.6% |
| Baa | 815 | 647 | 79.4% | $ 3,898 | $ 2,892 | 74.2% |
| Ba | 149 | 124 | 83.2% | $ 717 | $ 603 | 84.0% |
| B | 14 | 12 | 85.7% | $ 49 | $ 44 | 89.7% |
| Total | 8,065 | 3,502 | 43.4% | $ 416,955 | $ 101,837 | 24.4% |

| Summary of Negative Rating Actions on 2007 Vintage Alt-A Transactions As of 6/2/08 | | | | | |
|---|---|---|---|---|---|
| | By Number of Tranches | | | By Dollar Volume (S mil) | |
| | Tranches Rated | Downgraded / On Review | % Impacted | Dollar Volume Rated | Dollar Volume Impacted | % Impacted |
| Aaa | 3,331 | 1,130 | 33.9% | $ 238,040 | $ 53,657 | 22.5% |
| Aa | 995 | 483 | 48.5% | $ 9,167 | $ 4,634 | 50.6% |
| A | 581 | 398 | 68.5% | $ 2,845 | $ 2,047 | 71.9% |
| Baa | 513 | 413 | 80.5% | $ 2,026 | $ 1,554 | 76.7% |
| Ba | 81 | 70 | 86.4% | $ 432 | $ 354 | 81.8% |
| B | 18 | 15 | 83.3% | $ 79 | $ 72 | 90.9% |
| Total | 5,519 | 2,509 | 45.5% | $ 252,589 | $ 62,318 | 24.7% |

267.   On average, for those Alt-A securities Moody's has downgraded, the downgrades

have been 9.0 notches for the 2006 vintage and 8.4 notches for the 2007 vintage.[63] A nine-notch downgrade moves an Aaa-rated security to the lowest rating that is still "investment grade", Baa3, and moves a Baa-rated security deep into default, mid-C ranges.

### c.   Downgrades: Collateralized Debt Obligations

268.   CDO credit ratings, for reasons already detailed and essentially having to with their heavy investment in subprime RMBS tranches, and especially the lower-rated tranches that have been overwhelmingly downgraded (as documented in the tables above), have required even more massive downgrades. On January 17, 2008, Moody's issued an interim report on CDO ratings status[64], detailing $76 billion in CDO tranche downgrades during 2007 with a further $185 billion on negative review. In April 2008, Moody's downgraded 1,418 tranches from 472 CDO deals totaling US$124.1 billion (25.9% of the total number of all Moody's-rated SF CDO securities outstanding at the end on April 30, 2008). The vast majority of this $260 billion disaster is concentrated in CDO tranches issued and rated during 2006 and 2007, which are "backed" by the highest levels of the worst assets – 2006 and 2007 subprime RMBS, whose downgrades are detailed above. More than 39% of all 2006 CDO tranches and more than 53% of all 2007 CDO tranches have been downgraded – and, still, more than 62% of all 2006 tranches remain on review for downgrade or further downgrade, as do more than 70% of all 2007 tranches. As Moody's January 17, 2008 press release summarized:

> **Moody's: SF CDO downgrades totaled $76 billion in 2007; $185 billion remain on negative review**
>
> New York, January 17, 2008 -- Moody's Investors Service's downgrades of US structured finance (SF) CDO securities in December totaled US$23.3 billion across 243 tranches of 75 deals, according to the agency's latest monthly CDO rating surveillance

135

report. For the entire year of 2007, 1,390 tranches from 462 SF CDO deals totaling US$75.9 billion have been downgraded, representing 30.6% by tranche count, 47.3% by deal count, and 14.1% by tranche original balance.

As of December 31, 2007, 2,120 tranches from 580 SF CDO deals totaling US$185.3 billion remained on review for downgrade. These outstanding negative reviews account for 46.6% of the total number of US SF CDO securities, 59.4% by deal count and 34.5% by tranche original balance.

Negative rating activity in 2007 has affected US SF CDOs issued in 2006 and 2007 significantly more than those issued prior to 2006. For example, less than 5% of US SF CDO securities issued in 2004 and 2005 were downgraded, compared to 39.1% from the 2006 vintage and 53.1% from the 2007 vintage. Additionally, 9.5% of the securities from the 2004 vintage and 16.9% of the securities from the 2005 vintage were on review for downgrade as of year-end 2007, compared to 62.4% for the 2006 vintage and 70.1% for the 2007 vintage.

By the end of 2007, Moody's completed its preliminary rating review of all SF CDOs and is now in the phase of resolving the ratings of more than 2,000 SF CDOs tranches still on review.

269.    Worse is to come. Moody's latest word on the issue was uttered in a June 4, 2008

Moody's Investors Service special report titled *Global Structured Finance Recap: a Summary of*

*2007 Review and 2008 Outlooks Across Asset Classes with Methodological Updates*, in which

Moody's stated that "large amount of downgrades on SF CDOs will continue in 2008":

> SF CDO outlook negative; large amount of downgrades on SF CDOs will continue in 2008 as the subprime mortgage crisis continues; synthetic corporate CDOs outlook is stable/negative with a substantial amount of downgrades expected; mortgage-related market value CDOs and market spread related CDO products show negative outlook and their downgrades expected to continue.

136

## f.   Downgrades: Structured Investment Vehicles (SIVs)

270.   SIVs issue short-term debt – mainly asset-backed commercial paper and medium term notes – to fund the purchase of longer-term and higher-yielding assets (such as, unfortunately and *inter alia,* RMBS and CDOs).[65] By early 2007, approximately 30 SIVs were operating with $400 billion in assets under management, together with a further six "SIV-lites"[66] with a further $12 billion under management (*Id.*)

271.   On or about July 20, 2007, Moody's Investors Service published a report titled *SIVs: An Oasis of Calm in the Sub-prime Maelstrom.*[67] In August 2007, Moody's downgraded most SIV-lite debt from investment grade to junk. In early November 2007, Moody's downgraded $2.4 billion of capital notes from three SIVs, and placed on review a further $30.3 billion of capital notes and senior debt from sixteen SIVs. On or about November 30, 2007, Moody's downgraded $14 billion of SIV capital notes and placed a further $105 billion of SIV senior debt on review, and recently extended that review on January 15, 2008.[68]

> g.   **The Downgrades Moody's Actually Made Are Only A Fraction of the Downgrades Merited: Moody's Unique Failure to Downgrade Subprime Securities Granted Triple-A Ratings is Without Basis**

"Moody's trails badly" – UBS AG, April 2, 2008
"Moody's is the Least Accurate Subprime-Bond Rating Firm" -
Bloomberg, April 2, 2008

272.   As detailed below, Moody's performance or lack thereof in downgrading has in fact been the most inadequate of the three largest rating agencies active in structured finance.

273.   At least insofar as it has been made public, Moody's has implemented its 2007 model changes (discussed above in Section II.C, *supra*) only on a going-forwards basis, rather than on a

137

retrospective basis as well. Previously-issued securities bearing old ratings (e.g., Aaa) that often would have warranted lesser ratings under new models are *not* re-rated. Moody's claim (as expressed by Mr Kanef in his September 27, 2007 Congressional Hearing Testimony) is that, by monitoring subprime security performance in such manner, their ratings decisions (if any) are "data-dependent"; i.e., based on actual asset performance data (i.e., the monthly reports showing how the underlying mortgages are performing). If actual performance deteriorates to the extent that a downgrade is necessary, only then does the downgrade occur.

274.   In fact, actual performance *has* deteriorated to the extent that triple-A downgrades are necessary under Moody's purported "data dependent" standard, but Moody's has *still* declined – to a unique extent among its rating agency peers – to downgrade Aaa-rated securities based on those actual facts.

275.   On or about April 2, 2008, UBS AG analysts Laurie Goodman and Thomas Zimmerman published a study examining the 400 subprime RMBS securities that make up the Markit ABX indexes[69], the performance of the mortgage collateral underlying those securities, and the credit ratings bestowed by Moody's, Fitch and S&P on those securities. According to the UBS analysts, given collateral performance to date, 292 of the 400 subprime RMBS securities will default. Both Fitch and S&P have lowered their ratings to indicate default for 57% of those securities identified by the UBS analysts. Moody's, by contrast, assigned default-level ratings to just 12% of the likely-to-default securities. Connectedly, while Fitch did not rate any of those 292 securities as triple-A, *Moody's maintained Aaa-ratings on 35 of the securities identified by the UBS analysts as likely to default* (S&P maintained AAA-ratings on 24 of the securities). The UBS analysts concluded, unambiguously, that "Moody's trails badly" in revising its ratings to reflect performance

138

realities.

276.    The UBS AG analysts further observed that Fitch's current ratings for the ABX securities were on average 2.3 rating notches lower than S&P's ratings and 2.7 rating notches lower than Moody's. Further supporting the "ratings shopping" allegations (Section III.C-D, *infra*), while Moody's and S&P won assignments to rate every single one of the Markit ABX index securities (i.e., 400 out of 400), Fitch -- whose stricter standards were demonstrated by the USB AG study -- had only secured ratings assignments for 200 of the 400 securities.

277.    A March 2008 Bloomberg analysis of the same issue -- but focusing specifically on securities originally rated as triple-A -- came to exactly the same conclusion. The Bloomberg analysis focused on the 80 securities contained in the Markit ABX indices for triple-A rated subprime securities (i.e., 20 Aaa tranches issued in 2007, 20 in 2006, etc.), on the collateral performance of the assets underlying those securities, and on the credit ratings currently maintained by Moody's, S&P and Fitch on those securities. Bloomberg's analysis found that, given current collateral performance, *none of the 80 securities originally rated as triple-A met rating agency standards for such ratings (even before those standards were tightened), and, indeed, that almost all (74 out of the 80) failed even to meet "investment grade" standards (i.e. a rating of Baa).*[70] *Fitch had downgraded 19 of those triple-A securities, S&P downgraded only one, and Moody's refrained altogether from downgrading any triple-A securities.*[71]

278.    Given the widespread failures of such "triple-A" securities to meet triple-A standards, let alone Baa-standards, the Bloomberg analysis concluded:

> Even after downgrading almost 10,000 subprime mortgage bonds, Standard & Poor's and Moody's Investors Service haven't cut the ones that matter most: AAA securities that are the mainstays of bank

139

and insurance company investments.[72]

279. Kyle Bass, who manages billions of dollars in structured finance securities investments as chief executive officer of the hedge fund Hayman Capital Partners, and who provided testimony in the September 2007 Congressional hearings relating to the credit rating agencies, stated (in the same March 11, 2008 Bloomberg article):

> The fact that they've kept those ratings where they are is laughable...
> Downgrades of AAA and AA bonds are imminent, and they're going
> to be significant.

280. The models Moody's used during the class period to rate (and structure) 2006 vintage subprime RMBS – the models flawed by the below-alleged failures to consider information in plain view – generated expected loss estimates for the underlying subprime asset pools of 5.5%-6%.[73] Within a year, Moody's models for the same 2006 subprime instruments show expected losses of 14%-18% on average, and in some cases as high as 35%.[74] The trebling of expected losses without more at once tend to show how Moody's models permitted the grade inflation and belied its representations about independence and principles based methods of operation.

## E. Moody's Materially Misrepresented and Omitted to Disclose the Manner in Which it Had Generated the Financial Results and Growth it Reported

281. Prior to and during the class period, Moody's reported immense revenues, revenue growth, earnings, earnings growth, and operating margins, all of which were (1) primarily driven by Moody's structured finance rating operations, and (2) functioned dramatically to buoy Moody's share price.

282. Moody's explicitly attributed its strong and well-received financial results to, above all, Moody's structured finance ratings business, but materially misrepresented its actual conduct of

140

that business (Sections II.A-C, *infra*) – and thus the manner in which the financial results Moody's reported had in fact been earned. Moody's structured finance ratings success was not, as Moody's represented, the result of Moody's independence, objectivity and high quality/standards, *but rather the very opposite* – Moody's *abandonment* of independence, objectivity and high quality/standards.

283.     The essence: Moody's represented it was earning its bread, and its dominant market share in structured finance ratings, by working honorably to produce independent and objective credit ratings of high quality that purportedly aided investors in assessing the credit risks of structured finance instruments. Such representations were materially false and misleading. In truth, Moody's was earning its bread, and its dominant market share in structured finance ratings, by compromising its independence, objectivity and ratings standards (i.e., working *dishonorably*) so as to gain and maintain structured finance ratings work – which was controlled and doled out by structured finance issuers to those credit rating firms offering the most favorable ratings. Moody's resulting and compromised credit ratings were thus pulled away from the objective credit realities they purported to represent, by being written towards arrangers', rather than investors', interests.

284.     The details: throughout the class period until early 2007, as detailed in the table below, Moody's made statements in its quarterly conference calls and in its annual SEC 10-K filings attributing its strong reported results and growth to, above all, structured finance. These statements included the quarterly refrain that structured finance ratings were "once again the largest contributor to growth both on a dollar and percentage basis", often followed by upwards revisions of projected future financial results driven by structured finance issuance and ratings growth:

| Quarter / Date / Source | Statements |
|---|---|
| Q4 2005 Conference Call<br><br>February 3, 2006 | At Moody's Investors Service, U.S. ratings revenue rose 24% year-over-year and U.S. Research revenue grew 23%. U.S. **Structured Finance was once again the largest contributor to growth both on a dollar and percentage basis with revenue increasing 43% compared with the prior year.** |
| 2005 Form 10-K<br><br>March 1, 2006 | Moody's revenue for 2005 was $1,731.6 million, an increase of $293.3 million or 20.4% from $1,438.3 million during 2004. Moody's achieved strong revenue growth in several business sectors, including global structured finance, financial institutions and research, international corporate finance and U.S. public finance... Revenue in the United States was $1,085.4 million for 2005, an increase of $174.2 million or 19.1% from $911.2 million in 2004. Approximately 85% of the U.S growth was driven by structured finance and research... Structured finance revenue was $715.4 million for 2005, an increase of $162.3 million or 29.3% from $553.1 million in 2004. Approximately $129 million of the increase was in the U.S., with the residential mortgage, collateralized debt and commercial mortgage sectors, contributing approximately 88% of this amount. Attractive mortgage products, such as low-adjustable-rate mortgages, as well as rising home prices and continued strength in the new housing market were key drivers in providing assets for residential mortgage securitizations. Demand for collateralized debt obligations increased as an ample supply of collateralized loan obligations and cash flow resecuritizations drove issuance higher..Growth in issuance of structured finance securities has generally been stronger than growth in corporate and financial institutions issuance, and Moody's expects that trend to continue. Growth in structured finance has reflected increased adoption of structured finance as an acceptable financing mechanism... |
| Q1 2006 Conference Call<br><br>April 26, 2006 | At Moody's Investors Service, U.S. ratings revenue rose 15% year-over-year, U.S. structured finance was once again the largest contributor to growth on both a dollar and percentage basis, with revenue increasing $28 million, or 29% compared to the prior year period. U.S. structured finance benefitted from broad-based growth, particularly from rating commercial mortgage-backed securities and credit derivatives, and the continuation of strong growth from residential mortgage-backed securities... |
| Q2 2006 Conference Call<br><br>August 2, 2006 | U.S. structured finance again generated solid growth with revenue rising $19 million, an increase of 14% compared with a very strong prior year period. Particularly strong revenue growth from rating credit derivative driven by record breaking issuance more than offset a year-over-year decline from residential mortgage-backed securities... Based |

|  | on Moody's stronger than expected results for the first half of 2006 we have made a number of revisions to our outlook for the full year. For Moody's overall, we now project revenue growth in the low double digit percent range for the full year 2006... With respect to the CDO business in July, it does continue to be robust and we expect to have a good growth in CDOs through the rest of the year. Just one other area that I will highlight for the second half of the year is that we, in the residential mortgage area, we are seeing some weakening in parts of the residential mortgage market as as it relates to securitization volume. And that's for the prime mortgage sector. We have not seen as much of a decline in the subprime sector and the home equity sector yet. We're still expecting it, but most of the decline we've seen has been with respect to the prime portion of the residential mortgage sector... |
|---|---|
| Q3 2006<br>Conference Call<br><br>October 25, 2006 | Within Moody's Investors service, U.S. ratings revenues rose 15% year-over-year. On the dollar basis, U.S. structured finance was the largest single contributor to Moody's overall growth with revenue rising 23 million and an increase of 18%. We saw very strong growth in revenue from rating credit derivatives and a year-over-year increase from residential mortgage-backed securities... Based on Moody's strong results here today, year to date, we now believe the results for the full-year 2006 will exceed our prior forecast... So the stock of assets coming from the bank loan market, as well as the residential mortgage and asset-backed securities markets are all being funneled into the credit derivatives market and is, is strongly supporting the U.S. growth in that market... |
| Q4 2006<br>Conference Call<br><br>February 7, 2007 | Moody's U.S. revenue was 361 million in the fourth quarter, up 22% year-over-year. At Moody's Investors Service U.S. ratings revenue rose 22% year-over-year and U.S. research revenue grew 26%. U.S. structured finance was once again the largest contributor to growth both in the dollar and percentage basis with revenue increasing 27% compared with the prior year... |
| 2006 Form 10-K<br><br>February 28, 2007 | Moody's revenue in 2006 was $2,037.1 million, an increase of $305.5 million or 17.6% from $1,731.6 million for the same period of 2005. Moody's achieved strong revenue growth above the rate of the overall corporation in global structured finance, corporate finance and research,... Revenue in the United States was $1,277.8 million in 2006, an increase of $192.4 million or 17.7% from $1,085.4 million in 2005. Approximately 80% of the U.S. growth was driven by structured finance and corporate finance, reflecting strong issuance across most structured asset classes... Growth in issuance of structured finance securities has generally been stronger than growth in straight corporate and financial institutions |

143

| | debt issuance, and Moody's expects that trend to continue. Growth in structured finance has reflected increased acceptance of structured finance as a financing and refinancing mechanism... |
|---|---|
| Annual Report to Shareholders for 2006<br><br>~ March 2007 | Our revenue growth in 2006 was broad-based, with almost all business lines and geographic segments achieving increases, and most of those contributing at double-digit rates. **Ratings revenue growth at Moody's Investors Service was led by global structured finance at 24% and corporate finance at 23%... In structured finance, very strong performance in global credit derivatives and commercial mortgage-backed securities ratings led the list of revenue drivers,** while the U.S. residential mortgage and home equity securitization ratings unit unexpectedly achieved results on par with 2005 despite the housing market slowdown in the second half of the year. This strong performance was in large part due to the prevalence of new mortgage products, the persistence of low long-term interest rates and an increase in the percentage of mortgages being securitized. **As in 2004 and 2005, U.S. structured finance was the largest dollar contributor to Moody's revenue growth.** |

285.    Each of the above statements identifying Moody's structured finance operations to

be at the heart of Moody's reported results, growth and success was materially misleading, because

Moody's omitted to disclose that those results, growth and success were generated on the basis of

business conduct that was the very opposite of what Moody's concurrently (and falsely) represented.

286.    These misleading statements sustained and even increased the artificial inflation of

Moody's share price. For example:

(a)     after Moody's reported strong financial results and increased its full-year guidance

on August 2, 2006, both driven by structured finance operations, Moody's shares, as Bloomberg

reported, "had their biggest rise ever" (Bloomberg, Moody's Shares Surge After Profit Rises 18%

to Record (Update 7)). Moody's shares rose 11.1%,$6 per share, after defendants' August 2, 2006

statements, closing August 2, 2006 at $60.11 per share (up from their prior close of $54.11 per

share).

144

(b)     Likewise but less dramatically, Moody's October 25, 2006 statements (another set of strong financial results, another guidance increase, all due to structured finance) caused Moody's shares to rise 1.1% that day, closing October 25, 2006 at $65.12 per share (up $0.69 per share from the previous close).

(c)     Similarly, on February 7, 2007, after Moody's reported further strong structured finance growth, Moody's shares rose 1.9%, or $1.34 per share (their biggest gain in three months) to close at $73.95 per share.

## III.     UNIQUE CHARACTERISTICS OF THE STRUCTURED FINANCE MARKET INTENSIFIED CONFLICT OF INTEREST PRESSURES AND UNDERMINED MOODY'S INDEPENDENCE

287.     Throughout the class period, Moody's represented it had the conflicts under control (Section II.A, *supra*), when in truth the conflicts had control of Moody's.

### A.     The Structured Finance Market Trifecta: Moody's Largest Source of Revenue, Moody's Fastest Growing Source of Revenue; and Most Profitable Line of Business

288.     The singular materiality of structured finance ratings to Moody's – and to Moody's revenues, income, and share price – cannot be overstated. Moody's provision of structured finance ratings was (1) the single largest source of Moody's revenues and earnings during the class period, (2) the single largest source of the *growth* of Moody's revenues and earnings during the class period, and (3) Moody's most profitable line of business. As Moody's itself said in its Annual Report for 2005:

> Structured finance is Moody's largest ratings business and has been the fastest-growing over the last five years.

145

289.    In 1995, Moody's structured finance ratings business generated $50 million of revenues; in 2006, $848 million, accounting for 54% of Moody's ratings revenue and 44% of Moody's total revenue. Largely propelled by that structured finance growth, and particularly the boom in subprime/Alt-A-backed securities[75], Moody's revenues (and share price) more than tripled between 2000 and 2006.

290.    A table (replicating like tables contained in Moody's 2006 and 2005 Forms 10-K) displaying (1) Moody's ratings revenues for 2004, 2005, 2006 by source (e.g., corporate bonds, municipals, structured finance), (2) the contribution of each to total ratings revenues, and (3) the year-over-year growth for each ratings category is provided in the endnotes[76].

291.    In broad strokes: every other dollar coming into Moody's for ratings work came from structured finance ratings, and structured finance ratings revenues were growing at rate twice as fast as the rest of Moody's ratings revenues. In 2004, structured finance ratings generated $553.1 million in revenue and constituted 48.4% of all Moody's ratings revenue. In 2005, structured finance revenue grew 29.3% to $715.4 million, accounting for 51.7% of all Moody's rating revenue; by contrast, the rest of Moody's ratings revenues grew less than half as fast (13.4%). In 2006, structured finance rating revenue grew a further 23.9% to $886.7 million, accounting for 54.2% of all Moody's rating revenue, while the rest of Moody's rating revenues again grew less than half as fast (11.8%).

292.    The fees charged by Moody's to provide structured finance ratings were approximately three times greater than the fees for rating corporate bonds of equivalent issuance size (Moody's set its fees according to size of the security issuance). As structured finance rating revenues accounted for ever-greater proportions of Moody's ratings revenues, and worked their way

from top line (revenues) to bottom line (net income), Moody's operating margins increased to exceed 54% throughout 2004, 2005 and 2006. These margins made Moody's the third-most profitable large public company in the country (i.e., its operating margins were third-highest).

293.    Subprime securitization also drove the massive second-order securitization market, in which new securities – most notably, collateralized debt obligations (CDOs) – were issued by resecuritizing collections of first-order asset-backed securities. Subprime was the single largest asset category in structured finance CDOs, accounting, on average for approximately 40% of such CDOs' assets and, on occasion, nearly 90%. Structured finance CDO issuance growth was thus fed by subprime mortgage-backed security issuance growth, and was correspondingly extraordinary: in 2005, $177 billion of structured finance CDOs were issued; in 2006, issuance nearly *doubled* to $314 billion; in 2007, issuance reached $263 billion.

294.    Moody's made sure that the marketplace was fully aware of this dramatic expansion of what essentially was new business. Between 2000 and 2003, Moody's share's rose from $10 to $30 per share, and this at a time when markets were broadly declining. As structured finance issuance experienced its greatest growth, between 2004 and early 2007, Moody's shares more than doubled in value, rising from approximately $30 per share in early 2004 to more than $70 per share in early 2007.

## B.    The Structured Finance Market and Rating Process Reverse Normal Understanding of the Rating Process

295.    The structured finance market and rating process were qualitatively distinguished from the markets/processes for all other securities in three primary ways, detailed below at Section III.B.1-3. These distinguishing features of structured finance operated to intensify Moody's conflict

147

of interest and to undermine Moody's independence, as outlined in Section III.C and evidenced in Section III.D.

> **1. Structured Finance Issuance, Unlike All Other Ratings Segments, Was Highly Concentrated Among a Small Number of Repeat Issuers**

296.    In order to maintain the conceits of independence and ratings integrity, Moody's public pronouncements were misleading and concealed that this most important source of revenues was doled out by a handful of customers. For example, Moody's 2006 Form 10-K states that Moody's "had ratings relationships with more than 12,000 corporate issuers and... has rated more than 96,000 structured finance obligations". However, underlying those 96,000 structured finance obligations were a handful of repeat issuers. The ten largest controlled approximately 75% of total issuance.

