UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re MOODY'S CORPORATION SECURITIES LITIGATION | No. 1:07-cv-8375-SWK <br> (ECF) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR PARTIAL MODIFICATION OF THE PSLRA STAY**

**KIRBY McINERNEY, LLP**
Ira M. Press
Roger W. Kirby
Daniel Hume
David Bishop
825 Third Avenue, 16th floor
New York, NY 10022
Telephone:   (212) 371-6600
Facsimile:    (212) 751-2540

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160

and

Frederick W. Gerkens, III
1430 Broadway, Suite 1603
New York, New York 10018
Telephone:   (212) 382-2221
Facsimile:    (212) 382-3944

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Michael K. Yarnoff
Benjamin J. Hinerfeld
Jennifer L. Keeney
280 King of Prussia Road
Radnor, PA 19087
Telephone:   (610) 667-7706
Facsimile:    (610) 667-7056

*Co-lead counsel for Lead Plaintiffs*
*(additional counsel appears on signature page)*

## INTRODUCTION

This class action arises out of revelations that Moody's Corporation ("Moody's" or the "Company") misrepresented material facts and omitted other facts in its public disclosures about its business. Moody's principal source of revenue growth from February 3, 2006 through October 24, 2007 (the "Class Period") came from rating so-called "sub-prime" backed instruments. It repeatedly represented that it earned revenues because of its independence and integrity in rating the sub-prime instruments. As it turns out, Moody's lacked both. The Company was captive to its principal client base and systematically inflated its ratings to appease that client base. Disclosure of the truth regarding Moody's misrepresentations and omissions destroyed a large part of Moody's business, and cut its stock price in half.

Moody's role in the sub-prime debacle is the subject of continuing investigations by numerous state, federal and international bodies, and has already resulted in a settlement with the Attorney General of the State of New York. It is also the focus of a report and continuing investigation by the Securities & Exchange Commission ("SEC"). In addition, Moody's is named as a defendant in an action by the State of Connecticut and in several other private lawsuits.

Lead Plaintiffs[1] now seek access to a limited universe of documents Moody's provided to the SEC, and which the SEC reviewed and relied upon in generating its July 2008 report about credit rating agencies ("CRAs"), entitled "Summary Report of Issues Identified in the Commission Staff's Examination of Select Credit Rating Agencies" (the "SEC Report").[2] This case is exactly why the Private Securities Litigation Reform Act of 1995 (the "PSLRA") contains explicit exceptions to its automatic discovery stay

---

[1] Lead Plaintiffs are Teamsters Local 282 Pension Trust Fund, Charles W. McCurley, Jr. and Lewis Wetstein.

[2] The SEC Report is attached as Ex. "A" to the Affidavit of Ira M. Press in support of Lead Plaintiffs' motion for partial modification of the PSLRA stay (the "Press Aff.").

provision, 15 U.S.C. §78u-4(b)(3)(B). The instant motion raises none of the concerns Congress expressed in creating the PSLRA stay; the case is neither vexatious nor seeking discovery merely to coerce defendants into an unwarranted resolution. The SEC Report confirms that Moody's violated federal securities laws and regulations, as well as its own internal codes of conduct and ethics. Moreover, Moody's continuing efforts to control the public's negative perception of the Company's malfeasance by "cooperating" with state and federal authorities eliminate any argument that limited discovery now would place a burden on the Company.

Lead Plaintiffs, on the other hand, suffer undue prejudice so long as Moody's may use the PSLRA stay to allow it to disclose what it has to selected persons. There is no good reason why, during the pendency of their upcoming motion to dismiss, Defendants[3] may develop strategic advantages in this litigation by participating in numerous federal, state and international investigations, as well as state attorney general and private lawsuits, all of which deal with substantially similar legal issues as this case. Lead Plaintiffs are effectively the only player – including competing classes of plaintiffs suing under the federal securities laws – without the ability to develop their litigation strategy in what is currently a rapidly shifting legal landscape. Denying access would "unfairly insulate defendants from liability for securities fraud as alleged." *Vacold LLC v. Cerami*, No. 00 CIV. 4024 (AGS), 2001 WL 167704, at *7 (S.D.N.Y. Feb. 16, 2001).

