**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- x
                      :
                      :
In re MOODY'S CORPORATION  :  CASE NO. 1:07-CV-8375-SWK
SECURITIES LITIGATION      :
                      :
                      :
                      :
                      :
                      :
                      :
---------------------------------------------------- x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT</u>**

Sharon L. Nelles  (SN-3144)
Stephen Ehrenberg  (SE-3123)
Darrell S. Cafasso  (DC-7123)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
Email:  nelless@sullcrom.com

*Counsel for Defendants*

September 26, 2008

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................1

THE ALLEGATIONS OF THE COMPLAINT ....................................................4

THE SUBPRIME MORTGAGE CRISIS............................................................11

ARGUMENT ........................................................................................14

I.    THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION .....................15

    A.    Plaintiffs Fail To Allege Corrective Disclosures ..................................16

    B.    Plaintiffs Admit a Direct Intervening Cause of Their Losses................19

II.   THE COMPLAINT DOES NOT PLEAD ANY ACTIONABLE
MISREPRESENTATIONS ...................................................................22

    A.    There Are No Actionable Misstatements..............................................22

        1.    Declarations of Intention Are Not Actionable ...........................23

        2.    Generalizations Regarding Integrity, Independence and Risk
Management Amount to No More Than Puffery.......................25

    B.    Plaintiffs Fail To Explain Why Alleged Misstatements Were Misleading............27

        1.    Moody's Structured Finance Revenue Was Accurately Disclosed ..........27

        2.    Moody's Rating Methodologies Were Accurately Disclosed .................28

III.  THE COMPLAINT DOES NOT ADEQUATELY PLEAD SCIENTER........................29

    A.    Allegations of a Generalized Motive To Generate Trade or Increase
Revenues Is Not Sufficient To Plead Scienter.......................................30

    B.    Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness.........................31

    C.    Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness Against
the Individual Defendants.........................................................34

    D.    Opposing Inferences of Nonfraudulent Intent Are More Cogent and
Compelling.............................................................35

IV.   PLAINTIFFS FAIL TO STATE SECTION 20(a) CLAIMS AGAINST THE
INDIVIDUAL DEFENDANTS.........................................................37

V.    PLAINTIFFS' CLAIMS ARE TIME-BARRED.............................................38

CONCLUSION........................................................................45

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*Albert Fadem Trust* v. *Citigroup Inc.*,
   165 Fed Appx. 928 (2d Cir. 2006) ...................................................................................30

*Andropolis* v. *Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007) ..........................................................................23, 24

*ATSI Commc'ns* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...........................................................................................38

*Basic Inc.* v. *Levinson*,
   485 U.S. 224 (1988) .....................................................................................................22

*Bastian* v. *Petren Resources Corp.*,
   892 F.2d 680 (7th Cir. 1990) ........................................................................................20

*Bell Atlantic Corp.* v. *Twombly*,
   127 S. Ct. 1955 (2007) .............................................................................................14, 15

*Caiafa* v. *Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...........................................................................33

*Chambers* v. *Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...........................................................................................5

*Chill* v. *Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) .........................................................................................30

*City of Monroe Employees Ret. Sys.* v. *Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ........................................................................................26

*Cutsforth* v. *Renschler*,
   235 F. Supp. 2d 1216 (M.D. Fla. 2002) .........................................................................23

*Dura Pharm., Inc.* v. *Broudo*,
   544 U.S. 336 (2005) .........................................................................................15, 17, 18

*First Nationwide Bank* v. *Gelt Funding Corp.*,
   27 F.3d 736 (2d Cir. 1994) ...........................................................................................20

*Ganino* v. *Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) .........................................................................................29

*Garber* v. *Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)......................................................................17

*Greenberg* v. *Chrust*,
    282 F. Supp. 2d 112 (S.D.N.Y. 2003)......................................................................23

*Hunt* v. *Enzo Biochem, Inc.*,
    471 F. Supp. 2d 390 (S.D.N.Y. 2006)......................................................................17

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008)........................19, 33

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)......................................................14, 16, 17

*In re Bayou Hedge Fund Litig.*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)......................................................................33

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................34

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)......................................................................18

*In re Chaus Sec. Litig.*,
    801 F. Supp. 1257 (S.D.N.Y. 1992)......................................................................38

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ....................23

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)......................................................................30

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)......................................................................36

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)......................................................................22

*In re Initial Public Offering Sec. Litig.*,
    297 F. Supp. 2d 668 (S.D.N.Y. 2003)......................................................................18

*In re Initial Public Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)......................................................................17

*In re Initial Public Offering Sec. Litig.*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005)......................................................................17

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.,*
   850 F. Supp. 1105 (S.D.N.Y. 1993)..............................................................16

*In re JPMorgan Chase Sec. Litig.,*
   363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................25, 26

*In re JP Morgan Chase Sec. Litig.,*
   No. 02 Civ. 1282 (SHS), 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) .................................26

*In re Marsh & Mclennan Cos., Inc. Secs. Litig.,*
   501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................27, 38

*In re McKesson HBOC, Inc. Sec. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................35

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)...................................................12, 42

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   289 F. Supp. 2d 416 (S.D.N.Y. 2003)................................................ *passim*

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
   Nos. 02 MDL-1484, 07 CIV 6677 (JFK), 2008 WL 2019680 (S.D.N.Y. May 8, 2008).........21

*In re Merrill Lynch Ltd. P'Ships Litig.,*
   154 F.3d 56 (2d Cir. 1998)...................................................................39

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.,*
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ........................................................26

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.,*
   423 F. Supp. 2d 364 (S.D.N.Y. 2006).......................................................23

*In re Omnicom Group, Inc. Sec. Litig.,*
   541 F. Supp. 2d 546 (S.D.N.Y. 2008).......................................................21

*In re Pfizer, Inc. Sec. Litig.,*
   538 F. Supp. 2d 621 (S.D.N.Y. 2008)...................................................31, 32

*In re Rhodia S.A. Sec. Litig.,*
   531 F. Supp. 2d 527 (S.D.N.Y. 2007)...................................................17, 31

*In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001)................................................................33, 34

*In re Serologicals Sec. Litig.,*
   No. Civ.A.1:00-CV1025CAP, 2003 WL 24033694 (N.D. Ga. 2003)..............................33, 34

*In re Sofamor Danek Group, Inc.*,
　　123 F.3d 301 (6th Cir. 1997) ........................................................................................27

*In re Take-Two Interactive Sec. Litig.*,
　　551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................... *passim*

*In re Tower Auto. Sec. Litig.*,
　　483 F. Supp. 2d 327 (S.D.N.Y. 2007)............................................................................25

*In re Veeco Instruments, Inc. Sec. Litig.*,
　　235 F.R.D. 220 (S.D.N.Y. 2006) ...................................................................................31

*In re WorldCom, Inc., Sec. Litig.*,
　　No. 02 Civ. 3288 (DLC), 2003 WL 2148807 (S.D.N.Y. June 25, 2003) ...............................33

*In re WRT Energy Sec. Litig.*,
　　No. 96 CIV. 3610 (JFK), 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999)................................36

*Kalnit* v. *Eichler*,
　　264 F.3d 131 (2d Cir. 2001)................................................................................30, 32, 36

*Lapin* v. *Goldman Sachs Group, Inc.*,
　　506 F. Supp. 2d 221 (S.D.N.Y. 2006).............................................................................32

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
　　85 F.3d 55 (2d Cir. 1996) ..............................................................................................26

*Lattanzio* v. *Deloitte & Touche LLP*,
　　476 F.3d 147 (2d Cir. 2007).............................................................................................21

*LC Capital Partners, LP* v. *Frontier Ins. Group, Inc.*,
　　318 F.3d 148 (2d Cir. 2003).............................................................................................39

*Lentell* v. *Merrill Lynch & Co., Inc.*,
　　396 F.3d 161 (2d Cir. 2005)..............................................................................15, 16, 17, 44

*Nairobi Holdings Ltd.* v. *Brown Bros. Harriman & Co.*,
　　No. 02 Civ. 1230 (LMM), 2004 WL 1124660 (S.D.N.Y. May 20, 2004).............................31

*Novak* v. *Kasaks*,
　　216 F.3d 300 (2d Cir. 2000)....................................................................................... *passim*

*Powers* v. *British Vita, P.L.C.*,
　　57 F.3d 176 (2d Cir. 1995)................................................................................................20

*Rombach* v. *Chang*,
　　355 F.3d 164 (2d Cir. 2004)....................................................................................22, 31, 32, 38

*Seibert* v. *Sperry Rand Corp.*,
    586 F.2d 949 (2d Cir. 1978)..................................................................................42

*Shah* v. *Meeker*,
    435 F.3d 244 (2d Cir. 2006)..........................................................................39, 44

*Shields* v. *Citytrust Bancorp., Inc.*,
    25 F.3d 1124 (2d Cir. 1994)..................................................................................36

*Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................................2

*Teachers' Retirement Sys. of Louisiana* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) .................................................................................16

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................ *passim*

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ...........................................................................29, 35, 43

## Statutes and Other Authorities

Fed. R. Civ. P. 8(a) ...................................................................................................14

Fed. R. Civ. P. 9(b) ..........................................................................................3, 15, 22

Fed. R. Civ. P. 12(b)(6)......................................................................................14, 19

Fed. R. Civ. P. 15(c)(B) ...........................................................................................38

Fed. R. Evid. 201(b)...................................................................................................42

15 U.S.C. § 78o-7(c)(1) ..............................................................................................5

15 U.S.C. § 78u-4(b)(1) ............................................................................................22

15 U.S.C. § 78u-4(b)(1)(B)........................................................................................27

15 U.S.C. § 78u-4(b)(2) ......................................................................................15, 29

28 U.S.C. § 1658(b)(1) ..............................................................................................38

Defendant Moody's Corporation ("Moody's") and individual defendants Raymond W. McDaniel, Jr., Brian M. Clarkson and Michael Kanef respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' Consolidated Amended Complaint.

## PRELIMINARY STATEMENT

In this securities class action, plaintiffs purport to represent a putative class of investors in Moody's securities during the period February 3, 2006 to October 24, 2007. Plaintiffs assert causes of action pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, claiming that Moody's and certain officers of the Company violated the federal securities laws by issuing false and misleading statements and failing to provide material information concerning the integrity and independence of Moody's rating practices for structured finance securities. Specifically, plaintiffs assert that Moody's claimed, prior to the class period, to manage conflicts of interest arising from its "issuer pays" business model—a model Moody's has followed since the 1970s. Plaintiffs allege that Moody's stock price declined after the start of the class period when it was "revealed" in "corrective disclosures" that (i) Moody's had not managed these conflicts and (ii) Moody's rating practices were not independent or objective. Plaintiffs demand all "damages sustained" in "an amount to be proven at trial."

