Ira M. Press
Daniel Hume
David Bishop
Aaron Hovan
KIRBY McINERNEY LLP
825 Third Avenue, 16th floor
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
Lauren Wagner Pederson
SCHIFFRIN BARROWAY TOPAZ & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

*Co-lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re MOODY'S CORPORATION SECURITIES LITIGATION | **CASE NO. 1:07-CV-8375-SWK** |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.   The Credit Ratings Industry and Moody's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             1.   Moody's Credit Rating Scale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             2.   The Growth of Structured Finance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.   The Race to the Bottom for Rating Structured Finance Securities . . . . . . . . . . . 5

             1.   Independence is Indispensable to the NRSRO's Business . . . . . . . . . . . 5

             2.   Structured Finance Ratings Were Easily Manipulated . . . . . . . . . . . . . . 6

      D.   Defendants Misrepresent the State of Affairs at Moody's . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      FALSITY AND MATERIALITY ARE ADEQUATELY PLED . . . . . . . . . . . . . . . . . . 9

A.     Misstatements Concerning Moody's Independence, Integrity, and Objectivity
        are Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             1.   Statements Concerning the Code of Conduct Are Actionable . . . . . . . . 9

                  a.   Violations of Moody's Code Are Actionable . . . . . . . . . . . . . . . 10

                  b.   Statements Comparing Corporate Ratings to Structured
                       Finance Ratings Were Misleading . . . . . . . . . . . . . . . . . . . . . . . 11

                  c.   The Complaint Pleads Why Statements Concerning Moody's
                       Code of Conduct Were Material . . . . . . . . . . . . . . . . . . . . . . . . 12

i

2.    Defendants' Misstatements Concerning Their Integrity, Independence and Risk Assessment Are Not Puffery . . . . . . . . . . . . . . . . . . . . . . 13

B.    Misstatements Regarding the Meaning of Moody's Structured Finance Credit  Ratings and The Company's Method Of Arriving at Them Are Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1.    Misrepresentations Concerning the Source and Sustainability of Moody's Revenues Are Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

a.    Defendants Had a Duty to Disclose Moody's Source of "Success" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

b.    Moody's Had a Duty to Disclose Moody's True Practices . . . . . 17

2.    Defendants Failed to Disclose That Moody's Ratings Were Misleading Because of Undisclosed Actual Conflicts of Interest . . . . . . 18

a.    Defendants' Misrepresentations Concerning Moody's Evaluations of Originator Practices and Standards . . . . . . . . . . 18

b.    Plaintiffs Adequately Plead that Defendants Misrepresented Moody's Purported Stress Testing And Credit Support Levels . . 19

II.    PLAINTIFFS SATISFY THEIR BURDEN TO PLEAD SCIENTER . . . . . . . . . . . . . 21

A.    Scienter Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.    Direct Evidence of Defendants' Scienter-Facts Known to Defendants that Contradict Their Public Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    Circumstantial Evidence of Defendants' Scienter . . . . . . . . . . . . . . . . . . . . . 26

1.    Defendants Had Motive and Opportunity To Commit Fraud . . . . . . . . 27

a.    Profit and Reputation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

b.    Moody's Pervasive Conflicts of Interest . . . . . . . . . . . . . . . . . . 30

(1)    Allegations of Defendants' Actual and Operative, not just Theoretical, Conflicts . . . . . . . . . . . . . . . . . . . . . . . 30

(2)    Post Complaint Evidence of Defendants' Conflicts . . . . 32

2.      The Magnitude of the Fraud Strongly Suggests Scienter . . . . . . . . . . . . 34

III.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION . . . . . . . . . . . . . . 33

A.      The Complaint Establishes Loss Causation- Moody's Shares Declined
        In Price Following The Revelation of Its Concealed Reputational and
        Economic Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        1.      Materialization of Reputational Risk . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        2.      Materialization of Economic Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.      Moody's Stock Dropped As Artificial Inflation Was Removed From Its
        Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.      Defendants' Claims of an Intervening Event Do Not Warrant Dismissal . . . . . . 40

IV.     PLAINTIFFS' CLAIMS ARE NOT TIME BARRED  . . . . . . . . . . . . . . . . . . . . . . . . . 41

A.      Defendants Point to No "Storm Warnings" of Moody's Fraud . . . . . . . . . . . . . 42

B.      Defendants' Campaign of Reassurance Dissipated Any Duty to Investigate  . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

**Cases**

*Albert Fadem Trust v. Citigroup Inc.,*
165 Fed. Appx. 928 (2d. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bastian v. Peten Resources Corp.,*
892 F.2d 680 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Caiafa v. Sea Containers, Ltd.,*
525 F. Supp. 2d 398 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Carlson v. Xerox Corp.,*
392 F. Supp. 2d 267 (D. Conn. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chill v. GE,*
101 F.3d 263 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cosmas v. Hassett,*
886 F. 2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Craftmatic Sec. Litig.,*
890 F. 2d 628 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cross v. 21st Century HoldingCo.,*
No. 00 CV 4333 AGS, 2002 WL 31158901 (S.D.N.Y. Sept. 27, 2002) . . . . . . . . . . . . 39

*Darquea v. Jarden Corp.,*
No. 06 CV 0722, 2007 WL 2584744 (S.D.N.Y. Sept. 5, 2007) . . . . . . . . . . . . . . . . . . 22

*Dura Pharms. v. Broudo,*
544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Emergent Capital v. Inv. Mgmt, LLC v. Stonepath Group, Inc.,*
343 F.3d 189 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Fadem v. Ford Motor Co.,*
352 F. Supp. 2d 501 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iv

*Fisher v. Reich,*
　　No. 92 Civ 4158, 1995 WL 23966 (S.D.N.Y. Jan. 10, 1995) . . . . . . . . . . . . . . . . . . . . . 44

*Fogarazzo v. Lehman Bros., Inc.,*
　　341 F. Supp.2d 274 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 44

*Garber v. Legg Mason, Inc.*
　　537 F. Supp. 2d 597 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Gebhardt v. Conagra Foods, Inc.,*
　　335 F.3d 824 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Greenberg v. Chrust,*
　　282 F. Supp. 2d 112 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hall v. The Children's Place Retail Stores, Inc.,*
　　No. 07 Civ. 8252 (SAS), 2008 WL 2791526 (S.D.N.Y. July 18, 2008) . . . . . . . . . . . . 39

*Hunt v. Alliance N. Am. Gov't Inc. Tr., Inc.,*
　　159 F.3d 723 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hunt v. Enzo Biochem, Inc.,*
　　471 F. Supp. 2d 390 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re AOL Time Warner,*
　　503 F. Supp. 2d 666 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Asher v. Baxter Int'l nc.*
　　2006 U.S. Dist. Lexis 4826 (N.D. Ill. Feb. 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Boeing Sec. Litig.,*
　　40 F. Supp. 2d 1160 (W.D. Wash. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Bristol Myers Squibb Sec. Litig.,*
　　No. 07 Civ. 5867 (PAC), 2008 WL 3884384 (S.D.N.Y. Aug. 20, 2008) . . . . . . . . 34, 39

*In re Check Point Software Techs. Sec. Litig.,*
　　2006 U.S. Dist. Lexis 243 (S.D.N.Y. Apr. 26, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Comverse Tech., Inc. Sec. Litig.,*
　　543 F. Supp, 2d 134 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Daou Systems, Inc. Sec. Litig.*,
    411 F. 3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) . . . . . . . . . . . . . . . . 10

*In re Elan Corp. Securities Litigation*,
    543 F. Supp 2d 187 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Hasrtmarx Sec. Litig.*,
    No 01c7832, 2002 WL 31103491 (N.D. Ill. Sept. 19, 2002) . . . . . . . . . . . . . . . . . . . . . 39

*In re Healthsouth Corp. Sec. Litig.*,
    No. CV-98-J-2634-S, 2000 WL 34211319 (N.D. Ala. Dec. 13, 2000) . . . . . . . . . . . . . . 4

*In re Imax Sec. Litig.*,
    No. 06 Civ. 6128 (NRB), 2008 WL 4307981 (S.D.N.Y. Sept. 16, 2008) . . . . . . . . 35, 40

*In re Independent Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Initial Public Offering Sec. Litig.*,
    358 F. Supp.2d 189 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*In re IPO Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Marsh & McLennan Co., Inc., Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*In re Marsh & McLennan Cos., Inc., Sec. Litig.*,
    MDL No. 1744, 2006 WL 2789860 (S.D.N.Y. Sept. 27, 2006) . . . . . . . . . . . . . . . 15, 16

*In re Marvell Tech. Group Ltd. Sec. Litig.*
     No. 06-06286 RMW, 2008 WL 454439 (N.D. Cal. Sept. 29, 2008) . . . . . . . . . . . . . . . 40

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
     423 F. Supp. 2d 364 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Oxford Health Plans Inc. Sec. Litig.*,
     51 F. Supp. 2d 290 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Par Pharm., Inc. Sec. Litig.*,
     733 F. Supp. 668 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Parmalat Sec. Litig.*,
     375 F. Supp. 2d 278 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Refco, Inc. Sec. Litig.*,
     503 F. Supp. 2d 611 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Rhodia S.A. Sec. Litig.*,
     531 F. Supp. 2d. 527 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*In re Scholastic Corp. Sec. Litig.*,
     252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

*In re Serologicals Sec. Litig.*,
     No. Civ: 1:00-cv-1025, 2003 WL 24033694 (N.D. Ga. Feb. 20, 2003) . . . . . . . . . . . . 33

*In re Sumitomo Copper Litig.*,
     120 F. Supp. 2d 328 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Syncor Int'l Corp. Sec. Litig.*,
     No. 05-55748, 2007 WL 1729968 (9th Cir. June 12, 2007) . . . . . . . . . . . . . . . . . . . . . 16

*In re Take-Two Interactive Trade*,
     551 F. Supp. 2d 247 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 45

*In re TCW/DW N. Am. Gov't Income Tr. Sec. Litig.*,
     941 F. Supp. 326 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Tower Auto Sec. Litig,*
     83 F. Supp. 2d 327 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 34

*In re Van der Moolen Hldg. N.V. Sec. Litig.,*
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Veeco Instruments, Inc., Sec. Litig.,*
    235 F.R.D. 220 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

*In re Vivendi Universal S.A.,*
    No. 02 Civ. 5571 (RJH), 2004 WL 876050 (S.D.N.Y. April 22, 2004) . . . . . . . . . . . . 39

*In re Winstar Comm'cns,*
    No. 01 CV 3014 (GBD), 01 CV 11522,2006
    WL 473885 (S.D.N.Y. Feb. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re WorldCom Inc., Sec. Litig.,*
    No. 02 Civ. 3288, 2003 WL 21488087 (S.D.N.Y. June 25, 2003) . . . . . . . . . . . . . . . . 33

*In re MCI WorldCom, Inc. Sec. Litig.,*
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

*In re WorldCom, Inc. Sec. Litig.,*
    219 FRD 267 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re WorldCom, Inc. Sec. Litig.,*
    294 F. Supp.2d 392 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 27

*J&R Marketing, SEP v. General Motors Corp.,*
    519 F.3d 552 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Kalnit v. Eichler,*
    264 F. 3d.131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Katz v. Image Innovations Holdings, Inc.,*
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lapin v. Goldman Sachs Group, Inc.*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*LaSalle National Bank v. Duff & Phelps Credit Rating Co.,*
    951 F. Supp. 1071 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lentell v. Merrill Lynch & Co., Inc.*
    396 F.3d 161 (2d Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 37, 43

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*
    513 F. 3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McCarthy v. C-Cor Elec., Inc.*,
    909 F. Supp. 970 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Montoya v. Mamma.com. Inc.*
    No. 05 Civ. 2313, 2006 WL 770573 (S.D.N.Y. March 28, 2006) . . . . . . . . . . . . . . . . . 39

*Nathan v. Siegel*,
    No. 07 Civ. 10956 (LBS), 2008 WL 4684171 (S.D.N.Y. Oct. 20, 2008) . . . . . . . . . . . 41

