**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

In re MOODY'S CORPORATION
SECURITIES LITIGATION

: CASE NO. 1:07-CV-8375-SWK

------------------------------------------------------- x

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

Sharon L. Nelles  (SN-3144)
Stephen Ehrenberg  (SE-3123)
Darrell S. Cafasso  (DC-7123)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  212-558-4000
Facsimile:  212-558-3588
Email:  nelless@sullcrom.com

*Counsel for Defendants*

December 19, 2008

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................2

I.  PLAINTIFFS FAIL TO CONNECT THE ALLEGED FRAUD TO THE
    DECLINE IN MOODY'S STOCK PRICE. ..........................................................2

    A.  Plaintiffs Mischaracterize the Loss Causation Pleading Burden. ...........2

    B.  Ratings Downgrades Are Not Corrective Disclosures and None of the
        Purported Corrective Disclosures Revealed Any Fraud to the Market....4

    C.  Plaintiffs Simply Ignore the Subprime Mortgage Crisis............................6

II. PLAINTIFFS FAIL TO IDENTIFY A SINGLE ACTIONABLE
    MISREPRESENTATION IN THEIR COMPLAINT. ......................................8

    A.  Plaintiffs Ignore Controlling Case Law Holding That Statements
        Concerning Independence and Integrity Are Not Actionable.................8

    B.  Plaintiffs Cannot Explain Why Other Purported "Misstatements" Were
        Misleading................................................................................................9

III. PLAINTIFFS' SCIENTER ALLEGATIONS DO NOT SATISFY THE *TELLABS*
     TEST. .............................................................................................................11

    A.  Plaintiffs Cannot Show That Their Motive Allegations Are Concrete and
        Particularized. .......................................................................................12

    B.  Plaintiffs Fail To Distinguish *Dynex* and Improperly Rely on Ratings
        Downgrades and Methodology Changes To Establish Scienter............12

    C.  Plaintiffs' "Post Complaint Evidence" Fails To Raise an Inference of
        Scienter. .................................................................................................14

IV. PLAINTIFFS MISSTATE THE ELEMENTS OF THEIR SECTION 20(a)
    CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS. ...........................16

V.  PLAINTIFFS CANNOT AVOID THAT THIS ACTION IS TIME-BARRED. ..............17

CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*60223 Trust* v. *Goldman Sachs & Co., Inc.*,
    540 F. Supp. 2d 449 (S.D.N.Y. 2007)........................................................................4

*ATSI Commc'ns* v. *Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)........................................................................ 17

*Bastian* v. *Petren Resources Corp.*,
    892 F.2d 680 (7th Cir. 1990) ........................................................................7

*Bell Atl. Corp.* v. *Twombly*,
    127 S. Ct. 1955 (2007)........................................................................7

*Boguslavsky* v. *Kaplan*,
    159 F.3d 715 (2d Cir. 1998)........................................................................17

*Ciresi* v. *Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991)........................................................................14

*Compuware Corp.* v. *Moody's Investors Servs., Inc.*,
    499 F.3d 520 (6th Cir. 2007) ........................................................................5

*Drexel Burnham Lambert Inc.* v. *Saxony Heights Realty Assocs.*,
    777 F. Supp. 228 (S.D.N.Y. 1991)........................................................................20

*Druskin* v. *Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ........................................................................16

*First Nationwide Bank* v. *Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)........................................................................7

*Garber* v. *Legg Mason*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)........................................................................4

*Hunt* v. *Enzo Biochem, Inc.*,
    471 F. Supp. 2d 390 (S.D.N.Y. 2006)........................................................................4

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008)........................10, 14

*In re AOL Time Warner Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)........................................................................6

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................................3

*In re Cybershop.com Sec. Litig.*,
    189 F. Supp. 2d 214 (D.N.J. 2002) ....................................................................................20

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)................................................................................16

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................................2

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)................................................................................16

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 298 (S.D.N.Y. 2005)..................................................................................4

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................................8

*In re JPMorgan Chase Sec. Litig.*,
    No. 02 Civ. 1282 (SHS), 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) ..............................8, 9

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................................8, 9

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)..................................................................................7

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003)................................................................................18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    No. 02 CIV 9690 (JFK), 2008 WL 2324111 (S.D.N.Y. June 4, 2008) ..................................7

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008)................................................................................12

*In re Rhodia SA Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007)..................................................................................7

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005)................................................................................16

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................................... *passim*

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)...................................................................................3

*In re Verisign, Inc. Derivative Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................................................5

*In re Winstar Comm'ns*,
    No. 01 CV 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ..................................5

*Jefferson County Sch. Dist.* v. *Moody's Investors Servs., Inc.*,
    175 F.3d 848 (10th Cir. 1999) ........................................................................................5

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)..........................................................................................12

*Lasker* v. *N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ..............................................................................................8

*Lattanzio* v. *Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007).......................................................................................4, 6

*LC Capital Partners, LP* v. *Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)..........................................................................................19

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................. passim

*Leykin* v. *AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)..............................................................................7

*Nairobi Holdings Ltd.* v. *Brown Bros. Harriman & Co.*,
    No. 02 Civ. 1230 (LMM), 2004 WL 1124660 (S.D.N.Y. May 20, 2004).............................12

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................................................9, 11, 13, 14

*Powers* v. *British Vita, P.L.C.*,
    57 F.3d 176 (2d Cir. 1995)..............................................................................................7

*Shah* v. *Meeker*,
    435 F.3d 244 (2d. Cir. 2006).........................................................................................18

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)............................................................................................5

*Staehr* v. *The Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)...........................................................................................18

