UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------X
                                   x
                                   x   07 CV. 8375 (SWK)
                                   x
            In re MOODY'S CORPORATION   x   OPINION AND ORDER
            SECURITIES LITIGATION   x
                                   x
                                   x
                                   x
-----------------------------------X
```

**SHIRLEY WOHL KRAM, U.S.D.J.**

I.    BACKGROUND

In this putative class action, the Teamsters Local 282 Pension Trust Fund, Charles W. McCurley, Jr., and Lewis Wetstein (collectively, "Plaintiffs") bring securities fraud claims against the Moody's Corporation ("Moody's" or the "Company"), Moody's Chief Executive Officer ("CEO") Raymond W. McDaniel Jr., Moody's Chief Operating Officer ("COO") Brian M. Clarkson, and Michael Kanef, Group Managing Director of Moody's U.S. Asset Finance group (collectively, "Defendants") on behalf of all other persons and entities who acquired securities issued by Moody's from February 3, 2006 to October 24, 2007 (the "Class Period"). Pending before the court is Defendants' motion to dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(6), and 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, the motion to dismiss is granted in part and denied in part.

## A. Procedural History

On July 19, 2007, <u>Nach v. Huber</u>, the first of several putative class actions alleging securities fraud against Moody's, was filed in the U.S. District Court for the Northern District of Illinois. 08 Cv. 1536 (SWK). This action was transferred to the Southern District of New York; the Court consolidated it with all related securities cases pending in this District, and appointed Plaintiffs to represent the putative class. <u>In re Moody's Corp Sec. Litig.</u>, 07 Cv. 8375 (SWK), Dkt. No. 7.

Plaintiffs' Consolidated Amended Complaint (the "AC") alleges that Moody's made material misrepresentations and omissions in public statements respecting: (1) Moody's business, business conduct, and independence; (2) the meaning of Moody's credit ratings; (3) the method of Moody's credit ratings; and (4) the manner in which Moody's had generated financial results and growth. <u>See</u> 07 Cv. 8375 (SWK), Dkt. No. 9.  It also alleges control liability for defendants McDaniel, Clarkson, and Kanef (collectively, "Individual Defendants") under § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Defendants then filed the motions to dismiss that are the subject of this Opinion.

**B. FACTUAL ALLEGATIONS**[1]

**1. Credit Ratings and the Structured Finance Market**

Credit markets are a financial market where securities and debt instruments are bought and sold. For credit markets to operate, buyers and sellers must be able to evaluate the credit-worthiness, or expected loss, of a given security or debt instrument. For over one hundred years, Moody's has evaluated, rated, and provided credit ratings for securities and debt instruments. (AC ¶¶ 10, 12.) During the class period, it was one of a handful of United States based Nationally Recognized Statistical Rating Organizations ("NRSRO's"). (AC ¶ 11.)

The credit markets rely on credit ratings organizations such as Moody's and other NRSRO's to evaluate and rate the countless securities and debt instruments traded in global capital markets. In addition, the credit rating given to a particular security impacts its rate of interest (the higher the credit rating, the lower rate of interest the issuer has to pay to whomever buys its debt). During the class period, Moody's controlled approximately 40% of the credit rating market; the other 60% was divided largely between two competitors: Standard and Poor's ("S&P") and Fitch Ratings.

---

[1] Plaintiffs' principal allegations are summarized in this section. This summary accepts these allegations and factual assertions as true, but in no way constitutes factual findings by the Court.

Historically, Moody's evaluated and rated debt issued by corporations. Corporations would pay Moody's a fee proportionate to the size of the its issuance for a credit rating. (AC ¶ 12.) Although Moody's used to collect revenue from the investors who relied upon its ratings, in recent years, it has been paid by the entities issuing the debt. (AC ¶ 12.)

More recently, the bulk of Moody's revenue has come from rating structured finance products such as residential mortgage-backed securities ("RMBS"), collateralized debt obligations ("CDOs"), and structured investment vehicles ("SIVs"). (See AC ¶ 291.) Structured finance products are also known as asset-backed securities ("ABS") because they are based or collateralized on a pool of assets. (AC ¶ 26.) Any asset can form the basis for a structured finance security; the largest class of these securities is backed by residential mortgages. In 2006, approximately $1.9 trillion of mortgages were securitized into RMBS. (AC ¶ 27.) In addition, collections of ABS's can themselves serve as the basis for second-order structured finance securities, such as CDOs. (AC ¶ 30.) CDO issuance reached $314 billion in 2006. (AC ¶¶ 29-30.) Finally, SIVs borrow funds in the short term while investing in securities such as RMBS and CDOs. (AC ¶ 31.) Four hundred billion dollars worth of SIV related securities were issued in 2007. (AC ¶ 31.) By 2006, Moody's grossed $1.635 billion from its ratings

business; structured finance accounted for 54.2% of this revenue. (AC ¶ 290 n. 76.) Indeed, structured finance revenue accounted for 43.5% of Moody's *total* revenue for that year. (AC ¶ 290 n. 76.)

Conflicts of interest arise because the institutions paying Moody's for an evaluation are the very ones benefiting from a positive rating.[2] Therefore, although Moody's ostensibly trades in risk analysis and evaluation, in reality, Moody's trades on its reputation for honesty, integrity, and independence. (See AC ¶¶ 32-36.) They are a leader in the market because issuers and purchasers of securities alike trust that Moody's rates debt instruments accurately and impartially. (See AC ¶¶ 32-36.) Consequently, Moody's business model rests on its reputation for independence and integrity.

During the class period, several unique features of the structured finance market intensified the conflicts of interest inherent in the ratings of corporate bonds. First, structured finance generated the bulk of the Company's revenue and growth. (See AC ¶ 289.) During the class period, it accounted for 29.3% of the Company's growth and 54.2% of its ratings revenue. (AC ¶ 291.) The fees were three times higher than the fees for rating

---

[2] As Moody's itself states, they "recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of [its] rating process." AC ¶ 76.

corporate bonds of a similar size, (AC ¶ 292), and came from a smaller set of repeat issuers. (AC ¶ 17.) The process of issuing structured finance ratings also involved the bifurcation of rating and payment. Generally, issuers pay Moody's for the rating of corporate debt after Moody's conducts its evaluation and delivers its rating. In the structured finance market, however, issuers pay a nominal amount for a pre-evaluation of the ratings, and make a full payment only if they choose to publish the pre-evaluation rating provided by Moody's. (AC ¶ 306.)

Plaintiffs allege that Moody's made a host of false and misleading statements in order to artificially inflate their stock price. These statements can be grouped into four broad categories.[3]

### 2. Plaintiffs Allegations of Wrongdoing

#### i. First Category: Misrepresentations Regarding Moody's Independence, the Integrity of Its Ratings, and Its Handling of Conflicts of Interest

Plaintiffs first allege that Moody's made false statements regarding its independence from interested entities, particularly issuers of securities and investment banks. This category includes statements that Moody's made regarding its

---

[3] Defendants group the alleged misstatements into six categories. The Court considers the first three categories together as the issues of independence, conflict of interest, and ratings integrity inevitably overlap.

