Ira M. Press
Daniel Hume
David Bishop
Beverly Tse
KIRBY McINERNEY LLP
825 Third Avenue, 16th floor
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
Lauren Wagner Pederson
BARROWAY TOPAZ KESSLER MELTZER
& CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

*Co-lead Counsel for Lead Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re MOODY'S CORPORATION SECURITIES LITIGATION | :<br>:<br>: **CASE NO. 1:07-CV-8375-GBD**<br>:<br>: |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

PROCEDURAL HISTORY .......................................................................................... 1

    A.    Overview ...................................................................................................2

    B.    The Growth of Structured Finance ......................................................3

    C.    Independence is Indispensable to the NRSRO's Business .....................4

    D.    Conflicts of Interest and Lack of Independence .....................................5

    E.    Defendants Misrepresent the State of Affairs at Moody's......................6

    F.    Defendants Knew Moody's Independence Was Compromised ...........8

    G.    Materialization of Risk ...........................................................................9

ARGUMENT ............................................................................................................. 10

I.    APPLICABLE RULES AND STANDARDS .................................................. 10

II.    THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(a)......... 12

    A.    The Proposed Class Meets the Numerosity Requirement......................12

    B.  There Are Questions of Law and Fact Common to the Entire Class ...........................13

    C.  Lead Plaintiffs' Claims Are Typical of the Claims of Other Class Members ..............15

    D.    Lead Plaintiffs Will Fairly and Adequately Represent the Class ..........................16

III.    THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(b)(3) ...................... 17

    A.    Common Questions of Law and Fact Predominate ................................17

        1.    Reliance Is a Common Issue for All Class Members ............................... 18

        2.    Loss Causation Is A Common Issue for All Class Members................... 22

    B.    The Superiority Requirement is Satisfied Here ....................................23

IV.    CO-LEAD COUNSEL SATISFY RULE 23(g) ........................................... 24

CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)...............................................................................5

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................21, 29

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ....................................................................23, 24, 25

*Caridad v. Metro-North Commuter R.R.*,
  191 F.3d 283 (2d Cir. 1999)..................................................................................19

*Cross v. 21st Century Holding Co.*,
  No. 00 Civ. 4333 (MBM), 2004 WL 307306 (S.D.N.Y. Feb. 18, 2004)..........................14

*DeMarco v. Nat'l Collector's Mint, Inc.*,
  229 F.R.D. 73 (S.D.N.Y. 2005) ...............................................................................16

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)...............................................................................................12

*Epstein v. MCA, Inc.*,
  50 F.3d 644 (9th Cir. 1995) ...................................................................................29

*Fogarazzo v. Lehman Bros. Inc.*,
  No. 03 Civ. 5194 (SAS), 2009 WL 2390244 (S.D.N.Y. Aug. 4, 2009) ..........................23

*Fogarazzo v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) .......................................................................12, 16

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176 (2d Cir. 1990).......................................................................................12

*Gen. Tel. Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982)..................................................................................................12

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968)................................................................................13, 29

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
  No. 03 MD 1529 (S.D.N.Y.)........................................................................................30

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................25, 26

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95-CV-3431 (ARR), 1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ........................ 22

*In re Ashanti Goldfields Sec. Litig.*,
    Civ. 00-0717 (DGT), 2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) ................................ 25

*In re Bank of America Corp. Sec. Deriv. & ERISA Litig.*,
    No. 09 MDL 2058 (DC) (S.D.N.Y.) ................................................................................ 31

*In re BearingPoint, Inc. Sec. Litig.*,
    232 F.R.D. 534 (E.D. Va. 2006) ...................................................................................... 24

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ....................................................................................... 13

*In re Drexel Burnham Lambert Group, Inc.*,
    960 F.2d 285 (2d Cir. 1992) ...................................................................................... 18, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ........................................................................ 15, 18, 19

*In re Healthsouth Corp. Sec. Litig.*,
    No. CV-98-J-2634-S, 2000 WL 34211319 (N.D. Ala. 2000) ............................................ 3

*In re Heritage Bond Litig.*,
    No. 02-ML-1475-DT (C.D. Cal.) ...................................................................................... 31

*In re iMergent Sec. Litig.*,
    No. 2:05-cv-0204 (D. Utah) .............................................................................................. 30

*In re Initial Pub. Offering Sec. Litig.*,
    227 F.R.D. 65 (S.D.N.Y. 2004) ........................................................................................ 27

*In re Initial Public Offering Securities Litigation*,
    471 F.3d 24 (2d Cir. 2006) ............................................................................................... 13

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 09 MD 2017 (S.D.N.Y.) ............................................................................................. 31

*In re Mercury Interactive Sec. Litig.*,
    05-3395 (N.D. Cal.) .......................................................................................................... 30

*In re MetLife Demutualization Litig.*,
    229 F.R.D. 369 (E.D.N.Y. 2005) ...................................................................................... 16

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ....................................................................... passim

*In re Moody's Corp., Sec. Litig.*,
    612 F. Supp. 2d 397 (S.D.N.Y. 2009)............................................................... 2

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................... 14

*In re Natural Gas Commodities Litig.*,
    231 F.R.D. 171 (S.D.N.Y. 2005) .................................................................... 17

*In re NetBank Sec. Litig.*,
    259 F.R.D. 656 (N.D. Ga. 2009) .................................................................... 24

*In re Nortel Networks Corp. Sec. Litig.*,
    No. 01 Civ. 1855 (RMB), 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) ...................... 16

*In re NTL, Inc. Sec. Litig.*,
    No. 02 Civ. 3013 (LAK) (AJP), 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006).......... 16, 27

*In re NTL, Inc. Sec. Litig.*,
    No. 02 Civ. 3013 (LAK), 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006)............................ 16

*In re Omnicom Group, Inc. Sec. Litig.*,
    No. 02 Civ. 4483 (RCC), 2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007) ........................ 17

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
    No. 05 Civ. 6924 (CLB), 2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007).......................... 18

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).............................................................. 24

*In re Tyco Int'l, Ltd. Sec. Litig.*,
    No. 02-1335-B (D.N.H. 2002) ........................................................................ 31

*In re UBS AG Sec. Litig.*,
    No. 1:07-CV-11225-RJS (S.D.N.Y.) ................................................................ 31

