UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                               :

IN RE: MOODY'S CORPORATION      :
SECURITIES LITIGATION           :    DOCKET NO. 07-cv-8375-GBD
                               :
                               :
                               :
                               :
-----------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Erez J. Davy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants Moody's
Corporation and Raymond W. McDaniel, Jr.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ..............................................................................................5

ARGUMENT ...............................................................................................15

I.    PLAINTIFFS MISSTATE THE STANDARDS FOR CLASS CERTIFICATION .........15

II.   NO CLASS CAN BE CERTIFIED BECAUSE INDIVIDUALIZED
      KNOWLEDGE ISSUES PREDOMINATE ..................................................16

      A.    Individualized Issues About What Investors Knew Preclude Class
            Certification ...........................................................................16

      B.    Knowledge of Moody's Alleged Conflicts and Methodologies Was
            Widespread ...........................................................................18

      1.    Rating agency conflicts and methodologies received a thorough public
            airing up to and during the proposed class period. ...............................19

      2.    Structured finance industry participants openly discussed rating agency
            conflicts and methodologies. ........................................................23

      3.    Moody's shareholder base was largely institutional investors, including
            the largest structured finance industry participants ..............................24

III.  PLAINTIFFS CANNOT INVOKE A CLASS-WIDE RELIANCE
      PRESUMPTION..........................................................................26

      A.    Plaintiffs Cannot Invoke the *Basic* Presumption Because They Fail to
            Show That Any Alleged Misrepresentation Was Material ...........................26

      1.    Materiality cannot be determined class-wide .....................................27

      1.    Immateriality should be determined now ..........................................28

      B.    The *Basic* Presumption Is Rebutted Here by Market Makers' Alleged
            Knowledge, and by Moody's Stock Price History...................................30

      C.    The *Affiliated Ute* Presumption of Reliance Does Not Apply ......................32

## TABLE OF CONTENTS
*(continued)*

Page

IV.  PLAINTIFFS HAVE FAILED TO SET FORTH A METHODOLOGY BY
     WHICH LOSS CAUSATION MAY BE DETERMINED ON A CLASS-WIDE
     BASIS ...................................................................................................................34

V.   ALL THREE LEAD PLAINTIFFS LACK A CLAIM, OR ARE SUBJECT TO
     UNIQUE DEFENSES ..............................................................................................37

     A.    Local 282 and McCurley Cannot Demonstrate Loss Causation ...........................37

     B.    Local 282 Lacks Standing to Pursue a 10b-5 Cause of Action .............................39

     C.    Wetstein Cannot Demonstrate Reliance on Defendants' Alleged
           Misrepresentations ................................................................................................40

VI.  ANY CERTIFIED CLASS MUST EXCLUDE INVESTORS WHOSE CLAIMS
     FAIL AS A MATTER OF LAW ................................................................................40

CONCLUSION ....................................................................................................................42

## **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Affiliated Ute Citizens of Utah* v. *U.S.*,
    406 U.S. 128 (1972)............................................................................32, 33

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)........................................................................ *passim*

*Bastian* v. *Petren Resources Corp.*,
    892 F.2d 680 (7th Cir. 1990) ............................................................17

*Broussard* v. *Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ............................................................17

*Cabrera* v. *211 Garage Corp.*,
    2008 WL 3927457 (S.D.N.Y. Aug. 25, 2008).....................................16

*Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*,
    800 F.2d 177 (7th Cir. 1986) ............................................................39

*Dorchester Investors* v. *Peak Trends Trust*,
    No. 99-cv-4696, 2002 WL 272404 (S.D.N.Y. Feb. 26, 2002) ................41

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JPMorgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................27, 28

*Fadem* v. *Ford Motor Co.*,
    352 F. Supp. 2d 501 (S.D.N.Y. 2005)...................................................31

*Fogarazzo* v. *Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ........................................................34

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..............................................................27

*Gary Plastic Packing Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)......................................................... 15-16

*Gurary* v. *Winehouse*,
    190 F.3d 37 (2d Cir. 1999).......................................................2, 16, 39

*Hevesi* v. *Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)..................................................................4

## TABLE OF AUTHORITIES

*(continued)*

Page(s)

*In re AIG, Inc. Sec. Litig.*,
   265 F.R.D. 157 (S.D.N.Y. 2010) ....................................................................31, 41

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
   No. 08-cv-11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)...........................28

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) ..........................................................................15

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Litig*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ................................................................30, 31, 33

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)..................................................................... *passim*

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)...............................................................................34

*In re IBM*,
   163 F.3d 102 (2d Cir. 1998)...............................................................................41

*In re IPO Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)...................................................................... *passim*

*In re Lehman Bros. Sec. & Erisa Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010)...............................................................2, 29

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 416, 422 (S.D.N.Y. 2003).........................................................37

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   --- F. Supp. 2d ---, 2010 WL 1257597 (S.D.N.Y. Mar. 31, 2010)........................ 27

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................... *passim*

*In re NTL, Inc. Sec. Litig.*,
   No. 02-cv-3013, 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ...............................34

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...............................................................................35

*In re Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d Cir. 2008)......................................................................4, 26, 28, 30

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

*In re Sanofi-Aventis Sec. Litig.*,
  No. 07-cv-10279, 2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ...........................................27

*In re TJX Cos. Retail Security Breach Litigation*,
  246 F.R.D. 389 (D. Mass. 2007) ..........................................................................................17

*Johnston* v. *HBO Film Mgmt., Inc.*,
  265 F.3d 178 (3d Cir. 2001).................................................................................................17

*Lapin* v. *Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ....................................................................................18, 34

*Lasker* v. *New York State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) ....................................................................................................28

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)............................................................................................35, 36

*Masters* v. *GlaxoSmithKline*,
  271 F. App'x 46 (2d Cir. 2008) ......................................................................................35, 41

*McLaughlin* v. *Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)..............................................................17, 30, 31, 34, 40

*Moore* v. *PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002)...............................................................................................16

*New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group*,
  No. 08-cv-5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ..................................2, 29-30

*Nobel Ins. Co.* v. *City of N.Y.*,
  No. 00-cv-1328, 2006 WL 2848121 (S.D.N.Y. Sept. 29, 2006) .....................................29-30

*Press* v. *Chemical Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999)..................................................................................................26

*Rocco* v. *Nam Tai Electronics, Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ..........................................................................................40

*Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*,
  412 F.3d 103 (2d Cir. 2005)............................................................................................32, 33

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier, Inc.*,
  No. 05-cv-1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ........................................32-33

## TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Teamsters Local 445 Freight Division Pension Fund* v. *Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008) ....................................................................................14

*Thorn* v. *Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ............................................................................ 17-18

*Titan Pharms. & Nutrition, Inc.*,
   No. 05-cv-10580, 2006 WL 708552, at *2 (S.D.N.Y. Mar. 30, 2006) ...................34

*Wilson* v. *Comtech Telecomms. Corp.*,
   648 F.2d 88 (2d Cir. 1981)......................................................................................33

*Wollins* v. *Antman*,
   638 F. Supp. 989 (E.D.N.Y. 1986) ........................................................................32

*Zimmerman* v. *Bell*,
   800 F.2d 386 (4th Cir. 1986) ..................................................................................17

### STATUTES AND RULES

15 U.S.C. § 78o-7(a)(1)(B)(vi) ........................................................................................21

Fed. R. Civ. P. 23 .................................................................................................. *passim*

Fed. R. Evid. 801(c) .......................................................................................................18

Defendants Moody's Corporation ("Moody's") and Raymond W. McDaniel, Jr. respectfully submit this Memorandum in Opposition to Plaintiffs' January 22, 2010 Motion for Class Certification.

## PRELIMINARY STATEMENT

In this putative securities fraud class action by shareholders of Moody's Corporation, plaintiffs allege that the "revelation" of conflicts of interest inherent in Moody's Investors Service Inc.'s[1] "issuer-pays" business model and certain purported methodological shortcomings—rather than a broad market dislocation of historic scale during 2007 and 2008—caused the decline in the Company's share price during that period. In fact, according to plaintiffs, this "revelation" caused the collapse of the structured finance market and the failure of home developers, hedge funds and "major banks and investment banks." Thus, plaintiffs make the extraordinary claim that some supposed misinformation about the independence of Moody's ratings opinions brought about a global financial crisis.

Plaintiffs assert that this action is just like other class actions "traditionally certified in this District and elsewhere." (Pl. Br. at 12.) It is not. To the contrary, this action is nearly identical to several actions where the class complaint has been dismissed or class certification has been denied under exacting standards that the Second Circuit has recently clarified, and that plaintiffs' motion ignores. (*See* Point I, below.) Several of those failed actions involved the very same allegations made here—that credit rating agencies like Moody's suffer from disabling or corrupting "conflicts of interest" because the rating agency is paid by or works too closely with issuers of the product to be rated. In addressing such allegations, this District

---

[1]     Moody's Investors Service, Inc. is a wholly-owned subsidiary of Moody's Corporation. Moody's Investors Service is the credit rating agency arm of the corporation. Throughout this brief, each of the corporation and the rating agency may be referred to as "Moody's."

has squarely held that any "reasonable investor would be expected to know that the rating agencies were paid by the investment banks that hired them, and that they had a hand in determining the structure of securitizations." *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group*, No. 08-cv-5093, 2010 WL 1172694 at *14 (S.D.N.Y. Mar. 26, 2010) (Baer, J.). Indeed, "the risk that the ratings agencies operated under a conflict of interest because they were paid by the issuers had been known publicly for years." *In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 492 (S.D.N.Y. Feb. 17, 2010) (Kaplan, J.).

Widespread knowledge about rating agencies' "conflict of interest"—along with widespread discussion of how those conflicts were managed—gives rise to several distinct and insurmountable barriers to class certification. *First*, widespread knowledge opens the door to individualized inquiry into what investors knew about Moody's conflicts and rating methodologies in order to determine whether the investor traded in ignorance of the alleged fraud, or relied on any misinformation. *See In re IPO Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006); *see also Gurary* v. *Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). This inquiry could not be conducted class-wide or on a common basis because, even if extensive published information on these topics did not bar *all* investors' claims about being misled, *each investor* would remain subject to questioning to determine whether the investor had knowledge of the published information or whether information had reached the investor by word of mouth, through "chatroom" postings, or through professional networks.

