UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                         :
                         :
In re MOODY'S CORPORATION      : CASE NO. 1:07-CV-8375-GBD
SECURITIES LITIGATION          :
                         :
                         :
                         :
                         :
                         :
                         :
------------------------------------------------------- x

## DECLARATION OF STEPHEN EHRENBERG

Stephen Ehrenberg, under penalty of perjury hereby declares as follows:

1.       I am a member of the Bar of this Court and an associate at Sullivan & Cromwell LLP, counsel for defendants Moody's Corporation ("Moody's") and Raymond W. McDaniel, Jr.  I submit this declaration in support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

### Documents Referenced Concerning this Case's Procedural History and Discovery

2.       Attached hereto as Exhibit 1 is a true and correct copy of the complaint filed in *Nach* v. *Huber*, No. 07-cv-4071, filed on July 19, 2007 in the United States District Court for the Northern District of Illinois.

3.       Attached hereto as Exhibit 2 is a true and correct copy of the complaint, captioned *Teamsters Local 282 Pension Trust Fund* v. *Moody's Corp.*, No. 07-cv-8375, filed on September 26, 2007 in the United States District Court for the Southern District of New York.

4.      Attached hereto as Exhibit 3 is a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, dated November 17, 2008.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the subpoena issued by plaintiffs to IndyMac MBS, Inc., on April 27, 2010.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the subpoena issued by plaintiffs to Washington Mutual Mortgage Securities Corporation, on April 20, 2010.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the subpoena issued by plaintiffs to JPMorgan Chase Bank NA on December 16, 2009.

8.      Attached hereto as Exhibit 7 is a true and correct copy of an article entitled *Prosecutors Ask If 8 Banks Duped Rating Agencies*, published by *The New York Times* on May 13, 2010.

### Documents Referenced Concerning Moody's Disclosures

9.      Attached hereto as Exhibit 8 is a true and correct copy of Moody's Investors Service Code of Professional Conduct, dated June 2005.

10.     Attached hereto as Exhibit 9 is a true and correct copy of Moody's Investors Service Announcement: Moody's Publishes Code of Professional Conduct, dated June 2, 2005.

11.     Attached hereto as Exhibit 10 is a true and correct copy of Moody's Investors Service Report on the Code of Professional Conduct, dated April 2006.

12.     Attached hereto as Exhibit 11 is a true and correct copy of Moody's Corporation's Form 10-K, dated March 1, 2006.

### Documents Referenced Concerning Regulatory and Congressional Reports

13.    Attached hereto as Exhibit 12 is a true and correct copy of a report by the Securities and Exchange Commission entitled *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, dated January 2003.

14.    Attached hereto as Exhibit 13 is a true and correct copy of comments submitted by California Public Employees' Retirement System to the Securities and Exchange Commission, dated September 15, 2003.

15.    Attached hereto as Exhibit 14 is a true and correct copy of an SEC release entitled *Definition of Nationally Recognized Statistical Rating Organization*, dated April 10, 2005.

16.    Attached hereto as Exhibit 15 is a true and correct copy of excerpts of a document entitled *Rating the Rating Agencies: The State of Transparency and Competition*, Hearing before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises of the Committee on Financial Services, U.S. House of Representatives, dated April 2, 2003.

17.    Attached hereto as Exhibit 16 is a true and correct copy of a document entitled *The Ratings Game: Improving Transparency and Competition Among the Credit Rating Agencies*, Hearing before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises of the Committee on Financial Services, U.S. House of Representatives, dated September 14, 2004.

18.    Attached hereto as Exhibit 17 is a true and correct copy of excerpts of a document entitled *Examining the Role of Credit Rating Agencies in the Capital Markets*, Hearing before the Committee on Banking, Housing, and Urban Affairs, United States Senate, dated February 8, 2005.

19.     Attached hereto as Exhibit 18 is a true and correct copy of a document entitled *Assessing the Current Oversight and Operations of Credit Rating Agencies*, Hearing before the Committee on Banking, Housing, and Urban Affairs, United States Senate, dated March 7, 2006.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a Report of the United States Senate, No. 109-326, dated September 6, 2006.

