# EXHIBIT 39



2 of 3 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2007, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.
The Wall Street Journal

September 7, 2007 Friday

**SECTION:** Pg. A15

**LENGTH:** 1384 words

**HEADLINE:** Conflicts and the Credit Crunch

**BYLINE:** By Arthur Levitt Jr.

**BODY:**

In terms of market meltdowns and the degree of pain inflicted on the financial system, the subprime mortgage crisis has the potential to rival just about anything in recent financial history from the savings-and-loan crisis of the late 1980s to the post-Enron turndown at the beginning of this decade.

The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed. Then, these symptoms were found among a key group of gatekeepers -- auditors. Now, they are found in an equally critical gatekeeper -- the credit ratings agencies.

As documented both in the media and by the Securities and Exchange Commission (SEC), credit ratings agencies -- such as Moody's Investor Service, S&P, and Fitch Ratings -- are playing both coach and referee in the debt game. They rate companies and issuers that pay them for that service. And, in the case of structured financial instruments which make it possible to securitize all those subprime mortgages, they help issuers construct these products to obtain the highest possible rating. These conflicts are hard to spot because transparency among these agencies is murky at best, and currently it is difficult to hold these agencies accountable for any wrongdoing.

And the credit ratings agencies need to be held accountable. They rated Enron debt at investment grade until four days before default, performed similarly when Orange County went bankrupt in 1994, and up until the middle of this summer, they gave top ratings to securities built from risky subprime mortgages.

While Congress passed legislation last year to bring competition and accountability to the credit ratings agencies, it's clear that further action must be taken to reform this critical part of our financial markets.

Up until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions. Then the business model changed, and the issuers of securities became the ones who paid to be rated.

This conflict of interest deepened with the rise of complex structured financial products. The credit ratings agencies not only rate these instruments, but also offer the issuer help in constructing the product in order to obtain a certain rating. Over the past few years, this has become a lucrative business for the ratings agencies (for example, structured

Conflicts and the Credit Crunch The Wall Street Journal September 7, 2007 Friday

finance deals accounted for 40% of   Moody's total revenue last year), calling into question the objectivity of ratings that are critical to the proper functioning of the market.

While an outright ban on ancillary or consulting services may be the easiest way to eliminate this conflict of inter-est, it is not the most feasible course of action. The rules passed earlier this year by the SEC to implement the Credit Rating Reform Act of 2006 recognize that, and require credit ratings agencies to have polices and procedures in place to manage these conflicts.

This is a good start, but, we should go further.

First, we need more oversight. Under current rules, the SEC only can judge whether or not the agencies are living up to the policies and procedures that they set for themselves. It cannot judge the quality of these standards or set them. This is similar to the type of oversight we had of auditors pre-Enron. Thankfully that changed, and this must as well. The SEC should be given the authority to set standards, monitor and evaluate compliance, and discipline ratings agen-cies for violations -- including, in the most egregious cases, the revocation of SEC recognition.

As we have seen with auditors, this sort of meaningful oversight makes a difference in behavior that benefits in-vestors. But oversight cannot happen without the right personnel. The legislation passed last year provided no budget for additional SEC personnel to perform the inspections of credit ratings agencies. If we want a more robust oversight regime to make sure that ratings agencies are serving investors, then that will take more SEC employees and the funds to pay for them.

Second, we need more independence. Those that help structure a financial instrument for an investment bank or other issuer should have to wait a year before joining that firm -- a requirement that auditors, for instance, currently have. Ratings agency employees also should be prohibited from soliciting or accepting money, gifts or favors from is-suers and the lead analyst for a client should be rotated every five years. We also should resurrect the SEC proposal from 2003 which would have prohibited the linkage of new business development with analyst compensation.

In addition, just as Sarbanes-Oxley gave audit committees direct responsibility for the selection, monitoring and compensation of external monitors, audit committees should be given this responsibility over credit ratings agencies. This would bolster their independence from management and lessen any pressure brought to bear on them.

Third, we need more transparency. In addition to the disclosure requirements issued by the SEC this February, we also should require, in debt-offering documents or in annual filings of a registrant whose publicly held debt is being rated, the disclosure of any services a ratings agency has provided to the company in connection with the issuance or rating of debt, including any consulting on the structuring of the transaction and the amount of fees related to those ser-vices that were paid to the rating agency. This will help prod the ratings agencies to diminish their conflicts of interest.

Moreover, we need more transparency in the market for structured financial products itself. We need to improve disclosure of rating triggers so that investors are not surprised when they become operational and cause a liquidity issue. We also need more transparency on secondary market prices and volumes as well as liquidity, which ideally can be achieved through market mechanisms.

Fourth, we need more accountability. Credit ratings agencies -- just like other gatekeepers -- should be held liable for malfeasance that is more than mere negligence. Of course, the ratings agencies will respond that their ratings are constitutionally protected speech since they do not offer a recommendation to "buy" or "sell." Yet, when it comes to ratings of structured financial products that the credit ratings agencies helped create, their claims of First Amendment protections are on very shaky ground (as opposed to when they offer just unsolicited ratings). Whether done through court decision or congressional action, we should make clear that credit ratings agencies' opinions are no different from those of other gatekeepers, and they can be held accountable for wrongdoing.

Finally, we need investors to accept more responsibility for evaluating structured financial products. Credit ratings agencies play a critical role in the capital markets, but their judgments are guides, not stamps of approval. Too often, institutional investors have been investing in sophisticated credit products on the basis solely of the credit rating and without fully understanding the inherent risks they are undertaking. The current crisis may change this behavior for some. But to remedy this further, a new set of rules worked out by the Basel Committee on Banking Supervision (Basel II) and their emphasis on internal risk evaluations -- not just external ratings -- represent a possible model to emulate.

Hopefully, this set of reforms will prove to be effective in mitigating the central problem with ratings agencies -- their conflict of interest. If not, then we should consider more direct methods to change who pays for ratings fees.

Conflicts and the Credit Crunch The Wall Street Journal September 7, 2007 Friday

For now, however, we should keep in mind that this should not be an occasion for overreaction and finger-pointing. Rather, it's a chance to strengthen our financial system as the capital markets grow more complex and global, a move that will help investors of all sizes world-wide.

---

Mr. Levitt is a former chairman of the Securities and Exchange Commission.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** September 8, 2007

# EXHIBIT 40



FOCUS - 1 of 1 DOCUMENT

Copyright 2007 The Washington Post
All Rights Reserved

**The Washington Post**

washingtonpost.com

The Washington Post

September 27, 2007 Thursday
Met 2 Edition

**SECTION:** FINANCIAL; Pg. D02

**DISTRIBUTION:** Maryland

**LENGTH:** 791 words

**HEADLINE:** CREDIT

**BODY:**

 CREDIT

 Rating Firms Criticized

    Senators accused executives from major credit-rating agencies of being hampered by conflicts of interest that may have contributed to mortgage market turmoil. The biggest rating agencies --Standard & Poor's, Moody's Investors Service and Fitch Ratings -- are under fire from critics who say they failed to give investors adequate warning of the risks associated with mortgage-backed securities.

    Several members of the Senate Banking Committee questioned agency executives about whether they provided advice to investment banks that issue mortgage securities tied to subprime home loans.

    Executives from S&P and Moody's said their methodology for monitoring the risk of mortgage-backed bonds was sound. But they also pledged improvement.

    The Securities and Exchange Commission said an investigation of credit-rating companies was focused on whether bond issuers put pressure on the raters to win higher rankings for subprime-mortgage bonds.

CONSUMER SAFETY

FDA Investigates Dog Deaths

    Regulators are investigating more than 95 reports of dogs that became ill or died after eating chicken jerky. The Food and Drug Administration has not determined the cause of the illnesses, and many of the cases may stem from other sources, according to the agency's Web site. Owners were urged to monitor pets for signs of illness.

    No specific brand names were identified by the FDA, which said the products may be described as chicken tenders, strips or treats.

CREDIT The Washington Post September 27, 2007 Thursday

ENERGY

Computer System Fails on Royalties

A $150 million computer system that is supposed to help the government keep track of oil and gas royalties has been a "profound failure," contributing to possibly millions of dollars in lost revenue, according to Interior Department investigators.

The department's inspector general cited the computer system's shortcomings in a report that said the royalty-collection process is riddled with mismanagement, ethical lapses and conflicting relationships with the energy industry.

The year-long investigation found "a Band-Aid approach to holding together one of the federal government's largest revenue producing operations," Inspector General Earl E. Devaney wrote.

LEGISLATION

Limit Sought on Entry Ports for Food

Shipments of foreign food would be funneled through 13 ports of entry, cutting out Chicago, Houston, Miami and several hundred other cities, under legislation to tighten U.S. oversight of imports. The restrictions would fix an import safety network now "equivalent in holes to a block of Swiss cheese," Rep. John D. Dingell (D-Mich.) said during the first legislative hearing on his bill.

Dingell also proposes assessing $500 million in fees on shipments of food and drugs to step up Food and Drug Administration inspections of both.

The grocery industry, importers and exporters warned the proposal would disrupt trade and send consumer prices soaring.

TECHNOLOGY

Amazon.com Launches Music Store

Amazon.com has launched its digital music store, Amazon MP3, a move analysts say represents the first hint of real competition for Apple's market-leading iTunes. Amazon MP3 stocks nearly 2.3 million songs, all without copy-protection technology. Shoppers can buy and download individual songs or entire albums. The tracks can be copied to multiple computers, burned onto CDs and played on most types of PCs and portable devices, including the iPod and Microsoft's Zune.

LEGAL

Review of FCC Policy Sought

The government will ask the Supreme Court to review a ruling that invalidated the Federal Communication Commission's policy on the broadcast of profanity. In June, the U.S. Court of Appeals for the 2nd Circuit rejected the agency's policies on "fleeting expletives" on procedural grounds but was "skeptical that the commission can provide a reasoned explanation for its fleeting expletive regime that would pass constitutional muster."

ECONOMY

Durable-Goods Orders Fall

Demand for big-ticket manufactured goods plunged in August by 4.9 percent, the largest amount in seven months, with weakness in many categories, the Commerce Department said. Durable-goods orders gained 6.1 percent in July. Orders in the category considered a proxy for business investment plans edged down by 0.7 percent in August. Excluding the transportation category, orders would have still been down by 1.8 percent after a 3.4 percent rise in July.

INVESTING

CREDIT The Washington Post September 27, 2007 Thursday

KKR Fund Forecasts Loss

KKR Financial Holdings, the publicly traded credit fund backed by Kohlberg Kravis Roberts, forecast a third-quarter pro forma loss of $238.3 million, partly due to a $250 million writedown on asset-backed commercial paper. The fund's net asset value is $1.58 billion.

Compiled from reports by Washington Post staff writers, the Associated Press and Bloomberg News.

**GRAPHIC:** IMAGE; By Keyur Khamar -- Bloomberg News; Amazon.com launched its Amazon MP3 service on Tuesday. Songs are priced at 89 to 99 cents, and entire albums cost $5.99 to $9.99.

**LOAD-DATE:** September 27, 2007

# EXHIBIT 41

| From: | Brennan, Mary Elizabeth ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
|---|---|
| Sent: | Wednesday, July 11, 2007 10:55 PM (GMT) |
| To: | Moody's - Subprime Working Group ▮▮▮▮▮▮▮▮▮▮ |
| | Tulenko, Stephen ▮▮▮▮▮▮▮▮▮▮▮▮▮, McKenna, Mark |
| | Adler, Michelle ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | Porter, Ann <Ann.Porter▮▮▮▮▮, Little, David ▮▮▮▮▮▮▮ |
| Subject: | RMBS Investor Outreach |

Today I reached out to RMBS investors at three large institutions: PIMCO, Vanguard and Blackstone. Their comments regarding Moody's RMBS activities are attached. As I continue to reach out to investors, I will pass their comments along to you. Please don't hesitate to contact me with any questions.

Mary Elizabeth Brennan
Vice President
Senior Calling Officer
▮▮▮▮▮▮▮

**RMBS Investor Call**
Josh Anderson
PIMCO
▮▮▮▮▮
Wednesday, July 11, 2007
11:32 am

I had a very direct and candid discussion with Josh Anderson. He started the discussion by saying that Moody's has "a lot more to do" with respect to ratings adjustments and that the recent downgrades "don't help." Josh reported that PIMCO was surprised by the timing of the ratings actions. They thought that Moody's would wait to downgrade bonds at the end of the summer or closer to the beginning of the fourth quarter. I asked if he thought the timing was appropriate and he responded, "You have to do what you have to do. You know what I mean?"

Josh's main point is that PIMCO and others (he mentioned Blackrock and WAMCO) have previously been very vocal about their disagreements over Moody's ratings methodology. He cited several meetings they have had with Pramila Gupta questioning Moody's rating methodologies and assumptions. He found the Moody's analyst to be arrogant and gave the indication that "We're smarter than you." Despite wanting to work with Moody's as a "good ally with good discussions," eventually they "gave up."

Josh then became very passionate in the call - almost emotional. He complimented Moody's for doing "a great job, moving the capital markets forward." He said that PIMCO would "go to bat" for Moody's. He feels that Moody's has "a powerful control over Wall Street" but is "frustrated that Moody's doesn't stand up to Wall Street." They are disappointed that in this case Moody's has "toed the line"-"Someone up there just wasn't on top of it," he said. He complimented Moody's work in CDO's and CLO's but, in the case of RMBS, its mistakes were "so obvious - you have to step back." I questioned him about Moody's communication and timeliness but he said that it didn't matter if the message communicated was "flawed."

Our discussion concluded with PIMCO's belief that Moody's methodology was "still flawed - and we'll tell you why." He proposed that we convene a call with "senior managing directors" at Moody's and investment professionals at PIMCO and they would have an off-the-record discussion of what they still thought were major shortcomings in the methodology and assumptions. I thanked him for the offer and said that I would follow-up.

**CONFIDENTIAL & PROPRIETARY**          MOODY'S-COGR-0019693

RMBS Investor Call
Mabel Yu
Vanguard
████████

Wednesday, July 11, 2007
1:05pm

Mabel Yu was very open and direct in her comments about Moody's and its ratings process. She was talkative and anxious to share her concerns and perspectives about recent headlines. She began our discussion by referring to S&P's previous day's RMBS call (7/10/07) where specific criticism was levied at the perceived delay in actions on the part of S&P. "I thought it was very rude the way he said it," said Yu, "but I agreed with the caller completely. My phone was on mute but I jumped up and down and clapped my hands and screamed. He was the only one to say it but all the investors were all feeling the same way. He said what we all wanted to say." Yu later commented that she believed S&P's actions came about 1 ½ years too late; she felt the rating criteria should have been adjusted earlier. Yu expressed "frustration" with the rating agencies' willingness to "allow issuers to get away with murder." She is finding the phenomenon particular to RMBS and CMBS. She feels that, particularly in the area of sub-prime, too much credit is given to individuals who haven't had access to credit before. She felt that there wasn't enough historical data available to track the performance of these more aggressive loans. Yu said that over time, Vanguard bought less and less of this asset class and stopped investing in it entirely by early 2006. Vanguard has witnessed the deals "getting worse and worse" and Yu reported that the market has been screaming for a while, "look at sub-prime!"

Over the recent months, Yu reports that Vanguard has become less and less comfortable with rating labels. "It feels likes there's a big party out there. The agencies are giving issuers every benefit of the doubt." She feels that there's also too much competition between the rating agencies. "I feel that if Moody's doesn't give the rating, the issuer can simply go elsewhere and get it somewhere else," she said. She believes that some of poor performance in RMBS with its problems in underwriting could also be faced by CMBS bonds if not for the underlying strength of the commercial real estate market.

I asked Mabel if she had shared her concerns with anyone at Moody's. She replied that she had only talked with deal analysts commenting to them that LTV's have gone up, FICO's have gone down, that there are more negative amortization loans, more ARM loans and that rates and default rates have been rising. "They would always come back with the standard answers: 'we have enough subordination - we've stressed the portfolio.' But I would always wonder if they only stressed the portfolio factor by factor or if they had stressed all the factors simultaneously. I never got a straight answer," commented Yu. Yu says that Vanguard finds itself "less and less relying on the opinions of rating agencies" and comments that "this isn't good for Vanguard." She wants to "have a dialogue" with the agencies and feels strongly that an Aaa in sub-prime isn't the same as an Aaa in credit cards. In her role at Vanguard, Yu is overwhelmed by the number of new issues and secondary issues in the market today and wishes she could rely more on rating agency opinions. Yu feels that Aaa "doesn't mean that we're protected anymore." "If this trend continues, it's not good for the market," she said. She explains her analysis of new CMBS deals: "When I look at a deal, I have to do a deep dive on loan quality, loan-by-loan, and then I have to take a haircut. All this analysis takes time." Yu states that she "wants to rely on the work done by the rating agencies. We want to work together, get more work done and work more efficiently. I'd like someone else to analyze the risk and be able to rely on that analysis."

Yu then commented a bit about frustrations she's faced in analyzing CMBS transactions. She noted that in the reports, rating agencies are clear about their stress levels but are not clear about why they are stressing at those levels. She feels that "risks are not laid out" and that when talking to analysts she needs to be very specific in her questions and "know exactly what to ask to uncover risk." She felt that sometimes her questions were too specific and she was frustrated when analysts would reply "I can't answer that or I'd be giving you 'preferential treatment.'" Yu commented, "If that's their problem, that makes me uncomfortable. Rating agencies aren't helping me to make the right decisions. They are giving just enough information to make a decision but not enough to be fully informed. They are not helping out."

**CONFIDENTIAL & PROPRIETARY**                    MOODY'S-COGR-0019694

Mabel Yu concluded the discussion by saying that "rating agencies are losing credibility - slowly." She feels now that bonds rated Aaa are not all the same. She feels that they now come in "different shades and forms." She said that she and other portfolio managers at Vanguard began to see problems in the work of the rating agencies beginning about 18 months ago. "At first we thought that these problems were isolated events. Then they became isolated trends. Now they are normal trends. These trends are getting worse and not getting better."

Her final comment for me was a warning for our analysts leading the next day's RMBS call to "be prepared; be very prepared."

RMBS Investor Call
Ron D'Vari
Blackrock
████████
Wednesday, July 11, 2007
3:00 pm

Ron D'Vari was less talkative than others regarding his views on the RMBS market and seemed to prefer to reserve his comments for his role as moderator of next week's panel discussion on sub-prime hosted by Fixed Income Forum. He'll be leading a panel of representatives of Moody's, S&P and Fitch as they discuss this timely topic.

He has a few comments to share which, to me, seemed a little bit pat and rehearsed. I had the feeling he'd used these phrases before: "We can do a better job to ensure that credit, origination, re-packaging, and structuring have an integrity and that there's proper due diligence at all levels. At this point, we have lost control at all stages." He feels that rating analysts need to focus more on the "quality aspects" of transactions and less on "give me the tape and I'll figure it out." To make sure I understood his point, I asked if what he meant was that quantitative analysis took precedence over qualitative analysis. He said I got it right.

"The rating agency process is run to be efficient rather than to 'have a good sense of the pieces'" he commented and continued to elaborate on his perceived quality of due diligence. He compared RMBS to CMBS and said he believed that there was "more of an understanding of collateral" in CMBS. He said that in RMBS, analysts "relied too much on manufactured data that is weak." He emphasized that there's "too much reliance on data not fully verified." He questioned any analyst's ability to adequately analyze data without a long track record of performance. He asked, "How do you establish quality on low doc loans? How do you rate that? It's not just LTV. There's been a lack of pro-active questioning."

I asked Ron how his participation in sub-prime has changed over time. He said that he began to notice "disturbing trends" in mid-2005 and, as a result, his participation in deals moved further up the capital structure.

**CONFIDENTIAL & PROPRIETARY**          MOODY'S-COGR-0019695

# EXHIBIT 42

| From: | McDaniel, Raymond |
|---|---|
| Sent: | Friday, July 13, 2007 1:32 PM (GMT) |
| To: | Almeida, Mark |
| Subject: | RE: Fortis / Subprime / Needs Immediate Attention |

Maybe I should visit and have a high level chat to hear what's on their mind?

---Original Message---
From: Almeida, Mark
Sent: Thursday, July 12, 2007 3:35 PM
To: McDaniel, Raymond
Subject: FW: Fortis / Subprime / Needs Immediate Attention
Importance: High

Not so good.

---Original Message---
From: Tulenko, Stephen
Sent: Thursday, July 12, 2007 3:24 PM
To: Clarkson, Brian; Almeida, Mark; Adler, Michelle
Cc: McKenna, Mark; Lovatt, Mary
Subject: FW: Fortis / Subprime / Needs Immediate Attention
Importance: High

Some feedback here that you need to see right away.

Michelle and I will get a little more info and come back to you.  Wanted to put this on your radar screens right away.

---Original Message---
From: Lovatt, Mary
Sent: Thursday, July 12, 2007 3:15 PM
To: McKenna, Mark; Tulenko, Stephen; Adler, Michelle; Brennan, Mary Elizabeth; Little, David
Cc: Slicklein, Kelly; Schwarz, Jason; Levy, James; Garcia, Afonso; Zita, Tomas (Tom); Mazzola, James; Humphrey, Shawn; Gross, Gary

Subject: Fortis / Subprime / Needs Immediate Attention
Importance: High

All -
I just got off a tough call with Maryam Muessel from Fortis Investments. She's the Chief Investment Officer of Global CDOs. She requested to speak to someone **very senior, very quickly**. She and other investors (blackrock is one of the names she mentioned) have formed a steering group to try to get the rating agencies to listen to the needs of investors. She is extremely frustrated. Had a few choice words for me, here's a recap:

"if you can't figure out the loss ahead of the fact, what's the use of using your ratings?"
"you have legitimized these things" referring to subprime & abs cdos and "leading people into dangerous risk."
"if the ratings are b.s., the only use in ratings is comparing b.s. relative to more b.s."
"luckily I avoided Moody's ratings, didn't buy into your ratings, but 91 sucker managers did and were punished yesterday."

I helped her get the materials from this mornings call. She was unable to listen because of the Windows Media Player issue and wants a telephone number for replay, rather than going through the web. Asked if our technology group could help out.

**CONFIDENTIAL & PROPRIETARY**

MOODY'S-COGR-0005495

She appreciated that we were proactively calling to ask for feedback and said she would call me back if she was unable to get the documents / replay to work. She said that her group came to Moody's last fall to discuss our rating methodology and she believes we're missing the layered risks. I told her we would get someone senior to listen to her concerns.

Mary

Contact information (her home phone was listed on the spreadsheet):
Maryam Muessel



*Mary Lovatt*
**Product Specialist**
**Moody's Investors Service**
**99 Church Street**
**NY, NY 10007**

Office:
Fax:

Client Service Desk

# EXHIBIT 43

# Moody's Corporation
## Share Holdings by Selected Institutional Investors
### Q4 2005 – Q4 2008

Source:  Thomson Financial; Opinion and Order filed February 23, 2009; Moody's Investors Service Press Releases dated July 10 and 11, 2007



Note:  Dates in blue are days of alleged misstatements and dates in red are days of alleged corrective disclosures, as recounted in the Opinion and Order filed February 23, 2009.  On July 10, 2007, Moody's announced negative rating actions on 431 securities originated in 2006 and backed by subprime first-lien mortgage loans.  On July 11, 2007, Moody's put 184 CDO tranches on review for possible downgrade.

# EXHIBIT 44

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 45

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 46

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 47

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 48

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 49

Filed Under Seal Pursuant to the Confidentiality Stipulation and Protective Order
Entered by the Court on March 15, 2010.

# EXHIBIT 50

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                           :
                           :
IN RE: MOODY'S CORPORATION      :
SECURITIES LITIGATION            :
                           :    DOCKET NO. 07-cv-8375-GBD
                           :
                           :
                           :
                           :
------------------------------------------------------------ x

# EXPERT REPORT OF

## RENÉ M. STULZ, PH.D.
## EVERETT D. REESE CHAIR OF
## BANKING AND MONETARY ECONOMICS
## OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS

# May 28, 2010

I. Introduction ......................................................................................................................... 2

    I.A. Qualifications .................................................................................................................. 2

    I.B. Assignment and Compensation .................................................................................... 3

    I.C. Documents Considered .................................................................................................. 3

    I.D. Summary of Opinions and Outline of Report ............................................................ 3

II. Common Knowledge Regarding Credit Ratings and Potential Conflicts of Interest ......................... 5

    II.A. Knowledge of rating methodologies – and rating limitations – was widespread before (and throughout) the purported Class Period .......................................................... 6

        II.A.1. Limitations of credit ratings were well-known before the purported Class Period ........ 6

        II.A.2. Inherent limitations of structured finance rating methodologies were known before (and throughout) the purported Class Period .................................................. 8

    II.B. Knowledge of potential conflicts of interest was widespread before (and throughout) the purported Class Period ................................................................................ 17

        II.B.1. The potential "issuer-pays" conflict was widely discussed at all times ......................... 17

        II.B.2. Potential conflicts of interest in structured finance ratings were widely discussed throughout the Class Period ...................................................................... 20

    II.C. Knowledge of the allegedly undisclosed or misrepresented information would have been widespread among putative class members ............................................................ 23

III. Materiality and Loss Causation ......................................................................................... 26

    III.A. Plaintiffs fail to demonstrate that any alleged misrepresentation was material ................... 26

    III.B. Plaintiffs fail to present a basis to prove loss causation on a class-wide basis ...................... 30

        III.B.1. The financial crisis during 2007 and 2008 .................................................................. 31

        III.B.2. Plaintiffs have not shown that the crisis was caused by Moody's structured finance rating activity ...................................................................................... 36

        III.B.3. Plaintiffs have not shown that the alleged misrepresentations caused Moody's ratings actions during the crisis, or any related stock price drop ............................... 38

        III.B.4. Plaintiffs fail to demonstrate that the decline in Moody's stock price over the Class Period was due to alleged misrepresentations ........................................................ 41

        III.B.5. Plaintiffs fail to demonstrate investors suffered any loss due to alleged corrective disclosures ................................................................................................ 45

        III.B.6. Putative class members could be situated differently with respect to loss causation .. 54

## I. Introduction

## I.A. Qualifications

1. I hold the Everett D. Reese Chair in Money and Banking at the Ohio State University. I am also Director of the Dice Center for Research in Financial Economics at the Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts. Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and the Ohio State University. I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2. I am an expert in financial economics. I am a past president of the American Finance Association, a fellow of the American Finance Association and of the Financial Management Association, and a past president of the Western Finance Association. I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland. I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker. I belong to the editorial boards of more than ten academic and practitioner publications. I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years. I serve on the boards of the Community First Financial Group, Banque Bonhôte, and Weggelin Fund Management, as well as on the board of trustees of the Global Association of Risk Professionals. I have been a consultant for the IMF, the World Bank, the New York Stock Exchange, the Federal Reserve Bank of New York, corporations, and law firms. I have published more than 60 articles on issues in financial economics, authored a textbook on derivatives and risk management, and edited several books.

3. A copy of my curriculum vitae is attached as Appendix A, which includes my publications over the last ten years. A list of all cases in which I have provided testimony in the last four years is attached as Appendix B.

2

**I.B. Assignment and Compensation**

4. I have been retained by Moody's Corporation ("Moody's") to evaluate as a financial economist whether there is a reliable basis for Plaintiffs to assert that the alleged misstatements are material, caused the claimed losses to Moody's shareholders, and were unknown to or relied upon by the members of the class proposed by the Plaintiffs.

5. The analysis and opinions expressed in this report are my own. I am being compensated for my time and services at my regular hourly rate of $750. I also receive periodic compensation from Cornerstone Research, the firm that assists me on this matter and with which I have a longstanding relationship. Those payments are made entirely at Cornerstone Research's discretion, and my understanding is that they are based generally on my services for and work with Cornerstone Research, including, in particular, the level of fees that Cornerstone Research generated on matters in which they provided support to me. I understand that those payments are in no way based on the content of my opinions or the outcome of any matter. My work in this matter is ongoing.

**I.C. Documents Considered**

6. In undertaking this assignment, I have considered documents and data related to issues in this case. These materials are listed in Appendix C. I reserve the right to supplement my opinions in this matter in the event that additional information or arguments are provided.

**I.D. Summary of Opinions and Outline of Report**

7. It was well-known before and throughout the purported Class Period that ratings of structured products are heavily reliant on forecasts of future outcomes based on historical data and quantitative models. It was also known (and regulators warned) that there was model risk in ratings of structured products, i.e., the risk that model imperfections could turn out to materially affect ratings. Methodological limitations were known to have applied to Moody's evaluation of subprime-related securities.

3

8.  It was also widely known before the putative Class Period that potential conflicts of interest were an inherent characteristic of the rating agencies' issuer-pays model. Market participants were well aware that potential inherent conflicts of interest would not be eliminated. Plaintiffs assert that distinct features of the structured finance market (and structured finance rating practices) exacerbated conflicts of interest. However, these features too were obvious and knowledge of them was widespread.

9.  If Plaintiffs' allegations were correct, the alleged fraud would have been known by market participants during the Class Period. In an efficient market, the valuation impact of a fraud that is known by many market participants is rapidly incorporated in the stock price by the trading of these market participants. Therefore, in such a market, the alleged fraud cannot have a lasting inflationary effect on the stock price. If the alleged fraud was not incorporated in the stock price, on the other hand, this would indicate that the market for Moody's stock was not efficient. In any case, since the investors who knew of the alleged fraud would not have relied upon Moody's alleged misrepresentations (whether or not they were incorporated in the stock price), reliance cannot be established for a potentially large portion of the putative class proposed by the Plaintiffs.

10. Plaintiffs' general allegations regarding Moody's structured finance ratings are inconsistent with evidence in financial economics about the properties of credit ratings, about how rating methodologies evolve over time, and about the determination of ratings of structured finance products. Specifically, unexpected rating downgrades and methodology improvements do not mean that Moody's had been systematically overrating structured products due to conflicts of interest, which allegedly caused the "collapse" of the structured finance market.

11. Plaintiffs fail to present any evidence that the decline in Moody's stock price that began in the fall of 2007 was caused by disclosures correcting alleged misstatements, rather than an unexpected and unprecedented financial crisis that was outside of Moody's control. Plaintiffs have not provided scientific evidence that the alleged misstatements

inflated Moody's stock price, nor have they shown that there were disclosures that cured alleged misstatements and caused investor losses.

12. Plaintiffs fail to demonstrate that loss causation is common to all class members and that lead Plaintiffs' claims are typical of other potential class members. The proposed class includes investors who sold their shares before alleged disclosure dates.

13. This report is organized as follows. In Section II, I discuss how there was widespread knowledge of the limitations of credit ratings generally (and structured finance ratings specifically), as well as knowledge of the potential for conflicts of interest, before and throughout the purported Class Period. The section will also address how semi-private knowledge about a firm can be expected to impact the stock price of that firm, and how such knowledge is likely to be transmitted to other market participants. In Section III, I address materiality and loss causation and show that, from the perspective of a financial economist, Plaintiffs have not scientifically demonstrated either in this matter.

## II. Common Knowledge Regarding Credit Ratings and Potential Conflicts of Interest

14. Plaintiffs allege that Moody's made fraudulent misrepresentations regarding its independence and its rating methodologies for structured finance products.[1] However, as I will show in this section, key features of the alleged fraud were publicly discussed before (and throughout) the purported Class Period. Additionally, as issuers and underwriters of structured finance securities – agents in Plaintiffs' alleged scheme – also traded Moody's stock and are members of the putative class, more nuanced knowledge of the alleged fraud would necessarily have diffused through various avenues to other market participants and become widespread. Because of this widespread knowledge, a financial economist would expect that any impact of the

---

[1] Specifically, Moody's allegedly made material misrepresentations that the company, (1) "was an 'independent' and 'objective' provider of credit ratings," (2) "had adequately managed and/or eliminated the potential conflicts of interest," (3) "issued credit ratings that reflected all known relevant information," and (4) "evaluated the quality of originator practices as part of its rating methodology." Lead Plaintiffs' Memorandum of Law in Support of Motion for Class Certification ("Memorandum for Class Certification"), filed January 22, 2010, pp. 5-9. In Re Moody's Corporation Securities Litigation, Consolidated Amended Complaint ("Complaint"), filed June 27, 2008.

alleged fraud would already have been reflected in Moody's stock price prior to Plaintiffs' alleged curative disclosures.[2]

## II.A. Knowledge of rating methodologies – and rating limitations – was widespread before (and throughout) the purported Class Period

## II.A.1. Limitations of credit ratings were well-known before the purported Class Period

15. Credit ratings have been scrutinized for a long time.  A classic study by the National Bureau of Economic Research ("NBER") in 1958 investigated the industry to that point.  The study found that "[a]s a general rule, the various rating systems were efficient in ranking issues within an industry but were less successful in judging default risks as between major industrial groups." Further, it pointed out a result that investors are familiar with, namely that "the market rating usually reflects changes in the credit standing of obligors more promptly than other ratings do."[3]

---

[2] I have not been asked to opine about whether the market for Moody's stock was efficient during the proposed Class Period. However, I have reviewed Plaintiffs' filings and note that their analysis is not sufficient to show market efficiency during the Class Period. According to a commonly cited authority on market efficiency, "[a]n efficient capital market is a market that is efficient in processing information.  The prices of securities observed at any time are based on 'correct' evaluation of all information available at that time.  In an efficient market, prices 'fully reflect' available information." See: Eugene F. Fama (1976), "Foundations of Finance:  Portfolio Decisions and Securities Prices," *Basic Books, Inc.*, p. 133.

Plaintiffs posit factors derived from court decisions, often referred to as "*Cammer* factors," as bearing upon market efficiency (Memorandum for Class Certification, pp. 18-19).  However, most of these factors — trading volume, analyst coverage, number of market makers, and eligibility to file form S-3— are simply metrics that are generally satisfied by almost any security that trades on a major exchange; they are not tests of market efficiency.  The fifth *Cammer* factor, in contrast, is the most critical test for market efficiency.  It requires an assessment of whether new information is fully reflected in the stock price in a timely fashion.  Plaintiffs' discussion of the fifth *Cammer* factor is deficient in at least two key respects.  First, in discussing how Moody's stock price reacts to new information, they present only *raw* stock returns, without investigating whether such reaction was due to market effects and industry effects or was simply random noise.  The second deficiency is that all of the example days Plaintiffs cite (October 24-25, 2007, April 11, 2008, and May 21, 2008) are at the close or even outside of the proposed Class Period.  (Memorandum for Class Certification, p. 21.)  Even if Plaintiffs had presented an appropriate scientific inquiry including abnormal returns, it seems that the question at hand is whether the market was efficient during the proposed Class Period when class members would have relied on the supposedly efficient pricing to make their investment decisions.