297.    The balance of power in the structured finance arena was different than – and, in fact, qualitatively opposite to – the balance that prevailed in the corporate debt market. Because so few had so much power to give this lucrative business to ratings agencies, John C. Coffee, Jr. (Adolphe A. Berle Professor of Law, Columbia University) was prompted to testify before the Senate Banking Committee on September 26, 2007, that credit rating agencies had been newly "destabilized" by the "small number" of "large repeat clients" that control access to credit rating opportunities in structured finance:

> The major change that destabilized rating agencies appears to have been the rise of structured finance... [T]he rating agency is no longer facing an atomized market of clients who each come to it only intermittently (and thus lack market power), but instead large repeat clients who have the ability to take their business elsewhere. Today, structured finance accounts for a major share of some rating agencies' total revenues; equally important, these amounts are paid by a small number of investment banks that

148

know how to exploit their leverage...

298. The interest of the influential debt issuers and structured financiers was inherently in conflict with provision of independent ratings. Their aim was to garner the highest possible credit rating and thus lower issuance costs. In the case of corporate debt, a higher credit rating allows the issuer to access capital markets at lower interest rates; in the case of structured finance, structured finance issuers have had far greater leverage with which to exert their interests. As Professor Coffee explained to the Senate:

> I'm not suggesting that there were demons here. I'm going to paint a picture of the gatekeeper in this market who is under great pressure and who is vulnerable to that pressure... What's causing this, I give a number of reasons, but one distinctive factor is this market is behaving very differently in its rating of corporate bonds versus its rating of structured finance products. And I think that's because structured finance gives new power to the investment banks. They are assembling large pools of securitized assets. They have repeat players. And they can remove their business if they don't get what they like. They have much more power than the traditional corporation, which was only .01 percent of the agencies business. (Congressional Hearing Testimony, Professor John C. Coffee, Jr., September 26, 2007)

2. **The Unique Degree to Which Structured Finance Securities Depended on Credit Ratings – "You Start With a Rating and Build a Deal Around a Rating"**

299. In corporate finance ratings, ratings techniques are applied to a corporation that in an obvious and fundamental way exists wholly apart from those ratings. In structured finance markets, the reverse occurs: a structured finance security is applied ("structured") to fit already-existing statistical techniques used to determine credit ratings. This is a crucially consequential difference, for reasons discussed further below.

300. The point is both important and capable of easy summarization. Moody's Chief

149

Operating Officer Brian Clarkson (whose resignation was announced on May 8, 2008, shortly after a Wall Street Journal exposé detailed how he presided over the loosening of Moody's structured finance rating standards (¶ 344, *infra*)), put it succinctly:

> You start with a rating and build a deal around a rating.
> (Portfolio, *Overrated*, September 2007)[77]

301.    Subprime mortgage assets, in and of themselves, are far too risky to merit Aaa ratings. Yet the securities backed by subprime mortgages regularly garner those very Aaa ratings. This is made possible through *structuring* the securities (in Mr Clarkson's vernacular, "build[ing] a deal"), in ways ostensibly intended to protect the securities from the inherent risk of the underlying bundled assets. This structuring process depends fundamentally on credit rating agency statistical models used to determine the inherent risk of the underlying assets themselves, which then determines how the security must be structured to compensate for those very risks. Structured finance securities come into being, therefore, with credit rating agency models in their DNA.

302.    Obviously, structuring the securitization to create the appearance of greater creditworthiness makes it a far more marketable and profitable product for the issuer, as it produces from one pool of risky mortgages an array of security tranches designed to achieve different credit ratings (from extremely safe Aaa-tranches to lower-rated Baa and Ba tranches) that appeal to a broad range of investors with different tolerance for risk.[78] These structuring processes permit the perversion of the resulting structured finance security tranches away from reflecting the "natural" credit quality of the underlying asset pool, as a corporate bond does the issuing corporation.

303.    A pool of assets is bundled together, and a security structured through tranching *et alia*, precisely on the basis of, and so as to conform itself to, pre-existing credit rating agency models

and rating standards. So, what the resulting structured finance security actually reflects is the credit

rating agency models that are used to evaluate the credit risks of the underlying assets, on the basis

of which the security is structured.[79]

304.     As both IOSCO and the Financial Stability Forum concluded, the structured finance

rating process is the "reverse" of, or an "inverted" version of, how ratings are traditionally bestowed:

> Because structured products are designed to take advantage of
> different investor risk preferences, they are typically structured for
> each tranche to achieve a particular credit rating... But **structured
> finance ratings differ from traditional corporate debt ratings in
> that they [] result from an "inverted" ratings process in which a
> structure is fitted to a desired rating...** (Financial Stability Forum,
> *Report of the Financial Stability Forum on Enhancing Market and
> Institutional Resilience*, April 7, 2008 at pp. 33-34).
>
> \*\*\*\*\*
>
> [S]tructured financial products... are, in a sense, designed for a
> particular credit rating (even in cases where no CRA opinion or
> formal credit rating is sought). **Where credit ratings are sought, the
> "rating process" for these products can appear to be the reverse
> of how a more traditional product is rated. This is because the
> issuer of the structured product often decides beforehand what
> rating it would like for each tranche (presumably within the
> limits of what is possible), and the tranches are structured
> accordingly.** Some critics have argued that the inherently iterative
> nature of this process may give rise to potential conflicts of interest.
> (IOSCO, *The Role of the Credit Rating Agencies in Structured
> Finance Markets – Final Report*, May 28, 2008, at p. 5)

305.     As alleged below, structured finance's unique dependence on credit rating agency

models resulted in acute pressure on those very models.

### 3.     Rather Than a Credit Rating Agency Determining a Credit Rating, an *Ex-Ante* Credit Rating Determines a Credit Rating Agency

306.     The manner of operation of the Issuer Pays model was different in structured finance

than in all other ratings spheres because of structured finance's uniquely bifurcated evaluation,

retention and compensation structure. In corporate finance, a ratings agency is retained, does work, pronounces its rating, and is paid. In structured finance, rating agencies were paid *de minimis* amounts for an initial pre-evaluation of ratings, but received the much larger full payment only were the issuer to choose to officially use (or "publish") the ratings indicated by the credit rating agency in its pre-evaluation.

307.   Specifically, multiple ratings agencies are called in by an issuer to analyze the security structure proposed by the issuer and opine as to whether the ratings targeted by the issuer are merited, for which ratings agencies are paid a *de minimis* initial fee. Rating agencies either confirm that the structure merits the ratings targeted by the issuer (which formed the basis for that structure), or engage in an iterative negotiation process (depending on the flexibility of the issuer and the rating agency) as to whether the assets or the security structure could be modified to achieve desired ratings.[80] Thus, prior to selecting a rating agency to deliver the "official" credit rating, the issuer knows exactly what ratings the rating agencies will deliver.

308.   It is axiomatic that the issuer chooses the more amenable credit ratings agencies as the ones whose ratings will be officially "published" in connection with the structured finance security issuance.[81] Providers of those ratings receive the much larger fee. Any other ratings opinions, provided by rating agencies that were not selected by the issuer for the security's final "published" ratings, disappear without a trace.

309.   Were Moody's to refuse to confer the ratings desired by the issuer, it was not the case -- as with a corporate bond -- that Moody's would issue lower-than-desired ratings. Instead, no ratings would be issued by Moody's at all, no Moody's rating would be "published", and no payment to Moody's would be made (apart from the *de minimis* initial payment). As hedge fund manager Bill

152

Ackman put it, "the ratings agencies get their fee... if they just say the deal works. If they say the deal doesn't work, well, you just go across the street" to another agency to get the rating desired (Portfolio, *Overrated*, September 2007). In structured finance, Moody's is not really paid for the work it performs in evaluating credit risk and creditworthiness, but for delivering a rating guaranteed *ex ante* to be to the issuer's liking. *It is selling its rating, not its work.*

310.    As a result, there are no ratings "surprises" in structured finance. There is either prior agreement on ratings, or no "published" rating at all. Admissions by Moody's in this regard have been perhaps subtle but certainly striking. For example, Nicolas Weill, Moody's chief credit officer for structured finance, was interviewed in a Fortune article (Fortune, *Junk Mortgages Under the Microscope*, October 16, 2007). The article scrutinized the asset pool underlying a 13-tranche, $494 million subprime RMBS securitization: Moody's had rated the senior tranche Aaa in April 2006 and, within a year, downgraded that tranche to Baa. Mr Weill said that, in hindsight, "we would not have rated it". But that begs this truth: Moody's could have and but for its conflicts would have rated it Baa to begin with.[52]

311.    The ability of issuers in structured finance to determine which ratings agencies will be chosen to rate a security and thus be paid for their ratings – *prior to security issuance and on the very basis of the ratings the agencies say they will deliver* – has no analogue in corporate finance, and understandably generates extreme pressures on ratings agencies to deliver favorable ratings at the initial pre-evaluation stage. Their payment depends on it. The practice necessarily creates conflicted interests.[53]

**C.    Moody's Independence, Methods/Models, and Ratings Were Systematically Debased In Structured Finance**

1.    **Ratings Shopping**

312.    The systemic and structural features of the structured finance ratings process

described above resulted in what is termed "ratings shopping", as Mark Adelson, former Moody's

managing director of structured finance, explained to the House of Representatives:

> Another aspect of conflict of interest, though, that's a little different, is that ... rating agencies can come under a pressure to loosen their standards for a whole sector. And this can happen from behavior from the issuers called "ratings shopping," where an issuer, let's say, shows a deal to multiple rating agencies and then picks one or two that have the easiest standards to rate the deal. Then, the other rating agencies that had tougher standards become invisible. And what's more, they don't make any money, because the way you make money rating a deal is you rate the deal and charge the issuer. So it puts pressure on the rating agencies to loosen their standards. (Congressional Hearing Testimony, September 27, 2007 – Mark Adelson)

313.    Because the structured finance security is, essentially, a direct expression of the

models used by credit rating agencies to evaluate the underlying assets, issuer desires for more

favorable ratings place pressure on the underlying, fundamental models used by Moody's to

determine thousands of ratings on thousand of securities (namely, the models examined in detail in

Section II.C, *supra*). *Whereas similar issuer desires in corporate finance pressure Moody's only to*

*make an exception to its rules (i.e., to give an issuer a higher rating), issuer desires in structured*

*finance pressure Moody's to change the rules themselves.*

314.    Because structured finance issuance is so highly concentrated, and so material to

Moody's, structured finance issuers had far more leverage than in any other ratings sphere in

translating their rating desires into realities.

154

315.    Issuer leverage and Moody's conflict of interest pressures were further heightened by the unique-to-structured finance bifurcation of evaluation, ratings, and payment. The ability of structured finance issuers to hold back payment for "published" ratings, and to choose agencies on the basis of ratings promised in advance at the "pre-evaluation" stage, made ratings assignments and ratings payment a function of delivering ratings more favorable than competing rating agencies.

316.    Again, throughout the class period, Moody's represented it had the conflicts under control (Section II.A, *supra*), when in truth the conflicts had control of Moody's. In structured finance, ratings shopping is a fact evidenced by hard data, by Moody's own experience, and is admitted to by numerous industry insiders, including former Moody's personnel (Section III.D., *infra*).

## 2.    Gaming the System

317.    The structured finance ratings process was, with rating agencies' active participation, entirely oriented to production of securities that just barely met minimum standards for their ratings.

318.    "Gaming is the whole thing" – Chris Flanagan, J.P. Morgan subprime analyst (as quoted in the New York Times, *Triple A Failure*, April 27, 2008).

319.    Structured finance issuers, together with the rating agencies, were "gaming the system" so as to produce structured finance triple-A tranches that were as close as they could be to double-A credit quality without actually being labeled as double-A, with like results at each stop along the credit rating scale.[34] As the New York Times reported on April 27, 2008, and as Professor Coffee informed Congress in his April 22, 2008 Congressional Hearing Testimony:

> Point two of what we learned recently:   Loan originators and
> investment banks have learned how to game the model, how to
> play with it. This is partly because, for a large advisory fee, the

155

rating agencies show them how their model works. And once you've shown how it works, you learn how, just tweaking it a little bit, and selectively editing the data, can get you a better rating. (Professor Coffee, April 22, 2008 Congressional Hearing Testimony)

*****

What the bankers in these deals are really doing is buying a bunch of I.O.U.'s and repackaging them in a different form. Something has to make the package worth -- or seem to be worth -- more that the sum of its parts, otherwise there would be no point in packaging such securities, nor would there be any profits from which to pay the bankers' fees. That something is the rating. Credit markets are not continuous; a bond that qualifies, though only by a hair, as investment grade is worth a lot more than one that just fails. As with a would-be immigrant traveling from Mexico, there is a huge incentive to get over the line. The challenge to investment banks is to design securities that just meet the rating agencies' tests. Risky mortgages serve their purpose; since interest rate is higher, more money comes into the pool available for paying interest. But if mortgages are too risky, Moody's will object.

... Banks are adroit at working the system. pools like Subprime XYZ are intentionally designed to include a layer of Baa bonds, or those just over the border. "Every agency has a model available to bankers that allows them to run the numbers until they get something they like and send it in for a rating," a former Moody's expert in securitization says. In other words, banks were gaming the system; according to Chris Flanagan, subprime analyst at JPMorgan, "Gaming is the whole thing." When a bank proposes a rating structure, the rating agency will insist on a cushion of extra capital, known as an "enhancement." The bank lobbies for a thin cushion (the thinner the capitalization, the fatter the bank's profits). It's up to the agency to make sure that cushion is big enough to safeguard the bonds. process involves extended consultations between the agency and its client. In short, obtaining a rating is a collaborative process (New York Times, *Triple A Failure*, April 27, 2008)

320.    Moody's actually marketed itself to issuers on the very basis of Moody's willingness

to give issuers an advantage in the "game" for which Moody's served as the umpire:

Late last year, officials from Moody's Investors Service gave a

156

PowerPoint presentation to a group of mortgage lenders in Moscow. There were the usual arcana about what the ratings mean and how the agency creates them. Along with competitors Standard & Poor's and Fitch Ratings, Moody's serves as an unofficial umpire in major league finance, helping investors and underwriters gauge what to buy and what to avoid. Many big investors aren't allowed to even touch bonds that don't have the blessing of a good credit rating.

But midway through the presentation, Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets. The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued. They laid out how Moody's and its peers help their clients put together complicated mortgage securities before they receive an official ratings stamp. But this give-and-take can go too far: Imagine if you wanted a B-plus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.

\* \* \* \* \*

It's becoming clear that the ratings agencies were far from passive raters, particularly when it came to housing bonds. With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been looking for to finally force the Big Three to change. The credit-ratings agencies "made the market. Nobody would have been able to sell these bonds without the ratings," says Ohio attorney general Marc Dann, who is investigating the agencies for possibly aiding and abetting mortgage fraud. "That relationship was never disclosed to anybody." (Portfolio magazine, *Overrated*, September 2007)

### 3. Moody's "Inside" Role Decreases Moody's Objectivity and Heightens Moody's Conflict of Interest

321. An additional distinction from corporate finance is that Moody's occupied a position in structured finance that had no analogue in Moody's corporate finance ratings business. In structured finance rating, Moody's in fact was on the "inside" of the very deal it was supposedly assessing as an independent, outside observer (i.e., a gatekeeper). Moody's inside position had two distinct aspects, both of which decreased independence and objectivity.

157

322.   First, Moody's was in the conflicted position of essentially evaluating its own work. Issuers are familiar with rating agency models and the consequences of those models for issuance/sale profits. Issuers of structured finance securities will seek the rating agency whose model is most advantageous to the issuer and pre-structure the securitization (e.g., include "x" million dollars of mortgages of "y" quality, overlaid with a securitization structure featuring "z" amount of triple-A rated tranches, etc.) to be in line with the agency's models. As structured finance expert and former Moody's managing director Mark Adelson stated, rating agencies

> make the actual models available to market participants to use. On the issuer side of the market there are many professionals who become experts in using the rating agency models in order to optimize their transactions to achieve "best execution". (Asset Securitization Report, *Subprime Mortgages - A Realistic Outlook*, August 20, 2007)

323.   Often, such issuer pre-structuring is achieved through purchase from the credit rating agency of the rating agency's analytical tools, software packages and/or consulting services. As Professor Coffee informed the Senate (quoted above at ¶ 319), rating agencies were profiting by selling to issuers ("for a large advisory fee, the rating agencies show them how their model works") the very key to the gate they were charged with keeping.

324.   For its part, Moody's maintained throughout the class period that it had created a structure that had prevented the conflicts from compromising its independence (Section II.A, *supra*).

325.   Second, Moody's actively helped to structure the very securities it evaluated, thus further decreasing its objectivity. This occurred in the pre-rating, pre-issuance discussions with the issuers, when issuers presented for evaluation (at *de minimis* fee) the asset pool they had assembled and the security structure they had created, to verify in advance whether the credit ratings targeted by the issuer would be granted by credit rating agencies. If not, Moody's suggested how the asset

158

pool could be recomposed and/or the structure reworked in such a way that Moody's would deliver the ratings desired by the issuer.

326.    This process was attested to by a former Moody's employee, referred to as "CW 2", who was employed by Moody's from July 1998 until September 2004 as a Senior Credit Officer in the Residential Mortgages Group. CW 2 was responsible for issuing credit ratings, and, as a senior employee, was selected as chair for rating committee meetings. CW 2 reported that Moody's used a Mortgage Model Platform ("MMP") to assign and evaluate credit ratings. The MMP provided information about how to restructure loan pools in order to obtain better credit ratings.    CW 2 stated that Moody's analysts could indicate to clients the credit enhancements and structural changes that needed to be made to loan pools in order to obtain the desired credit rating. CW 2 described the process as a give and take because several adjustments were made to the structure of the loan pool in order to get the preferred rating.

327.    Thus, Moody's participated in security structuring and issuance not only (1) in the "once removed" fashion of having its models or analytical services used by issuers to pre-structure the securitization, but (2) directly participated in "fine tuning" asset composition and security structuring to ensure a pre-issuance meeting of the minds, and so as to secure further ratings assignments.

328.    This doubly-inside role of rating agencies in structured finance (aptly summarized during the Congressional Hearings as "playing both coach and referee") makes the conflicts of interest in structured finance more acute, as the Financial Stability Forum concluded:

> While the issuer-pays model applies to all the products rated by these CRAs, including corporate bonds, **the standard conflicts of interest may be more acute for structured finance ratings.** Because

159

structured products are designed to take advantage of different investor risk preferences, they are typically structured for each tranche to achieve a particular credit rating. To the extent that CRAs discuss with issuers during this structuring process the rating implications of particular structures, the potential for conflicts of interest becomes greater. The conflicts are exacerbated when CRAs also sell consulting services to entities that purchased ratings. (Financial Stability Forum, *Report of the Financial Stability Forum on Enhancing Market and Institutional Resilience*, April 7, 2008)

329.  Moody's inside role in structured finance is by itself a conflict and inconsistent with

independence, as numerous experts explicitly conclude:

### Larry Summers – former Secretary of the Treasury

Larry Summers, former Treasury Secretary, said there were obvious conflicts: "If you are hired by someone at twice your regular fee to work collaboratively with their people to design a security that will receive a triple A rating from yourself" then you are likely to deliver certain results. "There needs to be a lot of cleaning up in this area" (Financial Times, September 29, 2007)

*****

### Robert Reich - former Secretary of Labor

"It's as if movie studios hired film critics to review their movies, and paid them only if the reviews were positive enough to get lots of people to see a movie", former Labor Secretary Robert Reich wrote on his blog. "The whole thing rested on a conflict of interest analogous to that of stock analysts who, before the dotcom bubble burst, advised clients to buy stocks their own investment banks were issuing." (TheStreet.com, *Why the Ratings Agencies Flunked*, January 3, 2008)

*****

### Arthur Levitt - former SEC Chairman

The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of

160

interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed. Then, these symptoms were found among a key group of gatekeepers -- auditors. Now, they are found in an equally critical gatekeeper -- the credit ratings agencies.

As documented both in the media and by the Securities and Exchange Commission (SEC), credit ratings agencies -- such as Moody's Investor Service, S&P, and Fitch Ratings -- are playing both coach and referee in the debt game. They rate companies and issuers that pay them for that service. And, in the case of structured financial instruments which make it possible to securitize all those subprime mortgages, they help issuers construct these products to obtain the highest possible rating. These conflicts are hard to spot because transparency among these agencies is murky at best, and currently it is difficult to hold these agencies accountable for any wrongdoing.

And the credit ratings agencies need to be held accountable... (Wall Street Journal, *Conflicts and the Credit Crunch*, September 7, 2007)

\*\*\*\*\*

... the credit rating agencies are high among the number of miscreants that went along with this game... [They were] severely conflicted... I think we are going to have great change there in how they go about their business. I think their conflicts are going to have to be announced. I think the transparency of their ratings is going to have to be enhanced... I think there will be a very strong push to remove those conflicts from the rating agencies, and perhaps they will consider the possibility of having someone other than the companies being rated pay the agencies to rate themselves. Therein lies the basic conflict... (Arthur Levitt, Bloomberg interview, 2008)"

330.    Moody's improper collaboration with its issuer-clients is further illustrated by interactions it had with UBS in the summer of 2007. That summer, according to the complaint in *Pursuit Partners LLC et al v. UBS AG. et al.*, No. FST-CV-08-4013452-S (Ct. Super, Mar 5, 2008). Moody's shared inside information with UBS concerning impending changes to its ratings methodology for certain types of CDOs, prior to publicly disclosed those changes in October 2007.

ᴿᴬ

D.  Evidence

1.  **Insiders Admit Ratings Shopping is "Rampant" and "Happens all the Time"**

331.  In structured finance, ratings shopping is a fact evidenced by hard data (Sections

III.D.2-7) and admitted to by numerous industry insiders, including former Moody's personnel:

(a)  Mark Adelson, a former managing director in Moody's structured finance

division, stated in his September 27, 2007 testimony before the House Subcommittee that ratings

shopping had been "rampant" in structured finance:

> There is, however, another type of potential conflict of interest that can affect rating agencies. It is the potential conflict of interest that arises when rating agencies compete to win business from many issuers in a sector by generally loosening their rating standards for the entire sector. This practice has been termed competitive laxity. The credit rating industry is potentially vulnerable to the threat of competitive laxity in areas where issuers can engage in rating shopping. Rating shopping refers to the practice among issuers of presenting their transactions to multiple rating agencies and then selecting only some of them (usually one or two) based on which ones will permit the highest leverage and still grant the desired ratings.
>
> It is indisputable that securitization issuers in the MBS, CMBS, and CDO areas engage in rating shopping. They do so openly. (Congressional Hearing Testimony, September 27, 2007 – Mark Adelson)

(b)  As Mr Adelson explained in an article published on the front page of the Wall

Street Journal on August 15, 2007, ratings shopping was an industry fixture and took place under

double-speak euphemisms such as "best execution":

> The underwriters, in turn, assiduously tailored securities to meet the concerns of the ratings agencies, say people familiar with the process.

162

> Underwriters, these people say, would sometimes take their business to another rating company if they couldn't get the rating they needed. "It was always about shopping around" for higher ratings, says Mark Adelson, a former Moody's managing director, although he says Wall Street and mortgage firms called the process by other names, like "best execution" or "maximizing value." (Wall Street Journal, Credit and Blame: How Rating Firms' Calls Fueled Subprime Mess – Benign View of Loans Helped Create Bonds, Led to More Lending, August 15, 2007)

(c)     In March/April 2008 interviews with the Wall Street Journal (that led to its

exposé of Moody's and to his resignation shortly after publication of that exposé (¶ 344, *infra*)).