Lead Plaintiffs' proposed document request[4] is particularized and comports with both the language and rationale of the PSLRA. The request seeks only documents and things Moody's provided to the SEC in connection with that agency's investigation. Lead Plaintiffs' consolidated amended complaint (the "CAC" or "Complaint") alleges

---

[3] Moody's, Raymond W. McDaniel, Jr., Brian M. Clarkson and Michael Kanef are, collectively, the "Defendants."

[4] Lead Plaintiffs' document request is attached as Ex. "B" to the Press Aff.

facts "that it found independently in support of its claims," and Defendants will not be burdened by delivering to Lead Plaintiffs what they have already produced to others. *In re FirstEnergy Corp. Sec. Litig.,* 229 F.R.D. 541, 545 (N.D. Ohio 2004). Denial of this limited and targeted discovery serves no legitimate purpose - not for the parties, not for judicial economy, and not for reaching a just and timely outcome based on an informed record.

## THE ALLEGATIONS

During the Class Period, Moody's made a series of material misrepresentations and omissions regarding its financial condition and its reputation. Beginning in July 2007 and continuing through October 2007, the truth gradually emerged that (1) Moody's was in far poorer financial condition than it had claimed, and (2) its reputation hinged on fraudulent and deceitful practices. In addition to reporting and projecting substantially reduced future revenues, Moody's has revised downward thousands of its credit ratings for asset-backed securities, affecting hundreds of billions of dollars in structured finance instruments. It also was exposed as having concealed computer errors for more than a year, which, ultimately, resulted in billions of dollars of additional downgrades. More recently, the SEC Report described numerous instances of unethical, deceitful and fraudulent conduct at Moody's and the other two CRAs.[5]

Thus, there already is ample evidence of Moody's culpability.

---

[5] Similarly, according to the European Commission, "[i]t is generally accepted that CRAs underestimated the credit risk of structured credit products and failed to reflect early enough in their ratings the worsening of market conditions thereby sharing a large responsibility for the current market turmoil." *See* "Consultation by the Commission services on Credit Rating Agencies (CRAs)" July 31, 2008, IP/08/1224.

**PROCEDURAL BACKGROUND**

    A.  **The Complaint**

    Lead Plaintiffs filed the Complaint on June 27, 2008. It alleges that Moody's artificially inflated its stock price by making material misrepresentations and omissions – both quantitative and qualitative - about its business and financial condition. The disclosure of the truth caused Moody's stock price to be halved from its Class Period high, where it remains.

    Moody's built its reputation for integrity with repeated representations that it was independent of its clients, and that it issued ratings based on objective data and rigorous analysis. In truth, Moody's was not independent, and its ratings in the area of structured finance were not rigorous. To the contrary, Moody's was captive to a select client base – the small cadre of global financial institutions that issued hundreds of billons of dollars in structured finance instruments – and earned record revenues by pandering to this base. Moody's has long acknowledged that its business flows from "reputational capital." Recent subprime disclosures have destroyed Moody's reputational capital, and reduced its revenues and future prospects. Moreover, Moody's fraud has not only harmed its own shareholders, but also has weakened the global economy, as so many of the esoteric instruments sold with the endorsement of Moody's inflated ratings have lost significant value or are indeed valueless.

    The Complaint alleges Moody's misdeeds with the specificity required by the PSLRA; Lead Plaintiffs need no additional discovery to withstand Defendants' impending motion to dismiss. Nevertheless, the SEC Report, published coincidentally just days after Lead Plaintiffs filed the Complaint, provides further corroboration of Lead Plaintiffs' well-pleaded facts.

### B. Other Legal Proceedings and Investigation

#### i. The SEC Investigation and the SEC Report

The SEC is one of several institutions examining Moody's and other rating agencies.[6]  On or about July 8, 2008, the SEC issued the SEC Report on CRAs.[7]  The SEC Report generally confirms the Complaint's allegations regarding Moody's conflicts of interest, and it specifies instances of improper activities at all three CRAs.  According to the SEC Report, the SEC's Staff of the Office of Compliance Inspections and Examination (the "Staff") began its investigation of the CRAs on August 31, 2007, covering the period from January 2004 to July 2008.  The Report states that the Staff conducted examinations which:

> [I]ncluded extensive on-site interviews with the ratings agencies' staff, including senior and mid-level managers, initial ratings analysts and surveillance analysts, internal compliance personnel and auditors, personnel responsible for building, maintaining and upgrading the ratings models and methodologies used in the ratings process and other relevant ratings agency staff.
>
> In addition, the Staff reviewed a large quantity of the ratings agencies' internal records, including written policies, procedures and other such documents related to