Plaintiffs assert not only that the alleged misrepresentations and omissions concerning Moody's independence and objectivity caused a decline in Moody's stock price, but also that they caused the collapse of the *entire* structured finance market. Indeed, plaintiffs allege that Moody's has caused

> hundreds of thousands of subprime borrowers to lose homes to foreclosure, subprime mortgage originators and housing developers to go out of business . . . , hedge funds to turn belly-up with billion dollar losses, multi-billion dollar asset writedowns in major banks and investment banks . . . , widespread and shocking

> losses suffered by pension funds all over the world . . . , the
> capsizing of the bond insurance industry, the seizing up of credit
> and credit markets, the specter of recession emerging from all of
> the above and unprecedented emergency actions by the Federal
> Reserve to prevent the same.

(Consolidated Amended Complaint ("CAC") ¶ 355.)  The Court need look no further than the recent failures and bailouts of some of the most prominent financial institutions in the United States—Bear Stearns, Fannie Mae, Freddie Mac, Lehman Brothers, AIG and Washington Mutual—to appreciate the implausibility of plaintiffs' allegations.  The decline in Moody's stock price is part and parcel of a broad market dislocation of historic scale that has gripped Wall Street and Main Street in the wake of the subprime mortgage crisis.  In times of financial upheaval, it is not surprising that investors look for someone to blame.  But plaintiffs' losses are not the result of alleged misstatements and omissions by Moody's about its "independence" or "integrity."

Plaintiffs' complaint illustrates precisely how a "complaint can be long-winded, even prolix, without pleading with particularity."  *Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quotations and citation omitted).  Plaintiffs' complaint, consisting of 432 paragraphs, 98 endnotes, and 248 pages, presents nothing more than the illusion of detail.  Length should not be mistaken for merit; the complaint should be dismissed for at least five reasons:

*First*, plaintiffs have not pleaded loss causation.  None of the purported "corrective disclosures" revealed the falsity of any prior alleged misrepresentations.  Thus, plaintiffs have failed to establish the requisite causal connection between the decline in Moody's stock price and the alleged misstatements and omissions.  Rather, the decline in Moody's stock price is attributable to the collapse of the structured finance market as a whole.

*Second,* plaintiffs have not pleaded actionable misrepresentations or material omissions under the federal securities laws.  The alleged misstatements concerning independence and integrity—which constitute the core of plaintiffs' claims—are non-actionable declarations of intention or vague statements of puffery.  The rest of the alleged misrepresentations are not pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, because plaintiffs fail to explain how the alleged misstatements were false.

*Third*, plaintiffs have not adequately pleaded scienter.  Plaintiffs rely on wholly conclusory allegations that defendants were motivated by the desire to increase revenues and "knew" that the alleged misstatements were false when made.  This is not enough.  Plaintiffs' assertions of recklessness likewise fail because plaintiffs do not specifically identify reports or statements showing that defendants knew facts or had access to information suggesting that Moody's public statements were not accurate.  Lastly, scienter allegations must be at least as compelling as any opposing inference of non-fraudulent intent.  The far more compelling inference here, however, is that Moody's would not risk its reputation—the "sine qua non" of its business (CAC ¶ 32)—for a short-term gain in structured finance rating business.

*Fourth*, plaintiffs' Section 20(a) claims against the individual defendants fail because the predicate Section 10(b) claims fail.  The Section 20(a) claims also fail because plaintiffs do not plead culpable participation by any individual defendant.

*Fifth*, and finally, the complaint fails for the independent reason that plaintiffs' claims are time-barred.  Information about the alleged conflicts of interest arising out of the "issuer pays" business model has been a matter of public knowledge for many years—and

certainly more than two years prior to the commencement of this action. Plaintiffs' purported losses may be recent but these claims are old. The Court should dismiss the complaint.

## THE ALLEGATIONS OF THE COMPLAINT

Moody's Investors Service, the primary operating subsidiary of Moody's, is a credit rating agency and is registered with the United States Securities and Exchange Commission ("SEC") as a Nationally Recognized Statistical Rating Organization ("NRSRO"). (CAC ¶¶ 10, 11.) Raymond W. McDaniel is the Chief Executive Officer and Chairman of Moody's Board of Directors. (CAC ¶ 14.) Brian M. Clarkson is the former President and Chief Operating Officer of Moody's Investors Service. (CAC ¶ 15.) Michael Kanef is former Group Managing Director of the Asset Finance Group of Moody's Investors Service and the current Chief Regulatory and Compliance Officer for Moody's. (CAC ¶ 16.)

Moody's provides credit opinions "on a broad range of credit obligations . . . including various corporate and governmental obligations and structured finance securities." (CAC ¶ 10.) Moody's is paid for its services by the issuers of debt obligations, and has been since the 1970s. (CAC ¶¶ 38-39.) Plaintiffs allege that this "issuer pays" business model introduces a conflict of interest "in the form of wariness to bite the hand that feeds." (CAC ¶ 40.) Specifically, plaintiffs allege that the "issuer pays" model "degrade[s] credit rating agency independence" by "impos[ing] tremendous pressure for a credit rating agency to deliver" the rating sought by the issuer. (CAC ¶¶ 40, 49.)

The "issuer pays" model is fully disclosed to the market and is the subject of extensive regulation under the Credit Rating Agency Reform Act of 2006 ("CRARA"), 15 U.S.C. § 78o-7 *et seq*, and its implementing regulations. (CAC ¶¶ 86-91.) Under the CRARA, the SEC has "exclusive authority" to regulate the management and disclosure of conflicts of interest.

15 U.S.C. § 78o-7(c)(1).  The CRARA requires NRSROs to identify and disclose potential

conflicts and to maintain and enforce written policies and procedures designed to manage

conflicts.  (CAC ¶ 88.)  Moody's Form NRSRO specifically identifies the potential conflicts of

interest arising from the "issuer pays" business model and refers to Moody's Code of

Professional Conduct ("Code of Conduct") for Moody's written policies and procedures relating

to potential conflicts.  (CAC ¶ 89.)

   Moody's Code of Conduct, adopted in June 2005, sets forth certain principles that

are designed to "protect the integrity of the rating process."  (CAC ¶ 68.)  The Code of Conduct

states that the principles in the Code are derived from a model code published by the

International Organization of Securities Commissions (the "IOSCO Code").  (Declaration of

Darrell S. Cafasso, dated September 26, 2008 ("Cafasso Decl.") Ex. A (Code § 4.2).)[1]  Moody's

Code of Conduct discloses the inherent conflict in the "issuer pays" business model and sets

forth policies and procedures designed to manage that conflict.  (CAC ¶ 68.)  In addition to

policies relating to conflict management, the Code of Conduct

> discloses that most issuers of debt securities . . . rated by
> MOODY'S have, prior to assignment of any rating, agreed to pay
> to MOODY'S for appraisal and rating services rendered by it fees
> ranging from $1,500 to $2,300,000.

(Cafasso Decl. Ex. A.)  Moody's published its 2006 Report on Implementing the Code of

Conduct ("Code Implementation Report") on its website on or about April 12, 2006.

(CAC ¶ 76.)

   Plaintiffs allege that Moody's made six categories of allegedly false or misleading

statements: (i) statements that Moody's was independent (*e.g.*, CAC ¶¶ 68, 71, 73, 76);

---

[1] Because the Code of Conduct is incorporated by reference and is integral to the complaint, thus the Court
can consider its contents on this motion.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

(ii) statements that Moody's adequately managed its conflicts of interest (*e.g*., CAC ¶¶ 68, 76, 89); (iii) statements that Moody's ratings had integrity and were of high quality (*e.g*., CAC ¶¶ 68, 76, 89, 104, 107, 111, 112, 200, 211); (iv) statements concerning the applicability of Moody's Global Rating Scale to structured finance products (*e.g*., CAC ¶¶ 93, 94); (v) statements implying that Moody's structured finance revenue was derived from legitimate business practices (*e.g*., CAC ¶¶ 71, 73, 284); and (vi) statements concerning Moody's rating methodologies (*e.g*., CAC ¶¶ 111, 200-11).   Plaintiffs allege that these "misstatements" can be found in Moody's Code of Conduct, Code Implementation Report, Annual Reports and Forms 10-K for 2005 and 2006, Form NRSRO, and various other publications, including transcripts of analyst calls.  Below are illustrative examples of purported misstatements:[2]

**Independence:**

- Moody's "will deal fairly and honestly with Issuers, investors, other market participants, and the public."  (CAC ¶ 68 (quoting Code of Conduct).)

- Moody's "maintains independence in its relationships with Issuers" and operates as "an independent and objective publisher of opinions."  (CAC ¶ 68 (quoting Code of Conduct).)

- "With respect to the subjective standards that are incorporated in this Code, Moody's will use its good faith efforts in implementing such standards." (CAC ¶ 68 (quoting Code of Conduct).)

- Moody's is devoted to "preserving trust" among stakeholders. (CAC ¶ 71 (quoting 2005 Annual Report).)

- "Moody's is committed to reinforcing . . . a sense of trust in the . . . independence . . . of Moody's products and services, and our stewardship of the business . . ."; "we remain committed to upholding the independence . . . of our business."  (CAC ¶ 71 (quoting 2005 Annual Report).)

---

[2]     It is not possible (or necessary) to identify and address each alleged misrepresentation in the complaint's 432 paragraphs, many of which are within multi-page block quotes from various Moody's publications.  In this memorandum, the alleged misstatements are grouped into six categories and illustrative examples of each category are provided.

**Management of Conflicts:**

- "The Credit Rating Moody's assigns to an Issuer . . . will not be affected by the existence of, or potential for, a business relationship between Moody's . . . and the issuer." (CAC ¶ 68 (quoting Code of Conduct).)

- "Moody's will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political, or otherwise) of the action on Moody's, an Issuer, an investor, or other market participant." (CAC ¶ 68 (quoting Code of Conduct).)

- "The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment." (CAC ¶ 68 (quoting Code of Conduct).)

- "[W]e recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process . . . To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee." (CAC ¶ 76 (quoting Code Implementation Report).)

**Quality and Integrity of Ratings:**

- "Through this Code, Moody's seeks to protect the integrity of the rating process." (CAC ¶ 68 (quoting Code of Conduct).)

- Moody's "objective" is "to protect the integrity, objectivity and transparency of our credit rating process." (CAC ¶ 76 (quoting Code Implementation Report).)

- "Through the implementation of the Moody's Code, we seek to protect the quality, integrity and independence of the rating process, to ensure that investors and Issuers are treated fairly." (CAC ¶ 76 (quoting Code Implementation Report).)