*Newman v. Warnaco Group, Inc.*,
    335 F.3d 187 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Novak v. Kasaks*,
    216 F. 3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Richardson v. TVIA, Inc.*
    2007 U.S. Dist. Lexis 28406 (N.D.Cal. Apr. 16, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Rombach v. Chang*,
    355 F.3d (2d. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33

*Schleichner v. Wendt*,
    529 F. Supp. 959 (S.D. Ind. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Seippel v. Sidley, Austin, Brown & Wood, LLP*,
    399 F. Supp. 2d 283 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 44

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ix

*Silverman* v. *Motorola, Inc.*,
   No. 07c4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) . . . . . . . . . . . . . . . . . . . . . . . 40

*Sloman v, Presstek, Inc.*,
   No. 06 Civ. 377, 2007 WL2740047 (D.N.H. Sept.18, 2007) . . . . . . . . . . . . . . . . . . . . . 22

*Steiner v. Medquist Inc.*,
   No. 04-5487, 2006 WL 2827740 (D.N.J. Sept. 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Stumpf v. Garvey*,
   No. 03cv1352, 2005 WL 2127674 (D.N.H. Sept. 2, 2005) . . . . . . . . . . . . . . . . . . . . . . . 40

*Suez Equity Investors v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Sutton v. Shearson Hayden Stone, Inc.*,
   490 F. Supp. 98 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Tellabs, Inc. v. Makor Issues & Rights, LTD.*,
   __ U.S. __, 127 S. Ct. 2499, 2509 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*U.S. v. Benjamin*,
   328 F.2d 854 (2d Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*In re Winstar Commc'ns*,
   01-cv-3014, 2006 WL 473885 (S.D.N.Y. July 18, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 39

**Other Authorities**

*Financial Gate Keepers 59*
   (Yasuyuki Fuchita & Robert E. Litan, eds., 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTRODUCTION

This case involves a classic "fox guarding the hen house" story. Moody's, Inc. ("Moody's" or "the Company") advertised itself as an independent appraiser of the debt that in large part fueled significant areas of the U.S. economy during the Class Period. The investing public trusted Defendants'[1] representations that Moody's played this role with independence and rigor, and purchased Moody's shares based on this portrayal. Privately, however, Moody's operated a lucrative back-room ratings bazaar, where its blessing was coveted by investment banking clients who paid top dollar for the highest ratings. A high Moody's rating could turn lead to gold, and did, as Moody's clients took sub-prime mortgage based debt that had no business being foisted on the markets, wrapped it with an artificially high Moody's rating, and presto – a worthless product became valuable. Defendants and their clients made a lot of money. The economy was left holding the bag, and when the truth about Moody's finally came to light, so were its shareholders.

Defendants' motion to dismiss this case should be denied. Plaintiffs have more than adequately alleged that Defendants made material misrepresentations during the Class Period, with scienter, that caused significant damage to the Class.[2] The requirements of the PSLRA and Rule 9(b) are met where "the [c]omplaint alleges the specific statement, the reasons why [plaintiff] believe the statement is misleading, and the facts on which that belief is formed." *In re MCI Worldcom, Inc.*

---

[1]    Between February 3, 2006 and October 24, 2007 (the "Class Period"), Defendant McDaniel served as Moody's CEO and Chairman. Defendant Clarkson served in a number of capacities, notably President and COO of Moody's Investors' Service. Defendant Kanef served as the Group Managing Director of the Moody's U.S. Asset Finance Group.

[2]    Defendants' sole challenge to Plaintiffs' control person allegations rest on the purported failure of Plaintiffs to plead scienter. Def. Br. at 37. As detailed *infra* at point II, Plaintiffs properly allege the underlying primary violations by the Company. As such, control person liability should be sustained.

1

*Sec. Litig.*, 93 F. Supp. 2d 276, 280 (E.D.N.Y. 2000).  *See also Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based.") (*internal citation omitted*).   However, a plaintiff is not required to plead with particularity "every single fact upon which their beliefs concerning false or misleading statements are based."  *Id.* at 313.

Plaintiffs' 248 page Consolidated Amended Complaint[3] certainly puts defendants on "fair notice" of Plaintiffs' claim here and the "factual ground on which it is based."  *Id.* at 314. Plaintiffs allege in exhaustive detail Defendants' misrepresentations and how they: (i) were instrumental in allowing Moody's exclusive access to and capture of the ratings market; (ii) expanded the market for the instruments that Moody's then validated in exchange for exorbitant fees that fueled record revenues; and (iii) deliberately and recklessly caused artificial inflation to Moody's stock price.  ¶ 25.

The structured finance market involved particularly acute conflict of interest pressures that motivated Moody's to relax the standards used in its models to determine tens of thousands of structured finance securities ratings.  It was not, as it would be with respect to a corporate bond, a question of making an exception to the model to please an individual client, but debasing the model itself.  Toward the end of and after the Class Period, these conditions manifested themselves by over 10,000 credit ratings downgrades and model failures so glaring that they can only be explained by a lack of independence rather than a lack of expertise.  ¶¶ 51-52.

Direct evidence of Defendants' scienter abounds.  As set forth in § II, *infra*, Defendants and/or their employees have:  (I) admitted Moody's refused to change ratings in the face

---

[3]      Referred to herein as the "Complaint."  "¶ __" refers to paragraphs in the Complaint.

of overwhelming evidence they were wrong; (ii) modified rating methodology to justify the initial errors; (iii) admitted to rampant ratings shopping by structured finance issuers that worked to degrade the ratings Moody's provided; (iv) removed analysts from particular structured finance rating assignments whom issuers deemed "too fussy" – such removals were widespread, specifically under Defendant Clarkson and specifically in Moody's mortgage-backed securities rating operations; (v) embraced Moody's conflicted role by selling further services to structured finance issuers that allowed issuers to construct securities that would garner the ratings issuers desired; and (vi) relied on the use of consequential assumptions (*e.g.*, housing prices) that were not merely optimistic, but untethered to objective realities and contradicted by Moody's own experts.

Finally, the Complaint alleges all that is required at this stage to show loss causation. Moody's revenues more than tripled during 2000-06 as it engaged in the practices Plaintiffs complain of.  Its operating earnings more than quadrupled and share price more than sextupled, rising from approximately $10 per share to more than $70 per share until the truth was revealed.  ¶ 53.  Moody's revenue growth was fueled by an undisclosed lowering of the standards it touted to the public.  As the truth became known, (I) Moody's practices were criticized; (ii) investors in the structured finance instruments lost confidence in Moody's ratings; and (iii) Moody's lost much of this lucrative business segment.  Predictably, Moody's stock price declined materially, falling from $73.71 in February 2007 to $43.39 on October 26, 2007.  ¶ 56.

Plaintiffs' Complaint more than adequately overcomes Defendants' motion to dismiss with its use of Class Period admissions, investigative news reports, confidential witnesses, and Congressional and SEC hearings.  Further post-Complaint Congressional testimony strongly confirms Plaintiffs' allegations.  *See* Declaration of Daniel Hume in Opposition to Defendants'

Motion to Dismiss (the "Hume Decl.").[4]   Accordingly, Defendants' motion should be denied.

## STATEMENT OF FACTS

### A.   Overview

Moody's is a "Nationally-Recognized Statistical Rating Organization," ("NRSRO"), which opines on the creditworthiness of debt instruments and is paid billions of dollars for its ratings ¶ 11.  It is one of the world's two largest credit rating agencies, with approximately 40% of the market. ¶11.  Throughout the Class Period, Moody's credit ratings supplied approximately 90% of its revenues. ¶ 10.  Moody's recent business growth has been driven by extraordinary growth in its structured finance ratings business. ¶ 12.  Since 2004, structured finance has provided Moody's with more rating revenue than all other product ratings combined. ¶ 12.  As the structured finance market exploded in 2004-2007, Moody's shares more than doubled in value to more than $70.

### B.   The Credit Ratings Industry and Moody's

#### 1.   Moody's Credit Rating Scale

Moody's expresses its credit rating evaluations by means of a renowned categorical grading scale, involving no less than 10 scores (including "notches"), which run from the highest, or Aaa ("triple-A") (obligations that are judged to be of the highest quality, with minimal credit

---

[4]        After Plaintiffs filed the Complaint, Moody's gave testimony and documents to Congress that were made public which confirm many of Plaintiffs' allegations.  Plaintiffs request that the Court take judicial notice of this material, which is attached to the Hume Decl.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2509 (2007) ("courts must consider complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12 (b)(6) motions to dismiss, in particular...matters of which a court may take judicial notice").  Courts may take judicial notice of documents that are relevant, public, and whose contents are verifiable under Fed. R. Evid. 201(b)(2).  *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice of SEC disclosures); *In re Healthsouth Corp. Sec. Litig.,* No. CV-98-J-2634-S, 2000 WL 34211319, *2 (N.D. Ala. Dec. 13, 2000) (judicial notice of congressional testimony).  In the event the Court does not take judicial notice of these materials, then the Court should likewise decline to take judicial notice of the materials submitted by Defendants that are not referenced in the Complaint.

risk); to the lowest rated class of bonds, C, which typically are in default and have little chance for recovery of principal and interest.  Defendants referred to the Company's scale as "Moody's Global Scale" – "global" because it purportedly conveyed identical meanings as to risk across multiple classes of securities.  As such, Moody's consistently represented that a "triple-A rating assigned to a structured finance security was...identical to the triple-A rating assigned to a corporate bond."  ¶ 22.  This was particularly important to structured finance investors because they usually lacked access to information to perform meaningful creditworthiness cross checks.  ¶¶ 54, 56, 94-102.

### 2.   The Growth of  Structured Finance

At their most general level, structured finance securities are all Asset-Backed Securities ("ABS").  The ABS at issue here are securities backed by subprime and "Alt-A" mortgages – primarily residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"). ¶ 26.  During 2006, approximately $2.5 trillion of mortgages were originated in the U.S. of which $1.9 trillion (or 80% of all mortgages) were securitized into RMBS. Approximately $520 billion (or 25%) of these RMBS were backed by subprime mortgages. Collections of asset-backed securities such as RMBS can serve as the basis for "second order" structured finance securities that pool various ABS securities to issue a further round of securities such as CDOs.  ¶ 29.  Indeed, correct CRA ratings are necessary for the creation of RMBS.

### C.   The Race to the Bottom for Rating Structured Finance Securities

### 1.   Independence is Indispensable to the NRSRO's Business

NRSROs, like independent public accountants and financial analysts, are considered "financial gatekeepers."  ¶¶ 32-37.  Gatekeeper functionality depends on reputational capital stemming from independence, integrity, and ability to assess risk.  Just as accountants provide

opinions on the validity and completeness of audited financial statements, and analysts provide "ratings" on the stocks of publicly listed companies, rating agencies provide "credit ratings" for debt securities. ¶¶ 33-35.

Throughout the Class Period, Moody's consistently and frequently misrepresented that: (I) its independence was both paramount and maintained; (ii) its conflicts of interest posed by the "Issuer Pays" business model (explained below) were fully disclosed and defused; and (iii) its credit ratings were arrived at independently. ¶ 37; *see also* Hume Decl. Ex. F at COGR-0038026.

### 2.    Structured Finance Ratings Were Easily Manipulated

Moody's is paid for its credit rating opinions on an issuer's debt by the very issuer whose debt is being rated. This practice is known as the "Issuer Pays" business model, and it presents Moody's with a potential conflict of interest. Should Moody's not deliver a rating to the issuer's liking, the issuer may refuse to retain Moody's in the future. ¶¶ 38, 40.

In structured finance, unlike Moody's other rating markets, control over ratings assignments was dominated by a small number of large repeat issuer investment banks. Losing one client, for example, could result in the loss of 10% of the market or more – a blow all the larger given the size and volume of the market. ¶ 43.