*Teachers' Ret. Sys. of Louisiana* v. *Hunter*,
    477 F.3d 162 (4th Cir. 2007) ....................................................................3

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................12, 13

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)............................................................1, 11, 15

## <u>Statutes and Other Authorities</u>

Credit Rating Agency Reform Act of 2006, 15 U.S.C. § 78o-7 *et seq.*.........................................15

Fed. R. Civ. P. 8(a) ........................................................................2, 3, 4

Fed. R. Civ. P. 9(b) ........................................................................2, 3, 16

Fed. R. Civ. P. 12(b)(6)........................................................................7

## PRELIMINARY STATEMENT

The mere fact that a complaint is 248-pages long does not mean that it is sufficient to state a claim for securities fraud, and plaintiffs' defense of their complaint only serves to highlight its glaring defects.  First, plaintiffs cannot plug the most gaping hole:  their failure to plead a causal link between the alleged misrepresentations and the decline in Moody's stock price.  That failure alone dooms their complaint.  Second, plaintiffs repeatedly contend that allegations of ratings downgrades and methodology changes can establish fraud.  But no matter how many times plaintiffs say otherwise, these allegations do not reveal the falsity of any prior statements or support any inference of fraudulent intent.  Indeed, plaintiffs fail to identify a single actionable "misrepresentation" and ignore controlling decisions from both the Second Circuit and this Court in their attempts to create one.  Third, plaintiffs' complaint fails the *Tellabs* test—as essentially conceded by plaintiffs' urging of this Court to consider improper "post complaint evidence."  And, in addition to all this, the complaint is time barred.  "Post complaint evidence" cannot cure any of these deficiencies.

In short, Moody's stock price fell along with the stock market as the subprime mortgage crisis unfolded.  That decline in stock price does not show—as plaintiffs would have it—that Moody's did not provide independent and objective ratings.  And the mere fact that plaintiffs, like so many others today, have suffered a loss, does not mean there has been securities fraud.  Plaintiffs' protestations otherwise constitute a paradigmatic example of pleading "fraud by hindsight."  Plaintiffs' complaint should be dismissed with prejudice.

## ARGUMENT

I.     **PLAINTIFFS FAIL TO CONNECT THE ALLEGED FRAUD TO THE DECLINE IN MOODY'S STOCK PRICE.**

Plaintiffs argue that the complaint adequately alleges that the decline in Moody's stock price resulted from revelation of the falsity of Moody's alleged misstatements and omissions concerning the Company's independence and integrity.  (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, dated November 17, 2008 ("Opp."), at 35.)  This is wrong for three reasons:

- *First*, plaintiffs incorrectly assert that Federal Rule of Civil Procedure 8(a) excuses the fatal failure to plead the requisite causal link between the alleged misrepresentations and plaintiffs' alleged losses.

- *Second*, plaintiffs have no support for their claim that alleged "corrective disclosures" (i) revealed the falsity of the alleged misrepresentations and (ii) thereby caused the decline in Moody's stock price.

- *Third*, plaintiffs fail to account for intervening causes—the subprime mortgage crisis and concomitant collapse of the global credit markets.[1]

### A.     **Plaintiffs Mischaracterize the Loss Causation Pleading Burden.**

Plaintiffs contend that Rule 8(a) provides the governing pleading standard for loss causation and that "Rule 8 requires nothing more" than "fair notice" to defendants of their claims and alleged losses.  (Opp. at 34.)  Neither the Supreme Court nor the Second Circuit has squarely addressed whether loss causation is governed by Rule 8(a) or Rule 9(b).  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 295 (S.D.N.Y. 2006) ("This is an issue left open by *Dura* and

---

[1]     In their opposition papers, plaintiffs confuse two distinct loss causation theories: (i) corrective disclosures and (ii) materialization of concealed risks.  (*See, e.g.*, Opp. at 35 ("a series of disclosures revealed the concealed risks at Moody's"); at 35 ("Moody's concealed reputational and economic risks materialized"); at 39 (referring to "corrective disclosures").)  The complaint clearly alleges, however, that "a series of public disclosures" revealed the alleged fraud, thereby causing the decline in Moody's share price.  (Consolidated Amended Complaint, dated June 27, 2008 ("CAC"), ¶ 399.)  Nowhere do plaintiffs allege that their alleged losses were caused by the materialization of a concealed risk.

not squarely addressed by the Second Circuit."). A "strong case can be made," however, that "loss causation should be pleaded with particularity." *Teachers' Ret. Sys. of Louisiana* v. *Hunter*, 477 F.3d 162, 186 (4th Cir. 2007) (citation omitted).[2]

In any event, plaintiffs' loss causation allegations fail under either standard. To plead loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). That fundamental pleading requirement applies under Rule 8(a) and it applies under Rule 9(b). Thus, even if "[l]oss causation need not be pled with particularity" (Opp. at 34), plaintiffs must plead loss causation with "sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Teachers' Ret. Sys.*, 477 F.3d at 186 (citing *Lentell*, 396 F.3d at 172).

Here, plaintiffs have not alleged the requisite causal link between the purported misrepresentations and the decline in Moody's stock price. It is not enough to say, as plaintiffs do, that (i) Moody's made misrepresentations; and (ii) Moody's stock price declined over several months—during which time there was a marketwide collapse. The two events have to be connected. *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) ("To survive a motion to dismiss, the complaint must adequately allege that the company's misrepresentation was the cause of Plaintiffs' economic loss."). As set forth below, plaintiffs fail to "connect the diminution in stock price to a particular corrective disclosure." *In re Take-Two*

---

[2]    There is no dispute that material misrepresentations and scienter—the other two elements of a securities fraud claim at issue here—must be pleaded with particularity. *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 556 (S.D.N.Y. 2004).

*Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008).  Rule 8(a) does not excuse that failure.[3]

**B.     Ratings Downgrades Are Not Corrective Disclosures and None of the Purported Corrective Disclosures Revealed Any Fraud to the Market.**

Plaintiffs baldly assert that ratings downgrades constitute corrective disclosures. (*See* Opp. at 37.)  The law, however, is clear:  ratings downgrades are *not* corrective disclosures because they do not reveal that previously published ratings were fraudulent.  *Lentell*, 396 F.3d at 175 n.4 (ratings downgrades "do not reveal to the market the falsity of the prior [ratings]"); *Hunt* v. *Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 410 (S.D.N.Y. 2006); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005).  Plaintiffs cite no authority to the contrary, and their attempt to distinguish *Lentell* is wholly unavailing.  Even assuming, *arguendo*, that "*Lentell* did not announce a blanket rule that . . . ratings downgrades . . . cannot support the loss causation element" (Opp. at 37), *Lentell* is plainly applicable here.  Moody's ratings downgrades did not reveal that "Moody's was not operating as an 'independent' and 'objective' provider of credit ratings" or that "Moody's had declined to manage let alone eliminate its conflicts of interest."  (CAC ¶ 55.)  At most, as plaintiffs admit, ratings downgrades may have revealed that "Moody's credits ratings were wrong" (Opp. at 36)—*i.e.*, that its initial ratings may

---

[3]     Plaintiffs also argue that "loss causation is an individualized, fact-based inquiry, and should not ordinarily be decided before trial."  (Opp. at 35.)  In fact, the Second Circuit and this Court routinely dismiss securities fraud claims for failure to plead loss causation.  *See, e.g.*, *Lentell*, 396 F.3d at 164; *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007); *Garber* v. *Legg Mason*, 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008); *60223 Trust* v. *Goldman Sachs & Co., Inc.*, 540 F. Supp. 2d 449, 451 (S.D.N.Y. 2007).

be seen, with the benefit of hindsight, to have been inaccurate predictive opinions.[4]   Predicting

wrong is not the same as committing fraud.  Even if plaintiffs could establish that Moody's

ratings were "wrong," they could have been "wrong" for any number of reasons, for example,

that Moody's, like countless financial institutions worldwide, failed to predict the magnitude and

effects of the subprime mortgage crisis.  *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1129 (2d Cir. 1994) ("The pleading strongly suggests that the defendants should have been more

alert and more skeptical, but nothing alleged indicates that management was promoting a

fraud.").[5]

        Plaintiffs are equally mistaken in arguing that "Moody's earnings reports

gradually revealed the truth of Moody's fraud to the market" because they "chronicle the

materialization of the risk that Moody's would lose revenues as issuers and investors recognized

that the Company's structured finance credit rating models were flawed."  (Opp. at 38.)  This

argument is backwards.  Revelations of flawed models might lead to lower earnings, but negative

earnings reports do not mean or even suggest that Moody's models were "flawed."  And even if

Moody's models were flawed, they could have been flawed for a host of reasons wholly

---

[4]   It is well settled that a Moody's credit rating—which is a predictive assessment of an
entity's ability to repay debt at some future time, involving the subjective weighing of numerous
factors—is not capable of being proven "false" or "wrong" at the time it is issued.  *See*, *e.g.*,
*Compuware Corp.* v. *Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007);
*Jefferson County Sch. Dist.* v. *Moody's Investors Servs., Inc.*, 175 F.3d 848, 855 (10th Cir. 1999).

[5]   Plaintiffs also fail to allege a corresponding stock drop following the downgrades.
Although plaintiffs argue that they need not allege "[i]nstantaneous stock price reaction" (Opp. at
39 n.25), they must allege that "the market reacted negatively" when the "truth" finally emerged.
*In re Winstar Comm'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006).  In fact, Moody's
stock price increased following the announcements of ratings downgrades (*see* Defendants'
Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended
Complaint, dated September 26, 2008 ("Mem."), at 9-10), which further undermines the
plausibility of plaintiffs' loss causation allegations.  *See In re Verisign, Inc. Derivative Litig.*,
531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) (failure to plead loss causation where stock price
increased after announcements relating to company's allegedly improper stock option practices).

unrelated to the alleged fraud.  Plaintiffs' reliance on these reports is misplaced.[6]  Because

plaintiffs have not adequately pleaded the necessary causal link between the alleged

misrepresentations and their alleged losses, they have not pleaded loss causation.  *See In re Take-*

*Two*, 551 F. Supp. 2d at 283 (corrective disclosures must "somehow reveal[] to the market that a

defendant's prior statements were not entirely true or accurate").[7]

      **C.**    **Plaintiffs Simply Ignore the Subprime Mortgage Crisis.**

      Even if plaintiffs had adequately linked their alleged corrective disclosures to the

alleged misrepresentations, their loss causation allegations would still be deficient because they

fail to account for the obvious intervening cause of the decline in Moody's stock price—the

subprime mortgage crisis.  Plaintiffs likewise fail to plead "facts that would allow a factfinder to

ascribe some rough proportion of the whole loss to [defendants' alleged] misstatements."  *In re*

*AOL Time Warner Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 680 (S.D.N.Y. 2007) (quoting *Lattanzio*,

476 F.3d at 158).  Instead, plaintiffs argue that (i) *Moody's caused the subprime mortgage crisis*,

which therefore cannot constitute an intervening cause, and (ii) "possible intervening causes of

the price decline cannot support dismissal as a matter of law at this stage of the action."  (Opp. at

40.)