handling of conflicts of interest as well as statements concerning the integrity of Moody's ratings. Moody's attempted to preserve its independence and ratings integrity in two distinct ways. First, Moody's did so by assertion.

### a. Moody's Asserts Its Independence

Moody's 2005 and 2006 Annual Reports ("2005 Report" and "2006 Report") repeatedly refer to its reputation for independence and integrity. (See generally AC ¶¶ 71, 83.) The 2005 Report cites "the market's trust in and reliance upon Moody's" as one of the two "raw materials" supporting Moody's business, and asserts that Moody's is committed to "reinforcing . . . a sense of trust in the accuracy, independence, and reliability of Moody's products and services." (AC ¶ 71.) The 2005 Report further characterizes the Company's "operating, financial, and regulatory strategies" as "strategies of trust." (AC ¶ 71.) In closing, the 2005 Report emphasizes that Moody's remains committed to "upholding the independence and integrity" of the business. (AC ¶ 71.) Moody's 2006 Report reiterated the 2005 Report's message and added that Moody's must "embrace the demand for trust," and "apply [its] opinions consistently, fairly, and objectively." (AC ¶ 83.) Likewise, the Forms 10-K filed by Moody's in 2005 and 2006 contain assertions that Moody's provides "independent credit opinions," and that these

"independent credit ratings" help investors analyze credit risks with fixed income securities. (AC ¶¶ 73, 80.)

### b. Moody's Code of Conduct

Moody's also promulgated a Code of Conduct (the "Code") to address the potential for conflicts of interest and protect the integrity of the ratings process. (AC ¶ 68.) The Code details, inter alia, Moody's plan to protect the quality and integrity of the ratings process, manage conflicts of interests, and adopt internal procedures to identify and address conflicts of interests. (See AC ¶ 68.)

Moody's Code specifies that Moody's "maintains independence in its relationships with Issuers and other interested entities." (AC ¶ 68.) It also states that "Credit Ratings will reflect consideration of all information known," and that Moody's will "take steps to avoid issuing credit analyses, ratings or reports" that "are otherwise misleading as to the general creditworthiness of an Issuer or obligation." (AC ¶ 68.) In the Code, Moody's also commits to rating issuances using only "factors relevant to the credit assessment." (AC ¶ 68.)

Plaintiffs allege that, despite the assurances enumerated in the Code, Moody's independence had been "systematically compromised" resulting in "debased" rating methodologies that did not reflect objective credit realities. (AC ¶ 55.) They allege that Moody's did not address or manage its conflicts of

interests and that the Company failed to consider "information in plain view." (AC ¶ 55.)

### ii.   Second Category: Misrepresentations Regarding the Meaning of Moody's Ratings

The AC also alleges that the Company misrepresented the applicability of Moody's Global Rating Scale to structured finance products. Moody's uses the Global Ratings Scale to express its credit rating evaluations. (AC ¶¶ 20, 22.) The ratings run from Aaa, representing obligations with the highest quality and minimal risk, to C, the lowest rated class of bonds, associated with the highest risk of losing one's investment. (AC ¶ 20.) The Company issued a reference guide entitled "Moody's Rating Symbols and Definitions" (the "Ratings Guide") to explain the Global Rating Scale. (See AC ¶ 93.) The Ratings Guide explains that "structured finance ratings are engineered to replicate the expected loss content of Moody's Global Scale." (AC ¶ 93.) It goes on to state that the Company's structured finance ratings "use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss." (AC ¶ 94.) Plaintiffs allege that, in reality, a structured finance Aaa rating is not comparable to a corporate finance Aaa rating, and allege that the methodology used to evaluate structured finance transactions improperly

inflated credit ratings assigned to structured finance securities. (AC ¶ 99.)

### iii. Third Category: Misrepresentations Concerning Moody's Structured Finance Revenue

The third category of alleged misstatements includes statements implying that Moody's structured finance revenue was derived from legitimate business practices. Throughout the class period, Moody's promulgated multiple statements suggesting that structured finance operations were critical to Moody's growth and success. (AC ¶ 285.) Plaintiffs allege that these statements were false and misleading because Moody's had debased its models and lowered its standards to award high ratings to structured finance securities. (See AC ¶¶ 138-60; AC ¶ 145 (alleging that "substantial increase in issuance [of subprime loans] . . . is the result of the loosening of mortgage underwriting standards that has occurred over the past few years").)

### iv. Fourth Category: Misrepresentations Regarding Rating Methodologies

The fourth and final category consists of statements concerning Moody's rating methodologies, particularly with respect to RMBS, CDOs, and SIVs. Plaintiffs allege that, as early as 2003, Moody's knew that it was "important" to examine the quality of originator practices and that one way to assess the quality of individual loan originators was to "monitor the past performance of its loans." (AC ¶ 111.) At that time,

Moody's asserted that it relied on "quantitative means as well as qualitative reviews to assess originator and servicer quality." (AC ¶ 111.)

In 2007, Moody's reiterated this commitment, asserting that its models incorporated salient loan attributes as well as "qualitative elements" of originators in the subprime market into its "analysis of loan performance." (AC ¶ 112.) At the time, Moody's unequivocally stated that its evaluation of the "overall quality of origination . . . as well as originator[']s historical performance is applied to assess the pool loss estimates." (AC ¶ 112.)

Plaintiffs allege that, despite these statements, Moody's misrepresented that it was "keeping a close eye" on origination standards. (AC ¶ 114.) They also allege that Moody's purported evaluations of originator practices and standards were "a sham, wholly devoid of substance." (AC ¶ 115.)

### C. LEGAL CLAIMS

Count I alleges that Defendants made materially misleading statements and omissions throughout the Class Period in violation of § 10(b) of the Exchange Act and Rule 10b-5.

Count II alleges that the Individual Defendants controlled primary violators of the securities laws in violation of § 20(a) of the Exchange Act.

## II.  LEGAL STANDARDS

## A. Standard of Review for a 12(b)(6) Claim

Under Federal Rule of Civil Procedure 12(b)(6), the touchstone for adequate pleading is plausibility. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also ATSI Commc'ns v. Shaar Fund Ltd., 493 F.3d 87, 98 & n.2 (applying Twombly to securities fraud complaint). Thus, materials properly before the court must provide grounds for more than mere speculation or suspicion that a plaintiff is entitled to the requested relief. See Twombly, 550 U.S. 556-57 (citations omitted). Instead, a plaintiff must "nudge[] [his] claims across the line from conceivable to plausible." Id. at 1974.

In ruling upon a motion to dismiss an action for securities fraud, courts must accept the complaint's allegations as true, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007), and draw all reasonable inferences in the plaintiff's favor, Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d Cir. 2002). The court only "assess[es] the legal feasibility of the complaint," it does not "assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (citations omitted).

In addition to the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally

required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, 493 F.3d at 98. Courts may also consider matters subject to judicial notice. Tellabs, 127 S.Ct. at 2509 (citation omitted).