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................... 18, 21

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)...................................................................... 12, 27

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .................................................................... 19

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)........................................................................... 3

*Lapin v. Goldman Sachs & Co.*,
    No. 04 Civ. 2236 (S.D.N.Y.) ........................................................................... 30

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)............................................................... 15, 18, 19

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) .......................................................................................... 29

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)........................................................................... 21

*Nach v Huber*,
    07 Civ. 04071 ...................................................................................................... 2

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993).......................................................................14, 19

*Robinson v. Metro-North Commuter R.R.*,
    267 F.3d 147 (2d Cir. 2001)............................................................................. 15

*Teamsters Local Freight Div. Pension Fund v. Bombardier*,
    No. 05 Civ. 1898 (SAS), 2006 WL 2161887  (S.D.N.Y. Aug. 1, 2006) .......... 23

*Toure v. Cent. Parking Sys.*,
    No. 05 Civ. 5237 (WHP), 2007 WL 2872455 (S.D.N.Y. Sept. 28, 2007) ...... 19

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ..................................................................... 25

## Statutes

15 U.S.C. § 78j(b) ................................................................................................... 1

15 U.S.C. § 78t(a) ................................................................................................... 1

15 U.S.C. § 78u-4(a) .............................................................................................. 1

## Rules

Fed. R. Civ. P.  23(a)(3)......................................................................................... 15

Fed. R. Civ. P. 23 ....................................................................................1, 10, 11, 12

Fed. R. Civ. P. 23(a) ....................................................................................... 10, 12

Fed. R. Civ. P. 23(a)(2)........................................................................................... 13, 14

Fed. R. Civ. P. 23(a)(4)................................................................................................. 16

Fed. R. Civ. P. 23(b) .................................................................................................... 10, 22

Fed. R. Civ. P. 23(b)(3)............................................................................................ 11, 17, 23

Fed. R. Civ. P. 23(c)(1)(C) .......................................................................................... 11

Fed. R. Civ. P. 26(a) .................................................................................................... 16

Fed. R. Evid. 201(b)(2)................................................................................................... 3

## Other Authorities

Bromberg & Lowenfels,
    4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ...................................... 19

## INTRODUCTION

This is a securities class action involving claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a).  Lead Plaintiffs Teamsters Local 282 Pension Trust Fund ("Local 282"), Charles W. McCurley, Jr. ("McCurley") and Dr. Lewis Wetstein ("Wetstein") (collectively, "Lead Plaintiffs") respectfully request certification of the following class pursuant to Fed. R. Civ. P. 23:

> All persons who purchased or otherwise acquired Moody's Corporation ("Moody's") common stock between February 3, 2006 and October 24, 2007 inclusive (the "Class Period"), and who were damaged thereby.  Excluded from the class are defendants, members of the immediate family of defendants, any subsidiary or affiliate of Moody's and the directors, officers, and employees of Moody's or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person (the "Class").

Lead Plaintiffs also seek appointment of Local 282, McCurley and Wetstein as Class Representatives and Kirby McInerney LLP ("Kirby"), Glancy Binkow & Goldberg LLP ("Glancy"), and Barroway Topaz Kessler Meltzer & Check, LLP ("Barroway") as Class Counsel.

Lead Plaintiffs purchased Moody's common stock during the Class Period at artificially inflated prices and were damaged thereby.  As such, they are members of the Class.  As demonstrated below, Lead Plaintiffs have established all requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq*., ("PSLRA") and Rule 23 and, as such, the Class should be certified, Lead Plaintiffs should be appointed Class Representatives, and the undersigned should be appointed Class Counsel.

## PROCEDURAL HISTORY

This action was originally filed on July 19, 2007, pursuant to the PSLRA, in the U.S. District Court for the Northern District of Illinois. *Nach v Huber,* 07 Civ. 04071.  It was

transferred to the Southern District of New York, where it was consolidated with related securities cases pending in this District.  On December 12, 2007, the Court appointed Lead Plaintiffs and Co-Lead Counsel to represent the putative class. *In re Moody's Corp. Sec. Litig.*, 07 Civ. 8375 (GBD), Dkt. No. 7.  Lead Plaintiffs filed the Consolidated Amended Complaint ("CAC") on June 27, 2008.  By order and opinion dated February 18, 2009, the Court denied in substantial part Defendants' motion to dismiss Lead Plaintiffs' CAC.  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 518 (S.D.N.Y. 2009).  The Court granted the motion to dismiss in part with respect to claims filed against Brian M. Clarkson, Moody's Chief Operating Officer, and Michael Kanef, the Group Managing Director of Moody's U.S. Asset Finance Group. *Id.* Defendants subsequently moved for reconsideration, which was denied by Judge Shirley Wohl Kram by order and opinion dated April 29, 2009.  *In re Moody's Corp.*, *Sec. Litig.*, 612 F. Supp. 2d 397, 401 (S.D.N.Y. 2009).  Lead Plaintiffs now move for class certification.

## STATEMENT OF FACTS

### A.    Overview

Moody's Corporation ("Moody's" or the "Company") is one of a handful of United States-based Nationally Recognized Statistical Rating Organizations ("NRSRO"), which evaluate and rate the creditworthiness of debt instruments. ¶ 11;[1] *In re Moody's*, 599 F. Supp. 2d at 499.  Moody's is one of the world's two largest credit rating agencies, with approximately 40% of the credit rating market.  ¶ 11; *In re Moody's*, 599 F. Supp. 2d at 500.  Moody's stock publicly trades on the New York Stock Exchange ("NYSE") with over 275 million shares in its float and an average daily trading volume of approximately 2.5 million shares.  ¶ 422(a); *see also*

---

[1]    References to "¶ __" are to the CAC.  Unless otherwise defined, capitalized terms shall have the meanings attributed to them in the CAC.

Moody's Form 10-K for 2005 and 2006.[2]  Major analysts following Moody's included Goldman Sachs, UBS, Morgan Stanley, Merrill Lynch, JP Morgan and Credit Suisse.  *See, e.g.,* ¶¶ 275-76, 318, 341, 343.