In fact, even beyond media exposure, there is good reason to expect that shareholders here were privy to the allegedly concealed information. Plaintiffs expressly assert in their consolidated amended complaint that Moody's conflicts of interest and alleged methodological shortcomings materialized in dealings with roughly a dozen issuing banks, as

-2-

well as various other structured finance industry participants. That complaint itself thus lays the foundation for individualized inquiries directed at all putative class members with a connection to the structured finance industry. As it turns out, some of the largest shareholders of Moody's during the putative class period were active industry participants. From 2006 to 2008, 10-13% of Moody's shares were held by major structured finance issuers, managers and underwriters of structured securities. Any of these institutional shareholders, through their thousands of employees whose work exposed them directly to Moody's ratings processes, could have unique knowledge about Moody's conflicts and methodologies. Other large and sophisticated institutional investors also held sizable portions of Moody's shares. Together, institutions held upwards of 77% of Moody's shares during the proposed class period. The Second Circuit repeatedly has deemed class certification inappropriate where, as here, the litigation would involve individualized inquiry into what putative class members knew. In those cases and this one, Rule 23(b)(3) cannot be satisfied, because individual questions predominate over common ones. (*See* Point II, below.)

*Second*, because of widespread knowledge, plaintiffs also cannot invoke a class-wide reliance presumption, such as the "fraud on the market" presumption of reliance on an "efficient market" under *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). Plaintiffs' own allegations—which concede that "numerous industry insiders" knew of such practices as "ratings shopping" (CAC ¶ 331)—fundamentally contradict their assertions that Moody's traded on an efficient market, because in an efficient market where so many market makers are "privy to the truth," Moody's stock price could not have remained "inflated" over the months and years alleged by plaintiffs. *Basic*, 485 U.S. at 248. Reliance presumptions also are unavailable here because, with so much information in the public domain, plaintiffs cannot establish the necessary

materiality of any misstatement or omission. *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008). As a practical matter, without a reliance presumption, no securities fraud class action can proceed. *See Basic*, 485 U.S. at 242; *Hevesi* v. *Citigroup Inc.*, 366 F.3d 70, 78 (2d Cir. 2004). (*See* Point III, below.)

*Third*, even if knowledge and reliance inquiries did not predominate here, class treatment would remain unavailable because plaintiffs have failed to present a common basis on which to prove the essential element of loss causation. Moody's stock price history contradicts rather than supports plaintiffs' only loss causation theories. Moody's stock price did not rise in response to allegedly inflationary statements, and Moody's stock price did not fall in response to allegedly corrective disclosures during the class period. Plaintiffs thus seek to rely on alleged corrective disclosures made *after* the close of the proposed class period, *after* plaintiffs had already sued Moody's, and *after* much of the proposed class had already sold all of their shares. This effort too is unavailing: Stock drops that occur after the close of the class period cannot support loss causation. (*See* Point IV, below.)

Moreover, plaintiffs lack a proposed lead plaintiff with adequate and typical claims about loss causation or other elements. Two of the proposed lead plaintiffs sold their shares before any alleged "corrective disclosure." The third proposed lead plaintiff increased his holdings even while alleging fraud, eschewing reliance on any purported misstatements but admittedly instead engaging in a game of "intellectual gambling." (*See* Point V, below.)

Finally, even if this Court decides that some class may properly be certified— which it should not—the certification order would need to define the class so as to exclude institutional investors from membership. The order also would need to exclude all shareholders who sold their shares before any recognized allegedly corrective disclosure. Under no

circumstance should the Court approve a class period that extends beyond July 2007, when plaintiffs commenced this action.  (*See* Point VI, below.)

## BACKGROUND

**Moody's.**    Moody's Investors Service, the primary operating subsidiary of Moody's, is a credit rating agency and is registered with the United States Securities and Exchange Commission ("SEC") as a Nationally Recognized Statistical Rating Organization ("NRSRO").  (Consolidated Amended Complaint ("CAC") ¶¶ 10, 11.)  Moody's publishes credit opinions "on a broad range of credit obligations . . . including various corporate and governmental obligations and structured finance securities."  (*Id.* ¶ 10.)  Moody's rating opinions are assigned through a committee process, and no one analyst may determine a rating.  (Declaration of Stephen Ehrenberg, dated May 28, 2010, ("Ehrenberg Decl.") Ex. 8 § 1.4.)  Ratings are assigned pursuant to Moody's well-known ratings scale, which is designed to provide investors with a system of gradation by which relative creditworthiness of long-term debt obligations can be understood.  These gradations are indicated with a rating symbol used to designate least credit risk to greatest credit risk:  Aaa, Aa, A, Baa, Ba, B, Caa, Ca and C.

A credit rating is a predictive opinion concerning the risk of default and any estimated losses associated with a default.  Market participants and Moody's shareholders have long been aware that Moody's opinions do not measure or otherwise consider market and other non-credit risks.  For example, the release accompanying Moody's issuance of its June 2005 Code of Professional Conduct is plain:

> **CREDIT RATINGS ARE MOODY'S INVESTORS SERVICE, INC.'S ("MIS") CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES.  MIS DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED**

**FINANCIAL LOSS IN THE EVENT OF DEFAULT.  CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO:  LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. . . .**

MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. . . .  (Ehrenberg Decl. Ex. 9.)

Market participants and Moody's shareholders also have been long well aware of the analysis Moody's undertakes to reach its opinions.  Credit ratings are derived through the application of a published methodology, which sets forth an analytical framework for assessing the credit risk of a particular issuer or asset class.  (Ehrenberg Decl. Ex. 8 § 1.4.)  Moody's, like other major credit rating agencies, has been transparent about the methodologies it employs, including those used to rate structured finance products such as collateralized debt obligations ("CDOs") and residential mortgage-backed securities ("RMBS").  (Expert Report of Dr. René M. Stulz, dated May 28, 2010 ("Stulz Rpt.") ¶ 26, attached as Exhibit 50 to the Ehrenberg Declaration.)  In addition to published methodologies, rating agencies also employ, with respect to certain asset classes, quantitative models that reflect the analytical framework set forth in the applicable rating methodology.  (*Id.*)  Such models are generally dependent upon the availability of historical data concerning the performance of securities in the applicable asset class.  (*Id.* ¶ 7.)  And, "[w]hen experience with a financial instrument is limited, forecasts using past experience are not as precise as they would be with more data"—a fact which was "well-known."  (*Id.* ¶ 28.)

*The Original Complaint and Lead-Plaintiff Appointments.*  A putative class of Moody's shareholders originally commenced this action on July 19, 2007 in the Northern District of Illinois on behalf of a class of shareholders who purchased Moody's stock between October 25, 2006 and July 10, 2007.  (Ehrenberg Decl. Ex. 1 ¶ 1.)  That complaint (the "July 2007 Complaint") alleged that, during the then-proposed October 2006 to July 2007 class period,

Moody's "misrepresented or failed to disclose that the Company assigned excessively high ratings to bonds backed by risky subprime mortgages." (*Id.* ¶ 4.) The July 2007 Complaint further alleged that Moody's "shocked investors" when it announced, on July 11, 2007, that it "was downgrading 399 mortgage-backed securities issued in 2006 and reviewing an additional thirty-two for downgrade," and further disclosed "that it had downgraded 52 bonds issued in 2005." (*Id.* ¶ 5.)

On September 26, 2007, putative lead plaintiffs the Teamsters Local 282 Group (the "Local 282"), Charles W. McCurley, Jr. ("McCurley"), and Dr. Lewis Wetstein ("Wetstein") moved to be appointed as lead plaintiff in the Northern District of Illinois and to have their selection of class counsel approved. *See Nach* v. *Huber*, No. 07-cv-4071 (N.D. Ill.). On the same date, Local 282 filed a complaint in the Southern District of New York, on behalf of an identical group of Moody's shareholders, setting forth essentially identical allegations against Moody's and defendant Linda S. Huber. (Ehrenberg Decl. Ex. 2.) On December 12, 2007, Judge Castillo of the Northern District of Illinois appointed Local 282, McCurley, and Wetstein as lead plaintiffs and approved their selection of class counsel. *See Nach* v. *Huber*, No. 07-cv-04071 (N.D. Ill.). On February 13, 2008, *Nach* v. *Huber* was transferred to the Southern District of New York, and, on May 28, 2008, was consolidated with the Southern District of New York action filed by Local 282 under the caption *In re Moody's Corporation Securities Litigation.* *See Nach et al.* v. *Huber*, No. 08-cv-01536 (S.D.N.Y.); *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.).

**The Consolidated Amended Complaint.** On June 27, 2008, after these cases were consolidated, plaintiffs amended their complaint. The consolidated amended complaint ("CAC") differs from plaintiffs' prior pleadings in several significant respects. To begin, it extends the

proposed class period back to February 3, 2006 (from October 2006) and forward to October 24, 2007 (from July 2007). This additional period extends three beyond the July 2007 date when, according to the original pleadings, the mortgage backed securities downgrades already had "shocked investors." By July 19, 2007, when plaintiffs filed their July 2007 Complaint, plaintiffs themselves had asserted, under threat of PSLRA and Rule 11 sanctions, that they had enough information to accuse Moody's of having intentionally assigned "excessively high ratings" as part of a widespread fraud. (Ehrenberg Ex. 1 ¶ 4.)

Further, unlike the original pleadings, the CAC's central allegation is not that Moody's stock price rose then fell in tandem with certain rating opinions it had issued. The CAC alleges instead that Moody's had artificially inflated its stock by stating falsely that it was "committed to upholding" and had "a reputation for independence from its clients," or that its "ratings were achieved by integrity of process [sic]." (CAC ¶ 3; *see also id.* ¶¶ 37, 68, 71.) Plaintiffs' "core allegation" now is that "Moody's falsely claimed that it was an independent body publishing ratings accurately and impartially." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507-08 (S.D.N.Y. 2009).

According to the CAC, the economic pressures associated with the "issuer pays" business model "destroyed" Moody's independence in structured finance in three ways. (CAC at 16.) *First*, economic pressures associated with the "issuer pays" fee model were heightened because "structured finance was Moody's single largest and single fastest growing line of ratings business," and "control over structured finance ratings assignments was dominated by a small number of repeat issuers (essentially, investment banks such as Lehman Brothers, Bear Stearns, etc.)." (*Id.* ¶ 43.) *Second*, in structured finance, the alleged practice of paying rating agencies for "pre-evaluations" allegedly enabled issuers to engage in "ratings shopping," that is, "to select

-8-

rating agencies on the very basis of the *ex ante* ratings." (*Id.* ¶ 44.) *Third*, structured-finance ratings depended on "malleable combinations of collected assets assembled by the issuer" that were rated based on rating-agency models. (*Id.* ¶ 45.)