### Documents Referenced Concerning Media Reports and Market-Participant Awareness of Alleged Conflicts of Interest

21.     Attached hereto as Exhibit 20 is a true and correct copy of a document entitled *Investors question the rating agencies*, published by *Euromoney* in April 2001.  In that article, *Euromoney* reports that "[an] issue that has further added to investors' suspicions about the cosy relationship between rating agencies and the issuers they are supposed to be policing is the agencies' practice of privately informing management of their verdict before making it public—and giving them the opportunity to contest it."

22.     Attached hereto as Exhibit 21 is a true and correct copy of an article entitled *Borrowers Find System Open to Conflicts, Manipulation*, published by *The Washington Post* on November 22, 2004.  In that article, *The Washington Post* reports that "at the heart of the increasingly profitable [rating-agency] business is a conflict:  The rating companies get the bulk of their revenues from the fees they charge to the very entities they are rating."

23.     Attached hereto as Exhibit 22 is a true and correct copy of an article entitled *Credit-rating firms under scrutiny*, published by *The International Herald Tribune* on February 8, 2005.  In that article, *The International Herald Tribune* reports that "[f]or years, the big U.S. credit-rating companies have thrived, booking mouth-watering profits from operations that critics say are riddled with conflicts and shielded from competition."

24.    Attached hereto as Exhibit 23 is a true and correct copy of an article entitled *Debt-Rating Firms Resist Prospect of More Supervision*, published by *The Washington Post* on February 9, 2005.  In that article, *The Washington Post* reports that "[s]everal senators said the lack of competition is compounded by potential conflicts.  The major credit raters receive the bulk of their revenue from the fees they charge to the companies they are rating."

25.    Attached hereto as Exhibit 24 is a true and correct copy of an article entitled *Moving the Market: SEC Says Voluntary Policing By Ratings Firms Lacks Bite*, published by *The Wall Street Journal* on March 10, 2005.  In that article, *The Wall Street Journal* states that "[l]awmakers have called on the SEC to regulate ratings firms more closely and to monitor conflicts of interest in a system where issuers pay the companies that perform their ratings.  The industry has come under fire for failing to spot red flags that exploded in scandal."

26.    Attached hereto as Exhibit 25 is a true and correct copy of an article entitled *Three is no crowd—Credit-rating agencies*, published by *The Economist* on March 26, 2005.  In that article, *The Economist* reports that "[t]he big agencies' business model has a built-in conflict of interest.  Ratings are paid for by the issuers of bonds and other forms of tradable debt, not by investors who use them.  Can they be completely independent of the firms who pay their bills?"

27.    Attached hereto as Exhibit 26 is a true and correct copy of an article entitled *US Senate's Shelby urges credit rater changes*, published by *Reuters* on February 1, 2006.  In that document, *Reuters* reports that Senator Shelby urged further competition and transparency in the credit-rating industry, "especially when there gets to be conflicts of interest."

28.    Attached hereto as Exhibit 27 is a true and correct copy of a document entitled *Rating Shopping – Now the Consequences*, published by Nomura Fixed Income

Research on February 16, 2006.  In that document, Nomura Fixed Income Research reports that "[r]ating shopping . . . is common for securitization issuers."

29.    Attached hereto as Exhibit 28 is a true and correct copy of an article entitled *Issuers leery of credit raters*, published by *The Globe and Mail* on February 24, 2006.  In that article, *The Globe and Mail* reports that "[t]wo-thirds of bond issuers are worried about a lack of competition among credit rating agencies, and almost half are concerned about the way potential conflicts of interest are tackled, a survey has found. . . .  The survey also found 45 per cent of borrowers were not comfortable that agencies were effectively managing potential conflicts of interest."

30.    Attached hereto as Exhibit 29 is a true and correct copy of a transcript of the March 22, 2006 episode of the CNBC show "Mad Money," as provided by Westlaw.  According to that transcript, Jim Cramer stated that "[w]hen you're selling bonds you pay Moody's to rate them.  But [if] that's not a conflict of interest I don't know what is."  Based on publication figures provided by Investopedia, "Mad Money" attracted more than 300,000 viewers nightly in 2006.