[3] W. Braddock Hickman (1958), "Corporate Bond Quality and Investor Experience," *Princeton University Press*, pp. 13, 18. Since publication of the NBER study, a number of studies have come to similar conclusions: A firm's stock price, debt prices, and the credit-default swap premiums (periodic payments required from the buyers of such derivative instruments in order to be protected in an event of default) on debt for that firm often change to reflect an increase in default risk before that firm's credit rating reflects such a change. (John Hull, Mirela Predescu, and Alan White (2004), "The Relationship Between Credit Default Swap Spreads, Bond Yields, and Credit Rating Announcements," *Journal of Banking and Finance*, v28, pp. 2789 – 2811; Manfred Steiner and Volker G. Heinke (2001), "Event Study Concerning International Bond Price Effects of Credit Rating Actions" *International Journal of Finance and Economics*, v6, pp. 139 – 157). Statistical models of default prediction are also well-known to reflect changes in default risk ahead of rating changes (Edward I. Altman and Herbert A. Rijken (2006), "A Point-in-Time Perspective on Through-the-Cycle Ratings," *Financial Analysts Journal*, v62(1), pp. 54-70; Stephen Kealhofer (2003), "Quantifying Credit Risk I: Default Prediction," *Financial Analysts Journal*, v59, pp. 30-44).

16. The issues raised by the NBER study have beset the rating agencies ever since. Rating agencies have always been criticized for changing ratings slowly. The fact that they maintained Enron at investment grade until shortly before bankruptcy led to investor criticism and Congressional inquiries.[4] A survey of institutional investors published in 2002 found that 71% of respondents "think the ratings on the corporate bonds that they buy lag the issuers' creditworthiness at any given moment."[5]

17. At least part of the reason for the lack of timeliness in rating changes is the fact that rating agencies aim for rating stability. They want an assessment of credit risk that is an accurate long-run assessment and one that is appropriate through the business cycle for a debt issue rather than the best possible assessment of the credit risk at a given point in time.[6] As a result of this approach, default rates can vary sharply for a given rating because of industry or business cycle effects. For instance, the default rate of B-rated bonds was over 15% in 1991, a recession year, and almost zero in 2006, a growth year.[7] The rating agencies have made every attempt to ensure that customers of ratings understand this and focus on the performance of ratings on average across the cycle rather than in a given year.[8]

18. Moreover, when there are strong unexpected adverse shocks to an industry, all firms in that industry will perform poorly, so that bonds initially rated Aa in that industry may

---

[4] "Moody's Investors Service plans to respond to criticism from investors by speeding up the process the oldest credit rating company uses to review and change ratings …follow[ing] complaints Moody's acted too slowly to downgrade Enron Corp. and other troubled companies. …Enron had an investment-grade rating from Moody's until four days before it filed for bankruptcy." ("Moody's May Change Credit Ratings Faster, More Often," *Bloomberg*, January 18, 2002). "On March 20, 2002, the Senate Committee held a hearing – entitled 'Rating the Raters: Enron and the Credit Rating Agencies' – that focused on the role of credit rating agencies in the Enron collapse." ("Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," U.S. Securities and Exchange Commission, January 2003, available at http://www.sec.gov/news/studies/credratingreport0103.pdf).

[5] H. Kent Baker and Sattar A. Mansi, (2002), "Assessing Credit Rating Agencies By Bond Issuers And Institutional Investors," *Journal of Business Finance & Accounting*, v29(9), pp. 1367-1398. See also: Edward I. Altman and Herbert A. Rijken (2004), "How Rating Agencies Achieve Rating Stability," *Journal of Banking & Finance*, v28(11), pp. 2679-2714.

[6] Frank J. Fabozzi (ed)(2001), "The Handbook of Fixed Income Securities," 6th Edition, *McGraw-Hill*, p. 457; Edward I. Altman and Herbert A. Rijken (2006), "A Point-in-Time Perspective on Through-the-Cycle Ratings," *Financial Analysts Journal*, v62(1), pp. 54-70.

[7] "Moody's Credit Policy – Maintaining Consistent Corporate Ratings Over Time," *Moody's Investors Service*, August 2008, p. 11.

[8] See, for example: "Our published performance metrics generally relate to the two attributes of our ratings that we believe are the most important for market participants: accuracy … and stability ..." ("Report on the Code of Professional Conduct," *Moody's Investors Service*, April 2006).

end up performing much more poorly than Baa-rated bonds in an industry that was not subject to the shock. At times, downgrades are endemic within an industry.[9]

19. The problems of slow rating adjustment and downgrade clustering within industries are inherent to the way ratings are defined and to the statistical properties of default losses. The existence of these problems, which were identified by the 1958 NBER study, cannot be attributed to the alleged conflicts of interest as the study predates the rating agencies' adoption of the issuer-pays business model in the 1970s.[10]

20. It is also well-known that ratings only measure creditworthiness, while bond prices depend on many other variables.[11]   First, investors demand compensation to bear the risk of default in the form of an interest rate premium (or **"risk premium"**), and this premium can change sharply over time.[12]   In financial economics, this compensation for credit risk depends on how a bond price co-moves with the prices of other bonds and other financial assets.[13]   Moody's ratings are not meant to provide information about this co-movement.   Second, investors want to be compensated for risk associated with liquidity.[14]   Investors want to receive a higher yield for bonds that are (at risk of) becoming more difficult to trade.   Liquidity risk is not addressed by credit ratings.[15]

**II.A.2. Inherent limitations of structured finance rating methodologies were known before (and throughout) the purported Class Period**

---

[9] For example, this happened in the power, telephone, and technology industries following the collapse of Enron. ("Corporate Credit-Rating Cuts Reach Record This Year (Update 2)," *Bloomberg*, December 26, 2002).

[10] "Moody's History", available at http://www.moodys.com/moodys/cust/AboutMoodys/AboutMoodys.aspx?topic=history.

[11] "Limitation to Use of Rating: …As ratings are designed exclusively for the purpose of grading obligations according to their credit quality, they should not be used alone as a basis for investment operations. For example, they have no value in forecasting the direction of future trends of market price," available at: http://v3 moodys.com/ratings-process/Ratings-Definitions/002002.

[12] Eugene Fama and Kenneth French (1989), "Business Conditions and Expected Returns on Stocks and Bonds," *Journal of Financial Economics*, v25, p. 28.

[13] A well-known model used by financial economists is the capital asset pricing model ("CAPM").  In this model, the risk premium on a security depends on how that security co-moves with the market (proxied by a broad equity index, for instance). Richard A. Brealey and Stewart C. Myers (2003), "Principles of Corporate Finance," 7th Edition, *McGraw-Hill*, pp.194-203.

[14] See, for instance: Viral V. Acharya and Lasse H. Pedersen (2005), "Asset Pricing with Liquidity Risk," *Journal of Financial Economics*, v77, pp. 375-410.

[15] See, for example: "CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY," available at: http://www.moodys.com/moodys/cust/AboutMoodys/AboutMoodys.aspx?topic=copyright.

21. Until the 1980s, most of the securities issued by companies and evaluated by rating agencies were corporate bonds. Since the early 1980s, a new segment of the bond market grew tremendously, reaching a historical peak in 2007. This segment is the market for structured finance. Though there are many definitions of structured finance, the one that corresponds most closely to what rating agencies call structured finance is that "it takes pools of undifferentiated risks – such as those contained in a portfolio of residential mortgages or credit card debts – and parcels them out into debt instruments with different risk profiles."[16] A more formal definition is given by the Bank for International Settlements ("BIS"), in a report published in 2005 before the start of the Class Period:

> Structured finance instruments can be defined through three key characteristics: (1) *pooling* of assets (either cash-based or synthetically created); (2) *tranching* of liabilities that are backed by the asset pool (this property differentiates structured finance from traditional 'pass-through' securitisations); (3) *de-linking* of the credit risk of the collateral asset pool from the credit risk of the originator, usually through use of a finite-lived, standalone special purpose vehicle (SPV).[17]

22. Structured finance functions in a fundamentally different way from corporate finance. With structured finance, an entity is created to issue securities. This entity houses assets and issues multiple classes of securities. The assets can be loans, bonds, physical assets such as houses or airplanes, contractual claims, and so on. Issuers construct the classes of securities with the purpose of obtaining specific ratings at issue. The securities issued in the largest amount are designed to garner Aaa ratings. The whole construct is engineered with the specific purpose of achieving security issuances with a favorable rating mix.[18]

23. Exhibit 1 shows the dramatic growth of the securitization market over time, as well as the expansion of the structured finance market compared to the corporate debt and

---

[16] "The Fundamentals Of Structured Finance Ratings," *Standard & Poor's*, August 23, 2007, p. 2.

[17] "The Role of Ratings in Structured Finance: Issues and Implications," *Bank for International Settlements, Committee on the Global Financial System*, January 2005, p. 5. The committee under whose umbrella this report was published is currently chaired by Donald L. Kohn, the Vice-Chairman of the Board of Governors of the Federal Reserve System and is charged with monitoring "developments in global financial markets for central bank Governors." See: http://www.bis.org/cgfs/index.htm.

[18] *Ibid.*, p. 1.

municipal bond issuance markets.  Notably, the subprime mortgage securitization market grew dramatically as well.  In 2000, only $81 billion (approximately 3%) of the $3 trillion of outstanding mortgage-backed securities ("MBS") were backed by subprime mortgages.  At the end of 2006, the amount of subprime mortgage-backed securities outstanding was $732 billion, accounting for 13% of the total MBS outstanding (See Exhibit 2 for residential mortgage-backed security ("RMBS") issuance after 2002).[19]

24. As discussed previously, the rating for a corporate bond measures only the creditworthiness of the bond and contains no information about other critical determinants of the risk of a bond.  This is a well-known general property of credit ratings, and also applies to structured finance.[20]  In times of market turmoil, the relative importance of these other risk factors increases, and thus market prices can change dramatically even with no change in the underlying creditworthiness of the instrument.[21]

25. Rating structured finance deals is technically challenging and requires making a large number of assumptions. Consider a securitization of subprime loans.  The starting point is to forecast the statistical distribution of losses due to default on these mortgages over time.  The estimated distribution can then be used to simulate possible outcomes for individual tranches of the securitization.  Suppose for simplicity that in order to receive the Aaa rating, a tranche should have an expected loss of 0.006% or lower.  Given the statistical distribution of losses to the assets in the trust, it is possible to find out the distribution of the losses that would accrue to a hypothetical Aaa-rated tranche (which

---

[19] Alt-A mortgages have creditworthiness between prime and subprime mortgages. There were $44 billion of Alt-A MBS outstanding in 2000. By the end of 2006, there were $730 billion Alt-A MBS outstanding. (Gary Gorton (2008), "The Panic of 2007," NBER Working Paper, pp. 8-9).

[20] "Ratings Definitions," available at: http://v3.moodys.com/ratings-process/Structured-Finance-Long-Term-Ratings/002002001007.

[21] See, for example: Ingo Fender and Martin Scheicher (2009), "The Pricing of Subprime Mortgage Risk in Good Times and Bad: Evidence from the ABX.HE Indices," *Bank for International Settlements*, BIS Working Paper No. 279,  p. 20: "While fundamental factors, such as indicators of housing market activity, have continued to exert an important influence on the subordinated ABX indices, the AA and AAA indices have tended to react more to the general deterioration of the financial market environment, such as declining risk appetite and market liquidity. These results underline the well-established view that risk premia are important components of observed prices for default-risky products, and that the relative importance of non-default risk factors will tend to increase in periods of strong repricing of credit risk."  See also: Francis A. Longstaff, Sanjay Mithal, and Eric Neis (2005), "Corporate Yield Spreads: Default Risk or Liquidity? New Evidence from the Credit Default Swap Market," *The Journal of Finance*, v60(5), pp. 2213-2253.

depends on the size of the cushion of lower-rated tranches that will absorb losses first, among other factors). Suppose that an issuer approaches the rating agency to rate the deal. If the rating agency were to find that the expected loss of the tranche the issuer envisions having an Aaa-rating is 1%, which is greater than 0.006%, it would refuse to rate that tranche Aaa.

26. Since well before the Class Period, Moody's and other major credit ratings agencies ("CRAs") have been transparent about the methodologies they employ to rate various structured finance products, such as collateralized debt obligations ("CDOs") and RMBS. They made their quantitative models available to market participants.[22] They issued frequent reports on the technical features of their approach. This allowed academics and regulators alike to study, compare, and comment on their methods.[23] Moody's also published data that made it possible to assess the performance of the structured finance securities it rated. Users of ratings could therefore dissect these models and make changes to them if they felt that such changes were appropriate. In addition, transparency of rating methodologies comes from "the steady turnover of rating agency analytic staff – who take jobs with investors, issuers, and investment banks – spreads hands-on knowledge of rating methodologies beyond the confines of the rating agencies."[24] Thus in my hypothetical example in the previous paragraph, a possibility is that before the issuer approaches the rating agency to rate the deal, the issuer itself anticipates and applies the rating agencies' likely models, assumptions, and requirements in order to present tranches that it expects will be rated at certain levels.

27. In a broad study of ratings in the structured finance marketplace, BIS noted: "[B]y making their rating models freely available to the market, the rating agencies have

---

[22] For example, S&P's LEVELS, Moody's Mortgage Metrics, S&P's CDO Evaluator, and Moody's CDOROM are described on the rating agencies' websites and can be licensed from the rating agencies.

[23] See, for example: the description and comparison of then-current ratings methodologies in Ingo Fender and John Kiff (2004), "CDO Rating Methodology: Some Thoughts on Model Risk and its Implications," *Bank for International Settlements*, BIS Working Papers, No. 163.

[24] Mark Adelson, "The Role of the Credit Rating Agencies in the Structured Finance Market," Testimony before the U.S. House of Representatives' Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, September 27, 2007. "Mr. Adelson joins S&P [as Chief Credit Officer in May 2008] from Adelson & Jacob Consulting, a firm that provides strategic consultation on securitization, real estate and investments. Prior to that, he was managing director and head of Structured Finance Research at Nomura Securities International. Previously, Mr. Adelson was managing director, Residential Mortgage Finance, for Moody's Investors Service."
(http://www2.standardandpoors.com/spf/pdf/media/leadership_actions_griep__050808.pdf).

increased transparency and may have helped to strengthen the objectivity of the rating process.  Inviting practitioner and academic comments on their methodologies also helps the agencies to keep their approaches up to the mark."[25]  Widespread discussions of rating methodologies and rating practices apparently also occurred at securitization industry conferences that were frequently attended by academics, asset managers, investment bankers, and other industry professionals.[26]

28. The approach to rating I have described above relies crucially on predictions about possible outcomes for losses and the probability attached to such outcomes.  To make these predictions for subprime securities, the rating agencies openly used historical data on subprime losses as well as macroeconomic scenarios concerning housing and interest rates.[27]  However, subprime mortgages, especially with the layering of multiple risk characteristics that came to dominate 2006 and 2007 vintage subprime loans, had not been available on a large scale for very long, and had not gone through a severe recession yet.[28]  Consequently, the databases used by the agencies included a relatively small number of years, and during that limited timeframe the subprime market as well as the economy was constantly changing. When experience with a financial instrument is limited, forecasts using past experience are not as precise as they would be with more data. Therefore, rating agencies modify their methodologies and assumptions based on new data and experiences. Such methodology refinements imply nothing improper or

---

[25] "The Role of Ratings in Structured Finance: Issues and Implications," *Bank for International Settlements, Committee on the Global Financial System*, January 2005, p. 27.

[26] For example, the speaker list for Standard & Poor's October 20, 2006 "Credit Risk Summit" on correlation modeling and CDOs consisted of academics, asset managers, and employees from major investment banks such as JP Morgan, Merrill Lynch, and Barclays Capital (http://www2.standardandpoors.com/spf/pdf/events/CreditRisk2006.pdf).  Similarly, the American Securitization Forum's 2006 Annual Meeting had a panel discussion of "Rating Agency Standards and Practices for Evaluation CDOs" and employees from JP Morgan Chase, Lehman Brothers, Bear Stearns, Morgan Stanley, Citi, and many buy-side organizations attended the conference (http://www.americansecuritization.com/story.aspx?id=416).

[27] See, for example: "Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," *Moody's Investors Service*, April 1, 2003.  See also: "U.S. Subprime Mortgage Securitization Cashflow Analytics," *Moody's Investors Service*, March 17, 2004.

[28] See, for example: Laurie Goodman, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*, pp. 295-308.  Allan N. Krinsman (2007), "Subprime Mortgage Meltdown:  How Did It Happen and How Will It End?"  *The Journal of Structured Finance*, pp. 13-19.  Also see: "Most of the data relates to basic, mainstream mortgage loans, rather than loans with multiple exotic features and risk factors.  Data covering times of stress is scarce. So is data relating to loans with multiple risk factors, such as loans with both high loan-to-value ratios and no documentation of borrower income." (Mark Adelson, "The Role of the Credit Rating Agencies in the Structured Finance Market," Testimony before the U.S. House of Representatives' Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, September 27, 2007).

fraudulent.[29]   And as I will discuss below, all of these rating agency practices and data limitations were well-known.

29. For example, loan performance data indicate that changes in house price appreciation (HPA) is one of the most important factors explaining the defaults of subprime mortgages.[30]   Consequently, ratings of subprime securitization tranches were dependent on HPA projections.   *Ex post*, house price appreciation forecasts from experts in 2006 and 2007 turned out to be wrong; Moody's was not alone in being too optimistic about HPA.[31]   However, anybody who plans an outing based on a weather forecast knows that the forecast could be wrong, and nobody would assume an incorrect forecast to be proof of a conflict of interest between the meteorologist and the tourism industry. Similarly, forecasting mistakes by Moody's do not mean that its ratings were biased because of conflicts of interest.

30. The concept of model risk is a well-known source of risk to which risk managers, regulators, and other market participants already paid great attention before the Class

---

[29] Moody's had been updating their methodologies for rating RMBSs, CDOs, and other instruments well before (and throughout) the purported Class Period.  For example, "An Update to Moody's Analysis of Payment Shock Risk in Sub-Prime Hybrid ARM Products," *Moody's Investors Service*, May 16, 2005. "Update to Subprime Residential Mortgage Securitization Assumptions," *Moody's Investors Service*, December 2, 2005. "Moody's Approach to Coding Subprime Residential Mortgage Documentation Programs: Updated Methodology," *Moody's Investors Service*, November 28, 2006.  "Moody's Modeling Approach to Rating Structured Finance Cash Flow CDO Transactions," *Moody's Investors Service*, September 26, 2005.

[30] Yuliya Demyanyk and Otto Van Hemert (2009), "Understanding the Subprime Mortgage Crisis," *Review of Financial Studies,* forthcoming; Geetesh Bhardwaj and Rajdeep Sengupta (2009), "Did Prepayments Sustain the Subprime Market," Federal Reserve Bank of St. Louis Working Paper; Kristopher Gerardi, Andreas Lehnert, Shane Sherlund, and Paul Willen (2008), "Making Sense of the Subprime Crisis," *Brookings Papers on Economics Activity*, Fall, pp. 69-145.

[31]  For example, experts from the Mortgage Bankers Association and the National Association of Realtors gave forecasts in 2006 that, after the fact, turned out to be too optimistic. ("Mortgage Finance Market Commentary #8: Housing Activity Should Decline Modestly This Year," Mortgage Bankers Association, January 2, 2006, available at www.mortgagebankers.org; "Home Sales Settling Down and Appreciation Slowing," National Association of Realtors, June 6, 2006).  See, also: "Economists Predict Soft Landing for Housing," National Association of Home Builders, April 28, 2006, available at www.NAHB.org; "Housing: Is the Worst Over?" *Business Week*, April 18, 2007; "A year ago at this time many top economists were looking for that recovery to begin in 2007. …Many other economists freely admit their year-ago forecasts missed the mark."  ("How They Got Housing Wrong," *CNN*, December 28, 2007, available at www.CNNMoney.com).  *The Wall Street Journal* periodically surveys analysts and economists on their outlook for key economic indicators, including HPA.  In November 2006, 65% of respondents to the survey indicated they believed "the worst of the housing bust is behind us", and by March 2007 the number of economists who believed the worst of the housing bust was behind us had increased to 80%.  (available at http://online.wsj.com/public/resources/documents/info-flash08 html?project=EFORECAST07).  That, *ex post*, some experts were too optimistic about HPA in 2006 and 2007 is not surprising given the historical evidence at the time.  As noted by current Fed chairman Ben Bernanke in 2005 (at that time he was an adviser to President Bush), "[w]e've never had a decline in housing prices on a nationwide basis." ("Drop Foreseen in Median Price of Homes in U.S.," *The New York Times*, August 26, 2007).

Moody's discussed the importance of HPA projections, and noted how they updated HPA assumptions in: "Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect," *Moody's Investors Service*, March 9, 2007.

Period.[32]  For instance, capital requirements for banks under the Basel II standards that are in effect in many countries, and to some extent for large banks in the U.S., explicitly require banks to set aside reserves for model risk.[33]  Research published in 2004 discussed in detail how "model risk" could result in "meaningful differences" in CDO tranche rating outcomes from different agencies, and sounded caution "against exclusive reliance on CDO ratings in taking investment decisions."[34]  Similarly, an independent industry consultant warned in 2005 that "for structured financial products, investors are inadequately informed by the rating of any of the three major rating agencies and have to do their own independent evaluations."[35]

31.  In May 2005, former Fed Chairman Alan Greenspan noted that "the credit risk profile of CDO tranches poses challenges to even the most-sophisticated market participants" and warned investors "not to rely solely on rating-agency assessments of credit risk, in part because a CDO rating cannot possibly reflect all the dimensions of the risk of these complex products."[36]  In addition, in a report published in 2005, a working group of representatives from the central banks of developed countries reached the following conclusion about model risk in the ratings of structured finance products:

> [M]odel-based risk assessments can be a long way from 'true' values and, to the extent that investors rely on ratings for their structured finance investments, the model risk linked to the

---

[32] One definition of model risk is: "the risk that theoretical models used in pricing, trading, hedging, and estimating risk will turn out to produce misleading results". (Steven Allen (2003), "Financial Risk Management, A Practitioner's Guide to Managing Market and Credit Risk," *John Wiley & Sons, Inc.*, p. 97).  According to the Financial Services Authority, the regulator of the financial services industry in the UK, model risk refers to the risk of suffering "[l]osses due to imperfect model or data." (Philippe Jorion and GARP (Global Association of Risk Professionals) (2007), "Financial Risk Manager Handbook," 4th Edition, *John Wiley & Sons, Inc.*, p. 553).  Model risk may include the risk of: using a model of reality that is ultimately incorrect, using a correct model inappropriately, approximating the solution of a model poorly, unstable data (e.g. past data trends not being indicative of future trends), and other potential problems arising from financial modeling.  (See: "Model Risk," *Goldman Sachs*, Quantitative Strategies and Research Notes, April 1996, pp. 6-8).

[33] See ¶ 699 of: "International Convergence of Capital Measurement and Capital Standards, A Revised Framework," *Bank for International Settlements, Basel Committee on Banking Supervision*, June 2004.

[34] Ingo Fender and John Kiff (2004), "CDO Rating Methodology: Some Thoughts on Model Risk and its Implications," BIS Working Papers, No. 163.

[35] Janet Tavakoli (2005), "Structured Finance:  Rating the Rating Agencies," *GARP Risk Review*, Issue 22, January/February.

[36] Remarks by Chairman Alan Greenspan, "Risk Transfer and Financial Stability," To the Federal Reserve Bank of Chicago's Forty-first Annual Conference on Bank Structure, May 5, 2005, available at: http://www.federalreserve.gov/Boarddocs/Speeches/2005/20050505/default.htm.

agencies' rating methodologies will be among the principal risks these investors are exposed to.[37]

32. The fact that there was not unanimous agreement on the assumptions, models, and projections used by rating agencies was well-known before the subprime crisis. For example, a study published by the Brookings Institution reports an instance in 2005 when analysts from a major bank disagreed with S&P's loss projections on certain RMBS products: "For 2005 subprime loans, S&P predicts lifetime cumulative losses of 5.8%, which is less than half our number…We believe that the S&P numbers greatly understate the risk of HPA declines."[38]   In a presentation at the Structured Credit Instruments Conference in November 2005, an analyst stated when discussing CDO modeling, "[m]y personal opinion is that correlation based on geographical location is not very accurate…. [D]espite my own misgivings as well as those of many other market participants, the rating agencies…continue to believe in the validity of geography-driven correlations."[39]

33. Ratings' heavy reliance on historical data and quantitative models is particularly important when considering allegations about Moody's loan originator evaluations. Plaintiffs allege without much specificity that Moody's misrepresented how it "evaluated the quality of originator practices," but it is unclear in what way Plaintiffs find Moody's statements about its methodology misleading.[40]

34. At all times, it was known that Moody's largely relied on hard, or verifiable, data and records (e.g., FICO scores, loan-to-value ratios, historical performance data) when

---

[37] "The Role of Ratings in Structured Finance: Issues and Implications," *Bank for International Settlements, Committee on the Global Financial System*, January 2005, p. 24.

[38] Kristopher Gerardi, Andreas Lehnert, Shane Sherlund, and Paul Willen (2008), "Making Sense of the Subprime Crisis," *Brookings Papers on Economics Activity*, Fall, p. 138.  Also see: "Market participants have been able to 'disagree' with rating models by using alternative assumptions or by ascribing less confidence to the models' estimates for stressful conditions.  Many have done so and have tailored their investment strategies accordingly." (Mark Adelson, "The Role of the Credit Rating Agencies in the Structured Finance Market," Testimony before the U.S. House of Representatives' Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, September 27, 2007.)

[39] Arturo Cifuentes (2006), "CDOs and Correlation: A Few Modeling Misconceptions," *CFA Institute Conference Proceedings Quarterly*, June, pp.54.

[40] Plaintiffs suggest that Moody's failed to adhere to its own stated methodology for evaluating loan originator quality in a 2003 research report titled "Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," *Moody's Investors Service*, April 1, 2003.  Plaintiffs chiefly point to a July 12, 2007 ratings action in which Moody's downgraded multiple 2006 vintage RMBS and CDO deals, 63% of which were attributed to four originators.  Moody's then also modified its rating methodology and noted the loan originators that had exhibited poor performance.  See: Memorandum for Class Certification, p. 6; Complaint ¶111-126.

assigning ratings.[41]  The increasing riskiness of certain originators' 2006 vintage loans lies largely in changes in the risk attributes of borrowers that generally could not be assessed using verifiable hard information that was available to rating agencies on mortgagors, loans, or originators.[42]

35. Moody's made it clear that it was not responsible for conducting the type of due diligence needed to immediately discern such changes in loan risk attributes.  As stated in the Code of Conduct: "Moody's has no obligation to perform, and does not perform, due diligence with respect to the accuracy of information it receives or obtains in connection with the rating process."[43]

36. Moreover, greater insight into loan originator quality required an analysis of loan performance data after a sufficient period of seasoning, because "it was not clear if [early delinquency patterns of the 2006 vintage] just reflected the impact of lower home price appreciation on investors using subprime loans to flip properties, or foreshadowed more serious problems."[44]  Moody's stated publicly in early 2007 that it was aware of the decline in recent vintage performance, as well as originator-specific problems, but wanted to observe additional data as the loans continued to evolve so it could assess the sources and severity of the problem and avoid making "drastic changes in ratings when

---

[41]  See, for example: the description of Moody's Mortgage Metrics, a predominantly quantitative model used for analyzing RMBS: "Loan-to-Value Ratio Remains Key: Borrower equity is an important buffer against default risk and a cushion against loss where a default occurs. …Borrower character and capacity to pay play a central role in our rating approach. …While there are many ways to assess a borrower's credit history, under-writers increasingly rely on automated approaches, usually a credit scoring system. …The credit scoring system developed by Fair, Isaacs & Co. (FICO) produces statistically significant predictions of default frequency on Jumbo A loans. Reliance on reported information from previous creditors necessarily introduces a source of error; and a borrower's reported FICO scores can vary widely across the 3 major reporting agencies. Yet, although imperfect, Moody's Mortgage Metrics utilizes FICO scores at loan origination to maximize its predictive power for pool losses." ("Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," *Moody's Investors Service*, April 1, 2003, pp. 6-7).  For the use of Mortgage Metrics for subprime securities see: "Moody's Approach to Coding Subprime Residential Mortgage Documentation Programs: Updated Methodology," *Moody's Investors Service*, November 28, 2006, p.1.

[42]  Laurie Goodman, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*, pp. 70-71, 303-308.  As the securitization market evolved, lenders paid less attention to "soft" information about the borrowers or properties that were difficult to verify, and mortgages were increasingly underwritten for borrowers for whom the hard information offered a biased assessment of their capacity to pay. (Uday Rajan, Amit Seru, and Vikrant Vig (2008), "The Failure of Models That Predict Failure: Distance, Incentives and Defaults," University of Michigan Working Paper, pp. 3, 5).

[43]  "Code of Professional Conduct," *Moody's Investors Service*, June 2005, p. 4.

[44]  See: Adam Ashcraft and Til Schuermann (2008), "Understanding the Securitization of Subprime Mortgage Credit," Federal Reserve Bank of New York Staff Report, March, p. 59.  See also: "Rating agencies also assess the underwriting standards by looking at historical default rates of an originator and monitor the default rates over time to determine if there has been deterioration or an improvement in underwriting standards." (Frank Fabozzi, Henry Davis, and Moorad Choudhry (2006), "Introduction to Structured Finance," *John Wiley & Sons, Inc.*, p. 80).

it's too early."[45]  For example, Moody's flagged the poor performance of recent vintage loans in a January 22, 2007 review and noted that "Moody's loss expectations on pools securitized since 2004 through today have been increasing in response to the weakening of the housing market and collateral quality. …There is … significant dispersion in performance of deals issued in 2006 by the different originators."[46]

37.  While Plaintiffs criticize Moody's for updating its methodology related to loan originator standards, it is important to note that other credit rating agencies and other market participants also had to adapt their methodologies to put more emphasis on loan originator identity and quality after the fallout of the crisis.[47]

**II.B.  Knowledge of potential conflicts of interest was widespread before (and throughout) the purported Class Period**

**II.B.1.  The potential "issuer-pays" conflict was widely discussed at all times**

38.  The potential for conflicts of interest to arise from the issuer-pays model was already well-known before the proposed Class Period, and was extensively discussed after the Enron and other corporate scandals.  For example, a Geneva Report on the World Economy published in 2004 noted "[a]n obvious risk is that the 'issuer fee' model

---

[45] "Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect," *Moody's Investors Service*, March 9, 2007. Also, in a January 18, 2007 report, Moody's states "Mortgages backing securities issued in late 2005 and early 2006 have had sharply higher rates of foreclosure, real estate owned (REO) and loss than previously issued securities at similar, early points in their lives. These 'early default' measures have been primarily visible in the subprime universe, but are not limited to that sector. Moody's is currently assessing whether this represents an overall worsening of collateral credit quality or merely a shifting forward of eventual defaults which may not significantly impact a pool's overall expected loss…. As we have frequently commented on in recent years, originators of subprime loans have loosened underwriting guidelines and materially increased the layering of risk…. Issuers are examining whether various degrees of underwriting or broker misrepresentation might be causing increases in early defaults; however, there is currently limited data to confirm this as a widespread phenomenon…. Finally, preliminary data […] may indicate that declines in home price appreciation nationwide also have played a role in these early defaults."  ("Early Defaults Rise in Mortgage Securitizations," *Moody's Investors Service*, January 18, 2007, pp. 1, 5).

[46] "2006 Review and 2007 Outlook: Home Equity ABS; 2006 Was Tough – Will 2007 Be Even More Challenging?," *Moody's Investors Service*, January 22, 2007.

In a March 9, 2007 teleconference, Moody's notes that Fremont in particular has done very poorly.  In the Q&A, Moody's notes that it has observed early payment default data "originator by originator, and the number is changing."  ("Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect," *Moody's Investors Service*, March 9, 2007).

[47] For S&P's and Fitch's methodology revisions to assess loan originator qualities, see, for example: "Update On U.S. RMBS: Performance, Expectations, Criteria," *Fitch Ratings*, February 2008, p. 36; "Standard & Poor's Enhanced Mortgage Originator And Underwriting Review Criteria for RMBS," *Standard & Poor's*, November 25, 2008, p. 2. See also: "I believe that market participants can be more effective in estimating the riskiness of loans by placing greater emphasis on how the loans were originated and who originated them. However, here too, it remains to be seen whether the market will embrace such an approach." (Mark Adelson, "Subprime Mortgages - A Realistic Outlook," *Asset Securitization Report*, August 20, 2007, p.3).

could result in rating agencies implicitly or explicitly offering more favourable ratings in exchange for business."[48] An *Economist* article in 2005 stated "[t]he big agencies' business model has a built-in conflict of interest. Ratings are paid for by the issuers of bonds and other forms of tradable debt, not by investors who use them. Can they be completely independent of the firms who pay the bills?"[49] A *Wall Street Journal* article similarly commented that "[l]awmakers have called on the SEC to regulate ratings firms more closely and to monitor conflicts of interest in a system where issuers pay the companies that perform their ratings. The industry has come under fire for failing to spot red flags that exploded in scandal."[50]

39. Contrary to Plaintiffs' allegations,[51] market participants were not misled by Moody's Code of Conduct released in June 2005 (and other alleged misrepresentations made during the purported Class Period) to think that potential inherent conflicts of interest would be completely eliminated. Moody's stated in its Code of Conduct that: "Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity. … [Moody's will adopt procedures to] eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses Moody's makes or the judgment and analyses of Moody's Employees who have an influence on Credit Rating decision."[52] Moody's cautionary language about using "care" and "managing" potential conflicts was not taken as a suggestion that potential for conflicts from the issuer-pays model would be completely eliminated. This is evidenced by regulators' statements, financial media articles, and market participants' commentaries during the purported Class Period that continued to flag the issue.[53]

---

[48] Andrew Crockett, Trevor Harris, Frederic Mishkin, and Eugene White (2003), "Conflicts of Interest in the Financial Service Industry: What Should We Do About Them?," *Geneva Reports on the World Economy 5*, p. 48.