Moody's head of structured finance ratings Mr Clarkson stated:

> There is a lot of ratings shopping that goes on. There just is. People shop for deals all the time. They're looking for the highest rating...[47]

(d)     John Rutherfurd, Jr., former President, CEO and Chairman of Moody's

between 2000 and 2005, explained to the SEC:

> The most frequent situation where a rating agency does not rate the securities of a structured product is when the proposed assets and structures of the issuer and the proposed ratings of the sponsor do not meet the credit requirements of the rating agency following its specified methodologies. Normally, in this situation another credit rating agency, which may be an NRSRO, has concluded that the proposed ratings of the sponsor do meet the credit requirements of such agency. In this manner, sponsors of structured products "shop" for the ratings they desire. (Rutherfurd, March 8, 2007 Letter to SEC)

(e)     Other Moody's personnel and industry experts likewise attest.[48]

2. **Principles Cost Principal: Moody's Own Experience in the Commercial Mortgage-Backed Securities (CMBS) Market Confirms the Real Financial Consequence of Trying to Resolve the Conflict on a Principled Basis**

332. On April 10, 2007, Moody's Investors Service issued a Structured Finance Special Report announcing that Moody's was changing the models it used to assess commercial mortgage-backed securities' ("CMBS") creditworthiness (and thus the models that issuers retaining Moody's would use to pre-compose the asset pool and pre-determine the security/tranche structures). The catch was that Moody's was changing its models to make them stricter (e.g., a pool of assets that had previously been able to product $80 million of AAA-rated securities would now only generate $70 million of such securities). Within three months, Moody's market share for CMBS ratings sank from 75% to 25%; it went from rating three of every four CMBS securitizations to rating only one of every four. Moody's market share, as Moody's managing director Tad Phillips observed, had done a "complete flip":

> Moody's Investors Service says it is paying a high price for its tough stance on lax lending standards for commercial mortgage-backed securities.
>
> In a new report that assesses the status of the market, the Moody's Corp. unit said it was passed over and not hired for 75% of the commercial mortgage-backed securities rating assignments issued in the past few months as a result of its requirement that issuers add an extra layer of credit enhancement. Moody's said issuers are "rating shopping" — meaning they were hiring competitors that would hand out higher ratings on securities. Because Moody's makes money rating the creditworthiness of bond issuances, blacklisting could potentially eat away at the firm's bottom line if the trend continues.
>
> *****
>
> But on April 10, Moody's put the brakes on this frenzy by

164

announcing it was raising subordination levels of commercial mortgage-backed securities in an effort to enhance the credit quality and further reduce the possibility of wide-spread defaults. This meant the ratings agency would require an increase in the amount of lower-rated bonds needed in transactions to take losses before the higher-rated ones were affected, a move that raises the cost of structuring the securities for the issuer. In a CMBS pool, lower-rated bonds, or those at the subordinate level, can offer better returns than the more highly-rated investment-grade bonds, but the lower-rated bonds are the first to be hit with losses.

*****

Moody's now says it is taking a hit for being the first rating service to publicly announce it would significantly raise subordination levels. In a report on the CMBS market scheduled for release today, Moody's wrote it has been shut out of eight of the past 12 deals with a face value of $25 billion since April. "We used to rate 75% of the deals, but since our announcement, we were not asked to rate 75% of them," says Tad Philipp, a managing director for Moody's. "Our market share has done a complete flip."

On a recent CMBS offering issued by Morgan Stanley, which included 225 fixed-rate loans on 268 multifamily, commercial, and manufactured housing community properties, S&P and Fitch issued the ratings. Morgan Stanley didn't return calls seeking comment on why it selected these two rating outlets. Moody's says it cannot comment on the details of a specific deal or issuer, but suspects its higher subordination levels are the reason it isn't in on most of the deals.

Analysts say the rejection of Moody's by some issuers – typically investment banks – is a direct result of its April announcement. Since the lower-rated bonds needed to increase subordination levels are more expensive, Moody's move could trim profit margins for CMBS issuers. (Wall Street Journal, *Moody's Says It Is Taking Hit — Ratings Firm Loses Business As Tougher CMBS Stance Spurs Issuers to 'Rate Shop'*, July 17, 2007)

333.   The pressure on Moody's to rate for pay could not be clearer.

334.   The consequences of insistence on raised standards are demonstrably severe. Or

rather, particularly severe for a ratings agency that are paid by issuers who use agency models to

165

structure the securities they create. That is why independence is both so important and so lacking, particularly in the structured finance arena. Moody's would have had no *raison d'etre*, much less earnings together with a swollen stock price, if it could not misrepresent its independence. That is why a rating agency's claim that independence has been maintained is a meaningful one – that it has earned its bread through the fundamental validity of its ratings rather than their relative laxity. That is why false claims to independence materially misrepresent the way ratings agencies' business was actually done.

335.    Moody's represented that it had immunized itself from this *potential* conflict of interest, that it was in the business of analyzing the risk of securities rather than advertising models to issuers, that it could and would speak out (and be the first if need be) to maintain fundamental creditworthiness standards embodied in the credit ratings is assigned. Were Moody's massive revenue growth from its structured finance activities generated by conducting business in this manner, as Moody's in fact claimed it did, that would lead to the conclusion that Moody's success was a function of the independence and trustworthy nature of its product. Recent events have made clear that this was not true.

336.    Moody's ostensible brave CMBS stance, which in fact just reversed its prior moves to loosen its CMBS models, stands inevitably and perhaps intentionally in contrast to Moody's subprime residential mortgage-backed securities ("RMBS") market. stance. All the CMBS market facts and dynamics cited by Moody's to require/justify newly-increased CMBS rating standards[19] had *exact* parallels in subprime RMBS – the exact same facts were present, the exact same dynamics at work. These included: record-high LTV levels; an economic and real estate boom understood to temporarily occlude more normal levels of price appreciation, default rates, and loss severity; a real

166

estate cycle in its late and baroque stages, producing declines in mortgage underwriting quality and increases in exotic and riskier mortgage products; and security structures containing relatively thin subordinate tranches that could be easily wiped out entirely by losses and thus increase the potential impact on higher, investment-grade tranches.

### 3.    Grade Inflation: A Simple Empirical Test

337.    A simple and elegant test indicates that structured finance ratings were debased. As Professor Coffee stated in his testimony to the Senate on September 26, 2007:

> If the rating agency is subject to more pressure in the case of structured finance offerings than in corporate bond offerings, this diagnosis leads to a testable prediction: default rates should be higher on structured finance products than on corporate bond offerings for securities having the same ratings grade. The evidence appears to corroborate this prediction that debt ratings are more likely to be inflated on structured finance products than on corporate bonds. Looking at the default rate on Moody's lowest investment grade rating (Baa), two financial economists recently reported that the five year cumulative default rate on corporate bonds receiving a Baa rating from Moody's between 1983 and 2005 was only 2.2%, but the same five year cumulative default rate for CDO's receiving the same Baa rating from Moody's between 1993 and 2005 was 24%—more than ten times higher. Moody's informs me that they consider the default or impairment rate for 2005 to be aberrational for several reasons, and they have advised me that the comparable five-year cumulative default rates ending in 2006 (as opposed to 2005) were 2.1% for corporate bonds and 17% for CDOs. But even on their preferred comparative basis, the ratio is still over 8 to 1 (as opposed to over 10 to 1) comparable five-year cumulative default rates ending in 2006 (as opposed to 2005) were 2.1% for corporate bonds and 17% for CDOs.,
>
> Even as so modified, the most plausible interpretation of this disparity is that ratings were inflated on CDOs (at least more so than on the corporate bonds), probably because only the issuers of the former had sufficient leverage with the rating agency. This hypothesis is not presented as established fact or as a permanent tendency, but it is exactly the type of issue that the SEC should focus on in its

> investigation: what were the default rates for individual underwriters'
> offerings? Until rebutted, the most reasonable inference is that the
> underwriters that did the most business with a rating agency had a
> higher rate of default on their offerings (Congressional Hearing
> Testimony, September 26, 2007 – Professor John C. Coffee, Jr.)

338.    The disparity in the default likelihood of equivalently-rated CDO tranches and corporate bonds vastly understates the disparity because the analysis ends in 2005 and thus does not include the massive wave of subprime structured finance securities downgrades that started in 2007 (detailed in Section II.D.2.e), many of which will lead to default. Updated calculations of default rates, should, for many years into the future, show an even wider disparity.

339.    In a Moody's Investor Service report titled *Should Moody's Consider Differentiating Structured Finance and Corporate Ratings?*, published on or about February 4, 2008, Moody's conceded the failure of its subprime structured finance ratings to live up to long-held understandings of those ratings. In the report, Moody's proposed a variety of alternatives to distinguish the ratings it would confer on structured finance ratings from the ratings it had been conferring on corporate bonds, including, *inter alia*, a "completely new rating scale" that would not use the traditional letter designations (Aaa, Aa, etc.) used in corporate ratings. Other choices proposed by Moody's consisted of keeping the traditional letter designations but, for structured finance, appending various modifiers or suffixes to the letter designations that would in various ways signify that the ratings were importantly different than seemingly equivalent letter designations in corporate finance. For example, one Moody's proposal was simply (and simplistically) to attach the suffix ".sf" after the letter rating given to a structured finance security (e.g., Aaa.sf) to indicate (1) the anyway evident fact that the Aaa rating was for a structured finance security and (2) the newly intended meaning that that Aaa was different than previous understandings of Aaa.[86]

4.   Ratings Shopping Drives Market Share: Moody's Gained Market Share

340.   Moody's "complete flip" in CMBS rating market share (¶ 332, *supra*) is sure sign

that ratings drive market share. Prior to and during the class period, Moody's *gained* structured

finance market share. As H. Sean Mathis indicated in his Congressional Testimony, Moody's

structured finance revenue growth rates exceeded the overall growth of structured finance issuance:

> From 1997 to 2000, structured finance issues were around $500
> billion a year. In 2001, the growth curve took off and never looked
> back, jumping to over $900 billion that year and growing from 2002
> to the present day at a compound growth rate of nearly 30% annually.
> This year global structured finance issuance is expected to reach $3.3
> trillion . The growth rate of Moody's structured finance revenues has
> not only matched that of the issuances, it actually exceeded it.
> (Congressional Hearing Testimony, September 27, 2007 – H. Sean
> Mathis)

341.   Analysts also observed that Moody's was gaining structured finance market share.

For example, during the Company's February 7, 2007 conference call, despite defendant McDaniel's

curious reluctance to so admit, Goldman Sachs analyst Peter Appert effectively proved on the basis

of objective data that Moody's gained ratings market share from its largest competitors, S&P and

Fitch:

> PETER APPERT, ANALYST, GOLDMAN SACHS: Thanks. Ray,
> **the very impressive revenue momentum that Moody's has
> enjoyed in the second half of the year in particular suggests that
> you're probably gaining market share with the ratings market.
> So I was wondering if you could talk about where you think those
> gains might be coming in terms of whether it's geographic or
> product-specific that's driving that performance, and if you think
> there's further upside?**
>
> RAY MCDANIEL: It is somewhat difficult for me to give you
> market share information at a very granular level, because of different
> levels of reporting for the different business segments across rating
> agencies... I **can't really comment on whether they are against**

169

other credit rating firms.

> PETER APPERT: Your revenue growth is certainly – it would
> appear your revenue growth is certainly higher than both Fitch
> and S&P's, so it would seem that you are gaining share.

342.   Defendant McDaniel's reluctance to admit what executives in most other companies

would proclaim – market share gains – was motivated by the desire to obscure evidence of Moody's

lack of independence given ratings shopping pressures.

343.   Moody's April 25, 2007 conference call featured a near-exact replay, this time

prompted by Morgan Stanley analyst Lisa Monaco (who observed, again, that Moody's had taken

market share away from its chief rival S&P):

> LISA MONACO: Hi. Just quickly, Ray, I'm wondering if you could
> comment on your competitive position in the marketplace. It looks
> like S&P, while we don't know the exact revenue performance for
> their credit ratings business, but it looks like it underperformed
> your performance in the quarter. Is that market share shift, or
> could that be just a composition of revenues which is more geared
> towards relationship-based revenue? Thanks.
>
> RAY MCDANIEL: I think it's probably both... we did have some
> gains in important areas in our market coverage, our paid market
> share, including, for example, our commercial mortgage-backed
> securities area and our residential mortgage-backed securities area
> and structured finance. I don't know what the market share numbers
> are for our chief competitor on those particular lines, but I know that
> we had gains.

### 5.   Exposé: Moody's Unmasked

344.   On April 11, 2008, the Wall Street Journal published a front-page article detailing

how, as Mr Clarkson was put in charge of a series of different structured finance ratings groups

within Moody's (e.g., commercial mortgage backed securities, residential mortgage-backed

securities, CDOs), those groups became more client-friendly, loosened their ratings standards and

170

gained market share:

> A decade ago, as the housing market was just beginning to take off,
> Moody's was a small player in analyzing complex securities based on
> home mortgages. Then, Moody's joined Wall Street and many
> investors in partaking of the punch bowl.
>
> A firm once known for its bookish culture began to focus on the
> market share that affected its own revenue and profit. The rating firm
> became willing, on occasion, to switch analysts if clients
> complained... By the height of the mortgage securities frenzy in 2006,
> Moody's had pulled even with its largest competitor, rating nine out
> of every ten dollars raised in these instruments. It gave many bonds
> its coveted triple-A rating.
>
> Profits at the 99-year-old firm, which John Moody started to rate
> railroad bonds, rose 375% in six years. The share price quintupled.
>
> Now, Moody's [et al.] are under fire for putting top ratings on
> securities that ultimately collapsed in value. Investors, many of
> whom relied on ratings to signal which securities were safe to buy,
> have lost more than $100 billion in market value. The credibility of
> the ratings system is in tatters... Investigators from Congress, the
> Securities and Exchange Commission and several state attorneys
> general are examining the rating firms' practices.
>
> Moody's acknowledges it sometimes got things wrong in judging
> mortgage bonds, but says these were honest mistakes and not the
> result of efforts to garner market share. It says it has maintained its
> rigor and objectivity in a rating process that is still adversarial toward
> big investment banks.
>
> Of the three big rating agencies, Moody's underwent the deepest
> cultural change amid the housing boom. At the heart of the firm's
> gradual transformation into a player into the mortgage game was
> Brian Clarkson, 51 years old, who joined the company as an analyst
> in 1991 and became president last August. Mr Clarkson maintains
> that his focus on making Moody's friendlier to Wall Street was what
> the Company needed early this decade. "We're in a service
> business", he says. "I don't apologize for that".
>
> &ast;&ast;&ast;&ast;&ast;
>
> Mr Clarkson himself had dealt with Moody's as an outsider, and had
> been frustrated with its manner. As he began to rise within the firm,

171

he set out to make it more client-friendly and focused on market share.

\*\*\*\*\*

Moody's toughness gave issuers reason to go elsewhere, and back in the mid-1990s, Fitch and S&P were both rating more mortgage bonds than Moody's, in large part because their standards were considered easier. For instance, in commercial mortgage-backed securities, Moody's trailed its two main competitors by 30 percentage points in market coverage in 1996.

That year, Mr Clarkson took over the group at Moody's that analyzed such securities. The firm added new analysts and overhauled its ratings approach, allowing for higher ratings in the area. Within a year, Moody's moved ahead of both Fitch and S&P in the sector. Rivals said that Moody's had cut its standards. Mr Clarkson was quoted as calling this "sour grapes". He says now that the change in ratings approach was the right call.

In 1999, Mr Clarkson took over the part of the firm's structured finance business that oversaw bonds and complex securities based on home mortgages. Moody's rated just 14% of high-quality "prime" bonds in that area the year before he took over, compared with 51% that Fitch rated and 89% that S&P rated...

Moody's top home mortgage analyst at the time, Mark Adelson, took a cautious approach that resulted in fewer triple A ratings. Mr Clarkson shook things up, firing or reassigning about two dozen analysts and hiring new ones who started giving higher grades under a new methodology. Mr Adelson left for an investment bank. In 2001, Moody's market coverage was up to 64%...

\*\*\*\*\*

Mr Clarkson encouraged his people to be more responsive... and to find ways deals could get done within Moody's methodologies...

"Brian Clarkson created a dialogue between Moody's and the Street that was good", says Paul Stevenson, a former Moody's executive who now works at BMO Financial Group. But "the most recent problem", he says, "is that the rating process became a negotiation".

Consider a Bank of America mortgage deal in early 2001. As in most such deals, the vast majority of the securities based on the pool of

172

mortgages would be rated triple-A. The question was how big a chunk would be rated lower – paying a higher interest rate and bearing the brunt of any defaults that occurred.

A rating committee at Moody's voted to require that the issuer put about 4.25% of the deal's value in the lower-rated section, to provide extra protection for buyers of the top-rated section. But after Bank of America complained and said it might go with a different rating firm, Moody's reduced the size of the lower-rated chunk slightly – saving the issuer some interest costs – according to people with knowledge of the matter.

*****

In 2002, Mr Clarkson's realm extended to the fast-growing business of CDOs. In this complex product, already-sliced-up bonds are further sliced into new pieces, based on risk and potential return. Moody's was already rating 90% of the dollar value of CDOs. Mr Clarkson told an analyst he didn't want bad service to cause that to slip, people familiar with the matter say.

"There was never an explicit directive to subordinate rating quality to market share", says Mark Froeba, a former Moody's analyst who recently started a bond valuation company that may compete with rating firms. "There was, rather, a palpable erosion of institutional support for rating analysis that threatened market share"...

*****

Mr Clarkson's structured finance group grew to account for about 43% of Moody's revenue in 2006, up from 28% in 1998. By 2006, the firm had more revenue from structured finance – $881 million – than its entire revenue had been in 2001... Moody's rated about 94% of the $190 billion in mortgage-related and other structured finance CDOs issued in 2007, the second-busiest year ever.

345.    Mr Clarkson, based on his sixteen year record with the Company (and presumably

upon the market share gains and tremendous revenue growth he had overseen), had been promoted

on or about August 7, 2007 to President and Chief Operating Officer of Moody's Investors Service,

"with overall responsibility for leading Moody's ratings and research business" (from Executive Vice

173

President and Co-Chief Operating Officer, which positions he had held since 2004). Clearly, Moody's board was entirely satisfied with and adopted Mr Clarkson's altered way of doing business.

346.    On May 7, 2008, shortly after the Wall Street Journal exposé, Moody's issued a press release announcing Mr Clarkson's resignation.[91]

### 6.    Specific Examples of the General Principle

347.    The April 11, 2008 Wall Street Journal exposé of the inverse relationship between Moody's credit rating standards and its market share (detailed just above) provided a specific example of how "ratings shopping" pressures led Moody's to relax its own standards and provide ratings it otherwise would not have granted:

> Consider a Bank of America mortgage deal in early 2001. As in most such deals, the vast majority of the securities based on the pool of mortgages would be rated triple-A. The question was how big a chunk would be rated lower – paying a higher interest rate and bearing the brunt of any defaults that occurred.
>
> A rating committee at Moody's voted to require that the issuer put about 4.25% of the deal's value in the lower-rated section, to provide extra protection for buyers of the top-rated section. But after Bank of American complained and said it might go with a different rating firm, Moody's reduced the size of the lower-rated chunk slightly – saving the issuer some interest costs – according to people with knowledge of the matter. (Wall Street Journal, *As Housing Boomed, Moody's Opened Up*, April 11, 2008)

348.    Exactly the same scenario was described by a former Moody's employee, referred to as "CW 1", who was employed by Moody's from July 2004 until March 2007 as Assistant Vice President in the Commercial Mortgage-Backed Securities Division. CW 1 was responsible for leading a team of underwriters, interacting with banks, and mentoring new analysts. CW 1 reported that in those situations where an analyst may have asked a client too many questions or the bank was

174

not happy with the rating assigned by Moody's, the bank pushed back and engaged Moody's in negotiations outside the realm of structured finance. CW 1 referred to these negotiations as "market negotiations", meaning the bank would put the question to Moody's, "Do you want the fee?" or "Do you want us to come back?"

349.   CW 1 further stated banks which were not happy with the rating provided by CW 1 would call him/her and ask "What the f*** are you doing?" CW 1 would tell the bank he/she had spent a month arriving at the rating and if the bank did not like the rating, then to call his/her boss. If his/her boss asked him/her to revisit the rating then CW 1 would do so. In those situations where CW 1's boss asked him/her to revisit a rating, CW 1 would *pull back on the assumptions* he/she used in arriving at the rating. In so doing, CW 1 typically focused on the "haircut" given to the projected cash flows for the deal. CW 1 explained that the "haircut" referred to is the difference in projected cash flows calculated by the issuer and the projected cash flows calculated by Moody's, since the projected cash flows calculated by Moody's were always the lower figure. CW 1 further explained that an increase in cash flows resulted in a higher credit rating.

### 7.   To Retain Ratings Assignments, Moody's Re-Assigned Credit Rating Analysts Who Were Too Independent for Issuers' (and Moody's) Liking

350.   Moody's, at the request of issuers, removed individual structured finance ratings personnel from ratings assignments when issuers deemed such individuals to be "too fussy" or to raise too many questions concerning the security at issue:

> At Moody's, at least one analyst in the group that rated collateralized debt obligations, or CDOs, was moved off of a particular investment bank's deals within the past few years after bankers requested an analyst who raised fewer questions about their deals, according to people familiar with the matter.

175

Another mortgage analyst at Moody's was moved to the firm's surveillance unit after a Moody's official agreed with an investment banker's opinion that the analyst was too fussy, a person familiar with the situation said. The surveillance unit monitors the performance of deals that already have been rated, but doesn't rate new issues.

\*\*\*\*\*

When business was booming, Wall Street firms prized analysts who moved quickly, since investors were eager to pile into the mortgage market by buying bonds. Analysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank.(Wall Street Journal, *At Request of Bond Issuers or Bankers, Credit-Rating Firms Switch Analysts*, May 23, 2008)

351.    This is remarkable. CDO and mortgage-backed security analysts who carried out in practice the sort of independence that Moody's ceaselessly represented that it maintained, were removed from ratings operations precisely because of their exercise of that independence.

352.    The April 11, 2008 Wall Street Journal exposé discussed above indicates that such removals were widespread, specifically under defendant Clarkson and specifically in Moody's mortgage-backed securities rating operations. *See* ¶ 344, *supra* ("Moody's top home mortgage analyst at the time, Mark Adelson, took a cautious approach that resulted in fewer triple A ratings. Mr Clarkson shook things up, firing or reassigning about two dozen analysts and hiring new ones who started giving higher grades under a new methodology...").

## IV.    LOSS AND LOSS CAUSATION

353.    Moody's material misrepresentations and omissions deceived the market about the essential, most lucrative and most promising features of Moody's business. These deceptions caused the market prices for Moody's shares to trade at artificially inflated levels for an extensive period. The disclosures of lack of independence and integrity at once signaled a material erosion of revenues and earnings, and, astonishingly, that the market upon which Moody's had been feasting

176

was, at bottom a sham. Upon disclosure, Moody's stock price was cut in half, as it became known that the market for Moody's services was a Potemkin Village of its own making. Moody's shares, trading above $70 at the beginning of 2007, fell to below $35 by the first days of 2008 as the scope of Moody's misrepresentations and what their revelations meant for its earnings prospects became increasingly clear. In excess of $7 billion of market capitalization vanished.

354.   There are many highly-publicized investigations into Moody's wrongdoing. None touches on Moody's misrepresentations, their impact on Moody's stock prices, and ultimately, injuries to those investors who purchased in reliance on them. No other proceeding seeks recovery on behalf of injured Moody's investors who trusted the Company's repeated and extended representations that created a false impression among investors of a financial and business state of affairs that differed in material ways from the one that actually existed.

355.   This case concerns itself with the destruction of shareholder's investments. We cannot however ignore that Moody's material misrepresentations and omissions regarding its business have done more than that. Subprime-related losses have caused hundreds of thousands of subprime borrowers to lose homes to foreclosure, subprime mortgage originators and housing developers to go out of business and/or into bankruptcy by the dozen, hedge funds to turn belly-up with billion dollar losses, multi-billion dollar asset writedowns in major banks and investment banks that in some cases reach into the tens of billions of dollars per institution, widespread and shocking losses suffered by pension funds all over the world that ended up holding investment-grade rated securities backed by structured subprime collateral that did not merit such ratings, the capsizing of the bond insurance industry, the seizing up of credit and credit markets, the specter of recession emerging from all the above and unprecedented emergency actions by the Federal Reserve to prevent

the same.

356.   Still, these losses are not the losses at issue here. Here, the focus is on the losses suffered by Moody's investors when Moody's misconduct of its subprime structured finance ratings business became clear. These losses are immediately apparent:

**Moody's Share Price: February 3, 2006 - January 24, 2008**



178

357. The losses suffered by class members are the direct consequence of Moody's misrepresentations and omissions.

## A. Overview

358. For analytical purposes, the share price declines and class member losses occasioned by the emergence of the truth concerning Moody's conduct of its structured finance securities credit ratings may be distinguished into several constituent aspects, summarized here and detailed below. These are: (1) the resulting loss of "reputational capital"; (2) the resulting loss of ratings business; and (3) the regulatory consequences and legal liabilities to which Moody's has exposed itself by operating as it did, rather than as it described.