---

[6] In addition to the SEC investigation discussed herein, Moody's is also under investigation by the Attorneys General of New York, Connecticut, and Ohio, and Moody's conduct has been the focus of three rounds of hearings before the Senate Committee on Banking, Housing and Urban Affairs and the House of Representatives Committee on Financial Services (Subcommittee on Capital Market, Insurance and Government-Sponsored Entities).  On September 26 and 27, 2007, respectively, these Senate and House committees held hearings on "The Role and Impact of Credit Rating Agencies on the Subprime Credit Market."  On April 22, 2008, the Senate Committee held a further hearing on "Turmoil in U.S. Credit Markets: the Role of the Credit Rating Agencies."

[7] The SEC Report summarizes the SEC's examination of three CRAs, including Moody's.

5

> initial ratings, the ongoing surveillance of ratings, the management of conflicts of interest and the public disclosures of the procedures and methodologies for determining credit ratings. The Staff also reviewed deal files for subprime RMBS and CDO ratings, internal audit reports and records and other internal records, including a large quantity of email communications *(the ratings agencies produced over two million emails and instant messages that were sorted, analyzed and reviewed using software filtering tools)*. Finally the Staff reviewed the ratings agencies' public disclosures, filings with the Commission and other public documents.

SEC Report at pp. 3-4 (emphasis added).

The SEC Report identifies several basic problems/issues at CRAs relating to ratings for residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") linked to subprime residential mortgage-backed securities," and it addresses proposed means by which to fix these problems/issues. The basic problems/issues the SEC Report covers are, *inter alia*:

- Moody's and the other CRAs' failure to disclose significant aspects of the ratings process;

- Moody's and the other CRAs' appear to have been reckless in their failure to document significant steps in the ratings process – including the rationale for deviations from their models and for rating committee actions and decisions – and their failure to document significant participants in the ratings process;

- CRAs appear to have been reckless in their surveillance processes;

- The CRAs' failure to manage conflicts of interest properly; and

- The significant variations of the CRAs' interest audit processes.

On June 16, 2008, the SEC proposed rules meant, *inter alia*, to "increase transparency in the ratings process and *to curb practices that contributed to recent turmoil in the credit market*." SEC Report at p.4 (emphasis added). The Complaint contains allegations against Moody's consistent with the activities and improper conflicts

6

of interest confirmed by the SEC. For example, the Complaint alleges degraded ratings methodologies (CAC ¶¶ 103-247, 272-280), and conflicts of interest and their influence upon Moody's structured finance ratings (CAC ¶¶ 287-352).[8]

### ii. State Attorney General Investigations

#### 1. Attorney General of New York

On June 5, 2008, the Attorney General of the State of New York (the "NYAG") announced that, following an investigation, his office had reached a settlement agreement pursuant to which Moody's and its fellow CRAs would establish: (1) a "fee-for-service" pay structure; (2) criteria for reviewing mortgage lenders and originators' processes; and (3) procedures for performing due diligence on information provided by investment banks.[9] This agreement flowed directly from the conflicts of interest and information gaps that caused the recent subprime problems. According to SEC chairman Christopher Cox, the NYAG and the SEC were "motivated by our mutual desire to promote ratings with integrity and curb the questionable practices that contributed to the credit market turmoil." The New York settlement also requires Moody's and the other CRAs to cooperate with the NYAG in its ongoing investigations against other subprime players.

---

[8] The SEC elected not to publish individualized allegations against the CRAs or their employees. According to the *Wall Street Journal*, the SEC asserted that its "general practice" is not to reveal the identity of individual actors when it conducts an "industry review." *See* Aaron Lucchetti, "S&P Email: 'We Should Not Be Rating It,'" *Wall St. Journal*, Sat. Aug. 2, 2008 at B1. According to the *Journal* article, "[a] draft version of the SEC's report on credit-rating firms reveals their questionable internal procedures, heavy workload and accommodations made for business reasons, and -- unlike the final report -- ties the various references to specific firms." Lead Plaintiffs do not have access to the draft SEC Report referenced by the *Journal*.

[9] *See* press release issued by the Office of the New York State Attorney General, *Attorney General Cuomo Announces Landmark Reform Agreements with the Nation's Three Principal Credit Rating Agencies*, June 5, 2008.