- "The quality and integrity of the processes by which we develop our Credit Ratings are of utmost importance to us. We have developed policies, practices and procedures over time to govern the rating process and promote quality and integrity in that process." (CAC ¶ 76 (quoting Code Implementation Report).)

- "Credit ratings will reflect consideration of all information known, and believed to be relevant." (CAC ¶ 68 (quoting Code of Conduct).)

**Meaning of Moody's Structured Finance Ratings:**

- "It is Moody's intention that the expected loss rate associated with a given rating symbol and time horizon be the same across obligations and issuers rated on the Global Scale. Moody's rating methodologies, rating practices and performance monitoring systems are each designed to ensure a consistency of meaning. . . ."

Moody's ratings on long-term structured finance . . . are calibrated to Moody's Global Scale . . . ."  (CAC ¶ 93 (quoting Moody's Rating Symbols and Definitions).)

- "We use globally consistent rating symbols and definitions to communicate our rating opinions, and we have implemented policies and procedures to promote broad consistency in our overall rating methodologies and practices as well as global comparability in our Credit Ratings."  (CAC ¶ 94 (quoting Code Implementation Report).)

**Basis of Structured Finance Revenue:**

- "US structured finance again generated solid growth with revenue rising $19 million, an increase of 14% compared with a very strong prior year period."  (CAC ¶ 284 (quoting Q2 2006 Conference Call, August 2, 2006).)

- "Moody's achieved strong revenue growth in several business sectors, including global structured finance."  (CAC ¶ 284 (quoting 2005 Form 10-K).)

**Moody's Rating Methodologies:**

- "Moody's continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance.  These assessments form an integral part of Moody's Mortgage Metrics credit support calculations.  Moody's considers numerous factors when determining the quality and performance of the originator and servicer, including Past performance of an originator's loans; Underwriting guidelines for the mortgage loans and adherence to them; Loan marketing practices; Credit checks made on borrowers; Appraisal standards; Experience in origination of mortgages."  (CAC ¶ 111 (quoting *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003).)

- "[E]conomic scenarios used in our modeling represent a 'universe' of potential scenarios. Moody's has long recognized the superiority of considering a distribution of future economic stresses rather than relying on a single historical economy as a presumed 'worst case' scenario."  (CAC ¶ 211 (quoting *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools*, April 1, 2003).)

Plaintiffs allege that, contrary to the above statements, Moody's was not, in fact,

independent (CAC ¶¶ 38-53, 287-311), did not adequately manage its conflicts of interest (CAC

¶¶ 38-53, 287-311), degraded the quality and integrity of its rating methodologies to appease

issuers (CAC ¶¶ 103-228, 312-30), issued structured finance ratings on the same scale as

corporate bonds when, in fact, the ratings had different meanings (CAC ¶¶ 96-102), and should have disclosed that Moody's earned its structured finance revenues by compromising the independence, objectivity and integrity of its rating standards (CAC ¶¶ 281-85).  Plaintiffs assert that the alleged misrepresentations "were material to investors in Moody's common stock" because "[i]t is vitally important to investors' assessment" of Moody's rating business "to learn any information that materially impacts the revenue generation and profitability of the business going forward."  (CAC ¶¶ 402-03.)

        According to plaintiffs, beginning in July 2007, Moody's made announcements "revealing" that the statements in the Code of Conduct, Code Implementation Report and other publications were "misleading or inaccurate," causing the decline in Moody's stock from $74.84 on February 8, 2007 to $43.33 per share on October 25, 2007.  (CAC ¶¶ 399-400.)  Specifically, plaintiffs allege the following "corrective disclosures": [3]

        *Ratings Downgrades*:  Plaintiffs allege that, on July 12, 2007, Moody's "announced its first very large wave of subprime RMBS downgrades, which gave the market reason to believe that Moody's prior ratings were materially inflated."  (CAC ¶ 400(a).) Plaintiffs also assert that Moody's September 21, 2007 reclassification of its "midprime" ratings provided further evidence of the "inaccuracy and unreliability of its previous rating system." (CAC ¶ 400(f).)  Plaintiffs do not allege a corresponding stock drop.  Moody's stock price rose from $60.89 on July 11, 2007 to $61.18 on July 12, 2007 (and to $62.61 on July 13, 2007), and

---

[3]        In their complaint, plaintiffs generally do not connect these "corrective disclosures" to any downward movement in Moody's stock price.  Attached as Exhibit B to the Cafasso Declaration is a chart that sets forth Moody's stock price history during the class period. The Court can take judicial notice of stock prices on a motion to dismiss.  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 n.26 (S.D.N.Y. 2008).  Plaintiffs do not provide the time of publication for these announcements, thus making it difficult to ascertain which day's closing price is potentially reflective of market reaction.

rose from $47.68 on September 20, 2007 to $48.34 on September 21, 2007.  (Cafasso Decl. Ex. B.)

 *Financial Results*:  Plaintiffs allege that Moody's October 24, 2007 quarterly earnings announcement revealed "the deterioration -- if not the decimation -- of Moody's structured finance business."  (CAC ¶¶ 377, 400(i).)  Plaintiffs allege that the news caused Moody's stock price to decline from $47.38 on October 23, 2007 to $43.33 on October 25, 2007.  (CAC ¶ 400(i).)[4]

 *Congressional Hearings*:  Plaintiffs allege that congressional hearings held on September 26 and 27, 2007 constituted corrective disclosures because "several present and former Moody's personnel faced serious and pointed questions from angry members of Congress."  (CAC ¶ 400(g).)  Plaintiffs do not allege a corresponding stock drop.  Moody's stock price rose from $46.07 on September 25, 2007 to $50.40 on September 28, 2007.  (Cafasso Decl. Ex. B.)

 *Congressional Remarks*:  Plaintiffs allege that, on August 20, 2007, "there were reports that Senator Richard Shelby, the head of the U.S. Senate Banking Committee, had remarked that credit rating agencies must shoulder some responsibility for the subprime mortgage crisis."  (CAC ¶ 400(e).)  "The report noted that Moody's was facing Congressional scrutiny for an 'inherent' conflict in helping to construct mortgage-backed securities and then issuing ratings on them."  (CAC ¶ 400(e).)  Plaintiffs allege that this news caused Moody's stock to decline $3.90 per share (from August 19 to August 20, 2007).  (CAC ¶ 400(e).)  Moody's

---

[4] Plaintiffs note other negative financial announcements by Moody's on August 1, 2007, October 31, 2007, January 9, 2008, February 8, 2008, March 11, 2008, April 23, 2008 and May 14, 2008 (CAC ¶¶ 376-92), but do not allege any corresponding stock drop.  (*See* CAC ¶ 400.)

stock price rose from $45.89 on August 20, 2007 to $46.79 on August 21, 2007.  (Cafasso Decl. Ex. B.)

   *Moody's Reports on the Subprime Market*:  As part of its business, Moody's issues public reports on a periodic basis regarding its rating methodologies, performance of issuances, market conditions and other events.  Plaintiffs focus on Moody's July 24, 2007 "report on subprime losses" and October 3, 2007 "disclosure of the structural defect in many of the subprime products that it rated in 2006."  (CAC ¶ 400(b), (h).)[5]  The July 24 report noted that: (i) "a deterioration in subprime mortgage origination standards" caused higher losses in the structured finance market than predicted by Moody's models (CAC ¶ 113 & n.8); (ii) Moody's was revising its models for analyzing certain structured finance products based on "recent" data (CAC ¶¶ 120, 154); and (iii) Moody's had downgraded certain ratings (CAC ¶ 254 n.52).  The October 3 report provided performance information concerning 2006 subprime loans. (CAC ¶¶ 146, 155.)  Plaintiffs do not allege any corresponding stock drop for either report.  Moody's stock price rose from $52.99 on October 2, 2007 to $53.92 on October 3, 2007. (Cafasso Decl. Ex. B.)

## <u>THE SUBPRIME MORTGAGE CRISIS</u>

   In plaintiffs' 248-page complaint, there is scarce mention of the collapse of the structured finance market as a whole, the most significant financial event in recent history.  The collapse occurred, not incidentally, between the dates of the purported misstatements and the so-called "corrective disclosures."  The Court may take judicial notice of the subprime mortgage crisis—the elephant in the room plaintiffs largely ignore.  *In re Merrill Lynch & Co., Inc.*

---

[5] Plaintiffs also refer to "a series of public reports detailing the conflict of interest in Moody's structured finance business" on August 10, 2007.  (CAC ¶ 400(c).)  Plaintiffs fail to identify these reports in their complaint.

*Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (taking judicial notice of "the internet bubble and its subsequent crash" as a fact "'generally known within the territorial jurisdiction of the trial court'") (quoting Fed. R. Evid. 201).

Plaintiffs admit elements of the crisis—for instance, plaintiffs allege that, from 2005 through early 2007, there was a "deterioration in [mortgage] origination standards," that lenders issued "unprecedentedly risky and unwise" subprime mortgages, and that originators introduced "new" types of loans about which "no [historical] data" existed. (CAC ¶¶ 128-29, 163.) Plaintiffs also acknowledge that "[s]ubprime mortgage performance during [that] period was 'masked' by unprecedented housing price appreciation, which allowed homeowners who would otherwise have defaulted merely to sell their houses at a profit and pay back the mortgages in full." (CAC ¶ 163.) As housing prices in the United States unexpectedly began to fall in 2006, defaults and foreclosures on risky mortgages accelerated dramatically in late 2006 and early 2007. (*See* CAC ¶ 355.) Structured finance securities backed by those mortgages faced significant losses. (*See* CAC ¶ 355.)

Plaintiffs assert that "Moody's stock price declined materially throughout the latter portion of the class period." (CAC ¶ 399.) Specifically, plaintiffs allege that "Moody's stock price fell from $74.84 per share on February 8, 2007 to $43.33 per share on October 25, 2007." (CAC ¶ 399.) Plaintiffs make the conclusory assertion that this decline "can not [sic] be explained as epiphenomena of broader factors operative in the wider stock market." (CAC ¶ 401.) From February 15, 2007 to October 25, 2007, the following "epiphenomena" of the subprime crisis were widely reported:[6]

---

[6]    The Court can take judicial notice of news articles for the fact of their publication. *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 251 n.5 (S.D.N.Y. 2003).

- February 15, 2007:  Wall Street Journal reports that ResMae Mortgage, a subprime mortgage lender, filed for bankruptcy earlier that week.  (Cafasso Decl. Ex C.)

- February 28, 2007:  Wall Street Journal reports that due to rising defaults on subprime loans, Freddie Mac will stop purchasing subprime loans.  (Cafasso Decl. Ex D.)