Further, in structured finance, NRSROs were paid *de minimis* fees for a pre-evaluation of ratings and received the larger full payment **only** if the issuer officially choose to use or "publish" the ratings indicated by the NRSRO in its pre-evaluation. ¶ 44. Thus, because of pre-evaluations, issuers were able to select NRSROs on the very basis of the *ex ante* ratings (*i.e.,* ratings shopping). *Id.*

Jerome S. Fons, a 17 year Moody's employee who was Managing Director of Credit

Policy until his August 2007 departure. Mr. Fons confirmed Plaintiffs' allegations that a "race to the bottom" of ratings quality spurred by the conflicts of interest inherent in the structured finance market led to degraded ratings.  Specifically, Mr. Fons testified that

> My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and ratings shopping by issuers of structured securities.  A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree.  It was also relatively easy for the major banks to play the agencies off of one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency. *Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.  While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.*

*See* Hume Decl. Ex. C *Testimony of Jerome S. Fons Before the Committee on Oversight and Government Reform October 22, 2008* at 3. (Emphasis added).  Thus, a desired credit rating drove rating agency selection.[5]

### D.    Defendants Misrepresent the State of Affairs at Moody's

During the Class Period, Defendants represented in public statements that, *inter alia,* Moody's: (I) was an "independent" and "objective" provider of credit ratings; (ii) had adequately managed and/or eliminated the potential conflicts of interest; (iii) did not structure RMBS and CDOs it rated; (iv) had structured finance credit ratings that were consistent with ratings on corporate bonds; and (v) had credit ratings that reflected all known relevant information.  ¶ 54.

These were all material misrepresentations.  Moody's recently-disclosed failures with

---

[5]    *See also* ¶ 45 (Typically, a corporation that issues its own debt cannot "restructure" itself to obtain a higher credit rating.  However, structured finance vehicles can be structured to obtain higher ratings.  Issuers were familiar with these models and paid Moody's additional fees for consulting and for software tools so as to better understand how Moody's models worked.  Thus, issuers and CRAs started with a rating and built a deal around the rating.).

respect to independence and the resulting misconduct of its subprime structured finance credit ratings business have exposed it to significant regulatory scrutiny and sanctions. ¶ 55. Investors' evaluation of Moody's stock would have been altered by the information revealing that Moody's fastest growing and most lucrative business segment was operating in contravention to Defendants' representations.  Thus, it is not surprising that as Defendants and others began to reveal the extent to which Moody's structured finance ratings were issued in contravention to prior representations, Moody's structured finance business eroded precipitously, as did its share price – from a Class Period high of $73.71 in February 2007, to $43.39 on October 26, 2007.  ¶ 56.[6]

Finally, as set forth in § II, *infra*, investigative news reports, confidential witnesses, Congressional, and SEC hearings demonstrate: (I) Moody's senior management admitted its representations about independence, objectivity, and integrity were false; (ii) Moody's condoned, profited from, and facilitated ratings shopping among structured finance issuers; (iii) Moody's catered to its structured finance clients by favorably adjusting ratings models and/or reassigning analysts deemed insufficiently friendly to Moody's structured finance clients; and (iv) Moody's rating practices contradicted its public representations of independence and integrity by ignoring combined loan to value ratios, assignor standards and practices, differing performance among mortgage originators, documentation levels, and future housing price forecasts.

---

[6]     Post-Class Period disclosures on May 21, 2008 evidencing the falsity of Defendants' Class Period statements caused Moody's shares to decline about another $10 per share by May 22, 2008.  ¶ 56.

**ARGUMENT**

**I.    FALSITY AND MATERIALITY ARE ADEQUATELY PLED**

    **A.    Misstatements Concerning Moody's Independence, Integrity, and Objectivity Are Actionable**

        **1.    Statements Concerning the Code of Conduct Are Actionable**

Defendants begin from a false premise – that misrepresentations concerning a company's code of conduct are not actionable, because they are merely "declarations of intention" or "puffery." Def. Br. at 22-29. They are wrong. Stated principles and methods of conducting business, as well as breaches thereof, are material to investors and are not simply "puffery." *Cf.* Def. Br. at 24 *with In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 759 (S.D.N.Y. 2001) ("a reasonable juror could conclude that...the Company's violation of its codes of conduct were material facts," where such breaches were central to the company's business), *citing Craftmatic Sec. Litig.*, 890 F. 2d 628, 640 (3d Cir. 1989); *Sutton v. Shearson Hayden Stone, Inc.*, 490 F. Supp. 98, 101 (S.D.N.Y. 1980); *accord Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006): ("[I]t defies logic to suggest that, for example, an investor would not reasonably rely on a statement contained in what defendants concede was a list of Goldman's business principles, that recognized Goldman's dedication to complying with the letter and spirit of the laws and that Goldman's success depended on such adherence.").

    Defendants also contest liability for statements from ¶¶ 71 and 76 (Def. Br. at 24):

> Moody's is committed to reinforcing...a sense of trust in the...independence...of Moody's products and services, and our stewardship of the business...[W]e remain committed to upholding the independence...of our business...To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee.

These misstatements and others in the annual "Shareholders Letter" signed by McDaniel and incorporated in the 2005 Shareholders Annual Report, created a materially misleading impression of Moody's affairs that differed significantly from the conflict of interest laden one that actually existed.  ¶¶ 72, 77; *see also* ¶¶ 69, 82, 84; Hume Decl. Ex. B (*Opening Statement of Hon. Rep. Henry A. Waxman, Chair, Committee on Oversight and Government Reform, Credit Rating Agencies and the Financial Crisis,* October 22, 2008 at 2 ("Waxman Op. Stmnt.") (*quoting* McDaniel:  "[W]hat happened was it was a slippery slope...Everything was investment grade," and Moody's managing directors:  "we sold our soul to the devil for revenue."))[7]

### a.    Violations of Moody's Code Are Actionable

Violations of codes of conduct, particularly by "financial gatekeepers" are actionable. First, credibility, skill and management integrity are material to shareholders.  *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) (even though accounting restatement amount was relatively small, "[m]anagement's integrity would probably be important to investors."); S. Rep. No. 550, 90th Cong. 1st Sess. 2 (1967) (Senate Report on the bill to enact the Williams Act) ("The competence and integrity of a company's management, and of those persons who seek management positions, are of vital importance to stockholders."); *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 98-9 (2d Cir. 2001) (concealed lack of skill and competency of issuer's principal

---

[7]       *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006), cited by defendants, concerned oral forward looking statements and did not involve a code of conduct.  The *Nokia* court did not hold that "optimistic" or "imprecise" misleading statements are never actionable.  *See id.,* (imprecise or "highly optimistic" statements can be actionable "upon a showing that the defendants did not genuinely or reasonably believe [them]").  Here, Plaintiffs have made such a showing.  *See Infra*, § II (scienter); *Cf. Nokia*, 423 F. Supp. 2d at 402-08 (scienter not pled).  *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ 6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) is inapposite because where misstatements concern "parties' assessments of their own abilities and successes," such statements "when rendered" must be made "in good faith."  *See Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003).

is actionable under § 10(b)).

Second, independence is crucial to financial gatekeepers such as NRSROs.  *See J&R Mktg, SEP v. General Motors Corp.*, 519 F.3d 552, 560 (6th Cir. 2008) ("Investors consider credit rating agencies' opinions important, and investors want to know those opinions, regardless of whether the company agrees or disagrees with the agencies' opinions.") (*citing*, *inter alia,* Financial Gatekeepers 59, 59-61 (Yasuyuki Fuchita & Robert E. Litan, eds., 2006).  Thus, it would be material to investors to know whether Moody's was complying with its stated practices of trustworthiness and independence.  ¶¶ 72(a)-(d); 281-286.

### b. Statements Comparing Corporate Ratings to Structured Finance Ratings Were Misleading

Defendants' Class Period statements comparing its structured finance ratings to Moody's traditional ratings of corporate debt were materially false and misleading.  For example, Defendants asserted the following:

> Moody's global corporate, financial institutions, sovereign and non-US, sub-sovereign..., and Structured Finance Credit Ratings use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss...The Ratings Symbols and Practices Committee ensure that Moody's rating system continues to represent a globally consistent framework for comparing the credit quality of debt securities.  ¶ 94

The foregoing comparison was misleading because structured-finance ratings were dominated by conflicts, which inhibited analysts from using all relevant and available information in rating RMBS and CDOs.  ¶¶ 96-101 (investors were very familiar with Moody's Global Scale as a result of decades of its use and performance with respect to corporate bonds.  Structured finance securities were complex and opaque securities, making independent analysis of their creditworthiness impossible and fostering *de facto* reliance on NRSROs' analyses); *See also*

11

Waxman Op. Stmnt. at 1 ("These new financial inventions were so complex that virtually no one understood them."); and Hume Decl. Ex. A, part II, lines 1897-1907, Fidelity's Peter Lynch:

> My constituents... did not have the ability to scrutinize the different tranches of securities. They just did not have that ability and they were not sophisticated like this. But they knew what triple-A meant– and what it has meant for the past 75 to 100 years – and they relied on that. And they were induced to rely on that. These securities are so complex. People in America and across the globe knew what triple-A meant because Moody's and Standard and Poor's as agencies were trusted. They were trusted to be accurate and honest.

### c.   The Complaint Pleads Why Statements Concerning Moody's Code of Conduct Were Material

Defendants cannot escape liability by simply situating materially false and misleading factual statements with language related to the future or containing some opinion (Def. Br. at 24). *See In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1169 (W.D. Wash. 1998) (if fact statements are deemed just immunized assumptions underlying projections, then the exception would "swallow the rule"); *In re Independent Energy*, 154 F. Supp. 2d 741, 757 (S.D.N.Y. 2001) (same). Each misstatement alleged in the Complaint is followed by the reasons why the statement is misleading (*e.g.*, ¶¶ 69, 72, 77) (ratings and the methods by which they were calculated were compromised, as conflicts were not controlled) and the bases for such reasons.

Plaintiffs adequately plead that Defendants published Moody's Codes on the Company's web site and in public documents, and touted them as vitally important to Moody's investors. *E.g.,* ¶¶ 281-86.[8] Strict adherence to the Codes ensured the validity and reliability of

---

[8]     It is irrelevant that Moody's Code "disclaimed any responsibility or liability to any third party arising out of or relating to this Code." Def. Br. at 23 n.11. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 300 (S.D.N.Y. 2003) ("Nothing in the press reports or in the boiler-plate disclaimer on which they rely provides notice to the public of the *quid pro quo* relationship detailed in the Amended Complaint."); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004) (same).

Moody's credit ratings – essentially Moody's lifeblood product. *Id.* The undisclosed Codes violations exposed Moody's investors to risk in their investments in the Company. *Id.* Defendants' charade was achieved by giving the appearance of implementing Moody's Code, but in actuality failing to do so. ¶ 69(h). Thus, Defendants' assertion that Plaintiffs failed to allege that the Code was not adopted is a distinction without a difference. Def. Br. at 24.

2.    **Defendants' Misstatements Concerning Their Integrity, Independence and Risk Assessment Are Not Puffery**

Defendants repackage their "declarations of intention" arguments to assert that Plaintiffs make only "generalized" allegations concerning Defendants' integrity, independence and conflict management, and that such statements are mere puffery. Def. Br. at 25. In so doing, they again only point to a few of the Complaint's allegations concerning these topics (*i.e.*, ¶¶ 68, 69 71,76). However, the statements at issue, read in context, are specific and substantive and their truth or falsity could have been determined at the time they were made.

What determines materiality is not precision, but timing and context. Imprecise statements are actionable so long as they create a misimpression of the current state of affairs. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991); *see also Novak*, 216 F.3d at 315 ("the inventory was in good shape" and "under control," are actionable). Statements attributed to financial gatekeepers such as rating agencies, which concern integrity, independence and credit risk assessment are inherently material to investors. *J&R Mktg, SEP*, 519 F.3d at 560 (rating agencies); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 289 (S.D.N.Y. 2005) (auditors); *Lapin*, 506 F. Supp. 2d at 240 (financial analysts). Independence is key to the veracity of the opinions made by financial gatekeepers, and if such independence is compromised, it can be the basis for a securities fraud

13

claim. *See e.g., In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 424-28 (S.D.N.Y. 2003) (analyst-underwriter); *Lapin*, 506 F. Supp. 2d at 239-42 (same).   Misstatements concerning management's integrity and/or competence are material as well. *Gebhardt,* 335 F.3d at 830; *Suez Equity,* 250 F.3d at 98-9.