---

[6]    Plaintiffs additionally argue that the market reacted negatively following the August 20, 2007 "remarks" from Senator Richard Shelby that "credit rating agencies must shoulder some of the responsibility for the subprime mortgage crisis."  (Opp. at 36, 39.)  This comment is too vague and indefinite to call into question Moody's prior statements concerning its independence and objectivity.  *See In re Take-Two*, 551 F. Supp. 2d at 285 (announcement of government investigation must "ma[k]e some part of a previously undisclosed truth known").

[7]    Loss causation may in some circumstances be pleaded on the theory that the truth slowly emerged through a series of partial disclosures.  (*See* Opp. at 39.)  Here, however, the alleged corrective disclosures, even considered collectively, never revealed the falsity of any prior "misstatements" or "omissions," and so no "truth" ever emerged, quickly, slowly or otherwise, as a result of these disclosures.

Plaintiffs' first argument is completely implausible.  Lehman Brothers has declared bankruptcy; Bear Stearns, Merrill Lynch and Wachovia have failed; Fannie Mae and Freddie Mac are in government conservatorship; the Federal Reserve has provided a $150 billion rescue package to AIG; and Congress has enacted a $700 billion bailout of the financial services industry.  The reasons for the current global financial crisis are matters of great debate and may never be fully understood, yet plaintiffs lay the blame wholly and squarely on Moody's.  Such allegations should be rejected out of hand.  *See Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007) (plaintiffs' allegations must be "plausible").

Plaintiffs' second argument has no merit.  As the Second Circuit explained:

> [W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and *a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.*

*Lentell*, 396 F.3d at 174 (citations and internal quotations omitted) (emphasis added).  Under this doctrine, courts routinely dismiss securities fraud claims where an intervening market decline significantly weakens the inference that fraud caused the alleged losses.  *See*, *e.g*., *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 422 (S.D.N.Y. 2003) ("Where there is no proximate cause for the loss sustained other than the direct intervention of a market collapse, that collapse will govern on a Rule 12(b)(6) motion to dismiss.").[8]

---

[8]      *See also Powers* v. *British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 2008 WL 2324111, at *7 (S.D.N.Y. June 4, 2008); *In re Rhodia SA Sec. Litig.*, 531 F. Supp. 2d 527, 548 (S.D.N.Y. 2007); *Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006); *Bastian* v. *Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990).

II.     **PLAINTIFFS FAIL TO IDENTIFY A SINGLE ACTIONABLE MISREPRESENTATION IN THEIR COMPLAINT.**

Plaintiffs fault defendants for not addressing each allegation in their 248-page complaint.  (*See*, *e.g*., Opp. at 13.)  But it is plaintiffs' burden to plead actionable misrepresentations, and they have failed to identify a single one.

A.     **Plaintiffs Ignore Controlling Case Law Holding That Statements Concerning Independence and Integrity Are Not Actionable.**

Plaintiffs argue that the alleged misrepresentations concerning independence and integrity are actionable because "it would be material to investors to know whether Moody's was complying with its stated practices of trustworthiness and independence."  (Opp. at 11.)  The law in this Circuit, however, is plain:  "Broad, general statements such as these are insufficient to state a claim for securities fraud."  *In re Marsh & McLennan Cos., Inc. Sec. Litig*., 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006); *see also Lasker* v. *N.Y. State Elec. & Gas Corp*., 85 F.3d 55, 59 (2d Cir. 1996); *In re JPMorgan Chase Sec. Litig*., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005). Indeed, plaintiffs completely ignore this Court's decision in *In re Marsh*, where the Court found that statements regarding defendants' "culture of excellence," its "independence of thought and objective advice" and "dedicat[ion] to client service" amounted to no more than puffery.  501 F. Supp. 2d at 475.

Instead, plaintiffs argue that Moody's alleged misstatements cannot be dismissed as puffery because "independence is crucial" to Moody's as a "financial gatekeeper[]."  (Opp. at 11.)  But plaintiffs cite no authority for this proposition that otherwise non-actionable statements may give rise to securities fraud liability for "financial gatekeepers"—an ambiguous classification which evidently includes auditors, financial analysts and credit rating agencies.  In fact, the authority is to the contrary.  In *In re JPMorgan Chase*, the court flatly rejected the argument that statements concerning integrity should be actionable "because investment banking

is an industry in which integrity and risk management are 'matters of great importance to investors.'"  2007 WL 950132, at *12 (S.D.N.Y. Mar. 29, 2007).[9]

**B.     Plaintiffs Cannot Explain Why Other Purported "Misstatements" Were Misleading.**

Perhaps aware that their alleged misstatements concerning independence and integrity—the crux of their complaint—are not actionable, plaintiffs look to (i) statements comparing corporate ratings to structured finance ratings (Opp. at 11); (ii) statements concerning Moody's evaluations of originator practices (Opp. at 18); and (iii) statements concerning Moody's "stress testing" and "credit support levels" (Opp. at 20) for help.  But plaintiffs fail to plead particularized facts "sufficient to support a reasonable belief as to the misleading nature" of these statements.  *Novak* v. *Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).  Instead, plaintiffs again rely on (i) ratings downgrades and (ii) methodology changes to demonstrate the falsity of these statements—a defect in reasoning that pervades the entire complaint.[10]

For instance, plaintiffs argue that Moody's misrepresented to investors that it conducted "independent and qualitative assessments of loan originator standards and practices"