## B. Hume Declaration

The Court will also take judicial notice of the documents submitted by the Plaintiffs in opposition to the motion to dismiss that were not filed with the original complaint. Generally, the Court only considers facts "stated on face of complaint, and documents appended to complaint or incorporated in complaint by reference and to matters of which judicial notice may be taken." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (citing Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991); Fed. R. Civ. P. 12(b)(6). When a plaintiff files documents outside the pleadings, the Court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Rule 56 and afford all parties the opportunity to present supporting material. See Fed. R. Civ. P. 12(b); Fonte v. Bd. of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988) (citations omitted); Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). The court can, however, consider public records without converting the motion to one for

summary judgment. Johnson & Johnson v. Am. Nat. Red Cross, 528 F. Supp. 2d 462, 463 n. 1 (S.D.N.Y. 2008); see also Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F. Supp. 1442, 1446 n. 3 (S.D.N.Y. 1986); Watterson, 987 F.2d at 3 ("[C]ourts have made narrow exceptions . . . for public records.").

The document in question is the Declaration of Daniel Hume ("Hume Decl."), filed with the Plaintiffs' Opp'n. These documents are transcripts of Congressional hearing testimony conducted on October 22, 2008, after the AC was filed. As such, they are public records, which courts in this District have found to be subject to judicial notice. Johnson & Johnson v. American Nat. Red Cross, 528 F. Supp. 2d 462, 463 n. 1 (S.D.N.Y. 2008) (finding that Congressional hearing testimony is a public record subject to judicial notice); See Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F. Supp. 1442, 1446 (S.D.N.Y. 1986) (considering published decisions of state commissions when ruling upon motion to dismiss).

**C. Pleading under Rules 8, 9(b), and PSLRA**

In general, only a "short and plain statement" of the plaintiff's claim for relief is necessary. Fed. R. Civ. P 8. Claims of securities fraud, however, are subject to the heightened pleading standards set forth in Rule 9(b), requiring a plaintiff to state their claim "with particularity." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), a securities fraud

complaint premised upon material misstatements "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, 493 F.3d at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

Private securities fraud actions must also pass muster under the PSLRA. See 15 U.S.C. § 78u-4(b)(3)(A); ATSI Commc'ns, 493 F.3d at 99. In an action for money damages requiring proof of scienter, the PSLRA prescribes that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). An inference is "strong" under the PSLRA only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510.

## III. DISCUSSION

Defendants argue that the Court should dismiss the AC in its entirety as time barred. (Defs.' Mot. 38.) Alternatively, they argue that the AC fails to sufficiently allege (1) any material misrepresentation, (2) scienter for any defendant, and (3) loss causation. (Defs.' Mot. 15-37.) Finally, Defendant's claim that the AC fails to state a § 20(a) claim against the Individual Defendants. (Defs.' Mot. 37.)

A. **Plaintiffs' Claims Are Not Barred by the Statute of Limitations**

The statute of limitations for the commencement of a securities fraud action is two years "after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The statute of limitations recognizes both actual and inquiry notice. Seippel v. Sidley, Austin, Brown & Wood, LLP, 399 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) (internal quotation marks and citations omitted). Here, Defendants argue that the statute of limitations expired prior to the filing of the AC because Plaintiffs were on inquiry notice as of July 2003. (Defs.' Mot. 38-39.)

Inquiry notice, triggered by "storm warnings," creates a duty to inquire "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003) (internal quotation marks and citations omitted). Media reports and regulatory materials are sufficient to trigger inquiry notice. See e.g. In re Merrill Lynch & Co., 289 F. Supp. 2d 416, 424 (S.D.N.Y. 2003). The storm warnings do not have to make plaintiff aware of the entire fraud, rather, the germane question "is whether the materials suggest there were any material misrepresentations." In re Merrill Lynch, 289 F. Supp. 2d at 424 (internal quotation marks

and citations omitted); see also Addeo v. Braver, 956 F. Supp. 443, 450-51 (S.D.N.Y. 1997). In this District, as little as one news article is enough to put an investor on inquiry notice. See Shah v. Meeker, 435 F.3d 244, 249 (2d Cir. 2006).

Once on inquiry notice, the timing of notice is imputed in one of two ways: (1) "if the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose;" and (2) if some inquiry is made, "[the Court] will impute knowledge of what an investor in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005) (quoting LC Capital Partners, 318 F.3d at 154 (internal citation and quotation marks omitted)). Defendants have an "extraordinary" burden to demonstrate that there was the "probability," rather than the mere "possibility," of fraud. Seippel, 399 F. Supp. 2d at 291 (internal quotation marks and citation omitted); see also Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003). The mere identification of potential conflicts of interest is not sufficient to trigger inquiry notice. Lentell, 396 F.3d at 170 ("Conflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud -- let alone furnish a basis sufficiently

particular to support a fraud complaint."); see also Fisher v. Reich, 92 Cv. 4158 (MBM) 1995 WL 23966, at *5 (S.D.N.Y. 1995) (holding that disclosures of general risks "unrelated to the alleged wrongdoing" do not constitute inquiry notice).

Defendants argue that Plaintiffs were put on inquiry notice by numerous SEC releases, news articles and other publications that warned of potential conflicts of interest in the credit-ratings industry. (See Defs.' Mot. 38-44; Defs.' Mot., Declaration of Darrell S. Cafasso ("Cafasso Decl.") Exs. Q, W, U, V.) Media reports, to constitute "storm warnings" must contain sufficient detail to put investors on notice of an alleged fraud. See e.g., Shah, 435 F.3d at 250-51 (finding that media reports went beyond "mere existence of a conflict of interest" and "specifically describe[ed] the business practices" that formed the basis for plaintiff's complaint); In Re Merrill Lynch, 289 F. Supp. 2d at 425. No such detail exists in the statements presented by Defendants.

The statements cited by Defendants' refer to the credit ratings industry in general terms and make no specific reference to Moody's. Nor is there any mention of fraud. (See Defs.' Mot. 38-44; Cafasso Decl. Exs. Q, W, U, V.) In Fogarazzo v. Lehman Bros., Inc., the court cited "allegations that investment bankers were requiring analysts to issue certain recommendations, that analysts' compensation was derived from

the amount of investment banking revenue that they generated, or
that the analysts' views of the securities they covered were the
exact opposite of what they recommended to the public" as
examples of statements that trigger inquiry notice. 341 F. Supp.
2d 274, 300 (S.D.N.Y. 2004). In contrast, the statements offered
by Defendants identify only potential conflicts of interest
couched in equivocating language. (Defs.' Mot. 41 ("Reliance on
issuer fees by a credit rating agency could lead to conflicts of
interest . . . [,and] credit rating agencies may be unduly
influenced by obligors."); Defs.' Mot. 43 (" 'Arguabl[y] the
dependence of rating agencies on revenues from the companies
they rate could induce them to rate issuers more liberally, and
temper their diligence in probing for negative information.' ");
Cafasso Decl. Ex. A) Even the articles that specifically refer
to Moody's identify only "possible mismanagement of conflicts of
interest," (See Defs' Reply 17), which is insufficient to raise
the probability of fraud. LC Capital Partners, 318 F.3d at 154.[4]

---

[4] Indeed, the articles mention conflicts of interest only in the
most general terms. For example, the only mention of conflicts
of interest in the cited Euromoney article is a general
statement that Moody's and S&P give the same rating over 70% of
the time. (Cafasso Decl. Ex. V.) This is only a weak suggestion
of a potential conflict of interest, the nature of which is not
at issue in this litigation. The November 2004 Washington Post
article contains similarly vague allegations. (Cafasso Decl. Ex.