Throughout the Class Period, Moody's issuance of credit ratings supplied approximately 90% of its revenues. ¶ 10.  Moody's provided credit ratings for corporate debt, municipal debt and structured finance.  *Id.*  Since 2004, structured finance ratings had provided Moody's with more rating revenue than all other product ratings combined.  ¶ 12.  For example, in 2006, structured finance accounted for 54.2% of Moody's $1.635 billion in revenue from its credit ratings business, and 43.5% of Moody's total revenue for that year.  ¶ 290 n.76; *In re Moody's*, 599 F. Supp. 2d at 500.  Moody's business growth from 2003 through the Class Period had been driven by extraordinary growth in its structured finance ratings business. ¶ 12.  As the structured finance market exploded between 2004-2007, Moody's shares more than doubled in value, rising from approximately $30 per share in early 2004 to more than $70 per share in early 2007.  ¶ 13.

### B.      The Growth of Structured Finance

Structured finance securities, also known as Asset-Backed Securities ("ABS"), are collateralized by pools of assets.  ¶ 26; *In re Moody's*, 599 F. Supp. 2d at 500.  The ABS at issue here are largely securities backed by sub-prime and "Alt-A" mortgages – primarily residential mortgage-backed securities ("RMBS"), and collateralized debt obligations ("CDOs").   ¶ 26.  During 2006, approximately $2.5 trillion in mortgages were originated in the U.S. of which $1.9

---

[2]    Courts in the Second Circuit may take judicial notice of documents that are relevant, public, and whose contents are verifiable under Fed. R. Evid. 201(b)(2).  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (Taking judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2)).  *Kramer* has been extended from SEC filings to documents produced in congressional investigations.  *See In re Healthsouth Corp. Sec. Litig.*, No. CV-98-J-2634-S, 2000 WL 34211319, at *2 (N.D. Ala. Dec. 13, 2000) (taking judicial notice of documents summarizing the congressional testimony offered by HealthSouth executives).

trillion (or 80% of all mortgages) were securitized into RMBS.  ¶ 27; *In re Moody's*, 599 F. Supp. 2d at 500.  Approximately $520 billion (or 25%) of these RMBS were backed by sub-prime mortgages.  Furthermore, collections of ABS such as RMBS served as the basis for "second order" structured finance securities that pooled various ABS to issue a further round of securities, such as CDOs.  ¶ 29; *In re Moody's*, 599 F. Supp. 2d at 500.  In 2006, approximately $314 billion CDOs were issued in the U.S.  ¶¶ 29-30; *In re Moody's*, 599 F. Supp. 2d at 500.

### C.     Independence is Indispensable to the NRSRO's Business

As repeatedly represented by Moody's, credit ratings are worthless unless the credit rating agency is trusted to provide ratings that accurately reflect credit realities.  ¶ 32.  NRSROs, like independent public accountants and financial analysts, are considered "financial gatekeepers."  ¶¶ 32-37.  Gatekeeper functionality depends on reputational capital stemming from independence, integrity, and ability to assess risk.  Just as accountants provide independent opinions on the validity and completeness of audited financial statements, and analysts provide independent "ratings" on the stocks of publicly listed companies, rating agencies provide independent "credit ratings" for debt securities.  ¶¶ 33-35.

The need for secondary verification or certification arises from the recognition that the primary entity may find it in its interest to misrepresent itself.  Therefore, it is the independence of an external credit rating agency which makes its opinion trustworthy and useful.  ¶ 33.  In fact, the SEC has articulated that its decision to award NRSRO status to a rating agency hinges upon "the rating organization's independence from the company[y] it rates."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.,* 651 F. Supp. 2d 155, 164-65 (S.D.N.Y. 2009).  Thus, Moody's position as both a gatekeeper firm and a leader in its market is predicated on its ability to maintain its independence and objectivity.  ¶ 35.

### D.     Conflicts of Interest and Lack of Independence

Since the 1970s, Moody's has been paid for its credit rating opinions by the very issuer whose debt is being rated.  *In re Moody's*, 599 F. Supp. 2d at 500.  This practice, known as the "Issuer Pays" business model, presents Moody's with a conflict of interest.  Should Moody's not deliver a rating to the issuer's liking, the issuer is under no obligation to publish the rating, and may refuse to retain Moody's in the future.  ¶¶ 38, 40.

Several features of the structured finance market worked to intensify the conflicts of interest inherent in the Issuer Pays model.  First, the fees for rating structured finance securities were three times higher than the fees for rating corporate bonds of comparable size.  ¶ 292; *In re Moody's*, 599 F. Supp. 2d at 500.  Significantly, and wholly unlike Moody's other ratings markets, control over structured finance ratings assignments was dominated by a small number of large, repeat-issuer investment banks.  Losing one client, for example, could result in the loss of 10% of the market or more – a blow all the more significant given the size and volume of the market. ¶ 43.  Further, in contrast to Moody's other rating markets, structured finance had a uniquely bifurcated evaluation, retention, and compensation structure.  NRSROs were paid *de minimis* fees for a pre-evaluation of ratings, but only received full payment if the issuer officially chose to use or "publish" the ratings indicated by the NRSRO in its pre-evaluation.  ¶ 44.  Thus, because of pre-evaluations, issuers were able to select NRSROs on the very basis of the *ex ante* ratings (*i.e.*, ratings shopping), *id.,* and NRSROs felt significant pressure to deliver favorable ratings in order to secure and retain clients.  *See also,* ¶¶ 312-16.

Jerome S. Fons, a 17-year Moody's employee who was Managing Director of Credit Policy, in testimony before the U.S. Congress, confirmed Lead Plaintiffs' allegations that a "race

to the bottom" of ratings quality, spurred by the conflicts of interest inherent in the structured

finance market, led to degraded ratings.  Specifically, Mr. Fons testified that:

> My view is that a large part of the blame can be placed on the inherent conflicts of
> interest found in the issuer-pays business model and ratings shopping by issuers
> of structured securities.  A drive to maintain or expand market share made the
> rating agencies willing participants in this shopping spree.  It was also relatively
> easy for the major banks to play the agencies off of one another because of the
> opacity of the structured transactions and the high potential fees earned by the
> winning agency.  *Originators of structured securities typically chose the agency
> with the lowest standards, engendering a race to the bottom in terms of rating
> quality.  While the methods used to rate structured securities have rightly come
> under fire, in my opinion, the business model prevented analysts from putting
> investor interests first.*

*See* Hume Decl.[3] Ex. A (*Testimony of Jerome S. Fons Before the Committee on Oversight and

Government Reform October 22, 2008* at 3 (emphasis added)).  Thus, because the issuer's

desired credit rating drove its rating agency selection, the agencies, Moody's included, chose to

please their customers, at the expense of objectivity.  *See also*, ¶¶ 313-16.