Plaintiffs' allegations rest on the assertion that Moody's stock dropped when these conflicts were exposed to the market. But the CAC acknowledges that "ratings shopping" was "admitted to by numerous industry insiders," was a "fixture" of the structured-finance industry, and took place "'openly.'" (*Id.* ¶ 331.) Likewise, the CAC acknowledges that "[i]ssuers were familiar with those models," and "paid Moody's further fees for consulting and for software tools so as to better understand how Moody's evaluations worked." (*Id* ¶ 45.) Thus, according to the CAC itself, conflicts of interest in the issuer-pays fee model were transparent.

Documents on which the CAC relies also expressly disclosed the conflicts of interest plaintiffs say were hidden. For example, in the very June 2, 2005 Code of Professional Conduct on which plaintiffs point to as an allegedly false inflationary statement, Moody's fully and accurately disclosed, among other things, that "most issuers of debt securities . . . rated by Moody's have, prior to assignment of any rating, agreed to pay . . . fees ranging from $1,500 to $2,300,000." (Ehrenberg Decl. Ex. 8, at 13), and fully and accurately disclosed that Moody's provides "provisional assessments . . . in structured financings or similar transactions," where "Moody's will inform the Issuer of the critical information and principal considerations upon which the Credit Rating is based and afford the Issuer an opportunity to submit additional factual information . . . ." (*Id.* §§ 1.14, 3.8.) Likewise, in its Report on the Code of Professional Conduct, Moody's fully and accurately disclosed that it "derived approximately 87% of [its] revenue from Issuer payments for Credit Ratings," and that the "issuer pays" model "entails

potential conflicts of interest that could impact the independence and objectivity of our rating process." (*Id*. Ex. 10, at 15.)  Moody's likewise warned in its Code that it "has no obligation to perform, and does not perform, due diligence with respect to the accuracy of information it receives or obtains in connection with the rating process." (*Id*. Ex. 8, at 4.)  And Moody's further warned in its Report on the Code of Professional Conduct that it "[sought] to protect"— but did not guarantee—"the quality, integrity and independence of the rating process." (*Id*. Ex. 10, at 3.)  All of these public statements thoroughly contradict plaintiffs' assertions that Moody's promised it had "eliminated" conflicts.

In addition to allegations concerning conflicts arising from the issuer-pays model, the CAC asserts that Moody's "[mis]represented" that its structured-finance rating methodologies involved "independent and qualitative assessments of loan originator standards and practices, and took such standards and practices into account as an 'integral part' of its credit ratings." (CAC ¶ 111.)  According to the CAC, Moody's assertion that, among other things, it "'continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance,'" including "'[p]ast performance of an originator's loans,'" must have been false because, when Moody's began to downgrade structured-finance securities in the Summer and Fall of 2007, Moody's stated that "it would *henceforwards* consider some originators' loans more risky than others (by as much as 20%) when estimating losses and determining credit ratings." (*Id.* ¶ 118 (emphasis in original).)  The CAC does not explain how this announcement of a forward adjustment in the application of originator factors somehow exposed that Moody's had not previously undertaken independent and qualitative assessments of loan originator standards and practices as an "integral part" of its credit ratings.

**Defendants' Motion to Dismiss.** On September 26, 2008, defendants moved to dismiss the CAC on the grounds that it is time-barred, fails to plead loss causation, fails to plead actionable misrepresentations, and fails to plead scienter. In opposition, plaintiffs argued that "a series of disclosures" made "[b]etween June 7 and October 24, 2007" allegedly revealed risks that Moody's had concealed. (Ehrenberg Decl. Ex. 3, at 35 (citing CAC ¶¶ 248-80, 361-400).) Plaintiffs also asked the Court for permission to amend the CAC should the Court "find any deficiencies" in it. (*Id.* at 45 n.29.)

On February 23, 2009, this Court (Kram, J.) granted defendants' motion in part. The Court narrowed the actionable alleged misstatements in the CAC to (1) those regarding "independence," such as assertions that Moody's "'maintains independence in its relationship with Issuers,'" operates "'as an independent and objective publisher of opinions,'" or seeks "'to protect the integrity of [its] rating process,'" CAC ¶ 69(e), (j); and (2) those regarding the consideration of "originator" characteristics as part of Moody's rating methodologies. *See In re Moody's*, 599 F. Supp. 2d at 508-10.

The Court also expressly rejected plaintiffs' "series of disclosures" (Ehrenberg Ex. 3, at 35) between June 7 and October 24, 2007. *See In re Moody's*, 599 F. Supp. 2d at 510-11. Instead, the Court recognized only four statements in the CAC sufficient to serve as "corrective disclosures" of the actionable alleged misstatements. *Id.* at 512. Three of these disclosures, however—dated April 11, 2008, May 21, 2008, and October 22, 2008—are outside the class period. Each of these disclosures long post-dates both the original and the current putative class period, and even the date on which this action was commenced. The fourth recognized alleged corrective disclosure came on October 12-17, 2007, when Moody's "first announced that it was separating originator quality into tiers." *Id.* at 513. Thus, this is the *only*

alleged corrective disclosure in this case during the class period.  The Court expressly invited plaintiffs to "amend [their complaint] in order to cure the deficiencies identified in [the Court's] Opinion," by March 18, 2009.  *Id.* at 518.  Plaintiffs declined to do so.

   ***Discovery, Congressional, and Regulatory Investigations.***  Over the ensuing year, Moody's produced, among other things, publications concerning the methodologies used to assign credit ratings to RMBS and CDOs, and internal policy and procedure documents concerning structured-finance credit rating and monitoring committees.  Plaintiffs also sought non-party discovery from several firms that participated actively in the RMBS market, such as IndyMac, Washington Mutual, and JPMorgan Chase.  (Ehrenberg Decl. Exs. 4-6.)  Those discovery requests include, among other things, all documents or communications concerning "any actual or proposed fee arrangements or other remuneration" with Moody's in connection with structured-finance instruments. (Exs. 4-6, Request no. 4.)[2]  Recently, Congress, the New York State Attorney General and others have inquired into the dynamics that drove ratings of mortgage backed securities during the years at issue, questioning a wide array of securities issuers, originators and others.  (Ehrenberg Decl. Exs. 7, 39.)

   Defendants also requested documents and took the depositions of the putative class representatives.  Those depositions revealed that two of the proposed class representatives sold their Moody's shares prior to the first corrective disclosure identified in the Court's February 23, 2009 decision.  The third purchased Moody's shares after becoming aware of the alleged fraud.

   ***Plaintiffs' Motion for Class Certification.***  On January 22, 2010, plaintiffs moved to certify a class of "[a]ll persons who purchased or otherwise acquired Moody's Corporation . . .

---

[2]  To date, to Moody's knowledge, the subpoenaed non-parties have not produced the requested information.

common stock between February 3, 2006 and October 24, 2007 inclusive . . . and who were damaged thereby." (Pl. Br. at 1.) They did so on the purported basis that common issues predominated, and claimed that this action "embodies all the hallmarks . . . of class actions traditionally certified in this District and elsewhere." (Pl. Br. at 12.) Plaintiffs' motion depends almost entirely on cites to plaintiffs' own pleading. They failed to put forth any expert report demonstrating how, among other things, reliance and loss causation can be resolved on a class-wide basis.[3]

        ***Defendants' Evidence.*** By contrast to plaintiffs' presentation, defendants submit the expert report of Dr. Rene Stulz, a highly regarded expert in financial economics who has, among other things, served as past president of the American Finance Association and as editor of the Journal of Finance, authored a textbook on derivatives, and advised the International Monetary Fund, the World Bank, the New York Stock Exchange, and the Federal Reserve Bank of New York. (Stulz ¶ 2.) Dr. Stulz lays out in detail numerous SEC releases, Congressional reports, academic and industry publications, and media articles demonstrating that market participants received extensive and varied information about Moody's alleged conflicts of interest and ratings methodologies before and during the proposed class period. Dr. Stulz presents thorough research into and analysis of the causes of the financial crisis, Moody's business and practices, Moody's statements and stock price history, and plaintiffs' trading.

---

[3]     Under the Stipulation and Amendment to Scheduling Order dated April 7, 2010, plaintiffs were required to designate any expert in support of class certification by April 9, 2010. Plaintiffs may have gambled that they would be allowed to serve and file an expert report in reply. The Court should not condone that tactic. At the very least, if plaintiffs' reply seeks to introduce support that ought to have been presented previously, it should be limited in scope and defendants should be afforded an opportunity to respond in sur-reply.

Dr. Stulz establishes that the stock price drop in this case coincides with the unprecedented subprime crisis that caught virtually all market participants and regulators by surprise. As explained by Dr. Stulz, the credit crisis of 2007 was brought about by various governmental and market forces far greater than any statement Moody's made about its independence or its methodologies:

> Many factors laid the foundation for the crisis. After the recession of 2001, the United States as well as the global economy experienced a period of steady growth. The growth of global GDP was accompanied by an even faster growth in global financial assets. Increasing globalization also facilitated capital flows across countries, especially funds from emerging countries to industrial nations via investments in financial assets. In the U.S., the Federal Reserve pursued a policy of cutting short-term interest rates through the end of 2003 in an effort to help the economy. The combination of low interest rates and increased supply of funds resulted in rapid growth in credit. (*Id.* ¶ 67 (footnotes omitted).)

Thereafter, a period of "spectacular" housing appreciation slowed, then turned negative, triggering unprecedented default rates. (*Id.* ¶¶ 70-71.) This affected the balance sheets of banks and their capitalization, and the "bank capitalization problems turned a manageable housing recession into a housing crisis, which worsened the recession, worsened the default rates on mortgages, and in turn worsened bank balance sheets further. The vicious cycle eventually led to an unprecedented series of financial institution failures . . . ." (*Id.* ¶ 77.)

These major economic events happened in plain view, with many participants and informed observers. The record related to those events establishes that plaintiffs' class certification motion must be denied.