31.    Attached hereto as Exhibit 30 is a true and correct copy of an article entitled *Bush Signs Rating Agency Reform Act*, published by CFO.com on October 2, 2006.  The article states that "The new law [*i.e.*, the Credit Rating Agency Reform Act], according to one lawmaker, addresses an 'industry that was beset by conflicts of interest and a lack of competition."

32.    Attached hereto as Exhibit 31 is a true and correct copy of an article entitled *Credit: Rating agencies face shake-up*, published by *Euromoney* on August 1, 2006.  In that article, *Euormoney* reports that Moody's and S&P's "entrenched position allows the leading

NRSROs to make significant profits.  At the heart of this is the continuing conflict of interest in the rating agency world.  Before the 1970s, rating agencies were paid by the investors; since then the issuer has paid.  Allied to the current NRSRO system this gave the leading agencies monopoly pricing power.  A $500 million corporate deal costs $300,000 with Moody's and $297[,]500 with S&P.  The costs are much higher for structured finance."

33.     Attached hereto as Exhibit 32 is a true and correct copy of an article entitled *The rating game*, published by *The Daily Deal* on August 4, 2006.  In that article, *The Daily Deal* reports that "Moody's shares are now valued at around $20 billion, an increase of 500% since the company went public in 2002 (S&P's data is unavailable since it is a McGraw-Hill subsidiary). Critics doubt just how independent such ratings are.  Critics also worry that agencies could potentially use nonpublic information that is used to determine ratings for insider trading or to benefit other clients."

34.     Attached hereto as Exhibit 33 is a true and correct copy of an article entitled *Objectivity Of a Rating Questioned*, published by *The New York Times* on December 12, 2006.  In that article, *The New York Times* reports that "Congress, European securities regulators, investor advocates and even some rival credit rating agencies questioned the independence and integrity of the credit rating system, in part because since the early 1970s the services have been paid by the very companies whose creditworthiness they evaluate."  According to the *International Year Book: The Encyclopedia of the Newspaper Industry* (2006), the circulation figure for the morning edition of *The New York Times* was 1,126,190.

35.     Attached hereto as Exhibit 34 is a true and correct copy of an article entitled *Moody's earnings rise 86% on back of complex new products*, published by *The Financial Times* on February 8, 2007.  In that article, *The Financial Times* reports that "[a]s with

corporate ratings, it is the issuers—often investment banks or structured finance firms—that approach and pay the rating agencies, not investors. Critics highlight this as a potential conflict of interest, and point to what they claim have been failures on the part of rating agencies, such as the largely unanticipated collapse of Enron." According to the 87th edition of the *International Yearbook: Encyclopedia of the Newspaper Industry* (2007), the circulation figure for the morning edition of *The Financial Times* was 438,041.

36.    Attached hereto as Exhibit 35 is a true and correct copy of an article entitled *Inside Investment: Sorcerer's apprentices*, published by *Euromoney* on April 1, 2007. In that article, *Euromoney* reports that "the rating business is built on a central conflict of interest: ratings are paid for by issuers not investors. . . . Last year the rating agencies came under scrutiny in the US. House of Representatives legislation pointedly entitled the Credit Rating Duopoly Relief Act was passed into law in September. It gives the SEC the power to regulate credit rating agencies and address possible abusive or anti-competitive practices. The SEC might like to delve into the world of structured finance. For one thing, the profits the credit rating agencies make in this area blow a hole in their defence that they are not overly dependent on any one source of revenue. The issuers of ABS, MBS, ABCP, CDOs, et al, are overwhelmingly the big investment banks. Wall Street is a very important client for the rating agencies."

37.    Attached hereto as Exhibit 36 is a true and correct copy of an article entitled *Conflicts Lead Rtgs Agencies to Downplay Risk, Panel Says*, published by Dow Jones Capital Markets Report on May 3, 2007. In that article, the Dow Jones Capital Market Reports writes: "[T]he agencies have a disincentive to really fine-tune their bond ratings because the issuers of bonds provide most of a rating agency's revenue. In his discussion of the paper at the Hudson Institute, [a managing director at Graham Fisher and Co.] raised the question of whether

rating agencies have in fact ceased to be impartial publishers of opinions on bonds but might in fact be considered part of a bond's underwriting team."