[49] "Three is no crowd - Credit-rating agencies," *The Economist*, March 26, 2005.

[50] "Moving the Market: SEC Says Voluntary Policing By Ratings Firms Lacks Bite," *The Wall Street Journal,* March 10, 2005.

[51] Complaint, ¶69; Memorandum for Class Certification, pp. 6-7.

[52] "Code of Professional Conduct," *Moody's Investors Service*, June 2005.

[53] In addition to coverage in the mainstream financial media, this issue was discussed by bloggers. See, for example: "The ratings of our competitors were biased by serious conflicts of interest. Ours were not. You see, A.M. Best, Moody's, S&P, and Duff & Phelps were paid substantial sums BY the insurance companies to provide ratings FOR the insurance companies, a blatant and direct conflict of interest." (Martin D. Weiss, "The Greatest Scam of All," Prudent Investor Newsletters , October 19, 2004). "This conflicted business model means that the paying customers for these agencies are the corporations they analyze, not

40. For example, Senator Richard Shelby stated in February 2006 that "he is concerned about the industry's basic business model…that some critics say poses an inherent conflict of interest."[54]  The conflicts of interest issue was then extensively discussed during the Senate hearing entitled "Assessing the Current Oversight and Operation of Credit Rating Agencies" on March 7, 2006.[55]  Again, remarking in a September 2006 report accompanying legislation aimed at rating agency practices, Senator Shelby noted that "NRSROs have been criticized by a broad array of interested parties with respect to conflicts of interest…"[56]  Similarly, Pennsylvania Congressman Michael Fitzpatrick remarked in July 2006 that "[t]he lack of competition in the credit rating industry has lowered the quality of ratings, inflated prices, stifled innovation and allowed abusive industry practices and conflicts of interest to go unchecked."[57]

41. When discussing rating agencies' regulatory and competitive environment, a *Euromoney* article commented in August 2006 that "[a]t the heart of this is the continuing conflict of interests in the rating agency world. Before the 1970s, rating agencies were paid by the investors; since then the issuer has paid."[58]  Similarly, *The New York Times* noted in December 2006, "Congress, European securities regulators, investor advocates and even some rival credit ratings agencies questioned the independence and integrity of the credit rating system, in part because since the early

---

the investors who look to the ratings for help in assessing a company's creditworthiness. …I am encouraging everyone to Email the SEC at: SEC Center for Complaints and Enforcement Tips and complain about the obvious conflict of interest between ratings companies and their clients." (Mish's Global Economic Trend Analysis, March 16, 2005).  "[I]f Disney Corp wants to sell some bonds, it pays S&P and Moody's to give them a rating. This creates an obvious conflict of interest. On the other hand, who else is going to pay the agencies?" (Accrued Interest, September 28, 2006).  "In short, the problems with the ratings agencies are the same as the problems with auditors. He who pays the piper calls the tune. Except in crises, the ratings agencies are more beholden to the issuers than their subscribers," and "[t]hey are paid by the issuers, and have a conflict of interest. They can argue that they are zealous to protect their reputations, but in the short run, they get paid by issuers to rate deals. Only in times of crisis do they adjust their standards to meet the needs of the bond buyers." (Aleph blog, March 21, 2007).

[54] "US Senate's Shelby urges credit rater changes," *Reuters News*, February 1, 2006.

[55]  "Assessing the Current Oversight and Operation of Credit Rating Agencies," Hearing before the Committee of Banking, Housing, and Urban Affairs, March 7, 2006.

[56] Senate Report to Accompany S. 3850: Credit Rating Agency Reform Act of 2006, Report 109-326, September 6, 2006.  Note, although Senator Shelby had expressed concern about rating agencies' basic business model, ultimately the Credit Rating Agency Reform Act of 2006 did not abolish the issuer-pays system, but rather focused on increasing competition, transparency, and accountability (see, for example: "Legislation Congress Approves Credit Rating Agency Reform Act of 2006," *Bond Buyer*, September 28, 2006).

[57] "Pressure mounting over US ratings agency 'duopoly'," *Financial Times*, July 11, 2006.

[58] "Ratings agencies face shake-up," *Euromoney,* August 1, 2006.

1970s the services have been paid by the very companies whose creditworthiness they evaluate."[59]

### II.B.2. Potential conflicts of interest in structured finance ratings were widely discussed throughout the Class Period

42. Plaintiffs claim that potential conflicts of interest are intensified with structured finance ratings because of specific features of the rating process and of the market for structured finance issues. For instance, Plaintiffs make much of the fact that there were discussions between Moody's and issuers in the process of rating a deal and issuers could pre-structure the securities on the basis of their knowledge of the ratings methodology.[60] Such discussions would have been natural. As in the simple example discussed in II.A.2, an agency would not assign a Aaa rating if the expected loss of the tranche was 1% but would assign such a rating if the expected loss was 0.006% or lower. The issuer could seek to secure a higher rating by adjusting the deal structure and reducing the amount of Aaa notes sold in the deal, and thus discussions with rating agencies would be a natural part of that effort.

43. This issue of whether rating agencies are involved in structuring deals had been debated by market participants before the purported Class Period. The BIS report in 2005 comments that "the agencies' involvement in the structuring of deals[] has sparked concern that potential conflicts of interest in structured finance markets may be especially pronounced. According to this view, the fact that the agencies may have expressed an 'ex ante opinion' regarding deal structure suggests that they are providing 'structuring advice'."[61] On the other hand, Karen Johnson from The Federal Reserve Board stated her opinion in 2004 that "[i]nvolving the raters in the structuring of a

---

[59] "Objectivity of a Rating Questioned," *The New York Times*, December 12, 2006.

[60] Complaint, ¶ 45, 325.

[61] The report also notes, however, "[i]n fact, there appear to be no fundamental differences in the rating processes for structured finance products and traditional bonds. ... In both [corporate bond and structured finance] cases, the agency can communicate to the issuer the rating that it plans to assign, with the main difference lying in the issuer's flexibility to adjust credit characteristics in response." ("The Role of Ratings in Structured Finance: Issues and Implications," *Bank for International Settlements, Committee on the Global Financial System*, January 2005 p. 25).

particular issue *ex ante* rather than *ex post* does not amount to rating their own ratings."[62]

44. Plaintiffs also argue that conflicts of interest issues had a completely different dimension for structured finance because, with structured finance, Moody's was dealing with a few repeat issuers, higher fees, and a unique fee structure that they argue lead to "rating shopping."[63]   Plaintiffs claim that because of these features, Moody's issued biased ratings for structured securities to gain market share and revenue growth.

45. The distinct features of the structured finance market and rating practices, as well as any potential effect of these features on conflicts of interest, were discussed prior to and throughout the purported Class Period. An article from the *Financial Times* noted in February 2007 that "it is the issuers - often investment banks or structured finance firms - that approach and pay the rating agencies, not investors. Critics highlight this as a potential conflict of interest."[64]   It was in plain sight to market participants that there were relatively few structured finance issuers (i.e., investment banks or structured finance firms) compared to myriad issuers of corporate securities.

46. Regarding fee structures, an independent industry consultant remarked in 2005 that "[structured finance rating] fee information is easily leaked. …Charges are typically seven basis points with a minimum floor charge for smaller transactions."   She also commented that "[rating agencies] face constant pressure to earn fees for rating deals… The pressure is applied by frequent issuers or placement agents, such as investment banks, and the heat gets turned up an extra notch when rating agencies are asked to quickly rate complicated deals.…In addition to enjoying a cozy relationship with

---

[62] Andrew Crockett, Trevor Harris, Frederic Mishkin, and Eugene White (2003), "Conflicts of Interest in the Financial Service Industry:  What Should We Do about Them?," *Geneva Reports on the World Economy 5*, p. 100.
[63] Memorandum for Class Certification, pp. 5-6. Complaint, ¶¶43-44.
[64] "Moody's earnings rise 86% on back of complex new products," *Financial Times*, February 8, 2007.

structured finance issuers, rating agencies have also made it clear that they do not hold themselves accountable for unearthing fraud."[65]

47. Similarly, in an article presented in the Brooking-Nomura forum in September 2005 it was noted that: "[f]or corporate debt, the fees are in the range of three to four basis points of the size of the issue… For structured finance issues, fees range up to 10 basis points, and fees for complex transactions are substantially higher, up to $2.4 million." Also, "credit rating agencies continue to face conflicts of interest. …Credit rating agencies increasingly focus on structured finance and new complex debt products, particularly credit derivatives, which now generate a substantial share of credit rating agency revenues and profits. With respect to these new instruments, the agencies have become more like 'gateopeners' than gatekeepers."[66]

48. Concerns about "rating shopping" behaviors also were frequently discussed.  Various academic articles discussed this phenomenon.[67]  A researcher from Moody's published an article in 2001 stating that "[t]he credit rating agency industry is subject to moral hazard. Every rating agency has a business incentive to assign high ratings to issuers, who are free to choose among the agencies….Pressure on issuers to 'shop' for the highest rating is increased by their use in regulation. Such practices could undermine the reliability of ratings over time."[68]  A Nomura research report noted in February 2006: "On December 19 [2005], securitization professionals received a strong reminder about the consequences of rating shopping…. Rating shopping rarely involves corporate, sovereign, and municipal bonds.  However, it is common for securitization

---

[65] Janet Tavakoli (2005), "Structured Finance:  Rating the Rating Agencies," *GARP Risk Review*, Issue 22, January/February.  In my report, I do not mean to suggest that the statements made in Ms. Tavakoli's piece, or in similarly cited works, accurately describe the role of rating agencies or how they carried out their business.  These materials are presented here instead in order to demonstrate how much information and how many criticisms were publicly discussed up to and throughout the Class Period.

[66] Frank Partnoy (2005), "How and Why Credit Rating Agencies Are Not Like Other Gatekeepers," Working Paper, available at http://www.nomurafoundation.or.jp/data/20050928_Frank_Partnoy.pdf.

[67] "Credit agencies have expressed concerns that the use of credit ratings in capital adequacy regulation may prompt firms to 'shop' for highest ratings in order to reduce their borrowing costs. Such 'rating-shopping' may pressure credit agencies to inflate their ratings, so that it may undermine their credibility." (Misa Tanaka (2003), "The Macroeconomic Implications of the New Basel Accord," *CESifo Economic Studies*, v49(2)).  "[I]ssuing firms may engage in 'rate shopping' in which an issuer releases a favorable rating but withholds an unfavorable one." (Jeff Jewell and Miles B. Livingston (2000), "The Impact of a Third Credit Rating on the Pricing of Bonds," *The Journal of Fixed Income*, December, p. 69).

[68] Richard Cantor (2001), "Moody's Investors Service Response to the Consultative Paper Issued by the Basel Committee on Bank Supervision 'A New Capital Adequacy Framework'," *Journal of Banking & Finance*, v25, pp.171-185.

issues."[69]    Moody's itself commented in a March 2007 research report that when comparing ratings for jointly rated structured securities, "rating shopping often causes large differences in rating opinions to be unobserved by the market."[70]

49. Finally, it was also in plain sight that structured finance had been a significant contributor to Moody's revenue growth since Moody's became a stand-alone, publicly-traded company in 2000. According to Moody's 10-Ks, structured finance ratings accounted for 39.4% of Moody's rating revenue in 2001, 47.2% in 2004, and 54.2% in 2006. [71]

50. In sum, the existence of potential conflicts of interest from the issuer-pays model was well-known before and throughout the purported Class Period.  The characteristics of the structured finance market that allegedly made such conflicts more acute were also transparent to market participants.

### II.C. Knowledge of the allegedly undisclosed or misrepresented information would have been widespread among putative class members

51. From 2006 through 2008, upwards of 10% of Moody's common stock was held by top structured finance issuers, managers, and book runners (see Exhibit 3). Upwards of 77% of Moody's common stock was held by institutional investors (including but not limited to those involved in structured finance noted above) during the purported Class Period (see Exhibit 4).   A large portion of Moody's shareholders were thus sophisticated investors who likely would have known the limitations of credit ratings and the dynamics of the structured finance market discussed above.  These institutional investors would have also known that the potential for conflicts of interest was an

---

[69] "Rating Shopping – Now the Consequences," *Nomura Fixed Income Research*, February 16, 2006. Also see: "It is indisputable that securitization issuers in the MBS, CMBS, and CDO areas engage in rating shopping. They do openly.  However… there is no conclusive evidence that the major rating agencies have ever succumbed to the effects of rating shopping and engaged in competitive laxity.  In fact, even though rating shopping became rampant in early 1990s, the major rating agencies achieved highly impressive track records during that time and in the years that followed." (Mark Adelson, "The Role of the Credit Rating Agencies in the Structured Finance Market," Testimony before the U.S. House of Representatives' Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, September 27, 2007, p. 10).

[70] "Comparing Ratings on Jointly-Rated U.S. Structured Finance Securities: 2007 Update," *Moody's Investors Service*, March 30, 2007.

[71] Moody's Corporation 2001, 2004, and 2006 Form 10-Ks.

inherent feature of the issuer-pays business model, and likely would have been familiar with the debate in the financial community about this topic.

52. Given the nature of Plaintiffs' claims in this matter, if the market for Moody's stock was efficient during the purported Class Period, and if a fraud happened as Plaintiffs allege, then Moody's stock price would quickly reflect market participants' knowledge of the alleged fraud.  This is because the gist of Plaintiffs' claims is that banks issuing structured finance products pressured ratings agencies to issue favorable opinions, and due to the concentrated number of repeat issuer clients, Moody's "chose to please their customers, at the expense of objectivity."[72]

53. As a simple matter of logic, if Plaintiffs' theory were right, then the issuing banks and their employees involved in securitizations necessarily would have had knowledge of the very wrongdoing Plaintiffs are alleging, as they would have been participants in the alleged scheme.[73]  Mobility of the employees within the financial services industry, and between banks and ratings agencies in particular, would also tend to make these institutions and yet more employees quickly aware of any such scheme.[74]  Indeed, Plaintiffs state (quoting Jerome Fons): "It was also relatively easy for the major banks to play the agencies off of one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency.  Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality."[75]

54. Not only large financial institutions, but also other investors would likely have learned about the alleged scheme.  Research in finance has shown that there is significant

---

[72] Memorandum for Class Certification, p. 6.

[73] The point that issuing banks *could* have possessed knowledge of any alleged compromise on ratings' integrity is supported by New York Attorney General Andrew Cuomo's recent inquiry into "information the investment banks provided to the rating agencies and whether the bankers knew the ratings were overly positive." ("Prosecutors Ask if 8 Banks Duped Rating Agencies," *The New York Times*, May 12, 2010).

[74] As Mark Adelson pointed out in testimony before Congress, countless former employees from the rating agencies went on to work at large banks and for buy-side investors.  One would thus expect that knowledge of any systematic fraud at a ratings agency would have been spread to hundreds or thousands of individuals throughout the financial industry. (Mark Adelson, "The Role of the Credit Rating Agencies in the Structured Finance Market," Testimony before the U.S. House of Representatives' Committee on Financial Services, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, September 27, 2007.).

[75] Memorandum for Class Certification, p. 6.

diffusion of information within various social networks in the financial community. For example, studies have found that word-of-mouth effects influence investor behavior, as shown by mutual fund managers' trading decisions being sensitive to trades of other managers in the same city and by individual investors' propensity to pick stocks from the same industry as their neighbors.[76]  Another study found that social networks based on educational background (e.g. Harvard Business School alumni) are important mechanisms for facilitating the flow of private information about asset prices.[77]  This research suggests that if the issuing banks knew of the alleged fraud, other individuals and institutions probably did as well.  I know of no economic methodology to identify who had such knowledge, and no methodology to identify a subset of the proposed class to which this knowledge *might* be imputed.

55.  Knowledge of the alleged scheme by many active market participants coupled with lasting inflation is inconsistent with an efficient market.  In an efficient market, information is rapidly incorporated into the stock price and investors trade so that any source of predictability in risk-adjusted returns that is known to investors is quickly incorporated in the stock price.[78]  If investors have reason to believe that a stock price is inflated because of a misrepresentation, then those investors will tend to sell the stock, driving the price down ahead of the expected bad news.  If issuing banks had reason to believe that Moody's stock price was inflated by misrepresentations about Moody's methodologies or independence, then in an efficient market the issuing banks (and other parties with knowledge of the scheme) would quickly act on their knowledge and seek to make arbitrage profits by selling Moody's stock, eliminating the alleged inflation in the process.[79]  On the other hand, these investors would not have purchased (or held) Moody's common stock had they believed that Moody's improperly carried out

---

[76] Harrison Hong, Jeffrey D. Kubik, and Jeremy C. Stein (2005), "Thy Neighbor's Portfolio: Word-of-Mouth Effects in the Holdings and Trades of Money Managers," *The Journal of Finance*, v 60(6), pp. 2801-2824; Zoran Ivkovic and Scott Weisbenner (2007), "Information Diffusion Effects in Individual Investors' Common Stock Purchases: Covet thy Neighbors' Investment Choices," *The Review of Financial Studies*, v20(4), pp. 1327-1357.

[77] Lauren Cohen, Andrea Frazzini, and Christopher Malloy (2008), "The Small World of Investing: Board Connections and Mutual Fund Returns," *Journal of Political Economy*, v116(5), pp. 951-979.

[78] Academic studies suggest that in an efficient market, stock prices should fully reflect new material information immediately after the release of the information. *Supra*, footnote 2.

[79] For a detailed discussion of the arbitrage mechanism, see: Nicholas Barberis and Richard Thaler (2003), "A Survey of Behavioral Finance," Chapter 18 in "Handbook of the Economics of Finance," George Constantinides, Milton Harris, and René Stulz, eds., *Elsevier Science B.V.*.

structured finance ratings, because these investors would have expected a drop in Moody's stock price when the supposed "truth" behind Moody's structured finance ratings was revealed. Therefore, either: 1) the market for Moody's stock was efficient and thus widespread knowledge of the alleged fraud among large market participants would quickly eliminate any artificial inflation due to the fraud (and thus there could be no basis to assert loss causation); 2) the market for Moody's stock was inefficient (and thus there could be no basis to presume reliance under the "fraud on the market" theory); or 3) there was no fraud.

### III. Materiality and Loss Causation

### III.A. Plaintiffs fail to demonstrate that any alleged misrepresentation was material

56. Plaintiffs assert in their Memorandum for Class Certification that "[a]ll of Defendants' misrepresentations were material. Because independence is essential to an NRSRO's functionality as a financial gatekeeper… [and] the decision to evaluate originator standards in rating structured finance instruments had serious consequences on the accuracy of ratings issued by Moody's…"[80]   However, Plaintiffs have provided no empirical basis to substantiate their assertion that any of the alleged misrepresentations were "material" to investors in Moody's common stock.

57. To assess materiality of any given piece of information to investors, financial economists normally rely on a technique known as an "event study" to measure the stock price impact of new information that enters the marketplace.  Event studies have been widely used for almost 40 years, and I have employed this technique repeatedly in my peer-reviewed research.[81]   To a financial economist, the notable lack of an event study in Plaintiffs' filings undermines the claim that alleged misstatements were

---

[80]  Memorandum for Class Certification, pp. 7-8.

[81] For a review of the role of event studies in litigation, see: Mark L. Mitchell and Jeffry M. Netter (1994), "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, v49, pp. 545-590. My resume lists my publications.  The first event study listed on my resume is "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, *Journal of Financial Economics*, 1988, v22 (2), pp. 189-205.

material.  I will explain below in more detail how event studies should be done in this setting and why Plaintiffs have failed to demonstrate that the alleged misrepresentations were material to investors.

58. Professor Craig MacKinlay sums up the essence of the event study approach: "[u]sing financial market data, an event study measures the impact of a specific event on the value of a firm."[82]   Typically, event studies use a regression model to isolate the firm-specific stock price return after controlling for market- and industry-wide factors.  Once a relationship between the firm's returns and these control factors is estimated, it is possible to predict a stock's expected return on any given day based on market and industry factors, i.e. what the return would have been absent the firm-specific "event."[83] The difference between a stock's actual return and its expected return is called the stock's "abnormal return."  Few, if any, abnormal returns will be exactly zero. However, financial economists view such non-zero abnormal returns as immeasurably different from zero unless they cross a certain threshold.  Abnormal returns that cross the threshold – typically set so the researcher is 95% confident the return is not due to random chance – are deemed "statistically significant" while other abnormal returns are attributed to random noise.[84]   A statistically significant abnormal return in an event study is typically taken to measure the impact the tested event had on the firm's value.

59. Event studies commonly estimate the relationship between a firm's stock returns and the market and industry returns over a period that precedes the event being analyzed. In this case, however, estimating the model prior to the purported Class Period poses some statistical problems.  To evaluate whether an abnormal return is statistically significant, one must compare it with the standard deviation of all abnormal returns over the estimation period.  Standard deviation is a volatility measure, and owing to the

---

[82] A. Craig MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, v35(1), p. 13.  This article also contains many examples of event studies and citations to other academic articles discussing the method.

[83] In the language of financial economists, the expected return is actually the "conditional expected return," that is, the expected return conditional on the day's observed market and industry returns.

[84] A 95% confidence level corresponds to t-statistics exceeding 1.96 in absolute value, which is a typical benchmark for evaluating statistical significance in event studies.  See: Mark L. Mitchell and Jeffry M. Netter (1994), *The Business Lawyer*, 1994, v49, p. 564: "An often used convention is the five percent rule – values greater than or equal to 1.96 standard deviations from the mean value are considered significantly different from the typical value because there is only a five percent chance that a randomly selected value will be 1.96 or more standard deviations from the true mean."

market turmoil during the credit crisis, volatilities for the whole market and especially financial stocks like Moody's were broadly greater in 2007 and 2008 compared with earlier years, as seen in Exhibit 5.[85] This gradual increase in volatility means any model estimated prior to the proposed Class Period would set an artificially low threshold for assessing the statistical significance of abnormal returns during the proposed Class Period. I therefore chose to estimate my model for Moody's stock return using data from the start of the proposed Class Period through the last potential disclosure date from the Plaintiffs' filings, October 22, 2008.[86] Since my objective is to evaluate the stock-price reactions to the alleged misstatements or disclosures mentioned in Plaintiffs' filings, I exclude the dates when these alleged misstatements or disclosures are made so that they do not affect the estimation of my model.[87]

60. Similarly, due to the pronounced increase in volatility after the financial crisis started, if the model was simply estimated over the entire period, the standard deviation of Moody's stock returns -- to be used as a benchmark to judge statistical significance -- would be too high early in the purported Class Period because its estimation incorporates post-crisis data points corresponding to a time of high volatility, and too low later because much of the data used would be from a pre-crisis period of lower volatility. Therefore, I've sub-divided my estimation period into three parts based on major events that unfolded during the credit crisis and would likely impact market volatility.

61. My first sub-period runs from February 3, 2006 through August 8, 2007, the day before BNP Paribas suspended redemptions from three of its funds due to subprime problems, deemed by many as a key development when the system-wide credit crisis started to

---

[85] The VIX Index is a widely-followed measure of market volatility. It closed at 11.79 on February 3, 2005 (one year before the proposed Class Period) and 12.96 on February 3, 2006 (the first day of the proposed Class Period) but had grown over 60% to close at 20.80 on October 24, 2007, the last day of the proposed Class Period. The VIX spiked further, generally closing above 50 (and even as high as 80.06) during October 2008. See:
http://www.cboe.com/publish/ScheduledTask/MktData/datahouse/vixcurrent.csv

[86] Another way to avoid the problem of gradual changes of parameters is to perform "rolling" estimation where a separate model is estimated for each day based on the previous 252 non-event data points. I also estimated rolling models, and my inferences regarding statistical significance of allegation days are robust to this alternative specification.

[87] The practice of estimating within an examination period and excluding event days is common in cases like this one where there is a compelling statistical reason. See, for example: A. Craig. MacKinlay, (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, v35(1), pp. 13-39, at p. 20.

unfold.[88]   The second sub-period runs from August 9, 2007 through September 12, 2008, the Friday prior to Lehman Brothers filing for bankruptcy,[89] after which market volatility skyrocketed to an unprecedented level (see Exhibit 5).   And the third estimation sub-period runs from September 15, 2008 to October 22, 2008.[90]

62. I determined that the best modeling specification estimates Moody's stock return as a function of three factors: a) the return on the NYSE/Nasdaq Composite index (a market proxy), b) the return on the S&P 500 Financials Index (an index of the financial industry, of which Moody's is a small component), and c) the return on an equal-weighted index of the return of the publicly-traded parents of Fitch and Standard & Poors, Fimalac and McGraw-Hill respectively (a proxy for the credit rating industry).[91] I used the relationship established by this regression model to estimate Moody's expected returns and calculate abnormal returns on all alleged misstatement and disclosure dates.   As robustness checks, I have also used model specifications with (1) only the market index, (2) only the market index and the S&P 500 Financial index, or (3) the market index, the S&P 500 Financial Index, and the peer companies according to Moody's annual report. My inferences regarding statistical significance of stock returns on the event days discussed in this report and my conclusions regarding materiality and loss causation are robust to these alternative specifications.[92]

63. Event study results are essential in assessing both materiality and loss causation.   If an alleged misstatement is material to investors, I would expect to observe a statistically

[88] For example, see: John B. Taylor and John C. Williams (2009), "A Black Swan in the Money Market," *American Economic Journal: Macroeconomics*, 2009, v1(1), pp. 58-59;  Markus K. Brunnermeier (2009), "Deciphering the Liquidity and Credit Crunch 2007 – 2008," *Journal of Economic Perspectives*, v23(1), pp. 77-100.

[89] "Wall Street Down, Lehman Out," *The Wall Street Journal*, September 15, 2008.

[90] Unsurprisingly, statistical tests show that the volatility of the second and the third sub-periods is significantly higher than the volatility of the preceding sub-period(s).

[91] I determine the best model specification by looking at, among other factors, the goodness of fit of each specification, as measured by the adjusted R-squared of the regression models.  Note that Fimalac S.A. is a French company and its common stock trades on the Paris stock exchange in Euros. I use U.S. dollar stock returns for Fimalac in my analysis.  These stock returns are obtained by converting the share price of Fimalac from Euros to U.S. dollars. I have also conducted the event study excluding Fimalac from the peer group as a sensitivity test and my inferences regarding the results do not change.

[92] The list of the peer firms includes Dow Jones & Company, Inc., The McGraw-Hill Companies, Pearson PLC, Reuters Group PLC, Thomson Corporation and Wolters Kluwer. See Moody's Corporation 2007 Form 10-K, p. 15.

significant positive abnormal return on that date.[93]    As shown in Exhibit 6, I have examined all the days on which alleged misrepresentations occurred according to the Opinion and Order and Plaintiffs' Memorandum for Class Certification.[94]    On these days, Moody's allegedly misrepresented its independence in various annual reports, SEC filings, and its Code of Professional Conduct report, and misrepresented its rating methodology regarding loan originator standards in research reports.    However, during the entire purported Class Period, there is no day on which Plaintiffs allege Moody's made a misstatement that is associated with a statistically significant and positive abnormal return.[95]    Therefore, contrary to what Plaintiffs have claimed, the market did not deem the information released on those days to be material.

### III.B. Plaintiffs fail to present a basis to prove loss causation on a class-wide basis

64. In order to demonstrate that investors suffered losses due to the alleged misrepresentations, I have been told that Plaintiffs must show (a) that the stock's price declined when the disclosures that corrected or revealed previous alleged misrepresentations became public and (b) that the decline was caused by the revelation of defendant's alleged fraud, rather than other non-allegation-related factors such as changed economic circumstances, changed industry conditions, changed investor expectations, or new firm-specific non-litigation-related events.

65. Plaintiffs have failed to put forward scientific evidence showing either that Moody's stock price declined when the alleged curative disclosures were made, or that Moody's

---

[93] To the extent that there is more than one piece of news that enters the market in a given day, a daily event study cannot isolate the effect of each individual disclosure.  In the course of my analysis, I have also considered how potentially confounding news could alter the conclusions from a daily event study.

[94] These days include April 1, 2003, June 2, 2005, March 1, 2006, March 23, 2006, March 1, 2007, March 22, 2007, April 2, 2007, and October 3, 2007. (In Re: Moody's Corporation Securities Litigation, Opinion and Order, filed February 23, 2009, pp.7-11, 23-29; Memorandum for Class Certification, pp. 6-7).

[95] As shown in Exhibit 6, Plaintiffs also allege that two misrepresentations occurred before the start of the purported Class Period.  On April 1, 2003, Moody's allegedly misrepresented its rating methodology, and Moody's stock price increased by 1.73%. On the same day, the NYSE index increased 1.20%, and S&P 500 Financials index increased by 2.23%.  On the next trading day, Moody's stock return was 0.55%, the NYSE index moved by 2.25%, and the S&P 500 Financials index moved by 2.83%.  On June 2, 2005, Moody's published its Code of Professional Conduct and allegedly made misrepresentations regarding its independence.  On June 2, 2005, Moody's stock return was -0.30%, the NYSE index moved by 0.16%, and the S&P 500 Financials index moved by -0.18%.  On the next trading day, Moody's stock return was -0.32%, the NYSE index moved by -0.43%, and the S&P 500 Financials index moved by -0.69%.

stock price declines were caused by the revelation of alleged previous misrepresentations, rather than by other non-fraud-related factors, such as the unprecedented financial crisis that impacted the whole financial industry. The claims to that effect in the Complaint and in Plaintiffs' Memorandum for Class Certification do not amount to scientific evidence.

66. In this section, I will discuss in more detail why Plaintiffs have not demonstrated a way to link the decrease in Moody's stock price to revelation of the alleged fraud, rather than to the unprecedented financial crisis. I will first discuss the contributing factors to the crisis, and the absence of any basis provided by Plaintiffs to assert that the financial crisis itself was caused by Moody's deceiving the market. I will then discuss Plaintiffs' failure to show that Moody's stock price declined due to corrections of alleged misrepresentations on each alleged curative disclosure day. Finally, I will show that putative class members, including certain lead Plaintiffs, could have different incentives (and different ability) to claim loss causation based on different events.

### III.B.1. The financial crisis during 2007 and 2008

67. Many factors laid the foundation for the crisis. After the recession of 2001, the United States as well as the global economy experienced a period of steady growth.[96] The growth of global GDP was accompanied by an even faster growth in global financial assets. Increasing globalization also facilitated capital flows across countries, especially funds from emerging countries to industrial nations via investments in financial assets.[97] In the U.S., the Federal Reserve pursued a policy of cutting short-term interest rates through the end of 2003 in an effort to help the economy.[98] The combination of low interest rates and increased supply of funds resulted in rapid growth in credit.

---

[96] "World Economic Outlook: Spillovers and Cycles in the Global Economy," *International Monetary Fund*, April 2007, p. 211.

[97] "Mapping Global Capital Markets: Fifth Annual Report," *McKinsey & Company*, October 2008, pp. 16-24.

[98] "Selected Interest Rates," Federal Reserve Statistical Release, http://www.federalreserve.gov/releases/h15/data.htm.

68. During the same time, a government desire to increase home ownership coupled with the easy availability of housing loans helped home ownership grow rapidly.[99] Section II.A.2 discusses that there was tremendous growth in subprime mortgage securitizations (as well as in other non-prime securitizations such as Alt-A securitizations). The growth in non-prime originations was viewed favorably at the time, as it coincided with a strong push by the federal government to increase housing "affordability" for lower-income families.[100]

69. There was much financial innovation to create mortgage products that would make it easier for families that did not qualify for prime mortgages to obtain mortgages they could afford. One example of such innovations was the introduction of option-ARMs. With an option-ARM mortgage, the mortgage holder had flexibility to make a lower mortgage payment. However, when she chooses to do so the principal amount of the mortgage is increased, reducing equity and increasing risk.[101]

70. It is important to note that the spectacular growth of house prices followed by a crash did not take place everywhere in the United States. Vast regions were relatively unaffected by house price increases.  Further, a number of foreign countries experienced so-called housing bubbles.[102]  These patterns in housing appreciation show that it is implausible to blame securitization or the credit rating agencies for housing appreciation.  Securitization was available in regions of the U.S. where house prices increased little, and often its availability was extremely limited in some of the foreign countries with sharp increases in house prices. However, a common factor among

---

[99] U.S. Census Bureau, US Department of Commerce, "Homeownership Rates for the US and Regions:  1965 to Present," http://www.census.gov/hhes/www/housing/hvs/historic/files/histtab14.xls

[100]  Laurie Goodman, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*, pp. 299-301, 310; John Taylor (2009), "Getting Off Track: How Government Actions and Interventions Caused, Prolonged, and Worsened the Financial Crisis," *Hoover Institution Press*, 1st ed., p. 11.

[101]  Laurie Goodman, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*, pp. 16, 299-301, 310.

[102] R. Glenn Hubbard, and Christopher J. Mayer (2009) "The Mortgage Market Meltdown and House Prices," *The B.E. Journal of Economic Analysis & Policy*: v9(3), Article 8, pp. 1-7.

countries that experienced high housing appreciation is monetary policies that led to low interest rates.[103]

71. As long as house prices were increasing, the risks associated with subprime mortgages were low. However, as shown in Exhibit 7, housing appreciation slowed down in later 2006, and then house prices started to fall.  When house price appreciation slowed and turned negative, mortgages that were originated in 2006 and 2007 experienced an unprecedented default rate that surprised the market.[104]  As discussed earlier in this report, the unexpectedly high early payment default rate of recent-vintage loans and originator-specific performance variation were flagged by Moody's as performance data came in.