## B. Loss of Reputational Capital

359. "Reputational capital" names an undeniable truth that Moody's itself repeatedly has acknowledged (¶¶ 35-36, 71, 83) as the linchpin of its ability to do its business. Moody's opinions will be in demand (and thus supply) only to the extent that people trust those opinions; for Moody's to continue to function as an utterer of worthwhile credit ratings opinions, it must be trusted. It must be trusted to manage the conflict of interest presented by the Issuer Pays model, to maintain its independence from the issuers who pay for its services, and to produce through objective analysis of all relevant data reliable credit ratings. The sum total of the trust is Moody's "reputational capital".

360. Loss of reputational capital is consonant with loss of business capital and prospects, and the market has accordingly devalued Moody's business and its share price. As Professor John C. Coffee, Jr. (Adolphe A. Berle Professor of Law, Columbia University) testified before the Senate

179

Banking Committee on September 26, 2007:

> By the term "gatekeeper," I mean those professionals on whom
> investors necessarily depend to provide certification and verification
> services: auditors, securities analysts, credit rating agencies,
> investment banking firms and sometimes corporate attorneys. These
> professionals develop "reputational capital" over many years and
> many clients that leads investors to rely on them, in part because
> investors know that the gatekeeper will suffer a serious reputational
> injury if it is associated with a fraud or unexpected insolvency.
> Because this injury should be greater than any amount the issuer can
> pay the gatekeeper to acquiesce in fraud, it should deter the
> gatekeeper from involvement in fraud. From this perspective,
> "reputational capital" is in effect "pledged" by the gatekeeper in
> support of the issuer's statements. But when the market learns that
> the gatekeeper failed to uncover fraud or related problems (or that it
> blinked at them), the resulting loss of confidence, both in the
> gatekeeper and the market's mechanisms generally, can produce a
> sharp decline in stock market values... (Coffee Testimony)

361.    On March 11, 2008, defendant McDaniel explicitly acknowledged Moody's loss of

reputation and of business, and announced a material reduction to Moody's financial guidance for

2008 (as detailed below):

> I think our reputation has been hurt by what's gone on. I think it
> would be frankly, disingenuous for me to say it hadn't been... [W]e
> are a business that really works off of reputational capital more so
> than others. And so it is a particular concern to me. That restoration
> of confidence is very much underway [] through action to enhance the
> quality of the ratings that we make available..

362.    During the April 22, 2008 Congressional Hearing, Moody's representative Claire

Robinson (senior managing director of Moody's asset finance group) conceded the point as well:

> SEN. SHELBY: Your reputation's in tatters right now, wouldn't you
> think, in the financial arena — all the rating agencies are challenged
> deeply now? You wouldn't agree to that?
> MS. ROBINSON: Oh, yeah. We are challenged at the present time.

363.    Moody's reputation was further diminished after a May 21, 2008 Financial Times

("FT") article further exposed the extent to which Moody's ratings had been disingenuously crafted. The FT reported that Moody's had reported incorrect Aaa ratings on billions of dollars worth of Constant Proportion Debt Obligations (CPDOs), a derivative instrument, due to a glitch in Moody's computer models. According to the FT, internal Moody's documents evidence that some of Moody's senior staff knew early in 2007 that the products rated the previous year had improperly received the Aaa ratings as a result of a computer error, and, in fact, absent that error should have been rated four notches lower. Although Moody's discovered the error in early 2007, Moody's not only (1) declined to downgrade ratings until January 2008, but (2) according to documents obtained by the FT, when Moody's finally recognized the error, rather than downgrading the erroneously-rated instruments, Moody's staff instead *amended the methodology employed in order to keep the Aaa ratings for the instruments that had been originally and erroneously assinged.* Such amendments included reducing assumptions about future volatility of the credit markets.

364.    Moody's, with respect to CPDOs, in effect threw a dart that missed the target, but subsequently redrew the target so that the dart appeared to have landed within the bulls eye. When such concrete evidence was revealed that Moody's had altered rating models to create the appearance that high ratings were justified, Moody's shares lost $9.40 per share, or 21.4% of their remaining value, falling from $43.90 on May 20, 2008 to $34.51 on May 22, 2008.

365.    CPDO issuance was and is tiny: a matter of several billions, as opposed to the half a trillion dollars of subprime RMBS that Moody's rated each year and the further hundreds of billions of CDOs. The market's response to disclosure of Moody's CPDO rating conduct had nothing to do with the size of the CPDO issuance market and/or the potential decrease in future CPDO rating assignments. Rather, the market's dramatic response had everything to do with the

181

matters complained of here – Moody's purported reputation, trustworthiness, objectivity – and further evidences their materiality.

## C.    Loss of Reputational Capital Translates to Business Losses

366.    The loss of reputational capital resulting from Moody's subprime Structured Finance Securities ratings conduct has translated directly into (1) substantial declines in Moody's structured finance ratings business and thus into (2) loss of the class' invested capital in Moody's common stock. Moody's business declines and the ensuing share price declines (and thus, class losses) have been all the greater for the reasons detailed below.

### 1.    Damage All the Greater Because the Structured Finance Market Was Moody's Largest Source of Revenue and Growth

367.    Structured finance ratings had provided Moody's with its largest source of ratings revenue, its fastest growing source of ratings revenue, and its most profitable source of ratings revenue (detailed above at Sections III.A and II.E). The collapse of Moody's creditworthiness in structured finance has made all the more sizeable the negative consequences for Moody's business, revenue, income, margins, growth, and future prospects. All have declined (as alleged in detail below at ¶¶ 372-401).

### 2.    Damage All the Greater Because of the Leveraged Nature of the Structured Finance Market

368.    Moody's has now downgraded its initial credit ratings for essentially every single junior subprime (and Alt-A) RMBS tranche that Moody's rated during 2006 (i.e., tranches originally rated A or below), as well as a substantial portion of those it rated during the second half of 2005 and the first half of 2007, as well as the CDOs which invested in those tranches and resecuritized them. The resulting investor loss of confidence has resulted in cessation of demand for such

tranches: no one wants to buy them anymore. Because it is now near-impossible to sell such junior tranches (or at the very least, uneconomical to do so due to the deep discount that would be required), the senior tranches cannot be produced as well.

369.    The consequence, for Moody's, is that the loss of trust focused most particularly on its junior tranche ratings has resulted in the loss of ratings work for junior tranches and a far greater loss of ratings work for the large amount of senior tranches that would rest on the back of the junior tranches.

370.    This leveraging effect is reinforced by and extends to CDOs, which, to a stunning degree, served as a sort of buyer of last resort for subprime RMBS junior tranche toxic waste. CDOs pooled those junior subprime RMBS tranches into re-constituted asset pools, and resecuritized them, producing (from this very toxic waste) senior-level CDO tranches with Aaa ratings as well as the inevitable junior tranches with lower credit ratings (themselves resecuritized into CDO-squareds with triple-A senior tranches, etc.). Awareness of the concocted nature of the ratings has caused CDO funding of subprime junior tranche RMBS, itself subsidizing the issuance of senior tranche subprime RMBS, to dry up; investors want nothing to do with CDOs backed by such assets. Recent word from Senator Schumer, a key member of the Senate Banking Committee (Congress Daily, *Schumer Looks At Credit Raters' Role In Housing Mess*, December 10, 2007):

> "The problem is a lot of deeper: it's an inherent conflict of interest. The person who wants the rating pays for it. The borrowers are now much more skeptical. The people who buy the product are much more skeptical of the triple-A rating", Schumer said.

371.    In short, the loss of faith in Moody's credit ratings for junior subprime RMBS tranches has resulted in a loss of further ratings business for those tranches, the much greater senior

tranches, and the CDO and CDO-squared resecuritizations, etc. The "subprime contagion" resulting from Moody's downgrades of lower-tranche subprime RMBS led to much, much larger declines in structured finance issuance (the larger, higher rated tranches, the CDOs, etc.), and thus steep declines in what had been Moody's largest and fastest-growing source of revenues.

372. The result: as detailed below, a stunning decline in structured finance issuance. As Moody's reported in June 2008 (*see* n. 96, *infra*), the issuance of CDOs, CMBS, and RMBS had each plunged by more than 90% in 2008. The consequence for Moody's: as detailed below, steep ratings revenue declines following such steep issuance declines, multiple financial guidance reductions, the admission that more than 10% of Moody's prior "revenue base" was "extinct" – "just gone" and never to return, and the consequent downsizing of Moody's and the firing of approximately 10% of its employees.

> **3.    Damages All the Greater Because the Destruction of the Credibility of Structured Finance Credit Ratings Resulted in Demolishing Large Parts of the Structured Finance Market and, with it, Rating and Revenue Opportunities**

373. The unique degree of reliance upon NRSRO credit ratings for structured finance securities (¶¶ 96-99, *supra*), and the unique degree to which structured finance securities depend for their existence and form upon NRSRO credit ratings (Section III.B.2, *supra*), further account for and explain the size of the collapse of the structured finance market, and the concomitant collapse of Moody's structured finance ratings revenues, growth, share price, etc., resulting from Moody's misconduct of its structured finance credit ratings. Moody's egregious conduct to feed its voracious appetite in the end cannibalized the very market that supplied its growth and earnings. Moody's actions have brought about the extinction of its markets.[92] As detailed below, entire classes of

184

structured finance issuance (subprime RMBS, CDOs backed by subprime RMBS, second-order CDO², and SIVs) became "extinct" – with issuance, and consequent ratings revenues, never to return. Issuance of less discredited structured finance securities – RMBS as a whole, CMBS, CDOs as a whole – plunged by more than 90%. More than 10% of Moody's entire "revenue base", as defendants acknowledged in late 2007 and 2008, had vanished permanently, together with the belief in structured finance securities' (and Moody's) creditworthiness.[53]

374.    Structured finance securities were mere expressions of Moody's models. Now that those models have been revealed to be illegitimate, the securities themselves become illegitimate and the subprime structured finance assembly line has essentially ground to a halt. Were this scandal to have occurred in the corporate finance arena rather than in structured finance, corporate bond issuance would necessarily continue, just with lower ratings. But because it occurred in structured finance, *issuance itself cannot continue*. Issuance can resume only once new and legitimate models are provided.[54]

375.    Even were legitimate models developed, they might not herald the rebirth of subprime structured finance issuance so much as pound the final nail into its coffin. Legitimate models that produce accurately-rated subprime structured finance securities may make the issuance so costly (e.g., more overcollateralization as credit support for all rated tranches) as to be uneconomical. So the very models that could make subprime structured finance issuance possible also should make it impossible.

376.    On August 1, 2007, Moody's announced financial and operational results for the second quarter of 2007, and held a conference call with analysts and investors to discuss the Company's results, performance and prospects. Defendants reported that RMBS revenues had

185

declined by 10% during the quarter and (together with CDOs) were expected to experience further

declines (respectively, 40% and approximately 25%):

> Within Moody's investor service U.S. ratings revenue rose 22%. U.S.
> Corporate finance was the largest contributor to growth on a
> percentage basis ...Very strong results from rating commercial
> mortgage backed securities and credit derivatives were somewhat
> offset by a 10% decline from rating residential mortgage backed
> securities... U.S. structured finance revenue for the second half of
> 2007 is projected to decline in the high teens percent range giving
> current market conditions a difficult comparisons versus the same
> period of 2006. This includes an expected year-over-year decline
> in second half revenue from rating residential mortgage-backed
> securities of about 40%, and a decline of second half revenue
> from rating credit derivatives in the mid 20% range. However we
> do expect revenue growth in the mid single digit percent range from
> rating both asset backed securities and commercial mortgage-backed
> securities...

377.    On October 24, 2007, Moody's announced financial and operational results for the

second quarter of 2007, and held a conference call with analysts and investors to discuss the

Company's results, performance and prospects. As defendants stated during the October 24, 2007

conference call, declines in structured finance revenues (including a 52% revenue decline from

RMBS ratings) were already severe enough to have outweighed all revenue gains in other ratings

areas. The steep structured finance declines caused Moody's to lower its financial guidance for 2007

(by then nearly over), driven by changes in Moody's outlook for RMBS ratings (declines now

expected to be in the low 30% range, approximately twice as bad as the previous outlook of declines

in the "high teen" range), CDO declines of 40%-50%, and what defendants referred to as marketwide

"basic rethinking about certain asset categories or classes of structured finance":

> U.S. structured finance performance in the quarter completely
> offset revenue gains across the other U.S. rating and research
> business, declining 14% year-over-year. Within U.S. structured

186

finance, revenue growth of 29% from rating commercial mortgage backed securities was more then offset by revenue declines across all other asset classes led by a 52% decreased in revenue from rating residential mortgage backed securities...

*****

[W]e have revised our outlook downward for the full year of 2007... In the U.S. structured finance business, the company now expects revenue for the year to be about flat to 2006 including low double digit percent growth in commercial mortgage back securities and low teen percent growth in credit derivative ratings offset by a decline in revenue from the U.S. residential mortgage backed securities ratings including home equity securitization and the low of 30s percent range which is a greater decline than the high teens percent range previously forecast... let me just give you the expectation for the fourth quarter on the CDO side. In the U.S., CDO market we're expecting a decline of 40 to 50% and that includes both CLOs and asset-backed CDOs. We expect the decline in the asset-back CDOs to be greater than 40-50% and decline in the CLO market to be somewhat less. Globally, we would expect a decline for CDOs to be between 30% and 40%...

*****

The reason I think, we will probably have a more retracted recovery period is that the credit issues that have come up in the structured finance area. I think we're probably going to drive some more basic rethinking about certain asset categories or classes of structured finance. Obviously, the areas that had been most hard hit are the subprime residential mortgages. The short-term markets, particularly the part of the market represent by the structured-investment vehicles and the knock on effect to the credit derivatives market. I think it's not unreasonable to expect that we will probably see more standardization coming out of this market going forward with some of the more complex securities being more difficult to place for a longer period of time. So, the combination of the market having to digest the ongoing problems with the housing market in the U.S. and to think about the adjustments that will be made to securities and potentially creating more standardized security classes in structured to accommodate more liquidity, more transparency, I think is going to take some time and that's why we're being cautious about the pace

187

of recovery coming out of this crunch.

378. In light of structured finance issuance declines of such magnitude and duration, Moody's revealed (in its October 24, 2007 conference call) that it was cutting expenses in light of its new revenue realities ("We are pursuing a program to bring expenses more in line with projected revenue for the fourth quarter"), that it had instituted a "soft freeze" on hiring new employees, and that it would take an unspecified "restructuring" charge during the fourth quarter of 2007.

379. Moody's integrity in its use of the phrase "soft freeze" matched the integrity of its representations of its independence and authenticity of its ratings. Within a week, on October 31, 2007, Moody's "soft freeze" on new hiring new employees had revealed the firing of old employees:

> Moodys spokeswoman Fran Laserson said job cuts will begin next month, through eliminating positions and not filling vacancies. The company last week reported its first drop in net income in seven years as revenue from rating residential mortgage securities tumbled 52%. "We're looking for ways to eliminate redundancies and reduce our costs in this difficult environment" Laserson said... The stock has fallen 37% this year... The sale of structured finance products including CDOs may fall as much as 50% in the 4th quarter, Moody's executives told investors on an Oct. 24 conference call. (Bloomberg, *Moody's to Cut Jobs in Next Two Months as Ratings Demand Slows,* October 31, 2007)"

380. On January 9, 2008, Moody's presented at Citigroup's 18th Annual Global Entertainment, Media & Telecommunications Conference in Phoenix, Arizona. The January 9, 2008 Presentation provided a "Restructuring Charge Update" which stated:

> Initiated in response to company reorganization and the decline in current and anticipated issuance of rated debt securities in some market sectors

> • Q407 pre-tax charge between $48-52 million

> • Restructuring charge of approximately $44-48 million related to

reduction in staff of 7.5%
- Consolidation of corporate staff functions
- Integration of businesses comprising Moody's Analytics
- Anticipated decline in new issuance activity in some markets

381. The first section of Moody's January 9, 2008 presentation (after the "Business Overview") was titled "Current Operating Conditions". The first slide of the "Current Operating Conditions" section was titled "Market Outlook", and acknowledged the extensive destruction of a market that Moody's violation of its representations permitted to bubble and then implode with adverse financial consequence to Moody's:

**Market Outlook**

• **Credit markets remain unsettled since subprime financial shock**

• U.S. residential mortgage sector will remain under stress
- Key question: "what's happening to the availability of credit outside of housing?"

• Credit spreads have widened and issuance has weakened sharply in the wake of the shock, with the exception of high grade bonds

• Near-term: corrective actions expected – but how beneficial?

• **Longer-term: prospects for credit markets are strong, but parts of structured finance materially affected and financial innovation in those sectors will only recover slowly...**

382. Moody's January 9, 2008 presentation also contained Moody's own dollar assessment of the direct impact on Moody's of the collapse of structured finance issuance of subprime RMBS (and CDOs, SIVs, etc.). *The January 9, 2008 presentation concluded that "About 10%-12% of Moody's Revenue", referred to as "Moody's Impaired Revenue", would disappear.*

383. The depth of the market collapse caused by Moody's ratings misconduct is hard to overstate. CDO demand and supply – averaging approximately $500 billion for each of the past three

189

full calendar years – have vanished, taking with them a correspondingly large supply of Moody's rating opportunities. In January 2008 only one single CDO was created, and the largest single creator of CDOs (Merrill Lynch) announced that it would cease further CDO origination "for the foreseeable future".

384.    On February 8, 2008, Moody's reported financial results for the fourth quarter of 2007, including (1) a 54% profit decline and a 23% revenue decline, (2) driven by a 25% *ratings* revenue decline, (3) driven by "*a 53% reduction in structured finance revenue driven by significant declines in issuance across most asset finance categories*" (Moody's chief financial officer Linda Huber, February 8, 2008 conference call). Revenue from rating residential mortgage backed securities was down an eye-popping 81%, as defendants stated during their February 8, 2008 conference call:

> Looking first of the fourth quarter, revenue of $505 million was down 14% from the same period of 2006. Revenue declined in the ratings business resulting from unfavorable market conditions... Moody's U.S. revenue was $277 million in the fourth quarter, down 23% year-over-year. At Moody's Investor Service we had revenue of $258 million, down 25% from a year-ago. U.S. ratings revenue declined 31% year-over-year, largely caused by a 53% reduction in structured finance revenue driven by significant declines in issuance across most asset financed categorize. Revenue from residential mortgage backed securities was down 81% while revenue from rating credit derivatives and commercial mortgaged backed securities declined 54% and 52% respectively...

385.    Given such steep declines in ratings revenue and especially structured finance ratings revenue, Moody's disclosed that it expected its revenues to *decline* during 2008 "in the low double digit percent range". Operating margins (guidance for "mid-to-high 40% range") and earnings (guidance for $2.17-$2.25 in earnings per share) would fall as well "due primarily to lower ratings

190

revenue" and especially steep declines in structured finance rating revenue:

> With a global Moody's Investor Services business we expect revenue for the full year 2008 to decline in the mid to high teens percent range... Within the U.S. we project revenue for Moody's Investor Service to decrease in the mid 20s percent range for the full year. In the structured finance business we expect revenue for the year to decline in the low to mid-40s percent range due primarily to a very substantial revenue decrease in residential mortgage backed securities rating and also significant decreases for credit derivatives and commercial mortgage backed securities.
> *****
> For the full year of 2007, global structured finance revenue was about 38%, 39% of total Moody's Corporation revenue. And that's going to decline fairly significantly in 2008 because of the expected decline in structured finance issuance activity. So that is going to be a reducing number. It reached a high point of about 45% in the first half of 2007, down to 39% for the full year and it will be below that in 2008, obviously.

386.    Four weeks later, on March 11, 2008, Moody's reduced the 2008 guidance it had

supplied on February 8, 2008 as a result of steeper-still declines in structured finance issuance.

Speaking at a media company investor conference hosted by Bear Stearns & Co., Inc. on March 11,

2008, defendant McDaniel admitted that RMBS issuance during 2008 was "essentially non-existent"

(together with other structured finance asset classes):

> ... what's driving this decreased forecast or changes in the Moody's Investor Service business, where we expect global revenue now to decrease in the mid-20-percent range, rather than in the mid-to-high teens' percent range, which we had forecast at the beginning of the year.

387.    As per defendants' March 11, 2008 statements, revenue guidance was reduced from

"low double digit" declines to a "mid-to-high-teens percent range" decline, earnings per share from

$2.17-$2.25 to $1.90-$2.00, operating margins were reduced from the "mid-to-high-forties percent

range" to the "mid-forties". All the above declines, Moody's acknowledged, were driven specifically

by decreased *ratings* revenue: guidance for Moody's other businesses remained "unchanged", while guidance for Moody's rating business (Moody's Investors' Service) was reduced from a revenue decline in the "mid-to-high teens percent range" to the "mid-twenties percent range".

388.   Defendant McDaniel made explicit in his March 11, 2008 comments that Moody's latest guidance reduction was necessitated by a need to "catch up with [] reality". That reality: what McDaniel labeled an "extinction event" with respect to several classes of structured finance securities (subprime RMBS, CDOs of subprime RMBS, CDO², SIVs) that had (1) previously constituted 10%-12% of Moody's revenue base and that (2) were now just "gone" without any expectation of coming back:

> what I don't expect to see come back in structured finance at all
> would equal about 10 to 12% of the Moody's Corporation
> revenue base. That includes subprime mortgage-backed
> securities, credit derivatives of subprime mortgage-backed
> securities and CDO-squared. The structured investment vehicle
> market, the SIV market, those are all markets that are gone, in
> my opinion... The other areas of structured finance may be in a
> cyclical downturn, but I expect those to come back, including
> commercial real estate, CLOs. Now, the credit card sector has
> actually continued to be fairly active in the first part of this year. Auto
> receivables will continue. Those areas, I think, are all much more
> robust and are not subject to the kind of extinction event that I
> think we've seen in some of the other areas... Markets have been
> very slow and some markets are completely inactive. High yields,
> corporate issuance in Europe, is just inactive and we had seen -- I
> think there has been one commercial mortgage-backed security
> issued in the U.S. year-to-date and we didn't rate that one. So we
> have just a complete freeze in some market sectors, and we are
> trying to -- frankly, to catch up with that reality in making this
> guidance available.

389.   Omitted was the reality that Moody's misconduct accompanied by its misrepresentations and omissions complained of had both allowed Moody's to exaggerate its

revenues and earnings, and then caused the extinction that had generated them. The prices of Moody's stock declined in line with the extinction of this most lucrative and falsely-promising aspect of Moody's business.

390.  Moody's first quarter financial results, announced April 23, 2008, further demonstrated the extinction of large parts of the structured finance market. While Moody's rating revenues declined 37% and Moody's U.S. ratings revenues declined 48%, Moody's structured finance revenues declined 57% and Moody's U.S. structured finance ratings revenues declined 69% "driven by significant declines in issuance across most categories with the biggest impact coming from residential mortgage backed securities, commercial real estate finance, and credit derivatives ratings businesses" (defendant Huber - April 23, 2008 conference call). Moody's projected U.S. ratings revenue declines "in the mid 30% range for the full year" and U.S. structured finance ratings revenue declines "in the high 50% range reflecting double digit percentage declines in most asset classes, led by residential mortgage-backed securities, commercial real estate finance, and credit derivative ratings".

391.  During the company's April 23, 2008 conference call, analyst William Slocum asked if the 10%-12% of revenue that Moody's had previously identified as "impaired" (i.e., ratings revenue tied to the hardest-hit sectors of the structured finance markets) would return soon. Defendant McDaniel made explicit that those revenues had been derived from rating products now so discredited as to be effectively extinct, and thus that those revenues would *never* return:

> WILLIAM SLOCUM, ANALYST, VALUE ACT CAPITAL: ...Ray, you talked about last Fall for 10 to 12% of the revenue going away for at least the next couple of years. How should investors think about certainly there's a secular decline or secular component and there's a cyclical component. How do you think about that 10 to 12% going

193

forward to 2009, 2010 ...?