### 2. Attorney General of Connecticut

On July 30, 2008, the Attorney General of Connecticut ("CTAG") sued Moody's in Connecticut state court alleging that it had established a "dual ratings system" to give lower credit ratings to bonds issued by states, municipalities and other public entities than corporate debt bearing similar degrees of risk. The CTAG's complaint alleges that Moody's committed "unfair, oppressive or unscrupulous" practices, and "made or caused to be made to Connecticut consumers, directly or indirectly, explicitly or by implication, representations which are material, reasonably interpreted, false and likely to mislead," in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*. *See* CTAG Compl. at ¶¶ 81-83. This litigation is ongoing.

### iii. State Lawsuits Against Moody's

Moody's is a named defendant in several putative class action lawsuits filed in New York State courts, which have been removed to district courts in this judicial district. *See New Jersey Carpenters Health Fund v. The Royal Bank of Scotland Group, plc, et al.*, (No. 1:08-cv-05310-DAB-THK) (Batts, J.) (the "RBS Compl."); *New Jersey Carpenters Health Fund v. Home Equity Mortgage Trust 2006-5, et al* (No. 1:08-cv-5653-PAC-THK) (Crotty, J.) (the "HEMT Compl."); *New Jersey Carpenters Vacation Fund et al v. HarborView Mortgage Loan Trust 2006-4, et al*, (1:08-cv-05093-HB) (Baer, J.) (the "HVMLT Compl.") (collectively, the "Section 11 actions").

The Section 11 actions allege that Moody's violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Among other wrongdoings, they allege that Moody's "prepared valuations, *i.e.*, assigned ratings to the [relevant certificates], in connection with the Offering, as defined in Section 11(a)(4) of the Securities Act," and "did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in [registration statements and prospectuses] were true, did not omit any material fact, and were not materially

misleading." RBS Compl. ¶¶ 80, 82; HEMT Compl. ¶¶ 87, 89; *see also,* HVMLT Compl. ¶¶ 98 ("The CRAs [including Moody's] served as appraisers as defined in Section 11(a)(4) of the Securities Act. The Rating Agencies Defendants purportedly reviewed and analyzed each Offering and provided the credit rating for each tranche of the HarborView Bonds. The Rating Agencies Defendants' service of providing the credit ratings for the HarborView Bonds was essential to pricing and marketing the bonds. The Rating Agencies Defendants' ratings were contained within the Prospectuses.")

Like this action, the Section 11 actions allege conflicts of interests at Moody's and the other CRAs. *See, e.g.*, HVMLT Compl. ¶ 92. They also contain allegations related to Moody's "outdated and inappropriate" ratings methodologies. *See, e.g., id.* ¶¶ 78-80, 90; RBS Compl. ¶ 44; HEMT Compl. ¶ 45. Moody's and its co-defendants removed the Section 11 actions to this district. Plaintiffs have moved to remand the cases to New York State Court. These motions have been fully briefed and are pending before the Honorable Harold Baer and the Honorable Theodore Katz.

The remand motion is likely to be successful. Recently, the United States Court of Appeal for the Ninth Circuit affirmed a district court's remand to state court of a similar action under Section 11 of the Securities Act, holding that actions pursuant to Section 11 are expressly exempt from removal under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1033-1034 (9th Cir. July 16, 2008). This decision adds further urgency to Lead Plaintiffs' argument, as the Section 11 actions will also likely be remanded to state court where the parties will not be subject to similar PSLRA restrictions.

### iv. Foreign Investigations of Moody's

In addition to the SEC, NYAG, CTAG and the Section 11 actions, Moody's is the subject of foreign regulatory activity. Following its own investigation, the International Organization of Securities Commissions ("IOSCO") proposed "significant changes" to its

9

"Code of Conduct Fundamentals for Credit Rating Agencies." *See* IOSCO Release, 3/26/2008.[10]  Like the SEC, IOSCO raised a number of concerns regarding the integrity of the rating process at Moody's and the other CRAs, as well as their independence, avoidance of conflicts of interest, and their responsibilities to the investing public. *Id.*

In short, several state, federal and foreign government agencies, as well as private litigants, have directly engaged Moody's in both litigation and regulatory activity. Although Lead Plaintiffs are aware of these activities – each of which relates directly to the Complaint's allegations – they have not been granted access to any documents produced by Moody's during the course of the above-identified litigation and regulatory activity.