- April 2, 2007:  CNN reports that New Century Financial, a subprime mortgage lender, files for bankruptcy.  (Cafasso Decl. Ex. E.)

- May 26, 2007:  Wall Street Journal reports slowest home sales pace since 2003. (Cafasso Decl. Ex. F.)

- June 23, 2007:  New York Times reports that Bear Stearns pledged up to $3.2 billion to bail out one of its hedge funds invested in subprime mortgages. (Cafasso Decl. Ex. G.)

- July 18, 2007:  New York Times reports that Bear Stearns announced that two hedge funds invested in the subprime market had lost almost all of their $1.5 billion value. (Cafasso Decl. Ex. H.)

- August 22, 2007:  New York Times reports that the rate of U.S. foreclosures was almost double that of a year ago.  (Cafasso Decl. Ex. I.)

- October 17, 2007:  Chicago Tribune reports that Treasury Secretary Henry Paulson says housing decline is not over.  (Cafasso Decl. Ex. J.)

- October 25, 2007:  New York Times reports that Merrill Lynch took a $7.9 billion write-down due to exposure to subprime mortgages and other structured finance products.  (Cafasso Decl. Ex. K.)

By early 2007, the fortunes of the large credit rating agencies depended on structured finance, and the structured finance market in turn depended on the subprime mortgage market.  (CAC ¶¶ 12, 26-27.)  Moody's stock price—and the stock price of Moody's only major publicly held competitor, the McGraw Hill Companies, of which Standard & Poor's Rating Services ("S&P") is a division—declined steadily and in tandem as news surfaced about the impending subprime mortgage crisis.  Both companies' stock declined in tandem with the S&P

500 Financials Index ("S&P Financials Index"), which plaintiffs concede tracks Moody's "peers." (CAC ¶ 401.)[7]



Although plaintiffs may want to ignore the subprime mortgage crisis, the consequent collapse of the structured finance market as a whole, and its effects on Moody's and its peers, the Court should not. For all the reasons set forth below, plaintiffs' complaint fails as a matter of law.

## ARGUMENT

"[T]he touchstone for a well-pleaded complaint under Federal Rules of Civil Procedure 8(a) and 12(b)(6) is plausibility." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Bell Atlantic Corp.* v. *Twombly*, 127 S. Ct. 1955, 1968, 1974 (2007)). A plaintiff must plead "'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 127 S. Ct. at

---

[7]     Attached as Exhibits L and M to the Cafasso Declaration are historical stock prices of the McGraw-Hill Companies and the S&P 500 Financials Index during the class period.

1964-65).  "Thus, materials properly before the court must provide grounds for more than mere speculation or suspicion that a plaintiff is entitled to the requested relief."  *In re Take-Two Interactive*, 551 F. Supp. 2d at 259 (citing *Twombly*, 127 S.Ct. at 1965 (quotations and citations omitted)).

In order to state a claim under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must allege that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted).  Securities fraud claims brought under Section 10(b) and Rule 10b-5 are also subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.  *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2).  Section 20(a) claims also depend on the adequate pleading of the predicate Section 10(b) claims.

The complaint is fatally defective in several respects.  Plaintiffs have inadequately pleaded the elements of a Section 10(b) claim—perhaps most glaringly, the loss causation element.  Further, this action is time-barred.

## I.    THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION.

To plead loss causation, a plaintiff must allege (i) that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security" and (ii) that the loss was a "foreseeable" consequence of the misrepresentation or omission.  *Lentell*, 396 F.3d at 173; *see Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 346-47 (2005).  The loss causation requirement is crucial, for without it "the federal

securities laws would establish an insurance program for every security purchased in reliance on a misstatement, even if the misstatement bears no relation to the reason for the decline in the security's value." *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1142 (S.D.N.Y. 1993) (quotations and citation omitted).  Here, the Court need look no further than this element to see that the complaint fails to state a claim as a matter of law.

### A.   Plaintiffs Fail To Allege Corrective Disclosures.

To plead loss causation, the complaint must allege (i) "that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted," or (ii) "that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." *In re AOL Time Warner*, 503 F. Supp. 2d at 677 (citing *Lentell*, 396 F.3d at 173, 175, 176). Plaintiffs assert that the following announcements within the class period constituted corrective disclosures:  (i) ratings downgrades (ii) financial results (iii) congressional hearings and remarks and (iv) publications about the subprime market.  (CAC ¶ 400.)  None of these announcements, however, reveals anything false or misleading in Moody's prior statements.[8]  (CAC ¶ 400.)

*Ratings Downgrades*:  It is well settled that ratings downgrades do not constitute corrective disclosures because they simply reveal that the rating is no longer accurate—not that the rating was fraudulent when issued.  *Lentell*, 396 F.3d at 175 n.4 ("Plaintiffs contend that they *have* alleged a corrective disclosure to the market, in alleging that Merrill's eventual downgrades of . . . stock . . . negatively impacted the price of those securities.  These allegations do not

---

[8]      To the extent plaintiffs rely on announcements of investigations by state authorities and others regulators, they have failed to allege the date of those investigations and what, if any, information they revealed to the market.  (CAC ¶¶ 393, 400.)  Plaintiffs must plead loss causation "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists."  *Teachers' Retirement Sys. of La.* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007).

amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations."); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005) (earnings downgrade cannot constitute a corrective disclosure because it does not reveal any prior false statement); *Hunt* v. *Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 410 (S.D.N.Y. 2006) (ratings downgrades simply reveal that the ratings are no longer accurate, not that the initial rating was fraudulent). Even assuming that the ratings downgrades revealed the alleged falsity of Moody's prior statements, plaintiffs have failed to allege a corresponding stock drop following the downgrades. *See Dura*, 544 U.S. at 347 (holding loss causation not adequately pleaded where the complaint "fail[s] to claim that Dura's share price fell significantly after the truth became known").

    *Financial Results*: Plaintiffs do not even attempt to explain how announcements about Moody's structured finance earnings reveal the falsity of any of Moody's prior statements. The fact that Moody's structured finance revenues declined does not establish that Moody's prior financial performance resulted from mismanagement of conflicts of interest. Indeed, "the mere failure to meet earnings forecasts is insufficient to establish loss causation." *In re AOL Time Warner*, 503 F. Supp. 2d at 678-79; *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("Disclosure of financial losses generally—even if those financial losses are a result of the specific concealed fact—is not sufficient" to allege loss causation); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) ("failures to meet forecasts and downward revisions of forecasts" are not "legally sufficient to constitute disclosures of securities fraud"); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008) ("disclosures attributing a share price drop to the failure to meet earnings estimates are not . . . sufficient to plead loss causation.").

*Congressional Hearings and Remarks*:  For a government investigation to constitute a corrective disclosure, it must "ma[ke] some part of a previously undisclosed truth known."  *In re Take-Two Interactive*, 551 F. Supp. 2d at 285 (citing *Dura*, 544 U.S. at 346-47).  Here, plaintiffs allege that "none" of the "many highly-publicized investigations into Moody's wrongdoing . . . touches on Moody's misrepresentations."  (CAC ¶ 354.)  Announcements of the congressional hearings on September 26 and 27, 2007 and the August 20, 2007 "remarks" by Senator Shelby are insufficient to plead loss causation because they do not call into question Moody's prior representations concerning its independence and objectivity.  *See In re Take-Two Interactive*, 551 F. Supp. 2d at 288 (contrasting SEC investigation from other regulatory inquiries).

Further, if the congressional hearings did reveal the falsity of Moody's prior statements, then plaintiffs' loss causation argument is fatally undermined.  Moody's stock price *rose* on both days of congressional hearings (September 26 and 27, 2007).  (Cafasso Decl. Ex. B.)  *See Dura*, 544 U.S. at 347; *see also In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 672 (S.D.N.Y. 2003) ("Where the value of a security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation.").  When an efficient market exists, information is "immaterial as a matter of law" where its disclosure "ha[s] no effect" on the defendant's stock price.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).  Plaintiffs have alleged that the market for Moody's stock is "efficient."  (CAC ¶ 422.)  Thus, because the congressional hearings did not cause Moody's stock price to drop, the information revealed was either already public or not material.  *Id.*

*Moody's Reports on the Subprime Market*:  Moody's July 24 and October 3, 2007 reports discussed recent market data on subprime loan performance and proposed enhancements to Moody's ratings methodologies.  (Cafasso Decl. Exs. N, O.)  Announcements of compiled data and proposed methodology changes do not reveal the falsity of Moody's prior statements concerning the integrity or quality of its previous rating methodologies.  *See*, *e.g.*, *In re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) ("[T]he Company may have changed or even weakened its internal controls or underwriting standards, but this does not mean that those controls or standards were not 'strong' or 'effective' as described in the Company's public statements.").  Furthermore, plaintiffs do not allege any corresponding stock drop following publication of the reports.  In fact, Moody's stock price rose by nearly a dollar on October 3, 2007.  (Cafasso Decl. Ex. B.)

**B.      Plaintiffs Admit a Direct Intervening Cause of Their Losses.**

Plaintiffs allege that Moody's stock price "more than doubled" when "structured finance issuance experienced its greatest growth, between 2004 and early 2007," and Moody's "share price declined in tandem" when "structured finance issuance . . . collapsed."  (CAC ¶¶ 13, 37, 72(d).)  The direct intervening cause of the decline in Moody's stock price—and hence, plaintiffs' losses—was the collapse of the structured finance market.

"Where there is no proximate cause for the loss sustained other than the direct intervention of a market collapse, that collapse will govern on a Rule 12(b)(6) motion to dismiss." *In re Merrill Lynch*, 289 F. Supp. 2d at 422.  In *Merrill Lynch*, plaintiffs alleged that corrective disclosures caused their losses notwithstanding the intervening "burst of the [internet bubble]." *Id.* at 421.  However, plaintiffs did "not allege a correlation, let alone a causal link, between the alleged disclosure of the purported fraudulent conduct . . . and the destruction of the

investment." *Id.* The court therefore took judicial notice of the dot.com market bust and found that it, not any corrective disclosures, caused plaintiffs' losses. *Id.* at 422. Here, plaintiffs failed to allege any direct correlation between the "corrective disclosures" and Moody's stock price. Thus, plaintiffs "have failed to plead a cause which could have accounted for their losses, and only the intervening cause, the burst of the [market] bubble, accounts therefor." *Id.*

Similarly, in *First Nationwide Bank* v. *Gelt Funding Corp.*, a RICO case, plaintiffs alleged that their losses, which occurred during a general decline in the real estate market, resulted from defendant's fraud, rather than the market decline. 27 F.3d 763, 769 (2d Cir. 1994). Although the complaint included the general allegation that the plaintiffs' "losses [were] not the result of any general decline in the real estate market," the court rejected the allegation as lacking a "factual basis," because it was supported only by "faulty damages theories" and "unsupported claims." *Id.* at 771. Here, too, plaintiff "has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Id.* at 769; *see Powers* v. *British Vita*, *P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) (affirming dismissal of securities fraud claims because intervening causes, including "recession," proximately caused injury); *Bastian* v. *Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (affirming dismissal of complaint because plaintiffs' inability to adequately allege loss causation was evidence that general downturn in oil prices actually caused loss).