Notwithstanding Defendants' baseless assertions to the contrary (Def. Br. at 25, citing ¶69(e)), Plaintiffs allege in great detail how and why Defendants more than compromised their independence, integrity and own internal risk assessment policies for their insatiable greed.

The Complaint sufficiently alleges the misstatements contained in Moody's Code, where Defendants list the practices that purportedly were functioning to ensure independence.  ¶¶ 68 (*E.g.*, Code §§2.1, 2.4, 2.7).  These were clearly present-tense statements of fact. The Complaint meticulously details why these statements are false when made. ¶¶ 69(a)-(k).  Similarly, the alleged statements concerning Moody's "fairness," "honesty,"  "trust," and "good faith," were equally particularized and misleading when read in context.  ¶¶ 68,71; *see also* ¶¶ 72(a) - (d).  Moody's was systematically undermining trust by distributing to the market credit ratings dominated by conflicts, resulting in debased rating methodologies, which did not reflect all "relevant information" actually known to Moody's. ¶ 72(a).   In turn, sections II through IV of the Complaint detail the bases for the alleged falsity.  These bases include:

• Statements from former employees contradicting the misrepresentations.  ¶¶ 331(a) - ©;

• Strong circumstantial evidence of falsity – such as Moody's loss of market share after strengthening its commercial mortgage backed securities models.  ¶¶ 332-36;

• Empirical evidence of "grade inflation" for structured finance securities.  ¶¶ 331, 337-39;

• April 11, 2008 *Wall Street Journal* ("WSJ") article exposing "ratings shopping."  ¶ 344;

14

•    Investigative reports from financial publications corroborated by confidential witness No. 1 ("CW 1"), an officer of Moody's, describing the practice of adjusting upward, without any basis, the cash flow variable to the ratings models, where the issuer-client complained of too low of an initial rating.  ¶¶ 347-49;

•    News reports of widespread "reassignment" of Moody's analysts at the direction of clients, because certain "[a]nalysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank." ¶¶ 350-52.

Accordingly, Defendants' authorities miss the mark.  *See e.g., In re Tower Auto Sec. Litig.*, 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007) (merger integration case, where plaintiffs, unlike here, alleged "non-specific pronouncements" of past "success" of merger integrations were misleading) (no scienter pled).  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) is equally unavailing.  Therein, the thrust of plaintiffs' claim was that defendant investment bank misrepresented the true nature and extent of accounting for its transactions with the now defunct Enron Corporation. JP Morgan's "integrity" and "sound risk-management procedures" were ancillary to plaintiffs' claims.  *Id.*, at 632-33 (also no scienter pled).  However, where, as here, the misstatements are "sufficiently related to the undisclosed misconduct alleged," the complaint should "withstand a motion to dismiss."  *In re Marsh & McLennan Cos., Inc., Sec. Litig.*, MDL No. 1744, 2006 WL 2789860, at *1 (S.D.N.Y. Sept. 27, 2006) (*citing J.P Morgan, supra*).[9]

In short, as with its counterpart financial gatekeepers, Moody's can be held liable for misrepresenting its independence, integrity and competence.[10]

---

[9]    Similarly, *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996), does not assist Defendants when the decision is read properly.  The Second Circuit held that the statement at issue there was not false – not that it was "puffery."

[10]    *See WorldCom*, 294 F. Supp. 2d at 424-28 (motion to dismiss denied where it failed to disclose its actual conflicts of interest and misrepresentations concerning issuer's financial condition); *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 290 (D. Conn. 2005) (particular auditor "known to go along with accounting practices [they] knew to be clear violations of GAAP" at client's behest);  *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071 (S.D.N.Y. 1996) (where a ratings agency

**B.     Misstatements Regarding the Meaning of Moody's Structured Finance Credit Ratings and The Company's Method Of Arriving at Them Are Actionable**

**1.     Misrepresentations Concerning the Source and Sustainability of Moody's Revenues Are Actionable**

Defendants misconstrue the nature of the Complaint and assert that because Plaintiffs do not challenge the accounting accuracy of Moody's results, there is no falsity.  Def. Br. at 27 Here, Defendants had a duty to disclose the manner in which Moody's "earned" its financial results, and the bases for the source of its purported continued success. ¶¶ 282-84.

**a.     Defendants Had a Duty to Disclose Moody's Source of "Success"**

As in *Marsh, supra,* Defendants had a duty to disclose that the source of Moody's success was in direct contradiction to the reasons provided therefor.  ¶ 285.

> [*Marsh*] stands for the proposition that isolated statements of revenues can not give rise to Section 10(b) liability, even when allegedly generated by improper activities, if the figures reported are factually accurate.  These cases are not inconsistent, however, with the proposition that Section 10(b) liability can arise when defendants know that statements putting the source of the company's revenue at issue are false or misleading, even though the financials themselves are otherwise accurate.

*Steiner v. Medquist Inc.*, No. 04-5487, 2006 WL 2827740, at *15-16 (D.N.J. Sept. 29, 2006).

Where, as here, the description and source of revenues cannot "be accurately described without reference to the widespread" improper undisclosed means "employed to enhance those revenues," statements concerning the Company's financial results and future prospects can "materially misle[ad] investors about the nature of the Company's" structured-finance revenues.  *In re Marsh & McLennan Co., Inc. Sec. Litig.,* 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006); *accord In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990); *see also In re Syncor Int'l*

---

possesses information that signaled its issuer-clients' rating is inflated, it can be liable under §10(b)).

16

*Corp. Sec. Litig.*, No. 05-55748, 2007 WL 1729968, at *1 (9th Cir. June 12, 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success").

Prior to and during the Class Period, Defendants attributed Moody's strong financial results to its structured finance ratings business, but misrepresented how it conducted that business, and thus, the manner in which Moody's reported financial results were earned. ¶¶ 281, 282, 54-228. In fact, the true reason for this success was Moody's bowing to its clients' demands for higher ratings than deserved. ¶¶ 331, 337-43. Relatedly, Moody's failed to disclose that it met these client demands by adjusting its ratings models for structured-finance securities by, *inter alia:* (I) using unrealistically low "expected" default rates for subprime instruments (¶¶ 94, 138-40, 337); (ii) deliberately under-collateralizing RMBS (¶¶ 141-58) and CDOs (¶¶ 215-42); and (iii) using baseless housing price assumptions. ¶¶ 200-06; *see also generally* Complaint at §§ II.C.D and III.

### b.   Moody's Had a Duty to Disclose its True Ratings Practices

Where, as here, an issuer conceals that a substantial source of its revenue is derived from improper sources and declines in such revenues result from ending such practices, the issuer is liable where it has placed the source of revenues "in play." *In re Van Der Moolen Hldg. N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005); *Marsh,* 501 F. Supp. 2d at 470. Plaintiffs allege that "Contrary to the representations made at Moody's Code Section 1.9...Moody's was failing to comply with 'applicable laws and regulations,' including the IOSCO Code and the Credit Rating Agency Reform Act of 2006." ¶ 69©; *see also* ¶¶ 69(h), 72©. At the same time, Defendants reported record-breaking revenues, gross margins and profitability. Defendants opined that such would continue unabated. ¶¶ 284-86. When the truth began to emerge concerning the actual manner

in which Moody's "earned" its structured finance ratings revenues, Moody's could not sustain such revenues.  The news also eviscerated Moody's reputation and created a panic that reverberated throughout global financial markets.  ¶¶ 115, 243-80, 353-403.

Accordingly, Defendants had a duty to disclose that Moody's was, in fact, not practicing what it preached to yield such stellar financial results before and during the Class Period.

### 2. Defendants Failed to Disclose That Moody's Ratings Were Misleading Because of Undisclosed Actual Conflicts of Interest

#### a. Defendants' Misrepresentations Concerning Moody's Evaluations of Originator Practices and Standards

Moody's represented that "Credit Ratings will reflect consideration of all information known, and believed to be relevant."  ¶ 68.  Defendants represented that in determining credit ratings, Moody's was purportedly doing three things: (I) assessing the relevant, salient characteristics of the mortgages underlying the security; (ii) simulating and evaluating the performance of those mortgages under "stressful" macroeconomic conditions, *i.e.,* "stress testing," and; (iii) taking into account the practices and standards of the loan originators responsible for the mortgages at issue. ¶¶ 104-05.  Specifically, Defendants represented, *inter alia,* that when determining credit ratings for RMBS, Moody's conducted further independent and qualitative assessments of loan originator standards and practices, and took them into account as an "integral part" of its credit ratings. ¶ 111.

These representations were materially false and misleading when made, as after the subprime crisis became publicly evident in 2007, Moody's made methodological adjustments with massive consequences for its expected loss determinations to begin to account for the most obvious

18

measure of originator quality – the comparative performance of different originators' loans.[11] Further, during 2008, Moody's revealed that it had yet to construct any meaningful protocol for assessing originator quality.   ¶ 115.   Even earlier, on July 24, 2007, Defendants admitted that Moody's was not accounting for "significant performance variance among originators."  ¶¶ 117-19.

As a direct result of Moody's coming clean and fixing these problems, in October 2007 the Company downgraded approximately 40% of all subprime RMBS tranches it issued and rated during 2006.   These downgrades were driven primarily by originator-specific matters – *e.g.*, loss expectations for certain originators. ¶ 122 & n.9; *see also id*. & n. 10 (in January 2008, Moody's revealed that it raised loss expectations a further 50% from the levels disclosed in October 2007).[12]

Thus, Defendants completely ignore the allegations supporting the falsity of Moody's statements concerning the lack of comparative analysis for issuers (¶ 117), and its considerations of origination and underwriting standards (¶ 114).   Additional bases for the reasons why these statements (as well as others) were false and misleading when made are found at ¶¶ 130-199.   Those allegations adequately plead that Defendants were aware of the shockingly frail mortgages produced by aggressive underwriting and the increasingly systemic deterioration in origination standards.

---

[11]     *Cf. Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 509 (S.D.N.Y. 2005), *aff'd on other grounds*, 157 Fed. Appx. 398 (2d Cir. Dec. 7, 2005) (plaintiffs may allege subsequent changes in disclosures as evidence of inadequacy of class period disclosures), *citing In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data may be relevant to determining what a defendant knew or should have known during the class period.)"; *In re TCW/DW N. Am. Gov't Income Tr. Sec. Litig.*, 941 F. Supp. 326, 331 n.7 (S.D.N.Y. 1996) (post-class period SEC filing may be used "as a tool to help explain the consequences of...risk in the context of this lawsuit...").

[12]     *Cf. Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("[W]e deem significant the amount of the write-off [the Company] eventually did take...[T]he write-off suggests something remarkable..."); *Cosmas v. Hassett*, 886 F. 2d 8, 10, 13 (2d Cir. 1989) (statements made during class period were contrary to information in plain view evidencing falsity and scienter).

**b.    Plaintiffs Adequately Plead that Defendants Misrepresented Moody's Purported Stress Testing And Credit Support Levels**

Defendants assert that the alleged misstatements concerning Moody's purported "stress testing" and "credit support levels" are not actionable. Def. Br. at 28-9 (*citing* ¶¶ 200-212). Defendants are wrong. *See Hunt v. Alliance N. Am. Gov't Inc. Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("A reader of these passages and others reasonably could have understood them to mean that these...techniques were available (even if they were not foolproof) and that the Fund would attempt to hedge against...risk by using these techniques."); *see also Lapin,* 506 F. Supp. 2d at 237 (duty to disclose arises whenever secret information renders prior pubic statements misleading).

Moody's stated that it performed "stress testing" as part of its expected loss determinations for credit ratings.  ¶ 200 ("credit support levels...are determined with a view toward protecting investors against collateral losses beyond those that would result in an average economy.").  However, Moody's actual stress testing violated conventional practice and Moody's own representations of the process, as the housing price assumptions Moody's used in determination of credit ratings were neither "conservative" nor grounded in reality. ¶¶ 202-206.  Further, Moody's declined to factor into its stress testing the "boom/bust" cycle, despite convention and Moody's long-time awareness that the cycle was turning to bust.  ¶¶ 207-210.