---

[9]     Similarly, in *In re Marsh*, this Court considered purported misstatements concerning independence by Marsh & McLennan Companies, Inc. ("MMC") that allegedly "steered unsuspecting clients to insurers with whom it had lucrative payoff agreements."  501 F. Supp. 2d at 459.  This Court found such statements too generalized to be actionable.  *Id.* at 475.  If, as plaintiffs contend, "it would be material to investors to know whether Moody's was complying with its stated practices of trustworthiness and independence" (Opp. at 11), then it would be equally material to investors of MMC to know whether it was acting independently or instead was beholden to certain insurers in order to maximize its own revenues.  *In re Marsh*, 501 F. Supp. 2d at 462-63.  The qualities of independence and integrity are no more essential for the *ad hoc* class of "financial gatekeepers" than for MMC, "the world's largest insurance broker." *Id.* at 461.

[10]     Plaintiffs also argue that statements concerning the Company's financial results were misleading.  (Opp. at 16-17.)  But "the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Marsh*, 501 F. Supp. 2d at 470.

and that these representations can be shown to be false and misleading because "Moody's made methodological adjustments" and came "clean" by downgrading securities. (Opp. at 18-19.) But, again, the fact that Moody's downgraded securities does not suggest that its prior statements about "independent and qualitative assessments" were false and misleading. *See Lentell*, 396 F.3d at 175 n.4. Moody's can make independent and qualitative assessments about a security and still conclude later that market developments require the security to be downgraded.

Moreover, contrary to plaintiffs' argument, nothing in the Company's reports disclosing "methodological adjustments" (Opp. at 18) contradicts Moody's earlier statements about its assessment of origination standards in the past. *See In re 2007 Novastar Fin., Inc., Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) ("[T]he Company may have changed or even weakened its internal controls or underwriting standards . . . this does not mean that those controls or standards were not 'strong' or 'effective' as described in the Company's public statements."). Plaintiffs contort these reports to imply that Moody's had not previously considered originator standards and practices (*see* CAC ¶ 116), but the explicit language is plain: Moody's had considered originator standards and practices but would increase the weight assigned to that factor in future assessments. (*See, e.g.*, CAC ¶ 124 ("Going forward . . . [e]ven greater emphasis will be placed on the originator's track record—in particular, the performance of its loans across different business cycles.") (quoting Moody's Proposed Enhancements to U.S. Residential Mortgage Securitizations:  Call for Comments, Mar. 26, 2008).) Methodology changes—which Moody's regularly undertakes and consistently discloses to the market (*see, e.g.*, CAC ¶¶ 101, 111-12, 120, 126)—are not "sufficient to support a reasonable belief as to the

misleading nature" of the statements concerning its prior methodologies.  *Novak*, 216 F.3d at 314 n.1.[11]

## III.    PLAINTIFFS' SCIENTER ALLEGATIONS DO NOT SATISFY THE *TELLABS* TEST.

Plaintiffs must allege particularized facts raising a strong inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2505 (2007).  Here, plaintiffs ask this Court to find that Moody's deliberately imperiled its reputation, the "linchpin of its ability to do its business" (CAC ¶ 359), rather than infer that Moody's—like market regulators, other financial institutions and sophisticated institutional investors—failed to predict the severity and magnitude of the subprime mortgage crisis.  Specifically, plaintiffs argue that their allegations against Moody's satisfy the *Tellabs* test because:

- defendants had the "motive and opportunity to conceal the true workings of [Moody's] structured finance ratings processes, including the need to safeguard [Moody's] reputation and relationship with issuers" (Opp. at 26);

- defendants knew or had access to information that contradicted their public statements (Opp. at 23-26); and

- post-complaint evidence "strongly confirms" their scienter allegations (Opp. at 3, 32-33).

Each of these arguments fails.

---

[11]    Similarly, plaintiffs argue that Moody's "statements comparing its structured finance ratings to Moody's traditional ratings of corporate debt were materially false and misleading." (Opp. at 11.)  In support of that argument, plaintiffs, of course, refer the Court to allegations of ratings downgrades and methodology changes.  (*See* Opp. at 11 (citing CAC ¶¶ 100 ("This fact is now evident, given the unprecedented rate and severity of downgrades . . . ."); 101 ("This fact has been conceded by Moody's, given Moody's February 2008 proposals to create a new ratings scale . . . .")).)  For the reason noted above, neither ratings downgrades nor methodology changes support any inference that Moody's prior statements were fraudulent.

### A. Plaintiffs Cannot Show That Their Motive Allegations Are Concrete and Particularized.

Allegations of a generalized motive to generate revenues or to maintain the appearance of corporate profitability are insufficient to plead scienter.  (*See* Mem. at 30-31.) Plaintiffs contend that their motive allegations are concrete and particularized because the "financial incentives created by the structured finance market . . . were unique and substantial." (Opp. at 28-29.)  The circumstances in which the desire to increase revenues or to maintain the appearance of corporate profitability materialize will always be "unique," however, and courts reject attempts to embellish these generalized motives with the veneer of particularity.  *See*, *e.g.*, *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 635 (S.D.N.Y. 2008) (rejecting alleged motive that Pfizer had a "desperate need" to assure the financial community of the existence of a new blockbuster drug as just another "way of saying, in a manner tailored to a pharmaceutical company, something that is true for all profit enterprises—each has an incentive to portray the likelihood that it will continue to prosper"); *Nairobi Holdings Ltd.* v. *Brown Bros. Harriman & Co.*, 2004 WL 1124660, at *3 (S.D.N.Y. May 20, 2004).