W ("Dozens of . . . [people] say the rating system has proved
vulnerable to subjective judgment, manipulation and pressure
from borrowers.").)

Even if the statements cited by Defendants were sufficient to create a baseline probability of inquiry notice, Plaintiffs are not considered to have been put in inquiry notice when they "reasonably rely" on "reliable words of comfort from management" that accompany warning signs. LC Capital Partners, 318 F.3d at 155. Plaintiffs identify numerous statements by Moody's implying that the stated criticisms did not apply to them. (See AC ¶ 71 (stating that Moody's is committed to "reinforcing . . . a sense of trust in the accuracy, independence, and reliability of Moody's products and services" and "upholding the independence and integrity" of its business).) In addition, CEO McDaniel articulated several steps that Moody's had taken to adequately manage conflicts of interest:

> We do not link analyst compensation, including bonus compensation, to the ratings they have on the companies they follow or to the amount of fees they receive from those companies . . . Beyond that, we have collection of business conduct policies and codes of practice and behavior which the entire Moody's population is required to adhere to.

(Cafasso Decl. Ex. Y (internal quotation marks omitted).) These words of comfort preclude a finding of inquiry notice in the instant case.

Therefore, the Court concludes that the Plaintiffs were not put on inquiry notice by public statements concerning potential conflicts of interest in the credit-ratings industry. Because the AC is not time-barred, the Court now turns to the purported

substantive grounds for dismissal set for in the motion to dismiss.

**B. Section 10(b) and 10b-5 Claims**

Rule 10b-5 makes it "unlawful for any person . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5. To state a claim under Rule 10b-5, a plaintiff must allege that defendants " ' (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that the plaintiff's reliance was the proximate cause of their injury.' " <u>Lentell</u>, 396 F.3d at 172 (quoting <u>In re IBM Sec. Litig.</u>, 163 F.3d 102, 106 (2d Cir. 1998)).

**C. Claims for Material Misrepresentations Under Section 10(b) and Rule 10b-5**

All claims under Rule 10b-5 must identify a false statement or misleading omission. <u>See</u>, <u>e.g.</u>, <u>ATSI Commc'ns</u>, 493 F.3d at 99; <u>Lentell</u>, 396 F.3d at 172 (internal quotation marks and citation omitted). The complaint must allege the specific statement, the reasons why the plaintiff believes the statement is misleading, and the facts on which the belief is formed. 15 USC § 78(u)-4(b)(1).

### 1. Actionable Misrepresentations

To be actionable, a misrepresentation must be "one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." Greenburg v. Chrust, 2003 WL 22097883 (S.D.N.Y. 2003) (quoting Smith v. Meyers, 130 B.R. 416, 423 (Bankr.S.D.N.Y. 1991); In re Duane Reade Inc. Sec. Litig., 2003 WL 22801416 at *4 (S.D.N.Y. 2003). Statements of "hope, opinion, or belief about [the company's] future performance" are not actionable. San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996); Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 239 (2d Cir. 2006).

Optimistic statements, however, "may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . ., or that the opinions imply certainty." Lapin, 506 F. Supp. 2d at 239-40 (finding that statements asserting that "integrity and honesty were at the heart of [the] business," and attempts to distinguish itself as "truly independent investment research while it allegedly knew the contrary was true" are actionable) (internal quotation marks omitted); See In re IBM, 163 F.3d 102, 107 (2d Cir. 1998) ("Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, . .

. or if the speaker does not genuinely or reasonably believe them [at the time they were made.]") (citations omitted); See Novak, 216 F.3d at 315 (finding that statements that inventory situation was "in good shape" or "under control" made while defendants "allegedly knew the contrary was true," are actionable statements of securities fraud as more than mere statements of opinion or puffery.) (citations and internal quotation marks omitted).

### i. Defendants Made Actionable Misrepresentations Regarding Moody's Independence

Plaintiffs' core allegation is that Moody's falsely claimed that it was an independent body publishing ratings accurately and impartially. (See AC ¶¶ 55, 68-69, 71-72, 80, 83.) Defendants contend that the statements cited by Plaintiffs are "declarations of intention" or "vague pronouncements" constituting "puffery." (Defs.' Mot. 22 (internal quotation marks omitted).) The Court disagrees with Defendants' characterization.

### a. The AC Sufficiently Alleges that Moody's Statements Regarding Independence Were False

Moody's repeatedly asserts its independence in its Code of Conduct, Forms 10-K, and 2005 and 2006 Annual Reports. (AC ¶¶ 55, 68, 71, 80, 83.) Plaintiffs provide sufficient facts to suggest that the statements issued by the Moody's were false.

First, the AC cites several news articles that challenge the Company's assertions of independence and ratings integrity. In an April 11, 2008 article, the <u>Wall Street Journal</u> chronicles an instance in which Moody's modified its rating in response to a client's complaint in order to retain the client's business. (<u>See</u> AC ¶ 347.) The same article revealed that Moody's COO Clarkson fired or reassigned mortgage-backed securities analysts seen as too cautious, and replaced them with individuals who gave higher ratings. (<u>See</u> AC ¶ 352.) Another <u>Wall Street Journal</u> article reports analyst reassignments in response to bankers' requests for analysts who ask fewer questions and are less "fussy" about ratings. (AC ¶ 350.) A May 21, 2008, <u>Financial Times</u> article indicates that Moody's had concealed the improper rating of some poorly rated bonds. (AC ¶ 363.) Instead of issuing new ratings for the bonds in question, Moody's chose to amend the methodology to maintain the fraudulent ratings. (AC ¶ 363.)

In addition, the AC adequately alleges that Moody's employees and clients attempted to raise questions about the Company's independence. In a confidential presentation, CEO McDaniel admits that analysts and managing directors sometimes succumb to the pressure placed upon them by issuers and ignore the strictures of the ratings system. (<u>See</u> Hume Decl. Exs. A5, 62, F.) Speaking to their ratings integrity, CEO McDaniel

acknowledges the Company's attempts to ensure quality "do NOT solve the problem" of the erosion in ratings integrity and accepts a "certain complacency" about the quality of ratings as "inevitable." (Hume Decl. Ex. F (emphasis in original).)

In addition, the AC alleges that financial institutions attempted to warn Moody's regarding the quality, or lack thereof, of their ratings. PIMCO, an investment firm specializing in bonds, attempted to warn Moody's of mistakes in their ratings to no avail. (See Hume Decl. Ex. A8.) Officials at Fortis Investments were more direct, asserting that ratings were useless if Moody's could not quantify potential losses. (Hume Decl. Ex. A8.)

Collectively, these facts belie Defendants' claims of independence and ratings integrity. The facts alleged by Plaintiffs challenge the Company's assertion that it applies its "opinions consistently, fairly, and objectively." (AC ¶ 83.) Similarly, the revelations that it altered ratings at the request of issuers called into question Moody's claim that it "maintains independence in its relationships with Issuers and other interested entities." (AC ¶ 68.)