### E.    Defendants Misrepresent the State of Affairs at Moody's

Defendants repeatedly represented in public statements that, *inter alia*, Moody's: (i) was

an "independent" and "objective" provider of credit ratings (¶¶ 3, 35, 54, 68, 70-71, 73, 76, 80,

83); (ii) had adequately managed and/or eliminated the potential conflicts of interest (¶¶ 54, 60-

61, 88-90); (iii) issued credit ratings that reflected all known relevant information (¶¶ 55, 68-69,

71-72, 80, 83); and (iv) evaluated the quality of originator practices as part of its rating

methodology.  ¶¶ 118, 122, 126; *In re Moody's*, 599 F. Supp. 2d at 508-10.

Moody's touted its independence in its Code of Conduct, Form 10-Ks, and its 2005 and

2006 Annual Reports.  ¶¶ 55, 68, 80, 83; *In re Moody's*, 599 F. Supp. 2d at 508.  *See* ¶ 71; *In re

Moody's*, 599 F. Supp. 2d at 501 (Moody's 2005 Annual Report states that the Company is

---

[3] "Hume Decl." refers to the Declaration of Daniel Hume in Support of Lead Plaintiffs' Motion for
Class Certification, filed concurrently herewith.

6

committed to "reinforcing…sense of trust in the accuracy, independence, and reliability of Moody's products and services" and "upholding independence and integrity."); ¶¶ 73, 80; *In re Moody's*, 599 F. Supp. 2d at 501 (Moody's 2005 and 2006 Form 10-Ks state that Moody's provides "independent credit opinions" that help investors analyze risks); ¶ 68; *In re Moody's*, 599 F. Supp. 2d at 501 (Moody's Code of Conduct specifies that Moody's "maintains independence in its relationships with Issuers and other interested entities."). Moody's also made numerous representations regarding the amount of information it considered when preparing credit ratings. For example, the Code of Conduct stated that "Credit Ratings [ ] reflect consideration of all information known." ¶ 68; *In re Moody's*, 599 F. Supp. 2d at 501-02.

None of the above representations were true and, collectively, they represented a state of affairs that differed materially from the one that actually existed at Moody's. Contrary to Moody's representations, investigative news reports, confidential witnesses and Congressional hearings demonstrate that: (i) Moody's was not operating as an "independent" and "objective" provider of credit ratings; rather, Moody's independence had been compromised to the point that its credit rating methodologies systematically failed to reflect objective credit realities; (ii) Moody's had declined to manage let alone eliminate its conflicts of interest; (iii) Moody's credit ratings failed to reflect all information known and believed to be relevant; and (iv) Moody's credit ratings were not solely influenced by factors relevant to the credit assessment, but were also affected by the existence of, or potential for, lucrative business relationships between Moody's and the entities that paid Moody's to provide credit ratings. ¶ 55.

All of Defendants' misrepresentations were material. Because independence is essential to an NRSRO's functionality as a financial gatekeeper, it was material for investors to know that Moody's was not complying with its purported practices of independence and objectivity.

Furthermore, since the decision to evaluate originator standards in rating structured finance instruments had serious consequences on the accuracy of ratings issued by Moody's, information that Moody's was <u>not</u> considering this factor was material to investors.  *E.g.,* ¶¶ 110-29; *In re Moody's*, 599 F. Supp. 2d at 510.

      **F.**    **Defendants Knew Moody's Independence Was Compromised**

Evidence of Defendants' scienter abounds. Multiple statements by Moody's officers confirm that Moody's was aware that its independence, ratings and methodology were compromised.  Hume Decl. Exs. B (at pgs. 4-6), C.  On October 21, 2007, Defendant McDaniel authored a confidential presentation in which he admitted that Moody's existing "safeguards" did "NOT solve the [conflict of interest] problem."  Hume Decl. Exs. B (at pg. 5), C (emphasis in original)).  McDaniel also admitted that Moody's had become "complacen[t] about ratings quality" and implied that ratings were not about accurately gauging risk as much as they were about balancing competing market interests.  Hume Decl. Ex. C.

Statements by other Moody's executives provide further evidence of scienter.  On September 27, 2007, a former managing director in Moody's structured finance division stated in his testimony before the house subcommittee that ratings shopping and competitive laxity had been "rampant" in structured finance. ¶ 331(a).  Managing directors at Moody's also admitted that Moody's structured finance ratings did not incorporate basic elements such as "how long has the asset class existed, how liquid is it, and how much experience do we have with regard to its behavior under market stress."  Hume Decl. Ex. D (Part 2 at COGR-0052157).  *See also* Hume Decl. Ex. D (Part 2 at COGR – 0052157 (Moody's managing directors admit that Moody's "refused to change their ratings in the face of overwhelming evidence that they were wrong"));

*id.* at COGR-0052159 (Moody's managing directors admit that Moody's "had blinders on [when rating structured finance securities] and never questioned the information [they] were given.").

Furthermore, multiple news reports demonstrate that: (i) Moody's condoned, profited from, and facilitated ratings shopping among structured finance issuers (*see* ¶ 347; *In re Moody's*, 599 F. Supp. 2d at 508 (*Wall Street Journal* reports that Moody's modified its ratings in order to retain clients' business)) (attached to Hume Decl. as Exhibit E); and (ii) Moody's catered to its structured finance clients by favorably adjusting ratings models (*see* ¶ 363; *In re Moody's*, 599 F. Supp. 2d at 508 (*Financial Times* reports that Moody's amended rating methodology to conceal fraudulently rated bonds)) (attached to Hume Decl as Exhibit F), and/or reassigning analysts deemed unfriendly to Moody's structured finance clients (*see* ¶ 352; *In re Moody's*, 599 F. Supp. 2d at 508 (*Wall Street Journal* reports that Moody's fired and/or reassigned analysts deemed too cautious, replacing them with analysts willing to give higher ratings)) (attached to Hume Decl. as Exhibit G).