-14-

# ARGUMENT

## I.    PLAINTIFFS MISSTATE THE STANDARDS FOR CLASS CERTIFICATION.

It is plaintiffs' burden to establish, by a "preponderance of the evidence," that all Rule 23 requirements have been met. *Teamsters Local 445 Freight Division Pension Fund* v. *Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). Here, those requirements include, among other things, that the proposed class representatives possess claims and are subject to defenses that are "typical of the claims or defenses of the class," and the representatives "will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(3)-(4); that "questions of law or fact common to class members predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3); and that any order certifying the class properly "define the class and the class claims, issues, or defenses," Fed. R. Civ. P. 23(c)(1)(B). In *In re IPO*, the Second Circuit made plain that, before certifying a class, the Court must "make[] a determination that all of the Rule 23 requirements are met," by "resolv[ing] factual disputes relevant to each Rule 23 requirement and find[ing] that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *In re IPO*, 471 F.3d at 40, 41. That determination is "not lessened by overlap between a Rule 23 requirement and a merits issue." *Id.* at 41; *see In re Flag Telecom Holdings Ltd. Sec. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009).

Plaintiffs have not provided this Court with anything like the record required to support class certification. Indeed, plaintiffs propose that the Court proceed under an outdated class certification standard, under which a court "'in doubt'" about certifying a class "'should err in favor of allowing the class to go forward.'" (Pl. Br. at 11.) For support, plaintiffs cite exclusively to cases that predate *IPO*, and predate significant 2003 amendments to Rule 23. (Pl. Br. at 11 (citing *Gary Plastic Packing Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903

F.2d 176, 179 (2d Cir. 1990) and *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999).)

Under current law, however, courts "'not satisfied that the requirements of Rule 23 have been

met should *refuse* certification until they have been met.'"  *In re IPO*, 471 F.3d at 39 (quoting

Fed. R. Civ. P. 23(c)(1)(C) Advisory Committee Notes) (emphasis added).

        It is plaintiffs' burden to meet this requirement, not with allegations but with

evidence.  *See Cabrera* v. *211 Garage Corp.*, 2008 WL 3927457, at *2 (S.D.N.Y. Aug. 25,

2008) (Daniels, J.).  Such evidence must be properly admitted into the record through, for

example, "affidavits, documents, or testimony."  *In re IPO*, 471 F.3d at 41.  Here, plaintiffs have

failed entirely.  They have not come forward with any evidence to support class certification, let

alone evidence establishing all class certification elements.

## II.    NO CLASS CAN BE CERTIFIED BECAUSE INDIVIDUALIZED KNOWLEDGE ISSUES PREDOMINATE.

### A.    Individualized Issues About What Investors Knew Preclude Class Certification.

        Plaintiffs assert that "[r]eliance in a securities fraud case like this one is

presumed" pursuant to the *Basic* and *Affiliated Ute* presumptions of reliance.  (Pl. Br. at 18.)

Plaintiffs thus skip over the more fundamental requirement that "a Section 10(b) claimant 'must

allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by

the alleged manipulation.'"  *In re IPO*, 471 F.3d at 43 (quoting *Gurary* v. *Winehouse*, 190 F.3d

37, 45 (2d Cir. 1999)).

        Under *IPO* and other settled authority in the Second Circuit and other Circuits,

class treatment is unavailable where claimants' exposure to or experience with an allegedly

fraudulent "scheme" varied.  *See*, *e.g.*, *Moore* v. *PaineWebber, Inc.*, 306 F.3d 1247, 1255-56 (2d

Cir. 2002) ("centralized sales scheme" not a "sufficient basis" for class treatment where

individual sales presentations varied); *Johnston* v. *HBO Film Mgmt., Inc.*, 265 F.3d 178, 190 (3d Cir. 2001) (because discussions "varied from customer-to-customer," individual issues "overwhelmed" common ones). Fraud claims cannot be certified where "widespread knowledge [] would precipitate individual inquiries as to the knowledge of each member of the class." *IPO*, 471 F.3d at 44. "[E]xamination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it." *Thorn* v. *Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320-21 (4th Cir. 2006). Certification is thus improper where "each class member potentially [has] access to several alternative sources of the information alleged to have been fraudulently concealed from him." *Broussard* v. *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341-42 (4th Cir. 1998); *see also Zimmerman* v. *Bell*, 800 F.2d 386, 390 (4th Cir. 1986) ("Because the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder, the question of whether the omission was material might require an individual inquiry for each shareholder.").

Applying these principles, courts deny certification where knowledge-based issues do not appear capable of resolution on a class-wide basis. In *IPO*, the need for these individualized inquiries was demonstrated by "Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme," as well as media reports and an SEC bulletin discussing the "tie-in" requirements that allegedly inflated the value of IPO shares. 471 F.3d at 43. In *McLaughlin* v. *American Tobacco Co.*, the probability that a "substantial number of class members were on notice of defendants' alleged fraud before the class period" led the Second Circuit to vacate a class certification order. 522 F.3d 215, 233 (2d Cir. 2008). In *Thorn*, the

need for individualized determinations arose from media reports "over the course of the twentieth century," which "*could have*" exposed class members to "sufficient information to give them either actual or constructive knowledge" of defendants' allegedly fraudulent insurance practices. 445 F.3d at 316 (emphasis added). In *In re TJX Cos. Retail Security Breach Litigation*, 246 F.R.D. 389, 396 (D. Mass. 2007), the court deemed problematic evidence that "at least *some*" class members were informed of the alleged fraud, requiring "individualized determination[s] of what each bank knew when it acted, and an individual evaluation of whether, given the information available to the bank, its reliance was reasonable."[4]

### B.    Knowledge of Moody's Alleged Conflicts and Methodologies Was Widespread.

Here, as in *IPO*, Rule 23(b)(3)'s predominance requirement cannot be met because information about the alleged fraud, which plaintiffs call a "fixture" of the structured-finance industry (CAC ¶ 331), was so widespread that it would require this Court to resolve "individual inquiries as to the knowledge of each member of the class." *In re IPO*, 471 F.3d at 44.[5] Before and throughout the class period, investors were well aware that Moody's and other

---

[4]    In a few cases, courts have declined to treat knowledge of facts bearing on an alleged fraud as sufficiently widespread to preclude class certification. None of these cases involved a situation, such as this one, where plaintiffs affirmatively alleged a fraud that depended on the complicity of third parties (and their thousands of employees), and where knowledge about the defendant's practices was transmitted throughout the community of market participants. *See Lapin* v. *Goldman, Sachs & Co.*, 254 F.R.D. 168, 184 (S.D.N.Y. 2008) (individualized knowledge issues did not predominate because "[u]nlike in *IPO*, neither the [complaint] nor any evidence put forth by [defendant] demonstrates that any potential class plaintiff—including investment banks—had *actual* knowledge of, or participated in, any alleged fraud that resulted from conflicts of interest *at [the defendant]*." (emphasis in original) (internal citation omitted)).

[5]    Moody's denies that it engaged in any wrongdoing, and denies knowledge of wrongdoing by other structured finance industry participants. In this submission and accompanying materials, Moody's presents plaintiffs' discovery requests, government inquiries or statements, and media or other published materials solely for purposes other than to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Collectively, as discussed

rating agencies operated under structural conflicts that were identified but not eliminated through the enactment of conduct codes.  (Stulz ¶¶ 8, 38-50.)  Investors were well aware of rating methodologies and their potential shortcomings.  (*Id.* ¶¶ 21-37.)  These conflicts and methodologies were "in plain sight" in the structured finance industry, as were that industry's allegedly distinct characteristics.  (*Id.* ¶¶ 45-50.)  This knowledge was transmitted through regulatory, Congressional, and media reports, as well as informal communications among thousands of former rating-agency employees, issuer employees, institutional investors, and others with knowledge of Moody's practices.  (*See id.* ¶¶ 38-55.)

1.   **Rating agency conflicts and methodologies received a thorough public airing up to and during the proposed class period.**

The "issuer pays" model, under which rating agencies are paid by the issuers they rate, has existed since the 1970s.  (CAC ¶ 39.)  The conflicts inherent in this business model were well known prior to June 2, 2005, when Moody's issued the Code of Conduct plaintiffs call misleading.  (*Id.* ¶ 68.)  As early as 1994, the SEC had "solicited comment on the practice of NRSROs charging issuers for ratings, and basing their fees on the size of the transaction." (Ehrenberg Decl. Ex. 12, at 40 n.109.)  And, in 2001, the financial press reported that credit rating agencies follow a "practice of privately informing" issuers of credit ratings before making those ratings public, affording issuers a chance to "contest" the ratings.  (*Id.* Ex. 20, at 2.)

These concerns received renewed attention in the wake of the Enron and Worldcom scandals, when rating agencies were faulted for their ratings' failure to anticipate those issuers' collapse.   From 2003 to 2005, the SEC reported on longstanding expressions of

below, these materials demonstrate that before and during the putative class period, investors and other market participants had access to extensive information that would tend to shed light on the allegedly misstated facts, so that this putative class litigation, no less than the many public inquiries, will involve extensive questioning of industry participants and investors to determine what they knew.

concern "about the potential conflict of interest that arises from the fact that the largest credit rating agencies rely on issuer fees for the vast majority of their revenues." (*Id.* Ex. 12, at 41.) The SEC observed that the "potential conflict" presented by the "issuer pays" model "could be exacerbated by the rating agencies' practice of charging fees based on the size of the issuance, as large issuers could be given inordinate influence with the rating agencies." (*Id.*) During this time, commentators, such as the California Public Employees' Retirement System, observed that Moody's "obtains more than 85% of its compensation from issuers." (*Id.* Ex. 13.) The SEC issued several proposals to "manage potential conflicts of interest," but did not propose to eliminate them. (*Id.* Ex. 14, at *8.)

At the same time, Congress also thoroughly explored at public hearings conflicts in the issuer pays model, "ratings shopping" among the issuers and other industry practices.[6] In 2005 hearings before the Senate Committee on Banking, Housing, and Urban Affairs, industry groups testified to widespread awareness of each of these issues, and even identified the concerns as particularly strong where structured finance products were involved. (*Id.* Ex. 17, at 62-63 (prepared testimony of Micah S. Green, President, the Bond Market Association).) Several senators agreed that the rating agencies operated under a conflicted business model. (*Id.* at 2, 49.)

---

[6]    For example, on April 2, 2003, the House Financial Services Committee held a hearing during which the SEC Director of Market Regulations stated that the "dependence of rating agencies on revenues from the companies they rate could induce them to rate issues more liberally and temper their diligence in probing for negative information." (Ehrenberg Decl. Ex. 15, at 9 (statement by Ms. Nazareth).) On September 14, 2004, during another Congressional hearing, further testimony was elicited concerning rating agencies' "blatant conflict of interest" because "each of the four SEC-approved rating agencies derives the bulk of its revenues . . . from fees charged to the companies they rate." (*Id.* Ex. 16, at 17 (statement by Ms. Brown-Waite).)