38.    Attached hereto as Exhibit 37 is a true and correct copy of an article entitled *Too close for comfort?*, published by *Euromoney* on June 1, 2007.  In that article, *Euromoney* reports that "Rating agencies such as Moody's Investors Service, Standard & Poor's and Fitch Ratings should be perceived as independent third parties; increasingly they are not. The conflict of interest is obvious:  those that they theoretically serve—investors—do not pay directly for the service received. . . .   Concerns are at their most intense in the fast-growing, multi-trillion dollar structured finance sector.  It's a highly profitable area for those involved in structuring and selling deals.  It is also the area in which the relationship between investment banks and rating agencies is closest."

39.    Attached hereto as Exhibit 38 is a true and correct copy of an article entitled *Ratings Firms Defend Assessment of Loan Securities*, published by *The Washington Post* on August 28, 2007.  In that document, *The Washington Post* reports that "Scholars . . . have frequently noted what they consider th[e] inherent conflict of interest in the raters' business model. . . .   In the case of securities backed by mortgages, the raters have an even closer relationship with the entities they rate, say those familiar with the business."

40.    Attached hereto as Exhibit 39 is a true and correct copy of an article entitled *Conflicts and the Credit Crunch*, published by *The Wall Street Journal* on September 7, 2007.  In that article, Arthur Levitt Jr., former Chairman of the Securities and Exchange Commission, writes that the rating agencies' "conflict of interest deepened with the rise of complex structured financial products.  The credit rating agencies not only rate these instruments, but also offer the issuer help in constructing the product in order to obtain a certain

rating. Over the past few years, this has become a lucrative business for the ratings agencies (for example, structured finance deals accounted for 40% of Moody's total revenue last year), calling into question the objectivity of ratings that are critical to the proper functioning of the market."

41.    Attached hereto as Exhibit 40 is a true and correct copy of an article entitled *Credit: Rating Firms Criticized*, published by *The Washington Post* on September 27, 2007. In that article, *The Washington Post* reports that "Senators accused executives from major credit-rating agencies of being hampered by conflicts of interest that may have contributed to mortgage market turmoil."

42.    Attached hereto as Exhibit 41 is a true and correct copy of a document bearing bates numbers MOODY'S-COGR-0019693-0019695. This document was made public as part of the United States House of Representatives' Committee on Oversight and Government Reform's October 22, 2008 hearing on the financial crisis on Wall Street.

43.    Attached hereto as Exhibit 42 is a true and correct copy of a document bearing bates numbers MOODY'S-COGR-005495-005496. This document was made public as part of the United States House of Representatives' Committee on Oversight and Government Reform's October 22, 2008 hearing on the financial crisis on Wall Street.

44.    Attached hereto as Exhibit 43 is a true and correct copy of a graphic reflecting the quarterly shareholdings of Vanguard Group, Inc. and Fortis Investments (US) in Moody's common stock, based on Thomson Financial institutional shareholding data.

**Documents Referenced Concerning the Proposed Class Representatives**

45.    Attached hereto as Exhibit 44 is a true and correct copy of excerpts of the transcript of the deposition of Charles W. McCurley, dated March 19, 2010.

46.     Attached hereto as Exhibit 45 is a true and correct copy of excerpts of the transcript of the deposition of Dr. Lewis Wetstein, dated March 19, 2010.

47.     Attached hereto as Exhibit 46 is a true and correct copy of excerpts of the transcript of the deposition of William Maye, dated April 1, 2010.

48.     Attached hereto as Exhibit 47 is a true and correct copy of documents bearing bates numbers McCurley 0001-0007, produced in this action by Charles W. McCurley, Jr.

49.     Attached hereto as Exhibit 48 is a true and correct copy of a document bearing bates number LTPF 0002852, produced in this action by Teamsters Local 282 Pension Trust Fund.

50.     Attached hereto as Exhibit 49 is a true and correct copy of a document bearing bates numbers LTPF 0002841-51, produced in this action by Teamsters Local 282 Pension Trust Fund.

51.     Attached hereto as Exhibit 50 is a true and correct copy of the Expert Report of Dr. René M. Stulz, dated May 28, 2010.

I declare that the foregoing is true and correct.

Executed in New York, New York on May 28, 2010.


/s/ Stephen Ehrenberg
Stephen Ehrenberg