72. Though market participants came to realize the looming problems with the recent vintage subprime mortgages in late 2006 and early 2007, until June 2007 it still seemed to many that the problem was contained, and it appeared highly unlikely that subprime losses could cause a credit seizure in the whole financial market.  In the first half of 2007, many market participants and regulators shared the view that "the severe contraction in the subprime mortgage market will not be so great as to threaten the expansion."[105]  Credit spreads, a market measure for the compensation premium investors demand to bear the risk of bonds with default risk, reached the lowest level in recent years in June 2007 (as shown in Exhibit 8, which tracks high yield bond spread). Even in July 2007, Federal Reserve officials, including Chairman Ben Bernanke, commented that the broader economic impact of the subprime problems was expected

---

[103]  John Taylor (2009), "The Financial Crisis and the Policy Responses: An Empirical Analysis of What Went Wrong," NBER Working Paper 14631; John Taylor (2009), "Getting Off Track: How Government Actions and Interventions Caused, Prolonged, and Worsened the Financial Crisis," *Hoover Institution Press*, 1st Edition, pp. 7-10; Rudiger Ahrend, Boris Cournede, and Robert Price (2008), "Monetary Policy, Market Excesses and Financial turmoil," OECD Economics Working Paper No. 597.

[104]  "The rapidity of the decline in the subprime mortgage market has likely taken most market participants and observers by surprise."  ("A Simple Guide to Subprime Mortgages, CDO, and Securitization," *Citi*, April 13, 2007).  See also: Laurie Goodman, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*, pp. 301-308.

[105]  "JP Morgan Q&A: A Fundamental View of Subprime Fallout," *JP Morgan*, March 19, 2007. See: "Subprime mortgage market woes seen well contained," *Reuters News*, April 11, 2007; "Bernanke Believes Housing Mess Contained," *Forbes*, May 17, 2007.  Also: "Morgan Stanley's Fixed Income team, while cautious on the outlook for credit, believes that the credit market broadly speaking is currently experiencing an orderly re-pricing of risk and an all-out liquidity crunch appears unlikely at this point."  ("Moody's Sub-prime Issues Manageable; Buying Opportunity," *Morgan Stanley*, June 28, 2007).

to be limited, and the credit problems from the subprime crisis "were not leading to systemic problems in financial markets."[106]

73. However, the market for subprime-backed securities worsened sharply as some hedge funds specializing in subprime shut down and as evidence of worsening creditworthiness of the underlying mortgages increased. These developments led to concerns about mark-to-market losses and "fire sales," which put further pressure on prices and led to growing illiquidity, so that by August 2007 credit spreads were sharply up for subprime securities, while one bank, BNP Paribas, concluded that it could not put a value on securities held by some funds.[107] As investors lost confidence, they tried to exit their investments in such instruments, but found few buyers.

74. The impending liquidity squeeze in the asset-backed commercial paper market and the disruption in interbank money markets in August 2007 (see Exhibits 9 and 10) signaled the advent of a systemic crisis and led to decreases in the value of Aaa mortgage-backed securities (Exhibit 11), decreases that had seemed extremely unlikely *ex ante*, and that had much less to do with changes in the creditworthiness than with the growing lack of liquidity and changes in risk premiums.[108] These effects are important during a credit crisis, but they are not incorporated into ratings, as I noted above in paragraph 24.

75. The stock market crash of 1987 destroyed more financial wealth than the subprime problems did in 2007. Why was it, then, that the crisis that started in 2007 was considered the worst financial crisis and the worst recession since the Great Depression of the 1930s? The consensus of economists on this issue is straightforward: the stock market crash of 1987 did not affect the capitalization of banks; in contrast, the collapse

---

[106] "STOCKS NEWS US-Housing not derailing growth outlk-Fed's Plosser," *Reuters News*, July 11, 2007; "Fed's Bernanke: Sees Economy Strengthening Into '08," *Dow Jones Capital Markets Report*, July 18, 2007; "Fed's Warsh says no systematic risk from subprime," *Reuters News*, July 11, 2007.

[107] Markus K. Brunnermeier (2009), "Deciphering the Liquidity and Credit Crunch 2007-2008," *Journal of Economic Perspectives*, v23(1), pp. 82-87.

[108] Indeed, in April 2008, the Bank of England published an analysis of the value of subprime asset-backed securities which showed that the main driver of lost value in tranches rated Aaa at issuance was not deterioration of creditworthiness, but rather other factors that economists typically would classify as liquidity and risk premium effects. ("Financial Stability Report," *Bank of England*, April 2008, Issue 23, pp. 17-25).

of the credit boom affected the balance sheets of banks and their capitalization.[109] Banks had been moving from a traditional banking model to an "originate and distribute" model in which they fund their business by securitizing the loans they have generated.[110] During this crisis, the securities held by banks had lost value; as banks absorbed losses from their securities and their loans became impaired, their equity fell. Banks are subject to regulatory capital requirement, and with less equity, banks were forced to raise supplemental equity and to cut back on issuing new loans.[111]

76. Because of the losses incurred by banks and the severe contraction of the securitization market, financing became hard to obtain, which worsened the crisis as it led to a slowdown of economic activity and prevented borrowers from taking advantage of the decline in interest rates. The recession that followed in 2008 naturally decreased the creditworthiness of many borrowers, compounding the problems in the credit markets and further damaging banks' balance sheets.

77. The bank capitalization problems turned a manageable housing recession into a housing crisis, which worsened the recession, worsened the default rates on mortgages, and in turn worsened bank balance sheets further. The vicious cycle eventually led to an unprecedented series of financial institution failures: the takeover of Bear Stearns on March 16, 2008, the run on IndyMac Bank in July 2008, Fannie Mae and Freddie Mac's placement into conservatorship on September 7, 2008, the takeover of Merrill Lynch on September 14, 2008, the bankruptcy of Lehman Brothers on September 15, 2008, the bailout of AIG on September 16, 2008, and the failure of Washington Mutual on September 25, 2008.[112]

---

[109] See: Markus K. Brunnermeier (2009), "Deciphering the Liquidity and Credit Crunch 2007-2008," *Journal of Economic Perspectives,* v23(1), pp. 77–100.

[110] "Global Financial Stability Report: Containing Systematic Risks and Restoring Financial Soundness," *International Monetary Fund,* April 2008, pp. 31-32, 74-77, 91.

[111] *Ibid.*, p. 34.

[112] See, for example: "JPMorgan Acts to Buy Ailing Bear Stearns at Huge Discount," *The New York Times,* March 16, 2008; "Lax Lending Standards Led to IndyMac's Downfall," *The New York Times,* July 29, 2008; "Treasury to Outline Fan-Fred Plan," *The Wall Street Journal,* September 7, 2008; "Wall Street Down, Lehman Out," *The Wall Street Journal,* September 15, 2008; "Fed's $85 Billion Loan Rescues Insurer," *The New York Times,* September 17, 2008; "Government Seizes WaMu and Sells Some Assets," *The New York Times,* September 25, 2008.

78. In summary, the financial crisis of 2007-2008 flowed from many factors that were outside of Moody's control.  Plaintiffs' accusation that the crisis was a result of Moody's alleged misstatements about independence or methodology (or even Moody's allegedly flawed ratings themselves) is highly implausible and unsubstantiated.

### III.B.2. Plaintiffs have not shown that the crisis was caused by Moody's structured finance rating activity

79. Plaintiffs assert that the "[d]estruction of the [c]redibility of [s]tructured [f]inance [c]redit [r]atings [r]esulted in [d]emolishing [l]arge [p]arts of the [s]tructured [f]inance [m]arket and with it, [r]ating and [r]evenue [o]pportunities."[113]  Plaintiffs have not demonstrated that the developments in the structured finance market during the financial crisis were caused by Moody's allegedly misstated rating practices, and Plaintiffs' assertion to that effect is contradicted by various findings discussed below.

80. As Section II demonstrated, the key risks and important facets of the structured finance marketplace and the rating methodological issues that broadly underpin the Plaintiffs' claims in this matter were known by market participants before -- and indeed throughout -- the proposed Class Period.  Even if one does not believe that Moody's adequately managed potential conflicts, modeling methodologies employed in the ratings process were known, and potential weaknesses were openly debated by academics and practitioners alike, providing an additional safeguard against potential bias.  Sophisticated investors knew that ratings were but one of many factors they should consider when evaluating a security, and if they were skeptical of an assigned rating they could use the published models and their own models to evaluate it.

81. The models of market participants and academics had important common elements. For example, the foundation for the pricing and risk models of credit derivatives was a technical tool based on the normal distribution (the Gaussian copula). This tool was

---

[113] Complaint, ¶¶ 373-392.

used by financial institutions and among institutional investors. It forms the theoretical basis for the structured finance rating models as they existed during the Class Period.[114]

82. Rating agencies were not somehow unique or distinct in the way they thought about the risks of structured finance. Traders and investors used similar approaches. One recent published study examines why bank analysts collectively failed to anticipate the subprime crisis: "[A]nalysts [of major banks] used fairly sophisticated tools to evaluate these mortgages but were hampered by the absence of episodes of falling prices in their data…[M]any analysts anticipated the possibility of a crises in a qualitative way…but never fleshed out the quantitative implications. Finally, analysts were remarkably optimistic about HPA."[115]

83. In addition to analysts at banks, there are many highly sophisticated investors in the securities markets. These investors had access to mountains of data and were familiar with the credit rating methodologies.[116]   They could make a killing by shorting securities that were overpriced due to any rating bias. Yet, the existing data on the prices of Aaa tranches of home equity loan securitizations for 2006, as depicted in Exhibit 11, shows that the market did not discount these tranches until July 2007.  The fact that sophisticated traders did not push down the price of these tranches in 2006 implies that their models did not suggest a crisis was on the horizon, which casts doubt on Plaintiffs' assertion that there was a systematic, purposeful bias in the ratings of these tranches.

84. Further, given that the characteristics of the structured finance market were transparent, if -- as Plaintiffs suggest -- Moody's was over-rating structured finance issues due to

---

[114] Jian Hu (2007), "Assessing the Credit Risk of CDOs Backed by Structured Finance Securities: Rating Analysts' Challenges and Solutions," Moody's Investors Service Working Paper.  However, this technical tool was subject to press scrutiny. See, for example, "Slices of Risk: How a Formula Ignited Market That Burned Some Big Investors," *The Wall Street Journal*, September 12, 2005. "Recipe for Disaster:  The Formula That Killed Wall Street," *Wired Magazine*, February 23, 2009.

[115] Gerardi, Kristopher, Andreas Lehnert, Shane Sherlund, and Paul Willen (2008), "Making Sense of the Subprime Crisis," *Brookings Papers on Economics Activity*, Fall, pp. 127-128, 141-142.

[116] See, for example: *ibid.*, p. 130; Manuel Adelino (2009), "Do Investors Rely Only on Ratings?  The Case of Mortgage-Backed Securities," MIT Working Paper, presents empirical evidence that RMBS pricing at issuance is based on more than just the assigned rating, which suggests sophisticated investors differentiated between equivalently-rated deals and were not blindly depending on the CRAs: "The results show that investors did not rely exclusively on ratings when pricing the deals at origination. In fact, yield spreads have predictive power for both the probability of downgrade and of default after taking into account all the information contained in the ratings."

conflicts of interest, market participants should have been aware of such a potential bias all along.  At the very least, issuers could recognize the bias.  After all, issuers knew as much, if not more, about the underlying collateral as Moody's did.  If the ratings were biased and the market mispriced the securities, then it would have made no sense for the issuers to hold them because their yield would have been too low to reflect the risk that issuers knew was present.  However, it is well-known that the issuers were holding large amounts of home-equity loan securitizations, and ultimately suffered large losses, which undermines Plaintiffs' hypothesis.[117]

85.   The Global Financial Stability Report published by the International Monetary Fund reports that as of March 2008, banks globally incurred $193 billion of subprime related losses, and were expected to incur $95 billion more.  Securitized debt accounts for the bulk of the losses.[118]  Such losses were not only incurred by banks, but shared by hedge funds, financial guaranty insurers and other financial companies alike.[119]   Notably, as shown in Exhibit 12, major structured finance issuers, managers, and book runners also suffered large, widely-publicized losses on subprime and Alt-A RMBS, CDOs, and related structured products held on their own balance sheets in 2007 and 2008.

86.   The BIS sums up what is discussed in this section nicely, noting in recapping post-crisis interviews it conducted that market participants were "generally reluctant to blame the CRAs for not foreseeing the wider implications of the subprime crisis, often noting that the CRA's recent shortcomings in risk evaluation were widely shared among market participants."[120]

### III.B.3.  Plaintiffs have not shown that the alleged misrepresentations caused Moody's ratings actions during the crisis, or any related stock price drop

---

[117] Gary Gorton (2008), "The Panic of 2007," NBER Working Paper, p. 70; "Global Financial Stability Report: Containing Systemic Risks and Restoring Financial Soundness," *International Monetary Fund*, April 2008, pp. 12-13, 52, 78.

[118] "Global Financial Stability Report: Containing Systemic Risks and Restoring Financial Soundness," *International Monetary Fund*, April 2008, pp. 50-52. Also note that Bloomberg reported $332 billion of write-downs "stem[ming] from the collapse of the U.S. subprime- mortgage market" for banks and securities firms globally from the beginning of 2007 to May 2008. ("Subprime Losses Top $379 Billion on Balance-Sheet Marks: Table," *Bloomberg*, May 19, 2008).

[119] "Global Financial Stability Report: Containing Systemic Risks and Restoring Financial Soundness," *International Monetary Fund*, April 2008, pp. 12, 78.

[120] "Ratings in Structured Finance: What Went Wrong and What Can be Done to Address the Shortcomings?," *Bank for International Settlements, Committee on the Global Financial System*, July 2008, p. 8.

87. Had Moody's been systematically inflating ratings because the structured finance market was overly prone to potential conflicts of interest as Plaintiffs allege, data on ratings performance should also reveal such inflation to market participants, arguably even before the purported Class Period. However, it does not appear from the evidence on the historical performance of structured finance ratings that they performed systematically more poorly than the corporate finance ratings.[121]

88. In a study of rating transitions from 1984 to 2008, Moody's reports that 97.79% of structured finance Aaa-rated issues still had that rating twelve months later in contrast to 92.76% of the Aaa-rated corporate debt issues.[122] An independent study published in 2004 concludes that the probability of default after five years for an Aaa-rated asset-backed securities ("ABS"), commercial mortgage backed securities ("CMBS"), or RMBS issue was 0.01% or less, in contrast to 0.17% for an identically-rated corporate bond.[123] In a Moody's study published in 2005, it was reported that the cumulative loss rate for initially Aaa-rated structured finance securities was 0.04% after 5 years during the period 1993-2004, and the cumulative loss rate was 0.00% for home-equity loan deals, including subprime securities.[124] Strikingly, at the time, some researchers criticized the agencies for being too conservative in their ratings of structured finance.[125]

---

[121] The traditional approach to evaluating the performance of credit ratings is to consider rating transitions, i.e., changes in ratings, across long periods of time and across different sectors.

[122] "Structured Finance Rating Transitions: 1983-2008," *Moody's Investors Service*, March 2009.

[123] Douglas J. Lucas, Laurie S. Goodman, and Frank J. Fabozzi (2004), "Default Rates on Structured Finance Securities," *Journal of Fixed Income*, pp. 44-53.

[124] "Default & Loss Rates of Structured Finance Securities: 1993-2004," *Moody's Investors Service*, July 2005, pp. 38-39. Another striking piece of evidence is that from 1984 to 2004 on average only 0.03% of Aaa-rated structured finance securities reached an extremely distressed rating of Caa or lower twelve months later. ("Structured Finance Rating Transitions: 1983-2005," *Moody's Investors Service*, February 2006, p. 8).

[125] Douglas J. Lucas, Laurie S. Goodman, and Frank J. Fabozzi (2004), "Default Rates on Structured Finance Securities," *The Journal of Fixed Income*, pp. 44-53.
It was always clear, however, that ratings volatility for corporate bonds and structured finance transactions was different. For instance, for the period 1984-2008, the average downgrade for a structured finance security was 6.99 notches; it was 1.78 notches for a corporate debt issue. Nonetheless, this does not indicate that the initial structured finance rating was of poor quality, because a rating is not meant to say anything about the extent of a potential downgrade. See: "Structured Finance Rating Transitions: 1983 – 2009," *Moody's Investors Service*, March 2009, p. 12. This was also noted in studies before the purported Class Period. See, for example: "Structured Finance Rating Transitions: 1983 – 2005," *Moody's Investors Service*, February 2006, p.2.

89. In 2007, Moody's downgraded 8,725 structured finance issues and the average downgrade was almost twice the size of the average downgrade in 2006.[126] Plaintiffs attribute the unusual waves of downgrades to Moody's alleged misrepresentations regarding its independence.[127]

90. However, the unusually high rate of downgrades in 2007 took place mostly in one segment of the structured finance universe, namely structured finance deals that had subprime loans as collateral. U.S. ABS (excluding home equity loans) and CMBS, for example, had a much lower downgrade rate than historical average.[128] In contrast, home equity loan deals (including subprime) experienced a downgrade rate of 18.1%, which was six times the average annual rate of 3.0% from 1998 to 2007,[129] and accounted for 61.2% of the total downgrades in 2007 although these securities represented only 25.3% of total rated structured finance securities outstanding as of January 1, 2007. In addition, almost 80% of the home equity loan securities downgrades in 2007 were for securities issued in 2006 and 2007.[130]

91. The fact that only a very specific sector of the structured finance market was the root of the recent crisis suggests that *endemic* conflicts of interest did not plague Moody's structured finance ratings systematically, as Plaintiffs suggest. The historic rating performance record for this sector and for structured finance in general had been good prior to the crisis, and it is hardly unusual for ratings downgrades to be clustered in a

---

[126] "Structured Finance Rating Transitions: 1983-2007," *Moody's Investors Service*, February 2008, p. 5-6. Despite the unusual downgrades, the downgrade rate that year was higher for corporate debt than it was for structured finance: 8.72% versus 7.40% (*Ibid.*, p. 10).

[127] Complaint, ¶¶ 248-280.

[128] According to a Moody's study, U.S. ABS securitizations excluding home equity loans (home equity loans include subprime) had a downgrade rate of only 0.4% in 2007, much lower than the average annual downgrade rate of 4.8% from 1998 to 2007. Notably, 0.0% of credit card and auto loan securitizations, and only 0.1% of student loan securitizations, were downgraded. Similarly, U.S. CMBS had a downgrade rate of 0.8% in 2007, lower than the historical average of 2.6%; U.S. CBO, CLO, and synthetic CDOs had downgrade rates from 0.2% to 2.7%, all lower than the historical average. In fact, for U.S. ABS securitizations other than home equity loans, CMBS, CBOs, and CLOs, the upgrade rate *exceeded* the downgrade rate in 2007. ("Structured Finance Ratings Transitions: 1983-2007," *Moody's Investors Service*, February 2008).

[129] *Ibid.*, pp.2, 4-5, 26. Structured finance CDOs experienced a downgrade rate of 20.1% because of the problems with subprime and Alt-A loans originated in 2006 and 2007.

[130] Similarly, 90% of US CDO downgrades in 2007 occurred among structured finance CDOs issued in 2006 and 2007 that had the most significant exposures to the poorly performing 2006 and 2007 subprime and Alt-A vintages. (*Ibid.*, p. 4-5, 15-16, 25-26).

sector when market conditions change.[131]  The downgrades resulting from the subprime crisis were consistent with other historic examples of clustering when a common shock affects multiple firms or structured finance deals, and therefore are not evidence that the initial ratings for subprime securities were systematically and purposefully biased.

92. Additionally, Plaintiffs fail to connect the ratings downgrades to declines in Moody's stock price.  If Plaintiffs' claims were true, one would expect Moody's rating actions and announcements that allegedly revealed the fraudulently inflated ratings and resulted in "demolishing" the structured finance market to be associated with significant stock price declines.  However, Plaintiffs fail to show that major downgrade announcements in 2007 and 2008 were associated with significant stock-price declines, and in my examination I have not found evidence to support the claimed connection.[132]

### III.B.4. Plaintiffs fail to demonstrate that the decline in Moody's stock price over the Class Period was due to alleged misrepresentations

93. Plaintiffs claim that "[a]s Moody's misconduct and misrepresentations slowly came to light, occasioning severe regulatory scrutiny and sanctions, Moody's reputation and Moody's structured finance rating business collapsed, directly causing Moody's share price to collapse."[133]  Implausibly, Plaintiffs attribute none of the decline in Moody's stock price and business performance, or the structured finance market's contraction, to the unprecedented and unexpected financial crisis.

---

[131] It has been always clear that a key lesson from the NBER study applies to both corporate and structured finance ratings, namely that the credit quality of whole sectors can deteriorate so that bonds throughout that sector will experience clustered downgrades and defaults. Researchers at Moody's published a study that made this point regarding default rates very explicitly in 2001.  See: Richard Cantor and Eric Falkenstein (2001), "Testing for Rating Consistency in Annual Default Rates," *The Journal of Fixed Income*, v11(2), pp. 36-51

[132] The following ratings actions and announcements, for example, were not associated with statistically significant negative stock returns: "Announcement:  Moody's comments on today's rating actions on second-lien RMBS," *Moody's Investors Service*, June 15, 2007; "Moody's Downgrades Subprime First-Lien RMBS," *Moody's Investors Service Press Release*, July 10, 2007; "Moody's Puts 184 CDO Tranches on Review for Possible Downgrade," *Moody's Investors Service Press Release*, July 11, 2007; "Moody's slashes ratings on 691 securities backed by 'piggyback' loans," *Associated Press Newswires*, August 16, 2007; "Rating Action:  Moody's downgrades ratings of 120 subprime RMBS tranches issued in 2005," *Moody's Investors Service*, August 22, 2007; "Rating Action:  Moody's Downgrades $33.4 billion of 2006 Subprime First-Lien RMBS and Affirms $280 billion Aaa's and Aa's," *Moody's Investors Service*, October 11, 2007; "UPDATE: Moody's Downgrades Or Gives Warning On $40B In CDOs," *Dow Jones News Service*, March 27, 2008.

[133] Memorandum for Class Certification, p. 9.

94. Instead, Plaintiffs claim that "[t]his latter collapse [of Moody's stock price] was specific to Moody's, whose share price trajectory followed its own path – demarcated by company-specific corrective disclosures – rather than set by the market or industry."[134]  Plaintiffs fail to acknowledge that the decline in the stock price was common to companies in the financial sector and even the whole market during the relevant period. As Exhibit 13 shows, the evolution of Moody's stock price over the proposed Class Period is similar to that of its principal peers McGraw-Hill and Fimalac, to that of a broad index of financial firms, and to that of the broader stock market as a whole.  Moody's stock held up well from the beginning of the purported Class Period until July 2007.[135]  From July 2007 through the last alleged disclosure day (October 22, 2008), the stock prices of the credit rating agencies, financial firms, and the broad market all suffered steep declines as a result of the financial crisis.  Lost market capitalization was not unique to Moody's. Specifically, Moody's stock price dropped 64.78% from July 2, 2007 to October 22, 2008.  In comparison, McGraw-Hill's stock price dropped 65.76%, Fimalac's stock price dropped 47.20%, the S&P 500 Financials index (which includes a broad list of banks, saving and loan associations, asset management firms, insurance companies, and other finance service companies) dropped 58.33%, and the NYSE index dropped 40.19% during the same time period.[136]

95. Second, Plaintiffs neglect the fact that Moody's business and stock performance was correlated with (and largely driven by) the growth of the credit markets.  This was true historically and during the purported Class Period.  Financial analysts view Moody's stock as "in effect, an investment in the long-term growth of the debt capital markets," and therefore "[n]ew issue dollar volume is a key driver of revenue and profitability growth for Moody's."[137]  Exhibit 14 shows that Moody's financial results by segment were highly correlated with issuance activity in the credit markets.  As a result,

---

[134] *Ibid.*, p. 10.

[135]  Moody's closing stock price was $63.89 as of February 3, 2006, and $62.04 as of July 2, 2007.

[136]  All these stock returns are adjusted for splits and dividends. The difference between Moody's stock price drop and that of the S&P 500 Financials index is not statistically significant.

[137] "We have found a strong relationship between Moody's ratings revenue growth and 'adjusted' new issue dollar volume growth (correlation of 0.75)." ("Ests. Raised: Q4 Strength Broad-Based," *Citi*, January 16, 2007).  Also see: "Not surprisingly, there is a fairly high correlation between rate of change in new issue bond volumes and growth in rating agency revenues … We calculate an R-squared of about 48% between these variables." ("MCO & MHP: Measuring downside risk amid credit market turmoil," *Goldman Sachs*, August 29, 2007).

securities analysts have always paid great attention to analyzing and projecting Moody's rating revenue from issuance activities in different sectors and geographical segments.[138]   For example, in the first half of 2007, analysts were aware of the recent-vintage subprime woes, but given that Moody's had only 7-8% revenue exposure to subprime related issues,[139] they were cautiously optimistic about Moody's business fundamentals.[140]

96.   When the subprime problems started to deepen and spill over to the general credit markets in July and August 2007, however, Moody's earnings prospect became uncertain (see Exhibit 15).   On July 2, 2007, a JP Morgan analyst stated that "we believe that recent events in the credit ecosystem have raised the risk that growth could slow more than anticipated in 2H…Whether the credit markets have reached an inflection point is an open question mark."[141]   Indeed, with the liquidity crisis unfolding in the third quarter of 2007, ratings revenue growth came to an abrupt halt -- as shown by Exhibit 14 – and Moody's stock price declined.[142]

97.   However, if as Plaintiffs allege, Moody's rating business declined because Moody's rating independence was compromised,[143] one would expect its business to be impacted

---

[138]   See, for example: "We continue to believe that MCO is a growth business due to secular growth drivers, though the exceptionally benign credit cycle has been quite extended." ("Moody's Corp.:  Management Meeting Highlights," *JP Morgan*, February 28, 2007). "Moody's debt rating business is highly diversified, both from a product and geographical standpoint, and we continue to expect solid revenue and EPS growth in '07." ("Moody's Corp.:  Upgrading Moody's To Buy 2 On Valuation," *UBS*, March 16, 2007).

[139]   "Moody's Corp. (MCO- $68.79 – Peer Perform):  Subprime Pain/Concern Hurting MCO Shares," *Bear Stearns*, February 22, 2007); "Moody's Corporation (MCO): Comments on Sub-Prime Weakness," *Citi*, February 22, 2007; "Moody's Corporation: Subprime exposures manageable, but…," *Merrill Lynch*, March 5, 2007.

[140]   "Moreover, the diversity of the revenue base should mitigate the impact from a slowdown in issuance in any one asset class (such as RMBS) and/or higher interest rates." ("Moody's:  Raising Estimates and Rating to Overweight," *Morgan Stanley*, June 6, 2007). "Our regression … predicts a higher increase in revenues after the strong May.  Strong growth in US Corp Fin more than offset slight US ABS decline." ("Moody's Corp (MCO):  May Flowers After April Showers," *Citi*, June 18, 2007). Also see: "Moody's Corp:  Highlights From Moody's Investor Day," *UBS*, June 6, 2007.

[141]   "Moody's Corp:  Downgrading to Neutral Due to Higher Risk Profile," *JP Morgan*, July 2, 2007. Similarly, on August 1, 2007, a Goldman Sachs analyst stated that "[w]e believe that the prospect of decelerating earnings growth and the looming uncertainty in the credit markets will pressure the shares and lead to significant near-term volatility." "Moody's Corp (MCO): Great long-term fundamentals, but too soon to own stock," *Goldman Sachs*, August 1, 2007.

[142]   From February 2004 through July 2007, Moody's P/E ratio, a useful metric to assess the earnings growth potential, was generally higher than that of the Russell Growth 1000 index (of which Moody's stock was a member during the purported Class Period).  Given that Moody's had been viewed by the market as a growth stock, it is not surprising that even a modest revision of its future earnings prospects could have impacted the value of the stock substantially. Richard Sloan and Douglas Skinner (2002), "Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio," *Review of Accounting Studies*, Volume 7, Numbers 2-3/June, pp. 289-312.

[143]   Complaint. ¶¶ 366-392.

across the board *at once*.  Exhibits 16 and 17, on the other hand, show that the revenue of Moody's various segments did not move in a synchronized fashion, but in correlation with how and when each sector was impacted by the crisis.  For example, while the U.S. RMBS rating revenue dropped 52% year-over-year in Q3 2007, the U.S. CMBS and ABS rating business held up relatively well or even grew over the same quarter in the prior year (Exhibit 17).[144]  Interestingly, international structured finance revenues grew by 10% year-over-year, including a 32% increase from RMBS, reportedly because the European market did not include as much subprime credit or experience a housing downturn to the same extent as the U.S.[145]

98. Third, Plaintiffs' view that the revelation of Moody's alleged misrepresentations caused a "collapse" of Moody's business franchise and stock value was not shared by securities analysts.  Had the decline in Moody's ratings business been primarily caused by damage to Moody's ratings integrity, such a decline would be permanent and would not rebound with economic recovery (and increasing bond issuance).  Financial analysts, however, viewed lost ratings business as largely cyclical and expressed confidence in Moody's franchise value and long-term prospects even after the purported Class Period.  On October 26, 2007, for instance, a Goldman Sachs analyst stated that "we believe the pressures facing these companies are cyclical in nature and don't represent a structural change in the economics of their business models."[146]  In October 2008, a William Blair analyst stated that "[w]e believe that Moody's competitive stature and franchise will be relatively unchanged from what has been true over the past 108 years… As such, we believe that Moody's will be re-engaged by debt issuers of all kinds once the crisis passes."[147]  Similarly, a Citi analyst stated "we expect Moody's to recover as the US economy climbs out of the recession, but more importantly, when the global financial system stabilizes. Moody's has reported strong

---

[144] "Q3 2007 Moody's Corporation Earnings Conference Call," *Fair Disclosure Wire*, October 24, 2007; the RMBS segment includes home equity loans and subprime securities.

[145] Another counterexample can be seen by the fact that Moody's revenue from rating financial institutions and public finance continued to grow during Q3 2007 and in subsequent quarters.  See: "Q3 2007 Moody's Corporation Earnings Conference Call," *Fair Disclosure Wire*, October 24, 2007; "Q4 2007 Moody's Corporation Earnings Conference Call," *Fair Disclosure Wire*, February 7, 2008.

[146] "Revisiting the rating agencies post 3Q results," *Goldman Sachs*, October 26, 2007.

[147] "Moody's Corporation: Cutting Estimates in Light of Credit Market Shutdown, but Maintain Outperform Rating," *William Blair & Company*, October 9, 2008.

revenue and EPS growth coming out [sic] previous economic downturns, and we don't expect this episode to be different."[148]

99. In sum, Plaintiffs' theory that Moody's alleged misrepresentations caused a unique decline in its stock price beginning in the fall of 2007 cannot be reconciled with the facts (1) that the market and the industry suffered similar declines during the same period; (2) that Moody's financial performance can be largely explained by the development of the general credit markets; and (3) that financial analysts view Moody's stock price decline as mostly cyclical.

### III.B.5. Plaintiffs fail to demonstrate investors suffered any loss due to alleged corrective disclosures

100.    Contrary to Plaintiffs' claim, Moody's stock price movement during the purported Class Period reflected industry and market developments.  In this section I will examine whether Plaintiffs have demonstrated that Moody's stock price moved in a statistically significant manner on specific days when alleged corrective disclosures occurred.

101.    For an alleged disclosure to be deemed the proximate cause of an investor's loss, a financial economist would expect to observe a statistically significant negative abnormal return on that date.  However, even when the negative abnormal stock return is statistically significant on a particular alleged curative disclosure day, my understanding is that the Plaintiffs have to show that the negative abnormal return was indeed caused by the revelation of previous alleged misrepresentations rather than other pertinent information in the market place.  The mere fact the stock price declined is not enough to prove that an investor's loss was caused by an alleged disclosure because the observed price decline may have been driven by market or industry factors, or other non-fraud-related firm-specific factors. As discussed previously, the presence of a negative but statistically insignificant firm-specific abnormal return is not sufficient evidence of loss causation because such a return cannot be distinguished from random noise.  Therefore, by failing to provide an event study or any scientific empirical

---

[148] "Q3 Rating Agency Preview/Sept New Issuance:  Won't Try to Call the Bottom, but Govt Actions Bring Relief," *Citi*, October 15, 2008.

evidence, Plaintiffs have failed to demonstrate that Moody's shareholders suffered any losses due to alleged corrective disclosures.

102.     I have examined the stock price movements, as well as the newspaper articles, analyst reports, and other public information surrounding the four corrective disclosures specifically mentioned in the Opinion and Order dismissing some of Plaintiffs' claims,[149] as well as any additional alleged disclosure days specifically referenced in Plaintiffs' Memorandum for Class Certification (see Exhibit 6).[150] Of the four alleged disclosure days specifically mentioned by the Opinion and Order, only May 21, 2008 is associated with a statistically significant negative stock price movement, while the October 12-17, 2007, April 11, 2008, and October 22, 2008 alleged disclosures are not.[151]

103.     The following sub-sections individually address the few Plaintiff-alleged disclosure days (August 20, 2007, October 24-25, 2007, and May 21, 2008) with statistically significant abnormal returns, and show that there is no scientific basis to attribute the abnormal returns to Plaintiffs' allegations.

### III.B.5.a. August 20, 2007

104.     On August 20, 2007, Senator Richard Shelby, the ranking member of the U.S. Senate Banking, Housing, and Urban Affairs Committee, made a remark that rating agencies "have played a central role in the subprime debacle," and hence they must "shoulder some responsibility."[152] This news is cited by Plaintiffs as a corrective

---

[149] In Re: Moody's Corporation Securities Litigation, Opinion and Order, Filed February 23, 2009, pp. 35-37. These four disclosures include an article from *Financial Times* alleging Moody's changed its methodology to mask a rating error on May 21, 2008, Moody's CEO testifying at a Congressional hearing on October 22, 2008, an article from *The Wall Street Journal* alleging that Moody's adjusted a bond rating in a case of ratings shopping on April 11, 2008, and a report titled "October 11, 2007 Rating Actions Related to 2006 Subprime First-Lien RMBS" that was supposedly discussed in a conference call on October 12, 2007 and sent to investors on October 17, 2007.

[150] Memorandum for Class Certification, pp. 9-10.

[151] In Re: Moody's Corporation Securities Litigation, Opinion and Order, Filed February 23, 2009, pp. 35-36.