RAY MCDANIEL: Thanks, Will. The 10 to 12% revenue extinction that I've talked about before I think is secular. That is not as a result of cyclical conditions. Those are sectors of fixed income activity coming out of structured finance that I just don't believe are going to return... I do think that 200 million to $250 million that we talked about before is going on a essentially a permanent basis... I just don't think we're going to get that back.
*****

I would just add also that we certainly recognize that the ability to introduce new instruments or instruments that are currently not very active back into the market is heavily reliant on a restoration of confidence and credit ratings and what we do, and we are very focused on that to have a justifiable sense of confidence in the opinions we are putting out through our credit ratings. But that, that process is going to take awhile. Folks have lost a lot of money and they're going to take awhile to come back into certain areas of the capital markets.

392.   In a May 14, 2008 article published by the Financial Times and titled "Moody's Sticks to Ratings Scale", Moody's head of structured finance Noel Kirnon stated that CDOs were effectively extinct and "might not return to the market". Robert Litterman, chairman of the Quantitative Investment Strategies group of Goldman Sachs Asset Management, agreed. Asked if the structured finance business would ever come back to its previous activity, Litterman (as quoted in an April 23, 2008 Bloomberg article) "replied "Well, I kind of doubt it", and added that "the ratings agencies here really let people down"."

D.   Regulatory Impact and Other Liabilities

393.   The now-evident illegitimacy of Moody's subprime structured finance credit ratings, and the now evident fact that Moody's functioned with respect to subprime as a gate-opener rather than gatekeeper, has drawn down upon Moody's intense regulatory scrutiny. This includes: investigations by the SEC; investigations by the Attorneys General of New York, Connecticut and

194

Ohio; and inquiries by international regulatory bodies such as IOSCO, the Committee of European Securities Regulators ("CESR"), and the Financial Stability Forum ("FSF"). The SEC investigation is ongoing, with preliminary results in the form of proposed rule-making recently announced on June 16, 2008, as are the state AG investigations, and IOSCO, CESR and FSF have all already released reports.

394.    The regulatory scrutiny is focused on the exact matter at issue here: Moody's conflicts of interest in rating structured finance securities and Moody's conduct of its structured finance securities ratings.

395.    Likely consequences include potential and substantial fines as well as regulation and legislation that may substantially impact or even fundamentally alter Moody's business. Legislators and regulators have emphasized that "all options are on the table", including legislating out of existence the Issuer Pays business model and even broadly rewriting the regulatory schema governing financial institutions to remove the current *de jure* necessity for credit ratings. As former SEC Chairman Arthur Levitt, interviewed on February 6, 2008 by Bloomberg Satellite Radio, concluded:

> Moody's is concerned that the government is going to crack down on the rating agencies and I think that's probably true.

396.    It is probable that the benefits Moody's has long enjoyed from its protected status as an NRSRO will be diminished; if not destroyed. Moody's misconduct in the protected market for NRSRO ratings has placed the market dominance it until now enjoyed at risk. Longstanding regulatory barriers that drastically restricted the pool of possible competitors have protected the few firms already blessed with an NRSRO license (such as Moody's) from the kinds of product pricing

and margin pressures that unrestricted competition provides.[97]

397.   The potential liabilities to which Moody's has exposed itself through its misconduct, and the potential business-altering regulatory responses, have further weighed down the share price and caused investor losses. That the regulatory response has yet to be finalized is of little import: it is the perceived threat evident in massing regulatory storm clouds that has here, as in gatekeeper scandals past, caused the market to take out its protective umbrella.[98] Whether or not any of these realities come to pass, that Moody's persistent misconduct has put it at risk of suffering them also was a material influence on the deflation of the price for Moody's common stock.

398.   Each and all of these outcomes will have material consequences for Moody's, and will likely result in a less dominant market position and in increased costs, decreased revenue and profit growth, and decreased operating margins. Regulation will increase rating agency suppliers while decreasing credit rating demand: in short, there will be a smaller pie to divide among more hungry participants. As a result, Moody's absolute rating opportunities, relative market share and margins may all decrease, as competition takes away ratings business formerly enjoyed by Moody's and as competitive pressures lead to pricing cuts. Furthermore, regulatory actions taken to prohibit or cleanse structured finance conflict of interest pressures will make it impossible for Moody's to gain or retain ratings business through debasing its rating standards, and will force Moody's to gain or lose business – as Moody's had (mis)represented all along – on the basis of the objective quality of its ratings. A decline in Moody's ratings revenues, earnings, and growth is the likely result.

### E.    Moody's Share Price Declines

399.    For the reasons described above, Moody's stock price declined materially throughout the latter portion of the class period and even thereafter, as a series of public disclosures demonstrated that: (a) many of Moody's representations about and in the course of its all-important and lucrative structured finance business were misleading or inaccurate; (b) Moody's structured finance rating revenues would decrease materially going forward; and (c) Moody's was facing increasingly intense public criticism and scrutiny (from among other places the U.S. Congress and other U.S. and foreign government agencies) for the manner in which Moody's structured finance ratings were conducted. As a result, Moody's stock price fell from $74.84 per share on February 8, 2007 to $43.33 per share on October 25, 2007. Further such disclosures after the class period caused those declines to continue. Most notably, Moody's stock declined by $9.75 per share, or more than 20%, in reaction to the May 21, 2008 Financial Times report of possible fraud by Moody's during the class period in connection with CPDO ratings.

400.    Among the disclosures that contributed to the market's revaluation of Moody's stock and reassessment of the accuracy of Moody's prior representations of its structured finance business, are the following:

(a)    On July 12, 2007, Moody's announced its first very large wave of subprime RMBS downgrades, which gave the market reason to believe that Moody's prior ratings were materially inflated.

(b)    On July 24, 2007, Moody's issued a report on subprime losses.

(c)    On August 10, 2007, there were a series of public reports detailing the conflict of interest in Moody's structured finance business and suggesting that the conflict might have caused

197

inaccurate and inflated ratings by Moody's.

(e)   On August 20, 2007, there were reports that Senator Richard Shelby, the head of the U.S. Senate Banking Committee, had remarked that credit rating agencies must shoulder some responsibility for the subprime mortgage crisis. The report noted that Moody's was facing Congressional scrutiny for an "inherent" conflict in helping to construct mortgage-backed securities and then issuing ratings on them. This news caused Moody's stock to suffer a decline of $3.90 per share or 7.8%, Moody's largest single-day decline in over a year.

(f)   On September 21, 2007, Moody's reclassified many of its "midprime" ratings, further evidencing the inaccuracy and unreliability of its previous rating system.

(g)   On September 26 and 27, 2007, there were hearings in Congress concerning the role of the credit agencies in the credit crisis. As described elsewhere in this Complaint, several present and former Moody's personnel faced serious and pointed questions from angry members of Congress.

(h)   On October 3, 2007, Moody's made a disclosure of the structural defect in many of the subprime products that it rated in 2006.

(i)   On October 24, 2007, Moody's announced quarterly earnings. On that day and the following day, Moody's stock price fell from $47.38 per share (October 23, 2007 closing price) to $43.33 per share (October 25, 2007 closing price). The announced earnings were the first to reveal the deterioration – if not the decimation – of Moody's structured finance business. As Moody's chief financial officer reported, "U.S. structured finance performance in the quarter completely offset revenue gains across the other U.S. rating in research business, declining 14% year-over-year. Within U.S. structured finance, revenue growth of 29% from rating commercial mortgage back securities

was more then offset by revenue declines across all other asset classes led by a 52% decreased in revenue from rating residential mortgage back security". Structured finance, in short, was visibly dragging the Company down, and defendant McDaniel reduced financial guidance for the entire Company for 2007 as a result.

(j)    The disclosures continued even after the class period. For example, on March 11, 2008, defendant McDaniel reduced Moody's financial guidance for 2008 and publicly admitted to a lack of public confidence in Moody's, causing Moody's stock price to decline on a day when most comparable companies appreciated in price.

(k)    As noted previously (¶¶ 362-364, *supra*), the Financial Times' May 21, 2008 report of Moody's CPDO coverup provided the market with vivid confirmation of how Moody's had altered its rating methodologies to make high ratings appear justified.    When such concrete evidence was revealed, Moody's shares lost $9.40 per share, or 21.4% of their remaining value, falling from $43.90 on May 20, 2008 to $34.51 on May 22, 2008.

401.    Moody's share prices during the class period can not be explained as epiphenomena of broader factors operative in the wider stock market or among comparable companies in the same industry. Between the start of the class period (February 3, 2006) and ninety days after the end of the class period (January 24, 2008), Moody's share price declined by 42.6%. During exactly the same period, the S&P 500 index *rose* by 7%, and the S&P 500 Financials index declined by 11.3%. In sum, as the graph on the next page demonstrates, Moody's shares behaved *oppositely* to the wider market and suffered a decline nearly four times worse than that experienced on average by Moody's peers.

# Comparative Performance:
# Moody's, S&P 500, and S&P 500 Financials Index
Class Period and 90-Day Post-Class Period "Lookback" Period

## MATERIALITY

402. Investors in Moody's stock are in effect purchasing shares of Moody's ratings business. It is vitally important to investors' assessment of the value of that business to learn any information that materially impacts the revenue generation and profitability of the business going forward and the exposure that Moody's might face for misconduct. Investors' evaluation of Moody's stock will be (or would have been) altered by information suggesting that Moody's fastest growing and most lucrative business segment was operating in contravention of defendants' representations. It is not surprising that, as defendants began to reveal the extent to which Moody's structured finance ratings were issued in contravention of prior representations, that lucrative business segment began to erode predictably, and Moody's stock price began to decline materially, falling from a high of $74.84 in February 2007 to $43.33 by October 25, 2007.

403. Such misrepresentations (Section II.A-C, E, *supra*) were material to investors in Moody's common stock. In addition to fundamentally misrepresenting Moody's business and the nature and sources of Moody's apparent business success, defendants' undisclosed ratings misconduct exposed Moody's to substantial, negative financial and business consequences (detailed in full in Section IV, *supra*) of which, as a result of defendants' misrepresentations, the class remained wholly unaware. Perhaps more deeply still, Moody's apparent class period success would have been impossible *absent* its misrepresentations.

(a) **Business Mis-description.** Investors purchasing shares in Moody's were purchasing an interest in Moody's business. Defendants fundamentally misrepresented (1) how Moody's was conducting its single most important line of business – structured finance ratings, and (2) the reasons underlying Moody's apparent success in that business. Class members thought they were buying one

201

thing (a Company whose success was based on its maintenance of independence, objectivity and internal standards), but found themselves to be owning another (a Company whose success resulted from betrayal of the same). As Moody's misconduct of that business came to light, Moody's share price fell materially.

(b)     **Regulatory Compliance.** Any time a company operates in a regulatory environment, regulatory compliance or the lack thereof is material. The regulatory spotlight, with respect to credit rating agencies, shone most brightly on the issue of independence (as is detailed in Section II.A, *supra*). Moody's represented at all times that it operated in compliance with the letter and spirit of the regulatory framework (Section II.A, *supra*), when, in fact, the opposite was the case. Moody's misconduct of its structured finance business has engendered a degree of regulatory fury impossible to overstate – including investigations by the SEC and three states' attorneys general, three rounds of Congressional hearings focused on the credit agencies' role in what is now known as the subprime scandal and the credit crunch, and further inquiries by multiple multi-national regulatory and governmental organizations.

(c)     **Regulatory Consequences.** "Game changing" new regulation has already arrived (the SEC released proposed new credit rating agency rules on June 16, 2008) with more on the horizon. Such new regulation will not only require Moody's to change the way it does business, but will have a direct dampening effect on Moody's financial results going forwards. At all times prior to and during the class period, Moody's was one of a mere handful of credit rating agencies officially licensed as NRSROs, effectively sharing a government-endorsed oligopoly with its two largest rivals (S&P and Fitch). Regulators have concluded that the credit rating industry suffered from lack of competition, so regulators are now focused on, and have already begun, enlarging the formerly

severely-restricted field of Moody's NRSRO competitors. At the same time, regulators are also considering eliminating regulations that make credit ratings *de jure* necessities, and that thus maintained demand for credit ratings at levels that essentially could not be higher. In short, regulators are shrinking the "pie" of credit rating opportunities while enlarging the number of guests at the table (i.e., the pool of authorized credit rating providers). Both the absolute and relative size of Moody's share will suffer.

(d)      **Reputational Impairment.** Moreover, Moody's misconduct has dealt a serious blow to Moody's reputation, which, as Moody's itself has always and very explicitly acknowledged (Sections I.C and II.A, *supra*), is Moody's single most important asset. The reputational blow is widely acknowledged, evident at a mere glimpse of Moody's stock price performance, and anyway conceded by Moody's:

> I think our reputation has been hurt by what's gone on. I think it would be frankly, disingenuous for me to say it hadn't been... [W]e are a business that really works off of reputational capital more so than others. And so it is a particular concern to me. (Moody's CEO Mr McDaniel, March 11, 2008)

(e)      **Reputational Impairment Translates Directly Into Business Impairment.** Because of the particular nature of Moody's business as a gate-keeping firm, whose fundamental asset and stock in trade is trust, the loss of trust occasioned by Moody's ratings misconduct translates directly into a loss of business. Moody's misconduct of its structured finance ratings was not, as events have made clear, a matter of insufficient expertise, but of compromised independence. Without trust in its independence, the "added value" or imprimatur provided by a Moody's credit rating entirely disappears, taking demand for such ratings with it. Moody's misconduct destroyed trust in its ratings: as Senator Shelby informed a Moody's representative during April 22, 2008

203

Congressional hearings, "Your reputation's in tatters right now".

(f)     Moody's Undisclosed and Misrepresented Ratings Conduct Cannibalized Moody's Most Important Market and Caused that Market's Collapse. Finally, to an absolutely unique degree, structured finance securities and the market for them depended on credit ratings. Because of this rating-dependence, as trust in structured finance ratings collapsed when Moody's ratings' misconduct was revealed, large segments of the market were rendered "extinct" (as Moody's informed investors during Moody's June 5, 2008 annual "Investor Day"). Issuance of subprime RMBS has fallen by more than 90% in 2008, as has issuance of CDOs; while even more esoteric securities (SIVs, and second-order CDOs) have disappeared entirely and are not expected ever to be issued again. Such severe "extinction events" (defendant McDaniel's term) have imposed like extinction of Moody's structured finance rating opportunities – defendants explicitly concede that in excess of 10% of Moody's entire revenue base has completely disintegrated – and corresponding diminishment of Moody's share price. The role structured finance played for Moody's during the class period – the primary driver of Moody's growth – has reversed entirely: structured finance rating revenue declines are so steep that they are outweighing all Moody's growth in other business lines.

## ADDITIONAL SCIENTER ALLEGATIONS

404.     Moody's motive was of the most conventional kind: defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material information; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

204

405.   Moody's made these misrepresentations both to generate trade and to create the false impression among the stock markets and investors that Moody's most significant market was legitimate, and that Moody's was generating revenues and growth legitimately – that is, by independent and rules-based ratings.

406.   In "channel stuffing", abnormally-large levels of customer returns create a strong inference that a corporation was "stuffing" the channels over and above actual demand so as to book more revenue. Here, Moody's unprecedentedly widespread, severe and swift downgrades (Section II.D.2, *supra*) (essentially, product returns) create a strong inference of Moody's ratings misconduct. Moody's "channel stuffing" took the form of inflating credit ratings over and above objective credit realities – and ultimately, over and above what reality could bear – so as to book more revenue. Moreover, Moody's products were not merely "returned." Rather, the entire market for them was decimated.

407.   Moody's had in plain view all information it needed to provide objective, independent and accurate subprime structured finance credit ratings and still declined to provide such ratings (Section II.C, *supra*). Turning a blind eye to the obvious – whether in the form of information Moody's actually had (Sections II.C.2.a-d, II.C.3 *supra*), or "red flags" of which Moody's was aware (Sections II.C.1 and II.C.3, *supra*), or of *a priori* relevant information known to be crucial for adequate assessment of creditworthiness and available for the asking but never asked for by Moody's (Section II.C.2.e, *supra*) – supports a strong inference that Moody's ratings misconduct was reckless at the very least. What Moody's had in plain view, much less what it can have placed in its plain view without requiring due diligence, invalidates alternative explanations to the effect that "we did the best we could but just got it wrong". So do all the *post-facto* methodology changes instituted

by Moody's (Sections II.C, *supra*) as a form of proverbial barn door closing, after Moody's had provided its inflated ratings and after it was paid hundreds of millions for such provision – especially where such changes instituted *post facto* what had been apparent *a priori* (*Id.*).

408.    A finding of scienter is supported by the sheer breadth and extent of the misconduct occurring in Moody's core operations and key products. Structured finance credit ratings provided Moody's with half of its ratings revenue, and with its highest-margin and fastest-growing source of operations. The misconduct of Moody's subprime structured finance ratings was not an isolated incident involving the ratings of a single company or provided by one or several "rogue" analysts, but was occurring systematically and affecting entire classes of securities for which, during 2006 alone, Moody's provided approximately 10,000 ratings (*see* Section II.D.2, *supra*), the vast majority of which were downgraded, often severely, within a year (*Id.*). It is exceedingly unlikely that the allegedly false statements were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading.

409.    Further indication of the extent to which Moody's ratings were in fact disingenuously crafted is found in reports that surfaced on May 21, 2008 in the Financial Times ("FT"). The FT reported that Moody's had reported incorrect AAA ratings on billions of dollars worth of Constant Proportion Debt Obligations (CPDOs), a derivative instrument, due to a glitch in Moody's computer models. According to the FT, internal Moody's documents evidence that some of Moody's senior staff knew early in 2007 that the products rated the previous year had improperly received the AAA ratings as a result of a computer error, and, in fact, absent that error should have been rated four notches lower. Although Moody's discovered the error in early 2007, the products remained AAA

rated until January 2008. According to documents obtained by the FT, when Moody's finally recognized the error, rather than downgrading the erroneously-rated instruments, Moody's staff instead amended the methodology employed in order to keep the AAA ratings for the instruments. Such amendments included reducing assumptions about future volatility of the credit markets.

410.    Moody's, with respect to CPDOs, in effect threw a dart that missed the target, but subsequently redrew the target so that the dart appeared to have landed within the bulls eye. When such concrete evidence was revealed that Moody's had altered rating models to create the appearance that high ratings were justified, Moody's shares lost $9.40 per share, or 21.4% of their remaining value, falling from $43.90 on May 20, 2008 to $34.51 on May 22, 2008. CPDO issuance was and is tiny: a matter of several billions, as opposed to the half a trillion dollars of subprime RMBS that Moody's rated each year and the further hundreds of billions of CDOs. The market's response to disclosure of Moody's CPDO rating conduct had nothing to do with the size of the CPDO issuance market and/or the potential decrease in future CPDO rating assignments. Rather, the market's dramatic response had everything to do with the matters complained of here -- Moody's purported reputation, trustworthiness, objectivity -- and further evidences their materiality.

411.    The inference of scienter here is cogent. The desire for even greater revenues and earnings, the perverse incentives, independence-corroding pressures and model-altering effects of the Issuer Pays business model are clear and attested to by expert observers, market participants, Moody's own current and former employees and executives, Moody's own experience, and all empirical data (Section III.D, *supra*). They are further attested to by the resulting evident debasement of Moody's subprime structured finance ratings models which, in various ways, turned a blind eye to the obvious and declined to consider relevant information in plain view (Section II.C,

207

*supra*). And they are further attested to by the abysmal products of those models, Moody's subprime structured finance credit ratings themselves (Sections II.C and II.D.2, *supra*).

412. Moody's expected inference of innocence is not cogent. Moody's represented during the class period that it remained unaffected by extraneous considerations and influences introduced by the Issuer Pays business model, that it maintained its independence, that it managed or eliminated its conflicts of interests, and that it considered objectively all relevant information in determining its ratings. Moody's anticipated "inference of innocence" will be to the effect that "we believed these statements to be true because, in our credit ratings, we were doing the best we could but just got it wrong". It is not likely, if not downright false and ludicrous, that a cascade of innocent mistakes was responsible for the illegitimacy of the models Moody's used to determine its subprime structured finance credit ratings.

413. Moody's cannot justify a belief in the accuracy of its class period statements because there is no basis for Moody's to have believed – given failures that were so obvious and so systemic – that Moody's was "doing the best we could and just got it wrong". Moody's was, demonstrably, doing the best it could to serve its client masters, not to fulfill its representations of independence and principles-based methods. Moody's got it wrong precisely as a result of that fact. The question, really, is "why was Moody's not doing the best it could? So, why was Moody's failing to examine, consider and even ask for the obvious?". There is no answer to this question other than the one provided by plaintiffs here – Moody's compromised independence (i.e., Moody's retained such an obviously illegitimate model given the incentives to Moody's to have a model that minimized the measure of ARM risk). There is simply no other logical explanation.

414. As set forth elsewhere herein in detail, defendant McDaniel, by virtue of his receipt

of information reflecting the true facts regarding Moody's, his control over, and/or receipt and/or modification of Moody's allegedly materially misleading misstatements and/or his associations with the Company which made him privy to confidential proprietary information concerning Moody's, participated in the fraudulent scheme alleged herein. Furthermore, defendant McDaniel was familiar with structured finance issues, operations, practices, models and techniques, having started his career at Moody's in Moody's Mortgage Securitization Group in 1988-1989 and having continued as an associated director of Moody's Structured Finance Group until 1993.

415.    Exactly the same holds for defendant Clarkson. As set forth at ¶¶ 15 and 344, *supra*, defendant Clarkson led a variety of different structured finance ratings operations in Moody's during the previous fifteen years, and throughout the class period had overall responsibility for Moody's entire structured finance ratings operations. As set forth at ¶ 344, *supra*, defendant Clarkson's leadership at each level of structured finance ratings operations resulted in material and significant gains in structured finance rating share (and in decreased credit rating standards) as a result of defendant Clarkson's consistent effort to make Moody's more "issuer-friendly". Shortly after this pattern was exposed on the front page of the Wall Street Journal on April 11, 2008, Moody's announced defendant Clarkson's resignation -- further supporting an inference of scienter.

## CLASS ACTION ALLEGATIONS

416.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and(b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons who purchased or otherwise acquired Moody's common stock between February 3, 2006 and October 24, 2007 inclusive (the "class period"), and who were damaged thereby. Excluded from the class are

defendants, members of the immediate family of defendants, any subsidiary or affiliate of Moody's and the directors, officers, and employees of Moody's or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

417.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the class located throughout the United States. Record owners and other members of the class may be identified from records maintained by the Company and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

418.   Plaintiffs' claims are typical of the claims of the other members of the class as all members of the class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

419.   Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class and securities litigation.

420.   Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class. Among the questions of law and fact common to the class are:

(a)   whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

210

(b)    whether defendants participated in and pursued the common course of conduct complained of herein;

(c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the class period misrepresented material facts about the business, operations, financial condition, and prospects of the Company;

(d)    whether statements made by defendants to the investing public during the class period misrepresented and/or omitted to disclose material facts about the business, operations, value, performance, and prospects of the Company;

(e)    whether the market price of Moody's common stock during the class period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)    the extent to which the members of the class have sustained damages and the proper measure of damages.

421.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

422.    At all relevant times, the market for Moody's common stock was an efficient market for the following reasons, among others:

211

(a)     Moody's common stock was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     Moody's regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace;

(d)     National City was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(e)     As a result, the market for Moody's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Moody's common stock during the class period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

423.    The alleged misrepresentations, misleading statements and omissions complained of were not "forward looking" statements. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

424.    To the extent that the specific statements pleaded herein were identified as forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

212

statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made defendants knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF
## Violations Of Section 10(b) Of The Exchange Act
## And Rule 10b-5 Promulgated Thereunder

425.   Plaintiffs repeat and reallege each and every allegation contained above.

426.   Defendants: (a) knew or recklessly disregarded material adverse nonpublic information about the Company's then-existing business conduct, business prospects, business conditions and financial results and prospects, which were not disclosed.

427.   During the class period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

428.   Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of

213

Moody's stock during the class period.

429.    Plaintiffs and the class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Moody's stock. Plaintiffs and the class would not have purchased Moody's stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements. Plaintiffs and the class suffered damage when the price of Moody's stock declined in response to the various corrective disclosures detailed above.