## ARGUMENT

### I. THE PSLRA PROVIDES EXPRESS EXCEPTIONS TO THE DISCOVERY STAY

Although the PSLRA provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss…," it provides exceptions where "the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. §78u-4(b)(3)(B).  The rationale behind both the PSLRA stay *and* its exceptions is to promote judicial economy and fairness.  The exceptions exist because the PSLRA stay was not intended to apply to cases where, as here, (1) the fraud is apparent, (2) the requested materials have been assembled, (3) the defendant has produced the assembled materials to other parties and/or in other venues, and (4) the requesting party will be prejudiced by delayed production. *See, e.g., In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004) ("maintaining the discovery stay as to materials already provided to government entities does not further the policies behind the PSLRA"); *In re Enron Sec. Deriv. & "ERISA" Litig.,* Nos. MDL-1446, Civ. A. H-01-3624, 2002 WL 31845114, at

---

[10]   Available at http://www.iosco.org/news/pdf/IOSCONEWS114.pdf.

\*1 (S.D. Tex. Aug. 16, 2002) (PSLRA was "not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case").

Guided by these principles, federal courts have lifted or modified the PSLRA stay where plaintiffs have demonstrated some or all of the following factors, whether: (1) plaintiffs seek *particularized* discovery; (2) the discovery is needed to preserve evidence or *prevent undue prejudice*; and/or (3) production of the discovery will not place *an undue burden* on the defendant. *See In re LaBranche Sec. Litig.,* 333 F. Supp. 2d 178, 181-84 (S.D.N.Y. 2004) (Sweet, J.). As explained below, each of these factors supports Lead Plaintiffs' request to modify the PSLRA stay. Moreover, relief from the stay here – where Defendants' misconduct is plain – in no way frustrates Congress's purposes in enacting the PSLRA.

## II. THE FACTS AND CIRCUMSTANCES OF THIS ACTION WARRANT RELIEF FROM THE PSLRA STAY

### a. Lead Plaintiffs' Discovery Requests are Particularized

Lead Plaintiffs discovery requests are particularized (see Press Aff., Ex. B), as required by the PSLRA and the cases interpreting it. *See, e.g., In re Lernout & Hauspie Sec. Litig.,* 214 F. Supp. 2d 100, 108 (D. Mass. 2002) ("the party seeking discovery under the exception must adequately specify the target of the requested discovery and the types of information needed….").

Lead Plaintiffs seek the discrete universe of documents that Defendants already provided to the SEC. *See In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002) (Cote, J.) (granting modification of PSLRA stay and holding that "plaintiffs' request has already been pared down to address the concerns of the U.S. Attorney and involves a clearly defined universe of documents, specifically certain documents which WorldCom has already produced in connection with other identified

proceedings."). Moody's production to the SEC is a narrow and identifiable universe of documents, as the SEC Report states:

> The Staff also reviewed deal files for subprime RMBS and CDO ratings, internal audit reports and records and other internal records, including a large quantity of email communications (the ratings agencies produced over two million emails and instant messages that were sorted, analyzed and reviewed using software filtering tools).

SEC Report at 3-4.

Lead Plaintiffs seek only the documents referenced in the Report - deal files, internal audit reports and records, and internal records and emails – which Moody's produced. This limited request is not a "fishing expedition," as Lead Plaintiffs have identified the precise discovery they seek. *See* Lead Plaintiffs' document request (Press Aff., Ex. B). At this juncture, Lead Plaintiffs are not seeking generalized document requests, interrogatories, depositions, or discovery through third-party subpoenas. They seek only what Moody's has provided to the SEC.

### b. Lead Plaintiffs Will Be Unduly Prejudiced Without the Requested Discovery

Congress did not draft the PSLRA discovery stay to thwart the progress of legitimate lawsuits, and thus the statutory exception permits plaintiffs to seek discovery where delay will cause them "undue prejudice." Recognizing the prejudice a plaintiff faces by being excluded from discovery material produced in parallel government or private proceedings against a defendant, courts in this and other districts have granted full or partial relief from the PSLRA stay to level the playing field. *See, e.g., LaBranche*, 333. F. Supp. 2d at 183 (modifying stay where "the SEC and NYSE investigated and are continuing to investigate the precise schemes alleged by lead plaintiffs in the complaint…" and Lead Plaintiffs will "be prejudiced by their inability to make informed decisions about their litigation strategy in this rapidly shifting landscape."); *Singer v. Nicor, Inc*., No. 02 C 5168, 2003 WL 22013905 at *2 (N.D. Ill. April 23, 2003) (granting