To the extent plaintiffs contend that Moody's alleged misrepresentations or omissions about its independence and objectivity caused the rise of the structured finance market generally, and the exposure of the "truth" caused its fall (CAC ¶¶ 2, 4, 37, 72(d)), those allegations are implausible and the Court should dismiss them out of hand. Moody's had two

significant competitors in the credit rating market (CAC ¶ 11), and plaintiffs do not—and cannot—explain how a loss of faith in Moody's alone could cause the entire market to collapse.[9] Indeed, plaintiffs assert that "the most sophisticated investors" could conduct "independent analysis of the[] creditworthiness" of structured finance products, and that the dangers of the subprime market were "self-evident" and "obvious."  (CAC ¶¶ 96, 115, 119, 147.)  But plaintiffs do not explain why structured finance securities were not correctly priced by sophisticated investors aware of this "obvious" and "self-evident" information.[10]

In short, plaintiffs do not adequately plead loss causation.  Indeed, plaintiffs fail to allege that Moody's stock price declined following six of the eight purported corrective disclosures alleged at paragraph 400 of the complaint, and as noted above, Moody's stock price actually increased following at least four of the eight "disclosures."  *See* discussion *supra* at 9-11. The fall of the structured finance market generally is the cause of plaintiffs' losses, not "corrective disclosures" about Moody's purported mismanagement of conflicts.  The Court need go no further and should dismiss the complaint on this ground alone.  Nonetheless, several additional deficiencies in the plaintiffs' complaint are addressed below.

---

[9]     The causes of the market collapse are a matter of current debate among financial experts, regulators and legislators.

[10]     Even assuming, *arguendo*, that plaintiffs had alleged some causal relationship between the "corrective disclosures" and the decline in Moody's stock price, the presence of confounding factors—here, the collapse of the structured finance market—requires plaintiffs to "ascribe some rough proportion of the whole loss to" Moody's alleged misstatements as opposed to other factors that may have contributed to the loss.  *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *see also In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (requiring "the disaggregation of confounding factors" that may have also caused the defendants' stock price to decline); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2008 WL 2019680 at *12-13 (S.D.N.Y. May 8, 2008) (dismissing action where plaintiffs failed to allege facts sufficient to attribute losses to the alleged fraud as opposed to bursting of the internet bubble).

## II.   THE COMPLAINT DOES NOT PLEAD ANY ACTIONABLE MISREPRESENTATIONS.

In order to state a cause of action under Section 10(b), plaintiffs must allege "misstatements or omissions of material fact." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998).  A misstatement is material if there is a "substantial likelihood" that it would be "viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988) (quotation marks omitted).

Plaintiffs' allegations of misrepresentation are subject to heightened standards for pleading fraud under Rule 9(b) and the PSLRA.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy this rule, the complaint must:  "(1) specify the statements that the plaintiff[s] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citation omitted).  Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

### A.   There Are No Actionable Misstatements.

Plaintiffs allege misstatements concerning (i) Moody's independence; (ii) its management of conflicts of interest; and (iii) the integrity and quality of its ratings process.  (*E.g.*, CAC ¶¶ 68, 71, 73, 76, 89, 104, 107, 111, 112, 200, 211.)  Because these "misstatements" are, in fact, declarations of intention or "vague pronouncements" amounting to "puffery," they do not give rise to a securities fraud claim.

### 1.    Declarations of Intention Are Not Actionable.

Plaintiffs' core allegations—that Moody's falsely claimed that it is independent and that it manages conflicts of interest arising from the "issuer pays" business model—are based upon inactionable declarations of intent in various Moody's publications, including Moody' Code of Conduct, Code Implementation Report, and its 2005 and 2006 Annual Reports and Forms 10-K.[11]  (CAC ¶¶ 68, 71, 73, 76, 80, 83.)  For example, plaintiffs allege that Moody's falsely represented:

> The Credit Rating Moody's assigns to an Issuer, debt or debt-like obligation will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship.

(CAC ¶¶ 68, 69(e) (quoting Moody's Code of Conduct).)  This is a classic example of a declaration of intention that cannot give rise to securities fraud liability.  *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) (actionable statement "'must be one of existing fact, and not merely a[] . . . declaration of intention'") (quoting *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003)); *Greenberg* v. *Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003) (same); *Cutsforth* v. *Renschler*, 235 F. Supp. 2d 1216, 1246 (M.D. Fla. 2002) ("corporate goal" or "aspiration" is not actionable because "it is unreasonable to think that the market would have given the statement any significance").  Because a code of conduct is "inherently aspirational," statements contained in codes of conduct cannot give rise to securities fraud liability.  *Andropolis* v. *Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 686 (D. Colo. 2007) ("[I]t simply cannot be that every time a violation of

---

[11]    The Code of Conduct also states that Moody's "does not assume . . . any responsibility or liability to any third party arising out of or relating to this Code," and that it "retains complete discretion to revise this Code at any time."  (Cafasso Decl. Ex. A (Code at 1 n.2).)

that code occurs, a company is liable under federal law for having chosen to adopt the code at all.").

In addition to statements in Moody's Code of Conduct, plaintiffs allege similar misstatements concerning independence and management of conflicts in other Moody's publications. These alleged misstatements fail for the same reason; they constitute nothing more than declarations of intention. For example, plaintiffs note statements in Moody's 2005 Annual Report concerning Moody's devotion to "preserving trust" among stakeholders:

> Moody's is committed to reinforcing . . . a sense of trust in the . . . independence . . . of Moody's products and services, and our stewardship of the business . . . . [W]e remain committed to upholding the independence . . . of our business.

(CAC ¶ 71.)  Plaintiffs point to similar statements in Moody's Code Implementation Report:

> [W]e recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process . . . To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee.

(CAC ¶ 76.)  These statements convey an *intention* to remain independent and objective.  There is no false statement of fact.  Plaintiffs do not claim that Moody's did not adopt policies and procedures.  The Code of Conduct, upon which plaintiffs rely so heavily, is itself a conflict management policy that was adopted by Moody's.  Plaintiffs are essentially challenging Moody's alleged failure to adhere to the principles in its Code of Conduct, but such allegations— even if true—fail to state a claim for securities fraud.

Plaintiffs also assert that Moody's statements concerning the meaning of its structured finance ratings were false and misleading because those ratings "did not mean the same thing" as corporate finance ratings.  (CAC ¶ 99.)  But plaintiffs do not allege that Moody's

ever stated that structured finance ratings "mean the same thing" as other ratings.  Rather,

Moody's said that the various ratings were "intended" to be "broad[ly] consisten[t]," and to

"convey comparable information."  (CAC ¶ 94.)  These, too, are plainly non-actionable

declarations of intention.

## 2.   Generalizations Regarding Integrity, Independence and Risk Management Amount to No More Than Puffery.

Plaintiffs allege that Moody's made numerous generalized misleading statements

concerning "independence," "fairness," "honesty," "trust," and "good faith."  (*E.g.*, CAC ¶¶ 68,

71.)  Plaintiffs similarly allege that statements by Moody's concerning the "quality" and

"integrity" of its ratings processes, and that only "relevant" information would be considered in

that process, were misleading.  (*E.g.*, CAC ¶¶ 68, 76.)  In support, plaintiffs allege, in conclusory

fashion, that the opposite was in fact true:  "Moody's credit rating actions . . . were *not*

influenced only by factors relevant to the credit assessment itself but also by the extraneous

considerations and influences introduced by operation of the Issuer Pays business model."  (CAC

¶ 69(e) (emphasis in original).)  "Misstatements" of this nature are insufficient to sustain a claim

under the securities laws.

"Vague and non-specific pronouncements" that are "not capable of objective

verification" are inactionable "puffery."  *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 336

(S.D.N.Y. 2007).  For instance, in *In re JPMorgan Chase Securities Litigation*, plaintiffs alleged

that JPMorgan's statements emphasizing "its own integrity and risk management procedures"

were material misstatements under the securities laws because JPMorgan actually participated in

fraudulent transactions with Enron.  363 F. Supp. 2d 595, 608-09 (S.D.N.Y. 2005).  Plaintiffs

relied on statements that JPMorgan "set the standard for best practices in risk management

techniques," that it "had adequate reserves" for its non-performing assets, that it "set the standard

for integrity," and that its risks were "accurately assessed." *Id*. at 612.  The court dismissed

plaintiffs' claims because "generalizations regarding integrity, fiscal discipline and risk

management . . . amount to no more than puffery." *Id*. at 633.  The court rejected the same

allegations again as a basis for an amended complaint, reiterating that, even in industries where

"integrity and risk management are matters of great importance to investors," general statements

about financial integrity "could not [be] relied upon by reasonable investors as a specific

representation that [a] company would not take certain actions . . . that might adversely impact

its reputation." *In re JP Morgan Chase Sec. Litig.*, 2007 WL 950132, at *12 (S.D.N.Y. Mar. 29,

2007); *see also Lasker* v. *N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statement

that corporation would not "compromise its financial integrity" was "precisely the type of

'puffery' that this and other circuits have consistently held to be inactionable").

Here, too, statements by Moody's about its "quality" and "integrity" of ratings

and that ratings are based on information deemed "relevant" by Moody's are too general and

subjective to express anything about Moody's ratings process upon which a reasonable investor

would rely.[12] *City of Monroe Employees Ret. Sys.* v. *Bridgestone Corp.*, 399 F.3d 651, 671 (6th

Cir. 2005) ("[S]tatements describing a product in terms of 'quality' or 'best' or benefiting from

'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate

anything that a reasonable person would deem important to a securities investment decision.");

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 478-79 (E.D.N.Y. 2006)

(statement that company's "greatest asset was that it is risk-averse and that strategy permeates

every decision the company makes" was a "generalization[] regarding integrity, fiscal discipline,

---

[12]     Plaintiffs also allege that Moody's statements that it "endorses" the IOSCO code and that
its code "achieves the objectives" of the IOSCO code were misleading.  (CAC ¶¶ 61, 76, 78.)
These indefinite statements are too general and vague to be actionable under the securities laws.

and risk management, that amount[ed] to no more than inactionable puffery").  Accordingly, plaintiffs' core allegations fail to support a claim for securities fraud.