In contrast to Defendants' mischaracterizations, Plaintiffs pled that Defendants misrepresented the reasons for and the effects of not considering the "worst-case" scenario in its stress test modeling.  ¶¶ 211-14.  Housing price assumptions are critical to determining expected losses of mortgage pools.  Declining housing prices primarily function to increase loss severity upon default.  ¶ 202.  As subsequent events made clear, including Defendants' admissions, the housing

price assumptions Moody's used in its ratings models were not "conservative."   ¶ 203.  In fact, Defendants specifically ignored that *Moody's itself*, through its economist, Mark Zandi, was predicting house price declines throughout the Class Period, while Moody's models secretly assumed house prices would rise at a 6-8% annual rate indefinitely.  *See* ¶ 204.  Not only were Moody's housing price assumptions far too aggressive, they were not even remotely consistent with its own publicly-stated view of likely future housing prices.

Moreover, Defendants represented that Moody's did not rely "on a single historical economy as a presumed 'worst case scenario,'" and instead implied a superior modeling method – that of considering a "'universe' of potential scenarios." ¶ 211.  However, Defendants were acutely aware of the implications of not employing more than usual adverse housing and economic conditions, *i.e.,* housing market "bust-times" and "worst-case scenarios" in its ratings models.  ¶¶ 207-209.  Shortly after the end of the Class Period, Defendants admitted that Moody's did not even account for "a universe of scenarios," let alone "bust" or "worst-case." ¶ 214.

Accordingly, Plaintiffs adequately plead the basis for the falsity of Defendants' misstatements – Defendants' own statements of awareness and admissions.[13]

## II.   PLAINTIFFS SATISFY THEIR BURDEN TO PLEAD SCIENTER

The Complaint alleges, with exhaustive detail and particularity, facts that, especially when taken together, make it at least as likely as not that Defendants acted with scienter.  Defendants attempt to refute scienter here by ignoring most of these allegations and addressing the rest in

---

[13]   None of the statements alleged to be false and misleading concerning stress testing is mere puffery.  *E.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (a company's characterization of management practices as "adequate," "conservative," and "cautious" are actionable); *McCarthy v. C-Cor Elec., Inc.*, 909 F. Supp. 970, 976 (E.D. Pa. 1995) (the "adjective 'strong' is no less specific than the adjectives at issue in *Virginia Bankshares...*").

isolation, rather than "holistically" as the courts require. *See Tellabs* at 2511. Scienter may be shown with direct evidence of fraud, or circumstantial evidence such as motive and opportunity. *See In re IPO Sec. Litig.*, 544 F. Supp. 2d 277, 286 (S.D.N.Y. 2008). Here, Plaintiffs have alleged both.

### A.    Scienter Standards

Plaintiffs plead a "strong inference" of scienter by alleging misstatements that when "accepted as true and taken collectively, would [have] a reasonable person deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 127 S. Ct. at 2511. "In other words, a tie now goes to the plaintiff." *Sloman v. Presstek, Inc.*, No. 06 CV. 377, 2007 WL 2740047, at *7 (D.N.H. Sept. 18, 2007).

Contrary to Defendants' attempt to undermine Plaintiffs' scienter allegations piecemeal, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs* at 2503; *see also Darquea v. Jarden Corp.*, No. 06 CV 0722, 2007 WL 2584744, *2 (S.D.N.Y. 2007) (even where no one single allegation would compel inference of fraud, all allegations viewed "holistically" may adequately allege scienter). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences.'" *Tellabs* at 2510.

Finally, Plaintiffs may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008):

> [I]t is possible to draw a strong inference of corporate scienter without being able to name the individual who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently

knowledgeable about the company to know that the announcement was false.

*Id.* at 195-96 *(quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008))*.*  As set forth below, Plaintiffs more than meet their burden to allege scienter here.

**B.      Direct Evidence of Defendants' Scienter – Facts Known to Defendants that Contradict Their Public Statements**

Scienter is strongly inferred when defendants' public statements are contrary to specific facts known to them.  *See In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2007) (*citing Novak*, 216 F.2d at 311).  The Complaint pleads numerous examples of Defendants' knowledge or reckless disregard of facts that were contrary to their public statements. For example, Moody's consistently represented that a "triple-A rating assigned to a structured finance security was...identical to the triple-A ratings assigned to a corporate bond."  ¶ 22. This representation was crucial because most investors could not themselves assess the credit worthiness of complex RMBS.  ¶¶ 96-99.  The Complaint details evidence showing the representation to be false.  ¶¶ 337-397.  More recently, further confirmation of this fact was elicited in the September 2007 Congressional Testimony.  Hume Decl. Ex. I, part 2, at COGR-0052157.

The Complaint also alleges numerous facts that did or should have acted as "red flags" for Defendants, *i.e.* alerted them that their public statements were false or misleading.  *See, e.g., In re Converse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142 (E.D.N.Y. 2008) (finding scienter where it was alleged that red flags were so obvious that defendants "must have been aware" of the alleged fraud); *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

Defendants' knowledge that Moody's structured finance ratings were compiled without the independence, integrity or expertise described in its public statements is amply

demonstrated by the wealth of information to which Moody's had access.  ¶¶ 130-199.  Defendants

knew, or had access to these facts months before Moody's was supposedly, "caught unaware by the

subprime mortgage market meltdown."  Def. Br. at 37.  For example:

- Moody's had access to all relevant information on each RMBS it rated.  ¶¶ 129, 134-5.

- Moody's was aware of the superiority of the Combined Loan to Value ratio (the "CLTV") to the Loan to Value Ratio (the "LTV") in rating the ability of a particular asset to support a particular loan.  Further, Moody's possessed CLTV and LTV data for every mortgage originated from 2006-2007. ¶¶ 29-32, 134-35. Despite this knowledge, Moody's improperly relied on LTV and simultaneously failed to "explicitly consider the CLTV."  ¶¶ 154-155.

- Moody's had information indicating whether a loan was a hybrid or adjustable rate product, but neglected to acquire details of the rate reset, including the new/adjustable rate itself, a key factor in determining borrower ability to pay.  ¶¶ 191-195.

- Moody's had information revealing the reductions in documentation versus historical averages or the relatively new phenomenon of mortgages that lacked any documentation of borrower income and/or assets.  ¶¶ 134-35, ¶¶ 160-164.  Despite that Moody's stressed the importance of documentation from borrowers, evidence shows that most of the underlying loans were "no documentation" or "low documentation."  ¶¶ 160-61.

- Despite the facts that (I) income and assets are two primary factors in determining borrower ability to pay, ¶ 160, (ii) Moody's acknowledging that lack of documentation made any stated income or asset figure highly suspect, *id.*, and (iii) Moody's acknowledging that no documentation loans (particularly to wage earners) were a recent phenomenon, *id.*, Moody's "projected" the default rate on these loans by referring to data from a period when no such loans were in existence.  ¶¶ 163-165.

- Moody's evaluations of originator practices and standards ignored information concerning these very same practices and standards, and inadequately considered performance variations among different issuer loans.[14]  ¶¶ 111-118.

- Moody's evaluations of originator practices and standards ignored information revealing the performance of originators' loans.  ¶ 119.

    Defendants' reconstruction of *dicta* in *Dynex Capital*, 531 F.3d 190 at 194-95

---

[14]    This failure to properly consider originator standards is indicated by the fact that Moody's adopted "originator specific risk weightings" in July 2007.  ¶¶120-121.

misstates Plaintiffs' allegations (Def. Br. at 32): "[P]laintiffs' allegation that Moody's had access to all the information necessary to provide objective independent, and accurate subprime ratings does not adequately plead that Moody's had access to information suggesting that public statements were not accurate or that Moody's failed to check information they had a duty to monitor."  In contrast, here Plaintiffs have alleged extensively that Moody's not only had the information necessary to provide accurate ratings, but knew this and consciously ignored it in favor of greater market share and profit.  ¶ 407.[15]  Further, Plaintiffs detail 48 data fields known to Moody's which contained precisely the information that Moody's claimed to lack and on which Defendants falsely blamed Moody's problems.  ¶¶ 129-139, 146, 156.

Moody's, through its economist, Mark Zandi, was projecting house price declines throughout the Class Period, while Moody's models secretly assumed house prices would rise at a 6-8% annual rate indefinitely.  *See* ¶¶ 204.  But for the extraneous considerations and influences brought to bear by operation of the Issuer Pays business model in structured finance, Moody's would have considered this relevant in-plain-view information in making its credit rating evaluations, and would have issued credit ratings tethered to credit realities.  ¶ 206.  *See U.S. v. Benjamin,* 328 F.2d 854, 863 (2d Cir. 1964) (financial gatekeeper cannot escape liability "when they shut their eyes to what was plainly to be seen or have represented a knowledge they knew they did not possess."); *In*

---

[15]    Defendants invent a new "standard" by suggesting that only allegations of what they knew on a "daily, weekly, and monthly basis" will suffice, citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71, 76 (2d Cir. 2001).  However, this case does not impose such a standard.  They were merely the facts in *Scholastic,* which reversed the district's court's order of dismissal, not a bar which must be surpassed in order to plead a valid claim.  Indeed, the *Scholastic* holding supports Plaintiffs' position here.  There, defendants' public representations failing to mention rising inventory were inconsistent with their knowledge that inventory was rising – just as Defendants here made public representations that its ratings were independently generated while knowing full well that they were not.

*re Oxford Health Plans Inc. Sec. Litig.,* 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (same).

A good example of Moody's pleasing its structured finance issuer clients by maintaining inflated ratings while possessing information to the contrary was reported on May 21, 2008 by the *Financial Times* ("FT"). The FT reported that Moody's had reported incorrect Aaa ratings on billions of dollars worth of derivative instruments, due to a supposed glitch in Moody's computer models. Internal Moody's documents show that Moody's knew of the improper ratings early in 2007 but declined to downgrade ratings until January 2008. When Moody's recognized the error, rather than downgrading the erroneously-rated instruments, it instead amended the methodology employed in order to keep the Aaa ratings for the instruments. ¶ 363.[16]

## C.    Circumstantial Evidence of Defendants' Scienter

Besides direct evidence showing scienter, the standard can be met with circumstantial evidence. *See* Def. Br. 30, *citing Novak*, 216 F.3d at 307-08. Plaintiffs extensively allege (1) Defendants' motive and opportunity to conceal the true workings of its structured finance ratings processes, including the need to safeguard its reputation and relationships with issuers; (2) Moody's endemic and embraced conflicts of interest generated by rating the very debt it was also being paid handsomely to structure; and (3) the sheer magnitude of Defendants' fraud, which effectively misrepresented to the investing public Moody's entire structured finance ratings operation.

---

[16]    Recent facts have come to light that confirm this malfeasance. *See* The Declaration of Aaron Hovan dated November 17, 2008, Exhibit M, article dated July 2, 2008, stating that Moody's "did not alter its CPDO rating when it found the bug. Instead, the ratings on the CPDO remained unchanged, at AAA because shortly after the agency discovered the bug, it changed its overall ratings methodology in a manner that pushed the CPDO rating higher again- even with the bug." Moody's did not deny this sequence of events. Rather, in response to this report, Moody's "denied... 'that its personnel made changes to mask any model error'" while not disputing that the CPDO rating was erroneous when issued and unchanged. *Id.* Defendant McDaniel was more forthcoming, admitting Moody's subsequent ratings were improper because the "monitoring committee members considered issues not relevant to the rating process in reaching their conclusions....I am deeply disappointed by the conduct that occurred." *Id.*

### 1.   Defendants Had Motive and Opportunity To Commit Fraud

The Second Circuit's standards for pleading motive were outlined in *WorldCom*, 294 F. Supp. 2d at 412:   "'Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.   Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.'"[17]

### a.   Profit and Reputation

Plaintiffs allege two principal motives for Defendants' fraud.  *First* are the perverse, independence-corroding incentives created by the various characteristics of the market for rating structured finance securities.   Plaintiffs specifically allege that the following characteristics of the structured finance ratings market combined to create intense pressure to compromise ratings standards, and that Moody's succumbed to this pressure by compromising its rating standards:

- The business of rating structured finance securities was Moody's single largest source of earnings and revenue, and growth to earnings and revenue, and was also Moody's most profitable line of business during the Class Period.  (¶ 288-93).