### B. Plaintiffs Fail To Distinguish *Dynex* and Improperly Rely on Ratings Downgrades and Methodology Changes To Establish Scienter.

Having failed to plead any cognizable motive for the alleged fraud, plaintiffs must satisfy the more difficult burden of adequately alleging conscious misbehavior or recklessness.[12] *See*, *e.g.*, *Kalnit* v. *Eichler*, 264 F.3d 131, 142-44 (2d Cir. 2001).  Plaintiffs argue that Moody's "knew, or had access" to facts that contradicted its public statements.  (Opp. at 24.)  This argument is foreclosed by the Second Circuit's recent decision in *Teamsters Local 445 Freight*

---

[12] In their opposition papers, plaintiffs make no attempt to argue that they have pleaded scienter with respect to the individual defendants.  Plaintiffs' Section 10(b) claims against the individual defendants must therefore be dismissed.  (*See* Mem. at 34-35.)

*Division Pension Fund* v. *Dynex Capital, Inc.*, which requires plaintiffs to identify specific reports and statements in support of such allegations.  *See* 531 F.3d 190, 196 (2d Cir. 2008).

In *Dynex*, the complaint alleged that defendants invested in risky bonds backed by manufactured housing loans and then misrepresented the reasons for the poor performance of the bonds.  *Id.* at 193.  Plaintiffs alleged that management had access to "collection data" and other information which revealed that, contrary to defendants' public statements, risky origination practices were responsible for the deterioration of the bonds.  *Id.* at 196.  The Second Circuit held that such allegations failed to raise an inference of scienter because they did not "'specifically identify the reports or statements containing this information.'"  *Id.* (quoting *Novak*, 216 F.3d at 309).  In so holding, the court noted that plaintiffs failed to allege "information showing that the primary cause of the bond's poor performance was *not* the general weakness in the mobile homes market."  *Id.* at 197 (emphasis in original).

Here, too, plaintiffs have failed to identify specific reports or statements containing information that contradicted Moody's public statements.  In fact, plaintiffs make no attempt to argue that their complaint identifies any such reports or statements.  (*See* Opp. at 24-25.)  Instead, they try to distinguish *Dynex*, arguing that "Moody's not only had the information necessary to provide accurate ratings, but knew this and consciously ignored it in favor of greater market share and profit."  (Opp. at 25.)  This is a distinction without a difference, and the assertion that Moody's consciously disregarded information is based on nothing more than vague, conclusory and unsubstantiated allegations.

In essence, plaintiffs are asking the Court to infer conscious misbehavior or recklessness from (i) the magnitude of the ratings downgrades and (ii) "post facto" methodology changes.  Plaintiffs' complaint relies on this Court accepting that the ratings downgrades and

methodology changes can be explained only by Moody's conflicts and revenue ambitions.  (*See* CAC ¶¶ 109, 127.)  This is classic "fraud by hindsight."  And, yet again, ratings downgrades and methodology changes raise no inference of fraudulent intent.  *See Lentell*, 396 F.3d at 175 n.4; *In re 2007 Novastar*, 2008 WL 2354367, at *3.  They may have undermined Moody's reputation for professional skill and discernment in the eyes of plaintiffs, but Moody's lack of "greater clairvoyance" does not constitute securities fraud.  *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (citation omitted); *see also Novak*, 216 F.3d at 309 ("allegations that defendants should have anticipated future events . . . do not suffice to make out a claim of securities fraud"); *In re 2007 Novastar*, 2008 WL 2354367, at *4 ("bad decisions do not constitute securities fraud").

### C.  Plaintiffs' "Post Complaint Evidence" Fails To Raise an Inference of Scienter.

In a final effort to salvage their scienter allegations, plaintiffs argue that "new facts have come to light . . . that confirm Moody's knew during the Class Period its ratings practices were unsound . . . ."  (Opp. at 32.)  In their opposition, plaintiffs quote extensively from documents produced by Moody's to the U.S. House of Representatives Committee on Oversight and Government Reform in October 2008.  (*See* Declaration of Daniel Hume, dated November 17, 2008, Exs. A-L.)[13]  They argue that these materials "strongly confirm[]" their allegations. (Opp. at 3.)

---

[13]     Plaintiffs also rely on a July 2, 2008 article published in the Financial Times regarding errors in ratings of certain constant proportion debt obligations.  (*See* Opp. at 26 n.16; Declaration of Aaron D. Hovan, dated November 17, 2008, Ex. M).  The allegations raised in this article, however, have nothing to do with the alleged misrepresentations at issue in this litigation—*i.e.*, the alleged mismanagement of conflicts from the "issuer pays" business model. (*See* Mem. at 33 n.14.)

As an initial matter, these documents were neither referenced in nor considered in the drafting of the complaint.  Plaintiffs ask the Court to take "judicial notice" of these documents for the purpose of "confirm[ing]" their allegations.  (Opp. at 3, 4 n.4.)  This Court confronted a similar ploy by plaintiffs in *In re Take-Two*, and the Court there refused to consider the materials at all because it could "not consider [them] as support for the truth of the matters asserted therein."  551 F. Supp. 2d at 262 n.6.  The same is true here.