### b. Defendant's Contention that the Statements are Mere Puffery are Unavailing

Defendants argue that the statements cited by Plaintiffs are inactionable puffery because they are "vague and non-

specific pronouncements . . . not capable of objective verification." (Defs.' Mot. 25 (internal citations and quotation marks omitted).)  The statements alleged in the AC, however, are far different from those that courts in this District have found inactionable. Those courts have identified declaration of intention, hope, or projections of future earnings as the hallmarks of inactionable puffery. See e.g. In Re Nokia Oyj Sec. Litig., 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (finding statements such as "we expect to see continued momentum . . . going into the fourth quarter," and "we want to be present in all the key segments of the CDMA market" to be non-actionable.); In Re IBM, 163 F.3d at 105, 107, 111 (finding that statements such as "I have no plan, no desire, and I see no need to cut the dividend," and "we have no plans, nor do we see any need, to cut the dividend," are not actionable because they are "expressions of optimism or projections about the future."); In Re Duane Reade, 2003 WL 22801416 at *5 (finding that statements regarding "future earnings, sales goals, and [the company's] desire to achieve continued prosperity" were not actionable) (internal quotation marks, citation, and alteration omitted). Those statements easily fit into the category of a declaration of intention, hope, or projection of future earnings.

In contrast, Moody's steadfastly maintained independence as a cornerstone of its business. (AC ¶ 71 ("The market's trust in

and reliance upon Moody's" is one of the two "raw materials supporting Moody's business."); AC ¶ 71 ("[Moody's] operating, financial, and regulatory strategies [are] . . . strategies of trust."); AC ¶ 71 ("Independence. Performance. Transparency. . . . These are the watchwords by which stakeholders judge Moody's.").) Moody's does not couch this assertion in the language of optimism or hope. Rather, Moody's claimed that it based the "raw materials" of its business, its "operating, financial and regulatory strategies," and the "watchwords by which stakeholders" judged it on independence and a commitment to its ratings system.

For the same reasons, Moody's statements regarding its own independence do not constitute inactionable puffery. They were neither "vague" nor "non-specific" pronouncements that were incapable of "objective verification." In re Tower Auto. Sec. Litig., 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007). Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence. (AC ¶ 68 ("The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.").) Rather than being general statements, these were specific steps that Moody's was taking to ensure its independence and ratings integrity.

> **c. Even if Statements by Moody's Were Puffery, They Implied Certainty**

Moreover, even if the above mentioned statements asserting independence were ones of intention or desire, they also "imply certainty," and therefore fall into the limitation on the general rule articulated in Lapin, 506 F. Supp. 2d at 239. Indeed, Moody's proactively affirmed its independence. (AC ¶¶ 68, 71.)

These allegations are sufficient to suggest that the statements made were false. Plaintiffs have alleged facts that, if true, would entitle them to relief under the Twombly plausibility standard.

### ii. Defendants Made Actionable Misrepresentations Regarding Rating Methodologies

Statements made by Moody's regarding its ratings methodologies are similarly actionable. Moody's stated in at least two separate instances, once in 2003 and again in 2007, that it relied on "originator and servicer quality" in its "analysis of loan performance." (AC ¶¶ 111-12.) The AC alleges that Moody's did not, in fact, rely on originator information when assessing RMBS, CDOs, and SIVs until after April 2008. (AC ¶¶ 112-126.) In 2007, Moody's stated that it would "henceforwards consider some originators' loans more risky than others," and downgraded 40% of all subprime RMBS issued and rated during 2006. (AC ¶¶ 118, 122 (emphasis in original).) The AC alleges that, despite its statements in 2003 and 2007,

Moody's did not even begin to use originator standards for assessing originators until after April of 2008. (AC ¶ 126 ("We plan to develop a similar approach for assessing the credit and quality control processes of loan originators.").)

Defendants argue that the allegations in the AC are inadequate because the Company's methodologies were accurately disclosed. (See Defs.' Mot. 28-29.) In so doing, however, they rely on only a small selection of the statements listed in the AC. A full assessment of all pertinent statements reveals that Plaintiffs have alleged actionable misrepresentations. (AC ¶ 118, 122, 126.) Plaintiffs have alleged sufficient facts to show that Moody's rating methodologies were not "accurately disclosed" by alleging that Moody's did not even start to assess originator practices until well after it claimed that it had.

### a. These Actionable Misrepresentations Are Material

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000) (citations omitted). A complaint may be dismissed for failure to allege materiality only if the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could

not differ on the question of their importance." Id. at 162
(internal quotation marks and citation omitted).

### (1)   Statements   Regarding   Independence   Are Material

At least one court in this District has held that a
corporation's statements regarding its independence are material
to a reasonable investor. See Lapin, 506 F. Supp. 2d at 239-40.
Moody's statements regarding its independence, therefore, do
"alter the mix of available information" to its investors and
are actionable. In Re Van der Moolen Holding N.V. Sec. Litig.,
405 F. Supp. 2d 388 400-01 (S.D.N.Y. 2005) (internal quotation
marks and citations omitted).

### (2)   Statements  Regarding  Ratings  Methodologies Are Material

The misrepresentations regarding the ratings methodology
also meet the materiality standard. The AC alleges (and
Defendants do not contest) that including originator standards
in the structured finance evaluations had serious consequences
for the accuracy of the ratings issued by the company. (AC ¶ 122
n. 9 ("The average adjustment for originators in the worst tier
. . . was an increase [in the expected loss] of nearly 70%.").)
Information that Moody's was not, in fact, considering this
factor would be significant to a reasonable investor and would
"alter the mix of available information." In Re Van der Moolen
Holding, 405 F. Supp. 2d at 400-01.

### 2. Inactionable misrepresentations

In contrast to the sufficient allegations discussed above, the Company's statements regarding the meaning of structured finance securities and its pronouncements that structured finance revenues were derived from legitimate business practices, are not actionable.

### i. Defendants' Statements Regarding the Meaning of Structured Finance Securities Are Inactionable

Plaintiffs allege that, in an April 2006 Code Implementation Report, Moody's falsely represented that structured finance ratings "use the same symbol system and are intended to convey comparable information with respect to the relative risk of expected credit loss." (AC ¶ 94.) Although Plaintiffs have alleged specific false statements, the AC lacks sufficient information to suggest that such statements are false. Plaintiffs cite Moody's proposed creation of a new ratings scale designed to "distinguish [structured finance ratings] from corporate bond letter ratings," as evidence of the prior statement's falsity. (AC ¶ 101.) The creation of a new scale, however, cannot automatically be construed as an indictment of the previous rating system. Without additional facts to bolster their conclusory theory, Plaintiffs allegations fall short. This category of statements is therefore not actionable.

### ii. Defendants' Statements Regarding the Source of Structured Finance Securities Revenue Are Inactionable

The statements pertaining to the source of Moody's structured finance revenue are similarly inactionable. In this instance, although Plaintiffs allege that statements regarding the sources of the Company's revenue are false and misleading, they do not allege that Defendants falsely reported structured finance revenue. As such, Plaintiffs have not alleged a violation of federal securities laws. See In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006).