### G.    Materialization of Risk

Beginning in the Fall of 2007, a series of events and disclosures made increasingly clear that Moody's had materially misrepresented the nature and conduct of its structured finance ratings business, and that Moody's had secretly conducted that business contrary to its prior representations concerning ratings methods and independence. As Moody's misconduct and misrepresentations slowly came to light, occasioning severe regulatory scrutiny and sanctions (¶¶ 393-98, 403), Moody's reputation (¶¶ 359-65, 403) and Moody's structured finance ratings business (¶¶ 366-92, 403) collapsed, directly causing Moody's share price to collapse (¶¶ 353-58, 364-66, 399-403). *See also In re Moody's*, 599 F. Supp. 2d at 512-14 (finding loss causation adequately pled); *In re Moody's*, 612 F. Supp. 2d at 399-401 (same).

This latter collapse was specific to Moody's, whose share price trajectory followed its own path – demarcated by company-specific corrective disclosures -- rather than that set by the market or industry.  ¶ 401.  For example, on August 20, 2007, when the market as a whole was flat, Moody's shares lost 7.8% of their value ($3.90 per share) following disclosures that regulators were calling for investigation of Moody's structured finance ratings operations.  ¶ 400(e); *see also* ¶¶ 393, 403(b) (summarizing the many ensuing regulatory investigations). Likewise, on October 24 and 25, 2007, when the market as a whole again was flat, Moody's shares lost 8.5% of their value ($4.05 per share) upon disclosing the collapse of its structured finance ratings business.  ¶ 400(i); *see also* ¶¶ 366-92, 403(f) (further detailing the severity of that collapse, including the "extinction" of entire assets such as RMBS, CDOs and SIVs and with them, the permanent evaporation of more than 10% of Moody's "revenue base").

## ARGUMENT

## I.     APPLICABLE RULES AND STANDARDS

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.  A party seeking class certification must first show that the proposed class action satisfies the following four requirements set forth in Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The party seeking class certification must also satisfy one of the categories set forth in Rule 23(b).  Here, certification is sought pursuant to Rule 23(b)(3), which requires that:

> the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

10

Fed. R. Civ. P. 23(b)(3).

> This rule states that the matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

In determining whether a class should be certified, the question is not whether plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 have been met. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("[T]he question for the district court at the class certification stage is whether plaintiffs'…evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive."). Documentary evidence, affidavits, and the uncontested allegations of the complaint, among other things, are accepted by district courts to satisfy a plaintiff's showing on class certification. *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y. 2005) (Scheindlin, J.).

"In light of the importance of the class action device in securities fraud suits," the Second Circuit has instructed district courts to construe the factors of Rule 23 liberally in cases such as this one. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990) (citing *Green v. Wolf Corp.*, 406 F.2d 291, 295, 298 (2d Cir. 1968)). Further, because the court can alter or amend a class certification order at any time before final judgment, *see* Fed. R. Civ. P. 23(c)(1)(C), "when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) (Sweet, J.).

In *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (2d Cir. 2006), the Second Circuit held that a district judge must "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met…." *Id.* at 42.  This assessment, the court explained, cannot delve into merits issues completely unrelated to the requirements of Rule 23, but the district judge should be persuaded that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established…." *Id.* at 41.  The Second Circuit cautioned that the district court must "avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation, [therefore] a district judge must be accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements." *Id.*

As argued more fully below, this action is appropriate for class certification, as it embodies all the hallmarks, both in form and substance, of class actions traditionally certified in this District and elsewhere.  Accordingly, the Court should grant Lead Plaintiffs' motion.

## II.    THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(a)

As demonstrated below, the four prerequisites of Rule 23(a) - numerosity, commonality, typicality, and adequacy of representation - are met here.

### A.    The Proposed Class Meets the Numerosity Requirement

Rule 23(a) requires that the members of the Class be so numerous that joinder of all members is impracticable.  "Impracticable" does not mean impossible, however, and "[p]laintiffs are not obligated to prove the exact class size to satisfy numerosity." *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333 (MBM), 2004 WL 307306, at *1 (S.D.N.Y. Feb. 18, 2004) (Mukasey, J.) (citing *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).  Rather, a plaintiff "may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class," *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)

(Sweet, J.), and "the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (Holwell, J.) (quotation omitted).

Here, there can be no dispute that the putative Class satisfies numerosity and consists of (at least) thousands of investors.  The Court can take judicial notice from Moody's public filings with the SEC that the stock traded on the NYSE, with approximately 275 million shares of Moody's common stock outstanding and actively traded.  *See* Hume Decl. Ex. H.  While the precise number of class members can only be determined from records maintained by Moody's or its agents, common sense strongly suggests that the proposed Class numbers in the thousands (or tens of thousands) and that the members thereof are geographically dispersed.  The numerosity requirement is met.

### B.      There Are Questions of Law and Fact Common to the Entire Class

"The commonality requirement [of Rule 23(a)(2)] is met if plaintiffs' grievances share a common question of law or fact."  *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  This does *not* mean that all issues must be identical as to each class member.  Rather, it requires plaintiffs simply to "identify some unifying thread among the members' claims that warrants class treatment."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007) (Conner, J.) (quoting *In re Vivendi*, 242 F.R.D. at 84); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK) (AJP), 2006 WL 330113, at *6 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.).[4]  "[I]t is sufficient if a *single* common issue is shared by the class."  *DeMarco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (McMahon, J.) (emphasis added).

---

[4] Judge Kaplan subsequently overruled defendants' objections to the report and recommendation. *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2006 WL 568225 (S.D.N.Y. Mar. 9, 2006).

Consistent with this principle, "[t]he commonality requirement 'has been applied permissively' in securities fraud litigation," *In re Vivendi*, 242 F.R.D. at 84 (quoting *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003)), such that "[i]n general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo*, 232 F.R.D. at 180. Indeed, "[s]ecurities fraud cases by their nature usually allege a common course of conduct sufficient to satisfy Rule 23(a)(2)," *In re MetLife Demutualization Litig.*, 229 F.R.D. 369, 373 (E.D.N.Y. 2005), and courts in this district accordingly have characterized the commonality requirement as a "low hurdle." *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483 (RCC), 2007 WL 1280640, at *3 (S.D.N.Y. Apr. 30, 2007) (Casey, J.); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y. 2005) (citing cases) (Marrero, J.).