On June 2, 2005, Moody's issued an updated Code of Conduct, which continued to openly acknowledge that "most issuers of debt securities . . . rated by Moody's have, prior to assignment of any rating, agreed to pay to Moody's . . . for appraisal and rating services rendered by it fees ranging from $1,500 to $2,300,000." (*Id*. Ex. 8, at 13.)

Then and thereafter, Moody's SEC filings consistently disclosed the precise amount of revenue it received from issuers and the share of those revenues attributable to the structured finance business.[7]  Moody's continued to disclose expressly that its business model still "entails potential conflicts of interest that could impact the independence and objectivity of [Moody's] rating process." (*Id*. Ex. 10, at 15.)

Neither Congress nor industry observers treated Moody's (or other rating agencies') codes of conduct as having "eliminated" conflicts or other concerns, particularly in the structured finance business.  (*See*, *e.g.*, *id*. Ex. 18, at 50 (statement of Professor Frank Partnoy) (calling codes of conduct "self-serving and toothless").)  To the contrary, on September 29, 2006, Congress passed the Credit Rating Agency Reform Act of 2006, which did not outlaw or eliminate, but rather required NRSROs to *disclose* "any conflict of interest relating to the issuance of credit ratings."  15 U.S.C. § 78o-7(a)(1)(B)(vi).  The Senate Committee report acknowledged that NRSROs had been "criticized by a broad array of interested parties" for, among other things, "conflicts of interest" inherent in the business model.  (Ehrenberg Decl. Ex. 19, at 1-2.)  A wide range of commentators still continued to say that rating agencies operated under a conflict of interest.  (*See* Stulz ¶¶ 39-41; Ehrenberg Decl. Exs. 33-40.)

---

[7]     Specifically, in its 2005 10-K, filed on March 1, 2006, Moody's disclosed that Moody's Investors Service division obtained $715.4 million out of a total of approximately $1.7 billion from "[s]tructured finance revenue."  (Ehrenberg Ex. 11, at 25, 74.)  Moody's further revealed that "structured finance" business in the U.S. "was the largest contributor to year-over-year growth, primarily due to residential mortgage-backed and home equity loan securities." (*Id.* at 27.)

As *The New York Times* put it in December 2006, roughly half way through the alleged class period here:

> Congress, European securities regulators, investor advocates and even some rival credit rating agencies questioned the independence and integrity of the credit rating system, in part because since the early 1970s the services have been paid by the very companies whose creditworthiness they evaluate.

(Ehrenberg Decl. Ex. 33; Stulz ¶ 41.)   Expressions of concern just like these continuously appeared in both mainstream and financial media.  For example:

- On March 26, 2005, *The Economist* reported that "[t]he big agencies' business model has a built-in conflict of interest.  Ratings are paid for by the issuers of bonds and other forms of tradable debt, not by investors who use them.  Can they be completely independent of the firms who pay their bills?"  (Ehrenberg Decl. Ex. 25.)

- On February 16, 2006, Nomura Fixed Income Research reported that "[r]ating shopping . . . is common for securitization issues."  (Ehrenberg Decl. Ex. 27, at 1; Stulz ¶ 48.)

- On a March 22, 2006 episode of the CNBC show "Mad Money," Jim Cramer recommended that his audience purchase Moody's shares despite the "conflict of interest" that Moody's faced when issuing ratings.  (Ehrenberg Decl. Ex. 29.)

- On August 1, 2006, *Euromoney* observed that "at the heart" of the NRSROs' profitability was the "continuing conflict of interests in the rating agency world."  (*Id.* Ex. 31.)

- On February 8, 2007, *The Financial Times* reported that, "[a]s with corporate ratings, it is the issuers—often investment banks or structured finance firms—that approach and pay the rating agencies, not investors.  Critics highlight this as a potential conflict of interest, and point to what they claim have been failures on the part of rating agencies, such as the largely unanticipated collapse of Enron."  (*Id.* Ex. 34.)

- On April 1, 2007, *Euromoney* again reported on the "central conflict of interest" upon which the rating-agency business is built:  "ratings are paid for by issuers not investors."  (*Id.* Ex. 35.)

- On September 7, 2007, Arthur C. Levitt Jr., former Chairman of the SEC, wrote in the *Wall Street Journal* that the "conflicts of interest" faced by rating agencies "deepened with the rise of complex structured financial products," where "[t]he

credit rating agencies not only rate these instruments, but also offer the issuer help in constructing the product in order to obtain a certain rating." (*Id*. Ex. 39.)

Based on published accounts in *The Financial Times* and *The New York Times* alone, and on those outlets' circulations or audience size, well over one million people would have been exposed to information bearing on the alleged misrepresentations, during the proposed class period. (*See id.* ¶¶ 33-34.)[8]

### 2. Structured finance industry participants openly discussed rating agency conflicts and methodologies.

Plaintiffs affirmatively allege that Moody's structural conflict of interest, "ratings shopping," and failure to factor originators' quality into ratings were well known enough among structured finance industry participants to be called an "industry fixture." (CAC ¶¶ 316, 331.) According to plaintiffs, structured finance issuers engaged in ratings shopping "'openly.'" (*Id.* ¶ 331(a).) It was structured finance issuers that allegedly had the ability to "hold back payment for 'published' ratings, and to choose agencies on the basis of ratings promised in advance at the 'pre-evaluation' stage." (*Id.* ¶ 315.) It was also structured finance issuers, "together with the rating agencies," that were allegedly "gaming the system so as to produce [the desired] structured finance triple-A tranches." (*Id.* ¶ 319 (internal quotation marks omitted); *see also id.* (quoting JP Morgan analyst stating that "'Gaming [the system] is the whole thing.'").) The CAC asserts that structured finance issuers were fully familiar with rating-agency models and how to satisfy them. (*Id.* ¶¶ 45, 49, 308, 322.)[9]

---

[8]    Additional examples of extensive media coverage, chatroom postings, studies and commentary on these issues are presented by Professor Stulz (¶¶ 38-55) and in the Ehrenberg Declaration (¶¶ 21-40).

[9]    Bond issuers beyond those involved in structured finance also reportedly were well aware of rating agency conflicts from the start of the alleged class period. On February 24, 2006, *The Globe and Mail* reported that a survey conducted by the Bond Market Association revealed that "[t]wo-thirds of bond issuers are worried about a lack of

Not only issuers but also investors had full access to Moody's methodologies and to ample commentary about them.  Since well before the Class Period, Moody's and other major credit rating agencies published the methodologies they employ to rate various structured finance products, such as CDOs and RMBS.  (Stulz ¶ 26.)  Rating agencies provided many of their quantitative models and frequent reports on the models' technical features to market participants, allowing academics, regulators and others to study, compare, and comment on the methodologies and those methodologies' well known "model risk."  (*Id.* ¶¶ 26-32.)  Moody's also published data that made it possible to assess the performance of the structured finance securities it rated. (*Id.* ¶ 26.)  Thus, Moody's alleged statement that it would "*henceforwards* consider some originators' loans more risky than others" (CAC ¶ 118 (emphasis added)) or its alleged announcement on October 12, 2007 that it was separating originator quality into tiers, *see In re Moody's*, 599 F. Supp. 2d at 512, did not surprise the market.  If, as plaintiffs allege, Moody's was not assessing originator quality in the way that it claimed it was, then many sophisticated market participants, including Moody's own shareholders, could have discerned that gap through their own application of Moody's stated methodologies and models.  (*See* Stulz ¶¶ 33-37.)

### 3. Moody's shareholder base was largely institutional investors, including the largest structured finance industry participants.

Finance research establishes that "there is significant diffusion of information within various social networks in the financial community."  (Stulz ¶ 54.)  The "'steady turnover of rating agency analytic staff—who take jobs with investors, issuers, and investment banks'"— would "'spread[] hands-on knowledge of rating methodologies beyond the confines of the rating agencies.'"  (*Id.* ¶ 26.)  Discussions of rating methodologies and rating practices would naturally

---

competition among credit rating agencies, and almost half are concerned about the way potential conflicts of interest are tackled."  (Ehrenberg Decl. Ex. 28.)

occur at securitization industry conferences that were frequently attended by academics, asset managers, investment bankers, and other industry professionals. (*Id.* ¶ 27 & n.26.)

All of this information necessarily would have permeated the class of Moody's shareholders plaintiffs propose to certify. (*Id.* ¶¶ 51-55.) From 2006 through 2008, "upwards of 10% of Moody's common stock was held by top structured finance issuers, managers, and book runners." (*Id.* ¶ 51.) These institutions included, among others, Barclays, Deutsche Bank, Goldman Sachs, and Morgan Stanley. (Stulz Ex. 3.) According to the CAC, these institutions had to have known of the alleged fraud because they were the entities pressuring Moody's for favorable ratings.

Moreover, "upwards of 77% of Moody's common stock was held by institutional investors . . . during the purported Class period." (*Id.* ¶ 51.) As a result, a large portion of Moody's shareholders were "sophisticated investors who likely would have known the limitations of credit ratings and the dynamics of the structured finance market." (*Id.*) These shareholders "would have also known that the potential for conflicts of interest was an inherent feature of the issuer-pays model, and likely would have been familiar with the debate in the financial community about this topic." (*Id.*)

For example, based on quarterly filings, over the course of the proposed class period, the Vanguard Group, Inc. ("Vanguard") held anywhere from five to six million Moody's shares. (*Id.* Ex. 42.) During Moody's "Investor Outreach" calls in July 2007, Vanguard's representative Mabel Yu reportedly conveyed to Moody's that:

- The "portfolio managers at Vanguard began to see problems in the work of the rating agencies beginning about 18 months ago."

- Vanguard independently decided to stop investing in the RMBS market altogether by 2006 because of the view that "particularly in the area of sub-prime, too much credit is given to individuals who haven't had access to credit before[, and] there

wasn't enough historical data available to track the performance of these more aggressive loans."

- Vanguard had previously talked with deal analysts at Moody's about concerns over ratings methodologies and data, "commenting . . . that LTV's have gone up, FICO's have gone down, and there are more negative amortization loans, more ARM loans and that rates and default rates have been rising."  Vanguard "'never got a straight answer'" and over time relied "'less and less on the opinions of rating agencies.'"

- The "market has been screaming for a while, 'look at sub-prime!'"

- The "'[rating] agencies are giving issuers every benefit of the doubt.'"

- "'[I]f Moody's doesn't give the rating, the issuer can simply [g]o elsewhere and get it somewhere else.'"