[152] Complaint ¶400; "US senator sees sub-prime crisis getting worse before better," *Agence France Presse*, August 20, 2007, 6:33 AM; "U.S. legislators will quiz rating agencies - Senator," *Reuters News*, August 20, 2007, 9:06 AM.

disclosure that "regulators were calling for investigation of Moody's structured finance ratings operations."[153]  On the same day, Moody's stock price dropped 8.18%.

105.    First, it was not new news that Moody's was facing Congressional scrutiny related to the subprime crisis.[154]  On June 29 an article noted, Congressman Barney Frank, Chairman of the House Financial Service Committee, had announced a potential hearing on rating agencies.[155]  On August 1, Senator Christopher Dodd, Chairman of the Senate Banking Committee, stated that the Senate Banking Committee would introduce legislation to address rating agencies' conflicts of interest issues, and on August 17, Dodd again "expressed 'great concern' about how credit rating agencies assessed and rated packages of mortgage related assets" during a conference call with reporters and promised to conduct a "thorough examination" of credit rating agencies.[156]  Therefore, the remark made by Senator Shelby did not represent any new information on the Congressional scrutiny Moody's had been facing.  In an efficient market, stock prices should react only to new material information.[157]  Plaintiffs fail to show why the stock price drop on August 20, 2007 was due to the alleged corrective disclosure, which contained little, if any, new information that was supposedly negative.[158]

106.    Second, not only did Senator Shelby's comment contain little new negative information, it seemed to contain some positive information.  Although he had publicly

---

[153] Memorandum for Class Certification, p. 10.

[154] For example, a Moody's official testified before the Subcommittee on Securities, Insurance and Investment of the Senate Banking Committee, at a hearing entitled "Subprime Mortgage Market Turmoil: Examining the Role of Securitization" on April 17, 2007. <http://banking.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_ID=a14998f7-0b7d-4deb-8e2b-ce11fa95d79f>

[155] Congressman Barney Frank stated that lawmakers might examine the role of credit rating agencies if there were more hedge fund meltdowns due to subprime losses. "US rating agencies again seen as scapegoat," *Reuters News*, June 29, 2007, 6:25 PM. Moody's abnormal stock return is not statistically significant on June 29, 2007 nor on either surrounding trading day.

[156] "Moody's, S&P May Need Better SEC Regulation, Senator Dodd Says ," *Bloomberg*, August 1, 2007; "Hike caps on mortgage holdings, says Dodd," *Investment News*, August 17, 2007, 1:56 PM; "Dodd Reiterates Call To Increase GSEs' Portfolio Limits," *Congress Daily*, August 17, 2007, 2:17 PM; "Senator urges examination of ratings agencies," *Reuters News*, August 17, 2007, 4:48 PM.  Moody's abnormal stock return is not statistically significant on August 1 or August 17, 2007.

[157] Richard A. Brealey and Stewart C. Myers (2003), "Principles of Corporate Finance," 7th Edition, *McGraw-Hill*, pp. 351-358.

[158] On that same day, "J.P. Morgan analyst downgrades McGraw-Hill to 'Neutral' on credit market turmoil," *Associated Press Newswires*, August 20, 2007, 7:13 AM.  The JP Morgan downgrade of McGraw Hill was "principally due to signs that the credit markets will see a meaningful decline in issuance activity. Given the current freeze in some credit markets, we would expect MHP's shares to tread water in the near term."  ("The McGraw-Hill Cos.: Downgrading to Neutral," *JP Morgan*, August 20, 2007).  I show in my work with Roger Loh that an analyst recommendation change on one stock can impact other firms in the same industry (Roger K. Loh and René M. Stulz, (2010) "When are Analyst Recommendation Changes Influential?," Ohio State University Working Paper).

been a "persistent critic" of rating agencies,[159] Senator Shelby urged "legislative restraint" in his speech, and his comment was published with the headline "Lawmakers Must Not Over-Regulate Credit Agencies – US Senator" by *Dow Jones International News*. In the article, Senator Shelby was quoted as saying "[t]here will be calls for more regulation… My first thought is let's not over-regulate the market, the market will regulate itself."[160] Compared with Senator Dodd's earlier promise to introduce new legislation, Senator Shelby's comment would tend to alleviate Moody's regulatory risk to some extent.

107.    Third, the intra-day price movement on August 20, 2007 is inconsistent with Plaintiffs' claim that the alleged statement caused Moody's stock price to drop (see Exhibit 18). In an efficient market, academic studies find that it usually takes minutes or several trades for stock prices to reflect new material information, especially for overnight news.[161] Although Senator Shelby's remark was made overnight, Moody's stock price opened at approximately $49.30 on August 20, compared to the closing price of $49.98 on August 17, the previous trading day, and it declined throughout the remaining trading hours. Plaintiffs fail to explain why Moody's stock price did not respond immediately to the alleged disclosure, as it should have in a supposedly efficient market had the alleged disclosure contained material information.

108.    Finally, Plaintiffs simply fail to show how Senator Shelby's remark relates to Plaintiffs' allegations. In particular, he could have made the same comments in the

---

[159] "Democrats Turning To Credit Rating Agencies' Role In Subprime Loan Crisis," *Congress Daily*, April 18, 2007. Also see, for example: Senator Shelby's remarks in "Dodd: Fed Failed In Supervisory Role In Subprime Loans," *Congress Daily*, March 22, 2007; "Sen Christopher J. Dodd Holds a Hearing on the Mortgage Market—Committee Hearing," *CQ Transcriptions*, March 22, 2007. For Senator Shelby's comments on rating agencies before the financial crisis, see, for example: "Examining the Role of Credit Rating Agencies in the Capital Markets," Hearing before the Committee on Banking, Housing, and Urban Affairs, February 8, 2005; "Credit ratings groups come under attack," *Financial Times*, March 8, 2006; "Moving the Market: Credit-Rating Industry May Get More Oversight --- Congress Pushes Legislation To Encourage Competition; SEC Role Comes Under Fire," *The Wall Street Journal*, March 8, 2006; "Politics & Economics: Credit-Rating Oversight Measure Is Supported by a Senate Panel," *The Wall Street Journal*, August 3, 2006.

[160] "Lawmakers Must Not Over-Regulate Credit Agencies – US Senator," *Dow Jones International News*, August 20, 2007, 11:52 AM.

[161] See: Michael Barclay and Robert Litzenberger (1988), "Announcement Effects of New Equity Issues and the Use of Intraday Price Data," *Journal of Financial Economics*, v21, pp. 71-99; Jason T. Greene and Susan G. Watts (1996), " Price Discovery on the NYSE and the NASDAQ:  The Case of Overnight and Daytime News Releases," *Financial Management*, v25(1), pp. 19-42; Jeffrey A. Busse and T. Clifton Green (2002), "Market efficiency in real time," *Journal of Financial Economics*, v65, pp. 415–437; Raymond M. Brooks, Ajay Patel, and Tie Su (2003), "How the Equity Market Responds to Unanticipated Events," *Journal of Business*,  v76(1), pp. 109-133.

absence of the wrongdoing alleged by Plaintiffs.  Moreover, any potential regulatory scrutiny or legislative action can be costly to a company without any implication of fraud on the company's part.  For example, new regulations on rating agencies could imply higher compliance costs, greater uncertainty of the competitive environment, or even required changes to the business model.  The risk of these regulatory ramifications had been discussed by analysts extensively, even before the subprime crisis started.[162] I am not aware of any securities analyst who covered Moody's stock at that time commenting on Senator Shelby's remarks on August 20, 2007, let alone suggesting that it revealed any alleged wrongdoing by Moody's.  Therefore, even if Moody's stock price reacted negatively to Senator Shelby's remark, Plaintiffs have not demonstrated that investors suffered losses due to revelation of any alleged prior misrepresentation by Moody's on August 20, 2007.

### III.B.5.b. October 24-25, 2007

109.    On October 24, 2007, Moody's announced quarterly earnings for Q3 2007 and lowered its full year 2007 guidance due to a steep decline in revenue from its structured finance line of business.[163]  Plaintiffs allege that this announcement represents a disclosure by Moody's on "the collapse of its structured finance ratings business."[164] Moody's stock price dropped 3.06% on October 24, 2007, and 5.66% on October 25, 2007.  The Complaint cites the earnings release and the conference call on October 24,

---

[162] For example, see: "[T]here is some degree of risk, albeit small in our view, that the SEC could increase unfavorable legislation. Moody's could also face heightened competition from niche companies, particularly in international markets where local governments may provide support." ( "Moody's Corp: Expect Solid 4Q06; Growth Should Decelerate in 2007," *JP Morgan*, January 22, 2007).  "Although we view it as unlikely, the risk exists that a policymaking body somewhere in the world could meaningfully damage Moody's business model and/or market leadership position by legislative or regulatory action." ("4Q06 Preview--Raising Estimates Again on Strong Industry Comps," *FBR Research*, January 26, 2007).  "The regulatory compliance costs may place an asymmetrical burden on smaller agencies, but is unlikely to keep potential competitors from entering the space." ("Moody's Corporation:  Raised guidance largely in line with expectations," *Merrill Lynch*, June 6, 2007).  "[T]he worst case scenario from a regulatory standpoint would be a recommendation to alter the current pricing structure from one in which most rating agencies get paid by the issuers they rate. This would dramatically impact the profitability of the rating agencies." ("Moody's:  Sub-prime Issues Manageable; Buying Opportunity," *Morgan Stanley*, June 28, 2007). "Some investors are speculating that legislators and regulators will devise rules to reduce the market dominance of the two major credit rating agencies, as a result of the perception that the rating agencies misjudged the credit worthiness of a lot of these RMBS and CDOs…. While we see the potential for more political heat on the rating agencies, they have been in existence for a long time and survived reputation risks before." ("Moody's Corporation: Bull-bear analysis; Q2 preview," *Merrill Lynch*, July 12, 2007).

[163] "Moody's Profit Falls 13% as Credit Slump Slows Ratings Demand," *Bloomberg*, October 24, 2007, 7:09 AM; "Q3 2007 Moody's Corporation Earnings Conference Call," *Fair Disclosure Wire*, October 24, 2007, 11:30 AM; "Moody's Cut to 'Underweight' at JPMorgan," *Bloomberg*, October 25, 2007, 7:34 AM.

[164] Memorandum for Class Certification, p. 10.

2007 as the corrective disclosure.[165]   If Moody's stock traded in an efficient market, as claimed by Plaintiffs,[166] the stock price should react immediately to new material information, as discussed above. The earnings release was made before the start of trading on October 24, 2007, and the conference call concluded well before the end of the trading day.   Although there was ample time for the new information to be incorporated into the stock price on October 24, the abnormal return on October 24, 2007 is not statistically significant.

110.   The abnormal stock return on October 25, 2007 is negative and statistically significant.   However, Plaintiffs fail to show why the price movement on October 25, 2007 was in reaction to the purported disclosures on the previous day, rather than the incremental events and news that occurred afterwards.[167]

111.   More importantly, Plaintiffs do not demonstrate how the reported declining revenue or forecast reductions due to the disruption in the credit markets represents a curative disclosure of the alleged misrepresentations, or even "collapse of [Moody's] structured finance rating business."  As discussed in sections III.B.1. and III.B.4., there is no basis on which to assert that Moody's caused the financial crisis, or the credit market contraction that contributed to Moody's negative earnings news.   I have reviewed the public press and financial analyst commentary on October 24 and 25, 2007, and none of the commentary linked the negative earnings news to Moody's alleged compromise of independence, failure to adhere to the Code of Conduct, or conflicts of interest.   Instead, analysts viewed the diminishing rating revenue from several structured finance asset categories as the results of the credit crisis, and

---

[165] Complaint ¶377, 378, 400.

[166] Memorandum for Class Certification, pp. 18-21.

[167] JP Morgan downgraded Moody's stock and reduced 2008 EPS estimate on October 25 due to concerns over the credit market and the regulatory environment: "[w]e rate MCO Underweight as we see the shares facing continued near-term pressure owing to investor concerns about the subprime fallout and the adverse impact of less issuer friendly debt markets.  Credit markets have not reached an inflection point yet in our view…. Ratings agencies are currently facing heightened scrutiny as the credit markets have deteriorated.  Investor sentiment would improve should the current regulatory structure remain largely unchanged." ("Moody's Corp: Downgrading to Underweight; Lowering Ests," *JP Morgan*, October 25, 2007).  Also see, "Lowering estimates to reflect run rate trends," *Merrill Lynch*, October 25, 2007.  In addition, after market close on October 24, 2007: "BOE Says 'Intervention' May Be Required Over Credit Ratings," *Bloomberg*, October 24, 2007, 7:15 PM.

expressed confidence in Moody's long-run prospects.[168]   Therefore, Plaintiffs have failed to demonstrate that Moody's investors suffered losses on October 24-25, 2007 due to the alleged misrepresentations.

### III.B.5.c. May 21, 2008

112.    On May 21, 2008, a *Financial Times* article reported that Moody's had given incorrect Aaa ratings to billions of dollars of CPDO instruments due to a glitch in Moody's computer model, and "[t]he results showed that early CPDOs might lose… up to four ratings notches."  And although the senior staff reportedly knew in early 2007 about the error, rather than downgrade the instruments, they reportedly "looked at reducing assumptions about the future volatility of the credit markets" to help maintain the ratings.[169]  Plaintiffs cite the article as "vivid confirmation of how Moody's had altered its rating methodologies to make high ratings appear justified,"[170] and evidence that "Moody's catered to its structured finance clients by favorably adjusting rating models."[171]  The *Financial Times* article also triggered a series of events, including: Moody's launching an external investigation; Senator Schumer sending a letter to the SEC Chairman urging sanctions if Moody's is proved to have covered up the modeling error; and public statements by Connecticut Attorney General Blumenthal on an investigation of rating agencies.[172]  Moody's stock price dropped 15.92% on May 21, 2008, and 6.50% on May 22, 2008.

---

[168] "[W]e believe the pressures facing these companies are cyclical in nature and don't represent a structural change in the economics of their business models. Accordingly, we believe investors will be well rewarded in owning these shares when credit markets rebound." ("Revisiting the rating agencies post 3Q results," *Goldman Sachs*, October 26, 2007) "From a long-term perspective...we believe...concerns [of diminished revenues from rating structured products] run the risk of missing the bigger picture. There are ebbs and flows in issuance volumes by specific debt type and structure—always have been and always will be." ("Moody's Corporation:  Lowering Estimates but See Wednesday's Price Action as Potentially Significant; Maintain Outperform Rating," *William Blair & Company*, October 24, 2007). Also see: "Moody's Corporation:  Lowering estimates to reflect run rate trends," *Merrill Lynch*, October 25, 2007.

[169] Complaint, ¶363-365; "CPDOs expose ratings flaw at Moody's," *Financial Times*, May 20, 2008, 11:36 PM.

[170] Complaint, ¶400.

[171] Memorandum for Class Certification, p. 9.

[172] "UPDATE 5-Moody's launches inquiry after rating error report," *Reuters News,* May 21, 2008 3:56 AM; "MCO: Moody's: Hearing MCO downgraded to Underperform at Jefferies," *Briefing.com, Inc.,* May 21, 2008 1:57 PM; "Moody's (NYSE: MCO): Downgrading to Underperform: Report Alleges Potential Fraud in CPDO Ratings," *Jefferies*, May 21, 2008; "UPDATE: US Lawmaker Seeks SEC Probe Of Moody's Rating," *Dow Jones News Service,* May 21, 2008 5:47 PM; "Moody's Faces Connecticut Probe of Alleged 'Cover-Up' (Update1)," *Bloomberg,* May 21, 2008 7:02 PM.

113.    CPDOs are highly specialized products developed in 2006 to offer investors leveraged exposure to a corporate credit portfolio.[173]   Unlike other securities (e.g. RMBSs, CDOs) that are discussed previously and seem to be the focus of this case, CPDOs do not involve subprime mortgage related debt, and only account for a tiny fraction of structured finance issuance.  One would expect that the fees that could be expected from such a niche product were too small to be material to Moody's. Contrast the less than $1 billion of principal reportedly affected by Moody's CPDO error with over $2.5 *trillion* of total rated structured finance issuance in 2006 alone.[174]  Plaintiffs have not shown how the content of the *Financial Times* article about this niche product could serve as a "vivid confirmation" of the allegedly systematic rating problems for structured debt, let alone systematic rating biases due to potential conflicts of interest.

114.    Several analysts seemed to view the stock price drop as an overreaction. The Benchmark analyst stated that "[w]hile we're not diminishing the seriousness of the allegations, we believe concerns about the implications of the computer error may be overblown…. In our view, the computer errors applied to a relatively small amount of highly specialized securities and it was not as pervasive as the *Financial Times* article implied."  The William Blair analyst also commented that "[b]ased on what we know today, we view today's sell-off as an overreaction …While negative insinuations are clearly made, we so far fail to see how today's news has any lasting significance for Moody's."[175]

115.    Nonetheless, it is unsurprising that investors would react negatively to this article, as it raised some questions about the potential existence of large-scale model

---

[173] "Constant Proportion Debt Obligations (CPDOs) are leveraged credit investment strategies which appeared in… 2006 with the aim of generating high coupons while investing in investment grade credit. The asset side of the CPDO contains two positions: a money market account and leveraged credit exposure via index default swaps on indices of corporate names, typically the ITRAXX and DJ CDX."  See: Rama Cont and Cathrine Jessen (2009), "Constant Proportion Debt Obligations (CPDO): Modeling and Risk Analysis," Columbia University Working Paper.

[174] For total structured finance issuance figures, see: "Structured Finance Rating Transitions: 1983 – 2007," *Moody's Investors Service*, February 2008, p. 4.

[175] "Moody's (MCO): Impact of Computer Error Overblown.  Reiterate Buy Rating." *Benchmark*, May 22, 2008; "Moody's Corporation: We Would Be Active Buyers on Today's Press-Induced Weakness," *William Blair & Company*, May 21, 2008. Also: "Ratings Are Not a Guarantee of Value— We do not believe there is material legal liability here, unless fraud is uncovered. Interestingly, S&P had similar ratings on these securities, despite differing methodologies between the agencies."  ("Moody's Corp. (MCO): CPDO Ratings Glitches Likely a Tempest in a Teapot," *Citi*, May 21, 2008).

errors.[176]    The Lehman Brothers analyst stated that "[i]n our opinion, a risk on investors' minds is if there is a systematic problem at Moody's with errors being made on rating complicated debt instruments like CPDOs and the like.  Is it isolated to just this one product line in Europe? Or is it more widespread at Moody's?"[177]  Similarly, institutional investors such as one at Barclays Capital questioned, "[i]f it is true, does that mean other products haven't been rated correctly? … Will they be downgraded?  It could lead to turmoil."[178]

116.    The *Financial Times* article also caused heightened uncertainty regarding potential regulatory and litigation consequences.  For example, a Goldman Sachs analyst pointed out that "[t]he key question for investors is whether today's developments represent the 'smoking gun' that will trigger regulatory changes or litigation that could substantially alter the economic model of the ratings industry."[179]  "As a growing chorus of voices calls for more government oversight of these firms,…[a] report from the *Financial Times*…has added to the skepticism about the raters and will likely fuel calls for more regulation," commented another press article.[180]  Indeed, as shown in Exhibit 19, Moody's stock price substantially recovered when investors' concerns over regulatory changes were alleviated in the subsequent weeks.[181]  This price recovery happened even before the result of Moody's investigation was released on July 1, 2008.

117.    Contrary to what Plaintiffs allege, the external investigation found that Moody's personnel "did not make changes to the methodology for rating European CPDOs to

---

[176] "Small tweaks in the model can make a huge difference in a product that's this leveraged,' said Huston Loke, the global head of structured finance at Dominion Bond Rating Service in Toronto. 'They are complex, there's a significant amount of model risk, a presumption of market liquidity and leverage.'" ("Moody's Falls Most After Ratings Error Probe (Update2)," *Bloomberg*, May 21, 2008, 3:12 PM).

[177] "Moody's Corp.: Financial Times Article; Added Risk?" *Lehman Brothers*, May 21, 2008.

[178] "Moody's Falls Most Ever After Ratings Error Probe (Update2)," *Bloomberg*, May 21, 2008, 3:12 PM.

[179] "Allegations bring regulatory/legal risks to the fore," *Goldman Sachs*, May 22, 2008.  See also: "Moody's Corp. (MCO): Shares respond to allegations in FT article," *Goldman Sachs*, May 21, 2008.

[180] "CHANGING RATINGS: NYU Prof Urges Hands-Off Approach To Reform," *Dow Jones Capital Markets Report*, May 22, 2008.

[181] Moody's cumulative abnormal stock return over the period from May 21 through June 5, 2008 is not statistically significant.

mask any model error."[182] The investigation found no evidence that Moody's fraudulently inflated the structured finance ratings or concealed rating errors due to conflicts of interest. A Goldman Sachs analyst commented, "[o]ur sense is that the issue uncovered in the CPDO ratings was contained; we do not believe it points to widespread failings of the ratings process or cover-ups….The swift conclusion of this investigation and the relatively benign outcome should continue to ease investor concerns over litigation and regulatory risks to the ratings agencies." Similarly, the analyst from Citi stated "No 'cover-up' or changes were made to the methodology to 'mask' any model error, and it does not appear that any laws were broken….The model error impacted only 11 CPDO's with less than $1 billion of principal."[183]

118.    Therefore, Plaintiffs have not demonstrated that the stock price drop on May 21, 2008 reflected a revelation of alleged prior fraudulent misrepresentations, rather than investors' concerns about systematic model errors or regulatory risk, which could have existed regardless of any fraud.

### III.B.6. Putative class members could be situated differently with respect to loss causation

119.    Plaintiffs claim that loss causation is common to all class members and that lead Plaintiffs' claims are typical of other potential class members. However, in reviewing their filings it seems many alleged curative disclosures occurred well after the proposed Class Period, including April 11, 2008, May 21, 2008, and October 22, 2008. The inclusion of these dates undermines Plaintiffs' broad claims of commonality, as I will discuss below.

120.    Notwithstanding my opinion that there is no scientific evidence of loss causation with respect to any alleged disclosures, to illustrate my point, assume for the sake of argument that lead Plaintiffs have a strong incentive to argue loss causation based on,

---

[182] "Moody's Investors Service Announces Actions After Review of European CPDO Ratings Process," *Business Wire*, July 1, 2008. Moody's stock price dropped 1.48% on July 1, 2008, but the price movement is not statistically significant.

[183] "Moody's Corp. (MCO):  Swift conclusion to CPDO investigation," *Goldman Sachs*, July 1, 2008; "Moody's Corp (MCO): CPDO Review Completed – Headline Risk is Subsiding," *Citi*, July 1, 2008.

for example, the alleged April 11, 2008 disclosure. The aggressive pursuit of claims relating to April 11, 2008 would not benefit class members who had already sold all their Moody's stock before April 11, and thus suffered no economic damage resulting from that alleged disclosure. Since class members who sold all their Moody's shares prior to the alleged 2008 disclosures have no economic claim to damages based on those disclosures, obviously they have a strong incentive to forsake such claims (and avoid expending extra resources) and instead aggressively pursue claims related to earlier alleged disclosure dates.

121.    To put some concrete numbers behind this hypothetical situation, Exhibit 20 presents a table of quarterly institutional holdings after June 30, 2007. The exhibit demonstrates that there were indeed potential class members who were large holders of Moody's stock -- such as Marsico Capital Management and Atticus Capital -- and have no claim to alleged economic damages based on purported disclosures after March 31, 2008 as they had already liquidated their positions in Moody's stock by that date.

122.    Indeed, it also appears that Charles McCurley Jr. and Local 282 Pension Trust Fund, two of the three lead Plaintiffs, sold all their Moody's stock by early September 2007 and therefore would have suffered no economic loss from subsequent purported disclosures.[184]    Interestingly, another lead Plaintiff, Lewis Wetstein, held Moody's shares until August 2008.[185]    So even within the lead Plaintiff group there are stark differences in incentive to pursue claims based on different alleged disclosures. Therefore, Plaintiffs fail to demonstrate that the economic issues related to loss causation are common to all class members and that lead Plaintiffs' claims are typical of other potential class members.

---

[184] See: MCCURLEY 0001-0007; LTPF 0002852.
[185] See: Wetstein 0001-0003.

_____
Professor René M. Stulz

_____
Date    May 29, 2010

# Appendix A

## RENÉ M. STULZ

Fisher College of Business                                    2469 Southway Drive
2100 Neil Avenue                                              Columbus, OH 43221
Columbus, OH 43210-1399                                      Phone: (614) 486-3756
Phone:  (614) 292-1970
Cell: (614) 206-0265
Fax: (614) 292-2359
e-mail: stulz@cob.osu.edu
Homepage: http://www.cob.ohio_state.edu/fin/faculty/stulz/

**UNDERGRADUATE STUDIES**

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

**GRADUATE STUDIES**

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

**ACADEMIC APPOINTMENTS**

Ohio State University; Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University; Business School, August 1996 to July1997, Bower Fellow.

Ohio State University; Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University; Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University; Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University; Professor of Finance, 1985 to present.

University of Chicago; Visiting Professor of Finance, 1986-1987.

# Appendix A

Massachusetts Institute of Technology; Visiting Associate Professor of Finance, Fall 1985.

Ohio State University; Associate Professor of Finance, 1983-1985.

University of Rochester; Assistant Professor of Finance and Economics, 1980-1983.

## OTHER RELEVANT POSITIONS HELD

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Project on the Risks of Financial Institutions.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to present.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Taught executives in Europe, Asia and North America (open enrollment as well as for firms; courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to present.

Director, Weggelin Fund Management, 1999 to present.

President, Gamma Foundation, 2002 to present.

Director, Community First Financial Group, Inc., 2001 to present.

Director, Peninsula Banking Group, Inc., 2001 to present.

Trustee, Global Association of Risk Professionals, 2002 to present; Executive Committee, 2004 to present.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to present.

International Advisory Committee, NCCR, 2002 to present.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

# Appendix A

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

## HONORS, SCHOLARSHIPS, AND FELLOWSHIPS

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: Asia-Pacific Finance Association, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, European Financial Management Association, FDIC Annual Conference, Financial Management Association, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Notre Dame/SEC Conference, Northern Finance Association, Western Finance Association.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

3

# Appendix A

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk manager of the year award, Global Association of Risk Professionals, 2009.

**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, 2 volumes, edited with George Constantinides and Milton Harris, North-Holland, 2003.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group**,** Princeton University Press, 2010.

4

# Appendix A

**PUBLISHED PAPERS**

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, v36(4), 923-934, reprinted in Emerging Markets, Bekaert and Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, v9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, v12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, v10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, v38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, v15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, v19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, v16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting:  An Introduction," Journal of International Business Studies (Winter 1984), 55_73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, v14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, v20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw-Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds, Risk Publications, London, 1999.

# Appendix A

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, v41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, v6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, v17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, v3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, v42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, v95(5), 1024-1040.

"Managerial Control of Voting Rights:  Financing Policies and the Market for Corporate Control", Journal of Financial Economics, 1988, v20(1/2), 25_54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance,  McGraw-Hill, 1989 (second edition).

"Risk and the Economy:  A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk:  Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, v7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy:  A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, v22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, v8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, v24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, v24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company, 1989, v3, 247-262.

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets:  Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

# Appendix A

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, v9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, v45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, v26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, v16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A. Walkling and Larry H. Lang, Journal of Financial Economics, 1991, v29(2), 315-335.

"Is There a Global Market for Convertible Bonds?," with Yong-Cheol Kim, Journal of Business, 1992, v65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, v32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, v32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, v6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, v3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, v25(3), Part 2, 585-601.

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, v102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael J. Brennan, ed., Edward Elgar, 2001.

# Appendix A

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, v37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, v30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, v8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies,1995, v8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, v40(1), 3-29.

"How Different is Japanese Corporate Finance?,"  with Jun-Koo Kang, Review of Financial Studies, 1996, v9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, v20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, v42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed. Edward Elgar, 2001.

"Why Do Markets Move Together?  An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, v51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, v46(1), 3-28.

# Appendix A

"Are Internal Capital Market Efficient?," with Hyun-Han Shin, Quarterly Journal of Economics, 1998, v108(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, v52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001 v14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, v54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, v12(3), 519-534.

"International Portfolio Flows and Security Markets", in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293; reprinted in Emerging Markets, Bekaert and Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, v12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, v73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, v8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, v90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, v1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, v29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, v14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, v64, 117-144, reprinted in Corporate Restructuring, Campbell and Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?," in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

# Appendix A

"Corporate Governance and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, v38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, v93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, v70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, v16, 717-763.

"Are Assets Priced Locally or Globally?," with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms Listed in the U.S. Worth More?," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, v71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?," with Frederico Nardari and John Griffin, Review of Economics and Statistics, 2004, v86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara Moeller and Frederick Schlingemann, Journal of Financial Economics, 2004, v73, 201-228.

"Should we fear derivatives?," Journal of Economic Perspectives, 2004, v18(3), 173-192.

"Wealth destruction on a massive scale? A study of acquiring-firm returns in the recent merger wave," with Sara Moeller and Frederick Schlingemann, Journal of Finance, 2005, v60(2), 757-782.

"Do domestic investors have an edge? The trading experience of foreign investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, v18(3), 795-829.

"The limits of financial globalization," Journal of Finance, 2005, v60(4), 1595-1638.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A cross-country analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, v61(6), 2725-2751.

"Dividend policy and the earned/contributed capital mix: a test of the life-cycle theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, v81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, v18(8), 8-20.

# Appendix A

"Do investors trade more when stocks have performed well? Evidence from 46 countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, v20(3), 905-951.

"Why do firms become widely held? An analysis of the dynamics of corporate ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, v21(2), 175-194.

"The economics of conflicts of interests in financial institutions," with Hamid Mehran, Journal of Financial Economics, 2007, v85(2), 267-296.

"Why do countries matter so much for corporate governance?," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, v86, 1-39.

"How do diversity of opinion and information asymmetry affect acquirer returns?", with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, v20(6), 2047-2078.

"Do local analysts know more? A cross-country study of performance of local analysts and foreign analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, v88(3), 581-606.

"Why do private acquirers pay so little compared to public acquirers?," with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, v89(3), 375-390.

"Risk management failures: What are they and when do they happen?," Journal of Applied Corporate Finance, 2008, v20(4), 39-48.

"Private benefits of control, ownership, and the cross-listing decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, v64, 425-466.

"Has New York become less competitive than London in global markets? Evaluating foreign listing choices over time," with Craig Doidge, G. and G. Andrew Karolyi, Journal of Financial Economics, 2009, v91, 253-254.

"Differences in governance practices between U.S. and foreign firms: Measurement, causes, and consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, v22(8), 3171-3209.

"Managerial ownership dynamics and firm value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, v92(3), 342-361.

"How much do banks use credit derivatives to hedge loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, v35, 1-31.

# Appendix A

"Securities laws, disclosure, and national capital markets in the age of financial globalization," Journal of Accounting Research, 2009, v47(2), 349-390.

"Why do U.S. firms hold so much more cash than they used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, v64(5), 1985-2021.

"Financial globalization, governance, and the evolution of the home bias," with Bong-Chan Kho and Frank Warnock, Journal of Accounting Research, 2009, v47(2), 597-635.

"Seasoned equity offerings, market timing, and the corporate lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, forthcoming.

"Why do firms appoint CEOs as outside directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, forthcoming.

"Credit default swaps and the credit crisis," Journal of Economic Perspectives, 2010, v.24(1), 73-92.

"Why do firms leave U.S. equity markets?," with Craig Doidge and G. Andrew Karolyi, Journal of Finance, forthcoming.

"Hedge fund contagion and liquidity shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, forthcoming.


## PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

12

# Appendix A

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control," Robert Jameson, ed., Risk Publications, London, 1997, 33-51. Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds. Risk Publications, London, 1999.

"What's Wrong with Modern Capital Budgeting?," Financial Practice and Education, Fall/Winter 1999, 5-9.

"Diminishing the threats to shareholder wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why risk management is not rocket science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?," a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, v87(3), 86-94.


## SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS

"Earnings, growth, and acquisitions," (with Fred Schlingemann and Sara Moeller).

"Financing flows," (with Han Shin).

"Acquisitions in the firm's lifecycle," with Asli Arikan.

"Why do foreign firms have less idiosyncratic risk than U.S. firms?," with Söhnke M. Bartram and Gregory Brown.

"Why did some banks perform better during the credit crisis? A cross-country study of the impact of governance and regulation," with Andrea Beltratti.

"Were the ABX indices priced efficiently?," with Mike Anderson and Jérôme Taillard.

13

# Appendix A

"Bank CEO incentives and the credit crisis," with Rüdiger Fahlenbrach.

"Why did U.S. banks hold toxic securities," with Isil Erel and Taylor Nadauld.

"Are cross-border mergers worth it?," (with Jesse Ellis, Fred Schlingemann, and Sara Moeller).

"Do target CEOs sell out their shareholders to keep their job in a merger?," with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter.

"When are analyst recommendation changes influential?," with Roger Loh.

## EDITORIAL AND REFEREEING ACTIVITIES

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to present.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to present.