## SECOND CLAIM FOR RELIEF
### (against the Individual Defendants only)
### Violations Of Section 20(a) Of The Exchange Act

430.    Plaintiffs repeat and reallege each and every allegation contained above.

431.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act. By reason of their senior executive positions they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

432.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchases of Moody's stock during the class period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and the undersigned as class counsel;

B.    Awarding compensatory damages in favor of plaintiffs and the other class

members against defendants, for all damages sustained as a result of defendants' wrongdoing, in an

amount to be proven at trial, including interest thereon:

C.    Awarding plaintiffs and the class their reasonable costs and expenses incurred

in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: June 27, 2008

KIRBY McINERNEY, LLP

By: _____

Ira M. Press (IP 5313)
Roger W. Kirby
David Bishop
825 Third Avenue, 16ᵗʰ Floor
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
SCHIFFRIN BARROWAY TOPAZ
 & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056

215

*Co-lead counsel for Lead Plaintiffs*

Christopher Keller
Jonathan Gardner
Serena Richardson
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

## ENDNOTES

1.      Specifically, prior to and during the class period, there were no more than seven NRSROs. Even that overstates matters: two of NRSROs were Japanese firms operating primarily in Japan, a third Canadian, and a fourth specializing in rating insurance companies. For all intents and purposes, the number of NRSROs was effectively three: Moody's, S&P, and Fitch, known as the "big three". Of these three, Moody's and S&P were bigger: each controlled approximately 40% of the ratings market, with Fitch securing a further 15% (leaving 5% for the others). Prior to and during the class period, the process and requirements for gaining NRSRO recognition were never clearly set forth, and obtaining NRSRO status was legendarily difficult.

## 2.      A Structured Finance Primer

### 1.      What are Structured Finance Securities?

1.      A structured finance instrument begins as a pool of cash-generating assets (subprime mortgages, for example). Securities collateralized by those assets are structured (as per below), issued and sold, so that the monthly principal and interest payments generated by the underlying assets are redirected to the investors who purchased the securities.

2.      The "structured" aspect is, essentially, that the securities issued on the basis of the asset pool are not all created equal, but rather as a series of distinct classes (termed "tranches") endowed by design with differently-prioritized rights to the cash flow generated the underlying asset pool. The tranching structure of the securitization functions as a sort of prism, diverting the cash flow generated by the asset pool (subprime mortgage payments) first to tranche A, then to B, etc. To simplify somewhat, the cash flow generated by the assets cascades in a "waterfall" from tranche to tranche. It reaches the most "senior" tranche first, fills it up completely (i.e., makes all contractual payments); then, whatever is left flows to the next tranche, fills it up completely, and so on down the line (the simplification lies in the fact that there are often complex and conditional rules governing the waterfall's flow). To cut to the chase, the senior-most tranches are blessed with triple-A ratings, more junior tranches with double-A ratings, more junior tranches still (sometimes referred to as "mezzanine") with single-A or Baa or Ba ratings. To compensate for increased risks, as the tranches decrease in credit quality they also feature higher coupon rates.

3.      The result and the intention: senior tranches are placed at farthest remove from risk of loss, with more junior tranches edging progressively closer to such risk. Each tranche thus receives a different credit rating, based on its degree of proximity or remove from risk of loss. The risk of loss is, essentially, the degree to which the underlying assets cease to generate their cash flow (i.e., mortgage borrowers stop making their payments and ultimately default). If the underlying assets deteriorate to the extent that they fail to produce enough cash flow to pay the amounts owed to security holders, ensuing losses hit holders of the lowest tranches first. Subordinate tranches thus serve as "credit protection" for more senior tranches by standing first in line to absorb losses. Tranche holders are thus akin to a series of captives on pirate ship: the most junior tranche holders are the first to be forced to "walk the plank" and be thrown overboard, followed by the next most junior tranche holders, etc. As the SEC explained:

217

The trust typically issues different classes of RMBS (known as "tranches") offering a sliding scale of coupon rates based on the level of credit protection afforded to the security. Credit protection is designed to shield the tranche securities from loss of interest and principal arising from defaults of the loans backing the RMBS. The degree of credit protection afforded a tranche security is known as its "credit enhancement" and is provided through several means. The primary source of credit enhancement is subordination, which creates a hierarchy of loss absorption among the tranche securities. For example, if a trust issued securities in 10 different tranches of securities, the first (or senior) tranche would have nine subordinate tranches, the next highest tranche would have eight subordinate tranches and so on down the capital structure. Losses of interest and principal experienced by the trust from delinquencies and defaults among loans in the pool are allocated first to the lowest tranche until its principal amount is exhausted and then to the next lowest tranche and so on up the capital structure. Consequently, the senior tranche would not incur any loss until the principal amounts from all the lower tranches have been exhausted through the absorption of losses from the underlying loans. (*Proposed Rules for Nationally Recognized Statistical Rating Organizations*, SEC Release No. 34-57967, at pp. 9-10)

4.      The essential alchemy of structured finance arises from this tranching system. *With sufficient tranching credit protection*, a pool of risky subprime mortgages can serve as the basis for triple-A structured finance tranches (accompanied by a host of lower-rated tranches to protect against expected losses). The key question, of course, is *how much* credit protection is needed? And that is where the credit rating agencies come in.

### 2.      How are Structured Finance Securities Credit Ratings Determined?

5.      The principle is simple: in order to provide sufficient protection against the expected losses so as to assign a credit rating of "x", "y" or "z", one has to determine the amount of those expected losses. Thus, the primary task, in rating (and structuring) a structured finance security, is an evaluation of the creditworthiness of the underlying asset pool (e.g., a $300 million collection of subprime mortgages). The ultimate result of this evaluation is an estimate of the "expected loss" that the pool of assets will likely suffer. Once this expected loss is calculated, a tranching structure can be devised so that each tranche is sufficiently protected (against that expected loss) to merit its credit rating. Each step is explained quickly and in turn below.

#### a.      Determining "Expected Loss"

6.      In order to determine the expected loss of the asset pool ($300 million of subprime

mortgages) Moody's: (1) evaluates the risk characteristics of each and every mortgage contained in the pool, (2) simulates and evaluates the performance of those mortgages in more or less "stressful" macroeconomic conditions ("stress testing"), and (3) also (purportedly) takes into account other relevant data, most notably the practices and standards of the loan originators responsible for the mortgages at issue. Exactly how Moody's did so is alleged in detail at Section II.C, *infra* and evidences Moody's lack of independence.

7. What is important to emphasize here is the basic fact that, in order to opine on the creditworthiness of the securities backed by subprime mortgages, Moody's demands and receives whatever data Moody's considers necessary for an adequate evaluation of each and every mortgage's risk. At all times until April 2007, this meant that Moody's received 48 separate pieces of data for each mortgage in each pool. Had Moody's required more data, all it had to do was ask: precisely because Moody's controls access to the needed credit ratings, it has the leverage to demand that issuers supply it with whatever data Moody's deems necessary for its task. This is confirmed by Moody's April 2007 model revision nearly doubling its data request, and Moody's March 2008 contemplated revisions *quadrupling* Moody's request to as much as 192 separate pieces of data. .

### b. Determining Security Structure and Ratings

8. On the basis of the data it considered relevant and its stress testing of that data, Moody's would arrive at an expected loss: for example, on a $300 million pool of subprime mortgages, Moody's expected loss calculation might be $15 million (or 5% of the total). (As it so happens, this is roughly what Moody's had been estimating during most of the class period. Moody's now estimates that losses will in fact be three times higher on average and as much as seven times higher on occasion). Each category of Moody's credit rating scale (Aaa, Aa, A, Baa, etc.) had its specific standard vis a vis expected loss. There are different ways to conceptualize this, but the essence is that, in order to merit a given rating (e.g., triple-A), a structured finance tranche would have to be able to withstand a certain multiple of the losses actually expected without itself defaulting.

9. For example, if the triple-Aaa standard was that the security must be able to withstand losses three times greater than those expected (i.e., three times $15 million) without itself suffering any loss, that would imply a structure where the triple-A tranches had $45 million of credit protection in the form of more junior tranches. Meaning: the $300 million pool of subprime mortgages could generate $255 million of triple-A rated tranches, with $45 million serving as lower-rated or unrated tranches. This process would then be repeated at the Aa and lower levels, each time determining tranche size based on how much credit protection would be needed. If, for example, the Aa standard was to be able withstand losses twice as great as those expected (i.e., $30 million), and given that $255 million was already structured as triple-A, that left room for a further $15 million Aa-rated tranche (i.e., a $255 million Aaa tranche, a $15 million Aa tranche, and $30 million remaining in lower tranche credit support). Etc.

### c. The Consequence: Everything Depends on the "Expected Loss" Determined by the Credit Rating Agency

10. There are far-reaching consequences of the fact that the structure of a structured finance security is, essentially, an expression of the expected loss determined by the rating agency.

11. If the rating agency determines an expected loss of $15 million, that results in the creation of $255 million of Aaa-rated tranches, $15 million in Aa-rated tranches, etc. Were a rating agency to deliver a lower expected loss, e.g., $10 million, then the structure would change: $270 million in Aaa-rated tranches (having credit protection of $30 million, or three times expected losses), $10 million in Aa-rated tranches (having credit protection of $20 million, or two times expected losses), etc.

12. It is axiomatic that issuers would prefer the latter credit rating agency assessment, as it makes the securitization more profitable for the issuer. Were an issuer presented in the above-mentioned pre-evaluations with these two differing scenarios by two different credit raters, it would retain the provider of the more favorable scenario for the official "published" rating, while the less favorable analysis would neither see the light of day nor garner the lucrative fees consequent upon delivering published ratings. This imposes tremendous pressure for a credit rating agency to deliver a lower expected loss than its competitors. And, because of issuer familiarity with credit rating agencies models, it presents tremendous pressures to maintain models that deliver such lower expected losses.

13. The point to emphasize here is that getting the expected loss wrong, or understating it, invalidates the entire securitization structure and the credit ratings for each tranche. If, to continue with the above example, the issuer goes with the latter rating agency, the triple-A rating of the resulting $270 million in Aaa-rated tranches is predicted on the stated loss expectation of $10 million. But if in fact losses or expected losses are higher, then the Aaa-rated tranche no longer merits its Aaa rating (because available credit protection of $30 million is not sufficient to withstand losses three multiples of the "more than $10 million" in loss content), and AA-rated tranche no longer merits its rating, etc.

14. This is what has occurred here. During the class period, Moody's average expected losses for pools of subprime assets were on the order of 5%. Hundreds of billions of subprime RMBS and CDOs backed by subprime RMBS tranches were structured and rated by Moody's on the basis of those expected losses. Moody's current models, revised to be tougher only after the subprime scandal was revealed as a scandal, now generate expected losses three times greater on average (i.e., 15%) and, on occasion, as much as seven times greater (i.e., 35%).

### d. Determining *Ex-Ante* Credit Ratings and thus Credit Rating Agencies

15. Issuers – familiar with credit rating agency models, in part because the credit rating agencies gained additional fees from selling to issuers the key to those models – assemble the assets (the subprime mortgages in the pool) and determine a proposed structure (the size and "targeted" ratings of the tranches), and then present them to rating agencies to see what the agencies had to say (for a *de minimis* retainer fee). If the rating agency's own evaluation matched that of the issuer, the rating agency would confirm that it would indeed provide the "targeted" ratings, and the rating agency would be paid the much larger "published" rating fee.

16. If the rating agency's evaluation did not match the issuer's, matters were more

220

complicated. For example: if the issuer could propose a triple-A tranche of $260 million (with only $40 million of credit support, thus not meeting the $45 million credit protection requirement for such a rating). Were matters as they were with corporate bond ratings, the rating agency would pronounce that tranche double-A, rather than the triple-A targeted by the issuer, and that rating would be published. But matters were not as they were in corporate bond ratings. Rather, when evaluations did not match, a process variously termed "negotiation", "iterative feedback", and "collusion" ensued. The issuer could rework the structure to provide more credit support, or alter the composition of the mortgage pool (taking out some worse mortgages, replacing them with better ones) so as to reduce expected losses. The issuer could take the assignment to another credit rating agency that might bless the security as initially composed. The credit rating agency could change its evaluation as well. What never happened, however, was the publishing of a double-A rating for the large tranche "targeted" as triple-A by the issuer. As a result of the uniquely-bifurcated retention, evaluation and payment structure, there were never such ratings "surprises". Rather, the issuer would find the agency or agencies willing to bless the largest amount of the securitization triple-A, structure or restructure the security accordingly, and proceed with such ex-ante guaranteed triple-A ratings.

### e.   As Described by the SEC

17.   The above description is confirmed by the SEC's own:

> The procedures followed by these three NRSROs in developing ratings for subprime RMBS are generally similar. The arranger of the RMBS initiates the rating process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property, and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust, and the proposed levels of credit enhancement to be provided to each RMBS tranche issued by the trust...

> The next step in the ratings process is the development of predictions, based on a quantitative expected loss model and other qualitative factors, as to how many of the loans in the collateral pool would default under stresses of varying severity. This analysis also includes assumptions as to how much principal would be recovered after a defaulted loan is foreclosed. Each NRSRO generally uses between 40 and 60 specific credit characteristics to analyze each loan in the collateral pool of an RMBS in order to assess the potential future performance of the loan under various possible scenarios. These characteristics include the loan information described above as well as the amount of equity that the borrowers have in their homes, the

221

amount of documentation provided by borrowers to verify their assets and/or income levels, and whether the borrowers intend to rent or occupy the homes.

The purpose of this loss analysis is to determine how much credit enhancement a given tranche security would need for a particular category of credit rating. The severest stress test (i.e., the one that would result in the greatest number of defaults among the underlying loans) is run to determine the amount of credit enhancement required for an RMBS tranche issued by the trust to receive an AAA rating. For example, this test might result in an output that predicted that under the "worst case" scenario, 40 percent of the loans in the underlying pool would default and that after default the trust would recover only 50 percent of the principal amount of each loan in foreclosure. Consequently, to get an AAA rating, an RMBS tranche security issued by the trust would need credit enhancement sufficient to cover at least 20 percent of the principal amount of all the RMBS tranches issued by the trust. In other words, absent other forms of credit enhancement such as excess spread, at least 20 percent of the principal amount of the RMBS tranches issued by the trust, including the equity tranche, would have to be subordinate to the senior tranche and, therefore, obligated to absorb the losses resulting from 40% of the underlying loans defaulting.  The next severest stress test is run to determine the amount of credit enhancement required of the AA tranche and so on down the capital structure. The lowest rated tranche (typically BB or B) is analyzed under a more benign market scenario. Consequently, its required level of credit enhancement – typically provided primarily or exclusively by a subordinate equity tranche – is based on the number of loans expected to default in the normal course given the lowest possible level of macroeconomic stress.

Following the determination of the level of credit enhancement required for each credit rating category, the next step in the ratings process is to check the proposed capital structure of the RMBS against these requirements. For example, if the proposed structure would create a senior RMBS tranche that had 18 percent of the capital structure subordinate to it (the other RMBS tranches, including, as applicable, an equity tranche), the analyst reviewing the transaction might conclude that based on the output of the loss model the senior tranche should be rated AA since it would need 20 percent subordination to receive an AAA credit rating...

Typically, if the analyst concludes that the capital structure of the

222

RMBS did not support the desired ratings – in the example above, if it determined that 18 percent credit enhancement is insufficient for the desired AAA rating – this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired AAA rating (e.g., shift 2 percent of the principal amount of the senior tranche to a lower tranche or add or remove certain mortgages from the proposed asset pool). Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund. (*Proposed Rules for Nationally Recognized Statistical Rating Organizations*, SEC Release No. 34-57967, at pp. 13-16)

3.    See http://www.sec.gov/news/extra/credrate/moodys.htm .

4.
http://www.moodys.com/moodys/cust/AboutMoodys/AboutMoodys.aspx?topic=rdef&subtopic=moodys%20credit%20ratings&title=Structured~Finance~Long-Term~Ratings.htm

5.    See
http://www.moodys.com/moodys/cust/aboutmoodys/aboutmoodys.aspx?topic=rapproach

6.    See *Proposed Rules for Nationally Recognized Statistical Rating Organizations*, SEC Release No. 34-57967, at pp. 96-99.

7.    Expected loss, for Moody's and MMM, is the product of two analytically distinct factors: (1) frequency of mortgage default; and (2) the loss severity upon default. As Moody's explained in the April 19, 2007 Moody's Investors Service report titled *Subprime Residential Mortgage Securitizations: Frequently Asked Questions.*

8.    See *inter alia* Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS – 2006 Was Tough, Will 2007 Be Even More Challenging?*, January 22, 2007; Moody's Investors Service, *Challenging Times for the US Subprime Mortgage Market*, March 7, 2007; Moody's Investors Service, *US Subprime Mortgage Market Update: July 2007*, July 24, 2007; Moody's Investors Service, *Moody's Update on 2006 Closed-End Second Lien RMBS: Performance and Ratings Activity to Date*, August 30, 2007; Moody's Investors Service, *ABS 2007 First Half Review: Home Equity Slowdown Lead to Lower ABS Issuance*, September 6, 2007); Michael Kanef

Prepared Testimony, Senate Hearing, September 27, 2007, p. 1; Moody's Investors Service, *Rating Changes in the U.S. Assset-Backed Securities Market: 2007 Third Quarter Update*, October 17, 2007; Moody's Investors Service, *U.S. Alt-A RMBS 2005 and 2006 Vintage Rating Actions Update: November 2007*, December 4, 2007.

9.    On or about October 11, 2007, Moody's enacted a far larger wave of downgrades of 2006 subprime RMBS, downgrading 2,506 tranches (approximately 40% of all 2006 tranche issuance) worth $33.4 billion and placing on review for downgrade a further 577 tranches (approximately 8% of total 2006 tranche issuance) worth $23.8 billion. These downgrades were reported in the October 17, 2007 Moody's Investors Service report titled *October 11, 2007 Rating Actions Related to 2006 Subprime First-Lien RMBS*, as well as in an October 12, 2007 presentation prepared by Moody's, titled *RMBS and CDO Update (Rating Actions)* in connected with a conference call it held to discuss its actions. In that presentation, Moody's revealed that it had recently separated mortgage originators into three quality tiers (pp. 15, 17-19), that mortgage performance varied significantly between originator tiers (p. 16 – worst tier performance roughly twice as bad as best tier performance), and that its *future loss projections for 2006 subprime loans would be adjusted upwards by between 5% and 170% as a function of originator tiering and of in which quarter of 2006 the security had been issued*, and further adjusted upwards by yet other factors. Dis-aggregating the effects of the "quarter of issuance factor", the expected loss "adjustment" due to originator tier factors alone ranged from a 5% increase to a 120% increase. The average adjustment for originators in the worst tier, across all four quarters of 2006, was an increase of nearly 70%.

10.    On January 30, 2008, Moody's Investors Service issued a further report, titled *Moody's Updates Loss Projections for 2006 Subprime Loans*, referencing the October 2007 methodology changes that "applied a stress factor to each transaction based on its quarter of origination and the quality of its originator". Moody's January 2008 presentation announced that Moody's further-updated methodology for loss projection would apply an additional "stress multiple" to the October 2007 stress factor. The October 2007 stress factor alone resulted in expected loss estimates for subprime asset pools of 9.2%-12.2% on average; the January 2008 stress multiple increased expected losses by approximately 50%, to 14%-18%.

11.    As Mr Clarkson told the Wall Street Journal, in interview excerpts published by the paper on April 11, 2008: "There is a lot of rating shopping that goes on. There just is. People shop deals all the time. They're looking for the highest rating. Sometimes we rate the deal. Sometimes somebody else does. What the market doesn't know is who's seen it. **We virtually see 100% of the transactions..."**

12.    *E.g.*, a borrower with a worse credit history will make a mortgage more likely to default; a property purchased for investment rather than for primary residence is more likely to default; mortgages are more likely to default as borrower debt-to-income ratios increase; mortgages are more likely to have loss upon default the higher the loan-to-value ratio (i.e., the smaller the downpayment made by the purchaser); loans originated by banks with lower standards are more likely to default; loans originated with less strict documentation/verification practices are more likely to default, etc.

13.    http://moodys.com/cust/analyticmodels/Summary.aspx?busLine=Structured+Finance. *See also:* Moody's Investors Service, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools,* April 1, 2003 (at that time, the MMM model was only used for prime and Alt-A mortgages, but not for subprime); Moody's "launch presentation" for the subprime module of Moody's Mortgage Metrics – Moody's Investors Service, *Introducing Moody's Mortgage Metrics: Subprime*; Moody's Investors Service, *Subprime Residential Mortgage Securitizations: Frequently Asked Questions,* April 19, 2007; Moody's Investors Service, *Moody's Revised US Mortgage Loan-by-Loan Data Fields,* April 3, 2007; and Moody's Investors Service, *US Subprime – Overview of Recent Refinements to Moody's Methodology: July 2007,* August 2, 2007.

14.    See Moody's "launch presentation" for the subprime module of Moody's Mortgage Metrics – Moody's Investors Service, *Introducing Moody's Mortgage Metrics: Subprime,* at p. 52.

15.    It is impossible to overemphasize how often Moody's blamed the above-identified mortgages for the worst subprime losses. Rather than recite instances *ad nauseum*, we skip to the end of the story. On March 31, 2008, Moody's Investor's Service issued a special report titled *U.S. Mortgage Market Update: First Quarter 2008.* As that report stated:

> Significant changes in subprime lending practices have been made in the last few months that are expected to result in better performance on future loan originations and greater investor confidence. **The origination of the riskiest types of loans – for instance, those where borrowers contribute no equity and those where borrowers do not provide documented proof of their income and assets – has been limited.**

16.    Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS,* January 22, 2007.

17.    Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology,* April 2, 2007.

18.    Risk of loss upon default is mitigated for the first lien by using the second lien as a down payment that reduces LTV from the perspective of the first lien. But that risk of loss is merely shifted to the second lien. And moreover, both liens suffer from added risk of default given the higher debt burden imposed by the 100% CLTV aggregate loan and given the lack of homeowner equity.

19.    Moody's Investors Service, *Moody's Update on Closed-End Second Lien RMBS,* August 30, 2007.

20.    The same point was made in Moody's July 12, 2007 presentation titled Moody's Structured Finance Teleconference and Webcast: RMBS and CDO Ratings Actions. In that presentation, one of several slides listing "2007 Subprime Methodology Changes" included the item "Lack of Info Adjustments: Closed End Seconds - First Lien Loan Info (April)".

21.     Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS*, January 22, 2007.

22.     *See, e.g.,* Moody's Investors Service, *Moody's Update on Closed-End Second Lien RMBS*, August 30, 2007. After detailing $19.7 billion in CES downgrades, the report noted that "Moody's also notes that many underlying first lien mortgages might be subject to interest rate resets in coming months, thereby exacerbating the pressures on borrowers to default on their second lien loans".

23.     Yet, had Moody's taken such an objective stance despite the swift financial consequences that would ensue, it in the longer term could have compelled issuers not to include such loans in their asset pools, which would have compelled originators not to make those loans.

24.     Until recently, "reduced documentation" mortgages were offered only to a small subset of *prime* borrowers whose income sources were not capable of easy verification through wage statements – e.g., artists, self-employed persons, independently wealthy but jobless persons, etc. Reduced documentation mortgages were, initially, a fringe mortgage product born of necessity and available only to the obviously credit-worthy.

25.     Moody's Investors Service, *Moody's Structured Finance Teleconference and Webcast: RMBS and CDO Rating Actions,* July 12, 2007; Moody's Investors Service, *US Subprime – Overview of Recent Refinements to Moody's Methodology: July 2007*, August 2, 2007.

26.     A close look inside the "black box" of Moody's rating model reveals intrinsic deficiencies in the ways Moody's categorized documentation levels, and thus in the ways Moody's calculated associated risks. At all times until approximately November 28, 2006, Moody's employed a categorical variable for loan documentation that included five categories: Full, Alt, Limited, Reduced, and No documentation. A review of these categories reveals them to be *a priori* deficient. For example, there is fundamentally no difference between "No" documentation and "Reduced" documentation – neither involves verification of income. Moody's characterization of industry "limited" documentation programs indicates that they also do not include any verification of income, yet, amazingly, Moody's definition of its own "limited" variable indicates that its "limited" designation does include income verification. The "Alt" category is entirely mystifying in substance and description ("Alt Income/Alt Assets"). And even the "Full" category was itself debased: for subprime originators, "full" documentation verified income but only took asset verification into account to verify that sufficient assets existed to close the mortgage (i.e., down payment and closing costs) rather than to provide any extra cushion for it in the future.