12

partial modification of stay where "Plaintiffs here may well be unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have, during the pendency of the motion to dismiss."); *FirstEnergy*, 229 F.R.D. at 545 (same). Plaintiffs need not show *irreparable* harm. *See Vacold LLC*, 2001 WL 167704, at *6 ("courts have defined the 'undue prejudice' sufficient to overcome the statutory bar as 'improper or unfair treatment' amounting to something less than irreparable harm."). Given the many legal and regulatory actions ongoing against Moody's, Lead Plaintiffs face considerable prejudice if discovery here remains completely stayed.

Moody's is the subject of numerous legal matters closely related to the substance of Lead Plaintiffs' allegations. *See* section B, *supra*. Each of these matters is at a more advanced stage than this action, or as with the Section 11 actions, likely to have access to discovery before any ruling on Defendants' motion to dismiss. Moody's active participation in these matters places Lead Plaintiffs at a strategic disadvantage. For example, as described above, the NYAG has already investigated Moody's and entered into a settlement agreement with the Company. To end the NYAG's investigation, Moody's has agreed to make significant changes to key practices and to cooperate with the NYAG against other parties. Moody's past and present cooperation with the NYAG permits it to consider the evidentiary and legal significance of what is being made available to and discussed with the NYAG. In effect, the NYAG's investigation has been a trial run for this litigation, and places Lead Plaintiffs at a strategic disadvantage *vis a vis* the Defendants. Moreover, Lead Plaintiffs are at a strategic disadvantage in formulating their own settlement strategies.

Similarly, Moody's production and statements to the SEC permit it to familiarize itself with, evaluate and consider strategic responses to the questions and issues, as well as the underlying evidence, that Lead Plaintiffs intend to develop in this action. The SEC Report discusses, *inter alia*: Moody's poor handling of the growth of the structured

13

finance industry; its failure to provide full disclosure of its ratings process; its deviations from its ratings models, which led to inaccurate ratings; and its inability to contain the conflicts of interest inherent in its "issuer-pays" business model. These findings, and others in the SEC Report, show how Moody's failed and deceived investors during the Class Period. While Lead Plaintiffs will remain in the dark until granted access to the documents Moody's produced to the SEC, the Company can and will develop legal defenses based on its intimate knowledge of these documents, as well as the millions of other documents it did not produce to the SEC.

In *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02-cv-5575 (SWK), 2003 WL 21729842, at *1 (S.D.N.Y., July 25, 2003), this Court denied an application to lift a stay where plaintiffs had not demonstrated the "distinct circumstances" that justified relief from the stay in *WorldCom* and *Enron*. Unlike in *AOL*, where this Court held that the plaintiffs' "assertions of an impending settlement that could prejudice plaintiffs' possible recovery [were] premature," *id.* at *1, here Moody's already completed settlement negotiations with one party (the NYAG), cooperated with another (the SEC), and is facing state lawsuits likely not subject to the PSLRA's restrictions (the Section 11 Actions and the CTAG suit). Thus, Lead Plaintiffs find themselves last in line behind a large and growing number of parties investigating, and suing Moody's as well as settling and formulating settlement strategies in those actions.

Moreover, in a subsequent *AOL* decision, this Court granted the defendant's motion to lift the PSLRA stay to rectify an "asymmetry" in the parties' access to discovery. *In re AOL Time Warner, Inc. Sec. Litig.*, No. 06-cv-0695 (SWK), 2006 WL 1997704 (S.D.N.Y. July 13, 2006) ("*AOL II*"). As this Court reasoned in *AOL II,* "discovery informs a litigant's statement of applicable claims and affirmative defenses as well as its decisions regarding settlement. Discovery also allows the parties to focus on the issues most relevant to the claims being litigated, thereby expediting the resolution of the lawsuit." 2006 WL 1997704, at *2. As this Court recognized in *AOL II*, it is not

merely Defendants' production to these governmental bodies that prejudices Lead Plaintiffs; rather, Defendants gain unfair advantage by reviewing and filtering massive amounts of evidence, and by developing legal theories and putting their legal defenses to the test against able and experienced SEC and state government lawyers, while Lead Plaintiffs must sit on the sidelines. Defendants' cooperation with the SEC and the NYAG, as well as the litigation with the CTAG and in the Section 11 actions, foster the very asymmetry this Court sought to correct in *AOL II*.