**B.     Plaintiffs Fail To Explain Why Alleged Misstatements Were Misleading.**

As to the grab bag of remaining alleged "misstatements," plaintiffs either give no reason "why the statement is misleading," or they fail to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *Novak* v. *Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000) (plaintiffs must allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission").

**1.     Moody's Structured Finance Revenue Was Accurately Disclosed.**

Plaintiffs allege that Moody's reports of 2005 and 2006 revenue attributable to structured finance ratings were materially misleading because Moody's "omitted to disclose that those results, growth and success were generated on the basis of business conduct that was the very opposite of what Moody's concurrently (and falsely) represented."  (CAC ¶ 285.)  These reports cannot be the basis for plaintiffs' 10(b) claim because plaintiffs do not allege they are untrue:  "[i]t is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."  *In re Marsh & Mclennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)).  "Absent an allegation that [defendant] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *Id*. at 470.

### 2.      Moody's Rating Methodologies Were Accurately Disclosed.

Plaintiffs allege that Moody's made multiple misstatements concerning its rating

methodologies.  For example, plaintiffs take issue with Moody's April 1, 2004 report discussing

"Moody's Mortgage Metrics model":

> Moody's continues to rely on both quantitative means as well as
> qualitative reviews to assess originator and servicer quality and
> their impact on pool performance.  These assessments form an
> integral part of Moody's Mortgage Metrics credit support
> calculations.  Moody's considers numerous factors when
> determining the quality and performance of the originator and
> servicer, including Past performance of an originator's loans;
> Underwriting guidelines for the mortgage loans and adherence to
> them; Loan marketing practices; Credit checks made on borrowers;
> Appraisal standards; Experience in origination of mortgages.

(CAC ¶ 111.)  Plaintiffs allege that this statement is false or misleading because "Moody's

purported evaluations of originator practices and standards . . . were a sham."  (CAC ¶ 115.)

Plaintiffs' so-called support for this proposition is that, beginning in July 2007, Moody's

announced an increased focus on originator quality, stating it (i) would be "increasing the

distinctions it makes in loss expectations based on the originator," (ii) would "conduct a more

comprehensive review of each originator," and (iii) was changing the emphasis of its originator

reviews.  (CAC ¶¶ 120, 124, 126.)  None of these statements about improvements to originator

evaluation practices evidences that Moody's previous evaluations of originators were a "sham,"

however.

Plaintiffs also allege that Moody's falsely represented that it performed "stress

testing" and that "[c]redit support levels . . . are determined with a view toward protecting

investors against collateral losses beyond those that would result in an average economy."  (CAC

¶ 200.)  Plaintiffs assert that this statement is false or misleading because Moody's housing price

appreciation assumptions were too high given the cyclical nature of the real estate market.  (CAC

¶¶ 201-10.)  Plaintiffs allege no facts to support the proposition that Moody's did not perform

stress testing, or that it did not determine credit support levels "with a view toward protecting

investors" in unusual economic times.  In fact, in the next breath, plaintiffs expressly state that

Moody's does not make "worst case" assumptions:

> The economic scenarios used in our modeling represent a
> 'universe' of potential scenarios.  Moody's has long recognized the
> superiority of considering a distribution of future economic
> stresses rather than relying on a single historical economy as a
> presumed 'worst case' scenario.

(CAC ¶ 211.)  Plaintiffs assert that this statement, too, is false or misleading because Moody's

model was not, in fact, superior.  (CAC ¶ 212.)  This conclusory allegation of plaintiffs' opinion

is not supported by any facts.  Moreover, a statement that something is "superior[]" is too vague

to be material and constitutes inactionable puffery.

Like loss causation, plaintiffs' failure to identify a single actionable misstatement

is a threshold failure.  A third follows.

### III.    THE COMPLAINT DOES NOT ADEQUATELY PLEAD SCIENTER.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2).  To qualify as "strong" under the PSLRA, "an inference of scienter must be more than

merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent" that could be drawn from the facts alleged.  *Tellabs, Inc.* v.

*Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007); *id*. at 2510 (scienter inference

must be "strong in light of other explanations").  "[S]peculation and conclusory allegations will

not suffice" to establish scienter.  *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000).

Rather, to plead scienter, a plaintiff must allege either (i) "facts to show that defendants had both

motive and opportunity to commit fraud" or (ii) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (citation omitted). Plaintiffs have failed to plead scienter under either theory.[13]

### A. Allegations of a Generalized Motive To Generate Trade or Increase Revenues Is Not Sufficient To Plead Scienter.

To plead motive, a plaintiff must allege "concrete benefits" that a defendant could have derived from the alleged fraud. *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted). A "generalized motive, one which could be imputed to any publicly owned, for-profit endeavor" is not enough. *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Here, plaintiffs assert that Moody's made the alleged misrepresentations (i) "to generate trade" and "book more revenue" and (ii) "to create the false impression among the stock markets and investors that Moody's most significant market was legitimate, and that Moody's was generating revenues and growth legitimately -- that is, by independent and rules-based ratings." (CAC ¶¶ 405, 406.) It is well established that the desire to generate trade or book more revenue is insufficient as a matter of law to establish motive and opportunity. *In re Take-Two Interactive*, 551 F. Supp. 2d at 270 ("The desire to improve a company's year-end financial numbers . . . does not give rise to [an] inference of scienter."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit" but "[t]hese allegations do not support an inference of scienter."); *Albert Fadem Trust* v. *Citigroup Inc.*, 165 Fed. Appx. 928, 930 (2d Cir. 2006) (desire to maintain "long-term profitability through the cultivation of major clients" is insufficient to establish motive).

Plaintiffs' allegation that Moody's was motivated to create the false impression that its most significant market was "legitimate" likewise fails to raise the "strong inference" of

---

[13]     Plaintiffs do not plead motive and opportunity as to the individual defendants.

scienter needed here.  In *In re Veeco Instruments, Inc. Securities Litigation*, for example, the

court held that an alleged motive to protect a corporation's "reputation" was "neither personal

nor specific, but could be imputed to any publicly-owned corporation" and was therefore

inadequate to plead scienter.  235 F.R.D. 220, 230 (S.D.N.Y. 2006); *see also Rombach*, 355 F.3d

at 177 (alleged desire to "maintain the appearance of corporate profitability . . . does not entail

concrete benefits sufficient to demonstrate motive"); *In re Rhodia*, 531 F. Supp. 2d at 549

("desire to maintain a false veneer of corporate profitability" insufficient to allege motive).

Similarly, in *In re Pfizer, Inc. Securities Litigation*, the court found that Pfizer's alleged

"desperate need" to show the financial community it had a blockbuster drug was simply another

way of saying that Pfizer had "an incentive to portray the likelihood that it will continue to

prosper"—"something that is true for all profit enterprises," and insufficient as a matter of law.

538 F. Supp. 2d 621, 635 (S.D.N.Y. 2008); *see also Nairobi Holdings Ltd.* v. *Brown Bros.

Harriman & Co.*, 2004 WL 1124660, at *3 (S.D.N.Y. May 20, 2004) (defendant's alleged

"unique and meaningful reputational interest" in success of investment it recommended not a

concrete benefit sufficient to allege motive).  In short, plaintiffs have failed to plead motive and

opportunity.  They fare no better with conscious misbehavior and recklessness.

### B.     Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness.

To plead conscious misbehavior, a plaintiff must allege that defendants engaged

in "deliberate[ly] illegal behavior."  *Novak*, 216 F.3d at 308.  To plead recklessness, a plaintiff

must allege that defendants "knew facts or had access to information suggesting that their public

statements were not accurate" or that defendants "failed to review or check information they had

a duty to monitor."  *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,

531 F.3d 190, 196 (2d Cir. 2008).  The "strength of the circumstantial allegations must be

correspondingly greater" than what is required to show motive and opportunity.  *Kalnit*, 264 F.3d at 142 (quotations and citation omitted).

To allege conscious misbehavior, plaintiffs assert that Moody's "knew that the public documents and statements" issued were "materially false and misleading and omitted material information."  (CAC ¶ 404.)  "[C]onclusory allegation of fraudulent intent" is insufficient to "support the inference that the defendants acted . . . with fraudulent intent."  *Rombach*, 355 F.3d at 176-77 (quotations and citation omitted); *see In re Pfizer*, 538 F. Supp. 2d at 637 ("Conclusory allegations of intent are not sufficient.").  Plaintiffs must provide specific evidentiary support for their conscious misbehavior allegations.  They have failed to do so.  *Cf. Lapin* v. *Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 242, n.5 (S.D.N.Y. 2006) (complaint adequately alleged conscious misbehavior because it provided "specific detail").

To allege recklessness, plaintiffs assert that (i) Moody's "had in plain view all information it needed to provide objective, independent and accurate subprime structured finance ratings and still declined to provide such ratings" (CAC ¶ 407); (ii) Moody's changed its ratings methodologies when the subprime market fell (CAC ¶ 407); and (iii) the "sheer breadth and extent of the" alleged misconduct "systematically" affected "Moody's core operations and key products" (CAC ¶ 408).

Plaintiffs' allegation that Moody's had access to all the "information" necessary to provide objective, independent and accurate subprime ratings does not adequately plead that Moody's "had access to information suggesting that their public statements were not accurate" or that Moody's "failed to review or check information that they had a duty to monitor."  *Teamsters*, 531 F.3d at 196.  "'[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'"  *Id*. (quoting *Novak*,

216 F.3d at 309).  A complaint adequately pleads recklessness where it provided "detailed allegations as to what defendants knew on a daily, weekly and monthly basis" about the subject of alleged misstatements.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71, 76 (2d Cir. 2001); *see Caiafa* v. *Sea Containers Ltd.*, 525 F. Supp. 2d 398, 413 (S.D.N.Y. 2007) ("While the Complaint alleges that SCL's senior management received regular reports on inventory . . . , it does not allege that such inventory reports suggested that SCL's ferries or containers were overvalued or the amount by which they were overvalued.").  Clearly, plaintiffs have not provided such detail here.[14]

Nor does plaintiffs' allegation that Moody's changed its ratings methodologies after the decline in the subprime mortgage market establish that Moody's believed that its prior methodologies were deficient at the time it issued any of the alleged misstatements.  (CAC ¶ 407.)  A change in Moody's ratings methodology reflects a recurring business process that does not reveal fraud.  *See*, *e.g.*, *In re 2007 Novastar Fin.,* 2008 WL 2354367, at *3.