- The combination of high degree of market concentration (¶¶ 296-97), the fact the structured finance rating market was inherently dependent on rating agencies as the "structuring" was entirely centered on the rating, (¶¶ 299-305),  the contingent nature of the rating fee (¶¶ 306-309), the related practice of ratings shopping (¶¶ 312-315, 331), the provision of models to issuers (¶¶ 320,322), and the active structuring of groups of mortgages in collaboration with issuers (¶¶ 320, 325-27).

*Second*, Plaintiffs allege that Moody's was motivated to create the false impression that Moody's most significant market (*i.e.* structured finance ratings) was legitimate and based on independence and rules based ratings (¶ 405) because Moody's ability to continue to generate structured finance rating revenue and profits depended on its ability to maintain its position as an

---

[17]   Defendants do not dispute that they had the opportunity to commit this alleged fraud.

objective "gatekeeper."   ¶¶ 32-37.   Defendant McDaniel described the pressure from issuers to

perform low-quality,  "degraded" credit analyses and thereby inflate ratings as follows:

> The real problem is not that the market underweight[s] ratings quality but rather that
> in [structured finance], it actually penalizes quality by awarding rating mandates
> based on the lowest credit enhancement needed for the highest rating.  *Unchecked,
> competition on this basis can place the entire financial system at risk.*  It turns out
> that ratings quality has surprisingly few friends: issuers want high ratings; investors
> don't want ratings downgrades; *short-sighted bankers labor short-sightedly to game
> the rating agencies.*

Hume Decl. Ex. F at COGR-0038026 (emphasis added).

When this testimony was read into the Congressional record on October 22, 2008,

Congresswoman Maloney noted that McDaniel's statement, made during the Class Period "appears

to contradict years of public statements by Mr. McDaniel and other Moody's officials that they are

not pressured by issuers."  Hume Decl. Ex. A, part two, at 44.  Former Moody's managing director

Jerome Fons agreed with her characterization, noting that Defendant McDaniel's statement "totally

reflected [Mr. Fons'] views and the views of many others at [Moody's]."  *Id.*

McDaniel also admitted that Moody's was motivated to compromise its structured

finance ratings processes as a result of these conflicts.  McDaniel went on to characterize Moody's

other (*i.e.* lesser) efforts to address the conflict as ultimately unsuccessful, noting that Moody's

proposed solutions do "not solve the problem...the RMBS and CDO and SIV ratings are simply the

latest instance of trying to hit a perfect rating pitch in a noisy market of *competing interests*."  *See

id.* at 0038027.  Thus, McDaniel conceded that the motivation to "serve his issuer clients" impacted

Moody's ratings methodologies by degrading them.

Defendants' attempt to characterize Moody's motivations as generic fails because

their own statements make clear that Moody's was motivated to compromise its ratings in response

28

to financial incentives created by the structured finance market that were unique and substantial.  The benefit to Moody's of compromising its ratings of structured finance securities were tangible and recognized by Moody's on multiple occasions, including when Moody's tightened its ratings methodology in the market for CMBS and saw its market share plummet from 75% to 25% in less than one year.  ¶¶ 332-36.

Defendants' authorities are inapposite.  They cite *Kalnit v. Eichler*, 264 F.3d.131 (2d Cir. 2001), and *Chill v. GE*, 101 F.3d 263, 268 (2d Cir. 1996), for the unremarkable proposition that "plaintiffs must assert a concrete and personal benefit to the individual Defendants resulting from the fraud" to plead motive.  *Kalnit* at 139.  Here, Plaintiffs have done just that.  They have pled Moody's strong motive to foster a public image that it was generating revenues and growth legitimately – that is, by independent and rule-based ratings.  ¶ 405.  *In re Take-Two Interactive Trade*, 551 F. Supp 2d 247, 270 (S.D.N.Y. 2008) is also unhelpful to Moody's.  *Take-Two* simply held that putting off disclosure of bad news by itself is not actionable because eventually the bad news will come out and defendant has merely "postponed an inevitable day of reckoning." *Id.*  Here, Plaintiffs allege that Moody's was not putting off bad news but rather concealing a business practice that garnered market share and vastly increased revenues.  *See* ¶ 406.

Finally, Defendants' misrepresentations "are not merely generalized statements about...profit motives."  *See Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp 2d 274, 296 (S.D.N.Y. 2004).  Rather, Plaintiffs have alleged a *quid pro quo* – that in exchange for issuing ratings of degraded quality, issuers would continue to give Moody's their lucrative structured finance rating business.  ¶ 411.  At the same time, Defendants told the public that (I) independence is key to objectively evaluating a securities credit risk, and (ii) credit ratings are worthless unless the rating

agency is trusted to provide credit ratings that accurately reflect credit realities.  ¶¶  32-35.  *See Fogarazzo* at 296 ("[T]he Banks gave RSL favorable research coverage in exchange for investment banking business...plaintiffs have alleged wide-spread conflicts of interest").[18]

**b.    Moody's Pervasive Conflicts of Interest**

**(1)    Allegations of Defendants' Actual and Operative, not just Theoretical, Conflicts**

Defendants' general disclosure of potential conflicts of interest are insufficient to put Plaintiffs on notice of Moody's multiple Class Period misrepresentations concealing actual and active conflicts.  Knowing that a conflict may potentially exist does not equal knowing that Moody's actually succumbed to the conflict by compromising the integrity of its ratings.  This is particularly true where, as here, Moody's publicly insisted *ad nauseam* that it managed the conflicts, while internally admitting the opposite.  *See Lentell v. Merrill Lynch & Co., Inc.* 396 F.3d 161, 170 (2d Cir 2005) (Distinguishing between conflicts of interest that may present incentives to engage in fraudulent activities, and the fraudulent actions Defendants engaged in after being "actually corrupted" by the conflict of interest); *see also Lapin*, 506 F. Supp. 2d at 234-36 (explanations of conflicts of interest are distinguishable from descriptions of challenged business practices adopted

---

[18]    Defendants cite to *Veeco Instruments*, 235 F.R.D. at 230 for the proposition that "the alleged motive to protect a corporations' reputation was neither personal nor specific, but could be imputed to any publicly owned corporation" and is insufficient to plead motive.  However, Judge McMahon in *Veeco* denied the motion to dismiss partly because plaintiffs there did meet the PSLRA's scienter requirements, noting that "great specificity" in scienter pleading is not required.  *Id.* at 231.  In any event, Plaintiffs allege more than the general motivation of every corporation to protect its reputation.  Defendants cite *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) and *Rombach v. Chang*, 355 F.3d 164 (2d. Cir. 2004) as if Plaintiffs' allegations consisted only of generic corporate motives, *i.e.* that Moody's fraud was motivated merely to "generate trade" or appear profitable without allegations of further wrongdoing.  However, Plaintiffs allege at least two specific motives:  (I) the corroding conflicts of interest presented by the Issuer Pays model in the market for ratings of structured finance securities; and (ii) that Moody's was motivated to create the false impression that the structured finance rating market was based on independent ratings (¶ 405) because of the centrality of its reputation to its continued success.  ¶¶ 32-37.

to manage conflicts.).

   Plaintiffs allege that Moody's bid to submit the highest rating to structured finance debt without regard necessarily to the underlying data in order to secure investment banking business. ¶¶ 332-336.[19]  Mark Adelson, a former managing director in Moody's structured finance division, stated in his September 27, 2007 testimony before the House Subcommittee that ratings shopping had been "rampant" in structured finance (¶ 331(a)):

> There is, however, another type of potential conflict of interest that can affect rating agencies. It is the potential conflict of interest that arises when rating agencies compete to win business from many issuers in a sector by generally loosening their rating standards for the entire sector. This practice has been termed competitive laxity. The credit rating industry is potentially vulnerable to the threat of competitive laxity in areas where issuers can engage in rating shopping.  Rating shopping refers to the practice among issuers of presenting their transactions to multiple rating agencies and then selecting only some of them (usually one or two) based on which ones will permit the highest leverage and still grant the desired ratings.

   Defendant Clarkson confirmed the practice in March/April 2008 interviews with the WSJ (that led to its exposé of Moody's and to his resignation shortly after publication of that exposé. ¶ 344; *see also* ¶ 331©.  The complaint is replete with similar admissions from other Moody's executives.  *See* ¶ 331(d), ¶¶ 347-349.

   According to the May 23, 2008 WSJ, Moody's removed structured finance ratings personnel from ratings assignments when issuers deemed such individuals to be "too fussy" or to raise too many questions concerning the security at issue.  ¶ 350.  The WSJ reported that analysts who raised doubts about a deal could hurt revenues for the rating firm and investment.  In an April 11, 2008 article, the WSJ reported that such removals were widespread, specifically under Defendant

---

[19]   Thus, Defendants' cite to *Albert Fadem Trust v. Citigroup Inc.,* 165 Fed. Appx. 928, 930 (2d Cir. 2006) is unpersuasive because unlike there, Plaintiffs here allege much more than just the desire to maintain "long-term profitability through the cultivation of major clients."

Clarkson and specifically in Moody's mortgage-backed securities rating operations. ¶ 344.  Moody's

embraced its conflict and touted its ability to come up with whatever ratings issuers wanted.   ¶ 320.

### (2)      Post Complaint Evidence of Defendants' Conflicts

Since Plaintiffs filed the Consolidated Amended Complaint, new facts have come to

light through recent Congressional hearings that confirm Moody's knew during the Class Period its

ratings practices were unsound, but issued them nonetheless in pursuit of investment banking profits:

- On October 21, 2007, Defendant McDaniel authored a presentation titled "Credit Policy issues at Moody's suggested by the subprime/liquidity crisis." In this presentation, Mr. McDaniel describes what he calls a "dilemma" and a "very tough problem" facing Moody's. Hume Decl. Ex. F at COGR-0038026.

- Also therein, McDaniel stated that during the Class Period, Moody's was aware that the unique characteristics of the issuer pays business model in the market for ratings of structured finance securities (a highly concentrated market in which Moody's was one of the biggest participants) "penalizes quality" by awarding ratings to the issuer based on the lowest credit enhancement needed for the best ratings.   McDaniel concluded that this market structure allowed "short-sighted bankers" to "game the rating agencies."[20]  *Id*.

- McDaniel noted that management, while aware of the structured finance conflicts, delegated them to subordinates without resolving them: "for the most part, we hand the dilemma off to the team M.D.s to solve."  *Id;*[21] *see also* Hume Decl Ex. F at COGR-0038026-7.

- McDaniel conceded that Moody's proposed conflict solutions did "not solve the problem...the RMBS and CDO and SIV ratings are simply the latest instance of trying to hit perfect rating pitch in a noisy market place of *competing interests*." Hume Decl. Ex. F at COGR-0038027.

- McDaniel then elaborated on how conflicts occur, stating that "Analysts and Managing Directors are continually 'pitched' by bankers, issuers, investors." McDaniel noted that this pressure "degrades" credit judgement, causing Moody's to "drink the kool-aid" and presumably issue ratings that reflect this "degraded" credit judgement.  *Id.*

---

[20]      *See* Hume Decl Ex. F at COGR-0038026.

[21]      *See also id.* at 0038026-7, stating that "Moody's for years has struggled with this dilemma. On the one hand, we need to win the business [to stay] relevant.  On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes)."

- McDaniel noted that issuer pressure, combined with Moody's "emphasis on market share and margin focus" constitutes a "risk" to ratings quality. McDaniel's statements make clear that the "risk" of compromised and or degraded ratings quality was realized quite often given that the conflict presented by the issuers pressure was "not solve[d]." *Id.*

- Admission by Moody's managing directors that "[Moody's] refused to change their ratings in the face of overwhelming evidence that they were wrong." Hume Decl. Ex. I, Part 2 at COGR-0052157.