Moreover, even if the Court were to consider these documents, they fail to cure the deficiencies in plaintiffs' scienter allegations.  First, the presentation by Mr. McDaniel, quoted extensively in the opposition (*see* Opp. at 32), provides no information that is not publicly disclosed annually in Moody's Form NRSRO:  that the "issuer pays" model presents a conflict of interest that must be managed and disclosed.  (*See* Mem. at 5.)  The Credit Rating Agency Reform Act of 2006, 15 U.S.C. § 78o-7 *et seq*., requires Moody's to disclose conflicts arising from the "issuer pays" business model and to implement policies and procedures designed to manage those conflicts.  (*See* Mem. at 4-5; CAC ¶¶ 88, 89.)  In addition, the potential conflict inherent in the "issuer pays" business model has been widely reported in the financial press for years.  The presentation shows only that Moody's management acknowledged that policies and procedures designed to *manage* conflicts do not *eliminate* those conflicts.  The presentation does not in any way suggest that Moody's (or any of the individual defendants) published the alleged misstatements with "a mental state embracing intent to deceive, manipulate or defraud," *Tellabs*, 127 S. Ct. at 2507 (citation omitted), because Moody's never claimed to eliminate conflicts of interest arising from the "issuer pays" model.

Second, plaintiffs' references to other documents from the congressional hearing reflecting statements by Moody's employees (*see* Opp. at 33) are likewise insufficient to raise an

inference of scienter.  For example, plaintiffs rely on statements that "Moody's refused to change their ratings in the face of overwhelming evidence that they were wrong" and that Moody's structured finance group suffered from a "lack of oversight."  (Opp. at 33.)  Such statements are "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached."  *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 267-68 (S.D.N.Y. 2004) (report by senior vice president of "terrible" business conditions held "far too vague" and insufficient to establish scienter).  Plaintiffs cannot satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA by referring to vague and non-specific assertions by a handful of Moody's employees, particularly where, as here, they plead no particularized facts showing what information, if any, actually was conveyed to the individual defendants (or other senior management at Moody's) or when.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]he fact that other individuals within SSB may have had views different from [research analyst] Grubman's does not provide any basis for an inference that Grubman did not believe his own professed opinions . . . or that the other valuation models, rather than Grubman's, constituted SSB's true institutional opinion."); *Druskin* v. *Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) ("Plaintiffs' allegations amount to no more [than] former employees who either disagreed with management's decisions or held personal beliefs unsupported by particularized factual allegations.").

## IV.   PLAINTIFFS MISSTATE THE ELEMENTS OF THEIR SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

Plaintiffs assert that they may establish liability under Section 20(a) over the individual defendants simply by "properly alleg[ing] the underlying primary violations by the Company."  (Opp. at 1 n.2.)  Plaintiffs are wrong.  In order to establish control person liability,

plaintiffs must plead three elements with particularity: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (citation omitted). Here, plaintiffs have made no attempt to plead scienter with respect to the individual defendants (*see* note 12 *supra*), and they have failed to plead "culpable participation" for purposes of their Section 20(a) claims. *See In re Take-Two*, 551 F. Supp. 2d at 307-08 n.47 (holding that "plaintiffs must plead at least recklessness in order to state a claim under Section 20(a) of the Exchange Act"). Thus, even if the complaint adequately pleads a primary violation by Moody's—which it does not—the Section 20(a) claims against the individual defendants still must be dismissed. *See, e.g.*, *Boguslavsky* v. *Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ("[W]e note that a determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability.").

## V.    PLAINTIFFS CANNOT AVOID THAT THIS ACTION IS TIME-BARRED.

Plaintiffs contend that defendants "have pointed to no Pre-Class Period information that would trigger a duty to investigate Moody's structured finance-based fraud." (Opp. at 43.) There are at least four articles, however, that specifically discuss and describe possible mismanagement of conflicts of interest at Moody's from the following mainstream publications: (i) Euromoney Institutional Investor (April 2001); (ii) The Washington Post (November 22, 2004); (iii) The New York Times (February 6, 2005); and (iv) The States News Service (April 6, 2005). (*See* Declaration of Darrell S. Cafasso, dated September 26, 2008, Exs. V, W, Y, Z.) Each of these articles specifically refers to business practices *at Moody's* and addresses the crux of plaintiffs' complaint—that inherent conflicts undermine the objectivity of credit ratings. (*See* Mem. at 42-44.)

- 17 -

In *Staehr* v. *The Hartford Fin. Servs. Group, Inc*., the Second Circuit recently addressed whether generic articles concerning conflicts of interest of insurance brokers arising from contingent commission kickback arrangements were sufficient to put plaintiffs, a class of investors in the common stock of The Hartford Financial Services Group, Inc. ("Hartford"), on inquiry notice of the alleged fraud more than two years prior to the filing of their complaint.  547 F.3d 406, 428-31 (2d Cir. 2008).  In so doing, *Staehr* clarified the inquiry notice analyses in *Shah* and *Lentell*, finding that the articles in question were too vague and non-specific to constitute "storm warnings" and that the case more closely resembled *Lentell* than *Shah*.  *See id*. at 430 (citing *Shah* v. *Meeker*, 435 F.3d 244, 251 (2d. Cir. 2006), and *Lentell*, 396 F.3d 168, 170-72).  Notably, the court emphasized that, in contrast to the media reports in *Shah*, "none of the stories that appeared in the mainstream press contains any specific information about The Hartford's business practices—they do not even mention The Hartford by name."  *Id*.  Unlike the circumstances in *Staehr*, which repeatedly emphasized the fact that the articles did not mention Hartford by name, this case is closely analogous to *Shah* (a Second Circuit decision which plaintiffs wholly ignore), where the court found that "[a]n article specifically describing the business practices at [defendant corporation] that serve as the basis of [plaintiff's] complaint as a holder of stock in [defendant corporation] must be regarded as a 'storm warning' of the fraud alleged."  *Shah*, 435 F.3d at 251.  Under *Staehr* and *Shah*, this action is clearly time-barred.[14]