As this Court has stated previously, a "company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading." Id. Instead, liability is "limited to the misleading statements themselves." Id.; but see In re Van der Moolen Holding, 405 F. Supp. 2d at 401 (holding that a company's failure to disclose revenue sources gives rise to liability under § 10(b) and Rule 10b-5.) Consequently, these statements do not allege a "violation of federal securities laws . . . premised upon a company's disclosure of accurate historical data." In re Marsh & McLennan, 501 F. Supp. 2d at 470 (internal quotation marks and citation omitted).

32

In sum, the Court finds to be actionable the statements made by Moody's regarding its independence and ratings methodologies. Conversely, Plaintiffs' allegations regarding the meaning of structured finance securities and the source of structured finance revenue are inactionable.

### 3. Loss Causation

The Court now assesses loss causation with respect to the actionable misstatements. Loss causation is the causal link between a defendant's misconduct and economic harm ultimately suffered by the plaintiffs. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005); Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003). Originally a judge-made requirement, it has since been codified by the PSLRA: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

A showing of loss causation requires a plaintiff to demonstrate that (1) a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security, and (2) that the loss was a foreseeable consequence of the misrepresentation or omission. Lentell, 396 F.3d at 173. Defendants do not challenge

Plaintiffs' allegation that the loss was a "foreseeable consequence" of the alleged misrepresentations, so the Court addresses only the first prong of the loss-causation analysis.

As to the first prong, "it is not enough to allege that a defendant's misrepresentations and omissions induced a purchase-time value disparity between the price paid for a security and its true investment quality." Lentell, 396 F.3d at 174 (internal quotation marks and citation omitted). Instead, a plaintiff must allege that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001). Although Defendants imply that loss causation must be pled as a single announcement (See Defs.' Mot. 15-16), this Court has previously held that it may be pled as a "truth [that] slowly emerged through a series of partial disclosures." In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008). All that is required at this stage is a showing by Plaintiffs that Defendants' misstatements concealed something from the market, and that its disclosure negatively affected the value of the security. Lentell, 396 F.3d at 173.

### i. Plaintiffs Have Met Their Burden for Pleading Loss Causation

The poor organization of the AC dilutes Plaintiffs allegations of loss causation. Ultimately, however, the AC

alleges sufficient corrective disclosures regarding Moody's independence, integrity, and ratings methodologies to survive Defendants' motion to dismiss.

### a. Effect of Disclosures Related to Independence

Plaintiffs identify three disclosures relating to Moody's independence that allegedly impacted the Company's stock price. First, on April 11, 2008, the <u>Wall Street Journal</u> reported that Moody's had adjusted a bond rating in response to a threat by an issuer in a case of ratings shopping. (AC ¶ 347.) That day, the Company's stock price dipped 2.4%.[5] The next month, in a more serious story, the <u>Financial Times</u> reported that Moody's had concealed improper ratings of several bonds, and, rather than lower the rating on those bonds, had amended the ratings methodology to maintain the false rankings. (AC ¶ 363.) On that day, the stock price dipped 14.5%. Finally, in another damaging disclosure, on October 22, 2008, Moody's CEO McDaniel strongly implied the Company's own analysts and managing directors were not independent from the companies they rated. (Hume Decl. Ex. F.) On that day, the stock price fell 6.1%.

Defendants contend that the statements cited by Plaintiffs do not constitute corrective disclosures and, alternatively,

---

[5] The Court takes judicial notice of the stock prices enumerated below when assessing the sufficiency of the Plaintiffs loss causation allegations. <u>Ganino</u>, 228 F.3d at 166 n. 8 (citations omitted). All stock price information is taken from the historical data listed at http://finance.yahoo.com/q/hp?s=MCO.

that the stock price did not fall after every one of the disclosures.[6] (Defs.' Mot. 16-18.) The first argument is untenable given the drops in the stock price listed above. The second argument is irrelevant. Defendants cite no precedence for their implication that the stock price must fall after every corrective disclosure.[7]

### b. Effect of Disclosures Related to Ratings Methodologies

Corrective disclosures relating to misrepresentations in Moody's ratings methodologies emerged in a series of partial disclosures. According to Plaintiffs, Moody's first announced that it was separating originator quality into tiers in a Moody's Investor's Service report entitled <u>October 11, 20007 Rating Actions Related to 2006 Subprime First-Lien RMBS</u>. (AC ¶ 122 n. 9.) This report was not sent to investors until October 17, 2007. (AC ¶ 122 n. 9.) Meanwhile, on October 12, 2007, Moody's held a conference call to discuss the report. (AC ¶ 122 n. 9.) In the six days between the report's official publication

---

[6] Defendants do not, however, challenge Plaintiffs' allegations that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." <u>Suez Equity Investors</u>, 250 F.3d at 95.

[7] Moreover, it would set a poor precedent if every repetitive disclosure had to be accompanied by a concomitant fall in the stock price. Companies would then have an incentive to repeatedly state the same corrective disclosure. They could count on the stock price not to drop after every one under the assumption that the market had already absorbed the information. In such a way, a rogue company could avoid liability under securities laws.

and the date its contents were disclosed, the stock fell 7.5%. These allegations are sufficient to suggest that the revelation of the report's contents during the October 12 conference call caused the drop in the stock price.

### ii.  There Is No Intervening Cause Precluding a Finding of Loss Causation

Defendants argue that the decline in Moody's stock price was due to the direct intervening cause of market collapse, specifically the market crash as a result of the subprime mortgage crisis. (Defs.' Mot. 11-14.)

In cases of an intervening event, the question of causation is reserved for trial and is not subject to analysis in a Rule 12(b)(6) motion to dismiss. Lentell, 396 F.3d at 174 (quoting Emergent Capital, 343 F.3d at 197)). Where there is a market-wide downturn in a particular industry, however, Plaintiffs must show that their loss was caused by the Defendants' fraud, rather than the intervening events, in order to survive a motion to dismiss. Lentell, 396 F.3d at 174.

The Court must therefore determine whether there was a "market-wide downturn in the credit-ratings industry at the time the alleged corrective disclosures occurred. If there was such a downturn, one would expect the stock prices for Moody's competitors to fall along with that of Moody's. Defendants' evidence disproves their claims. Their declarations provide the

daily stock prices for Moody's biggest competitor – S&P – during the Class Period.[8] If there was an industry wide downturn, one would expect the fall in the S&P stock price to be commensurate to that of Moody's. A cursory glance at the stock prices reveals the opposite. Moody's stock fell from 64.5 to 45.93. (Cafasso Decl. Ex. B.) In contrast, the parent company of Standard and Poor's, McGraw Hill fell only from 50.85 to 49.97. (Cafasso Decl. Ex. L.) S&P stock itself *rose* from 423.46 to 443.12. (Cafasso Decl. Ex. M.) Therefore, while Moody's experienced a 28.8% drop, S&P rose 2.5% and its parent company fell a mere 1.7%. Given these facts, the Court cannot conclude that there was an industry-wide downturn, and the question of loss causation due to an intervening event is reserved for trial.

**4. Scienter**

The PSLRA requires a plaintiff alleging securities fraud to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite state of mind for an action pursuant to § 10(b) and Rule 10b-5 is "an intent to deceive, manipulate, or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). Plaintiffs can establish scienter either by: (a)

---

[8] Fitch Ratings, another Moody's competitor, is a private company and thus does not have a stock price.