Here, Lead Plaintiffs assert that the following questions of fact or law are common to all members of the proposed Class:

(a) whether the Federal securities laws were violated by Defendants' acts and omissions as alleged in the CAC;

(b) whether Defendants participated in and pursued the common course of conduct alleged in the CAC;

(c) whether Defendants acted with scienter;

(d) whether documents, press releases, and other statements disseminated to the investing public and Moody's shareholders misrepresented material facts about the business, operations, financial condition, and prospects of Moody's;

(e) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about, among other things, Moody's business, business conduct, independence, and method of Moody's credit ratings;

(f) whether the market price of Moody's common stock was artificially inflated due to the material misrepresentations and omissions and failures to correct such material misrepresentations and omissions;

(g) whether Moody's stock trades on an efficient market; and

(h)     whether and to what extent the members of the Class have sustained
damages as a result of Defendants' conduct.

The "common question" prong is satisfied because the CAC alleges that (i) Defendants

are liable to each individual class member for the same violations of Exchange Act § 10(b)

through the dissemination of numerous false and misleading statements and (ii) Defendant

McDaniel is liable under Exchange Act § 20(a) as a control person.  *See In re Prestige Brands

Holdings, Inc. Sec. Litig.*, No. 05 Civ. 6924 (CLB), 2007 WL 2585088, at *2 (S.D.N.Y. Sept. 5,

2007); *see also Flag Telecom*, 245 F.R.D. at 158 (finding that courts have "consistently found

substantially similar allegations to be sufficient").

### C.     Lead Plaintiffs' Claims Are Typical of the Claims of Other Class Members

Rule 23(a)(3), the typicality requirement, is satisfied when the plaintiff shows that "each

class member's claim arises from the same course of events, and each class member makes

similar legal arguments to prove the defendant's liability."  *Marisol A.*, 126 F.3d at 376; (quoting

*In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).  Typicality does

not require, however, "that the situations of the named representatives and the class members be

identical."  *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006)

(McMahon, J.) (quotation omitted).  Rather, so long as "the disputed issue of law or fact

occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of

other members of the proposed class,"  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 280

(S.D.N.Y. 2003) (quoting *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir.

1999)) (Newman, J.), "the typicality requirement is usually met irrespective of minor variations

in the fact patterns underlying individual claims."  *Robidoux v. Celani*, 987 F.2d at 937; *Toure v.

Cent. Parking Sys.*, No. 05 Civ. 5237 (WHP), 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28,

2007) (Pauley, J.).  Moreover, the typicality and commonality requirements "tend to merge" in

15

securities cases, suggesting that typicality generally will be found if commonality is found. *Marisol A.*, 126 F.3d at 376; *Flag Telecom*, 245 F.R.D. at 161.

Lead Plaintiffs' claims in this action are identical to those of the other members of the proposed Class. Lead Plaintiffs, like all class members, purchased Moody's publicly-traded securities at artificially-inflated prices during the Class Period and suffered damages because of Defendants' alleged material misstatements and omissions. Lead Plaintiffs assert the same claims and make the same legal and factual arguments as does the Class. The liability, causation, and damage elements of the claims against Defendants - as well as Defendants' defenses thereto - will succeed or fail on the same factual and legal theories for the Lead Plaintiffs and the Class. Therefore, Lead Plaintiffs' claims are typical of those of the Class.

### D.    Lead Plaintiffs Will Fairly and Adequately Represent the Class

Rule 23(a)(4), the adequacy of representation requirement, entails two showings: (1) class counsel must be qualified, experienced and generally able to conduct the litigation; and (2) the representative plaintiff's interests must not be antagonistic to those of the remainder of the class. *See Drexel Burnham*, 960 F.2d at 291.

First, Kirby, Glancy and Barroway, court-appointed Co-Lead Counsel for Lead Plaintiffs, are amply qualified, experienced and able to conduct this litigation vigorously and effectively. The Court may take judicial notice of this fact based upon the litigation history of this case to date. Co-Lead Counsel, on behalf of Lead Plaintiffs, have prepared and filed a CAC, opposed and defeated Defendants' motion to dismiss the CAC, defeated Defendants' motion for reconsideration, prepared Initial Disclosures pursuant to Fed. R. Civ. P. Rule 26(a), and have participated in discovery and mediation efforts before Special Master Paul D. Wachter. (*See* Docket Nos. 9, 30, 35, 41, 44). Copies of Co-Lead Counsel's firm's resumes are annexed to the Hume Decl. as Exhibits I, J and K.

Second, there are no potential intra-class conflicts here.  Indeed, there is not a hint of conflict or antagonism between the claims of the proposed class representatives and those of the other members of the proposed Class.  Lead Plaintiffs purchased shares of Moody's during the Class Period, just as the remaining members of the Class, and all members of the Class have been similarly damaged by disclosures of Defendants' conduct during the Class Period.  Given that no conflicts, including unique defenses, exist between Lead Plaintiffs' interests and those of other Class members, and that Co-Lead Counsel are able and competent lawyers in this area of practice, the adequacy of representation requirement is met.

## III.   THE PROPOSED CLASS SATISFIES THE PREREQUISITES OF RULE 23(b)(3)

### A.   Common Questions of Law and Fact Predominate

Rule 23(b)(3) sets forth two requirements, the first being that the questions of law or fact common to the members of the class must "predominate" over any questions affecting only individual members.  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).  The Supreme Court recognized in *Amchem* that "[p]redominance is a test readily met in certain cases alleging…securities fraud[.]"  *Id.* at 625.

The Second Circuit has stated that "[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (citing *Visa Check*, 280 F.3d at 136).  This is undoubtedly true here. The common questions of law and fact noted above clearly predominate over any conceivable individual question, because Defendants' alleged misconduct affected class members in the same manner, and any class member would need to establish the same facts to demonstrate violations

17

of the Exchange Act. *See In re Veeco Instruments, Inc.*, 235 F.R.D. 220 at 240 ("[Q]uestions of fact regarding the content and implications of defendants' statements and defendants' intent in making these statements are central to the claims of each member of the putative class. Any individual issues will necessarily be secondary."); *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431 (ARR), 1999 WL 1021819, at *10 (E.D.N.Y. Apr. 27, 1999) ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues.").