(*Id.* Ex. 41.)  Each member of any class certified here will be subject to overwhelming individual inquiry into communications and viewpoints just like these.

## III.    PLAINTIFFS CANNOT INVOKE A CLASS-WIDE RELIANCE PRESUMPTION.

### A.    Plaintiffs Cannot Invoke the *Basic* Presumption Because They Fail to Show That Any Alleged Misrepresentation Was Material.

Plaintiffs claim that they are entitled to the *Basic* presumption of reliance simply by asserting that "Moody's stock traded in an open, developed and efficient market during the Class Period."  (Pl. Br. at 21.)  Under controlling Second Circuit law, however, to invoke the fraud-on-the-market presumption, plaintiffs must show that "a defendant has (1) publicly made (2) a *material* misrepresentation (3) about stock that traded on an impersonal, well-developed (i.e., efficient) market."  *In re Salomon Analyst*, 544 F.3d at 481 (citing *Basic*, 485 U.S. at 248 n.27) (emphasis added).  To demonstrate "materiality," plaintiffs must make a showing *beyond* a "prima facie" one that the alleged misrepresentation "'significantly altered the 'total mix' of information.'"  *Id.* at 483, 486 n.9 (quoting *Basic*, 485 U.S. at 232).

Plaintiffs here fail to make *any* showing—let alone a "prima facie" one—that any alleged misstatement was material.  Instead, plaintiffs only discuss "materiality" by way of

background, stating that the alleged misrepresentations were material because "independence is essential to an NRSRO's functionality as a financial gatekeeper" and because "the decision to evaluate originator standards in rating structured finance instruments had serious consequences on the accuracy of ratings issued by Moody's." (Pl. Br. at 7-8.) As support, plaintiffs cite only to their own allegations and the Court's prior ruling on the motion to dismiss. (*Id.*)

### 1.    Materiality cannot be determined class-wide.

There is substantial reason to doubt that disclosure of more information about Moody's conflict of interest or rating methodologies "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JPMorgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted). Because the "total mix" of information includes information already in the public domain, a "misrepresentation is immaterial if the information is already known to the market"; in such a case, the misrepresentation simply "cannot . . . defraud the market." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000). For example, a statement characterizing a side-effect of a drug as "mild" is inactionable where the company releases accurate data about the drug through press releases, SEC filings, and various medical publications. *In re Sanofi-Aventis Sec. Litig.*, No. 07-cv-10279, 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009) (Daniels, J.); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, --- F. Supp. 2d ---, 2010 WL 1257597, at *16 (S.D.N.Y. Mar. 31, 2010) (dismissing claims where "prospectuses, [a] 2006 SEC Order, and Merrill Lynch's [Auction Rate Securities] website demonstrate that the 'total mix' of available information included the very information plaintiffs claim was concealed." (internal quotation marks omitted)).

-27-

Moreover, general statements, such as a company's claim to "integrity," are inactionable. *ECA*, 553 F.3d at 206. In *ECA*, for instance, plaintiffs argued that a bank's statements that, among other things, it "set the standard for integrity" were material because "the significance of a bank's reputation is undeniable." *Id.* (internal quotation marks omitted). The Second Circuit rejected the argument, however, because plaintiffs had improperly "conflate[d] the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation." *Id.* "While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." *Id.* Other courts have agreed. In *Lasker* v. *New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996), for instance, the Court concluded that a company's statement that it "would not 'compromise its financial integrity'" was not a "represent[ation] that its actions would in no way impact the company's finances." *Id.* Not surprisingly, many courts in this district have followed *Lasker* and *ECA* to conclude that statements analogous to those at issue here are inactionable. *See, e.g.*, *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08-cv-11278, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) ("risk management practices and controls").

Here, because of the extensive, accurate information about conflicts and methodologies in the public domain, and additional information floating around privately, the Court cannot rule on a class-wide basis that the allegedly misstated information "would have 'significantly altered the total "total mix" of information.'" *In re Salomon Analyst*, 544 F.3d at 482. The *Basic* presumption of reliance is therefore unavailable. *See id.*

### 2.    Immateriality should be determined now.

If materiality could be determined class-wide, the only proper determination here would be that the alleged misstatements were immaterial. Indeed, two courts in this district

-28-

recently dismissed as immaterial and non-actionable nearly identical statements about rating agency independence and methodologies. In *In re Lehman Brothers Securities and Erisa Litigation*, plaintiffs brought Securities Act claims alleging that certain offering documents were misleading because they failed to disclose that Lehman Brothers engaged in "'ratings shopping' and paid the ratings agencies for their ratings." 684 F. Supp. 2d at 492. As a result, plaintiffs claimed that the documents "created the false impression that the Ratings Agencies were independent evaluators of the [issued] Certificates." *Id*. Judge Kaplan dismissed those claims on the ground that there was no obligation to disclose "that which is publicly known," *i.e.*, that "the ratings agencies operated under a conflict of interest." *Id*. Similarly, "the rating agencies' role in structuring the Certificates [was] not material as a matter of law" because "[a] reasonable investor would have known that the ratings agencies were paid by the issuers." *Id*. "If the fee arrangement undermined an investor's confidence in the rating agencies' independence, a disclosure that a rating agency was involved in structuring the Certificates prior to rating them would have added nothing important to the 'total mix' of information available." *Id*.

Likewise, in *New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, plaintiffs alleged that various offering documents failed to disclose that rating agencies operated under an allegedly undisclosed "conflict of interest," "particularly with regard to [the rating agencies'] role in structuring the securitizations and the practice of 'ratings shopping.'" 2010 WL 1172694, at *14. Judge Baer dismissed those allegations, reasoning, like Judge Kaplan, that "[a] reasonable investor would be expected to know that the rating agencies

were paid by the investment banks that hired them, and that they had a hand in determining the structure of securitizations." *Id.*[10]

**B.    The *Basic* Presumption Is Rebutted Here by Market Makers' Alleged Knowledge, and by Moody's Stock Price History.**

Under *In re Salomon Analyst*, 544 F.3d at 483-84, 486, defendants may rebut the fraud-on-the-market presumption, prior to class certification, by showing that "the market price [of defendant's stock] was not affected by the alleged misstatements." *See also In re Credit Suisse First Boston Corp. (Latronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 143 (S.D.N.Y. 2008). As *Basic* explained, a lack of "market impact" may be expected whenever market makers are "privy to the truth," because in an "efficient" market material information will quickly be reflected in stock prices. 485 U.S. at 248. The Second Circuit similarly observed in *McLaughlin* that a publication's "minimal impact" on the market for light cigarettes "suggest[ed] that [the publication] may have been a reinterpretation of existing studies." 522 F.3d at 234.

Here, Moody's stock price history reflects *no inflation* from the alleged misrepresentations. Analysis of all the trading days on which Moody's allegedly made

_____

[10]    Moody's acknowledges that before Judges Kaplan's and Baer's rulings, Judge Kram ruled in this case that the same statements were *potentially* actionable and material. *See In re Moody's*, 599 F. Supp. 2d at 510. Because Judge Kram ruled only on a motion to dismiss, accepting plaintiffs' allegations "as true" and expressly eschewing "factual findings," *id.* at 499 n.1, this Court's determination of the class certification motion can and should take account of pertinent factual and legal developments, so as to meet the heightened requirements of Rule 23. *See In re IPO*, 471 F.3d at 27; *see also Nobel Ins. Co.* v. *City of N.Y.*, No. 00-cv-1328, 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("[A]s a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery"). Since Judge Kram's motion to dismiss decision, (i) the factual record more fully reflects the "total mix of information" that plaintiffs chose not to plead; (ii) the Second Circuit ruled in *In re Salomon Analyst* that plaintiffs may *not* rely on allegations or a "prima facie showing" to demonstrate materiality, 544 F.3d at 486 n.9; and (iii) two respected Judges in this District deemed allegations concerning rating-agency conflicts of interest immaterial as a matter of law.

misrepresentations—concerning Moody's independence, its management of potential conflicts of interest, adherence to its Code of Conduct, and its evaluation of originator practices—confirms that, "during the entire purported Class Period, there is no day on which Plaintiffs allege Moody's made a misstatement that is associated with a statistically significant and positive abnormal return." (Stulz ¶ 63.)[11]

   Nor is there any day during the purported Class Period when an alleged "corrective disclosure" triggered a statistically significant and negative abnormal return. (*Id.* ¶¶ 103-11.) This is significant because the absence of a "price decrease in [the] stock on the date a misrepresentation was disclosed" is "strong evidence that there was no price change on the date of the misrepresentation, thus rebutting the fraud-on-the-market presumption." *In re AIG Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y. 2010); *see also In re Credit Suisse*, 250 F.R.D. at 143-48 (analyzing significance of market responses to statements and disclosures at the beginning, middle, and end of the class period); *see also McLaughlin*, 522 F.3d at 227 ("Given the lack of an appreciable drop in the demand or price of light cigarettes after the truth about Lights was revealed . . . , plaintiffs' argument that defendants' misrepresentations caused the market to shift and the price of Lights to be inflated fails as a matter of law."). In all, the market simply "did not deem the information released on those days to be material." (Stulz ¶ 63.)

   Moody's stock price history also tends to confirm that market makers (at least) were aware of the conflicts of interest and methodologies at issue here. Because "key features of the alleged fraud were publicly discussed before (and throughout) the purported Class Period," a "financial economist would expect that any impact of the alleged fraud would already have been

---

[11]  Similarly, comparison of Moody's stock returns on April 1, 2003 (when it stated that it would evaluate originator standards) and June 2, 2005 (when Moody's issued its Code of Conduct) against market- and industry-adjusted returns does not suggest any statistically significant positive returns. (*See* Stulz ¶ 63 n.95.)

reflected in Moody's stock price prior to Plaintiff's alleged curative disclosures." (*Id.* ¶ 14.)
This is so because, in an efficient market, "Moody's stock price would quickly reflect market
participants' knowledge of the alleged fraud." (*Id.* ¶ 52.)[12]

      C.      **The *Affiliated Ute* Presumption of Reliance Does Not Apply.**

           Plaintiffs assert that "reliance is presumed to the extent that the claims are based
on omissions of material facts" under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S.
128 (1972). (Pl. Br. at 22.) As discussed above, however, plaintiffs have identified no material
misstatement or omission, so they cannot invoke a presumption of reliance under *Affiliated Ute*
any more than they could invoke one under *Basic*. *See Press* v. *Chemical Inv. Servs. Corp.*, 166
F.3d 529, 539 (2d Cir. 1999). Likewise, under *Affiliated Ute* the reliance presumption is rebutted
by "demonstrating that plaintiff[s] had access to and knowledge of the omitted information, and
therefore, that the alleged omission did not cause the injury suffered." *Wollins* v. *Antman*, 638 F.
Supp. 989, 995 (E.D.N.Y. 1986).