14

# Appendix A

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983 to 1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

# Appendix B

## REPORTS AND PRIOR TESTIMONY OF RENÉ M. STULZ

---

**Case Name:**         Procter & Gamble Co. v. Bankers Trust Co.
**Court:**              U.S. District Court, Cincinnati, OH
**Date of Testimony:**  March, 1996 (Report)


**Case Name:**         Danaher v. Acme-Cleveland
**Court:**              U.S. District Court for the South District of Ohio
**Date of Testimony:**  April, 1996 (Deposition)


**Case Name:**         Community Hospital of Springfield and Clark County v. Kidder
                        Peabody.
**Court:**              NASD hearing
**Date of Testimony:**  January, 1998 (Arbitration Hearing)


**Case Name:**         Mckesson-HBOC v. Salomon Smith Barney
**Court:**              U.S. District Court, Southern District of New York
**Date of Testimony:**  September, 1999 (Report)


**Case Name:**         Franklin Federal Savings Bank v. United States
**Court:**              U.S. Court of Federal Claims
**Date of Testimony:**  October, 1999 (Report), January, 2000 (Deposition), October, 2001
                        (Affidavit), September 2002 (Trial)


**Case Name:**         WestFed Holdings, Inc., et al. v. United States
**Court:**              U.S. Court of Federal Claims
**Date of Testimony:**  April, 2000 (Report), July, 2000 (Deposition)


**Case Name:**         Compagnie NOGA d'Importation et d'Exportation v. The
                        Government of the Russian Federation (Arbitration)
**Court:**              Arbitration Institute of the Stockholm Chamber of Commerce
**Date of Testimony:**  August, 2000 (Report)
                        November, 2000 (Testimony)

# Appendix B

**Case Name:**       Stanford Square LLC v. Nomura Assets Capital Corporation
**Case No.:**         00 Civ. 1001
**Date of Testimony:** June, 2001 (Affidavit), March 2002 (Report), April 2002
                      (Deposition), July 2002 (Trial)


**Case Name:**       Home Federal Bank of Tennessee, F.S.B. v. United States of
                      America
**Case No.:**         U.S. Court of Federal Claims
**Date of Testimony:** July, 2001 (Report), December, 2001 (Deposition)


**Case Name:**       Charter Federal Savings Bank v. United States of America
**Case No.:**         U.S. Court of Federal Claims
**Date of Testimony:** July, 2001 (Report), September, 2001 (Deposition)


**Case Name:**       D&N Bank, a Federal Savings Bank, et. al. v. United States of
                      America
**Case No.:**         U.S. Court of Federal Claims
**Date of Testimony:** July, 2001 (Report), October, 2001 (Deposition)


**Case Name:**       Mercury Insurance Company, et al. v. Martin H. Ruby, et al.
**Case No.:**         U.S. District Court, Central District of California, Western
                      Division
**Date of Testimony:** February, 2002 (Report)


**Case Name:**       Credit Suisse First Boston Corporation, et al. v. ARM Financial
                      Group, Inc., et al.
**Case No.:**         U.S. District Court, Southern District of New York
**Date of Testimony:** February, 2002 (Report), March 2002 (Rebuttal Report)
                      March 2002 (Deposition)


**Case Name:**       Aucoven v. Venezuela
**Case No.:**         International Center for Settlement of Investment Disputes
**Date of Testimony:** June 2002 (Report)
                      September 2002 (Rebuttal Report), October 2002 (Arbitration
                      Hearing)


**Case Name:**       K. Derhalli v. Lehman, et al.
**Case No.:**         High Court of Justice, Commercial Division, London
**Date of Testimony:** August 2002 (Report), December 2002 (Joint Report)

# Appendix B

**Case Name:** Richard Hanley et al. v. Warburg Pincus, et al.
**Case No.:** United States District Court for Arizona
**Date of Testimony:** September 2003 (Report)


**Case Name:** Marriott International Resorts, L.P. and Marriott International JBS Corporation v. The United States
**Case No.:** United States Court of Federal Claims, Nos. 01-256T and 01-257T
**Date of Testimony:** September 2003 (Report), December 2003 (Rebuttal Report), January 2004 (Deposition)


**Case Name:** FirePond IPO Securities Litigation
**Case No.:** United States District Court 01 Civ. 7048 (S.D.N.Y.)
**Date of Testimony:** February 2004 (Report), December 2007 (Report), February 2008 (Deposition)


**Case Name:** Corvis Securities Litigation
**Case No.:** United States District Court 03 Civ. 0590 (GEL)
**Date of Testimony:** October 2004 (Report)


**Case Name:** Bancorp Services, L.L.C. v. Zurich Insurance Company and others
**Case No.:** American Arbitration Association, No. 50T 180 002 04
**Date of Testimony:** February 2005 (Report), March 2005 (Arbitration Hearing)


**Case Name:** Bristol Myers Squibb Securities Litigation
**Case No.:** United States District Court Civil Action No. 00-1990 (SRC)
**Date of Testimony:** May 2005 (First declaration), May 2005 (Second declaration)


**Case Name:** Anglo American Security Fund and others v. S.R. Global International Fund and others
**Case No.:** Court of Chancery of the State of Delaware, C.A. No. 20066-NC
**Date of Testimony:** September 2005 (Report)


**Case Name:** Robert Ahearn and Almar Sales Company v. Credit Suisse First Boston
**Case No.:** United States District Court, Massachusetts, C.A. No. 03-CV-10956 (JLT)
**Date of Testimony:** December 2005 (Report)

3

# Appendix B

| | |
|---|---|
| **Case Name:** | Asset Alliance v. Barry et al. |
| **Case No.:** | American Arbitration Association, AA No. 13 169 Y 00224 03 |
| **Date of Testimony:** | December 2005 (Report); March 2005 (Rebuttal Report) |

| | |
|---|---|
| **Case Name:** | PSEG Global Inc. et al. v. Republic of Turkey |
| **Case No.:** | ICSID CASE NO. ARB/02/5 |
| **Date of Testimony:** | September 2005 (Report); March 2006 (Rebuttal Report); April 2006 (Arbitration hearing) |

| | |
|---|---|
| **Case Name:** | In re Enron corporation securities, derivative, and "ERISA" litigation |
| **Case No.:** | United States District Court, Southern District, Texas, MDL 1446 |
| **Date of Testimony:** | July 2006 (Report), October 2006 (Deposition) |

| | |
|---|---|
| **Case Name:** | West Basin Municipal Water District v. Rice Financial et al. |
| **Case No.:** | Superior Court of the State of California, BC 325420 |
| **Date of Testimony:** | September 2006 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Salomon Analyst Metromedia Litigation |
| **Case No.:** | United States District Court, Southern District of New York, No. 02-Civ-7966 (GEL) |
| **Date of Testimony:** | December 2006 (Report) |

| | |
|---|---|
| **Case Name:** | In re Lantronix Litigation |
| **Case No.:** | United States District Court, Southern District of New York, No. 03-CV-2467 (JES) |
| **Date of Testimony:** | February 2007 (Affidavit); April 2007 (Reply Declaration); October 2007 (Testimony) |

| | |
|---|---|
| **Case Name:** | Toledo Blade Newspaper Unions - Blade Pension Plan, et al. v. Investment Performance Services, LLC, et al. |
| **Case No.:** | 3:04-CV-7123 (N.D. Ohio) |
| **Date of Testimony:** | April 2007 (Report), July 2007 (Deposition), September 2007 (Declaration) |

| | |
|---|---|
| **Case Name:** | In Re Credit Suisse – AOL Securities Litigation |
| **Case No.:** | United States District Court of Massachusetts, Case No. 1:02 CV 12146 |
| **Date of Testimony:** | April 2007 (Declaration), June 2007 (Deposition), April 2008 (Report), August 2008 (Deposition), July 2009 (Declaration) |

# Appendix B

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – Enrico Bondi v. Bank of America Corporation, *et al.* |
| **Case No.:** | 05 CIV 4015 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report), August 2007 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – Gerald K. Smith, as Litigation Trustee of the Farmland Dairies LLC Litigation Trust, v. Bank of America Corporation, *et al.* |
| **Case No.:** | 06 CIV 0383 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – G. Peter Pappas, as the Plan Administrator of the Plan of Liquidation of Parmalat-USA Corporation, v. Bank of America Corporation, *et al.* |
| **Case No.:** | 06 CIV 3109 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report), August 2007 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – Class Action |
| **Case No.:** | 04 CIV 0030 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report), August 2007 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – Food Holdings Limited and Dairy Holdings Limited, acting by their Joint Official Liquidators, Gordon I. MacRae and G. James Cleaver, v. Bank of America Corporation, *et al.* |
| **Case No.:** | 05 CIV 9934 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report), August 2007 (Deposition), August 2009 (Written Testimony), September 2009 (Testimony) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – Parmalat Capital Finance Limited, acting by its Joint Official Liquidators, Gordon I. MacRae and G. James Cleaver, v. Bank of America Corporation, *et al.* |
| **Case No.:** | 06 CIV 0074 (LAK) (Southern District of New York) |
| **Date of Testimony:** | May 2007 (Report), June 2007 (Rebuttal Report), August 2007 (Deposition) |

| | |
|---|---|
| **Case Name:** | McGill v. Board of Trade of the City of Chicago, Incorporated |
| **Case No.:** | AAA No. 51 148 Y 01529 06 |
| **Date of Testimony:** | October 2007 (Report), January 2008 (Arbitration Testimony) |

# Appendix B

| | |
|---|---|
| **Case Name:** | In re Enron Creditor Recovery Corp |
| **Case No.:** | 01-16034 (AJG) (United State Bankruptcy Court, Southern District of New York) |
| **Date of Testimony:** | January 2008 (Report), March 2008 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Parmalat Securities Litigation – John Hancock Life Insurance Company *et al.* |
| **Case No.:** | 04 MD 1653 (LAK) ECF Case (Southern District of New York) |
| **Date of Testimony:** | February 2008 (Report) |

| | |
|---|---|
| **Case Name:** | United States v. Ronald Ferguson *et al.* |
| **Case No.:** | 3:06-CR-137(CFD) (United State District Court, District of Connecticut) |
| **Date of Testimony:** | May 2008 (Report), June 2008 (Rebuttal), September 2008 (Supplemental Report) |

| | |
|---|---|
| **Case Name:** | John Bruhl, Keith Rotman and Scott Maltz v. Price Waterhouse Coopers et al. |
| **Case No.:** | 03-23044-CIV-MARA (United States District Court, Southern District of Florida) |
| **Date of Testimony:** | July 2008 (Report), July 2008 (Deposition), August 2008 (Testimony) |

| | |
|---|---|
| **Case Name:** | Robert Kelleher et al. v. ADVO, Inc., et al. |
| **Case No.:** | 3:06-cv-01-422-AVC (United States District Court, District of Connecticut) |
| **Date of Testimony:** | October 2008 (Report), November 2008 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re BP Prudhoe Bay Royalty Trust |
| **Case No.:** | C06-1505 MJP (United States District Court, Western District Court, Western District of Washington at Seattle) |
| **Date of Testimony:** | November 2008 (Declaration) |

| | |
|---|---|
| **Case Name:** | In Re Adelphia Communications Corp., et al. Debtors |
| **Case No.:** | Case No. 02-41729 (REG) (United States Bankruptcy Court, Southern District of New York) |
| **Date of Testimony:** | February 2009 (Report, Rebuttal Report), March 2009 (Deposition), August 2009 (Written Testimony), October 2009 (Trial) |

# Appendix B

| | |
|---|---|
| **Case Name:** | In Re TOUSA, Inc., et al. vs. Citicorp North America, Inc., et al. |
| **Case No.:** | 08-1435-JKO (United States Bankruptcy Court, Southern District of Florida, Fort Lauderdale Division) |
| **Date of Testimony:** | May 2009 (Report), June 2009 (Deposition), July 2009 (Testimony) |

| | |
|---|---|
| **Case Name:** | In Re Trigem America Corporation, Debtor |
| **Case No.:** | 8-07-01140-TA (United States Bankruptcy Court for the Central District of California, Santa Ana Division) |
| **Date of Testimony:** | June 2009 (Report), September 2009 (Report), October 2009 (Deposition), November 2009 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re SADIA S.A. Securities Litigation |
| **Case No.:** | 1:08-CV-09528 (United State District Court for the Southern District of New York) |
| **Date of Testimony:** | March 2010 (Report), April 2010 (Deposition), May 2010 (Reply) |

| | |
|---|---|
| **Case Name:** | Airbus UK Ltd v. Hawker Beechcraft Corp. |
| **Case No.:** | ICC Case No. 16231-VRO |
| **Date of Testimony:** | April 2010 (Report) |

# Appendix C
# Documents Considered

**LEGAL DOCUMENTS**

- In Re: Moody's Corporation Securities Litigation Consolidated Amended Complaint and documents cited therein, filed June 27, 2008.
- In Re: Moody's Corporation Securities Litigation, Opinion and Order, filed February 23, 2009.
- Lead Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, filed January 22, 2010.
- Declaration of Daniel Hume in Support of Lead Plaintiffs' Motion for Class Certification, Parts One and Two, filed January 22, 2010.

**DISCOVERY DOCUMENTS**

- LTPF 0002852
- MCCURLEY 0001-0007
- Wetstein 0001-0003

**SEC FILINGS AND ANNUAL REPORTS**

- Moody's Corporation, Form 10-K, 2001 – 2009
- Moody's Corporation, Form 10-Q, Q1 2001 – Q3 2009
- Moody's Corporation Annual Reports, 2001 – 2009
- Barclays Plc., Form 13F-HR, Q1 2007 – Q4 2009
- Credit Suisse Group AG, Form 13F-HR, Q1 2007 – Q4 2009
- ING Group N.V., Form 13F-HR, Q3 2008 – Q4 2009
- Royal Bank of Scotland Group Plc., Form 13F-HR, Q1 2007 – Q4 2009
- UBS AG, Form 13F-HR, Q1 2007 – Q4 2009
- ING Group N.V. Quarterly Results Overview, Q1 2007 – Q2 2008, available at: http://www.ing.com/group/showdoc.jsp?docid=039176_EN&menopt=ivr|qtr.
- Société Générale Quarterly and Annual Results, 2007 – 2009, available at: http://www.investor.socgen.com/phoenix.zhtml?c=69575&p=irol-results.

**PUBLIC PRESS**

Selected public press articles through searches on Factiva and Bloomberg including:

- Moody's Corporation Earnings Conference Calls, *Fair Disclosure Wire,* 2005 – 2009.
- "Moody's May Change Credit Ratings Faster, More Often," *Bloomberg,* January 18, 2002.
- "Corporate Credit-Rating Cuts Reach Record This Year (Update 2)," *Bloomberg*, December 26, 2002.
- "Moving the Market: SEC Says Voluntary Policing By Ratings Firms Lacks Bite," *The Wall Street Journal,* March 10, 2005.
- "Three is no crowd - Credit-rating agencies," *The Economist*, March 26, 2005.
- "Who rates the raters? – Credit-rating agencies – Credit-rating agencies," *The Economist*, March 26, 2005.
- "Credit raters make their mark," *Governing*, June 1, 2005.

# Appendix C
# Documents Considered

- "Moody's Revises Hybrid, ARM Analysis," *Mortgage Servicing News,* June 1, 2005.
- "Slices of Risk: How a Formula Ignited Market That Burned Some Big Investors," *The Wall Street Journal*, September 12, 2005.
- "US Senate's Shelby urges credit rater changes," *Reuters News*, February 1, 2006.
- "Senate Panel To Hold Hearing March 7 On Credit-Rating Cos," *Dow Jones News Service,* February 28, 2006.
- "Credit ratings groups come under attack," *Financial Times*, March 8, 2006.
- "Moving the Market: Credit-Rating Industry May Get More Oversight --- Congress Pushes Legislation To Encourage Competition; SEC Role Comes Under Fire," *The Wall Street Journal*, March 8, 2006.
- "Moody's CEO Got $1.6M Bonus For 2005," *Dow Jones Corporate Filings Alert*, March 22, 2006.
- "Pressure mounting over US ratings agency 'duopoly'," *Financial Times*, July 11, 2006.
- "Ratings agencies face shake-up," *Euromoney,* August 1, 2006.
- "Politics &Economics: Credit-Rating Oversight Measure Is Supported by a Senate Panel," *The Wall Street Journal*, August 3, 2006.
- "Legislation Congress Approves Credit Rating Agency Reform Act of 2006," *The Bond Buyer*, September 28, 2006.
- "Objectivity of a Rating Questioned," *The New York Times*, December 12, 2006.
- "Moody's earnings rise 86% on back of complex new products," *Financial Times*, February 8, 2007.
- "Analysts forced to rethink new Moody's system," *Financial Times*, February 28, 2007.
- "Dodd: Fed Failed In Supervisory Role In Subprime Loans," *CongressDaily*, March 22, 2007.
- "Moving the Market: Credit-Ratings Firms Get Caught Up in Subprime Meltdown," *The Wall Street Journal*, March 22, 2007.
- "Sen Christopher J. Dodd holds a hearing on the mortgage market—committee hearing," *CQ Transcriptions*, March 22, 2007.
- "Ill. attorney general asks for ICC help on credit rating probe," *Associated Press*, March 30, 2007.
- "Uproar forces Moody's into U-turn over banks' ratings," *Financial Times*, April 1, 2007.
- "Subprime mortgage market woes seen well contained," *Reuters News*, April 11, 2007.
- "Democrats Turning To Credit Rating Agencies' Role In Subprime Loan Crisis," *CongressDaily*, April 18, 2007.
- "Housing: Is the Worst Over?" *Business Week*, April 18, 2007.
- "Bernanke Believes Housing Mess Contained," *Forbes*, May 17, 2007.
- "REFILE-ANALYSIS-US rating agencies again seen as scapegoat," *Reuters News*, June 29, 2007.

# Appendix C
# Documents Considered

- "Fed's Warsh says no systematic risk from subprime," *Reuters News*, July 11, 2007.
- "STOCKS NEWS US-Housing not derailing growth outlk-Fed's Plosser," *Reuters News*, July 11, 2007.
- "Fed's Bernanke: Sees Economy Strengthening Into '08," *Dow Jones Capital Markets Report*, July 18, 2007.
- "Moody's, S&P May Need Better SEC Regulation, Senator Dodd Says," *Bloomberg*, August 1, 2007.
- "Moody's slashes ratings on 691 securities backed by 'piggyback' loans," *Associated Press Newswires*, August 16, 2007.
- "Dodd Reiterates Call To Increase GSEs' Portfolio Limits," *CongressDaily*, August 17, 2007.
- "Europeans Plan to Investigate Ratings Agencies and Their Warnings," *The New York Times*, August 17, 2007.
- "Fed finally gets Wall Street's message, investors respond with rally," *Associated Press Newswires*, August 17, 2007.
- "Hike caps on mortgage holdings, says Dodd," *Investment News*, August 17, 2007.
- "Leading the News: Sarkozy tackles credit -- Merkel letter urges market vigilance in wake of turmoil," *The Wall Street Journal Europe*, August 17, 2007.
- "Moody's moves on securities," *Financial Times*, August 17, 2007.
- "MORTGAGE WOES RIPPLE OUTWARD LACK OF CONFIDENCE EXTENDS FROM WALL STREET TO WAL-MART," *The Baltimore Sun*, August 17, 2007.
- "No shortage of legal claims in mortgage industry meltdown; NEWS," *The Recorder*, August 17, 2007.
- "S&P 500 Stocks With Biggest Gap Between Market Price, Estimate," *Bloomberg*, August 17, 2007.
- "S&P, Moody's face EU investigations; Credit rating agencies may have been slow to react to sub-prime crisis," *TODAY (Singapore)*, August 17, 2007.
- "Senator urges examination of ratings agencies," *Reuters News*, August 17, 2007.
- "SLOW RESPONSE TO LOAN DEFAULTS EYED," *San Jose Mercury News*, August 17, 2007.
- "Subprime ratings - Inquiries should focus on specifics of mortgage-backed debt," *Financial Times*, August 17, 2007.
- "UPDATE 3-U.S. senator urges examination of ratings agencies," *Reuters News*, August 17, 2007.
- "Feeling the Pain," *The Age*, August 18, 2007.
- "MOODY'S SAYS WIDESPREAD BANK RATINGS CHANGES UNNECESSARY," *Bernama Daily Malaysian News*, August 18, 2007.
- "Grading the Graders; With the markets in turmoil, familiar questions arise about the bond-rating agencies," *The Washington Post*, August 19, 2007.

# Appendix C
# Documents Considered

- "Loan by Loan, The Making of a Credit Squeeze," *The New York Times Abstracts*, August 19, 2007.
- "SUBPRIME MORTGAGES PROVED TO BE THE ULTIMATE RISK," *St. Paul Pioneer Press*, August 19, 2007.
- "J.P. Morgan analyst downgrades McGraw-Hill to 'Neutral' on credit market turmoil," *Associated Press Newswires*, August 20, 2007.
- "Lawmakers Must Not Over-Regulate Credit Agencies - US Senator," *Dow Jones International News*, August 20, 2007.
- "McGraw-Hill Cut to 'Neutral' at JPMorgan," *Bloomberg*, August 20, 2007.
- "McGraw-Hill Falls After JPMorgan Cuts Rating to 'Neutral',"  *Bloomberg*, August 20, 2007.
- "McGraw-Hill Falls on Analyst Downgrade; Moody's Drops (Update3)," *Bloomberg*, August 20, 2007.
- "Moody's and Countrywide Financial drag on S&P 500 Monday," *Associated Press*, August 20, 2007.
- "Moody's: Debt Reduction Key as U.S. Homebuilders Generate Cash; 'In the past two or more years, homebuilders have bulked up on land and inventory'," *National Mortgage News*, August 20, 2007.
- "S&P, Moody's, Fitch Bear Blame for Subprime Crisis, Shelby Says," *Bloomberg*, August 20, 2007.
- "Senator on banking committee says credit agencies should shoulder some blame for mortgage mess," *Associated Press Newswires*, August 20, 2007.
- "Subprime Infects $300 Billion of Money Market Funds, Hikes Risk," *Bloomberg*, August 20, 2007.
- "Trio of Banks Leads Moody's Back to Private Market For $300 Million," *Private Placement Letter*, August 20, 2007.
- "U.S. Bill Yields Near Lowest Since 2005 on Demand for Safety," *Bloomberg*, August 20, 2007.
- "U.S. lawmaker: Subprime defaults at center of financial storm set to climb," *Associated Press Newswires*, August 20, 2007.
- "U.S. legislators will quiz rating agencies - Senator," *Reuters News*, August 20, 2007.
- "US senator sees sub-prime crisis getting worse before better," *Agence France Presse*, August 20, 2007.
- "Global Banking Crisis Fears Are Exaggerated, Moody's Says," *Bloomberg*, August 21, 2007.
- "MOODY'S CORP," *The Boston Globe*, August 21, 2007.
- "SEC Watching Wall Street Firms Amid Market Turmoil (Update2)," *Bloomberg*, August 21, 2007.
- "Senator points finger at credit rating firms," *Deseret Morning News*, August 21, 2007.

# Appendix C
# Documents Considered

- "Subprime Crisis Isn't Fault of Ratings Companies: Matthew Lynn," *Bloomberg*, August 21, 2007.
- "Drop Foreseen in Median Price of Homes in U.S.," *The New York Times*, August 26, 2007.
- "Subprime Mortgages Shouldn't Be Modified, Drexel Professor Says," *Bloomberg*, October 3, 2007.
- "Moody's to revise ratings by end of year," *Financial Times*, October 11, 2007.
- "Moody's Chief Says New Rating Guidelines Coming, FT Reports," *Bloomberg*, October 12, 2007.
- "Moody's eyes rating changes by end year – FT," *Reuters News,* October 12, 2007.
- "View From the Top: Ray McDaniel, chief executive of Moody's Investors Service," *Financial Times*, October 12, 2007.
- "Yoshizawa Says Moody's Subprime Cuts Reach 40% of CDOs," *Bloomberg*, October 12, 2007.
- "Junk mortgages under the microscope," *Fortune Magazine*, October 16, 2007.
- "U.S. Home Loans Back 16% of European CP Funds, Moody's Says," *Bloomberg*, October 17, 2007.
- "Moody's Investors Service Updates its Code of Professional Conduct," *Business Wire*, October 23, 2007.
- "BOE FINANCIAL STABILITY REPORT: UK ECONOMIC OUTLOOK ROBUST," *Market News International*, October 24, 2007.
- "BOE Says 'Intervention' May Be Required Over Credit Ratings," *Bloomberg*, October 24, 2007.
- "Economic Outlook Remains Robust Despite Credit Turmoil," *Market News International*, October 24, 2007.
- "Financial system at risk of further shocks-BoE says," *Reuters News*, October 24, 2007.
- "Financial System Remains Vulnerable In Transition Period," *Dow Jones International News*, October 24, 2007.
- "HIGHLIGHTS-Bank of England's Financial Stability Report," *Reuters News*, October 24, 2007.
- "Moody's Corp - MCO: Q3 Earnings Call @ 11:30 ET Today," *Knobias*, October 24, 2007.
- "Moody's Corporation Declares Quarterly Dividend," *Business Wire*, October 24, 2007.
- "Moody's Corporation Reports Results for Third Quarter of 2007," *Business Wire*, October 24, 2007.
- "Moody's Corporation Revises FY 2007 Earnings Guidance Downwards; Comments on FY 2007 Revenue Growth Guidance; Declares Quarterly Dividend," *Reuters News*, October 24, 2007.
- "Moody's expects job cuts amid tough debt market," *Reuters News*, October 24, 2007.

# Appendix C
# Documents Considered

- "Moody's Profit Falls 13% as Credit Slump Slows Ratings Demand," *Bloomberg*, October 24, 2007.
- "Moody's sees slower credit mkt rebound than 1998," *Reuters News*, October 24, 2007.
- "Q3 2007 Moody's Corporation Earnings Conference Call - Final," *Voxant FD (Fair Disclosure) Wire*, October 24, 2007.
- "UK financial sector still 'vulnerable'," *Financial Times*, October 24, 2007.
- "UK Must Strengthen Crisis Management Tools," *Dow Jones International News*, October 24, 2007.
- "UPDATE 2-Moody's posts lower net, cuts view, sees charge," *Reuters News*, October 24, 2007.
- "ASSET-BACKEDS-ABX sinks to lows after weak loan data," *Reuters News*, October 25, 2007.
- "Banks, Facing Resistance From SIVs, Turn To S&P For Help," *Dow Jones News Service*, October 25, 2007.
- "Moody's Corp. downgraded to underweight from neutral at J.P. Morgan," *AFX Asia*, October 25, 2007.
- "Moody's Corp. downgraded to underweight from neutral at J.P. Morgan," *Thomson Financial*, October 25, 2007.
- "Moody's Cut to 'Underweight' at JPMorgan," *Bloomberg*, October 25, 2007.
- "Blumenthal Calls Reports of Debt Rating Abuse 'Credible'," *Bloomberg*, October 26, 2007.
- "McCreevy Targets EU Bank Accounting Rules in Answer to Turmoil," *Bloomberg*, October 26, 2007.
- "Moody's completes $300 million private placement of senior unsecured notes," *Financial Deals Tracker*, October 26, 2007.
- "Moody's Cuts Ratings on CDOs Tied to Subprime Bonds (Update3)," *Bloomberg*, October 26, 2007.
- "Moody's-MCO volume & volatility Up on Connecticut Attorney Gener," *Theflyonthewall.com*, October 26, 2007.
- "S&P Gets Subpoena From Connecticut Attorney General (Update1)," *Bloomberg*, October 26, 2007.
- "UPDATE 3-Connecticut AG subpoenas rating agencies," *Reuters News*, October 26, 2007.
- "UPDATE 3-Moody's begins cutting some top-rated CDOs to junk," *Reuters News*, October 26, 2007.
- "Moody's to Cut Jobs in Next Two Months as Ratings Demand Slows," *Bloomberg*, October 31, 2007.
- "How They Got Housing Wrong," *CNN*, December 28, 2007.
- "JPMorgan Acts to Buy Ailing Bear Stearns at Huge Discount," *The New York Times*, March 16, 2008.

# Appendix C
# Documents Considered

- "UPDATE: Moody's Downgrades Or Gives Warning On $40B In CDOs," *Dow Jones News Service*, March 27, 2008.
- "FT.com site: SEC to propose rules on ratings conflicts," *Financial Times (FT.Com)*, April 10, 2008.
- "S&P Requires Loan Data for Mortgage Debt, Forms Panel (Update3)," *Bloomberg*, April 10, 2008.
- "Unpaid Mortgages Rise on Job Losses, Home Price Drops (Update1)," *Bloomberg*, April 10, 2008.
- "As Housing Boomed, Moody's Opened Up," *The Wall Street Journal*, April 11, 2008.
- "Interview Excerpts: Moody's Executives; Ratings Agency's Clarkson, McDaniel: 'We Make Assumptions With Losses'," *The Wall Street Journal*, April 11, 2008.
- "Moody's Scrapped Its Old Culture During Housing Boom, WSJ Says," *Bloomberg*, April 11, 2008.
- "SEC to move on ratings conflict," *Financial Times*, April 11, 2008.
- "Fremont Options Few as Clock Ticks on Regulators' Deadline," *Orange County Business Journal*, April 14, 2008.
- "Subprime Losses Top $379 Billion on Balance-Sheet Marks," *Bloomberg*, May 19, 2008.
- "CPDOs expose ratings flaw at Moody's," *Financial Times*, May 20, 2008.
- "Eskom Says Timing Of Moody's Rating Review Regrettable," *Dow Jones International News*, May 20, 2008.
- "Hedge Funds in Swaps Face Peril With Rising Junk Bond Defaults," *Bloomberg*, May 20, 2008.
- "In Agreement On the Problem, But Not the Fix," *American Banker*, May 20, 2008.
- "Moody's Incorrectly Gave Top Ratings to Debt Products, FT Says," *Bloomberg*, May 20, 2008.
- "Berkshire's Buffett Affirms Faith in Moody's as Stock Drops," *Bloomberg*, May 21, 2008.
- "MCO: Moody's: Hearing MCO downgraded to Underperform at Jefferies," *Briefing.com, Inc.,* May 21, 2008.
- "MCO: Moody's: Senator seeks probe of Moody's errors," *Briefing.com, Inc.*, May 21, 2008.
- "MCO: Seven Year High in Cash Flow from Operations for Moodys," *Market News Publishing Inc.*, May 21, 2008.
- "Moody's Confirms External Review of European CPDO Rating Process," *Business Wire*, May 21, 2008.
- "Moody's Cut to 'Underperform' at Jefferies," *Bloomberg*, May 21, 2008.
- "Moody's Faces Connecticut Probe of Alleged 'Cover-Up' of Errors," *Bloomberg*, May 21, 2008.

# Appendix C
# Documents Considered

- "Moody's Faces Connecticut Probe of Alleged 'Cover-Up' (Update1)," *Bloomberg,* May 21, 2008.
- "Moody's Falls Most Ever After Ratings Error Probe (Update2)," *Bloomberg*, May 21 2008.
- "Moody's Falls Most in 9 Years on Probe of Aaa Computer Error," *Bloomberg*, May 21, 2008.
- "Moody's Probes Ratings on Report Computer Bug Caused Aaa Grades," *Bloomberg*, May 21, 2008.
- "SEC Should Investigate Moody's, Consider Fines, Schumer Says," *Bloomberg*, May 21, 2008.
- "SEC unsure of authority in reported Moody's error," *Reuters News*, May 21, 2008.
- "UPDATE 1-SEC unsure of authority in reported Moody's error," *Reuters News*, May 21, 2008.
- "UPDATE 5-Moody's launches inquiry after rating error report," *Reuters News,* May 21, 2008.
- "UPDATE: US Lawmaker Seeks SEC Probe Of Moody's Rating," *Dow Jones News Service,* May 21, 2008.
- "US senator urges SEC to probe Moody's reported error," *Reuters News*, May 21, 2008.
- "2nd UPDATE: Australia Reviews Credit Rtg Agency Regulations," *Dow Jones International News*, May 22, 2008.
- "Australia to Review Credit Rating Agencies Amid Market Concern," *Bloomberg*, May 22, 2008.
- "Australian Review of Credit Rating Agencies," *Australian Government – The Treasury*, May 22, 2008.
- "Blumenthal Says Moody's Cooperative in Connecticut Probe: Audio," *Bloomberg*, May 22, 2008.
- "Buffett says any wrongdoers should leave Moody's," *Reuters News*, May 22, 2008.
- "Buffett Says Moody's Should Dismiss Workers If Wrongdoing Found," *Bloomberg*, May 22, 2008.
- "CHANGING RATINGS: NYU Prof Urges Hands-Off Approach To Reform," *Dow Jones Capital Markets Report*, May 22, 2008.
- "Dismal outlook for U.S. growth sends stock markets reeling," *The Toronto Star*, May 22, 2008.
- "Lawmakers, SEC Concerned About News Article on Moody's," *The Bond Buyer*, May 22, 2008.
- "MCO: Moody's: Warren Buffett won't seek mgmt changes at Moody's," *Briefing.com, Inc.,* May 22, 2008.
- "MCO US: Moodys' EBITDA Decreases 7.5%," *Market News Publishing Inc.*, May 22, 2008.

# Appendix C
# Documents Considered

- "Minyanville's Kevin Depew: Five Things You Need To Know," *Bloomberg*, May 22, 2008.
- "Moody's Commercial Paper Rating May Be Cut by Standard & Poor's," *Bloomberg*, May 22, 2008.
- "Moody's Commercial Paper Rating May Be Cut, S&P Says (Update2)," *Bloomberg*, May 22, 2008.
- "Moody's Corporation - Company News," *NewsTrak Daily*, May 22, 2008.
- "Moody's error hits its shares," *Financial Times*, May 22, 2008.
- "Moody's Faces Scrutiny of Computer Error, Possible 'Cover-Up'," *Bloomberg*, May 22, 2008.
- "MOODY'S HAS HUGE COLLAPSE," *New York Post*, May 22, 2008.
- "Moody's Plunges for Second Day After Probe of Computer Error," *Bloomberg*, May 22, 2008.
- "Moody's Plunges for Second Day After Cover-Up Probe (Update1)," *Bloomberg*, May 22, 2008.
- "Moody's stock drops in New York on investigation of rating errors," *National Post*, May 22, 2008.
- "More Questions Are Raised About Moody's Ratings," *The New York Times*, May 22, 2008.
- "New Debt Products Test Moody's Methods," *The Wall Street Journal*, May 22, 2008.
- "S&P says may cut Moody's commercial paper rating," *Reuters News*, May 22, 2008.
- "STOCKS FALL ON $133 OIL, FED MEETING MINUTES," *Pittsburgh Post-Gazette*, May 22, 2008.
- "STOCKWATCH UK banks lower on Moody's implications; ABN Amro still 'underweight'," *AFX Asia*, May 22, 2008.
- "U.K. Stocks Decline, Led by Shell, BG on Oil; LSE, Tate Drop," *Bloomberg*, May 22, 2008.
- "Conn Atty Genl Probing Fitch, Moody's, S&P As Antitrust Case," *Dow Jones International News,* May 21, 2008.
- "Warren Buffett Won't Seek Mgmt Changes At Moody's," *Dow Jones International News*, May 22, 2008.
- "UPDATE: SEC To Probe Credit Rating Firms' Error Handling," *Dow Jones News Service,* May 27, 2008.
- "UPDATE: Global Regulators Give Ratings Agencies Guidelines," *Dow Jones International News,* May 28, 2008.
- "Rating agencies agree to change charges," *Financial Times*, June 3, 2008.
- "WSJ: Ratings Firms Near Deal With New York Atty General," *Dow Jones News Service,* June 3, 2008.
- "Bond Raters to Shift Fee Practices – Moody's, S&P, Fitch Settlement Aims to Restore Investor Confidence," *The Wall Street Journal Europe,* June 4, 2008.