27.     The initial period and adjustment periodicity identify the loan: a "5/1 Hybrid ARM" is one that carries a fixed rate for the first five years and thereafter an adjustable rate that resets every year. Further intricacies constrict the extent to which the rate can fluctuate by imposing, *inter alia*, "Initial Rate Adjustment Caps", subsequent Rate Adjustment Caps, Lifetime Caps, as well as minimum rates below which the rate will not ever go (the "Floor"). For example, if the initial 5% rate ends, and LIBOR stands at 6% and the fully-indexed rate is LIBOR +3, the loan would reset to 9%, but an Initial Rate Adjustment Cap limits the initial increase to 3%, so the loan resets to 8% for the first

year following reset.

28.     *See* Moody's Investors Service, *2006 Review and 2007 Outlook: Home Equity ABS*, January 22, 2007. As Moodys observed as early as May 2005, hybrid ARMs had "grown to become the dominant product type in home equity [i.e., subprime] securitizations". *See* Moody's Investors Service, *An Update to Moody's Analysis of Payment Shock Risk in Sub-Prime Hybrid ARM Products*, May 16, 2005. Likewise, as Moody's observed in a September 2007 report, option ARMs "dramatically took off in popularity starting in 2004... The securitizations backed by Option ARM collateral have grown phenomenally in this period, from a couple of billion dollars in 2002 to more than $154 billion in 2005. Securitization volume in 2006 reached approximately $183 billion". See Moody's Investors Service, *Rating US Option ARM RMBS - Moody's Updated Rating Approach*, September 4, 2007

29.     Indeed, a further badge of this shocking unawareness is Moody's continuing inability to say anything accurate about option ARM performance at all. For example, Moody's Investors Service December 4, 2007 report titled *U.S. Alt-A RMBS 2005 and 2006 Vintage Rating Actions Update: November 2007* purported to provide a cumulative report of Moody's downgrades in that sector, but noted that the report only covered "non-Option ARM" mortgages and that Moody's was still reviewing Option ARM mortgages.

30.     Prior to April 2007, unbeknownst to the class, and in direct contravention of Moody's representations concerning its and its credit ratings' independence, objectivity, trustworthiness, integrity and reliability, Moody's model did not have any of the basic moving parts. Moody's evaluation of option ARM mortgage risks was thus wholly without basis, and *Q.E.D.* of lack of adherence to fundamental ratings principles, a failure driven by Moody's lack of independence.

31.     *Moody's Structured Finance Teleconference and Webcast: Revised Alt-A and Option ARM RMBS Ratings*, August 15, 2007.

32.     That NRSRO was Moody's, as Bass's actual remarks during the House Hearing (quoted directly below) make clear.

33.     This obvious point, validated both by history and common sense, was made by legislators in the House Hearings: "Well, since you've faced an absolutely unprecedented, in over a century, increase, didn't you model for the possibility that you would have an unprecedented decrease? That which goes up, up, up real high, goes down real, real low." (House Hearing Transcript).

34.     CDOs, for instance, could invest in corporate bonds, in bank loans, and in a variety of structured finance securities backed by different assets (e.g., RMBS, CMBS, asset-backed securities backed by credit card debts, asset-backed securities backed by car loans, or student loans, or mutual fund 12b-1 fees, or aircraft leases, etc.).

35.     Rating categories refer to the letter gradations (e.g., Baa or Ba),while "notches" refer to finer distinctions within a ratings category (e.g., Baa1 or Baa2 or Baa3). Moody's provided a table of

downshift severities based on the dates of subprime RMBS issuance and the ratings given at issuance (reproduced below). As the table indicates, for subprime RMBS tranches originated during the second half of 2006 and first half of 2007, Moody's was informing that Aa-ratings should now downshifted two categories (to A, and then to Baa), A ratings should be downshifted three categories (through Baa and Ba to B), and Baa ratings downshifted six categories (through Ba, B, Caa, Ca, C all the way to D). D is literally off-the-scale default.

| Subprime RMBS Issued 2ⁿᵈ Half of 2005 | | Subprime RMBS Issued 1ˢᵗ Half of 2006 | | Subprime RMBS Issued 2ⁿᵈ Half of 2006 and 1ˢᵗ Half of 2007 | |
|---|---|---|---|---|---|
| Original Rating | Rating Downshift to be Applied | Original Rating | Rating Downshift to be Applied | Original Rating | Rating Downshift to be Applied |
| AA | 0 | AA | 1 | AA | 2 |
| A | 1 | A | 2 | A | 3 |
| Baa | 2 | Baa | 4 | Baa | 6 |

36.    Asset Securitization Report, *Rating Agencies Strive for Clarity in Soured Market*, October 1, 2007.

37.    See Mark Adelson, Asset Securitization Report, *Subprime Mortgages - A Realistic Outlook*, August 13, 2007.

38.    *See* Moody's Investors Service special report, *Updates to Moody's US Structured Finance Rating Methodologies*, April 1, 2008, at p. 3 ("We have also changed our analysis to account for the greater volatility in ratings exhibited by structured finance assets as compared to corporate debt. **This increased rating volatility is the result of unique characteristics of structured finance assets - for example, their higher leverage and small tranche sizes. As a result, we have adjusted our assumptions regarding probability of default to account for this greater volatility**").

39.    *See* Moody's Investors Service, *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*, March 23, 2007.

40.    Moody's Investors Service, *The Impact of Subprime Residential Mortgage-Backed Securities on Moody's-Rated Structured Finance CDOs: A Preliminary Review*, March 23, 2007.

41.    *See* October 12, 2007 Moody's Investors Service presentation *Moody's Enhanced ABS CDO Modeling Parameters and Surveillance*.

228

42.   See April 1, 2008 Moody's Investors Service special report, *Updates to Moody's US Structured Finance Rating Methodologies*:

> The poor credit performance of the residential mortgage-backed sector combined with the depressed market value of many securities have prompted Moody's to re-examine the rating methodologies for all types of so called "derivative" securities. These are principally collateralized debt obligations (CDOs), collateralized loan obligations (CLOs) and market-value CDOs. **When rating CDOs backed by the cash flows from a pool of assets - such as asset-backed securities or corporate loans - Moody's models the default likelihood and severity of loss for each of the underlying assets based on their ratings. Moody's also makes assumptions about the likelihood that the asset values will move up and down together (that is, the "asset correlation").** Many of the changes that Moody's has made to its methodologies address these three dynamics.
>
> Since mid-2007, we have adjusted upward the expected losses of securities in RMBS sectors that are under review for downgrade and are therefore more likely to have their ratings lowered. Recovery assumptions on defaulted and low-rated RMBS assets have also been reduced.   In addition, we increased our asset correlation assumptions for subprime RMBS and CDO assets by up to three times - to 75% for subprime RMBS and to 100% for CDOs in CDOs.

43.   As the SEC explained: "The process for assigning ratings to subprime CDOs also involves a review of the creditworthiness of each tranche of the CDO. As with RMBS, the process centers on an examination of the pool of assets held by the trust and analysis of how they would perform individually and in correlation during various stress scenarios. However, this analysis is based **primarily on the credit rating of each RMBS or CDO in the underlying pool or referenced through a credit default swap entered into by the CDO. In other words, the credit rating is the primary characteristic of the underlying debt instruments that the NRSROs take into consideration when performing their loss analysis. Hence, this review of the debt instruments in the collateral pool and the potential correlations among those securities does not "look through" those securities to their underlying asset pools. The analysis, consequently, generally only goes one level down to the credit ratings of the underlying instruments or reference securities."** (*Proposed Rules for Nationally Recognized Statistical Rating Organizations*, SEC Release No. 34-57967 (June 16, 2008), at p. 18.).

44.   Moody's Investors Service, *Moody's Enhanced ABS CDO Modeling Parameters and Surveillance*, October 12, 2007, at p. 28,
        The above-described methods that Moody's used to lower the asset correlation figures used

in its ratings models were attested to before Congress on September 27, 2007, in the prepared testimony of Mr Bass:

> Through the alchemy of Mezzanine CDOs this re-bundling process magically allowed the top 80% of the capital structure to be rated AAA. This magic came despite the underlying securities remaining mostly among the lowest rated tranches of the original Subprime securitizations. The justification for this process was that the securities were sufficiently diversified, both geographically and by originator, that their principal and interest payments could be restructured to prioritize the top of the newly created capital structure. Whereas in reality the underlying collateral remained a homogenous asset class whose default probability was highly correlated and therefore their risk was dramatically understated.
>
> In fact this correlation was further underestimated by an arbitrary decision to create the hereto unknown classification of "Midprime" borrowers by splitting up the existing Subprime category. Prior to this, Subprime was simply defined as loans made to borrowers with FICO scores below 660. Midprime was declared to be the top half of the Subprime spectrum. FICO scores between 625 and 660. This designation not only allowed NRSROs to use a second color in their CDO presentation pie charts but also allowed them to argue they were less correlated because they were a different asset class. This in turn allowed them to use more aggressive assumptions in their ratings models and deliver higher credit ratings to products containing both Midprime and Subprime loans even though they both were previously considered Subprime. With the stroke of a pen and some less than creative naming, Mezzanine CDOs were further able to mis-price and re-lever the riskiest tranches of Subprime RMBS securitizations. Interestingly enough, Moody's, just last week, issued a press release that eliminated the context of Midprime versus Subprime in ALL ABS CDOs. They did not say however if they were going to go back and re-rate previous transactions as all Subprime. (Congressional Hearing Testimony, J. Kyle Bass, September 27, 2007)

45.     The New York Times, invited by Moody's to take a look into its ratings process as exemplified by one subprime securitization (code-named "Subprime XYZ", part of which was resecuritized into a CDO), vividly summarized Moody's ignorance of the obvious (and the ensuing results):

Many of the lower-rated bonds issued by XYZ, and by mortgage pools like it, were purchased by CDOs, the second-order mortgage vehicles, which were eager to buy lower-rated mortgage paper because it paid a higher yield. As the agencies endowed C.D.O. securities with triple-A ratings, demand for them was red hot... In 2006 and 2007, the banks created more than $200 billion of C.D.O.'s backed by lower-rated mortgage paper. Moody's assigned a different team to rate C.D.O.'s. This team knew far less about the underlying mortgages than did the committee that evaluated Subprime XYZ. In fact, Moody's rated C.D.O.'s without knowing which bonds the pool would buy.

A C.D.O. operates like a mutual fund; it can buy or sell mortgage bonds and frequently does so. Thus, the agencies rate pools with assets that are perpetually shifting. They base their ratings on an extensive set of guidelines or covenants that limit the C.D.O. manager's discretion.

Late in 2006, Moody's rated a C.D.O. with $750 million worth of securities. The covenants, which act as a template, restricted the C.D.O. to, at most, an 80 percent exposure to subprime assets, and many other such conditions. "We're structure experts," Yuri Yoshizawa, the head of Moody's' derivative group, explained. "We're not underlying-asset experts." They were checking the math, not the mortgages. But no C.D.O. can be better than its collateral.

Moody's rated three-quarters of this C.D.O.'s bonds triple-A. The ratings were derived using a mathematical construct known as a Monte Carlo simulation -- as if each of the underlying bonds would perform like cards drawn at random from a deck of mortgage bonds in the past. There were two problems with this approach. First, the bonds weren't like those in the past; the mortgage market had changed. As Mark Adelson, a former managing director in Moody's structured-finance division, remarks, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." And second, the bonds weren't random. Moody's had underestimated the extent to which underwriting standards had weakened everywhere. When one mortgage bond failed, the odds were that others would, too.

Moody's estimated that this C.D.O. could potentially incur losses

of 2 percent. It has since revised its estimate to 27 percent. The bonds it rated have been decimated, their market value having plunged by half or more. A triple-A layer of bonds has been downgraded 16 notches, all the way to B. Hundreds of C.D.O.'s have suffered similar fates (most of Wall Street's losses have been on C.D.O.'s). For Moody's and the other rating agencies, it has been an extraordinary rout. (New York Times, *Triple A Failure*, April 27, 2008)

46.    Moody's Investors Service, *Challenging Times for the U.S. Subprime Market*, March 7, 2007 at p. 5,

47.    Moody's Investors Service, *Moody's Updates Loss Projections for 2006 Subprime Loans*, January 30, 2008.

48.    Such CES loans are far, far riskier than first-lien loans. First, because often originated simultaneously with a first-lien mortgage (on which they "piggyback" and for which they often provide a down payment), they produce debt burdens and *combined* loan-to-value levels that would not be countenanced in a single loan, thus increasing default risks. Second, upon default, because of their "second" priority status, losses are extremely large and often total because foreclosure proceeds (after foreclosure costs) first go to paying the first-lien loan.

49.    Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology*, April 2, 2007; Moody's Investors Service, *U.S. Subprime Mortgage Market Update: July 2007*, July 24, 2007; Moody's Investors Service, *Moody's Update on Closed-End Second Lien RMBS*, August 30, 2007.

50.    Compare Moody's Investors Service, *Closed-End Seconds: Recent Performance and Update to Methodology*, April 2, 2007 ($35 billion, p. 1) vs. Moody's Investors Service, *U.S. Subprime Mortgage Market Update: July 2007*, July 24, 2007 ($48 billion in Figure 6).

51.    The tables reproduce Tables 1 and 2 from Moody's Investors Service August 30, 2007 report, *Moody's Update on Closed-End Second Lien RMBS*.

52.    *See* Moody's Investors Service, *U.S. Subprime Mortgage Market Update: July 2007*, July 24, 2007 at Figure 6.

53.    *See* Moody's Investors Service February 1, 2008 special report titled *U.S. Subprime RMBS 2005-2007 Vintage Rating Actions Update: January 2008*, at Figure 4b, reproduced here in the table above.

54.    Second-lien security issuance peaked in 2006: both in number of tranches rated and dollar values of securities issued. 2006 issuance alone outweighs combined issuance during 2005 and 2007. Moody's 2005 and 2007 downgrades are not detailed here, in part because Moody's presentation of

those downgrades has been disingenuous and contradictory. As to the latter: Moody's initial 2005 second-lien ratings revisions (as reported in Moody's Investors Service, *U.S. Subprime Mortgage Market Update: July 2007*, July 24, 2007 at Figures 7-8) are difficult to reconcile with Moody's most recent report (Moody's Investors Service, *U.S. Subprime RMBS 2005-2007 Vintage Rating Actions Update: January 2008*, February 1, 2008, at Figure 3b): for example, the former reports 77 tranches downgraded or put on review for downgrade (14.1% of all tranches issued during all of 2005) having a value of $547 million, while the latter reports fewer tranches downgraded or on review (52 tranches, or 9.6% of the total) yet a greater dollar value of such tranches ($1.06 billion). The larger problem is that Moody's presentation of its 2005 and 2007 downgrades is an "apples to oranges" comparison that displays artificially-lower downgrade levels. Moody's did not review ratings for the *entire* 2005 and 2007 vintages, but merely subsets of those vintages closer in time to 2006; essentially, the latter half of 2005 and the first half of 2007. Moody's did not report the ensuing downgrades in light of total issuance *during that limited time*, but rather in light of total issuance for the entire calendar year – thus effectively halving actual downgrade frequency. Even so, as Moody's first disclosed in its above-mentioned February 1, 2008 special report (at Figure 5b), Moody's downgraded or placed on review for downgrade 55.6% of all 2nd-lien tranches it rated in 2007 (143 out of 247) and a like amount when issuance is expressed in dollars ($5.7 billion out of $11.8 billion, or 48.7%).

55.     Moody's Investors Service, *U.S. Subprime RMBS 2005-2007 Vintage Rating Actions Update: January 2008*, February 1, 2008, at Figures 9b and 11b.

56.     On December 20, 2007, Moody's Investors Service issued a report titled *U.S. Subprime RMBS 2007 Vintage Rating Actions* which reported the results of Moody's complete "review of all 2007 subprime first lien mortgage-backed securities rated on or before July 13, 2007, the implementation date of substantial refinements to its rating methodology". The table above reproduces Moody's own "Figure 1" from that report. Moody's last word as to its 2007 subprime re-ratings (the above-mentioned February 1, 2008 report) essentially reproduced the December 20, 2007 figures with minor discrepancies as to total numbers of tranches and dollars. Additionally, Moody's February 1, 2008 report disclosed 2007 second-lien downgrades and totals for 2007 first and second lien downgrades combined.

57.     Moody's Investors Service, *U.S. Subprime RMBS 2007 Vintage Rating Actions*, December 20, 2007, at p. 2.

58.     The Alt-A category, as Moody's explained, is a set of interstitial areas between prime and subprime:

> Alt-A RMBS includes those transactions with collateral that is generally considered weaker than prime quality but stronger than subprime. The Alt-A segment typically has weaker borrower and loan characteristics as compared to the prime market, such as less stringent documentation requirements, a higher percentage of non-owner occupied properties, and a higher percentage of two-to-four family properties. It also typically has certain strengths over the subprime

233

> market, including stronger borrower and loan characteristics
> represented by higher FICO scores, stronger payment histories, and
> the existence of cash reserves, among others. (Moody's Investors
> Service, *U.S. Alt-A RMBS 2005 and 2006 Vintage Rating Actions
> Update: November 2007*, December 4, 2007)

59.     The tables reproduce Figure 2a from the December 4, 2007 Moody's Investors Service
Report titled *U.S. Alt-A RMBS 2005 and 2006 Vintage Rating Actions Update: November 2007*.

60.     *Id.*, Figure 2b.

61.     Moody's Investors Service, *U.S. Alt-A RMBS 2005-2007 Vintage Ratings Actions Update:
June 2008*, June 4, 2008.

62.     The tables reproduce those provided by Moody's as Figures 4b and 4c in Moody's Investors
Service June 4, 2008 report titled *U.S. Alt-A RMBS 2005-2007 Vintage Ratings Actions Update:
June 2008*.

63.     As reported in Figures 6b and 6c in Moody's Investors Service, *U.S. Alt-A RMBS 2005-2007
Vintage Ratings Actions Update: June 2008*, June 4, 2008.

64.     Moody's Investors Service, *Structured Finance CDO Ratings Surveillance Brief - December
2007*, January 18, 2008.

65.     Moody's Investors Service, *A Short Guide to SIVs*, January 2008.

66.     SIV-lites are, or were, a particularly ill-favored hybrization of SIVs and CDOs. Like SIVs,
they invested in longer-term assets and funded themselves with short term debt. Like CDOs, they
invested much more heavily in subprime RMBS. See, e.g., Moody's Investors Service, *SIVs: An
Oasis of Calm in the Sub-prime Maelstrom*, July 20, 2007.

67.     *See also*, e.g., Moody's Investors Service January 16, 2008 press release titled "Update on
Structured Investment Vehicles (SIVs)": "The sector has reported a decline in assets under
management from almost US$400 billion in July 2007 to around US$300 billion by mid-November
and around US$200 billion by mid-December 2007,"says Henry Tabe, Team Managing Director for
Structured Finance Operating Companies and co-author of the reports. Moreover, Moody's reports
that managers and sponsors of SIVs now acknowledge that the senior debt investor base is unlikely
to return to the sector in the absence of fundamental changes to the business model."

68.     Moody's Investors Service, *FAQs Regarding the Current State of the Structured Investment
Vehicle (SIV) Market*, January 15, 2008.

69.     The Markit ABX indexes track the performance of the 20 largest subprime RMBS security
tranches issued each year (e.g., 2006, 2007) at each of the five principal ratings levels (Aaa, Aa, A,
Baa, and Ba): i.e., there are 20 securities in the 2006 Ba-rated index, 20 securities in the 2006 Baa-

234

rated index, etc., with like amounts for 2007, 2005, etc.

70.     As Sylvain Raynes, author of the college textbook The Analysis of Structured Finance Securities, explained, one triple-A standard requires credit-support to be five times expected losses. All the triple-A securities in the ABX indexes, given current performance indicating substantial expected losses, failed to meet this standard. Similarly, one test of investment-grade status is that credit support be twice the percentage of troubled collateral (e.g., credit support of 30% versus 15% of the underlying mortgages being substantially delinquent, nonperforming, or in foreclosure). 74 of the 80 triple-A securities failed to meet this standard.

71.     For example:

(a)     A $79 million tranche of a Deutsche Bank subprime security (known as ACE 2005-HE-7 A2D) had been rated triple-A by Moody's and S&P – and still retained those triple-A ratings in March of 2008 despite the facts that 18% of the underlying mortgages were in foreclosure, a further 15% had been seized by lenders, and a further 10% had been delinquent for 90 days or more.

(b)     Similarly, a $118 million tranche of a Washington Mutual subprime security (known as WMHE 2007-HE2 2A4) had been rated triple-A by all three rating agencies at issuance during 2007. As of March 2008 (i.e., within one year), 5.6% of the underlying loans were already in foreclosure, and credit support was less than the combined value of the mortgages currently at risk. While Moody's (and S&P) continued to maintain triple-A ratings, Fitch had downgraded the tranche to B – five levels below investment grade, and fifteen levels below the ratings maintained by Moody's.

(c)     Similarly, a $242 million tranche of a Morgan Stanley Capital Inc. subprime security (known as 2006-WMC2 A2D) had been rated triple-A by all three rating agencies at issuance during 2006. As of March 2008, however, it had credit support totaling only 64% of the value of the mortgages currently at risk. Whereas Fitch had already cut the credit rating to BBB (and had placed the security on review for further downgrade), and whereas S&P had placed the security on review for downgrade, Moody's maintained in full its original triple-A rating.

72.     See Bloomberg article published on March 11, 2008 and titled "Moody's, S&P Defer Cuts on AAA Subprime, Hiding Loss (Update 3)".

73.     Moody's Investors Service, Challenging Times for the U.S. Subprime Market, March 7, 2007 at p. 5.

74.     Moody's Investors Service, Moody's Updates Loss Projections for 2006 Subprime Loans, January 30, 2008.

75.     Prior to 2002, subprime RMBS issuance and subprime mortgage securitization was less than $100 billion each year. Between 2001 and 2003, subprime mortgage securitization doubled: 2003 subprime securitization created nearly $200 billion in subprime RMBS. In 2004, it doubled again: $400 billion in subprime RMBS. In 2005, subprime RMBS grew to $536 billion and plateaued during 2006 to $527 billion. See Moody's Investors Service, 2006 Review and 2007 Outlook: Home

235

*Equity ABS*, January 22, 2007.

76.

### Moody's Revenues and Revenue Growth (by Revenue Source): 2004-2006

|  | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|
| **Structured Finance Revenue** | 886.7 | 715.4 | 553.1 | 474.7 |
| **Growth** | 23.9% | 29.3% | 16.5% | - |
| **All Non-SF Revenue** | 748.9 | 669.6 | 590.7 | 535.1 |
| **Growth** | 11.8% | 13.4% | 10.4% | - |
| Corporate Finance Revenue | 396.2 | 323.2 | 299.6 | 266.7 |
| Growth | 22.6% | 7.9% | 12.3% | - |
| Financial / Sovereign Revenue | 266.8 | 254.6 | 208.9 | 181.2 |
| Growth | 4.8% | 21.9% | 15.3% | - |
| Public Finance Revenue | 85.9 | 91.8 | 82.2 | 87.2 |
| Growth | -6.4% | 11.7% | -5.7% | - |
| **All Ratings Revenue** | 1,635.6 | 1,385.0 | 1,143.8 | 1,009.8 |
| **Structured Finance Share** | 54.2% | 51.7% | 48.4% | 47.0% |
| **Total Moody's Revenue** | 2,037.1 | 1,731.6 | 1,438.3 | 1,245.6 |
| **Structured Finance Share** | 43.5% | 41.3% | 38.5% | 38.1% |

77.     Lewis Ranieri, the Salomon Brothers banker who pioneered mortgage-backed securities, stated exactly the same: "The whole creation of mortgage securities was involved with a rating." (New York Times, *Triple A Failure*, April 27, 2008).