The Section 11 actions cause Lead Plaintiffs even greater prejudice, both in terms of timing and in the availability of Company funds to satisfy a judgment or settlement. These actions allege illicit practices by Moody's in violation of the Securities Act, closely related to those alleged in the Complaint. The plaintiffs in these actions, holders of various notes and bonds rated by Moody's (structured finance instruments) are seeking remand to the New York State court, where they will not be subject to the PSLRA stay and will be permitted to take immediate discovery of Moody's and its co-defendants. The Section 11 action plaintiffs – wholly different classes than the putative class of Moody's shareholders in this action – potentially could enter into settlement negotiations before the briefing on Defendants' motion to dismiss is completed here. Lead Plaintiffs will then be in the unenviable position of being the only party without access to discovery, while other private parties are advancing similar claims. This is precisely the "shifting landscape" in which courts have given plaintiffs relief. *See, e.g., WorldCom*, 234 F. Supp. 2d at 305 (granting relief where plaintiffs were "only major interested party… without access to documents"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 252 (D. Md. 2004) (granting partial relief from PSLRA stay where "delay in the resolution of the securities' plaintiffs claims could limit their chances of recovery relative to other parties with claims of comparable, or even lesser, merit."); *LaBranche*, 333 F. Supp. 2d at 183 (granting relief from PSLRA stay where court found that plaintiffs would be the only interested party without access to documents, resulting in prejudice

15

from their "inability to make informed decisions about their litigation strategy in [a] rapidly shifting landscape").

### c. Defendants Will Not Be Burdened by Producing the Requested Documents to Lead Plaintiffs

Numerous decisions confirm that, where defendants have already made a production, fair play and a desire for a just outcome should assure plaintiffs access to that production. *See, e.g., Enron*, 2002 WL 31845114, at *2 ("In a sense this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse."); *LaBranche*, 333 F. Supp. 2d at 181 (stay lifted where concurrent government investigations and no frustration of PSLRA purpose); *FirstEnergy*, 229 F.R.D. at 543 ("This discovery stay provision seeks to reduce the filing of frivolous lawsuits aimed at forcing corporate defendants to settle rather than bear the costs of discovery and to preclude plaintiffs from engaging in fishing expeditions to secure facts for a sustainable claim") (citations omitted). In this case, the SEC Report and NYAG Settlement make clear that Moody's has already culled and produced a discrete universe of documents. Moody's will suffer no prejudice whatsoever by producing this same universe to Lead Plaintiffs.[11]  *See FirstEnergy*, 229 F.R.D. at 545 (noting that the defendants could not allege "any burden from providing documents that it has already reviewed and compiled.").

In sum, where, as here, (1) Defendants already have made their production to others; (2) Lead Plaintiffs seek only that which has been produced, (3) Lead Plaintiffs are merely seeking documents that inevitably will be produced and that support causes already asserted with particularity, and are not "fishing" for new causes of action; and (4) Lead Plaintiffs will suffer undue prejudice without this production, there is every reason to give Lead Plaintiffs access to what the SEC has been given. There is no good reason

---

[11] Lead plaintiffs agree to pay the reasonable costs incurred by Defendants in connection with this production.

16

to further insulate Defendants from liability, and justice dictates that Defendants not be permitted to hide behind a statute that is not applicable to this case.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Motion for Partial Modification of the PSRLA Stay should be granted.

Dated:  New York, New York
          September 4, 2008

**KIRBY McINERNEY, LLP**

By: ____/s/ Ira M. Press____
        Ira M. Press
Roger W. Kirby
Daniel Hume
David Bishop
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax: (310) 201-9160

- and -

Frederick W. Gerkens, III
1430 Broadway, Suite 1603
New York, New York 10018
Tel:  (212) 382-2221
Fax: (212) 382-3944

Michael K. Yarnoff
Benjamin J. Hinerfeld
Jennifer L. Keeney
**SCHIFFRIN BARROWAY TOPAZ**
  **& KESSLER LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056

*Co-lead counsel for Lead Plaintiffs*

Christopher Keller
Jonathan Gardner
Serena Richardson
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax: (212) 818-0477