Finally, plaintiffs' assertion that the "sheer breadth and extent of the" alleged misconduct demonstrates recklessness (CAC ¶ 408) fails because "'the size of the fraud alone does not create an inference of scienter.'"  *Caiafa*, 525 F. Supp. 2d at 413 (quoting *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)); *In re Serologicals Sec. Litig.*, 2003 WL 24033694, at *12 (N.D. Ga. 2003) ("The mere magnitude of

---

[14]     Plaintiffs contend that a May 2008 Financial Times article about errors in ratings (relating to structured finance products not at issue in this litigation) caused by a computer programming error establishes recklessness.  (CAC ¶ 409.)  But the erroneous ratings did not result from Moody's alleged mismanagement of conflicts of interest.  (CAC ¶ 409.)  The allegation that Moody's changed its ratings methodology to cover up a computer glitch, even if true, does not establish that Moody's was reckless with respect to any misstatement alleged in this action.  *See In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 416 (S.D.N.Y. 2007) (disregarding irrelevant allegations concerning misrepresentations for which plaintiffs did not seek relief when evaluating scienter allegations).

the improperly overestimated value provides no indication of how or when the defendants became aware of its true value.").

### C.     Plaintiffs Fail To Plead Conscious Misbehavior or Recklessness Against the Individual Defendants.

In order to state a Section 10(b) claim against an individual defendant, plaintiffs must establish scienter as to that defendant.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005).  Plaintiffs' sole allegation supporting their assertion that Mr. McDaniel, the CEO of Moody's, acted with scienter, is that scienter existed:

> by virtue of his receipt of information reflecting the true facts
> regarding Moody's, his control over, and/or receipt and/or
> modification of Moody's allegedly materially misleading
> misstatements and/or his associations with the Company which
> made him privy to confidential proprietary information concerning
> Moody's [and because he] was familiar with structured finance
> issues, operations, practices, models and techniques.

(CAC ¶ 414.)  That is not enough.  The complaint does not describe any "information reflecting the true facts" or "confidential proprietary information" that Mr. McDaniel purportedly received that would have alerted him to the alleged fraud.  *Teamsters*, 531 F.3d at 196.

Plaintiffs allege that Mr. Clarkson acted with scienter because he "led a variety of different structured finance ratings operations within Moody's" and because his "leadership at each level of structured finance ratings operations resulted in material and significant gains in structured finance rating share (and in decreased credit rating standards) as a result of [his] consistent effort to make Moody's more 'issuer-friendly.'"  (CAC ¶ 415.)  The only support plaintiffs provide for the assertion that Mr. Clarkson was aware of the alleged mismanagement of conflicts of interest or resulting inflated ratings is a *Wall Street Journal* article, dated April 11, 2008.  But that article does not assert or even suggest that Mr. Clarkson knew of the allegedly mismanaged conflicts.  (CAC ¶ 344; Aaron Luchetti, *Rating Game: As Housing Boomed,*

*Moody's Opened Up*, WALL ST. J., Apr. 11, 2008, at A1, attached as Ex. P to the Cafasso Decl.)

The article itself is devoid of the particularized allegations necessary to satisfy the scienter

requirement. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal.

2000) ("[N]ewspaper articles should be credited only to the extent that other factual allegations

would be -- if they are sufficiently particular and detailed to indicate their reliability.").

Finally, plaintiffs make no allegations—conclusory or otherwise—as to scienter

on the part of Mr. Kanef. (CAC ¶¶ 404-15.)  Accordingly, plaintiffs' Section 10(b) claims

against the individual defendants cannot stand.

### D.    Opposing Inferences of Nonfraudulent Intent Are More Cogent and Compelling.

Plaintiffs ask this Court to infer that Moody's intentionally misrepresented itself

as independent and its ratings as high quality while knowing that the opposite was true—that

conflicts of interest had caused Moody's to use unsound methodologies for valuing structured

finance securities.  Plaintiffs' scienter allegations can only succeed if they are "cogent and at

least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*,

127 S. Ct. at 2510.  They are not.

Indeed, plaintiffs' scienter allegations are quite implausible.  Plaintiffs allege that

Moody's knew the structured finance market would collapse, because it knew that "booms lead

to busts" and that, between 2002 and 2006, "bust was actually overtaking boom."  (CAC ¶¶ 208,

209.)  In other words, Moody's allegedly knew that the securities to which it was giving high

ratings would inevitably lose their value.  Given plaintiffs' allegations that "credit ratings are

worthless unless the credit agency is trusted to provide credit ratings that accurately reflect credit

realities" and that Moody's business "depend[s] upon and is driven by its 'reputational capital'"

(CAC ¶¶ 3, 32), it would be nonsensical for Moody's to destroy that trust and reputational capital

for a short-term benefit.  Courts have repeatedly found such implausible scienter allegations

insufficient to sustain a complaint.  *In re Take-Two Interactive*, 551 F. Supp. 2d at 270 n.12

(dismissing as "implausible" motive allegations that defendants failed to disclose information

that would "inevitably be discovered" in order to secure "an ephemeral benefit"); *In re*

*GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 n.83 (S.D.N.Y. 2006) ("Courts often

refuse to infer scienter, even on a recklessness theory, when confronted with illogical

allegations."); *In re WRT Energy Sec. Litig.*, 1999 WL 178749, at *9 (S.D.N.Y. Mar. 31, 1999)

(dismissing motive allegations that defendants risked reputations to "generate fees likely

amounting to only a small percentage of the annual revenues"); *Shields* v. *Citytrust Bancorp.,*

*Inc*., 25 F.3d 1124, 1130 (2d Cir. 1994) (implausible that defendants would commit fraud merely

to postpone "an inevitable day of reckoning"); *Kalnit*, 264 F.3d at 140-41 (dismissing plaintiff's

motive allegations partly because they were "nonsensical" and "defie[d] economic reason").

        There is a much more compelling inference for the Court to draw from plaintiffs'

allegations:  defendants did not intentionally misrepresent Moody's independence and the

integrity of their ratings methodology for a short-term stock price increase, but rather were as

blindsided by the subprime mortgage crisis and collapse of the structured finance market as

financial institutions throughout the world.  Plaintiffs themselves assert that "Independence is the

Single *Sine Qua Non* of Credit Rating Agencies' Business."  (CAC ¶ 32.)  According to

plaintiffs, the destruction of Moody's reputational capital would destroy "Moody's revenues,

income, and prospects."  (CAC ¶ 3.)  And as plaintiffs concede, "compromising standards and

independence by writing a credit rating opinion reflecting issuer desires rather than credit

realities [is] not worth the risk of reputational capital" to a credit rating agency.  (CAC ¶ 41.)

Plaintiffs ask this Court to infer that Moody's would risk the "sine qua non" of its business to

- 36 -

gain structured finance business in the short term—knowing the business could not be sustained, knowing Moody's stock would precipitously decline in the future, and thereby causing the collapse of the entire structured finance market.  This is not plausible.

The far more plausible inference is that Moody's, like other participants in the structured finance market, was caught unawares by the subprime mortgage meltdown and never intentionally misrepresented the quality of its ratings.  Plaintiffs' allegations directly support this inference.  According to the complaint, between 2005 and 2007, there was a "deterioration in [mortgage] origination standards," and the subprime mortgages originated during that period were "unprecedentedly risky and unwise."  (CAC ¶¶ 128, 129.)  Plaintiffs allege that "originators introduced "new" types of loans that were difficult to rate because "no [historical] data" about them existed.  (CAC ¶ 163.)  These allegations support the only plausible inference to be drawn: that Moody's, along with the market at large, did not immediately recognize the risks of new subprime origination practices because "[s]ubprime mortgage performance during [that] period was 'masked' by unprecedented housing price appreciation."  (CAC ¶ 163.)  This is far more plausible than plaintiffs' alternative inference that the rating agencies engaged in a policy of self-immolation.

## IV.    PLAINTIFFS FAIL TO STATE SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

In addition to their Section 10(b) claims against all defendants, plaintiffs assert a claim against Messrs. McDaniel, Clarkson and Kanef under Section 20(a) of the Securities and Exchange Act.  To allege Section 20(a) controlling-person liability, plaintiffs must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *ATSI Commc'ns* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (citation omitted).

As a threshold matter, plaintiffs' Section 20(a) claims fail because of the failure of the predicate Section 10(b) claim. *Rombach*, 355 F.3d at 177-78. Further, plaintiffs allege "culpable participation," which requires the same particularized allegations of "recklessness" needed to satisfy the Section 10(b) "strong inference" of scienter inquiry. *See In re Take-Two Interactive*, 551 F. Supp. 2d at 307-08 & n.47; *see also In re Marsh & Mclennan Cos., Inc.*, 501 F. Supp. 2d at 494. For all the reasons set forth above, plaintiffs have not adequately alleged recklessness. Thus, there is no culpable participation and plaintiffs' Section 20(a) claims must be dismissed.

## V.      PLAINTIFFS' CLAIMS ARE TIME-BARRED.

Even assuming, *arguendo*, that the allegations of the complaint are sufficient to plead securities fraud—which they are not—plaintiffs are too late. The statute of limitations for the commencement of a securities fraud action is two years "after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). Plaintiffs commenced this action on September 26, 2007.[15] Since at least July 2003, there were "storm warnings" in the market concerning the conflicts inherent in the "issuer pays" business model. Plaintiffs' claims are therefore precluded by the two-year limitations period.

---

[15]      The CAC relates back to the *Teamsters Local 282 Pension Trust Fund* complaint, filed on September 26, 2007. *See* Fed. R. Civ. P. 15(c)(B). A preceding complaint, *Nach* v. *Huber*, Docket No. 1:07-cv-4071 (RC) (N.D. Ill.), was filed on July 19, 2007. None of the current defendants, however, were named as defendants in the *Nach* action, which alleged misrepresentations by a Moody's officer not named in the CAC. Thus, the CAC cannot relate back to the filing of the *Nach* complaint. *See In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992).

Inquiry or "constructive" notice is "notice such that a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (citation omitted). It is triggered by "storm warnings," and "[t]he only question for the court is whether those storm warnings were sufficient to require the plaintiffs to inquire and investigate . . . [If so], knowledge of the alleged fraud will be imputed to them as of the date when the duty to inquire arose," and the statute of limitations begins to run. *In re Merrill Lynch & Co.*, 289 F. Supp. 2d at 424. Plaintiffs do not have to be aware of the entire fraud perpetrated; rather, "the question is whether the materials suggested that there were any material misrepresentations." *Id.* at 425 (quotations and citation omitted). Inquiry notice may be triggered by information found in the financial press and regulatory materials. *Id.* at 424-25; *see also Shah* v. *Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (motion to dismiss granted because inquiry notice of alleged fraud was triggered by a single article in *Fortune* magazine). Here, the complaint does not allege any investigation by plaintiffs. Where an "investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *LC Capital Partners, LP* v. *Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003).