- Admission by Moody's Managing Directors that Moody's structured finance ratings did not incorporate such basic elements as "how long has the asset class existed, how liquid is it, and how much experience do we have with regard to its behavior under market stress." *Id*.

- Admission by Moody's Managing Directors that Moody's structured finance ratings group suffered from a "lack of oversight." *Id.* at COGR-0052158.

- Admission by Moody's Managing Directors that Moody's "had blinders on [when rating structured finance securities] and never questioned the information [they] were given." The Managing Director went on to state that Moody's had the ability to consider, but chose to not consider the following – *why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan*." *Id*. at COGR-0052159.  (Emphasis added.)

## 2.    The Magnitude of the Fraud Strongly Suggests Scienter

Further *indicia* of scienter is supported by the sheer breadth of the misconduct occurring in Moody's core operations and key products. *Rothman*, 220 F.3d at 92; *Katz v. Image Innovations Hldgs., Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 215-217 (S.D.N.Y. 1999).[22]  Moody's structured finance credit ratings were the largest source of Moody's earnings and revenues, and growth in earnings and revenues during the Class Period.  ¶¶ 288-294.  The magnitude of the downgrades, and the related public condemnation

---

[22]    Defendants cite *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007)*, In re WorldCom Inc., Sec. Litig.*, No. 02 Civ. 3288, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003) and *In re Serologicals Sec. Litig.*, No. Civ: 1:00-cv-1025, 2003 WL 24033694 (N.D. Ga. Feb. 20, 2003) for the proposition that "the sheer magnitude of the improperly estimated value provides no indication of how and when the Defendants became aware of its true value." Def. Br. at 33.  However, in these cases the magnitude of the fraud was the only indicator of scienter.  Here, it is just one of several.

and outrage at the fact that the downgrades are not even larger alleged at ¶¶ 248-280 offers additional support for Plaintiffs' scienter allegations.

## III.  THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Loss causation need not be pled with particularity.  *See Tower Automotive*, 483 F. Supp. 2d at 348 ("The *Dura* Court assumed arguendo that the notice pleading standards of Rule 8 govern the pleading of loss causation, and nearly all courts addressing the issue since have also applied Rule 8, rather than the heightened pleading standards of Rule 9.").  The Complaint's loss causation allegations plainly satisfy Fed. R. Civ. P. 8(a),  according to which a defendant need receive only fair notice of the Plaintiff's claim through "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005); *In re Bristol Myers Squibb Sec. Litig.*, No. 07 Civ. 5867 (PAC), 2008 WL 3884384, *12 (S.D.N.Y. Aug. 20, 2008).  Defendants are on fair notice of the claim that the risks that caused class members' losses here were "within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."  *Bristol Myers*, No.07civ5867, 2008 WL 3884384 (S.D.N.Y. Aug. 20, 2008) at *12-13 (denying motion to dismiss claims under Exchange Act §§10(b) and 20(a)); *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Put differently, the Complaint gives notice of "a causal connection between the concealed information...and the ultimate failure of the venture." *Emergent Capital Inc. Mgmt, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003).   Rule 8 requires nothing more.

34

A.   **The Complaint Establishes Loss Causation – Moody's Shares Declined in Price Following the Revelation of its Concealed Reputational and Economic Risks**

Moody's stock fell from its February 2007 Class Period high of $73.71 to $43.33 on October 24, 2007, the end of the Class Period.  ¶ 56 . This drop represents more than $6 billion in lost market capitalization.  The Complaint clearly alleges that, as Moody's concealed reputational and economic risks materialized, the Company's stock price declined.  ¶¶ 353-401; *In re Imax Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2008 WL 4307981 at * 11 (S.D.N.Y. Sept. 16, 2008) ("The essence of loss causation is the notion that the alleged misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

The Courts in this Circuit repeatedly explain that loss causation is an individualized, fact-based inquiry, and should not ordinarily be decided before trial.  *E.g., Emergent Capital*, 343 F.3d at 197 (loss causation is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").  Between June 7 and October 24, 2007, a series of disclosures revealed the concealed risks at Moody's (discussed *supra*).  ¶¶ 248-80, 361-400. These disclosures originated from a number of sources, including, but not limited to, Moody's itself.  Elevating form over substance, Defendants attack the loss causation allegations summarily without ever addressing their content.  Def. Br. at 9-11, 15-19.  However, the Complaint alleges both reputational and economic risk which materialized as the market learned the truth about Moody's.  ¶¶ 359-401.

1.   **Materialization of Reputational Risk**

Moody's shares were inflated based on its false reputational claims that it was (I) issuing thousands of independent and accurate ratings; (ii) adhering to a strict code of conduct; and (iii) managing the conflicts of interest inherent in its issuer-pays business model. ¶¶ 54-129.  Listed

35

below are only some of the announcements and news articles that uncovered the concealed risks to

Moody's reputation, and caused the stock price to decline:

- June 7, 2007 – Moody's announced that downgrade actions associated with 2006 closed-end second lien (CES) securitizations were almost five times higher than rating actions on the 2005 vintage.  ¶ 149;

- June 15, 2007 – Moody's downgraded 131 CES tranches from 2006, keeping 111 of those tranches on review for further downgrade and putting an additional 136 CES tranches from 2006 on review for possible downgrade.  ¶ 150;

- July 12, 2007 – Moody's issued a wave of downgrades for subprime first-lien securities issued and rated during 2006.  Moody's revealed that there had been "significant performance variance among originators." ¶ 117-18;

- July 24, 2007 – Moody's issued a report titled US Subprime Mortgage Market Update: July 2007, further emphasizing loan performance variance among originators for 2006 vintage loans.  ¶ 120;

- August 16, 2007 – Moody's announced wide and severe downgrades for 2006 CES securities, affecting 705 tranches, with a total face value of $19.7 billion.  As of this date, only 30% of the securities Moody's had rated Aaa in 2006 retained those ratings, only 26% of Aa-rated securities, only 6% of the A-rated and Baa-rated securities, and only 2% of Ba-rated securities.  ¶ 150;

- August 20, 2007 – Senator Richard C. Shelby ®. Ala.), ranking Republican of the U.S. Senate Banking Committee, remarked that credit rating agencies must "shoulder some responsibility" for the subprime mortgage crisis.  ¶ 400(e);

- October 11, 2007 – Moody's issued a far larger wave of downgrades of 2006 subprime RMBS and increased previous loss projections by between 5% and 170%.  ¶ 197.

As the market absorbed these and other events, it realized not only that Moody's

credit ratings were wrong all along, but also that Moody's reputation for integrity was in peril.  ¶¶

353, 402-03.  *See also* ¶ 361 (McDaniel's statements regarding the negative effect of downgrades);

¶ 362 (April 22, 2008 Congressional testimony of senior managing director Claire Robinson).

Without addressing any of these disclosures in detail, Defendants *wrongly contend*

*that none of them can serve as a corrective disclosure.*  Def. Br. at 16-17 (*citing Lentell*, 396 F.3d at 175 n.4).   Defendants argue instead that "ratings downgrades do not constitute corrective disclosures because they simply reveal that the rating is no longer accurate - not that the rating was fraudulent when issued."  Def. Br. at 16.   This argument misconstrues the law, for *Lentell* did not announce a blanket rule that allegations regarding ratings downgrades, as a matter of law, cannot support the loss causation element of 10b-5.   To the contrary, *Lentell* hinged on a factual omission in the complaint, stating at 175 n.4:  "There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations and no allegation that Merrill misstated or omitted risks that did lead to the loss...."

A fundamental distinction between this action and *Lentell*, however, is that in *Lentell*, suit was brought by purchasers of stocks that Merrill had recommended, not purchasers of stock in Merrill itself.   While Merrill's stock price declined when it was revealed that Merrill's ratings were tainted, the securities that Plaintiffs purchased – securities that had been rated by Merrill – did not react, because their prices had declined long before that.   *Id.* at 175.   By way of contrast, the Complaint pleads that Moody's stock price declined as continuing disclosures made it clear that Moody's prior ratings were compromised, and that its reputation as an independent rating agency likewise was impaired.   ¶¶ 359-392.  *See also Lapin,* 506 F. Supp. 2d at 243 (suit by analyst's shareholders, where loss causation adequately pled, when it was revealed that "research reports were not objective and independent as touted...").[23]

---

[23]        Defendants' other authorities also involve ratings downgrade by the issuer-defendant on securities that were not the issuers'.  Def. Br. at 17 (*citing In re IPO Sec. Litig.,* 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005); *Hunt v. Enzo Biochem, Inc.,* 471 F. Supp. 2d 390, 410 (S.D.N.Y. 2006).

### 2.        Materialization of Economic Risk

Throughout and beyond the Class Period, Moody's earnings reports gradually revealed the truth of Moody's fraud to the market.  Specifically, the cited reports chronicle the materialization of the risk that Moody's would lose revenues as issuers and investors recognized that the Company's structured finance credit rating models were flawed.

- August 1, 2007 – Moody's announced second quarter 2007 operating results, including a decline from rating RMBS and a projected decline in U.S. based structured finance revenues. ¶ 376;

- October 24, 2007 – Moody's announced operating results, including a decline in structured finance revenues, a 52% drop in RMBS rating revenues, lowered guidance for 2007, and unspecified corporate restructuring and a "soft freeze" on hiring.  ¶¶ 377-78; and

- October 31, 2007 – Moody's explained that its "soft freeze" and "restructuring" actually meant eliminating positions.  ¶ 379.

Thus, when the market became aware that revenues were dropping due to the inflated structured finance ratings and accompanying loss of structured finance revenues, the materialized risk of economic harm to the Company was disclosed, and the stock price dropped.[24]

---

[24]        Defendants argue that "[i]f Plaintiffs plead a share prices fall due solely to missed earnings projections, generally, courts will not find loss causation adequately pled."  Def. Br. at 17 (*citing In re AOL Time Warner,* 503 F. Supp. 2d at 678-79;  *IPO Sec. Litig.,* 399 F. Supp. 2d at 266- 67; *Garber v. Legg Mason, Inc.,* 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008); *In re Rhodia S.A. Sec. Litig.,* 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007)).   However, where, as here, Plaintiffs plead that the loss of revenues and accompanying share price drop is linked to the alleged fraud, courts find that loss causation has been adequately pled.  *E.g., Lapin,* 506 F. Supp. 2d at 243; *In re Daou Systems, Inc. Sec. Litig.,* 411 F. 3d 1006, 1027 (9th Cir. 2005) (loss causation pled where financial analyst suggests that miss in earnings could be due to accounting manipulations); *In re Check Point Software Techs. Sec. Litig.,* 2006 U.S. Dist. LEXIS 243, at *17-19 (S.D.N.Y. Apr. 26, 2006) (loss causation pled where undisclosed business issues linked to plaintiff's allegations causing missed earnings and stock price drop); *In re Asher v. Baxter Int'l, Inc.,* 2006 U.S. Dist. LEXIS 4826, at *21 (N.D. Ill. Feb. 7, 2006) (same); *Richardson v. TVIA, Inc.,* 2007 U.S. Dist. LEXIS 28406, at *20 (N.D. Cal. Apr. 16, 2007) (same).

**B.     Moody's Stock Dropped As Artificial Inflation Was Removed From Its Price**

Again, Defendants incorrectly assert that Moody's stock price was required to drop in response to a specific one-time certain disclosure. Def. Br. at 17-19. However, this Court recently held that loss causation need not be pleaded as a discrete or single announcement, but may "be pleaded on the theory that the truth slowly emerged through a series of partial disclosures." *In re Take-Two Interactive*, 551 F. Supp. 2d at 288; *see also Bristol Myers*, 2008 WL 3884384 at *14 ("It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.") (*citing In re Vivendi Universal S.A.*, No. 02 Civ. 5571 (RJH), 2004 WL 876050, at *7 (S.D.N.Y. Apr. 22, 2004)); *In re Winstar Commc'ns*, No. 01cv3014, 2006 WL 473885, *14 (S.D.N.Y. Feb. 27, 2006); *Hall* v. *The Children's Place Retail Stores, Inc.,* No. 07civ8252, 2008 WL 2791526, *11 (S.D.N.Y. July 18, 2008).