Plaintiffs argue that "investors reasonably relied on Moody's reassuring statements that its ratings were legitimate and not compromised by the Company's potential

---

[14]     Plaintiffs argue that defendants' mainstream articles do not suffice because the complaint focuses on "new and unique strains on Moody's independence and ability to manage the conflicts of interest of the issuer-pays model . . . ."  (Opp. at 42.)  But "'[s]torm warnings' need not detail every aspect of the alleged fraudulent scheme . . . ."  *Staehr*, 547 F.3d at 427.

conflicts."  (Opp. at 44.)  "A plaintiff's duty to inquire," however, "is not dissipated merely because of a defendant's denial of wrongdoing."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 433 (S.D.N.Y. 2003).  "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend . . . on [i] how significant the company's disclosed  problems are, [ii] how likely they are of a recurring nature, and [iii] how substantial are the 'reassuring' steps announced to avoid their recurrence." *LC Capital Partners, LP* v. *Frontier Ins. Group, Inc*., 318 F.3d 148, 155 (2d Cir. 2003).  In applying the third factor, moreover, the "reassuring" statements by management cannot be "mere expressions of hope, devoid of any specific steps taken to avoid [the alleged problem] in the future."  *Id.* at 156.

        Here, as in *LC Capital Partners*, application of all three factors compels the conclusion that the "reassuring statements" were not sufficient to prevent the emergence of a duty to inquire.  First, the conflicts of interest inherent in Moody's "issuer pays" business model are plainly "significant" and integral to its business.  (*See*, *e.g.*, CAC ¶ 32) ("credit ratings are worthless unless the credit rating agency is *trusted* to provide credit ratings that accurately reflect credit realities").)  Second, because the conflicts are inherent in the "issuer pays" business model, they are "of a recurring nature."  *LC Capital Partners*, 318 F.2d at 155.  Finally, the generalized statements cited by plaintiffs that, for instance, Moody's "ratings are essentially a public good" or that Moody's "treat[s] the ratings committee process very seriously" (Opp. at 43-44 (quoting Alec Klein, *Borrowers Find System Open to Conflicts, Manipulation*, The Washington Post, November 22, 2004)), are nothing more than "mere expressions of hope" that fall far short of "specific steps" to avoid the reoccurrence of alleged conflicts of interest in the future.  *LC Capital Partners*, 318 F.2d at 156.  Consequently, the "storm warnings" contained in company-

specific, mainstream publications and other publicly available materials (*see* Mem. at 38-45)

should have raised a duty of inquiry, and plaintiffs cannot rely on "reassuring statements" to

excuse their duty to inquire.

### CONCLUSION

For the foregoing reasons and the reasons set forth in defendants' moving brief,

the Court should dismiss this action in its entirety with prejudice and deny leave to amend.[15]


Dated:  December 19, 2008
      New York, New York

/s/ Sharon L. Nelles
_____
Sharon L. Nelles  (SN-3144)
Stephen Ehrenberg  (SE-3123)
Darrell S. Cafasso  (DC-7123)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for Defendants*

---

[15]     Plaintiffs request the Court to grant them leave to amend in the event it "find[s] any deficiencies in the Complaint."  (Opp. at 45 n.29.)  That request should be denied for two reasons. First, plaintiffs have had ample time to craft a well-pleaded complaint.  The initial complaints were filed in July and September 2007, and the Consolidated Amended Complaint was not filed until June 27, 2008.  Plaintiffs' failure to draft proper amended allegations in the year that elapsed between the initial filings and the filing of the current complaint should not force defendants into a second round of time-consuming and costly briefing on their meritless claims. *See In re Cybershop.com Sec. Litig*., 189 F. Supp. 2d 214, 236 (D.N.J. 2002) ("Plaintiff had ample opportunity to craft a sufficiently pled complaint when the Court . . . ordered the lead Plaintiff to file an amended class action complaint.").  Second, leave to amend would be futile here because the complaint suffers from incurable defects—including fatally deficient loss causation allegations.  *See Drexel Burnham Lambert Inc.* v. *Saxony Heights Realty Assocs.*, 777 F. Supp. 228, 236 (S.D.N.Y. 1991) (denying leave to replead where "[t]he [plaintiffs'] own Amended Complaint supplies a non-fraudulent explanation for the [defendants] to have defaulted on their Agreements:  the downturn in the real estate market").

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 19, 2008, copies of the foregoing Defendants' Reply

Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended

Complaint, were served via ECF, on the following:

Ira M. Press                                Stuart L. Berman
Roger W. Kirby                              Michael K. Yarnoff
Daniel Hume                                 Benjamin J. Hinerfeld
David Bishop                                Lauren Wagner Pederson
Aaron Hovan                                 Schiffrin Barroway Topaz & Kessler, LLP
Kirby McInerney LLP                         280 King of Prussia Road
825 Third Avenue, 16th Floor                Radnor, PA  19087
New York, NY  10022


Lionel Z. Glancy                            Christopher Keller
Michael M. Goldberg                         Jonathan Gardner
Frederick W. Gerkins III                    Serena Richardson
Glancy Binkow & Goldberg LLP                Labaton Sucharow LLP
1801 Avenue of the Stars, Suite 311         140 Broadway
Los Angeles, CA  90067                      New York, NY 10005

*Co-lead Counsel for Lead Plaintiffs*


/s/ Darrell S. Cafasso
Darrell S. Cafasso (DC-7123)