"alleging facts to show that defendants had both motive and opportunity to commit fraud," or (b) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 138 (internal quotation marks and citation omitted).

To show motive, Plaintiffs must show "concrete benefits [to a defendant] that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996). A "generalized motive" that "could be imputed to any publicly-owned, for-profit endeavor" is not enough. Id.

Establishing strong circumstantial evidence of scienter requires a plaintiff to allege facts showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks and citation omitted). A plaintiff can meet this high standard by alleging, inter alia, that defendants (1) "engaged in deliberately illegal behavior;" (2) "knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check

information they had a duty to monitor." <u>Novak</u>, 216 F.3d at 311 (citations omitted).

Only in their reply to Defendants' motion do Plaintiffs clarify that they are pleading both theories of scienter. The Court finds that the AC sufficiently alleges scienter with respect to Moody's and CEO McDaniel. With respect to individual defendant's Clarkson and Kanef, however, the AC's scienter allegations are inadequate.

### i.  Scienter and Individual Defendants

The AC does not sufficiently allege scienter with respect to Clarkson and Kanef.[9] The AC does, however, plead sufficient facts to allege scienter for CEO McDaniel.

### a. Motive and Opportunity

Plaintiffs allege two principal motives for McDaniel's fraud: profit and preservation of reputation. (Pls.' Opp'n 27; <u>See</u> AC ¶¶ 404-415.)  Neither is sufficient. Courts in this District have specifically rejected profit as a motive for fraud. <u>In re Take-Two Interactive</u>, 551 F. Supp. 2d at 270 ("The desire to improve a company's year-end financial numbers . . . does not give rise to [an] inference of scienter.") (citation omitted); <u>In re Elan Corp. Sec. Litig.</u>, 543 F. Supp. 2d 187, 216

---

[9] The Court will not engage in the two-part scienter inquiry with respect to those defendants because the AC' scant references to the two defendants render the AC's insufficiency patently obvious. <u>See</u> AC ¶¶ 185, 284.

(S.D.N.Y. 2008) (finding that, because "[a]ny corporation would be motivated to make a profit," such allegations "do not support an inference of scienter"); Albert Fadem Trust v. Citigroup Inc., 165 Fed. Appx. 928, 930 (2d Cir. 2006) (finding that a desire to maintain "long-term profitability through the cultivation of major clients" is insufficient to establish motive).

Nor does the preservation of reputation constitute a cognizable motive for fraud. Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) ("Action taken to maintain the appearance of corporate profitability . . . does not entail concrete benefits sufficient to demonstrate motive.") (internal quotation marks and citations omitted); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 230 (S.D.N.Y. 2006) (finding that motive to "maintain appearance of corporate profitability" was "neither personal nor specific, but could be imputed to any publicly-owned corporation"). Thus, Plaintiffs have not adequately alleged CEO McDaniel's scienter by means of motive and opportunity.

### b. Circumstantial Evidence

Plaintiffs also contend that sufficient circumstantial evidence exists to demonstrate McDaniel's scienter. According to Plaintiffs, McDaniel's made several statements revealing his knowledge that Moody's was not truly independent and that its

ratings were compromised. The AC alleges that in a confidential slideshow, McDaniel stated that "the real problem" was that "the market . . . penalizes quality." (Hume Decl. Exs. A4, F.) He also admitted that although Moody's is aware of the risks inherent in structured finance ratings, and "has erected safeguards" to keep teams from "lowering standards" in order to solve the market share problem, those efforts "[do] NOT solve the problem." (Hume Decl. Exs. A5, F. (emphasis in original).) Furthermore, McDaniel acknowledged that Moody's "analysts and MD's, managing directors, are continually pitched by bankers, issuers, [and] investors[,] and sometimes [Moody's] drinks the Kool-Aid." (Hume Decl. Exs. A5 F.) Lastly, the AC alleges that in the same slideshow, McDaniel admitted to becoming "complacen[t] about ratings quality," (Hume Decl. Ex. F), and implied strongly that ratings are a game of balancing competing market interests rather than accurately gauging the risk in a security. (Hume Decl. Ex. F ("The RMBS and CDO and SIV ratings are simply the latest instance of trying to hit perfect rating pitch in a noisy marketplace of competing interests.").)

Defendants argue that Plaintiffs have not adequately plead that McDaniel had access to information suggesting that the Company's public statements were inaccurate or that he failed to review or check information that they had a duty to monitor. (Defs.' Motion 31 (citing Teamsters Local 445 Freight Div.

42

<u>Pension Fund v. Dynex Capital, Inc.</u>, 531 F.3d 190, 196 (2d Cir. 2008).) Defendants also maintain that Plaintiffs have provided only conclusory statements and do not provide factual support for these allegations. (Defs.' Mot. 32.) These claims are unfounded.

Plaintiff's allegations are sufficient to show that McDaniel had "information suggesting that their public statements were not accurate." These allegations are sufficient to allege that McDaniel had the requisite scienter. <u>See</u> <u>In re Marsh & McLennan</u>, 501 F. Supp. 2d at 480-81 (stating that the "standard may be met where plaintiffs allege that defendants . . . knew facts or had access to information suggesting that their public statements were not accurate.").

### ii.  Scienter and Moody's

Where the defendant is a corporation, its scienter can be derived from its employees. <u>See</u> <u>Suez Equity Investors</u>, 250 F.3d at 101; <u>In re Marsh & McLennan</u>, 501 F. Supp. 2d at 481. There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants. <u>See</u> <u>In re Marsh & McLennan</u>, 501 F. Supp. 2d at 481 (citations omitted). Furthermore, the individual making an alleged misstatement and the one with

scienter do not have to be one and the same. See In Re JPMorgan Chase Sec. Litig., 363 F. Supp. 2d at 627.

### a. Motive and Opportunity

Plaintiffs first allege that Moody's had both the motive and opportunity to commit fraud. Plaintiffs' allegations with respect to Moody's essentially mirror those lodged at individual defendant McDaniel. (See Pls.' Opp'n 23-30.) Thus, for the same reasons discussed supra Part III.C.4.i.a, the Court concludes that the AC's motive and opportunity allegations are insufficient to support a finding of scienter for the corporate defendant.

### b. Circumstantial Evidence of Scienter

Plaintiffs allege multiple statements by high ranking Moody's officers indicating that Moody's was aware that its independence, ratings, and methodology were compromised. (Hume Decl. Exs. A4-6, F.) Nevertheless, Moody's continued to assert its independence, insist that its ratings were accurate, and maintain that its methodology was sound. (See AC ¶ 404; Pls.' Opp'n 23.)

The Court has already determined that the AC alleges sufficient circumstantial evidence of McDaniel's scienter. See supra Part III.C.4.i.b. As CEO of the Company, his scienter is imputed to Moody's. In addition, Plaintiffs allege other

statements indicating that Moody's was cognizant that its public representations did not conform to reality.

First, the AC alleges that, when testifying before Congress, a former Moody's managing director stated that he and "many others" at the Company believed that Moody's experienced investor pressure. (Hume Decl. Ex. A44.) Plaintiffs also cite an instant message conversation as evidence of the Company's scienter. In that exchange, Moody's executives commented that their "model def [sic.] does not capture half the risk," and joke that an issuance could be "structured by cows and [they] would rate it." (Hume Decl. Ex. H.) The conversation ends with one Committee member saying that he or she "personally doesn't feel comfortable signing off" on that issuance. (Hume Decl. Ex. H.)