### 1.     Reliance Is a Common Issue for All Class Members

Reliance in a securities fraud case like this one is presumed pursuant to (i) the fraud on the market doctrine set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and/or (ii) the presumption of reliance on material omissions set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

The fraud on the market doctrine dispenses with the requirement that an investor prove awareness or reliance of a particular statement. *Basic*, 485 U.S. at 241-42. In order to be entitled to the *Basic* presumption of reliance, the market for the security must be "efficient." *Id.* at 245-46. Although the Second Circuit has not adopted a test for determining whether the market for a security is efficient, courts in this District have considered the following factors in determining whether a company's stock traded on an open, developed and efficient market: (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security;[5] (4) the eligibility of

---

[5] This *Cammer* factor is inapplicable here because Moody's common stock traded on the NYSE, which was not facilitated by market makers, but by "specialists" employed by the exchange to maintain an orderly market and to prevent share imbalances. *Cammer* itself dealt with whether "market makers in the ***over-the-counter market*** ... provided a sufficiently fluid and informed trading environment so that

the company to file an S-3 Registration Statement; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases.  *Fogarazzo v. Lehman Bros. Inc.*, No. 03 Civ. 5194 (SAS), 2009 WL 2390244, at *7 n.83 (S.D.N.Y. Aug. 4, 2009) (citing *Cammer*, 711 F. Supp. at 1286-87 (the "*Cammer*" factors")).

Courts should use these factors as an analytical tool rather than as a checklist.  *See, e.g., Teamsters Local Freight Div. Pension Fund v. Bombardier,* No. 05 Civ. 1898 (SAS), 2006 WL 2161887*,* at *5 (S.D.N.Y. Aug. 1, 2006); *In re NetBank Sec. Litig.*, 259 F.R.D. 656, 669 (N.D. Ga. 2009) ("[P]roof of every single factor is not always necessary, and 'once a court endeavors to apply these factors, they must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency.'").

Moreover, it is well-recognized that national securities exchanges like the NYSE (upon which Moody's common stock traded during the proposed Class Period) are efficient markets.  *See*, *e.g.*, *Bombardier,* 2006 WL 2161887, at *8 ("If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient."); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 539 (E.D. Va. 2006) (noting that where the security at issue is traded on the NYSE, the requirements of efficient market "are easily met").  While it is beyond doubt that the NYSE is efficient, thereby permitting

---

when material information about [the stock] was disseminated investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices." *Cammer v. Bloom*, 711 F. Supp. 1264, 1282-83 (D.N.J. 1989) (emphasis added).  The *Cammer* court cited with approval the following language: "We think that, at a minimum, there should be a presumption-probably conditional for class determination-that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System." *Id.* at 1292 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

19

a class-wide presumption of reliance based upon the fraud-on-the-market doctrine, this action also readily meets the *Cammer* factors considered by courts.

First, an average of 12,097,257 shares of Moody's stock traded each week on the NYSE during the Class Period, with an average of more than 2,525,973 shares trading daily and trading volume of 4.59% as average weekly turnover. *See* Hume Decl. Exs. L and O. *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 578-79 n.38 (S.D.N.Y. 2008) (average weekly turnover rate of 2.8% created a strong presumption of efficiency under *Cammer*); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (average daily trading volume of 3,983,826 supported finding of market efficiency); *In re Ashanti Goldfields Sec. Litig.*, Civ. 00-0717 (DGT), 2004 WL 626810, at *12 (E.D.N.Y. Mar. 30, 2004) (certifying class where*, inter alia*, daily trading volume was between 37,000 and 4,541,600 shares). Indeed, in *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008), the court observed that plaintiffs satisfied the first *Cammer* factor, as the average weekly trading volume was 4.3% percent, which far exceeded the 1-2% benchmark set forth in *Cammer*.

Second, a significant number of market analyst firms covered the Company, including Goldman Sachs, UBS, Morgan Stanley, Merrill Lynch, JPMorgan, Credit Suisse, Prudential Equity Group, Citigroup, Neuberger Berman, Lehman Brothers, Bear Stearns, Benchmark Company, Lipper Advisory Services, William Blair & Co, and KBW, issuing numerous research and other reports on the Company during the Class Period, easily satisfying the second *Cammer* factor. *See* Hume Decl. Ex. M. *See Alstom* 253 F.R.D. at 280 (second *Cammer* factor met where "analyst reports concerning [Company's] financial condition were generated and made publicly available on electronic databases during the Proposed Class Period by a significant number of brokerage firms.").

Third, Moody's generally satisfies the SEC's eligibility requirements for filing an S-3 registration statement because the value of Moody's shares held by nonaffiliates during the Class Period was approximately $16.6 billion, which substantially surpasses the SEC's threshold requirement that a company have at least $75 million in stock held by nonaffiliates to file an S-3 registration statement, thus satisfying the fourth *Cammer* factor.  *See* Hume Decl. Ex. N.  *See*, *e.g.*, S.E.C. Form S-3 ("Security offerings meeting any of the following conditions and made by a registrant meeting the Registrant Requirements [] may be registered on this Form … *provided* that the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant is $75 million or more."); *Alstom*, 253 F.R.D. at 280 (fourth *Cammer* factor generally satisfied where the value of Company's shares held by nonaffiliates ranged from $380 million to $7.6 billion).

Fourth, Moody's stock responded both positively and negatively when new information entered the market, satisfying the fifth *Cammer* factor.  For example, on October 24-25, 2007, Moody's shares dropped approximately 8.4% in reaction to news of reduced profits and increased analyst concern about regulatory scrutiny. ¶ 400(i).  When the Wall Street Journal reported on April 11, 2008 that Moody's had adjusted a bond rating in response to a threat by an issuer in a case of ratings shopping, ¶ 347, Moody's stock price fell approximately 2.4%.  Similarly, when the Financial Times reported on May 21, 2008 that Moody's had concealed improper ratings of several bonds and, rather than lower the rating on those bonds, had amended the ratings methodology to maintain the false rankings, ¶ 363, its stock plunged 14.5%.  ¶ 400(k).

As the foregoing factors separately and collectively demonstrate that Moody's stock traded in an open, developed and efficient market during the Class Period, a presumption of reliance premised upon fraud-on-the-market applies to this action.