           Plaintiffs' invocation of *Affiliated Ute* reliance fails as well because this is *not* an
"omissions" case. The Second Circuit has held that where, as here, both misstatements and
omissions are alleged, the *Affiliated Ute* presumption cannot apply unless the claims are
"primarily omission claims." *Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*, 412
F.3d 103, 109 n.5 (2d Cir. 2005) (quoting *Affiliated Ute*, 406 U.S. at 153) (internal quotation
marks omitted). "[W]here positive statements are central to the alleged fraud, thereby
eliminating the evidentiary problems inherent in proving reliance on an omission, the *Affiliated*

---

[12]    Moody's does not ask the Court to rule at this time that the market for Moody's shares
was inefficient, but Moody's reserves the right to challenge market efficiency on the
grounds that (i) plaintiffs' allegations of lasting inflation despite market knowledge is the
antithesis of market efficiency, and (ii) the "indicia" of efficiency to which plaintiffs'
papers point do not establish efficiency generally or as applied here, as explained by Dr.
Stulz. (*See* Stulz ¶¶ 9, 14 & n.2.)

*Ute* presumption does not apply." *Teamsters Local 445 Freight Div. Pension Fund* v.
*Bombardier, Inc.*, No. 05-cv-1898, 2006 WL 2161887, at *5 & n.62 (S.D.N.Y. Aug. 1, 2006),
*aff'd* 546 F.3d 196 (2d Cir. 2008); *see also In re Credit Suisse*, 250 F.R.D. at 143 (citing *Starr*,
412 F.3d 103 at 109 n.5).  Only in "cases like *Affiliated Ute*, in which no positive statement
exist," is "reliance as a practical matter [] impossible to prove."  *Wilson* v. *Comtech Telecomms.
Corp.*, 648 F.2d 88, 93 (2d Cir. 1981).

   Here, plaintiffs' entire case is premised on *misstatements* allegedly made by
Moody's concerning its independence and ratings methodologies.  Plaintiffs' "core allegation" is
that "Moody's falsely *claimed* that it was an independent body publishing ratings accurately and
impartially."  *In re Moody's*, 599 F. Supp. 2d at 507 (emphasis added).  Indeed, plaintiffs allege
that over a dozen affirmative statements in Moody's Code of Conduct, its Code Implementation
Report, Annual Reports, and 10-Ks were misleading.  Within Moody's Code of Conduct alone,
plaintiffs attack 15 sections or sub-sections.  (*See* CAC ¶ 69(a)-(k).)[13]  Plaintiffs' most specific
allegation—regarding Moody's consideration of loan-originator standards—turns on Moody's
"*representat[ation]* that it . . . conducted further, independent and qualitative assessments of loan
originator standards and practices, and took such standards and practices into account as an

---

[13]   Other examples of alleged "representations" abound.  *See*, *e.g.*, CAC ¶ 72(a)-(c)
(discussing "representations" contained in Moody's 2005 Annual Report concerning
"Moody's devotion to 'preserving,' 'reinforcing' and 'upholding' the public's trust in
Moody's"; the "fundamental importance of 'independence' in Moody's business conduct,
business strategy and regulatory affairs"; and "the adequacy of the steps that Moody's
was taking to respond to regulator concerns over Moody's independence"); *id.* ¶ 74(a)-(c)
(discussing similar "representations" in Moody's Form 2005 10-K); *id.* ¶ 77(a)-(j)
(discussing "representations" made in Code Implementation Report similar to those made
in the Code of Conduct); *id.* ¶ 78 (discussing "representation" in press release regarding
Moody's endorsement of IOSCO Principles); *id.* ¶ 82 (referring to "materially false and
misleading" "representation" contained in Moody's 2006 Form 10-K); *id.* ¶ 84 (alleging
that 2006 Annual Report "made the same representations as Moody's 2005 Annual
Report").

'integral part' of its credit ratings."  (*Id.* ¶ 111 (emphasis added); *see also id.* ¶ 112 (referring to "similar *representations*" made "throughout the class period" (emphasis added).)  Plaintiffs cannot "end run" the reliance element by pretending that this case is not about misstatements but about omissions.  *Titan Pharms. & Nutrition, Inc.*, No. 05-cv-10580, 2006 WL 708552, at \*2 (S.D.N.Y. Mar. 30, 2006).

## IV.  PLAINTIFFS HAVE FAILED TO SET FORTH A METHODOLOGY BY WHICH LOSS CAUSATION MAY BE DETERMINED ON A CLASS-WIDE BASIS.

Under controlling law, plaintiffs must, at the very least, propose a methodology by which they can prove loss causation on a class-wide basis.  *See McLaughlin*, 522 F.3d at 227. "A party's assurance to the court that it intends or plans to meet [Rule 23] requirements is insufficient."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008).  At a minimum, plaintiffs must propose a "suitable methodology" for a class-wide loss causation determination, such as "an event study" by an expert.  *See Fogarazzo* v. *Lehman Bros.*, 263 F.R.D. 90, 106-07 (S.D.N.Y. 2009); *Lapin* v. *Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008).

Plaintiffs contend that loss causation is "common to all class members because it can be proven on a class-wide basis by analyzing, *inter alia*, whether the drops in the price of Moody's securities upon disclosure of the truth were caused by the revelations of the fraud."  (Pl. Br. at 22.)  But in support, plaintiffs cite only to *In re NTL, Inc. Sec. Litig.*, No. 02-cv-3013, 2006 WL 330113, at \*9-10 (S.D.N.Y. Feb. 14, 2006), where the issue was only the *typicality* of the putative class representatives, *not* whether common issues of law or fact predominated.  *See id.* at \*8.  Worse, the *NTL* court relied on a "'some showing'" standard that was overruled in *IPO* and specifically disavowed in *In re Flag Telecom*.  *Compare NTL*, 2006 WL 330113, at \*9 (accepting "some showing" of loss causation) *with In re IPO*, 471 F.3d at 27 (rejecting "some

showing" standard) and *In re Flag Telecom*, 574 F.3d at 38-39 (imposing preponderance-of-the-evidence standard).

Plaintiffs present *no* event study or other recognized methodology to connect price movements to the alleged fraud. There is every reason to doubt that plaintiffs could present the required proof of loss causation here. As discussed above, Dr. Stulz's event study shows no statistically significant abnormal positive return associated with any alleged misstatement during the class period. Moreover, of the four allegedly corrective disclosures recognized by Judge Kram, the only one that occurred inside the class period (the October 12-17, 2007 corrective disclosure) did *not* cause a statistically significant decline attributable to revelation of allegedly undisclosed facts. (Stulz ¶ 102.) The three remaining allegedly corrective disclosures *occurred months after the close of the class period*, and well after plaintiffs had filed their Illinois Complaint. *See In re Moody's*, 599 F. Supp. 2d at 512-13. Because plaintiffs chose not to amend their pleading after Judge Kram's dismissal decision, plaintiffs cannot now seek to extend the class period further. These post-filing or post-class period disclosures cannot constitute corrective disclosures because a "stock drop [that] occur[s] after the close of the class period [] cannot be relied upon for loss causation." *Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008).

Moreover, as the evidence introduced by Moody's shows, *see supra* at 30-32, none of the alleged corrective disclosures could "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). One of the alleged corrective disclosures—the May 2008 *Financial Times* article—did not even concern conflicts of interest (*see* Stulz ¶¶ 112-18), and therefore could not have disclosed something that was within the "zone of risk concealed by

-35-

the [alleged] misrepresentations." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). And, as explained by Dr. Stulz, that May 2008 article was the *only* event associated with a statistically significant abnormal return on Moody's stock price. (Stulz ¶ 102.) Coming nearly a year after the close of the putative class period, that event could not serve as a basis for common proof of loss causation among those investors who had bought, and may have sold, between February 2006 and October 2007 in any event.

Further, "where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud— rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell*, 396 F.3d at 177. Here, Moody's fully disclosed that the issuer-pays business model entails potential conflicts of interest and it did not guarantee that those conflicts had been eliminated. *See supra* at 18-23. Thus, the risk that plaintiffs allege to have materialized *was* "unambiguously apparent" on the face of Moody's documents. Plaintiffs fail to, and cannot demonstrate, that there was some concealed portion of this risk that caused their investment losses.

Plaintiffs have suggested that all declines in Moody's stock price through 2008 (or even later) were caused by alleged misrepresentations about Moody's conflicts or methods, because generally, according to plaintiffs, "Moody's actions have brought about the extinction of its markets," and the reduction of its revenues. (CAC ¶ 373.) This cannot be supported and certainly does not provide a basis for certifying a class. As Dr. Stulz explains (and as is well recognized), the unprecedented credit crisis of 2007-08 was brought about by various

governmental and market forces far greater than any statement Moody's made about its independence or its methods.  (Stulz ¶¶ 67-86.)  It was the credit crisis that caused contractions across Moody's business, rather than a portion of Moody's business that caused the credit crisis.  (*Id*.)  As a matter of law, causation fails where losses arise out of "the direct intervention of a market collapse," *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 422 (S.D.N.Y. 2003), or other "industry-wide phenomena," *Bastian* v. *Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990).

## V.    ALL THREE LEAD PLAINTIFFS LACK A CLAIM, OR ARE SUBJECT TO UNIQUE DEFENSES.

Separate and apart from the predominance requirement, plaintiffs must establish, "by a preponderance of the evidence," that their proposed class representatives are both "adequate and typical representative[s] of the class and not subject to any unique defenses which threaten to become the focus of the litigation."  *In re Flag Telecom*, 574 F.3d at 40 (internal quotation marks omitted).

Two of the proposed lead representatives, Local 282 and McCurley, cannot demonstrate loss causation.  The third, Wetstein, purchased Moody's shares after becoming aware of the alleged fraud.  This is disqualifying.

### A.    Local 282 and McCurley Cannot Demonstrate Loss Causation.

Plaintiffs claim that "[l]ead Plaintiffs, like all class members, purchased Moody's publicly-traded securities at artificially-inflated prices during the Class Period and suffered damages because of Defendants' alleged material misstatements and omissions."  (Pl. Br. at 16.)  However, as the Second Circuit held in *In re Flag Telecom*, so-called "in and out traders"—*i.e.*, investors who purchased stock at an allegedly inflated price but sold that stock before a corrective disclosure—cannot be class members and cannot serve as class representatives.  574

-37-

F.3d at 40-41.  That is because where the sale of a stock precedes corrective disclosure of the alleged fraud, the misrepresentation cannot be the cause of an investor's loss.  "In-and-out" traders are thus subject to the unique and disqualifying defense that they cannot prove loss causation.  *See id*.  For the same reason, neither Local 282 nor McCurley is an adequate class representative because without typical claims, they cannot adequately represent absent class members.  *Id.*

Local 282 and McCurley are classic "in-and-out traders."  Both purchased and sold all of their Moody's shares before October 12, 2007, that is, the date determined by the Court to be the first potentially actionable corrective disclosure.  *See In re Moody's*, 599 F. Supp. 2d at 513.  The purchases and sales of these proposed lead plaintiffs are set forth below:

### Local 282 Purchases/Sales of Moody's Stock

| Date | Transaction | Total Moody's Shares Held on date of Transaction |
|---|---|---|
| 10/10/06 | B 950 | 950 |
| 11/7/06 | S 950 | 0 |
| 5/9/07 | B 1,430 | 1,430 |
| 7/6/07 | B 180 | 1,610 |
| 9/7/07 | S 1,610 | 0 |

### McCurley's Purchases/Sales of Moody's Stock

| Date | Transaction | Total Moody's Shares Held on date of Transaction |
|---|---|---|
| 3/9/07 | B 2,000 | 2,000 |
| 3/12/07 | B 2,000 | 4,000 |
| 3/13/07 | B 6,000 | 10,000 |
| 3/26/07 | S 4,000 | 6,000 |
| 6/20/07 | B 4,000 | 10,000 |
| 8/31/07 | S 5,000 | 5,000 |
| 9/4/07 | S 5,000 | 0 |

(Ehrenberg Decl. Ex. 44, at 33-34; Exs. 47-48.)   Because neither Local 282 nor McCurley suffered any loss caused by the alleged misrepresentations, neither can serve as a class representative nor even be a member of the class.  *See In re Flag Telecom*, 574 F.3d at 40-41.

   **B.**  **Local 282 Lacks Standing to Pursue a 10b-5 Cause of Action.**

   "[O]nly a purchaser or seller" of a security may sue under Section 10(b) and Rule 10b-5.  *Gurary* v. *Winehouse*, 190 F.3d 37, 46 n.9 (2d Cir. 1999).   Where an investor has transferred "full authority" to an investment manager to make an investment decision, that investor does not have statutory standing to pursue a 10b-5 claim.[14]   In this case, Local 282 delegated complete decision-making authority to its investment advisor.   Specifically, Local 282's investment policy, in place when it purchased Moody's stock (Ehrenberg Decl. Ex. 46, at 57:2-5), vests "[f]ull discretion" in "the Investment Managers as regards the sector mix of these assets, the selection of securities, and the timing of their transactions."   (*Id.* Ex. 49, at 3.) William Maye, who testified on behalf of Local 282 pursuant to Fed. R. Civ. P. 30(b)(6), confirmed at this deposition that Local 282 delegated complete decision-making authority to its investment advisor; Local 282 was not even required to approve any purchase or sale made on its behalf.  (*Id.* Ex. 46, at 57:6-58:2.)  This complete delegation means that Local 282 is subject to the unique defense that it lacks statutory standing to prosecute this action, and therefore cannot serve as a class representative.

---

[14]  *Compare Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*, 800 F.2d 177, 181 (7th Cir. 1986) ("In this case, we cannot imply a violation of section 10(b) and Rule 10b-5 when the plaintiff transferred to [its investment manager] full authority to make investment decisions.   The Congregation made no investment decisions; it hired [its investment manager] for that purpose.   [The investment manager] had 'full discretion to develop and implement a prudent portfolio strategy.' . . . [T]he Congregation was not required to approve each transaction.") *with Lapin*, 254 F.R.D. at 180 (rejecting standing argument where "Plaintiff has pointed to his testimony that he participated to a degree in the decisions of his investment manager to buy and sell stock").

C.    **Wetstein Cannot Demonstrate Reliance on Defendants' Alleged Misrepresentations.**

"Although there is no per se rule to this effect, this Court has consistently held that 'a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'"  *Rocco* v. *Nam Tai Elec., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007).  In such circumstances, the resulting inference is that the alleged fraud played no role in the initial purchasing decision, and the investor would have bought the stock even had he known of the alleged fraud.  *See McLaughlin*, 522 F.3d at 226 (observing that "[t]hree of the six named plaintiffs even continued to purchase [light cigarettes] after the filing of the complaint in this case, suggesting the influence of some other motivation" to purchase the product other than its supposed health benefits).  At his deposition, Wetstein testified that, as of August 2008—after the initial and amended complaints had been filed—he believed that Moody's had committed fraud.  (Ehrenberg Decl. Ex. 45, at 81:2-5.)  Still, notwithstanding this belief, he continued to buy Moody's stock in August 2008.  (*Id.* at 82:14-23.)  According to Wetstein, his general investment strategy for the account in which he bought Moody's stock was a form of "intellectual gambling." (*Id.* at 34:16.)  In other words, he would have purchased Moody's stock *ab initio* even if he had known of the alleged fraud.

VI.    **ANY CERTIFIED CLASS MUST EXCLUDE INVESTORS WHOSE CLAIMS FAIL AS A MATTER OF LAW.**

Under Fed. R. Civ. P. 23(c)(1)(B), "an order that certifies a class action must define the class and the class claims, issues, or defenses."  As with other Rule 23 requirements, a court must make "factual findings" when "defin[ing] the class." *In re Flag Telecom*, 574 F.3d at

38.  No class should be certified here.  In the event that this Court does certify a class, the order must limit the class as follows:

- *First*, any class definition must exclude all in-and-out traders—that is, all investors who had sold their Moody's shares prior to October 12, 2007, the date of the first alleged corrective disclosure.  *See In re Flag Telecom*, 574 F.3d at 41; *In re AIG, Inc. Sec. Litig.*, 265 F.R.D. at 189.  Among certain institutional investors alone, this likely reduces the size of any class by at least 7 %.  (Stulz Ex. 21.)

- *Second*, any class definition must exclude all institutional investors, or at least all institutions involved in the structured finance industry, and their thousands of employees.  *See Dorchester Investors* v. *Peak Trends Trust*, No. 99-cv-4696, 2002 WL 272404, at *6 (S.D.N.Y. Feb. 26, 2002) (excluding from the proposed class "those who actually participated in the short selling scheme . . . as well as those who knew of [it]").

- *Finally*, the class "claims" must be limited to those alleged misstatements and corrective disclosures made during the class period, rather than alleged misstatements made before the class period or alleged corrections long afterwards.  *See In re IBM*, 163 F.3d 102, 107 (2d Cir. 1998); *Masters*, 271 F. App'x at 51.

To illustrate the importance of these limitations, consider the Vanguard example discussed above.  The "Investor Outreach" discussion took place on July 11, 2007, months before the proposed end of the class period.  That discussion referred to many earlier discussions and a planned further discussion between Vanguard and Moody's about Moody's relationship with structured finance issuers, Moody's rating methodologies, the subprime market and market wide alarm over its risks, and perceived "problems in the work of the rating agencies beginning about 18 months ago."  (*See* Ehrenberg Decl. Ex. 41, at 3.)  Meanwhile, during that eighteen month period, Vanguard's quarterly filings reflected that it continued to hold five or six million shares of Moody's stock, sometimes buying and sometimes selling hundreds of thousands of shares within that range.  (Ehrenberg Decl. Ex. 43.)  Vanguard *accumulated* more shares in each quarter that included an allegedly corrective disclosure.  (*Id.*)

These facts raise distinct issues about knowledge, reliance and loss causation at various intervals in the proposed class period.  No less distinct or complex issues would arise out

-41-

of the necessary individual examination of most or all of the institutions that make up Moody's shareholder base.[15]  Those individualized inquires would overwhelm common ones.

## **CONCLUSION**

No class can be certified here because individualized issues regarding knowledge, reliance and loss causation predominate, and because the proposed class representatives are inadequate and present claims atypical of other class members.  If any class could be certified, it must be narrowed significantly to exclude class members with potentially disqualifying knowledge and who cannot demonstrate loss causation.

For the foregoing reasons, defendants respectfully request that plaintiffs' motion for class certification be denied in its entirety.

Dated:  New York, New York
        May 28, 2010

                                        /s/ Stephen Ehrenberg
                                        Sharon L. Nelles
                                        Penny Shane
                                        Stephen Ehrenberg
                                        Erez J. Davy
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, New York  10004
                                        Telephone:  (212) 558-4000
                                        Facsimile:  (212) 558-3588

                                        *Attorneys for Defendants Moody's*
                                        *Corporation and Raymond W. McDaniel, Jr.*

---

[15]  For example, the Chief Investment Officer of another Moody's shareholder, Fortis Investment, had one-on-one discussions with Moody's (and with other institutional investors) in July 2007, in which she referred to ratings as "b.s." (Ehrenberg Decl. Ex. 42.)  Fortis immediately sold the several hundred thousand shares it had purchased in early 2007, so that Fortis held no shares by the time of the first recognized allegedly corrective disclosure.  (Ehrenberg Decl. Ex. 43.)

-42-

## CERTIFICATE OF SERVICE

I certify that, on May 28, 2010, copies of the foregoing Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, along with supporting papers, were served via ECF on the following:

Ira M. Press                                    Stuart L. Berman
Roger W. Kirby                                  Michael K. Yarnoff
David Bishop                                    Benjamin J. Hinerfeld
Daniel Hume                                     Jennifer L. Keeney
Aaron Hovan                                     Lauren Wagner Pederson
Kirby McInerney LLP                             Barroway Topaz Kessler Meltzer & Check, LLP
825 Third Avenue, 13th Floor               280 King of Prussia Road
New York, NY  10022                             Radnor, PA  19087


Lionel Z. Glancy
Michael M. Goldberg
Frederick W. Gerkens III
Glancy Binkow & Goldberg LLP
1430 Broadway, Suite 1603
New York, NY  10018

*Co-lead Counsel for Lead Plaintiffs*

On the same day, copies of Exhibits 44-49, which will be filed under seal with the Clerk, were also served by e-mail on the counsel listed above.


                                    /s/ Stephen Ehrenberg
                                    Stephen Ehrenberg