# Appendix C
# Documents Considered

- "Rating Firms Seem Near Legal Deal On Reforms," *The New York Times,* June 4, 2008.
- "Cuomo, rating agencies agree on mortgage reforms," *AP Business Writer,* June 5, 2008.
- "Moody's CEO Says Regulatory Probes Won't Kill Model (Update2)," *Bloomberg,* June 5, 2008.
- "SEC Chairman Christopher Cox Statement on Ratings, Cuomo Pact," *Bloomberg,* June 5, 2008.
- "Speech By SEC Chairman Christopher Cox: Statement At Open Meeting On Rules For Credit Rating Agencies," *Exchange News Direct,* June 11, 2008.
- "Moody's Investors Service Announces Actions After Review of European CPDO Ratings Process," *Business Wire,* July 1, 2008.
- "Lax Lending Standards Led to IndyMac's Downfall," *The New York Times*, July 29, 2008.
- "Blumenthal Plans Legal Action of Moody's, S&P, Fitch Ratings," *Bloomberg,* July 30, 2008.
- "Banks' Subprime Losses Top $500 Billion on Writedowns (Update1)," *Bloomberg,* August 12, 2008.
- "Treasury to Outline Fan-Fred Plan," *The Wall Street Journal*, September 7, 2008.
- "Wall Street Down, Lehman Out," *The Wall Street Journal*, September 15, 2008.
- "Fed's $85 Billion Loan Rescues Insurer," *The New York Times*, September 17, 2008.
- "Government Seizes WaMu and Sells Some Assets," *The New York Times*, September 25, 2008.
- "Moody's Cuts Industrial Metal Outlook to 'Negative' vs 'Stable'," *Bloomberg*, October 21, 2008.
- "U.S. Treasuries Gain as Rate-Cut Bets Rise, Bank Profits Fall," *Bloomberg*, October 21, 2008.
- "2nd UPDATE: House Panel Eyes Problems At Credit-Rating Firms," *Dow Jones News Service*, October 22, 2008.
- "Blumenthal Says U.S. Needs to Regulate Ratings Companies: Video," *Bloomberg*, October 22, 2008.
- "Carolyn Maloney Says Rating Firms Need More Transparency: Video," *Bloomberg*, October 22, 2008.
- "Credit agencies 'broke bond of trust'," *Financial Times (FT.Com)*, October 22, 2008.
- "Credit Raters Get Grilled On Capitol Hill," *Associated Press*, October 22, 2008.
- "Credit-Rating Companies 'Sold Our Soul' for Pay, Employees Said," *Bloomberg*, October 22, 2008.
- "Fitch President & CEO Steve Joynt to Testify Before U.S. House Committee," *Business Wire*, October 22, 2008.
- "Fitch says ratings must be more predictive," *Reuters News*, October 22, 2008.
- "Lawmakers Blast Credit Rating Agencies," *HedgeWorld News*, October 22, 2008.

# Appendix C
# Documents Considered

- "Moody's CEO says investor-pays model more flawed," *Reuters News*, October 22, 2008.
- "Moody's, S&P Employees Doubted Ratings, E-Mails Say (Update2)," *Bloomberg*, October 22, 2008.
- "Raters Make a Live-and-Learn Defense," *CFO.com*, October 22, 2008.
- "Rating Agencies: Calif.'s Lockyer Says Raters Using Crisis as Excuse to Block Reform," *The Bond Buyer*, October 22, 2008.
- "Rating agencies under scrutiny," *Crain's New York Business*, October 22, 2008.
- "Rating Companies Put Profits First, Critics Testify (Update1)," *Bloomberg*, October 22, 2008.
- "S&P says no evidence of misconduct by analysts," *Reuters News*, October 22, 2008.
- "Sharma Says S&P Is 'Committed' to Restoring Confidence: Video," *Bloomberg*, October 22, 2008.
- "Standard & Poor's President Deven Sharma Says Credit Rating Firm Taking Steps to Restore Investor Confidence in the Capital Markets," *PR Newswire (U.S.)*, October 22, 2008.
- "U.S. Stocks Tumble, S&P 500 Drops to Lowest Level Since 2003," *Bloomberg*, October 22, 2008.
- "Who Will Take Responsibility For Crisis?" *NPR*, October 22, 2008.
- "WRAPUP 3-Moody's CEO warned board on rating quality," *Reuters News*, October 22, 2008.
- "Credit firms rated mortgage-related securities high despite knowing flaws; Bond-issuer pressure contributed to grade hikes, documents at a House hearing show," *Los Angeles Times*, October 23, 2008.
- "CREDIT-RATING ANALYSTS CREATED SUBPRIME MESS," *New York Post*, October 23, 2008.
- "House Panel Scrutinizes Rating Firms," *The New York Times*, October 23, 2008.
- "Profile: Credit rating agencies under fire in financial mess," *NBC News*, October 23, 2008.
- "Rating Agencies: Congressional Flak; Rating Agencies Under Fire in House," *The Bond Buyer*, October 23, 2008.
- "U.S. Commercial Real Estate Prices to Drop More, Moody's Says," *Bloomberg*, October 23, 2008.
- "US credit rating agencies 'a colossal failure'," *Irish Independent*, October 23, 2008.
- "U.S. News: Moody's CEO Warned Profit Push Posed a Risk to Quality of Ratings," *The Wall Street Journal*, October 23, 2008.
- "U.S. Stocks Decline on Foreclosures, Amazon's Sales Forecast," *Bloomberg*, October 23, 2008.
- "White Plains Nws: Lawmakers Blast Credit Rating Agencies," *Reuters News*, October 23, 2008.

# Appendix C
# Documents Considered

- "Recipe for Disaster:  The Formula that Killed Wall Street," *Wired Magazine*, February 23, 2009.
- "Prosecutors Ask if 8 Banks Duped Rating Agencies," *The New York Times*, May 12, 2010.


## SECURITY ANALYST REPORTS

- Selected equity research reports by equity analysts covering Moody's and McGraw-Hill stock, 2006 – 2008.
- "Rating Shopping – Now the Consequences," *Nomura Fixed Income Research*, February 16, 2006.
- "A Simple Guide to Subprime Mortgages, CDO, and Securitization," *Citi*, April 13, 2007


## RATING AGENCY PUBLICATIONS AND REPORTS

- "Understanding Moody's Corporate Bond Ratings and Rating Process," *Moody's Investors Service*, June 3, 2002.
- "Structured Finance Rating Transitions: 1983-2002," *Moody's Investors Service*, January 2003.
- "Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools," *Moody's Investors Service*, April 1, 2003.
- "U.S. Subprime Mortgage Securitization Cashflow Analytics," *Moody's Investors Service*, March 17, 2004.
- "An Update to Moody's Analysis of Payment Shock Risk in Sub-Prime Hybrid ARM Products," *Moody's Investors Service*, May 16, 2005.
- "Code of Professional Conduct," *Moody's Investors Service,* June 2005.
- "Announcement: MOODY'S PUBLISHES CODE OF PROFESSIONAL CONDUCT," *Moody's Investors Service,* June 2, 2005.
- "Default & Loss Rates of Structured Finance Securities: 1993-2004," *Moody's Investors Service,* July 2005.
- "Moody's Modeling Approach to Rating Structured Finance Cash Flow CDO Transactions," *Moody's Investors Service*, September 26, 2005.
- "Update to Subprime Residential Mortgage Securitization Assumptions," *Moody's Investors Service*, December 2, 2005.
- "Structured Finance Rating Transitions: 1983-2005," *Moody's Investors Service,* February 2006.
- "Report on the Code of Professional Conduct," *Moody's Investors Service*, April 2006.
- "Moody's Approach to Coding Subprime Residential Mortgage Documentation Programs: Updated Methodology," *Moody's Investors Service*, November 28, 2006.
- "Early Defaults Rise in Mortgage Securitizations," *Moody's Investors Service*, January 18, 2007.

# Appendix C
# Documents Considered

- "2006 Review and 2007 Outlook: Home Equity ABS; 2006 Was Tough – Will 2007 Be Even More Challenging?" *Moody's Investors Service*, January 22, 2007.

-  "Sub-Prime Mortgages: An Integrated Look into Credit Issues Today and What to Expect," *Moody's Investors Service*, March 2007.

- "Comparing Ratings on Jointly-Rated U.S. Structured Finance Securities: 2007 Update," *Moody's Investors Service*, March 30, 2007.

- "Announcement:  Moody's comments on today's rating actions on second-lien RMBS," *Moody's Investors Service*, June 15, 2007.

- "Moody's Downgrades Subprime First-Lien RMBS," *Moody's Investors Service*, July 10, 2007.

- "Moody's Puts 184 CDO Tranches on Review for Possible Downgrade," *Moody's Investors Service*, July 11, 2007.

- "Moody's Corporation Reports Results for Second Quarter of 2007," *Moody's Investors Service*, August 1, 2007.

- "Rating Action:  Moody's downgrades ratings of 120 subprime RMBS tranches issued in 2005," *Moody's Investors Service,* August 22, 2007.

- "The Fundamentals Of Structured Finance Ratings," *Standard & Poor's*, August 23, 2007.

-  "Rating Action:  Moody's Downgrades $33.4 billion of 2006 Subprime First-Lien RMBS and Affirms $280 billion Aaa's and Aa's," *Moody's Investors Service*, October 11, 2007.

- "Moody's Corporation Reports Results for Third Quarter of 2007," *Moody's Press Release*, October 24, 2007.

- "Structured Finance Rating Transitions: 1983-2007," *Moody's Investors Service*, February 2008.

- "Update On U.S. RMBS: Performance, Expectations, Criteria," *Fitch Ratings*, February 2008.

- "S&P Appoints Clifford Griep Executive Managing Director, Ratings Risk Management," *Standard & Poor's,* May 8, 2008.

- "Moody's Confirms External Review of European CPDO Rating Process," *Moody's Press Release*, May 21, 2008.

- "Default & Loss Rates of Structured Finance Securities: 1993 – 2007," *Moody's Investors Service,* July 2008.

- "Moody's Credit Policy – Maintaining Consistent Corporate Ratings Over Time," *Moody's Investors Service*, August 2008.

- "Standard & Poor's Enhanced Mortgage Originator And Underwriting Review Criteria for RMBS," *Standard & Poor's*, November 25, 2008.

- "Structured Finance Rating Transitions: 1983-2008," *Moody's Investors Service*, March 2009.

# Appendix C
# Documents Considered

- "The Performance of Structured Finance Ratings: Mid-Year 2009 Report," *Moody's Investors Service,* December 2009.

**MOODY'S CORPORATION INVESTOR PRESENTATIONS**

- Moody's Corporation Investor Presentation, *UBS Global Media & Communications Conference*, December 3, 2007.
- Moody's Corporation Investor Presentation, *Citi Global Entertainment, Media & Telecommunications Conference 2009*, January 6, 2009.
- Moody's Corporation Investor Presentation, *William Blair Growth Stock Conference*, June 9, 2009.
- Moody's Corporation Investor Presentation, *Credit Suisse 12th Annual Global Services Conference,* February 23, 2010.

**CONGRESSIONAL PUBLICATIONS**

- Selected testimony from: "Examining the Role of Credit Rating Agencies in the Capital Markets," U.S. Senate Committee on Banking, Housing, and Urban Affairs, February 8, 2005.
- Selected testimony from: "Assessing the Current Oversight and Operation of Credit Rating Agencies," U.S. Senate Committee on Banking, Housing, and Urban Affairs, March 7, 2006.
- "Credit Rating Agency Reform Act of 2006," U.S. Senate Committee on Banking, Housing, and Urban Affairs, September 6, 2006.
- Senate Report to Accompany S. 3850: Credit Rating Agency Reform Act of 2006, Report 109-326, September 6, 2006.
- Selected testimony from: "Subprime Mortgage Market Turmoil: Examining the Role of Securitization," U.S. Senate Committee on Banking, Housing and Urban Affairs, April 17, 2007.
- Selected testimony from: "The Impact of Credit Rating Agencies on the Subprime Credit Markets," U.S. Senate Committee on Banking, Housing, and Urban Affairs, September 26, 2007.
- Selected testimony from: "The Role of Credit Rating Agencies in the Structured Finance Market," U.S. House Committee on Financial Services, September 27, 2007.
- Selected testimony from: "Turmoil in U.S. Credit Markets – The Role of the Credit Rating Agencies," U.S. Senate Committee on Banking, Housing, and Urban Affairs, April 22, 2008.
- Selected testimony from: "Credit Rating Agencies and the Financial Crisis," U.S. House Committee on Oversight and Government Reform, October 22, 2008.
- Selected testimony from: "The Role of Federal Regulators in the Financial Crisis," U.S. House Committee on Oversight and Government Reform, October 23, 2008.

# Appendix C
# Documents Considered

## BOOKS

- Allen, Steven (2003), "Financial Risk Management, A Practitioner's Guide to Managing Market and Credit Risk," *John Wiley & Sons, Inc.*
- Brealey, Richard A. and Stewart C. Myers (2003), "Principles of Corporate Finance," 7th Edition, *McGraw-Hill.*
- Constantinides, George, Milton Harris, and René Stulz (eds), (2003), "Handbook of the Economics of Finance," *Elsevier Science B.V.*
- Fabozzi, Frank J., (ed) (2000), "The Handbook of Fixed Income Securities," 6th Edition, *McGraw-Hill.*
- Fabozzi, Frank J, Henry A. Davis and Moorad Choudhry (2006), "Introduction to Structured Finance," *John Wiley & Sons, Inc.*
- Fama, Eugene F. (1976), "Foundations of Finance: Portfolio Decisions and Securities Prices," *Basic Books, Inc.*
- Jorion, Philippe and GARP (Global Association of Risk Professionals) (2007), "Financial Risk Manager Handbook," 4th Edition, *John Wiley & Sons, Inc.*
- Goodman, Laurie, Shumin Li, Douglas Lucas, Thomas Zimmerman, and Frank Fabozzi (2008), "Subprime Mortgage Credit Derivatives," *John Wiley & Sons, Inc.*
- Hickman, W. Braddock (1958), "Corporate Bond Quality and Investor Experience," *Princeton University Press.*
- Taylor, John B. (2009), "Getting Off Track: How Government Actions and Interventions Caused, Prolonged, and Worsened the Financial Crisis," 1st Edition, *Hoover Institution Press.*

## PUBLICATIONS

- Acharya, Viral V. and Lasse H. Pedersen (2005),  "Asset Pricing with Liquidity Risk," *Journal of Financial Economics* v77(2), 375 – 410.
- Adelino, Manuel (2009) "Do Investors Rely Only on Ratings?  The Case of Mortgage-Backed Securities," MIT Working Paper.
- Adelson, Mark, "Subprime Mortgages – A Realistic Outlook," *Asset Securitization Report,* August 20, 2007.
- Ahrend, Rudiger, Boris Cournède, and Robert Price (2008), "Monetary Policy, Market Excesses and Financial Turmoil," OECD Economics Department Working Paper No. 597.
- Altman, Edward I. and Herbert A. Rijken (2004), "How Rating Agencies Achieve Rating Stability," *Journal of Banking & Finance,* v28(11), 2679 – 2714.
- Altman, Edward I. and Herbert A. Rijken (2006), "A Point-in-Time Perspective on Through-the-Cycle Ratings," *Financial Analysts Journal,* v62(1), 54 – 70.
- Ashcraft, Adam B. and Til Schuermann (2008), "Understanding the Securitization of Subprime Mortgage Credit," Federal Reserve Bank of New York Staff Reports, March, 1 – 76.

# Appendix C
# Documents Considered

- Baker, H. Kent and Sattar A. Mansi (2002), "Assessing Credit Rating Agencies By Bond Issuers And Institutional Investors," *Journal of Business Finance & Accounting,* v29(9), 1367 – 1398.
- Barclay, Michael J. and Robert H. Litzenberger (1988), "Announcement Effects of New Equity Issues and the Use of Intraday Price Data," *Journal of Financial Economics,* v21, 71 – 99.
- Bhardwaj, Geetesh and Rajdeep Sengupta (2009), "Did Prepayments Sustain the Subprime Market," Federal Reserve Bank of St. Louis Working Paper.
- Brooks, Raymond M., Ajay Patel, and Tie Su (2003), "How the Equity Market Responds to Unanticipated Events," *Journal of Business*, v76(1), 109 – 133.
- Brunnermeier, Markus K. (2009), "Deciphering the Liquidity and Credit Crunch 2007–2008," *Journal of Economic Perspectives,* v23(1), 77 – 100.
- Busse, Jeffrey A. and T. Clifton Green (2002), "Market Efficiency in Real Time," *Journal of Financial Economics,* v65, 415 – 437.
- Cantor, Richard (2001), "Moody's Investors Service Response to the Consultative Paper Issued by the Basel Committee on Bank Supervision 'A New Capital Adequacy Framework,'" *Journal of Banking & Finance,* v25, 171 – 185.
- Cantor, Richard and Eric Falkenstein (2001), "Testing for Rating Consistency in Annual Default Rates," *The Journal of Fixed Income,* v11(2), 36 – 51.
- Cifuentes, Arturo (2006), "CDOs and Correlation: A Few Modeling Misconceptions," *CFA Institute Conference Proceedings Quarterly,* v23(2), 53 – 58.
- Cohen, Lauren, Andrea Frazzini, and Christopher Malloy (2008), "The Small World of Investing: Board Connections and Mutual Fund Returns," *Journal of Political Economy,* v116(5), 951 – 979.
- Cont, Rama and Cathrine Jessen (2009), "Constant Proportion Debt Obligations (CPDO): Modeling and Risk Analysis," Columbia University Working Paper.
- Crockett, Andrew, Trevor Harris, Frederic S. Mishkin and Eugene N. White (2003), "Conflicts of Interest in the Financial Services Industry:  What Should We Do about Them?" *Geneva Reports on the World Economy 5.*
- Demyanyk, Yuliya and Otto Van Hemert (2009), "Understanding the Subprime Mortgage Crisis," *Review of Financial Studies,* forthcoming.
- Fama, Eugene and Kenneth R. French (1989), "Business Conditions and Expected Returns on Stocks and Bonds," *Journal of Financial Economics,* v25, 23 – 49.
- Fender, Ingo and John Kiff (2004), "CDO Rating Methodology: Some Thoughts on Model Risk and its Implications," Bank for International Settlements Working Paper No. 163.
- Fender, Ingo and Martin Scheicher (2009), "The Pricing of Subprime Mortgage Risk in Good Times and Bad: Evidence from the ABX.HE Indices," Bank for International Settlements Working Paper No. 279.
- "Financial Stability Report," *Bank of England*, April 2008, Issue 23.
- Gerardi, Kristopher, Andreas Lehnert, Shane Sherlund and Paul Willen (2008), "Making Sense of the Subprime Crisis," *Brookings Papers on Economics Activity*, Fall, 69 – 159.
- Gorton, Gary B. (2008), "The Panic of 2007," NBER Working Paper No. 14358.

# Appendix C
# Documents Considered

- "Global Financial Stability Report: Containing Systemic Risks and Restoring Financial Soundness," *International Monetary Fund*, April 2008.
- Greene, Jason T. and Susan G. Watts (1996), "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Release," *Financial Management,* v25(1), 19 – 42.
- Hong, Harrison, Jeffrey D. Kubik, and Jeremy C. Stein (2005), "Thy Neighbor's Portfolio: Word-of-Mouth Effects in the Holdings and Trades of Money Managers," *Journal of Finance,* v60(6), 2801 – 2824.
- Hu, Jian (2007), "Assessing the Credit Risk of CDOs Backed by Structured Finance Securities: Rating Analysts' Challenges and Solutions," Moody's Investors Service Working Paper.
- Hubbard, R. Glenn and Christopher J. Mayer (2009), "The Mortgage Market Meltdown and House Prices," *The B.E. Journal of Economic Analysis & Policy*: v9(3), Article 8.
- Hull, John, Mirela Predescu, and Alan White (2004), "The Relationship Between Credit Default Swap Spreads, Bond Yields, and Credit Rating Announcements," *Journal of Banking and Finance*, v28, 2789 – 2811.
- "International Convergence of Capital Measurement and Capital Standards, A Revised Framework," *Bank for International Settlements, Basel Committee on Banking Supervision*, June 2004.
- Ivkovic, Zoran and Scott Weisbenner (2007), "Information Diffusion Effects in Individual Investors' Common Stock Purchases: Covet thy Neighbors' Investment Choices," *The Review of Financial Studies*, v20(4), 1327 – 1357.
- Jewell, Jeff and Miles B. Livingston (2000), "The Impact of a Third Credit Rating on the Pricing of Bonds," *The Journal of Fixed Income*, December, 69 – 85.
- Kealhofer, Stephen (2003), "Quantifying Credit Risk I: Default Prediction," *Financial Analysts Journal,* v59, 30 – 44.
- Kim, Yong Cheol, and René M. Stulz (1988), "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics*, v22(2), 189 – 205.
- Krinsman, Allan N. (2007), "Subprime Mortgage Meltdown: How Did It Happen and How Will It End?" *The Journal of Structured Finance,* 13 – 19.
- Longstaff, Francis A., Sanjay Mithal, and Eric Neis (2005), "Corporate Yield Spreads: Default Risk or Liquidity? New Evidence from the Credit Default Swap Market," *The Journal of Finance,* v60(5), 2213 – 2253.
- Loh, Roger K. and René M. Stulz (2010), "When are Analyst Recommendation Changes Influential?" Ohio State University Working Paper.
- Lucas, Douglas J., Laurie S. Goodman, and Frank J. Fabozzi (2004), "Default Rates on Structured Finance Securities," *The Journal of Fixed Income,* v14(2), 44 – 53.
- MacKinlay, A. Craig (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature,* v35(1), 13 – 39.
- "Mapping Global Capital Markets: Fifth Annual Report," *McKinsey & Company,* October 2008.

# Appendix C
# Documents Considered

- Mitchell, Mark L. and Jeffry M. Netter (1994), "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer,* v49, 545 – 590.
- "Model Risk," *Goldman Sachs,* Quantitative Strategies and Research Notes, April 1996.
- Partnoy, Frank (2005), "How and Why Credit Rating Agencies Are Not Like Other Gatekeepers," Working Paper*,* available at: [www.nomurafoundation.or.jp/data/20050928_Frank_Partnoy.pdf](www.nomurafoundation.or.jp/data/20050928_Frank_Partnoy.pdf).
- "Proposed Rules for Nationally Recognized Statistical Rating Organizations," U.S. Securities and Exchange Commission, June 16, 2008.
- Rajan, Uday, Amit Seru, and Vikrant Vig (2008), "The Failure of Models That Predict Failure: Distance, Incentives and Defaults," University of Michigan Working Paper.
- "Ratings in Structured Finance: What Went Wrong and What Can Be Done to Address the Shortcomings?" *Bank for International Settlements, Committee on the Global Financial System,* July 2008.
- "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," U.S. Securities and Exchange Commission, January 2003.
- "The Role of Ratings in Structured Finance: Issues and Implications," *Bank for International Settlements, Committee on the Global Financial System*, January 2005.
- Skinner, Douglas and Richard Sloan (2002), "Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio," *Review of Accounting Studies,* v7(2-3), 289 – 312.
- "Stop Persecuting Ratings Agencies," *International Financial Law Review,* May 1, 2008.
- Steiner, Manfred and Volker G. Heinke (2001), "Event Study Concerning International Bond Price Effects of Credit Rating Actions," *International Journal of Finance and Economics,* v6, 139 – 157.
- "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies," U.S. Securities and Exchange Commission*,* July 2008.
- Tanaka, Misa (2003), "The Macroeconomic Implications of the New Basel Accord," *CESifo Economic Studies,* v49(2), 217 – 232.
- Tavakoli, Janet (2005), "Structured Finance: Rating the Rating Agencies," *GARP Risk Review* 22 (January/February).
- Taylor, John B. and John C. Williams (2009), "A Black Swan in the Money Market," *American Economic Journal:  Macroeconomics,* v1(1), 58 – 83.
- Taylor, John B. (2009), "The Financial Crisis and the Policy Responses: An Empirical Analysis of What Went Wrong," NBER Working Paper 14631.
- "World Economic Outlook: Spillovers and Cycles in the Global Economy," *International Monetary Fund,* April 2007.
- Zimmerman Thomas (2007), "The Great Subprime Meltdown of 2007," *The Journal of Structured Finance,* v13(3), 7 – 20.

# Appendix C
# Documents Considered

**OTHER DOCUMENTS AND WEBSITES**

- American Securitization Forum's 2006 Annual Meeting, available at: www.americansecuritization.com/story.aspx?id=416.
- "Economists Predict Soft Landing For Housing," *National Association of Home Builders,* April 28, 2006.
- "Home Sales Settling Down and Appreciation Slowing," *National Association of Realtors,* June 6, 2006, available at: www.mortgagebankers.org.
- "Moody's History," available at: www.moodys.com/moodys/cust/AboutMoodys.aspx?topic=history.
- "Moody's Rating Definitions," available at: http://v3.moodys.com/ratings-process/Ratings-Definitions/002002.
- Description of Moody's CDOROM Suite, available at: http://www.moodys.com/cust/prodserv/prodserv.aspx?source=StaticContent/Free%20Pages/Products%20and%20Services/cdorom.htm&viewtemplate=/templates/mdcHeaderFooter.xml.
- Description of Moody's Mortgage Metrics, available at: http://www.moodys.com/cust/prodserv/prodserv.aspx?source=StaticContent/Free%20Pages/Products%20and%20Services/MortgageMetrics.htm&viewtemplate=/templates/mdcHeaderFooter.xml.
- Moody's Structured Finance Long-Term Ratings Definitions, available at: http://v3.moodys.com/ratings-process/Structured-Finance-Long-Term-Ratings/002002001007.
- Moody's Terms of Copyright, available at: http://www.moodys.com/moodys/cust/AboutMoodys/AboutMoodys.aspx?topic=copyright.
- "Mortgage Finance Market Commentary #8: Housing Activity Should Decline Modestly This Year," *Mortgage Bankers Association*, January 2, 2006, available at: www.mortgagebankers.org.
- Remarks by Chairman Alan Greenspan, "Risk Transfer and Financial Stability," To the Federal Reserve Bank of Chicago's Forty-first Annual Conference on Bank Structure, May 5, 2005, available at: http://www.federalreserve.gov/Boarddocs/Speeches/2005/20050505/default.htm.
- Remarks by John B. Taylor, "Housing and Monetary Policy," To the Federal Reserve Bank of Kansas City's Symposium on Housing, Housing Finance and Monetary Policy, September 2007, available at: www.kansascityfed.org/PUBLICAT/SYMPOS/2007/PDF/Taylor_0415.pdf.
- Standard & Poor's Credit Risk Summit Speaker List, October 20, 2006, available at: http://www2.standardandpoors.com/spf/pdf/events/CreditRisk2006.pdf.
- Description of Standard & Poor's CDO Evaluator, available at: http://www.standardandpoors.com/products-services/CDO-Evaluator/en/us.

# Appendix C
# Documents Considered

- Description of Standard & Poor's LEVELS RMBS Credit Model, available at: http://www.standardandpoors.com/products-services/levels-rmbs-model/en/us.
- The Wall Street Journal Economic Forecasting Survey, November 2006 and March 2007, available at: http://online.wsj.com/public/resources/documents/info-flash08.html?project=EFORECAST07.

## BLOGS

- Accrued Interest, available at: www.accruedint.blogspot.com.
- Merkel, David, The Aleph Blog, available at: www.alephblog.com.
- Minyanville, available at: www.minyanville.com.
- My Daily Fatwa, available at: http://mydailyfatwa.blogspot.com.
- Shedlock, Micheal, Mish's Global Economic Trend Analysis, March 16, 2005, available at: www.globaleconomicanalysis.blogspot.com.
- Singh, Pankaj, Anupam Siddharth and Rama Kant. Panka Singh Blog, available at: http://pankajsinghblog.blogspot.com.
- Thisismoney.co.uk, available at: www.thisismoney.co.uk.
- Weiss, Martin D., "The Greatest Scam of All," Prudent Investor Newsletters, October 19, 2004, available at: www.prudentinvestornewsletters.blogspot.com.

## DATA SOURCES

- The Center for Research in Security Prices ("CRSP")
  - Stock and volume data for Moody's Corporation and The McGraw Hill Companies
  - Returns data for the NYSE Index
- Bloomberg
  - Stock, volume and dividend data for Fimalac
  - Data for Euro-dollar and Swiss Franc-dollar spot rate
  - Index price data for the S&P 500 Financials Total Returns Index
  - S&P 500 Financials Total Returns Index Members
  - TED Spread
  - LIBOR-OIS Spread
  - Price to Earnings Ratio for Moody's Corporation, S&P 500 Index and the Russell 1000 Growth Index
  - Moody's Corporation 30-Day and Implied Stock Price Volatility
  - S&P 500 Index 30-Day Volatility
  - Chicago Board Options Exchange's Volatility Index, also available at: http://www.cboe.com/publish/ScheduledTask/MktData/datahouse/vixcurrent.csv.
  - Merrill Lynch High Yield Master Index

# Appendix C
# Documents Considered

- o Price data for Markit ABX.HE.AAA and ABX.HE.BBB Indices
- o Summary of Credit Crisis Related Writedowns by Financial Institution as of Q4 2009
  - Command <WDCI>
  - Institutions include Citi, Wachovia, Bank of America, JPMorgan, UBS, Merrill Lynch, HSBC, Morgan Stanley, RBS, Barclays, Deutsche Bank, Credit Suisse, Lehman Brothers, Bear Stearns, Wells Fargo, Washington Mutual, HBOS, ING, BNP Paribas, Sociéte Générale, Bayerische Landesbank, and National City Corp.
- Thomson Financial
  - o Institutional Holdings Data for Moody's Corporation
  - o Analyst Annual and Quarterly EPS Forecasts for Moody's Corporation, January 2003-March 2010
  - o Actual Annual and Quarterly EPS for Moody's Corporation, December 2002-December 2009
- United States Federal Reserve
  - o Asset-Backed Commercial Paper Outstanding
  - o Yield Data for Five, Seven- and Ten- Year Treasury Notes
  - o Historical Selected Interest Rates
  - o Historical Exchange Rates for British Pound, Euro, and Swiss Francs to U.S. Dollars, 2007 – 2009.
- United States Department of Commerce, U.S. Census Bureau
  - o Homeownership Rates for the US and Regions:  1965 to Present
- TAQ
  - o Intraday Stock Trade Price and Volume for Moody's Corporation, selected dates
- Inside Mortgage Finance Publications
  - o Quarterly U.S. Prime, Alt-A, Subprime MBS Issuance Data
- DataStream
  - o Forecast and Actual EPS for Moody's Corporation, 2006 – 2008
  - o Long- and Short-Term Growth Forecasts for Moody's Corporation, 2006-2008
- SDC
  - o Monthly U.S. Syndicated Loan Issuance
  - o Monthly U.S. Investment Grade Corporate Debt Issuance
  - o Monthly U.S. High Yield Corporate Debt Issuance
- SIFMA
  - o Quarterly U.S. Non-Agency CMBS and RMBS Issuance
  - o Quarterly U.S. ABS Issuance
  - o Quarterly U.S. Municipal Issuance

# Appendix C
# Documents Considered

- o Quarterly U.S. CDO Issuance
- o Quarterly European Structured Finance Issuance
- ABAlert.com
  - o Issuers of Worldwide Asset- and Mortgage-Backed Securities, 2006-2008
  - o Managers of US Asset-Backed Securities, 2006-2008
  - o Bookrunners of US Asset-Backed Securities, 2006-2008
  - o Bookrunners of US MBS, 2006-2008
  - o Bookrunners of Worldwide Structured Finance Deals, 2006-2008
- International Monetary Fund
  - o Price data for Markit ABX.HE.AAA and ABX.HE.BBB Indices
- CMAlert.com
  - o US CMBS Bookrunners, 2006-2008
- Federal Housing Finance Agency
  - o Monthly House Price Indexes for Census Divisions and US: January 1991 – October 2009
- Standard & Poor's
  - Case-Shiller Home Price Indices, January 1987-January 2009

**Exhibit 1A**

# U.S. Debt Issuance
## Q1 2001 – Q4 2008
Source:  SDC; SIFMA



Note:  Non-Agency MBS contains Prime RMBS, Alt-A RMBS, and CMBS.  U.S. Subprime RMBS is included in U.S. ABS Issuance.  U.S. CDO issuance represents the subset of global CDOs that were issued in US dollars.  There was no available data for CMBS issuance in Q4 2008.

**Exhibit 1B**



# U.S. and European Structured Finance Issuance
## Q1 2001 – Q4 2008
Source: SIFMA

Note:  U.S. Subprime RMBS is included in U.S. ABS Issuance.  European structured finance issuance includes ABS, CMBS, CDO, and RMBS.  U.S. CDO issuance represents the subset of global CDOs that were issued in US dollars.  There was no available data for CMBS issuance in Q4 2008.

**Exhibit 2**



### U.S. RMBS Issuance
Q1 2002 – Q4 2008

Source: Inside Mortgage Finance Publications

Note: Excludes Agency RMBS.

# Exhibit 3
## Top Structured Finance Issuers, Managers, and Bookrunners Holding Moody's Stock[1,2]
### 2006 – 2008

Source: *Thomson Financial*; *ABAlert*; *CMAlert*

| Structured Finanace Issuer / Manager / Bookrunner | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|
| | Average Moody's Shares[3] | % of Total Shares Out | Average Moody's Shares[3] | % of Total Shares Out | Average Moody's Shares[3] | % of Total Shares Out |
| Bank of America Corp. | 768,615 | 0.269% | 1,303,870 | 0.484% | 2,018,046 | 0.828% |
| Barclays Bank PLC | 10,525,392 | 3.681% | 13,510,218 | 5.015% | 10,447,615 | 4.288% |
| Bear Stearns & Co., Inc. | 113,762 | 0.040% | 484,904 | 0.180% | 203,875 | 0.084% |
| Citigroup Inc. | 221,675 | 0.078% | 351,881 | 0.131% | 269,543 | 0.111% |
| Credit Suisse Group AG | 736,126 | 0.257% | 999,740 | 0.371% | 902,614 | 0.370% |
| Deutsche Bank | 1,259,744 | 0.441% | 907,142 | 0.337% | 728,037 | 0.299% |
| GMAC | 42,000 | 0.015% | 262,899 | 0.098% | - | - |
| Goldman Sachs & Company | 9,000,912 | 3.148% | 8,881,577 | 3.297% | 4,144,168 | 1.701% |
| ING Groep N.V. | 177,462 | 0.062% | 98,038 | 0.036% | 368,164 | 0.151% |
| J.P. Morgan Chase & Co. | 550,177 | 0.192% | 393,585 | 0.146% | 383,906 | 0.158% |
| Lehman Brothers, Inc. | 73,893 | 0.026% | 252,716 | 0.094% | 72,774 | 0.030% |
| Lloyds TSB Bank PLC | 26,041 | 0.009% | - | - | - | - |
| Merrill Lynch & Company | 357,792 | 0.125% | 748,672 | 0.278% | 540,136 | 0.222% |
| Morgan Stanley | 5,169,233 | 1.808% | 7,639,149 | 2.836% | 8,685,495 | 3.565% |
| Wachovia Corporation | 667,459 | 0.233% | 556,525 | 0.207% | 527,019 | 0.216% |
| Wells Fargo | 400,275 | 0.140% | 361,306 | 0.134% | 822,346 | 0.338% |
| Total | 30,090,557 | 10.524% | 36,752,221 | 13.642% | 30,113,735 | 12.360% |

Note:

[1] Entities in top 10 dollar volume of (1) US bookrunners (ABS, MBS, and CMBS); (2) US ABS managers; or (3) worldwide ABS, MBS, and CDO issuers at least once from 2006-2008 (as reported by *ABAlert* and *CMAlert*) who also held Moody's shares at some point during the same period.

[2] Overall, at least 40 entities that are identified by *ABAlert* and *CMAlert* as top structured finance issuers, managers, and bookrunners purchased or held Moody's shares at some point during 2006-2008.

[3] Yearly average shares calculated as the average of the holdings as of the end of each quarter. Entities with the same identifiable parent are aggregated. Thomson Financial collects holdings data from 13-F filings with the SEC, among other sources. The SEC only requires institutions report long positions.

## Exhibit 4A

## Top 20 Institutional Investors of Moody's Corporation

### As of Year End 2005 – 2008

Source: *Thomson Financial*

| Rank | 12/31/05 Institutional Investor | Total Holdings | 12/31/06 Institutional Investor | Total Holdings | 12/31/07 Institutional Investor | Total Holdings | 12/31/08 Institutional Investor | Total Holdings |
|---|---|---|---|---|---|---|---|---|
| 1 | Berkshire Hathaway Inc. | 48,000,000 | Berkshire Hathaway Inc. | 48,000,000 | Berkshire Hathaway Inc. | 48,000,000 | Berkshire Hathaway Inc. | 48,000,000 |
| 2 | Davis Selected Advisers, LP | 18,971,712 | Davis Selected Advisers, LP | 19,005,735 | Davis Selected Advisers, LP | 18,547,115 | Davis Selected Advisers, LP | 18,851,455 |
| 3 | Goldman Sachs & Company | 14,036,797 | Barclays Bank PLC | 12,393,498 | Sands Capital Management, LLC | 13,999,316 | MSDW & Company | 9,958,985 |
| 4 | Sands Capital Management, LLC | 10,893,717 | Sands Capital Management, LLC | 11,611,701 | MSDW & Company | 12,278,650 | Barclays Bank PLC | 9,100,171 |
| 5 | Baillie Gifford & Co. | 8,775,662 | Baillie Gifford & Co. | 10,386,808 | Barclays Bank PLC | 11,872,034 | Amvescap Plc London | 8,965,036 |
| 6 | Fidelity Management & Research | 8,594,862 | Goldman Sachs & Company | 8,111,563 | Baillie Gifford & Co. | 9,776,832 | State Street Corporation | 8,166,224 |
| 7 | Barclays Bank PLC | 8,469,662 | State Street Corpora ion | 8,042,301 | T. Rowe Price Associates, Inc. | 9,679,863 | Longview Asset Mgmt, LLC | 7,510,074 |
| 8 | State Street Corporation | 7,221,829 | Fidelity Management & Research | 7,654,884 | Amvescap PLC London | 6,934,732 | Sands Capital Management, LLC | 6,951,665 |
| 9 | Janus Capital Management LLC | 6,762,855 | Delaware Management Co. | 7,564,638 | State Street Corporation | 6,602,218 | Vanguard Group, Inc. | 6,449,910 |
| 10 | Delaware Management Co. | 6,401,166 | Janus Capital Management LLC | 6,482,783 | Vanguard Group, Inc. | 6,377,844 | Goldman Sachs & Company | 5,889,461 |
| 11 | Vanguard Group, Inc. | 5,890,256 | Vanguard Group, Inc. | 6,167,821 | Goldman Sachs & Company | 4,733,020 | Mellon Bank NA | 5,522,575 |
| 12 | WCM Investment Mgmt, Inc. | 4,600,254 | Mellon Bank NA | 5,522,928 | Valueact Cap Partners, LP | 3,877,900 | T. Rowe Price Associates, Inc. | 5,346,759 |
| 13 | Loomis, Sayles & Company, LP | 4,557,080 | MSDW & Company | 5,285,209 | Neuberger Berman, LLC | 3,675,550 | Select Equity Group, Inc. | 5,325,207 |
| 14 | MSDW & Company | 4,098,161 | American Cent Investment Mgmt. | 4,166,862 | John W. Bristol & Co, Inc. | 3,674,825 | Neuberger Berman, LLC | 4,970,131 |
| 15 | Northern Trust Corp. | 3,915,958 | Atticus Capital, LP | 3,427,400 | Allianz Dresdner Asset Mgmt AM | 3,661,179 | Capital World Investors | 4,290,000 |
| 16 | Mellon Bank NA | 3,551,996 | Northern Trust Corp. | 3,363,185 | Fidelity Management & Research | 3,267,339 | Aronson + Johnson + Ortiz LP | 4,279,200 |
| 17 | Putnam Investment Mgmt, LLC | 2,659,863 | Putnam Investment Mgmt, LLC | 2,766,609 | Northern Trust Corp. | 3,008,524 | Wellington Management Co, LLP | 3,073,192 |
| 18 | Harris Associates LP | 2,578,905 | Mackenzie Financial Corp | 2,675,700 | Axa Financial, Inc. | 2,967,859 | Janus Capital Management LLC | 2,659,950 |
| 19 | College Retire Equities | 2,411,334 | Grantham Mayo Van Otterloo & Co. | 2,522,128 | Alex. Brown Investment Mgmt | 2,962,250 | Northern Trust Corp. | 2,563,030 |
| 20 | Marathon Asset Management LLP | 2,368,676 | Marsico Capital Mgmt, LLC | 2,419,329 | Oppenheimer Funds, Inc. | 2,702,952 | Lord, Abbett & Co. LLC | 2,187,709 |
| **Total Holdings of Top 20 Institutions** | | **174,760,745** | | **177,571,082** | | **178,600,002** | | **170,060,734** |
| *% of Total Shares Outstanding* | | *59.16%* | | *63.46%* | | *69.12%* | | *70.92%* |

Note: Thomson Financial collects holdings data from 13-F filings with the SEC, among other sources.  The SEC only requires institutions report long positions.

**Exhibit 4B**

# Estimated Quarterly Net Institutional Holdings of Moody's Corporation Common Stock

12/31/05 – 12/31/07

Source: *Bloomberg*; *Thomson Financial*

| | 12/31/05 | 3/31/06 | 6/30/06 | 9/30/06 | 12/31/06 | 3/31/07 | 6/30/07 | 9/30/07 | 12/31/07 |
|---|---|---|---|---|---|---|---|---|---|
| Total Holdings of All Institutions (Net of Short Interest)[1] | 255,088,285 | 254,890,125 | 238,181,048 | 237,255,015 | 243,782,313 | 248,823,795 | 244,808,759 | 229,826,342 | 226,269,239 |
| *Number of Institutions* | *462* | *463* | *436* | *442* | *475* | *480* | *483* | *439* | *424* |
| *% of Total Shares Outstanding plus Short Interest[2]* | *85.02%* | *85.03%* | *80.56%* | *82.74%* | *85.89%* | *87.22%* | *83.87%* | *77.86%* | *77.04%* |

Note:

[1]  Total holdings of all institutions are adjusted by subtracting outstanding short interest.

[2]  Total shares outstanding plus short interest is used as the denominator in the percentage.

**Exhibit 5**



**Moody's Corporation vs. S&P 500
Actual and Implied Stock Price Volatility**
11/3/05 – 1/24/09
Source: *Bloomberg*

Note:  30-day volatilities are equal to the annualized standard deviation of the relative price change for the 30 most recent trading days' closing prices.  The implied volatility is equal to the weighted average of the volatilities derived from the closest out-of-the-money call option and the closest out-of-the-money put option.  VIX refers to the Chicago Board Options Exchange's Volatility Index, which is based on the S&P 500 Index and estimates expected volatility by averaging the weighted prices of S&P 500 Index puts and calls over a wide range of strike prices. All volatilities and VIX values are obtained directly from Bloomberg.  The two break points correspond to BNP Paribas' suspension of redemptions from three of its funds on August 9, 2007 and Lehman Brothers' bankruptcy on September 15, 2008.

**Exhibit 6**
**In Re: Moody's Corporation Securities Litigation**
**Summary of Alleged Misstatements and Corrective Disclosures**
4/1/03 – 10/22/08

Source: *CRSP*; *Bloomberg*; Plaintiffs' Consolidated Amended Complaint; Plaintiffs' Class Certification Memorandum; Opinion and Order filed February 23, 2009

| Date[1] | Alleged Misstatements | Moody's Return[2] | | Next Day Moody's Return[2] | |
|---|---|---|---|---|---|
| 4/1/03 | Moody's releases the report "Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools" in which Moody's represented that it conducted independent assessments of loan originator standards and practices. (Complaint ¶111). | 1.73% | | 0.55% | |
| 6/2/05 | Moody's publishes its "Code of Professional Conduct". (Complaint ¶68). | -0.30% | | -0.32% | |
| 3/1/06 | Moody's files its 2005 10-K and reiterates that its ratings are independent. (Complaint ¶73, 80). | 2.07% | | -0.57% | |
| 3/23/06 | Moody's publishes its 2005 Annual Report to Shareholders and reiterates that its ratings are independent. (Complaint ¶71–2). | 0.29% | | 1.22% | |
| 3/1/07 | Moody's files its 2006 10-K and reiterates that its ratings are independent. (Complaint ¶73, 80). | 2.21% | | -0.08% | |
| 3/22/07 | Moody's publishes its 2006 Annual Report to Shareholders and comments that revenue growth is tied to ratings independence and quality. (Complaint ¶83). | -0.05% | | -1.16% | |
| 4/2/07 | Moody's reiterates that its MBS rating methodology involves the review of elements of the origination and servicing processes of mortgage loans, such as mortgage loan underwriting quality, underwriting guidelines, appraisal standards, quality assuarance processes, and loan originators' historical performance. (Complaint ¶112). | -1.26% | | 0.18% | |
| 10/3/07 | Moody's states that because lender's loan origination and underwriting practices could ultimately explain significant differences in transaction performance, Moody's reviews the underwriting guidelines, operations and loan performance history of originators and makes rating distinctions based on its assessment of origination quality. (Complaint ¶112). | 1.76% | | -3.10% | |

| Date[1] | Alleged Disclosures | Moody's Return[2] | | Next Day Moody's Return[2] | |
|---|---|---|---|---|---|
| 8/20/07 | It is reported that Senator Richard Shelby, the top Republican on the U.S. Senate Banking, Housing, and Urban Affairs Committee, had remarked that rating agencies must shoulder some responsibility for the subprime mortgage crisis. (Complaint ¶400). | -8.18% | * | 1.96% | |
| 10/12/07 | Moody's reveals in a presentation entitled "RMBS and CDO Update (Rating Actions)" that it had separated mortgage originators into three quality tiers, that mortgage performance varied significantly across those tiers, and that its future loss projections for 2006 vintage subprime loans would be adjusted upwards due to originator tiering and other factors. In the presentation, Moody's also reports on its October 11, 2007 downgrades of 2006 vintage subprime RMBS. (Complaint ¶122, Endnote 9). | 0.49% | | -2.41% | |
| 10/17/07 | Moody's releases reports that cite deteriorating mortgage origination standards for losses in the subprime market and that again discuss Moody's October 11, 2007 downgrades of 2006 vintage subprime RMBS. (Complaint ¶113, 122, Endnotes 8–9). | -1.00% | | -0.42% | |
| 10/24/07 | Moody's reports Q2 2007 financial and operational results and lowers its 2007 guidance due to declines in revenues from structured finance. Moody's also announces expenditure cuts, a "soft freeze" on hiring, and an unspecified "restructuring" charge. (Complaint ¶377–9, 400, Endnote 95). | -3.06% | | -5.66% | * |
| 10/25/07 | | -5.66% | * | 0.14% | |
| 4/11/08 | A *Wall Street Journal* front-page article reveals a specific example of how "ratings shopping" pressures led Moody's to relax its ratings standards. (Complaint ¶347, 352). | -3.80% | | -2.07% | |
| 5/21/08 | The *Financial Times* reports that Moody's had misrated billions of dollars worth of CPDOs as a result of an error in its computer model and that rather than correcting the error, Moody's had instead amended the methodology employed in order to maintain the prior ratings. (Complaint ¶363–4, 399, 400). | -15.92% | * | -6.50% | * |
| 10/22/08 | A hearing on credit rating agencies is held before the U.S. Congressional House Oversight and Government Reform Committee. (Memorandum, pp. 5–6). | -11.07% | | -2.17% | |

Note:

[1] The dates included are the alleged misstatement and corrective disclosure days according to the Plaintiffs' Class Certification Memorandum and the Opinion and Order filed February 23, 2009.

[2] All returns are adjusted for splits and dividends. Moody's statistically significant abnormal returns during the putative Class Period are denoted by an asterisk (*). Due to the increase in volatility after the financial crisis started, the putative Class Period is divided into three parts. The first sub-period runs from February 3, 2006 through August 8, 2007, the day before BNP Paribas suspended redemptions from three of its funds due to subprime problems. The second sub-period runs from August 9, 2007 through September 12, 2008, the Friday prior to Lehman Brothers filing for bankruptcy. The third sub-period runs from September 15, 2008 to October 22, 2008. Within each sub-period, expected returns are calculated as a function of three factors: a) the return on the NYSE/Nasdaq Composite Index, b) the return on the S&P 500 Financials Index, and c) the return on an equal-weighted index of the returns of the publicly traded parents of Fitch and Standard & Poors, Fimalac and McGraw-Hill, respectively.

**Exhibit 7**

## Year-over-Year Percent Change in Home Prices
### January 2000 – January 2009
Source: FHFA/OFHEO; Standard & Poor's



Note: Federal Housing Finance Agency (FHFA) data is seasonally adjusted and reported monthly for the U.S. as a whole. Case-Shiller data is for the 10-City Metropolitan Area, which includes Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New York, San Diego, San Francisco, and Washington D.C. Percent change is calculated on a year-to-year basis using the index values from the month in question and the same month in the preceding year.

**Exhibit 8**

## Spread Between Merrill Lynch High Yield Bond Index and Intermediate Maturity U.S. Treasury Bonds

2/1/90 – 12/31/08

Source:  *Bloomberg*; Federal Reserve



Note:  The yield spread presented here is the average spread of the Merrill Lynch High Yield Master Index over 5, 7, and 10 year Treasury notes.

**Exhibit 9**

# Asset-Backed Commercial Paper Outstanding
## 1/1/01 – 10/22/08
Source:  U.S. Federal Reserve



Note:  Outstanding commercial paper amounts are calculated by the U.S. Federal Reserve Board and can be either seasonally adjusted using "the Bell Labs seasonal adjustment method" or unadjusted.  This chart shows seasonally unadjusted data.  The weekly series peaks on 8/8/07.

**Exhibit 10**



**TED Spread and LIBOR-OIS Spread**

12/5/01 – 10/22/08

Source: *Bloomberg*

Note: The TED spread is the difference between the 3 month LIBOR rate and the 3 month U.S. Treasury rate. The LIBOR-OIS spread is the difference between the 3 month LIBOR rate and the 3 month Overnight Index Swap (OIS) rate, which is tied to the Federal Funds rate. Increases in the TED and LIBOR-OIS spreads are generally associated with increased perceived counterparty risk and lower liquidity.

## Exhibit 11

## ABX.HE.AAA and BBB Indices:  2/3/06 – 10/22/08

Source:  *Bloomberg*; IMF



Note:  ABX.HE indices are liquid, tradable indices referencing subprime mortgage-backed securities.  Data for the four AAA series and four BBB series are displayed "on the run," such that only the most recent vintage is shown at all times.  For both the AAA and BBB series, the dashed vertical lines represent the start dates of the new 06-2, 07-1, and 07-2 series, which are 7/19/06, 1/19/07, and 7/19/07, respectively.  IMF data for the 07-2 series are supplemented by Bloomberg data after 7/17/08.

**Exhibit 12**

# Structured Finance-Related Write-downs for Select Financial Institutions
## Q3 2007 – Q4 2008

Source:  *ABAlert*; *Bloomberg*; Annual and Quarterly Reports; Federal Reserve; SEC Filings
*(all figures in millions)*

| Financial Institution[1] | Alt-A RMBS, Subprime RMBS, and CDO-related Write-downs[2] | | | | | | Total | Total Write-downs[3] |
|---|---|---|---|---|---|---|---|---|
| | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 | | |
| Citigroup Inc. | $ - | $ 17,635.00 | $ 7,020.00 | $ 3,825.00 | $ 1,547.00 | $ 5,900.00 | $ 35,927.00 | $ 123,899.80 |
| Wachovia Corp. | $ - | $ 818.00 | $ 483.00 | $ 390.00 | $ - | $ - | $ 1,691.00 | $ 101,887.00 |
| Bank of America Corp. | $ - | $ 5,280.00 | $ 1,470.00 | $ 645.00 | $ 952.00 | $ 1,720.00 | $ 10,067.00 | $ 89,305.00 |
| JPMorgan Chase & Co. | $ 379.00 | $ 1,371.00 | $ - | $ - | $ - | $ - | $ 1,750.00 | $ 63,134.00 |
| UBS AG | $ 4,400.00 | $ 12,800.00 | $ 13,324.00 | $ 1,400.00 | $ 1,100.00 | $ (400.00) | $ 32,624.00 | $ 57,212.76 |
| Merrill Lynch & Co, | $ 6,900.00 | $ 9,864.00 | $ 1,472.00 | $ - | $ 5,700.00 | $ - | $ 23,936.00 | $ 55,904.00 |
| Royal Bank of Scotland Group Plc | $ - | $ 1,307.65 | $ - | $ 3,766.22 | $ - | $ 1,584.70 | $ 6,658.57 | $ 53,177.94 |
| HSBC Holdings Plc | $ - | $ - | $ 500.00 | $ 466.00 | $ - | $ 442.00 | $ 1,408.00 | $ 50,476.00 |
| Washington Mutual Inc. | $ - | $ - | $ - | $ - | $ 5,761.00 | $ - | $ 5,761.00 | $ 45,329.00 |
| Barclays Bank PLC | $ - | $ 3,244.33 | $ 982.82 | $ 756.43 | $ - | $ - | $ 4,983.58 | $ 40,361.90 |
| Morgan Stanley | $ - | $ - | $ 1,200.00 | $ - | $ - | $ - | $ 1,200.00 | $ 23,388.00 |
| Credit Suisse Group AG | $ - | $ 1,183.69 | $ 2,721.50 | $ - | $ - | $ - | $ 3,905.19 | $ 20,034.70 |
| ING Groep N.V. | $ - | $ - | $ 79.03 | $ 85.04 | $ 575.91 | $ 2,759.91 | $ 3,499.88 | $ 19,855.32 |
| Société Générale | $ 176.32 | $ 1,581.50 | $ 553.18 | $ 31.50 | $ (443.55) | $ 89.08 | $ 1,988.02 | $ 19,168.52 |
| Total | $ 11,855.32 | $ 55,085.18 | $ 29,805.52 | $ 11,365.18 | $ 15,192.36 | $ 12,095.69 | $ 135,399.24 | $ 763,133.94 |

Note:

[1] This includes the top 20 banks or insurers with the highest total write-downs as listed in *Bloomberg*'s write-down and credit infusion (<WDCI>) database, which displays credit-related losses and capital infusions. The included banks were also among the top 20 firms listed in *ABAlert*'s Issuers of Worldwide Asset- and Mortgage-Backed Securities or Bookrunners of Worldwide Structured Finance Deals at some point during the period 2006 – 2008.  Note that the Issuers of Worldwide Asset- and Mortgage-Backed Securities reports also take CDO issuance into account.

[2] Write-downs are collected from the *Bloomberg* write-down and credit infusion (<WDCI>) database.  Only firms with the following types of write-downs are factored into the above calculations:  those related to Subprime RMBS (SUB), Alt-A RMBS (ALT), and CDOs (CDO).  Write-downs denominated in foreign currency are converted to U.S. Dollars based on the foreign exchange rate on the last day of the relevant quarter.  These rates are published daily by the Federal Reserve.

[3] Total write-downs includes all credit-related write-downs listed in *Bloomberg* from Q3 2007 – Q4 2008. In addition to the above write-downs, they include non-mortgage asset-backed securities (ABS), auction rate securities (ARS), credit default swaps or other derivatives (CDS), CMBS and commerical real estate (CMBS), subsidiaries or investments in other firms or corporate debt (CORP), credit costs or loan chargeoffs or increased provisions (COST), leveraged loans or collateralized loan obligations (LEV), monolines (MONO), o her or uncategorized mortgages or mortgage-related securities (MTGE), revaluation reserve or other comprehensive income (OCI), prime mortgages or securities (PRI), uncategorized residential mortgage asset write-downs (RES), SIVs or asset-backed commercial paper (SIV), trading losses (TRA) or unspecified losses (UNS).

# Exhibit 13

## Moody's Corporation vs. the NYSE Index, S&P 500 Financials Index, and Peers

Source: *CRSP; Bloomberg*



Note: All prices are adjusted for splits and dividends. All indices are pegged to MCO's adjusted closing stock price of $62.04 on 7/2/07. Fimalac returns are based on dollar-denominated closing prices calculated by Bloomberg on a daily basis; Euro-denominated Fimalac dividends were converted to dollar amounts using closing Euro spot prices.

**Exhibit 14**

# Moody's Corporation Financial Performance and U.S. Debt Issuance
## Q1 2001 − Q4 2008

Source: Moody's Corporation Presentations; SDC; SEC Filings; SIFMA



Note: Quarterly data is used to track Moody's ratings revenues and structured finance ratings revenue from Q1 2001 to Q4 2008. Total U.S. ratable debt issuance data from SDC and SIFMA includes RMBS, CMBS, ABS, syndicated loans, high yield corporate debt, investment grade corporate debt, CDOs, and municipal debt. U.S. structured finance issuance includes RMBS, CMBS, ABS, and CDOs. Issuance totals do not include agency MBS. From Q1 2005 to Q4 2008, Moody's structured finance revenues are adjusted retroactively for the business reclassification that began in January 2008. Prior to Q1 2005, structured finance revenues are taken as of the filing date of the relevant SEC filings .

**Exhibit 15**

## Moody's Corporation:  Median Analyst EPS Forecasts
2/3/06 – 10/22/08
Source:  *I/B/E/S*



Note:  For each fiscal year, solid lines represent the median EPS forecast, which is calculated for the two years prior to the actual EPS announcement using all available forecasts from the six banks that provide forecasts for the 2006 – 2008 period.  These banks are as follows:  Bank of America Merrill Lynch; Citi; Goldman Sachs; JPMorgan; Morgan Stanley; and William Blair & Company.  Dotted lines represent the actual EPS figure for each fiscal year and are displayed from the day after the previous year's EPS announcement to the day preceding the announcement of that year's figure.

**Exhibit 16**

## Moody's Corporation Ratings Revenue by Segment
### Q1 2005 – Q1 2009
Source:  SEC Filings; Moody's Corporation Presentations



Note:  The above revenue totals are adjusted retroactively for the business reclassification that began in January 2008.  The exhibit draws upon quarterly data.  Beginning in January 2008, there were several realignments within the Moody's Investors Service lines of business.  Sovereign and sub-sovereign ratings, which were previously part of financial institutions; infrastructure/utilities ratings, which were previously part of corporate finance; and project finance, which was previously part of structured finance, were combined with the public finance business to form a new line of business called public, project and infrastructure finance.  In addition, real estate investment trust ratings were moved from financial institutions and corporate finance to the structured finance business.  Furthermore, in August 2008, the global managed investments ratings group, previously part of the structured finance business, was combined with the financial institutions business.  The "All Other" revenue category refers to all non-ratings revenues, which includes proceeds from Moody's KMV, Moody's Analytics, intersegment royalty, and/or research.  The "All Other" revenue category has been calculated as total Moody's Corporation revenues minus Moody's ratings revenues.

**Exhibit 17**

# Moody's Corporation Structured Finance Revenue by Asset Class
## Q1 2006 – Q2 2009
Source:  SEC Filings; Moody's Corporation Presentations



Note:  Prior to Q1 2007, total structured finance revenue is taken as of the reported date from the SEC filings, and the breakdown in structured finance revenue is taken from Moody's Corporation Presentation on December 3, 2007.  From Q1 2007 to Q4 2008, total structured finance revenue is adjusted retroactively for the business reclassification that began in January 2008 and is taken from Moody's Corporation Presentation on February 23, 2010.  Total revenue for Q1 and Q2 2009 is taken as of the reported date from SEC filings.  The breakdown in structured finance revenue from Q1 2007 to Q4 2007, from Q1 2008 to Q4 2008, and from Q1 2009 to Q2 2009 is taken from Moody's Corporation Presentations on January 6, 2009, June 9, 2009 and February 23, 2010, respectively.  The CREF (commercial real estate finance) sub-segment includes REITs, commercial real estate CDOs, CMBS, and real estate finance.  It was created during Moody's January 2008 business reclassification by combining the CMBS segment with the REIT ratings from the financial institutions and corporate finance segments.  Prior to Q1 2007, CREF revenue is approximated by CMBS revenues.  The Other sub-segment was not reported from Q1 2007 onwards.  The ABS sub-segment includes asset-backed commercial paper and long-term asset-backed securities.

# Exhibit 18

# Moody's Corporation Intraday Stock Trades and Cumulative Volume

## August 20, 2007

Source: *TAQ*; *CRSP*; *Bloomberg*; *Factiva*



At 6:33 AM, it is reported that Senator Richard Shelby, the top Republican on the U.S. Senate Committee on Banking, Housing, and Urban Affairs, remarked that rating agencies must "shoulder some responsibility" for the subprime crisis. However, he also cautions that legislators should try not to "overregulate the market." Moreover, the Committee's Chairman, Senator Christopher Dodd, had previously called for an examination of the rating agencies' role in the subprime mortgage meltdown. For instance, on August 1, 2007, Dodd commented that the U.S. SEC needs additional authority to eliminate credit rating agencies' inherent conflicts of interest. On August 17, 2007, during market hours, Senator Dodd expressed "great concern" about how rating agencies valued mortgage-related assets.

Banc of America Securities, JPMorgan Securities, and Wachovia Securities price Moody's $300 million private debt placement, which was announced the previous week. (Time Unknown).

Before market open, JP Morgan downgrades McGraw-Hill due to concerns that turmoil in the U.S. credit markets could cut revenue at the Standard & Poor's division.

Closing price on 8/17/07: $49.98

Closing price on 8/20/07: $45.89

Market Open - 9:30 AM

Market Close - 4:00 PM

**Stock Price**

$50.50
$50.00
$49.50
$49.00
$48.50
$48.00
$47.50
$47.00
$46.50
$46.00
$45.50
$45.00

**Cumulative Volume (000's)**

16,000
14,000
12,000
10,000
8,000
6,000
4,000
2,000

9:00 AM     10:30 AM     12:00 PM     1:30 PM     3:00 PM     4:30 PM

# Exhibit 19

## Moody's Corporation vs.
## the S&P 500 Financials Index Following 5/21/08 Announcement
5/20/08 – 7/10/08



**Closing Price**

Source: *CRSP*; *Bloomberg*; *Factiva*; Analyst Reports; SEC Filings

**5/21/08 (pre-open):**
The *Financial Times* reports on Moody's alleged masking of an error in its CPDO ratings methodology. Sen. Schumer urges the SEC to impose sanctions on Moody's if these allegations proves correct.

**5/22/08 (pre-open):**
Connecticut's Attorney General (AG) says he has subpoenaed Moody's as part of an antitrust investigation.

**5/27/08:**
The SEC states it is widening its examination of ratings agencies.

**6/3/08 – 6/5/08:**
The *Financial Times* reports that New York's AG has reached an agreement with the ratings agencies regarding fee reforms for MBS-related credit ratings. After two days of speculation, the AG confirms this report. The SEC endorses the terms of the agreement. Moody's states that any changes stemming from regulatory probes are unlikely to have a significant impact on the firm's core business model or operations.

**7/8/08:**
The SEC releases a report discussing various concerns about the ratings agencies and suggesting that the firms improve their practices. The ratings agencies are reported to be cooperative and working to address the SEC's concerns.

**5/29/08 (pre-open):**
The IOSCO issues a revised code of conduct for ratings agencies.

**6/11/08:**
The SEC meets to propose additional regulatory requirements for ratings agencies. These requirements, which analysts say contain few surprises, primarily address conflicts of interest and disclosure issues. A proposal is subsequently published on 6/16/08.

**7/1/08:**
Moody's announces the results of an external investigation into the *Financial Times'* 5/21/08 allegations. No employees are found to have made methodological changes to mask the reported error.

**S&P 500 Financials**

**Moody's**

Note: All prices are adjusted for splits and dividends. The S&P 500 Financials Total Returns Index is pegged to MCO's adjusted closing stock price of $43.90 on 5/20/08.

**Exhibit 20**

**Example Institutional Members of the Proposed Class**
**Quarterly Holdings of Moody's Corp. Stock**
6/30/07 – 12/31/08
Source: *Thomson Financial*

| Rank | Institutional Investor[1] | 6/30/07 | 9/30/07 | 12/31/07 | 3/31/08 | 6/30/08 | 9/30/08 | 12/31/08 |
|------|---------------------------|---------|---------|----------|---------|---------|---------|----------|
| 1 | MARSICO CAPITAL MGMT, L.L.C. | 12,695,111 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 | ATTICUS CAPITAL, L.P. | 5,876,899 | 3,896,353 | 1,644,600 | 0 | 0 | 0 | 0 |
| 3 | LATEEF INVESTMENT MGMT, L.P. | 3,716,452 | 2,367,641 | 0 | 0 | 0 | 0 | 0 |
| 4 | ALLIANZ DRESDNER ASSET MGMT AM | 3,550,822 | 3,766,392 | 3,661,179 | 845,732 | 22,663 | 7,607 | 0 |
| 5 | RENAISSANCE TECHNOLOGIES CORP. | 2,014,100 | 1,204,500 | 704,200 | 678,800 | 0 | 29,500 | 0 |
| 6 | EMINENCE CAPITAL, L.L.C. | 1,785,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | U.S. TRUST COMPANY N.A. | 1,580,734 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | GRANTHAM MAYO VAN OTTERLOO&CO. | 1,449,900 | 281,000 | 54,000 | 30,900 | 8,800 | 0 | 129,500 |
| 9 | GATES CAPITAL MANAGEMENT, INC. | 731,601 | 1,276,840 | 492,713 | 0 | 0 | 0 | 0 |
| 10 | FARLEY, STEPHEN L. | 672,447 | 2,020,971 | 0 | 0 | 0 | 0 | 0 |
| 11 | MFS INVESTMENT MANAGEMENT | 550,716 | 968,822 | 782,200 | 72,100 | 0 | 0 | 0 |
| 12 | UBS O'CONNOR, L.L.C. | 476,407 | 0 | 0 | 0 | 31,600 | 0 | 0 |
| 13 | GENERAL MOTORS ASSET MGMT | 408,855 | 174,834 | 18,000 | 0 | 0 | 0 | 0 |
| 14 | CAXTON ASSOCIATES, L.L.C. | 395,436 | 100,000 | 363,600 | 286,757 | 150,002 | 0 | 46,856 |
| 15 | HIGHBRIDGE CAPITAL MGMT, LLC | 384,512 | 45,916 | 142,843 | 0 | 0 | 0 | 314,865 |
| 16 | WINSLOW CAPITAL MGMT, INC. | 356,000 | 0 | 0 | 0 | 0 | 0 | 0 |
| 17 | TIMESSQUARE CAPITAL MGMT, LLC | 334,700 | 567,900 | 569,400 | 0 | 0 | 0 | 0 |
| 18 | ALGERT COLDIRON INVESTORS L.L. | 297,045 | 0 | 0 | 0 | 0 | 0 | 0 |
| 19 | PROFIT INVESTMENT MANAGEMENT | 293,803 | 281,800 | 0 | 0 | 0 | 0 | 0 |
| 20 | DSM CAPITAL PARTNERS, LLC | 275,745 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | | **37,846,285** | **16,952,969** | **8,432,815** | **1,914,289** | **213,065** | **37,107** | **491,221** |
| | *% of Total Shares Outstanding* | *13.82%* | *6.35%* | *3.26%* | *0.78%* | *0.09%* | *0.02%* | *0.20%* |

Note:

[1] Examples of institutional investors who purchased Moody's stock during the putative class period, held Moody's stock on 6/30/07, and dropped to zero total holdings at some point prior to December 31, 2008. Thomson Financial collects holdings data from 13-F filings with the SEC, among other sources. The SEC only requires institutions report long positions.