78.     Subordinated tranching is the primary structuring process that generates highly-rated subprime RMBS security securities (and less highly-rated ones as well, as a necessary by-product) from risky subprime mortgage assets. Suppose a security is created on the basis of a pool of $100 million of subprime mortgages, giving security holders the right to the streams of interest and principal payments on those subprime mortgages (but exposing security holders to the risks of default and loss posed by those mortgages -- i.e., if the borrowers don't pay the mortgages, the security holders don't receive their payments). *Structured* finance breaks the security into distinct "tranches" with unequal rights to the payment stream thrown off by the entire asset pool. Holders of the senior-most tranche receive their payment in full, then holders of the next-most senior tranche, etc. The senior tranches -- those first to receive payment and last to receive losses -- are obviously the safest, and thus garner the highest credit ratings (e.g., Aaa). To emphasize: they do so only because other tranches have been created to absorb losses first. As the priority of payment recedes and the proximity to loss increases, the credit ratings decrease (e.g., Aa, A, Baa, Ba). The principle is basic: in order to merit an Aaa rating, tranche holders have to be removed from expected losses

by a factor of "x"; in order to merit an Aa rating, Aa-tranche holders have to be removed from expected loss by a factor of "x-1", etc.

Two other structuring techniques are also used: "overcollateralization", and "excess spread".

(a)  Overcollateralization provides an extra cushion against loss for all the rated tranches by issuing a lower dollar amount of rated securities than the total dollar amount of the underlying mortgage assets (e.g., a $100 million pool of subprime mortgages, but only $90 million in rated tranche security issuance).  A securitization overcollateralized in such amount could thus lose $10 million without any of the rated tranches suffering any loss.  However, overcollateralization is disadvantageous for issuers because it increases their issuance costs (e.g., issuers pay "X" for the mortgages but only receive "X-10" from selling rated securities) and thus reduces their issuance profits.

(b)  Excess spread is the amount by which (1) the payments made on the underlying mortgages exceeds (2) the payments that need to be made to the subprime RMBS purchasers.  Because of their relative risks, subprime mortgages have high interest rates while Aaa-rated securities have much lower interest rates.  Subprime securitizations are generally structured so that they take in more money from the underlying mortgages than they pay out to the subprime RMBS purchasers – and these excess sums also function as loss protection for the rated tranches and for the "equity" overcollateralization tranche.  Generally speaking, the interest of the issuer is to generate as much highly-rated paper as possible with as little overcollateralization as possible (i.e., at the lowest cost to the issuer).

79.  For example: one credit rating agency's model will come to one assessment of underlying credit risks (e.g., $10 million in expected losses from a $100 million pool of subprime mortgages) – but another credit rating agency's model could yield a different assessment (e.g., $5 million in expected losses from the same $100 million pool).  Assuming hypothetically that the standard for an Aaa credit rating is to be able to withstand three times expected losses, the first agency's evaluation will allow the production of $70 million in Aaa-rated tranches from the $100 million pool (as per above), but the second agency's evaluation will allow the production of $85 million of Aaa-rated tranches (i.e., with $15 million in subordinated tranches serving as loss protection three times greater than expected losses of $5 million).

80.  For example, the issuer could: (1) change the underlying assets by removing some mortgages from the asset pool and replacing them with better ones (to decrease the credit risk and expected losses of the underlying assets), or (2) change the securitization structure, by increasing the amount of overcollateralization, or by decreasing the size of the triple-A tranches so that more of the securitization serves as junior-tranche credit support.

81.  As it became increasingly evident in 2007 that subprime credit rating opinions did not accurately reflect credit realities, credit rating agencies belatedly attempted to conceal their trades by marking those models "gloomier".  As the credit rating agencies and RMBS issuers acknowledge, the result would be to reduce the amount of highly-rated tranches that could be issued from a given subprime asset pool, and thus make issuance more expensive for the issuers:

237

Tom Warrack, a managing director in S&P's residential mortgage-backed securities group, said in an interview Thursday that the gloomier expectations for defaults and prepayment speeds that his rating agency has incorporated into its models "will lower the ability of mortgage [bond] issuers to sell a maximum amount of highly rated bonds." "The percentage of transactions that will be able to be sold as triple-A will be reduced," he said. "More of the structure will have to be lowered to provide credit support and loss protection for the higher-rated bonds," he said.... Brian Simon, the chief operating officer at Freedom Mortgage Corp., called S&P's methodology revisions "more bad news for issuers because it will affect their prices as credit enhancement becomes more expensive.", (American Banker, July 13, 2007)

In their extent and because they drew on data that always was in plain view or could have been made so without engaging in due diligence, the modified conduct tends to prove the misrepresentations complained of.

82.     As detailed in Section II.D.2, Moody's has, between mid-2007 and mid-2008, cut thousands of ratings it originally conferred during 2006 and 2007 under this system.

83.     The extraordinary conflict of interest pressures generated by *ex-ante* determination of credit rating agencies on the basis of *ex-ante* determination of credit ratings was a primary focus of the September 2007 Congressional Hearings:

> I again would like to highlight that what I see as a potential Achilles Heel of this entire system is that credit ratings are not paid for the work of researching, analyzing and creating a rating. Rather they are paid for the actual rating. It doesn't matter how much work they did or didn't do that went into determining the rating, if the client doesn't like the final rating, they can walk away without paying a dime.
>
> The analogy that I can think of is if you're accountant and you're doing the books or doing the tax forms for somebody, you don't come up with the right tax balance, you wouldn't expect them not to pay the accountant. And I think this -- if you want credit ratings to be accountable, I think you base it on the time and research and effort that goes into the program, not on the results of whether you like the results or not. (Congressional Hearing Testimony transcript, September 26, 2007: Senator Allard's opening statements)

*****

I'd like to get back to the issue of what the economic incentives are

238

for those in the rating industry. I am an old CPA, auditor, and we used to say we were the only umpires that were paid by one of the teams. Now I realize we weren't alone. You folks are also umpires paid by one of the teams.

One thing that's obvious is if you're in a league in which the pitchers pay the umpires, you don't want to get a reputation as the guy with the narrowest strike zone. The economic incentive, with regard to this deal, is to make sure you have a good reputation as a pitcher's umpire in order to get the next assignment.

And so you're in a situation where you need some reputation with investors -- and, obviously, this recent problem has not helped any of your agencies with that. But up until the last few months, what you needed was at least an investment-grade image with investors. And then, with the issuers, if you were thought to be slightly more liberal, but still credible with investors, you got the assignment.       (Congressional Hearing Testimony transcript, September 27, 2007)

84.     Unlike a corporate entity, which fundamentally is what it is and can only alter its creditworthiness at the margins, structured finance securities were infinitely malleable. Their collateral – the group of mortgages assembled by the issuer – could be precisely adjusted so as to just barely merit the resulting ratings. The same was the case with regards to security structure (i.e., tranching, overcollateralization), which was under complete control of the issuer and even more susceptible to whatever adjustments were needed to ensure targeted ratings were obtained.

To illustrate (with a hypothetical): a $100 million pool of mortgages is assembled for securitization. Rating agency models calculate that the expected loss from those mortgages will be $6 million. Rating agency standards dictate that triple-A securities must be able to withstand losses three times worse than those actually expected (i.e., $18 million). So the asset pool will support the production of $82 million of triple-A tranches, protected by $18 million of lower-rated tranches and overcollateralization.

        (a)     The above asset pool would *also* support the production of $80 million of even safer triple-A tranches, or $75 million of safer still triple-A tranches (i.e., safer because having even more credit protection against expected losses). The structure was completely malleable and entirely under issuer control. The point: issuers structured their securities precisely to meet the bare minimum standards required by ratings (i.e., choosing to generate $82 million of triple-A tranches, rather than $80 million or $75 million).

        (b)     The above asset pool could also be modified. Supposed the issuer wanted to generate $85 million of triple-A tranches, rather than $82 million. In order to generate $85 in triple-A paper, mortgage pool losses would need to be $5 million, rather than $6 million. So the issuer could change the composition of the asset pool, taking away certain riskier mortgages, adding other less risky

239

mortgages, until the pool reached the desired loss expectation of $5 million.

The point: issuers likewise controlled and modified the asset pools underlying structured finance securities so that the underlying assets just barely merited the targeted credit ratings.

85.    The list goes on:

> Conflicts in rating CDOs are more acute because the raters work with the financial firms in creating these debt packages, says Karl Bergqwist, a senior manager at Gartmore Investment Management Plc in London.
>
> "When you assign a traditional rating on a company or bank, it is as it is, and you just make an assessment," says Bergqwist, who worked at Moody's until 1994. "When you move into structured finance, the agencies are effectively involved in structuring these transactions" (Bloomberg 5/31/07)

*****

> "Ratings firms used to be seen as good, objective folks dressed in white, who you could count on to give reliable opinions", said Christopher Whalen, an analyst at Institutional Risk Analytics, a research firm in Hawthorne, California, that writes software for auditors to determine if banks are accurately valuing their assets. "But when they got involved in structuring and pricing these deals, I think they crossed the line..." (8/14/07 Bloomberg)

*****

> "The idea that the rating agencies are impartial in the world of structured finance is a joke", Rosner says. "The issuers use the publicly-available model to structure a pool and then sit down with the ratings agencies to fine tune it until they reach the desired rating" (Bloomberg 12/20/07)

*****

> Charles Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia University:
>
> When it comes to CDOs, rating companies actually do much more than evaluate them and give them letter grades. The raters play an integral role in putting the CDOs together in the first place.

Banks and other financial firms typically create CDOs by wrapping together 100 or more bonds and other securities, including debt investments backed by home loans.

Credit rating companies help the financial firms divided the CDOs into sections known as tranches, each of which gets a separate grade, says Charles Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia University in New York.

Credit rates participate in every level of packaging a CDO, says Calomiris, who has worked as a consultant for Bank of America Corp., Citigroup, Inc., UBS AG and other major banks. The rating companies tell the CDO assemblers how to squeeze the most profit out of the CDOs by maximizing the size of the tranches with the highest ratings, he says.

... "This is note a passive process of rating corporate debt. This is a financial engineering business". (Bloomberg, CDO Boom Masks Subprime Losses, Abetted by S&P, Moody's, Fitch, May 31, 2007)

86.    According to the Pursuit Partners complaint against UBS:

Moody's changed its rating methodology from a performance-based method to a market-based method. Due to the change in rating methodology, instead of reflecting how the collateral actually performed in real time, the new Moody's rating reflected how the market projected the collateral would perform in the future...

Moreover, in or about the Summer of 2007, UBS knew about this upcoming change in methodology because UBS was continuing to attempt to create and sell new CDOs based upon the same or similar collateral. When UBS presented the new CDOs to Moody's, UBS was advised by Moody's, in confidence, that Moody's would no longer give investments grade rating to either the Notes or the referenced collateral.

Thus, although Moody's maintained ratings for CDOs based on actual historical performance until October 2007, it knew as early as July 2007 that such ratings were flawed, and that it would not use them prospectively. Moreover, Moody's stood by silently while its customer, UBS, sold CDOs that bore invalid ratings.

87.    See Wall Street Journal, *Interview Excerpts - Moody's Executives*, April 11, 2008.

88.     The ratings shopping dynamic was also attested to by, *inter alia*, Eileen Murphy, who had worked for Moody's for five years in structured finance ((three of which spent as a co-head of structured derivatives), as well as several further industry insiders. As quoted in an article titled *Overrated*, published in the September 2007 issue of Portfolio magazine.

> But the agencies know that if they crack down too hard, by toughening standards, it won't be good for business—theirs or their customers'. Securitization is the art of bundling loans and slicing them up into differently rated pieces called tranches. The investors in the lowest-rated—and potentially most-profitable—tranches take on the most risk, because they're on the hook for the first losses. The tranches can then be sliced up again into new bundles. By this alchemical process, risky loans, such as subprime mortgages, can be converted into triple-A-rated securities. An investment bank's goal is to have the highest percentage of its deals rated triple-A and to keep returns high for the investors who take on the lowest, riskiest tranches.

> If the ratings agencies prevent the creation of a high percentage of triple-A paper, the deal won't sell. The ratings agencies' customers—the investment banks—will be unhappy, and the ratings agencies' bottom lines will suffer. "Bankers get paid a lot of money. The ratings-agency people get pushed," says a hedge fund manager who is betting that the securitization market will continue to sour. The agencies "never stopped to question" this, he says, "because they had zero economic risk."

> While the agencies haven't entirely neglected the investors who ultimately buy these complex products, **"the ratings agencies were very banker-, manager-, and market-friendly,"** says Eileen **Murphy, who, before taking a job on Wall Street, worked at Moody's for five years, including three years as co-head of structured derivatives.** "They spent a lot of time developing new methodologies. We can argue how that turned out. It was enlightened self-interest. They created a huge moneymaker for themselves."

> \*\*\*\*\*

> The reason this works is because the ratings agencies have said it works," said Bill Ackman, a hedge fund manager who has about $6 billion under management, in a speech at a charity-investment conference in May. "The big point here is that everyone in the chain gets paid up front. **The rating agencies get their fee... if they say the**

> deal works. If they say the deal doesn't work, well, you just go
> across the street" to another agency to get the rating you want.
> (Portfolio, *Overrated*, September 2007)

89.  *See* Moody's Investors Service April 10, 2007 special report titled *US CMBS: Conduit Loan Underwriting Continues to Slide -- Credit Enhancement Increase Likely*:

> During the past few years the commercial mortgage market has
> witnessed a slow but steady erosion of underwriting quality.
> Subordination has gradually become somewhat out of alignment with
> the growing risks... The factors that are likely to lead to increased
> subordination include the following:  LTVs (by Moody's criteria)
> have reached record high levels... From here forward, increases in real
> estate values will have to come primarily from increased cash flows.
> Delinquency rates were sharply suppressed during the recent period
> of rapid appreciation, and as appreciation slows we believe
> delinquencies will start reverting to more normal levels.  Current
> vintage loans being made with high LTVs based on cyclically high
> valuations can not be counted on to defease and improve the credit
> quality of deals.  The increased use of IO loans... Junior classes have
> become exceedingly thin, exposing them to the risk that if one of the
> larger conduit loans defaults several classes at a time may be entirely
> wiped out, potentially setting the stage for more ratings volatility in
> investment grade classes... a fairly robust economic environment
> boosted values of the underlying real estate assets.  Recently, default
> rates have been at a pace that is a small fraction of historic levels, is
> inherently unsustainable, and has facilitated credit complacency...
> Moody's has long been mindful of the power of the real estate cycle
> on loan performance... We are now generally in the middle to later
> stages of the real estate cycle...

90.  Essentially, Moody's February 2008 proposals were an attempt to "make the problem go away" merely by changing definitions (what does a subprime structured finance Aaa rating mean?) rather than by changing the conditions that led subprime structured finance ratings to become unmoored from longstanding understanding of the meanings of those ratings.  As Sean Egan, managing director of Egan-Jones Ratings Co., which does *not* operate under an Issuer Pays business model, and which was recently ordained by the SEC as an NRSRO, concluded:

> The changes proposed by S&P and Moody's fail to address the root
> cause of the problem, which is skewed incentives... S&P and
> Moody's are paid by issuers which desire the highest possible ratings
> and, in turn, the lowest possible issuance cost. (Bloomberg News,
> *Cuomo Says S&P, Moody's Reforms Won't Stop His Probe (Update*

243

Regulators concluded the same with respect to Moody's "reform" proposals, which were met with swift and furious regulator condemnation. As the New York Attorney General stated on February 7, 2008, Moody's reform proposals were "public relations window dressing" rather than "systemic reform" (*Id.*). Calling these proposals "too little, too late", the New York Attorney General reaffirmed that his investigation into "the role played by the ratings agencies in the mortgage meltdown" would continue unabated (*Id.*).

91. Moody's May 7, 2008 press release stated. in relevant part:

> Moody's Investors Service Names Michel Madelain As COO
> Brian Clarkson to Retire After 17 Years at Company
>
> Moody's Investors Service, the credit rating agency unit of Moody's Corporation (NYSE: MCO), announced today the appointment of Michel Madelain as Chief Operating Officer with overall responsibility for managing the day-to-day operations of the ratings business.
>
> Michel Madelain (52), who currently serves as Executive Vice President in charge of the Global Fundamental Ratings business, will continue to be based in London, reflecting the increasingly global nature of Moody's business.
>
> *****
>
> I also appreciate the many contributions that Brian has made during his long career at Moody's, but understand his desire to retire from the company at this time and wish him well in the years ahead," Mr. McDaniel continued.
>
> Mr. Madelain said, "Moody's has undertaken a number of significant initiatives over the past year to enhance the quality of our analysis and further improve the usefulness of our credit ratings to investors. I am eager to work closely with Ray and the rest of the leadership team to expand on those efforts, while also helping the company navigate the difficult market conditions in which Moody's is operating."
>
> "It has been a privilege for me to spend the past two decades working with the exceptional people of Moody's, and I am proud of the great strides the company has made during that time," said Mr. Clarkson. "I feel the time is right for new leadership to drive forward the changes we've been making in recent months, and I am confident that Moody's and its people will continue to build on their strong

leadership position."

92.     On November 5, 2007, the Asset Securitization Report (an industry trade journal) published the transcript of a roundtable discussion titled "Real Estate Roundtable: Today, Yesterday and Tomorrow" held between mortgage securitization industry participants including senior Moody's employees. When asked whether they had witnessed the end of the subprime market, roundtable members spoke of the current impossibility of issuing subprime RMBS and of the difficulties its rebirth would require.

93.     First and quite practically, given the complexity and opacity of subprime structured finance securities, investors for the most part do not have the requisite skills, resources and data to evaluate these securities by themselves. So with the collapse of Moody's credit ratings opinions, and the inability to develop their own authoritative credit evaluations, all that structured finance securities investors know at this point is that *they don't know* how creditworthy these securities are. Hence, broad market paralysis and shutdown. As the New York Times put it:

> Rating agency downgrades do not destroy markets for corporate bonds, because enough information is disseminated that other analysts can reach their own conclusions. But the securitization markets collapsed when it became clear the rating agencies had been overly optimistic. When a security goes from AAA to junk within a few weeks, it does not inspire confidence in the rating process. (New York Times, *Being Kept in the Dark on Wall Street*, November 2, 2007)

Indeed, the loss of faith in Moody's credit ratings – a loss of faith occasioned by the evident debasement of those ratings with respect to subprime – metastized into a devastating "credit crunch" – a term that describes debt market paralysis and shutdown. Debt issuance shut down across the board precisely because of a loss of faith in the agencies that assigned ratings to such debt:

> BASS: ...and when you ask about the size of the problem, it's not the dollars that we're talking about here, all right? It is the loss of faith in the rating agencies because AAA is not AAA anymore. They bestowed 80 percent of that particular securitization's ratings AAA. AAA is -- I mean, that implies it's a U.S. government bond, right?... Basically, what you're seeing with the ABCP markets freezing -- the commercial paper market... the reason they're failing is, all of a sudden, people aren't buying AAA because it isn't AAA anymore. They realize that it's not what it was cracked up to be...So that's the crisis that the U.S. and the world are facing today. And the reason that is -- it's not just because of subprime. Subprime was the spark that set it off. (Bass Testimony, Congressional Hearing Transcript. September

245

27, 2007)

94.     As experts informed the Senate during April 22, 2008 hearings:

>      MR. COFFEE: ...this market has collapsed. No longer are there
>      any real estate mortgage-backed securitizations. There are also
>      very few commercial mortgage securitizations. Thus I think the
>      industry does have a common interest with the regulators. This
>      market is not going to come back and there are not going to be
>      fees for ratings securitizations that don't happen unless we can
>      make the rating agency credible again. So I want to focus
>      respectively, and I think the industry as well as regulators have to find
>      a way to create confidence because without it, there aren't going to be
>      fees.
>      SENATOR DODD: Just to make that point -- I think I made it the
>      other day in a hearing here -- in the commercial mortgage-backed
>      security area, last year that industry did $230 billion worth of
>      business -- in 2007. And this year, as of late April, they've done
>      $5 billion worth of business, just by comparison, to give some
>      sense of the magnitude of the problem that's come. (Congressional
>      Hearing, April 22, 2008, transcript)
>                         *****
>      MR. CIFUENTES: ...Basically what we have right now is
>      asset-backed commercial paper is very much -- stop -- CDOs of ABS.
>      That's totally gone and we slowly see a recovery of CLOs, which are
>      CDOs supported by bank loans. So broadly speaking, yes. The
>      structured finance market -- it's pretty paralyzed right now. I
>      hope that's not forever because as I said, the -- we're talking about a
>      market in the trillions of dollars. So it's a very significant amount
>      when it comes to provide financing. And as I said initially, the only
>      way people and investors are going to recover the confidence is
>      -- the confidence in the ratings. I mean, that's the end of it. I
>      mean, there is nothing beyond that. (Congressional Hearing, April
>      22, 2008, transcript)

95.     On January 7, 2008, Moody's filed a Form 8-K with the SEC updating, as per specific
disclosure requirements concerning "Costs Associated with Exit or Disposal Activities", the
"restructuring" charge announced on October 24, 2007. The update: firing 7.5% of Moody's
employees and incurring a $50 million charge to do so. The January 7, 2008 Form 8-K stated, in
relevant part:

>      ...in response to [] a decline in current and anticipated issuance

246

of rated debt securities in some market sectors... the Company committed to a restructuring plan (the "Plan") that it estimates will result in a fourth quarter 2007 pre-tax charge of approximately $47-$52 million.

Included in the Plan is a reduction of staff as a result of [] the anticipated decline in new securities issuance in some market sectors...

As part of the Plan staff reductions... the Company plans to reduce global headcount by approximately 275 positions, 7.5% of the headcount as of September 30, 2007... This is anticipated to result in restructuring charges of approximately $43-$48 million...

96.    On June 5, 2008, Moody's held its annual shareholder meeting. Moody's new ratings head Michel Madelain (who replaced Mr Clarkson as chief operating officer of Moody's Investors Service) presented on "Changes in the Global Credit Markets". Those changes, as Madelain's presentation stated, included the "extinct[ion]" of subprime RMBS, CDOs and SIVs, and issuance declines exceeding 90% for RMBS, CMBS, and CDOs:

## MARKET CONDITIONS REMAIN DIFFICULT

Year-to-year declines in 1Q U.S. debt issuance were exceptionally steep for:

- Residential and commercial MBS (down > 90% each)
- Derivatives (down > 90%)

*****

## IMMEDIATE EFFECTS OF FINANCIAL TURMOIL

| Structured Finance Markets | Products such as ABS CDOs, SIVs and Subprime RMBS "extinct" Innovation is stalled No liquidity in this asset class... |
|---|---|
| Credit Rating Agencies | Demands for revised rating methodologies and systems Credibility challenged |
| Fixed Income Investors | Lack of confidence in asset classes that are not transparent and do not have deep |

secondary markets

97.     These barriers allowed Moody's to enjoy profit margins that exceeded even those enjoyed by acknowledged monopolists such as Microsoft – throughout the class period. Moody's has been the third-most profitable large company in the U.S., with profit margins generally at or exceeding 50%. As Glenn Reynolds, head of the CreditSights research firm, put it, Moody's was "as close to Shangri La as you can get, at Microsoft-plus margins" (The Economist, *Rating Agencies: Measuring the Measurers*, June 2, 2007).

Motivated by Moody's ratings misconduct and independence failures, the SEC is focused as never before on enlarging the field of competition by approving further NRSROs to compete with Moody's.

The credit rating agencies' conduct also has been the focus of three rounds of hearings before the Senate Committee on Banking, Housing and Urban Affairs and the House of Representatives Committee on Financial Services (Subcommittee on Capital Market, Insurance and Government-Sponsored Entities). On September 26 and 27, 2007, respectively, these Senate and House committees held hearings on "The Role and Impact of Credit Rating Agencies on the Subprime Credit Market". On April 22, 2008, the Senate Committee held a further hearing on "Turmoil in U.S. Credit Markets: the Role of the Credit Rating Agencies". Testimony was provided at these hearings (collectively, "Congressional Hearing Testimony") from, *inter alia*, legislators and regulators (e.g., SEC Chairman Christopher Cox), representatives of the credit rating agencies, and a variety of academic and professional experts with knowledge of credit ratings, the credit ratings agencies, and/or structured finance.

98.     As a result of Moody's misconduct and misrepresentation of its ratings business, regulators are now considering and/or recommending, as detailed below: (1) that the pool of credit rating suppliers be increased, so as to increase rating agency competition and spur improvement in rating quality; (2) that regulation-induced *de jure* demand for credit ratings be reduced or eliminated; (3) that certain conflicts of interest particularly acute in structured finance under the Issuer Pays model either be prohibited outright or neutralized through damning requisite disclosures; (4) that rating transparency be increased by forcing open the rating agency "black box" and requiring disclosure of rating agency modeling assumptions; and (5) that rating agencies found to have engaged in the conduct complained of herein be subject to revocation of their NRSRO license.