Plaintiffs allege misrepresentations by Moody's concerning its rating methodologies beginning in April 2003. (CAC ¶¶ 111, 115, 200, 201.) Plaintiffs were on inquiry notice of the facts underlying their claims at least as early as June 4, 2003, when the SEC issued a Concept Release calling for comments on credit rating agencies' conflicts of interest, and commenters responded that conflicts affected the quality of ratings. The 2003 Concept Release asserted that "[c]onflicts of interest may arise in several areas within a credit rating agency" and "[r]eliance by credit rating agencies on issuer fees could lead to a conflict of interest

and the potential for rating inflation."  Rating Agencies and the Use of Credit Ratings Under the

Federal Securities Laws, Securities Act Release No. 33-8236, Exchange Act Release No. 47,972,

Investment Company Act Release No. 26,066, 68 Fed. Reg. 35,258 (June 4, 2003).  Sean Egan

of Egan-Jones Rating Co. responded that being paid by issuers creates insurmountable conflicts

of interest that affect the quality of ratings:

> The current SEC-recognized rating firms (i.e., NRSRO's) have
> failed to warn investors about failures such as Enron, WorldCom,
> Genuity, the California utilities, and AT&T Canada.  The
> fundamental reasons for such failures have been conflicts of
> interest and the lack of competition. Wall Street analysts were
> found to have favored issuers over investors because of the large
> issuer-paid investment banking fees.  Likewise, **the major rating
> firms receive approximately 90% of their revenues from issues
> and have been reluctant to take negative actions on large
> important issuers.**  Although the argument can be made that any
> one issuer represents a small share of the major rating firm's
> revenue base, the reality is that investors have not been protected.

(Cafasso Decl. Ex. Q.)  This letter is publicly available on the SEC's website at

http://www.sec.gov/rules/concept/s71203.shtml, as are the other letters submitted in response to

the SEC release.   (Cafasso Decl. ¶¶ 18-21.)   Egan suggested prohibiting issuer compensation of

NRSROs or, alternatively, prohibiting NRSROs from describing themselves as "independent," a

term that "mislead[s] investors."  (Cafasso Decl. Ex. Q.)  The California Public Employees'

Retirement System claimed that Moody's "obtains more than 85% of its compensation from

issuers," and that this system creates conflicts that affect ratings:

> We believe these conflicts and perhaps pressure on the NRSRO's
> from the issuers themselves (who devote a lot of time and
> resources to the relationship with rating agencies) and in some
> cases investment banks may have contributed in part to the failure
> of the rating agencies to provide adequate timely and quick
> assessment of the deteriorating credit qualities of some issuers over
> the past few years.

(Cafasso Decl. Ex. R.)  The Association of Corporate Treasurers raised the need for "revenue diversification to avoid influence by particular customers."  (Cafasso Decl. Ex. S.)  And the National Association of Insurance Commissioners asserted the existence of "practices in which ratings are provided for organizations with significant influence on or ownership in the rating agencies where no conflict of interest disclosures are currently provided."  (Cafasso Decl. Ex. T.)

The SEC responded to such comments with an April 10, 2005 proposed rule requiring NRSROs to "manage potential conflicts of interest."  Definition of Nationally Recognized Statistical Rating Organization, Securities Act Release No. 8570, Exchange Act Release No. 51,572, Investment Company Act Release No. 26,834, 70 Fed. Reg. 21,306 (proposed April 10, 2005).  In explaining the proposal, the SEC noted that "commenters to the 2003 Concept Release indicated that reliance on issuer fees by a credit rating agency could lead to conflicts of interest and the potential for rating inflation."  *Id.*  The SEC concurred, stating that "[w]e believe that concerns about conflicts of interest are valid."  *Id.*  According to the SEC, new rules were necessary because "credit ratings may be unduly influenced by obligors . . . or other interested persons if conflicts of interest are not handled appropriately."  *Id.*

Many others echoed the assertions described above long before the start of the class period.  In September 2004, a member of Congress specifically charged credit rating agencies with "misleading" the public by using the term "independent" and asserted that the agencies "are not independent" but "are being paid huge fees by the issuers":

> Lastly, you mentioned about the conflict of interest.  That is a problem.  It is a huge problem.  This industry is basically accepted because of the lack of competition . . .  First of all, that should be disallowed.  It might take some time.  Maybe they have to do it over a five-year period, but that should not happen.  You are waiting for another huge accident.  The incentives are in the wrong place.  **Secondly, they should not be allowed to use the term "independent."  They are not independent.  Take it away.  You**

> **are misleading the people who need the protection the most.
> They think that these terms [sic] are independent and they are
> being paid huge fees by selected issuers.**

*Credit Rating Agency Transparency and Competition: Hearing Before the H. Financial Services Comm.*, 108th Cong. (Sept. 14, 2004) (statement of Rep. Ginny Brown-Waite) (emphasis added) (attached as Ex. U to Cafasso Decl.).[16]  In fact, as far back as April 2001, the financial press reported that credit rating agencies follow a "practice of privately informing" issuers of credit ratings before making those ratings public, affording issuers a chance to "contest" the ratings:

> [Credit rating agencies] get most of their revenues from issuer fees
> and it is obvious that giving higher new-issue ratings will cause
> more companies to seek ratings from them.
>
> An issue that has further added to investors' suspicions about the
> cosy relationship between rating agencies and the issuers they are
> supposed to be policing is the **agencies' practice of privately
> informing management of their verdict before making it public
> – and giving them the opportunity to contest it.**

Euromoney Institutional Investor, April 2001 (emphasis added) (Cafasso Decl. Ex. V).   And The Washington Post reported in November 2004 that "[i]ndustry insiders" asserted that conflicts of interest had affected particular ratings:

> But at the heart of the increasingly profitable business is a conflict:
> The rating agencies get the bulk of their revenue from the fees they
> charge to the very entities they are rating.  **Industry insiders say
> the desire of a rater to hold onto a paying client – or recruit a
> new one – at times has interfered with the objectivity of a
> rating.**

---

[16]      On a motion to dismiss, the Court may take judicial notice of news articles when they are not presented for the truth of the matters asserted therein, but for the fact that the allegations of which a plaintiff complains were well-known to the public.  *See* Fed. R. Evid. 201(b); *see also In re Merrill Lynch & Co.*, 272 F. Supp. 2d at 251 n.5.  The Court may also take judicial notice of legislative materials.  *Seibert* v. *Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (taking judicial notice of matters "discussed in Congress").

Alec Klein, *Borrowers Find System Open to Conflicts, Manipulation*, WASH. POST, November 22, 2004 (emphasis added) (Cafasso Decl. Ex. W).  According to the Post, participants in the credit ratings market believed that borrowers "pressure[d]" and "manipulat[ed]" credit rating agencies:

> **Dozens of current and former rating officials, financial advisors and Wall Street traders and investors interviewed by The Washington Post say the rating system has proved vulnerable to subjective judgment, manipulation and pressure from borrowers.**  They say the big three are so dominant they can keep their rating processes secret, force clients to pay higher fees and fend off complaints about their mistakes.

(Cafasso Decl. Ex. W) (emphasis added).)

Below is just a sampling of more news articles and congressional testimony addressing conflicts and the integrity of ratings prior to September 2005.

- *Hearing Before the Capital Markets Subcomm. of the H. Financial Services Comm.*, 107th Cong. (April 2, 2003) (testimony of Annette Nazareth, Director, Division of Market Regulation, Securities and Exchange Commission):

  "Another set of issues the commission staff has been examining is the potential conflicts of interest faced by credit rating agencies.  First, the commission staff is reviewing potential conflicts of interest that could arise when issuers pay for ratings . . . **Arguably, the dependence of rating agencies on revenues from the companies they rate could induce them to rate issuers more liberally, and temper their diligence in probing for negative information**."

- Gretchen Morgenson, *Wanted:  Credit Ratings.  Objective Ones, Please.*, THE NEW YORK TIMES, February 6, 2005:

  "Within the next two months, the Securities and Exchange Commission will press a new regulatory framework for the industry to ensure that debt ratings published by the big three . . . are a result of thorough analysis, not a desire for fatter profits.

  Even more troubling, this oligopoly earns its keep from fees charged to the companies . . . This conflicted business model means that the paying customers for these agencies are the

corporations they analyze, not the investors who look to the ratings for help in assessing a company's creditworthiness."

- *SEC Issues Remarks on Regulation of Credit Rating Agencies*, States News Service, April 6, 2005:

    "Some critics noted an inherent conflict of interest in the business model of rating agencies whereby they received the bulk of their revenue from issuers.  These critics argue that by virtue of this payment structure, **rating agencies are beholden to issuers and their analytical independence is thereby undercut**."

(Transcripts and articles attached as Exs. X, Y, Z to Cafasso Decl.)

A "collection of notices from the press and speeches by top securities regulatory officials" is sufficient to suggest material misrepresentations and to trigger a duty to inquire.  *In re Merrill Lynch & Co.*, 289 F. Supp. 2d at 424-25.  Because of those articles and speeches, "the plaintiffs, as well as the public regulators and indeed the entire investment community, were on inquiry notice of the asserted fraud, and the alleged conflicts of interest, well more than two years prior to the filing of [the complaint]."  *Id.* at 425.  Indeed, the Second Circuit has held that information contained in a single article published in the financial press may be enough to trigger a plaintiff's duty to investigate and the two-year statute of limitations.  *Shah*, 435 F.3d at 249-50.  In *Shah*, the article at issue detailed a lack of objectivity and independence with respect to investment analysis that served as the basis for plaintiff's complaint.  *Id*. at 250-51.

To be sure, where reports of alleged wrongdoing are too general, they will not trigger inquiry notice.  *See Lentell*, 396 F.3d at 169.  The articles and hearings here are quite specific, referring to many of the exact same claims set forth in the complaint:  (i) that use of the word "independent" was "misleading"; (ii) that rating agencies allowed issuers to preview and "contest" ratings; (iii) that insiders reported that particular ratings had been affected by agencies' conflicts of interest; and (iv) that insiders reported that ratings methodologies were vulnerable to

"manipulation" and "pressure" from issuers.  Plaintiffs were on inquiry notice since June 4, 2003

when the SEC issued its Concept Release on NRSROs.  Plaintiffs' claims, therefore, have been

time barred since June 4, 2005.  The Consolidated Amended Complaint should be dismissed as

time-barred.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' complaint suffers from incurable fatal

defects.   The Court should dismiss this action in its entirety with prejudice.


Dated: September 26, 2008
        New York, New York


/s/ Sharon L. Nelles
_____
Sharon L. Nelles (SN-3144)
Stephen Ehrenberg (SE-3123)
Darrell S. Cafasso (DC-7123)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*