Here, the market absorbed differing news about Moody's, causing its stock to drop. *E.g.*, ¶ 400(I) (Moody's shares drop $4.05 or 8.5% in the two days following its October 24, 2007 earnings announcement). Where the market learned directly of ratings malfeasance at Moody's, the share price also fell precipitously. *See id.* at ¶ 400(e) (Moody's shares drop $3.90 or 7.8% following August 20, 2007 negative remarks on Moody's by Senator Richard Shelby).[25]

At this stage, no more is required to plead corrective disclosures under Rule 8.

___
[25]     The market learned of Moody's fraud through its periodic but massive ratings downgrades and linked this news to a decline in structured finance revenue. ¶¶ 399-401. Instantaneous stock price reaction is not required. *Montoya v. Mamma.com Inc.,* No. 05civ2313*,* 2006 WL 770573, at *7 (S.D.N.Y. March 28, 2006); *Schleicher v. Wendt,* 529 F.Supp.2d 959, 966 (S.D. Ind. 2007)*; Cross v. 21st Century Holding Co.*, No. 00cv4333, 2002 WL 31158901 at *6-7 (S.D.N.Y. Sept. 27, 2002) (loss causation where small stock price fall in week following disclosure, 22% decline during following months); *In re Hartmarx Sec. Litig.*, No. 01c7832, 2002 WL 31103491 at *3 (N.D. Ill. Sept. 19, 2002) (loss causation where "continuous price decline" over month-long period following corrective disclosure).

**C.     Defendants' Claims of an Intervening Event Do Not Warrant Dismissal**

Defendants' attempt to blame Moody's stock price decline on the collapse of the subprime mortgage market, attaching comparative stock charts and appending various news articles to their motion to dismiss is without merit.  Def. Br. at 11-14, 19-21.  Defendants mistake an effect for a cause in making this argument.  *See Stumpf v. Garvey,* No. 03cv1352, 2005 WL 2127674, *12 (D.N.H. Sept. 2, 2005) ("Here, the collapse of the market for telecommunications stock was arguably not an intervening event, but rather the proximate result of defendants' misrepresentation of the demand [for the company's product]").  As the Complaint explains in depth, the structured finance market was itself an expression of Moody's credit rating models.  ¶¶  373-74.  The collapse of that market is directly attributable to the realization that Moody's ratings models were flawed and illegitimate.  *Id.* at ¶¶ 374, 403.[26]  In any event, Defendants' proffer of possible intervening causes of the price decline cannot support dismissal as a matter of law at this stage of the action.  *See Silverman*, 2008 WL 4360648, at *15 ("There is no requirement at the pleading stage that a plaintiff 'affirmatively rule out those other factors in its complaint; rather that burden arises at trial.'") (citation omitted); *In re IMAX,* 2008 WL 4307981, at *11 (same, and: "[d]efendants will be entitled to interpose their defense of intervening facts...at trial."); *In re Marvell Tech.,* No.06-06286, 2008 WL 4544439,  *10 (N.D. Cal. Sept. 29, 2008) (more than one negative announcement in press

---

[26]     Nor do Defendants' authorities support their argument.  In *Bastian v. Peten Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990), although the Seventh Circuit referred to "national economic calamities," *id.* at 685, it dismissed plaintiffs' claims based on their failure to plead the loss causation element, holding: "[Plaintiffs] have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one."  Similarly, in *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 770-71 (2d Cir. 1994), the Second Circuit rejected plaintiff's loss causation allegations not because of the real estate market downturn, which the court noted among several factors in pricing that plaintiff would have to account for to establish its damages (*id.* at 770),  but because plaintiff's "methodology" at the pleading stage was "so defective, and the conclusions reached so def[ied] logic, that no 'reasonable inferences' [could] be drawn therefrom."  *Id.* at 772.

release does not result in plaintiffs failing to allege loss causation provided at least one disclosure relates to alleged fraud).

Here, Plaintiffs adequately pled that the revelation of the Company's fraudulent ratings revealed Moody's loss of reputational capital and financial prospects, which was a direct and foreseeable result of Defendants' fraud.

## IV.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

An action under Section 10(b) must commence within two years after the discovery of the facts constituting the violation.  *See* 28 U.S.C. § 1658(b).  This two year period begins to run "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."  *Nathan v. Siegel*, No. 07 Civ. 10956 (LBS), 2008 WL 4684171, at *3 (S.D.N.Y. Oct. 20, 2008).  To trigger inquiry notice, "[t]he fraud must be probable, not merely possible."  *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003).

The burden on defendants to prove that plaintiff was on inquiry notice is "extraordinary" and "appropriate only in extreme circumstances."  *Seippel v. Sidley, Austin, Brown & Wood, LLP*, 399 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (*citing In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000)).  Defendants have not and cannot meet their burden to demonstrate any facts that put Plaintiffs on notice of the fraud.

Moreover, where management provides investors with "reliable words of comfort" or "reassuring statements," the duty to investigate is dissipated.  *Lapin*, 506 F. Supp. 2d at 234-36 (defendants' statements "reiterat[ing] independence and objectivity of [defendant's] research" in the face of articles detailing industry-wide "conflicts of interest" were sufficient to "persuade a

reasonable investor into thinking that [defendant] was different from its peer[s]").  *Id*. at 236.[27]

A.     **Defendants Point to No "Storm Warnings" of Moody's Fraud**

Defendants contend that Plaintiffs' claims are time-barred because certain so-called "storm warnings" placed them on inquiry notice of Defendants' fraud.  Def. Br. at 38-45 (citing Cafasso Exs. Q - Z).  Defendants erroneously contend that Plaintiffs were on notice of the facts underlying their claims from as early as June 4, 2003, when the SEC requested comments on credit rating agencies' conflicts of interest.  The general nature of the SEC's review and responses to potential conflicts of interest cannot trigger inquiry notice of the specific fraud that spiraled out of Moody's failure to manage its conflicts of interest.  Def. Br. at. 39.

Defendants wrongly claim that the 2001-2005 news articles put Plaintiffs sufficiently on notice of the fraud alleged to trigger a duty to investigate the claims alleged in the Complaint. As an initial matter, the articles relate almost exclusively, to the agencies' corporate debt ratings, not to Moody's structured finance ratings which are the subject of this action.  The Complaint makes clear that the stunning proliferation of subprime-based securities put new and unique strains on Moody's independence and ability to manage the conflicts of interest of the issuer-pays model, and not that Moody's fraud carried over to its traditional credit ratings.  *See* ¶¶ 298-310.

Moreover, to the extent that any article alerted investors generally to conflicts of interest at the ratings agencies, none singled out Moody's to the point that it triggered a specific duty to investigate Moody's improprieties.  The Second Circuit has held that storm warnings must alert Plaintiffs to the specific fraud alleged.  *See Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 169

---

[27]     Investors are entitled to rely on reassuring statements especially where those statements relate to "technical" matters.  *See Seippel*, 399 F. Supp. 2d at 291-92 (limitations did not run where plaintiffs relied on defendants' expert advice regarding "technical issues" of tax law).

(2d Cir. 2005) ("Storm warnings in the form of company-specific information probative of fraud will trigger a duty to investigate."). The articles attached demonstrate that Defendants misapprehend the Complaint's allegations. The Complaint does not merely allege that Moody's fraud lay in its conflicts of interest, a fact that no one disputes, but rather that Moody's fraudulently concealed its failure to manage these disabling conflicts of interest. *See* § II, *supra*.[28] In short, Defendants have pointed to no pre-Class Period information that would trigger a duty to investigate Moody's structured finance-based fraud.

### B.   Defendants' Campaign of Reassurance Dissipated Any Duty to Investigate

Assuming *arguendo* that the articles and public filings Defendants rely upon could be construed as "storm warnings," (which they cannot), Moody's quelled this storm by mounting a systematic campaign to reassure investors that it was independent and fully able to manage its conflicts of interest. For example, in the November 22, 2004 Washington Post article, which Defendants contend shows borrowers' "pressure to manipulate" credit ratings, Def. Br. at 42-43, Moody's gave explicit, self-serving assurances that it was managing its conflicts of interest:

- For their part, the credit raters say they ably manage potential conflicts. They say they adhere to strict codes of conduct, such as prohibiting any link between the pay and bonuses of their ratings analysts and the fees that come in from the companies those analysts rate…

- And the credit raters say their success over time shows the ratings process works, and that their ratings bring stability to the markets, giving companies and counties access to capital. "**Our ratings are essentially a public good**," said Frances G. Laserson, a Moody's spokeswoman.

---

[28]   *See Lentell*, 396 F.3d at 170 (distinguishing between conflicts of interest that may present incentives to engage in fraudulent activities, and the fraudulent actions Defendants engaged in after being "actually corrupted" by the conflict of interest); *see also Lapin,* 506 F. Supp. 2d at 234-36 (explanations of conflicts are distinguishable from descriptions of challenged business practices adopted to manage conflicts).

- Laserson also said that The Post was raising questions about a small number of cases among thousands of Moody's ratings.

- The ratings companies say they do their job without regard to the impact, basing their ratings largely on statistical calculations of a borrower's likelihood of default….

- **[Raymond] McDaniel of Moody's said his company works diligently to provide well-researched ratings.   "We treat the ratings committee process very seriously," he said, but added, "We don't want to waste people's time."**

- The ratings companies said they already have strong internal controls designed to minimize mistakes or conflicts, including code of conduct at S&P and Moody's.

- **Moody's, for instance, instructs employees to do nothing that "might, or might appear to, compromise the integrity" of the rating process.   The credit raters say they also conduct ethics training in-house.**

"Borrowers Find System Open to Conflicts, Manipulation," Nov. 22, 2004, Washington Post, Cafasso Decl. Ex. W.  (Emphasis added.)

As explained *supra*, throughout the Class Period, Moody's made countless similar reassuring statements, all designed to convince investors that the Company was independent and was properly managing its conflicts.  Especially considering the highly-technical nature of the structured finance ratings that are the subject of this litigation, investors reasonably relied on Moody's reassuring statements that its ratings were legitimate and not compromised by the Company's potential conflicts.  *See Seippel,* 399 F. Supp. 2d at 291 (reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty) (citation omitted); *Fogarazzo,* 341 F. Supp. 2d at 300 ("[a]t most, those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal 'probability of fraud.'"); *Lapin,* 506 F. Supp. 2d at 235 (same); *cf.  Fisher v. Reich,* No. 92 civ. 4158 (MBM), 1995 WL 23966, at *5-6 (S.D.N.Y. Jan. 10, 1995) ("disclosure cannot trigger inquiry notice unless it relates directly to the fraudulent

44

misrepresentations or omissions at issue...Plaintiffs may be sophisticated, but they are not psychic").

Defendants have not met their "extraordinary" burden of showing that Plaintiffs were on notice of Moody's fraud prior to the close of the Class Period.  Investors were not on notice of any problems arising from structured finance-related ratings at Moody's until, at the very earliest, April 2007, when Moody's issued its first massive downgrade of structure finance instruments. Thus, their statute of limitations argument must fail.

## CONCLUSION

For the reasons stated herein, the accompanying Hume Declaration, and the Complaint, Defendants' motion to dismiss should be denied.[29]

Dated:  New York, NY
       November 17, 2008

**KIRBY McINERNEY, LLP**

By: _____ /s/ _____
      Daniel Hume
Ira M. Press
David Bishop
Aaron Hovan
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax: (310) 201-9160

---

[29]    Should the Court find any deficiencies in the Complaint, then plaintiffs respectfully request the opportunity to amend.  *See, e.g., Take-Two Interactive*, 551 F. Supp. 2d at 313.

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
Lauren Wagner Pederson
SCHIFFRIN BARROWAY TOPAZ
  & KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056

*Co-lead counsel for Lead Plaintiffs*

Christopher Keller
Jonathan Gardner
Serena Richardson
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax: (212) 818-0477

46