Defendants again claim that Plaintiffs have not adequately pled that Moody's had access to "information suggesting that their public statements were not accurate" or that Moody's "failed to review or check information that they had a duty to monitor." (Defs.' Mot. 32.) They further argue that Plaintiffs have provided only conclusory statements and do not provide factual support for these allegations. (Defs.' Mot. 32.) Their argument is unfounded.

Plaintiffs have provided ample allegations to demonstrate the Company's scienter. They have alleged specific statements

45

indicating that various top officials knew that Moody's independence, ratings, and methodology had been comprised. Consequently, the allegations of the AC sufficiently plead Moody's scienter.

**D. Section 20 Claims**

In conjunction with their securities fraud allegations, Plaintiffs contend that the Individual Defendants are subject to liability as "control person[s]" under § 20(a) of the Exchange Act. (AC ¶ 17.) The threshold for entertaining a control person claim is an underlying primary violation. SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). As discussed supra Part III.C, Plaintiffs adequately plead primary violations of § 10(b) by defendants McDaniel and Moody's. The Court now assesses whether the Individual Defendants are control persons under § 20(a).

Congress did not provide a definition for "control person" in the Exchange Act. In its stead, courts in this Circuit have devised a two part inquiry to determine control liability. Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973). First, a purported control person must actively participate in the overall management and operation of the controlled entity. Lanza, 479 F.2d at 1299. This phrase has been construed as requiring "only some indirect means of discipline or influence short of actual direction" by the purported controller. Drobbins

v. Nicolet, 631 F. Supp. 860, 884 (S.D.N.Y. 1986). Control allegations are evaluated under the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a). In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 415–16 (S.D.N.Y. 2003). Second, the alleged control person must actively participate in some meaningful sense ("culpable participation") in the fraud perpetrated by that entity. The Court adheres to its prior holding that plaintiffs must allege that the defendant acted at least with recklessness, as required by § 10(b) of the Exchange Act and Rule 10b-5. In re Take-Two Interactive, 551 F. Supp. 2d at 308; In re Marsh & McLennan, 501 F. Supp. 2d at 494. Moreover, plaintiffs must plead culpable participation with particularity as required by the PSLRA. In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 491 (S.D.N.Y. 2005) (citing 15 U.S.C. § 78u-4(b)(2)).

**1. Control Allegations**

The control allegations with respect to McDaniel, Clarkson, and Kanef are sufficient to survive Defendants' motion to dismiss. The AC alleges that any acts attributed to Moody's during the class period "were caused by and/or influenced by the Individual Defendants by virtue of their domination and control thereof." (AC ¶ 17.) Moreover, McDaniel was the CEO and Chairman of the Board of Directors since 2005, Clarkson has served in numerous executive roles, including COO, co-COO of Moody's

Investors Service, and senior Managing Director of Moody's Investors Service, and Kanef was the Group Managing Director of Moody's U.S. Asset Finance Group and later the Chief Regulatory and Compliance Officer for Moody's Investors Service. (AC ¶¶ 14-16.) These allegations give the Individual Defendants fair notice of the grounds on which Plaintiff's control allegations rest and are therefore sufficient to plead these defendants' actual control. In re Marsh & McLennan, 501 F. Supp. 2d at 494 ("Courts in this District . . . have generally found that control is adequately alleged with a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion.") (internal quotation marks and citations omitted.)

### 2. Culpable Participation Allegations

Despite the Individual Defendants' qualifications as control persons, only McDaniel qualifies as a culpable participant. Plaintiffs have not pled scienter with respect to the other two defendants. See supra Part III.C.4.i. They have, however, pled scienter with respect to McDaniel. See supra Part III.C.4.i.b. Therefore, the AC only pleads sufficient facts to hold McDaniel liable as a control person under § 20(a).

## IV.   LEAVE TO AMEND THE AC

Plaintiffs have requested leave to amend the AC to redress any deficiencies the Court might identify therein. (Pls.' Opp'n

45 n. 29 (internal citation omitted).) Under Rule 15(a)(2), a "court should freely give leave [to amend] when justice so requires." Indeed, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990) (internal quotation marks and citations omitted). This is especially true when a complaint is dismissed for lack of specificity under Rule 9(b), see Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.") (internal quotation marks and citation omitted). Defendants argue that Plaintiffs' request should be denied because they have had "ample time to craft a well-pleaded complaint" and because the AC contains "incurable defects--including fatally deficient loss causation allegations." ("Defs.' Reply 20 n. 15.)

With respect to Defendants' first argument, the Court had not previously evaluated the merits of Plaintiffs' pleadings and Plaintiffs had not had the benefit of a full adversarial briefing for their pleadings. In such a case, where re-pleading constitutes a second "bite at the apple," the Court has permitted plaintiffs to amend the complaint in order to cure whatever deficiencies the Court finds. In re Take-Two Interactive, 551 F. Supp. 2d at 312.

Furthermore, although a court may deny leave to amend where any amendment would be futile, see Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted), the Court is not convinced that repleading would be futile in this case. The Court has already found sufficient two of Plaintiffs loss causation arguments. Plaintiffs can cure the deficiencies found with respect to Counts I and II of the AC by averring facts demonstrating that statements regarding meaning and source of structured finance securities were false or that Clarkson and Kanef possessed the requisite scienter.

Therefore, the Court finds no reason to deviate from the general policy that leave to amend should be granted liberally in cases alleging securities fraud. The Court hereby grants Plaintiffs' request to amend the AC in order to cure the deficiencies identified in this Opinion.

## V.  CONCLUSION

Defendants' motion to dismiss the AC is granted in part and denied in part. The first count of the AC is dismissed in its entirety with respect to defendants Clarkson and Kanef. Count I is also dismissed with respect to defendants McDaniel and Moody's insofar as it rests on statements regarding the meaning of Moody's ratings and the source of the Company's structured finance revenue. The second count of the AC is dismissed insofar as it asserts claims against Kanef and Clarkson.

Plaintiffs' second amended complaint, along with a memorandum explaining how their amendments have cured the defects specified herein by the Court, shall be filed on or before March 18, 2009. Defendants' memoranda in opposition to Plaintiffs' further amended complaint shall be filed on or before April 15, 2009. Plaintiffs' reply memorandum shall be filed on or before April 29, 2009. Any request for modification of this schedule shall be made in writing and shall state good cause therefor.

SO ORDERED.

                                                  _____

                                                    SHIRLEY WOHL KRAM
                                      UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          February 18, 2009

Plaintiffs' second amended complaint, along with a memorandum explaining how their amendments have cured the defects specified herein by the Court, shall be filed on or before March 18, 2009. Defendants' memoranda in opposition to Plaintiffs' further amended complaint shall be filed on or before April 15, 2009. Plaintiffs' reply memorandum shall be filed on or before April 29, 2009. Any request for modification of this schedule shall be made in writing and shall state good cause therefor.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           February 18, 2009

51