21

Similarly, reliance is presumed to the extent that the claims are based on omissions of material facts.  *See Affiliated Ute*, 406 U.S. at 153-54 ("[P]ositive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.").  Further, because it is clear that common issues predominate over individual ones, the predominance inquiry under Rule 23(b) is satisfied.

### 2.    Loss Causation Is A Common Issue for All Class Members

Loss causation is common to all class members because it can be proven on a class-wide basis by analyzing, *inter alia*, whether the drops in the price of Moody's securities upon disclosure of the truth were caused by the revelations of the fraud.  *See NTL*, 2006 WL 330113, at *9-10 (loss causation common to all class members where plaintiffs' allegations of false and misleading statements are coupled with disclosures linked to the drop in Defendant's stock).

The only question of law or fact here that is *not* subject to "generalized proof," *Moore*, 306 F.3d at 1252, is the amount of each class member's damages.  *See In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 94 (S.D.N.Y. 2004) (observing that "the quantum of damages is the *only* element *plaintiffs* must prove on an individual basis") (emphasis in original).  Individual questions of damages, however, are obviously found in every securities class action and are no bar to class certification.  *See, e.g., Visa Check*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.") (citation omitted); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) ("While damages may vary among class members, all share common questions of liability.  Damage amounts can be calculated for each individual class member after a determination of liability.").

In sum, Lead Plaintiffs have alleged facts and presented evidence showing that the fraud on the market and/or *Affiliated Ute* presumptions of reliance are available to Lead Plaintiffs; that revelations of the fraud caused class members' losses; and that a nucleus of facts about Defendants' improper conduct will predominate over any individual issues.   In such circumstances, the predominance requirement is satisfied.

### B.      The Superiority Requirement is Satisfied Here

A class action must be superior to other available methods for the fair and efficient adjudication of the controversy.  *See* Fed. R. Civ. P. 23(b)(3) (listing factors to consider when determining whether a class action is superior: a) the interest of class members in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; c) whether it is desirable to concentrate litigation of claims in this forum; and d) the manageability of a class action).  Each factor strongly favors certification of the Class.

The federal securities law claims against Moody's arising out of the facts and circumstances alleged in the CAC have been consolidated in this action.  Concentrating class members' claims in this district, where Moody's is headquartered and where Defendant McDaniel works, ensures an efficient expenditure of judicial and private resources.

There are no management or administration issues that would cause difficulties going forward or at trial.  Indeed, "it is difficult to imagine a case where class certification would be more appropriate.  Without it, thousands of identical complaints by… shareholders would have to be filed – the very result the class action mechanism was designed to avoid."  *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).

Absent a class action, most class members would be discouraged from even seeking relief because their potential recovery would be outweighed by the massive costs of pursuing litigation. *See In re Vivendi*, 242 F.R.D. at 91 ("[A] class action in a federal securities action may well be the appropriate means for expeditious litigation of issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.") (quoting *Green*, 406 F.2d at 296).

As with most securities class actions, class action treatment is the best and, indeed, the only practicable means for adjudicating the claims asserted. *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (citation omitted). Accordingly, the superiority requirement is met.

## IV.   CO-LEAD COUNSEL SATISFY RULE 23(g)

Lead Plaintiffs respectfully request that Kirby, Glancy and Barroway, court-appointed Co-Lead Counsel for Lead Plaintiffs, be appointed Class Counsel. Kirby, Glancy and Barroway will fairly and adequately represent the Class because, among other things, these firms have to date already performed substantial work in investigating and prosecuting the claims asserted.

Kirby is among the nation's preeminent law firms in this area of practice. The firm has served as lead or co-counsel on behalf of major institutional investors in numerous class actions since the enactment of the PSLRA, including *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MD 1529 (S.D.N.Y.), *In re iMergent Sec. Litig.*, No. 2:05-cv-0204 (D. Utah), and *Lapin v. Goldman Sachs & Co.*, No. 04 Civ. 2236 (S.D.N.Y.). *See* Hume Decl. Ex. I.

Lead Plaintiffs further submit that Glancy is eminently and equally qualified to serve as Class Counsel and represent the interests of Lead Plaintiffs and the Class. Glancy has

represented investors and consumers in federal and state courts throughout the United States for over sixteen years and has recovered in excess of $1 billion for parties wronged by corporate fraud.  The firm has served as lead or co-counsel on behalf of major institutional investors in numerous class actions, including, *In re Mercury Interactive Sec. Litig.*, 05-3395 (N.D. Cal.), *In re Lumenis, Ltd. Sec. Litig.*, No. 02-CV-1989 (S.D.N.Y.), and *In re Heritage Bond Litig.*, No. 02-ML-1475-DT (C.D. Cal.).  *See* Hume Decl. Ex. J.

Likewise, Barroway has represented leading institutional and individual investors in securities class actions for over twenty years and has specialized in the prosecution of complex securities class actions in state and federal courts throughout the United States, and it is currently serving as lead or co-lead counsel in several high profile securities class actions, including *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09 MD 2017 (S.D.N.Y.), *In re UBS AG Sec. Litig.*, No. 1:07-CV-11225-RJS (S.D.N.Y.), and *In re Bank of America Corp. Sec. Deriv. & ERISA Litig.*, No. 09 MDL 2058 (DC) (S.D.N.Y.).  Barroway has recovered billions of dollars on behalf of its clients and the classes it represents, including serving as Co-Lead Counsel in *In re Tyco Int'l, Ltd. Sec. Litig.*, No. 02-1335-B (D.N.H. 2002), where Barroway helped to secure the largest securities fraud settlement ever against a single defendant.  *See* Hume Decl. Ex. K.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request this Court to grant their motion for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3), appoint Lead Plaintiffs as Class Representatives, appoint Co-Lead Counsel for Lead Plaintiffs as Class Counsel pursuant to Rule 23(g), and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      January 22, 2010

**KIRBY McINERNEY, LLP**

By:_____*/s/  Daniel Hume*_____
Daniel Hume

25

dhume@kmllp.com
Ira M. Press
David Bishop
Beverly Tse
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax: (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Benjamin J. Hinerfeld
Lauren Wagner Pederson
**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056

*Co-lead counsel for Lead Plaintiffs*

Christopher Keller
Jonathan Gardner
Serena Hallowell
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiffs*