EXHIBIT 1 (PART 2 OF 3)
TO THE HUME DECLARATION DATED
AUGUST 23, 2010

EXPERT REPORT OF CHAD COFFMAN, CFA

PORTIONS OF THIS DOCUMENT HAVE BEEN
REDACTED AND FILED UNDER SEAL PURSUANT
TO CONFIDENTIALITY STIPULATION AND
PROTECTIVE ORDER ENTERED BY THE COURT
ON MARCH 25, 2010

# APPENDIX A

## Appendix A

### List of Documents/Data Considered

#### Court Documents

- Final Consolidated Amended Class Action Complaint.
- Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification
- Opinion and Order granting in part motions to dismiss.
- Ehrenberg Declaration ISO Defendant's Opposition to Plaintiffs' Motion for Class Certification dated on May 28, 2010.
- Testimony of Raymond W. McDaniel, Jr. before the U.S. Senate Committee on Banking, Housing and Urban Affairs dated on February 8, 2005.
- Declaration of Daniel Hume in Support of Lead Plaintiffs' motion for Class Certification dated January 18, 2010.
- SEC Examination Report for Moody's.

#### Expert Reports

- Expert Report of René M. Stulz filed May 28, 2010.
- All the backup materials provided by Dr. Stulz.
- Transcripts and Excerpts of René M. Stulz's Deposition dated on August 10, 2010.

#### Court Decisions and Securities Law

- *Basic v. Levinson*, 485 U.S. 224, 240 (1988).
- *Cammer v. Bloom*, Civil Action No. 88-2458, U.S. District Court for the District of New Jersey, April 19th, 1989.

#### Moody's Analyst Reports & Credit Rating Reports

- Securities analyst reports provided by Counsel.

#### SEC Filings/Forms

- Moody's SEC forms 10-K, 10-Q, and Schedule 14a filed from 2004 through 2008.

## Security Data

- Historical data for Moody's and its peers' Common Stock obtained from Bloomberg.
- Historical price and market capitalization data for selected peers obtained from Bloomberg.
- Historical price data for the S&P 500 Total Return Index.

## Moody's News

- Moody's news headlines and articles downloaded from Factiva for the Class Period.
- Jonathan Weil, "Moody's Says Don't Inhale the Smoke It's Puffing," *Bloomberg*, March 12, 2009.

## Academic Articles/Texts

- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, "Foundations of Financial Markets and Institutions," Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix 1.

- William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, "Investments," Prentice Hall, Fifth Edition.

- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, Litigation Services Handbook, The Role of the Financial Expert, Third Edition, 2001.

- Randall S. Thomas and James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting." *Law and Contemporary Problems* Vol. 63, p 3.

- Craig A. MacKinlay, "Event Studies in Economics and Finance" Journal of Economic Literature Vol. 35, No. 1 (Mar., 1997).

- Dmitry Krivin, Robert Patton, Erica Rose and David Tabak, "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting*, November 4, 2003.

- Daniel M. Covitz and Paul Harrison titled *Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation: Evidence that Reputation Incentives Dominate*, The Federal Reserve Board Finance and Economics Discussion Series

## Other Documents

- Testimony of Raymond W. McDaniel, Jr. before the U.S. Senate Committee on Banking, Housing and Urban Affairs, dated February 8, 2005,

http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=7bacb
aef-ce4a-46c4-ba66-cc70ea89634a.

- Written Statement of Raymond W. McDaniel, President, Moody's Investors Service
  before the United States Securities and Exchange Commission, dated November 21,
  2002, http://www.sec.gov/news/extra/credrate/moodys.htm.

- Statement of Raymond McDaniel, President, Moody's Investors Services to the United
  States House of Representatives Subcommittee on Capital Markets, Insurance and
  Government Sponsored Enterprises dated September 15, 2003,
  http://v3.moodys.com/viewresearchdoc.aspx?docid=PBC_79492

- Letter from SEC Chairman William H. Donaldson to the Honorable Richard H. Baker,
  Chairman, Subcommittee on Capital Markets, Insurance and Government Sponsored
  Enterprises, U.S. House of Representatives, dated June 4, 2003,
  http://www.sec.gov/spotlight/ratingagency/baker060403.pdf.

- Excerpts of a document titled *Legislative Solutions for the Rating Agency Duopoly*,
  Hearing before the Subcommittee on Capital Markets, Insurance and Government
  Sponsored Enterprises of the Committee on Financial Services, U.S. House of
  Representatives, dated June 29, 2005, containing the *Statement of Rita M. Bolger,
  Manager Director and Associate General Counsel, Standard and Poor's*.

- "Panel III of a Hearing of the Investigations Subcommittee of the Senate Homeland
  Security and Governmental Affairs Committee; Subject: Wall Street and the Financial
  Crisis: The Role of Credit Rating Agencies," *Federal News Service,* April 23, 2010.

- "Hearing of the House Oversight and Government Reform Committee; Subject: Credit
  Rating Agencies and the Next Financial Crisis," *Federal News Service*, September 30,
  2009.

3

# APPENDIX B

## CHAD W. COFFMAN, CFA

Winnemac Consulting, L.L.C.
One South Wacker Drive, Suite 3800
Chicago, IL 60606
Office:       (312) 752-3329
Mobile: (815)       382-0092
Email:       coffman@winnemac.com

## EMPLOYMENT:

### Winnemac Consulting, LLC
President (2008 - Current)

Winnemac Consulting is a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation. Principals of Winnemac Consulting have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

CFA          Chartered Financial Analyst, 2003

M.P.P.       University of Chicago, 1997
             Masters of Public Policy, with a focus in economics including coursework in Finance,
             Labor Economics, Econometrics, and Regulation

B.A.         Knox College, 1995
             Economics, Magna Cum Laude
             Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
             Supply Pricing: Using Galesburg, Illinois as a Case Study"
             Dean's List Every Term
             Phi Beta Kappa

**SELECTED EXPERIENCE:**

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack Grubman's analyst coverage of various companies. This included supporting multiple experts at high-profile arbitration where plaintiffs claimed $900 million in damages. Arbitration panel returned a verdict in favor of client (reported in Wall Street Journal).

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
  - WorldCom
  - Enron
  - Tyco
  - Parmalat
  - Sears
  - Atlas Air
  - UnumProvident
  - XL Capital
  - Household Finance/HSBC
  - Dynegy
  - Anicom

- Expert consultant in multiple cases involving market timing and/or late-trading. Developed models to estimate market timing profits.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom. Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.

Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in Re: Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP. Filed declaration August 5, 2008 re: plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed rebuttal report August 4, 2010.

- Testifying expert in Re: DVI Securities Litigation, United States District Court, Eastern District of Pennsylvania, 2:03-CV-05336-LDD. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009.

- Testifying expert in Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007. Filed expert report October 31, 2008.

- Expert declaration in Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York. Filed declaration February 18, 2009.

- Expert declaration in Re: Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division. Filed declaration March 16, 2009.

- Testifying expert in Re: Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts. Filed expert report August 6th, 2009. Deposition October 6, 2009.

- Expert declaration in Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co., Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York. Filed declaration October, 2009.

- Testifying expert in Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann. Filed expert report on January 25, 2010.

- Expert report in Re: REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in Re: New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California. Filed declaration March 11, 2010.

- Expert report Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc.

and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware. Filed expert report April 23, 2010.

- Expert report Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB). Filed expert report for mediation June 23, 2010.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, United States Postal Service. United States District Court for the District of Columbia. C.A 1:00CV-1834 (TFH) – Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation. Before the American Arbitration Association – Filed report re: lost wages.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation. Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

## TEACHING EXPERIENCE:

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

## PUBLICATIONS:

Coffman, Chad and Mary Gregson, "Ra ilroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities." (Forthcoming).

## PROFESSIONAL AFFILIATIONS:

Associate Member CFA Society of Chicago
Associate        Member CFA Institute
Phi Beta Kappa

## AWARDS:

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

## PERSONAL ACTIVITIES:

Pro bono consulting for Cook County State's Attorney's Office

# EXHIBIT 1

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/3/2006 | $61.93 | -0.094% | 0.035% | -0.528% | 1.384% | -0.22% | 0.13% | 1.038% | 0.12 | Moody's Corp. 4Q EPS 50c Vs 40c |
| 2/6/2006 | $62.04 | 0.172% | 0.161% | 0.080% | -0.825% | 0.51% | -0.34% | 1.038% | -0.33 | |
| 2/7/2006 | $60.13 | -3.078% | 0.234% | -0.807% | 0.595% | -0.11% | -2.97% | 1.038% | -2.86 | |
| 2/8/2006 | $61.04 | 1.515% | -0.223% | 0.908% | -0.311% | 0.63% | 0.88% | 1.073% | 0.82 | |
| 2/9/2006 | $61.71 | 1.096% | 0.352% | -0.147% | 2.178% | 0.06% | 1.04% | 1.074% | 0.97 | |
| 2/10/2006 | $62.14 | 0.691% | 0.202% | 0.256% | -0.508% | 0.57% | 0.13% | 1.074% | 0.12 | |
| 2/13/2006 | $61.06 | -1.732% | -0.009% | -0.312% | 0.032% | 0.02% | -1.75% | 1.076% | -1.63 | |
| 2/14/2006 | $62.45 | 2.239% | 0.272% | 1.016% | -0.096% | 0.99% | 1.25% | 1.070% | 1.16 | |
| 2/15/2006 | $63.08 | 1.042% | 0.078% | 0.374% | 0.506% | 0.44% | 0.60% | 1.074% | 0.56 | |
| 2/16/2006 | $63.18 | 0.154% | -0.086% | 0.741% | -0.628% | 0.68% | -0.53% | 1.075% | -0.49 | |
| 2/17/2006 | $63.09 | -0.138% | -0.217% | -0.165% | 0.532% | -0.12% | -0.02% | 1.064% | -0.02 | |
| 2/21/2006 | $63.13 | 0.062% | 0.049% | -0.327% | -0.029% | 0.02% | 0.04% | 1.065% | 0.04 | |
| 2/22/2006 | $65.15 | 3.198% | 1.055% | 0.761% | -0.683% | 1.46% | 1.74% | 1.062% | 1.63 | |
| 2/23/2006 | $65.27 | 0.194% | 0.016% | -0.352% | -0.394% | 0.03% | 0.16% | 1.073% | 0.15 | Survey shows concern over rating agency competition |
| 2/24/2006 | $65.95 | 1.041% | 0.070% | 0.142% | 0.347% | 0.31% | 0.73% | 1.073% | 0.68 | |
| 2/27/2006 | $66.31 | 0.544% | -0.308% | 0.381% | 0.339% | 0.16% | 0.38% | 1.069% | 0.36 | |
| 2/28/2006 | $65.02 | -1.946% | 0.062% | -1.039% | -0.089% | -0.42% | -1.52% | 1.067% | -1.43 | |
| 3/1/2006 | $66.37 | 2.075% | -0.462% | 0.853% | 0.546% | 0.41% | 1.66% | 1.071% | 1.55 | |
| 3/2/2006 | $65.99 | -0.576% | -0.461% | -0.161% | 0.514% | -0.21% | -0.36% | 1.073% | -0.34 | |
| 3/3/2006 | $65.65 | -0.515% | -0.106% | -0.146% | 0.685% | -0.03% | -0.48% | 1.066% | -0.45 | |
| 3/6/2006 | $65.58 | -0.103% | 0.443% | -0.663% | 0.666% | -0.06% | -0.04% | 1.058% | -0.04 | |
| 3/7/2006 | $65.13 | -0.695% | 0.511% | -0.281% | 0.356% | 0.43% | -1.12% | 1.048% | -1.07 | Senator Seeks Oversight on Credit Raters |
| 3/8/2006 | $64.87 | -0.387% | -0.195% | 0.232% | -1.146% | 0.31% | -0.69% | 1.052% | -0.66 | |
| 3/9/2006 | $64.87 | 0.000% | -0.108% | -0.486% | 0.325% | -0.31% | 0.31% | 1.046% | 0.30 | |
| 3/10/2006 | $65.55 | 1.047% | 0.073% | 0.735% | 0.021% | 0.79% | 0.25% | 1.045% | 0.24 | |
| 3/13/2006 | $65.54 | -0.015% | -0.232% | 0.229% | 0.443% | 0.17% | -0.19% | 1.009% | -0.19 | |
| 3/14/2006 | $67.11 | 2.384% | 0.129% | 1.039% | 0.125% | 1.15% | 1.23% | 1.009% | 1.22 | |
| 3/15/2006 | $67.80 | 1.041% | -0.271% | 0.434% | 1.087% | 0.31% | 0.73% | 1.004% | 0.73 | |
| 3/16/2006 | $67.02 | -1.159% | 0.148% | 0.180% | 0.487% | 0.49% | -1.65% | 1.001% | -1.65 | |
| 3/17/2006 | $67.78 | 1.134% | 0.121% | 0.147% | -0.731% | 0.45% | 0.69% | 1.010% | 0.68 | |
| 3/20/2006 | $67.60 | -0.272% | 0.206% | -0.166% | -0.410% | 0.26% | -0.53% | 1.012% | -0.53 | |
| 3/21/2006 | $66.91 | -1.019% | -0.300% | -0.600% | 0.042% | -0.59% | -0.43% | 1.013% | -0.43 | |
| 3/22/2006 | $67.46 | 0.827% | 0.117% | 0.604% | -0.668% | 0.88% | -0.03% | 1.013% | -0.03 | |
| 3/23/2006 | $67.66 | 0.288% | -0.219% | -0.258% | 0.419% | -0.24% | 0.53% | 1.012% | 0.53 | |
| 3/24/2006 | $68.48 | 1.219% | -0.096% | 0.098% | 0.801% | 0.18% | 1.04% | 1.012% | 1.02 | |
| 3/27/2006 | $68.39 | -0.142% | 0.009% | -0.103% | -0.662% | 0.20% | -0.34% | 1.015% | -0.34 | |
| 3/28/2006 | $67.53 | -1.249% | -0.313% | -0.643% | 0.224% | -0.66% | -0.59% | 1.015% | -0.58 | |
| 3/29/2006 | $69.06 | 2.256% | -0.361% | 0.765% | -0.815% | 0.55% | 1.71% | 1.016% | 1.68 | |
| 3/30/2006 | $68.76 | -0.436% | -0.298% | -0.197% | 0.506% | -0.24% | -0.19% | 1.027% | -0.19 | |
| 3/31/2006 | $69.35 | 0.861% | 0.352% | -0.416% | -0.063% | 0.13% | 0.73% | 1.023% | 0.71 | |
| 4/3/2006 | $70.17 | 1.189% | -0.122% | 0.231% | -0.710% | 0.29% | 0.90% | 1.024% | 0.88 | |
| 4/4/2006 | $70.31 | 0.194% | 0.417% | 0.636% | 0.596% | 1.18% | -0.98% | 1.027% | -0.96 | |
| 4/5/2006 | $69.12 | -1.684% | -0.176% | 0.441% | -0.338% | 0.45% | -2.13% | 1.030% | -2.07 | |
| 4/6/2006 | $68.90 | -0.323% | -0.136% | -0.168% | 0.181% | -0.07% | -0.26% | 1.046% | -0.24 | |
| 4/7/2006 | $68.77 | -0.183% | 0.032% | -1.034% | 0.537% | -0.66% | 0.47% | 1.046% | 0.45 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/10/2006 | $68.32 | -0.665% | 0.074% | 0.088% | 0.528% | 0.36% | -1.02% | 1.043% | -0.98 | |
| 4/11/2006 | $67.69 | -0.923% | -0.128% | -0.756% | 0.097% | -0.58% | -0.35% | 1.043% | -0.33 | |
| 4/12/2006 | $67.60 | -0.129% | 0.046% | 0.121% | 0.737% | 0.34% | -0.47% | 1.039% | -0.45 | |
| 4/13/2006 | $67.64 | 0.057% | 0.104% | 0.077% | 0.631% | 0.35% | -0.29% | 1.035% | -0.28 | Moody's To Buy 49% Of China Cheng Xin Intl Credit Rating |
| 4/17/2006 | $68.42 | 1.148% | 0.259% | -0.294% | 0.263% | 0.17% | 0.98% | 1.036% | 0.95 | |
| 4/18/2006 | $69.04 | 0.908% | -0.005% | 1.736% | -1.001% | 1.77% | -0.86% | 1.038% | -0.83 | |
| 4/19/2006 | $68.78 | -0.365% | -0.026% | 0.184% | 0.259% | 0.34% | -0.70% | 1.036% | -0.68 | |
| 4/20/2006 | $69.25 | 0.677% | 0.069% | 0.120% | -0.733% | 0.33% | 0.34% | 1.024% | 0.33 | |
| 4/21/2006 | $68.87 | -0.547% | -0.067% | -0.012% | -0.287% | 0.07% | -0.62% | 0.995% | -0.62 | |
| 4/24/2006 | $68.94 | 0.099% | 0.157% | -0.240% | 0.111% | 0.03% | 0.07% | 0.994% | 0.07 | |
| 4/25/2006 | $68.35 | -0.859% | -0.103% | -0.487% | 0.261% | -0.50% | -0.36% | 0.898% | -0.40 | |
| 4/26/2006 | $60.17 | -11.969% | 0.346% | 0.292% | -1.015% | 0.75% | -12.72% | 0.898% | -14.21 | Moody's sinks 12 pct as revenue growth slows |
| 4/27/2006 | $60.17 | 0.000% | 1.029% | 0.358% | 0.737% | 1.25% | -1.25% | 1.457% | -0.86 | |
| 4/28/2006 | $60.18 | 0.016% | 0.895% | 0.070% | 0.144% | 0.52% | -0.50% | 1.460% | -0.34 | |
| 5/1/2006 | $58.16 | -3.354% | -1.094% | -0.413% | 0.324% | -0.75% | -2.60% | 1.459% | -1.78 | |
| 5/2/2006 | $57.31 | -1.452% | 0.087% | 0.614% | 0.231% | 0.88% | -2.33% | 1.477% | -1.58 | |
| 5/3/2006 | $57.01 | -0.523% | 0.246% | -0.390% | 0.845% | -0.13% | -0.39% | 1.490% | -0.26 | |
| 5/4/2006 | $56.90 | -0.204% | -0.118% | 0.340% | -0.447% | 0.13% | -0.33% | 1.484% | -0.22 | |
| 5/5/2006 | $56.87 | -0.051% | 0.381% | 1.331% | -0.779% | 1.21% | -1.26% | 1.480% | -0.85 | |
| 5/8/2006 | $55.89 | -1.724% | -0.362% | -0.074% | -0.848% | -0.51% | -1.21% | 1.480% | -0.82 | Moody's Puts Focus on REIT CDOs |
| 5/9/2006 | $53.82 | -3.698% | 0.134% | 0.038% | -0.117% | 0.01% | -3.71% | 1.483% | -2.50 | |
| 5/10/2006 | $54.97 | 2.128% | 0.156% | -0.129% | -0.767% | -0.43% | 2.55% | 1.522% | 1.68 | |
| 5/11/2006 | $54.52 | -0.812% | -0.309% | -1.263% | 0.602% | -1.53% | 0.74% | 1.536% | 0.48 | |
| 5/12/2006 | $56.14 | 2.973% | 0.130% | -1.121% | 0.441% | -1.19% | 4.16% | 1.537% | 2.71 | |
| 5/15/2006 | $56.43 | 1.400% | 0.331% | 0.264% | -0.216% | 0.31% | 1.09% | 1.557% | 0.70 | |
| 5/16/2006 | $56.93 | 0.000% | 0.070% | -0.186% | 0.836% | 0.04% | -0.04% | 1.559% | -0.02 | |
| 5/17/2006 | $55.53 | -2.458% | -0.352% | -1.857% | -0.236% | -1.90% | -0.55% | 1.556% | -0.36 | |
| 5/18/2006 | $53.84 | -3.045% | -0.177% | -0.465% | -0.129% | -0.86% | -2.19% | 1.556% | -1.41 | |
| 5/19/2006 | $52.89 | -1.751% | 0.040% | 0.414% | -0.708% | 0.16% | -1.91% | 1.568% | -1.22 | |
| 5/22/2006 | $52.35 | 0.210% | 0.149% | -0.391% | -0.249% | -0.49% | 0.69% | 1.578% | 0.38 | |
| 5/23/2006 | $52.49 | -0.881% | -0.030% | -0.434% | 0.087% | -0.36% | -0.32% | 1.562% | -0.21 | |
| 5/24/2006 | $52.14 | -0.666% | -0.111% | 0.167% | 0.459% | 0.16% | -0.83% | 1.561% | -0.53 | |
| 5/25/2006 | $52.39 | 0.485% | -0.242% | 1.150% | -0.104% | 0.95% | -0.46% | 1.558% | -0.30 | |
| 5/26/2006 | $52.30 | -0.167% | 0.173% | 0.585% | -0.050% | 0.62% | -0.79% | 1.558% | -0.50 | |
| 5/30/2006 | $51.06 | -2.378% | 0.107% | -1.578% | 2.105% | -1.12% | -1.26% | 1.559% | -0.81 | |
| 5/31/2006 | $50.81 | -0.476% | -0.252% | 0.850% | -0.061% | 0.65% | -1.13% | 1.563% | -0.72 | |
| 6/1/2006 | $51.14 | 0.631% | 0.048% | 1.233% | -1.460% | 0.84% | -0.21% | 1.566% | -0.13 | |
| 6/2/2006 | $51.42 | 0.551% | 0.200% | 0.195% | 1.057% | 0.48% | 0.07% | 1.566% | 0.04 | |
| 6/5/2006 | $50.36 | -2.060% | 0.167% | -1.776% | 0.088% | -1.95% | -0.11% | 1.563% | -0.07 | |
| 6/6/2006 | $51.48 | 2.238% | -0.145% | -0.109% | -0.954% | -0.62% | 2.86% | 1.563% | 1.83 | Moody's Corp Reaffirms Outlook For 2006 And Announces New Share Repurchase Authority |
| 6/7/2006 | $50.47 | -1.963% | 0.919% | -0.589% | 1.366% | 0.06% | -2.02% | 1.584% | -1.27 | |
| 6/8/2006 | $50.71 | 0.462% | 0.166% | 0.147% | -0.974% | -0.10% | 0.57% | 1.589% | 0.36 | |
| 6/9/2006 | $51.25 | 1.073% | 0.163% | -0.448% | 0.665% | -0.44% | 1.51% | 1.589% | 0.95 | |
| 6/12/2006 | $50.44 | -1.593% | 0.013% | -1.267% | 1.227% | -1.22% | -0.37% | 1.595% | -0.25 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/13/2006 | $49.00 | -2.851% | -0.920% | -1.002% | -0.892% | -1.73% | -1.13% | 1.596% | -0.71 | |
| 6/14/2006 | $49.41 | 0.833% | -1.119% | 0.522% | -0.577% | -0.24% | 1.07% | 1.597% | 0.67 | |
| 6/15/2006 | $50.65 | 2.517% | 0.073% | 2.126% | -1.559% | 1.89% | 0.62% | 1.598% | 0.39 | |
| 6/16/2006 | $51.23 | 1.151% | -0.322% | -0.367% | -0.207% | -0.73% | 1.88% | 1.598% | 1.18 | |
| 6/19/2006 | $51.14 | -0.171% | 0.290% | -0.911% | 0.888% | -0.87% | 0.70% | 1.607% | 0.44 | |
| 6/20/2006 | $51.14 | 0.000% | 0.289% | 0.001% | -0.058% | -0.03% | 0.03% | 1.608% | 0.02 | |
| 6/21/2006 | $51.56 | 0.817% | -0.224% | 0.977% | -0.708% | 0.85% | -0.04% | 1.607% | -0.02 | |
| 6/22/2006 | $51.20 | -0.697% | 0.127% | -0.504% | -1.089% | -0.86% | 0.16% | 1.607% | 0.10 | |
| 6/23/2006 | $51.84 | 1.252% | -0.492% | -0.087% | -0.660% | -0.53% | 1.78% | 1.607% | 1.11 | |
| 6/26/2006 | $51.53 | -0.600% | 0.296% | 0.487% | -0.077% | 0.49% | -1.09% | 1.615% | -0.68 | |
| 6/27/2006 | $51.30 | -0.462% | -0.069% | -0.908% | -0.646% | -1.21% | 0.76% | 1.616% | 0.47 | |
| 6/28/2006 | $52.04 | 1.439% | -0.092% | 0.568% | -0.832% | 0.32% | 1.12% | 1.617% | 0.69 | |
| 6/29/2006 | $52.48 | 0.840% | 0.028% | 2.361% | -0.265% | 2.11% | -1.27% | 1.620% | -0.78 | |
| 6/30/2006 | $52.91 | 0.833% | -0.241% | -0.208% | 1.226% | -0.23% | 1.06% | 1.624% | 0.65 | |
| 7/3/2006 | $53.58 | 1.267% | 0.332% | 0.797% | -0.790% | 0.59% | 0.67% | 1.620% | 0.42 | |
| 7/5/2006 | $53.37 | -0.399% | -0.061% | -0.713% | 0.756% | -0.72% | 0.32% | 1.616% | 0.20 | |
| 7/6/2006 | $53.25 | -0.218% | 0.014% | 0.275% | -0.106% | 0.12% | -0.34% | 1.615% | -0.21 | |
| 7/7/2006 | $52.23 | -1.916% | 0.241% | -0.675% | 0.338% | -0.71% | -1.21% | 1.615% | -0.75 | |
| 7/10/2006 | $52.24 | 0.019% | 0.341% | 0.148% | 0.131% | 0.11% | -0.09% | 1.615% | -0.06 | |
| 7/11/2006 | $51.58 | -1.265% | -0.297% | 0.416% | 0.058% | 0.31% | -1.57% | 1.608% | -0.98 | |
| 7/12/2006 | $50.43 | -2.241% | -0.012% | -1.082% | -0.539% | -1.47% | -0.78% | 1.611% | -0.48 | |
| 7/13/2006 | $49.02 | -2.794% | -0.105% | -1.295% | -0.796% | -1.84% | -0.96% | 1.613% | -0.59 | |
| 7/14/2006 | $48.90 | -0.238% | 0.052% | -0.490% | 0.769% | -0.40% | 0.16% | 1.614% | 0.10 | |
| 7/17/2006 | $48.87 | -0.060% | 0.192% | -0.138% | -0.852% | -0.61% | 0.55% | 1.596% | 0.35 | |
| 7/18/2006 | $49.60 | 1.491% | 0.010% | 0.394% | 0.267% | 0.12% | 1.37% | 1.593% | 0.86 | |
| 7/19/2006 | $50.66 | 2.135% | 0.833% | 1.866% | -0.557% | 1.74% | 0.40% | 1.597% | 0.25 | |
| 7/20/2006 | $49.66 | -1.975% | 0.537% | -0.848% | 0.472% | -0.86% | -1.12% | 1.597% | -0.70 | |
| 7/21/2006 | $49.10 | -1.115% | 0.120% | -0.706% | 0.672% | -0.71% | -0.41% | 1.600% | -0.25 | |
| 7/24/2006 | $50.47 | 2.790% | -0.462% | 1.665% | -0.579% | 1.40% | 1.39% | 1.598% | 0.87 | |
| 7/25/2006 | $51.49 | 2.021% | -0.404% | 0.632% | 1.684% | 1.11% | 0.91% | 1.598% | 0.57 | |
| 7/26/2006 | $53.20 | 3.321% | -0.059% | -0.037% | 0.784% | 0.10% | 3.22% | 1.599% | 2.01 | |
| 7/27/2006 | $53.10 | -0.201% | -0.092% | -0.395% | -0.126% | -0.66% | 0.46% | 1.621% | 0.28 | |
| 7/28/2006 | $54.49 | 2.617% | 0.623% | 1.220% | 1.156% | 1.78% | 0.84% | 1.621% | 0.52 | |
| 7/31/2006 | $53.32 | -2.140% | -0.154% | -0.146% | 0.683% | -0.01% | -2.13% | 1.622% | -1.31 | |
| 8/1/2006 | $52.57 | -1.405% | 0.204% | -0.450% | 1.025% | -0.21% | -1.20% | 1.621% | -0.74 | |
| 8/2/2006 | $58.40 | 11.088% | -0.498% | 0.616% | -0.094% | 0.48% | 10.61% | 1.623% | 6.54 | (1) Moody's profit rises 18 pct, raises 2006 forecast<br><br>(2) Senate Panel OKs Credit-Rating Bill<br><br>(3) ABS rating changes, upgrades decline in Q2-Moody's |
| 8/3/2006 | $57.71 | -1.181% | 0.139% | 0.165% | 0.434% | 0.29% | -1.47% | 1.889% | -0.78 | |
| 8/4/2006 | $57.63 | -0.152% | 0.328% | -0.070% | -0.014% | -0.29% | 0.14% | 1.892% | 0.07 | |
| 8/7/2006 | $57.49 | -0.236% | -0.109% | -0.277% | -0.070% | -0.41% | 0.17% | 1.889% | 0.09 | |
| 8/8/2006 | $56.47 | -1.775% | -0.198% | -0.328% | 0.691% | -0.13% | -1.65% | 1.886% | -0.87 | |
| 8/9/2006 | $56.01 | -0.809% | -0.812% | -0.407% | 0.382% | -0.17% | -0.64% | 1.891% | -0.34 | |

# Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/10/2006 | $56.34 | 0.590% | 0.044% | 0.481% | -1.288% | 0.01% | 0.58% | 1.891% | 0.31 | |
| 8/11/2006 | $55.58 | -1.362% | 0.051% | -0.385% | 0.779% | -0.30% | -1.06% | 1.892% | -0.56 | |
| 8/14/2006 | $55.41 | -0.297% | -0.074% | 0.122% | 0.150% | 0.13% | -0.43% | 1.894% | -0.23 | |
| 8/15/2006 | $57.47 | 3.717% | 0.528% | 1.379% | -1.181% | 0.94% | 2.78% | 1.873% | 2.49 | |
| 8/16/2006 | $57.86 | 0.677% | -0.260% | 0.791% | 0.098% | 1.07% | -0.39% | 1.888% | -0.21 | |
| 8/17/2006 | $58.20 | 0.589% | 0.134% | 0.163% | -0.678% | -0.22% | 0.80% | 1.886% | 0.43 | |
| 8/18/2006 | $58.00 | -0.334% | -0.234% | 0.372% | -0.945% | 0.15% | -0.48% | 1.888% | -0.26 | |
| 8/21/2006 | $57.71 | -0.503% | -0.011% | -0.367% | 1.507% | -0.06% | -0.44% | 1.888% | -0.24 | |
| 8/22/2006 | $58.07 | 0.624% | -0.189% | 0.100% | -0.988% | 0.05% | 0.57% | 1.887% | 0.30 | |
| 8/23/2006 | $57.58 | -0.854% | 0.333% | -0.440% | 0.308% | -0.72% | -0.13% | 1.887% | -0.07 | |
| 8/24/2006 | $56.90 | -1.183% | 0.000% | 0.240% | -0.221% | 0.12% | -1.30% | 1.886% | -0.69 | |
| 8/25/2006 | $57.39 | 0.872% | -0.442% | -0.065% | -0.253% | -0.08% | 0.95% | 1.888% | 0.50 | |
| 8/28/2006 | $58.41 | 1.769% | 0.107% | 0.517% | -0.124% | 0.44% | 1.34% | 1.890% | 0.71 | Moody's Approved to Acquire 49% Stake in CCXI |
| 8/29/2006 | $59.04 | 1.066% | -0.520% | 0.208% | -0.193% | 0.36% | 0.70% | 1.894% | 0.37 | |
| 8/30/2006 | $59.95 | 1.549% | -0.006% | 0.044% | 0.358% | 0.07% | 1.48% | 1.894% | 0.78 | |
| 8/31/2006 | $59.51 | -0.730% | 0.123% | -0.033% | -0.002% | -0.20% | -0.53% | 1.899% | -0.28 | |
| 9/1/2006 | $60.85 | 2.258% | -0.354% | 0.553% | 0.359% | 0.93% | 1.32% | 1.899% | 0.70 | |
| 9/5/2006 | $61.08 | 0.368% | 0.143% | 0.176% | -1.268% | -0.39% | 0.76% | 1.900% | 0.40 | |
| 9/6/2006 | $59.70 | -2.262% | 0.635% | -0.903% | -0.005% | -1.70% | -0.56% | 1.901% | -0.29 | |
| 9/7/2006 | $58.94 | -1.271% | -0.269% | -0.476% | -0.304% | -0.64% | -0.63% | 1.898% | -0.33 | |
| 9/8/2006 | $60.16 | 2.089% | 0.178% | 0.379% | -0.374% | 0.15% | 1.93% | 1.894% | 1.02 | |
| 9/11/2006 | $60.48 | 0.517% | 0.095% | 0.063% | -0.554% | -0.27% | 0.79% | 1.902% | 0.41 | |
| 9/12/2006 | $60.48 | 0.000% | 0.168% | 1.046% | -0.118% | 1.15% | -1.15% | 1.904% | -0.61 | |
| 9/13/2006 | $61.64 | 1.920% | 0.277% | 0.406% | -0.248% | 0.18% | 1.75% | 1.906% | 0.92 | |
| 9/14/2006 | $61.68 | -0.268% | 0.236% | -0.130% | -0.080% | -0.41% | 0.14% | 1.912% | 0.07 | |
| 9/15/2006 | $62.91 | 2.526% | 0.215% | 0.272% | -0.270% | 0.06% | 2.26% | 1.911% | 1.19 | |
| 9/18/2006 | $61.65 | -1.995% | -0.294% | 0.101% | -0.347% | 0.10% | -2.10% | 1.922% | -1.09 | |
| 9/19/2006 | $61.02 | -1.026% | 0.376% | -0.217% | -0.703% | -0.77% | -0.25% | 1.951% | -0.13 | |
| 9/20/2006 | $61.53 | 0.829% | 0.190% | 0.524% | 0.731% | 0.72% | 0.11% | 1.926% | 0.06 | |
| 9/21/2006 | $61.72 | 0.316% | 0.011% | -0.517% | 1.644% | -0.20% | 0.52% | 1.928% | 0.27 | |
| 9/22/2006 | $61.40 | -0.520% | 0.223% | -0.247% | 0.451% | -0.37% | -0.15% | 1.922% | -0.08 | Credit Raters May Face More Oversight |
| 9/25/2006 | $61.94 | 0.887% | 0.133% | 0.882% | 0.052% | 0.98% | -0.10% | 1.919% | -0.05 | |
| 9/26/2006 | $61.99 | 0.079% | -0.293% | 0.754% | -0.133% | 0.97% | -0.89% | 1.918% | -0.46 | |
| 9/27/2006 | $61.71 | -0.455% | -0.391% | 0.007% | -0.005% | 0.15% | -0.60% | 1.910% | -0.31 | |
| 9/28/2006 | $61.25 | -0.741% | 0.107% | 0.193% | -0.363% | -0.03% | -0.71% | 1.910% | -0.37 | Moody's Sees Short-Term Costs From New Bill, Competition |
| 9/29/2006 | $63.60 | 3.827% | 0.057% | -0.246% | 0.112% | -0.48% | 4.25% | 1.909% | 2.23 | |
| 10/2/2006 | $62.50 | -1.728% | -0.018% | -0.337% | 1.063% | -0.11% | -1.62% | 1.947% | -0.83 | (1) Bush Signs Credit Rating Agency Reform Bill Into Law<br>(2) The Bellwetherreport.com is Looking at Moody's Corp. |
| 10/3/2006 | $60.10 | -3.844% | 0.835% | 0.210% | -0.327% | -0.32% | -3.53% | 1.953% | -1.81 | |
| 10/4/2006 | $61.23 | 1.894% | -0.100% | 1.230% | -0.777% | 1.27% | 0.62% | 1.978% | 0.31 | |
| 10/5/2006 | $61.28 | 0.080% | -0.218% | 0.250% | -0.146% | 0.32% | -0.24% | 1.959% | -0.12 | |
| 10/6/2006 | $60.29 | -1.635% | -0.132% | -0.269% | -0.703% | -0.65% | -0.99% | 1.973% | -0.50 | |
| 10/9/2006 | $59.25 | -1.710% | 0.210% | 0.080% | -0.458% | -0.34% | -1.37% | 1.973% | -0.70 | |
| 10/10/2006 | $59.87 | 1.051% | -0.197% | 0.207% | -1.068% | -0.13% | 1.18% | 1.976% | 0.60 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/11/2006 | $59.75 | -0.211% | -0.035% | -0.246% | 0.235% | -0.34% | 0.13% | 1.977% | 0.07 | |
| 10/12/2006 | $59.92 | 0.293% | -0.428% | 0.955% | -0.598% | 1.27% | -0.98% | 1.977% | -0.49 | |
| 10/13/2006 | $61.05 | 1.883% | 0.035% | 0.205% | -0.486% | -0.07% | 1.96% | 1.978% | 0.99 | |
| 10/16/2006 | $61.66 | 1.004% | -0.483% | 0.253% | 0.197% | 0.65% | 0.36% | 1.986% | 0.18 | |
| 10/17/2006 | $61.14 | -0.852% | 0.208% | -0.366% | 0.469% | -0.52% | -0.34% | 1.656% | -0.20 | |
| 10/18/2006 | $61.93 | 1.305% | 0.078% | 0.149% | 0.258% | 0.18% | 1.12% | 1.656% | 0.68 | |
| 10/19/2006 | $63.78 | 2.984% | -0.828% | 0.007% | 2.467% | 0.83% | 2.16% | 1.659% | 1.30 | |
| 10/20/2006 | $63.39 | -0.610% | -0.098% | 0.121% | 1.046% | 0.56% | -1.17% | 1.634% | -0.71 | |
| 10/23/2006 | $64.33 | 1.473% | 0.040% | 0.617% | -0.121% | 0.81% | 0.66% | 1.623% | 0.41 | |
| 10/24/2006 | $62.67 | -2.571% | -0.087% | 0.026% | -0.012% | 0.15% | -2.72% | 1.624% | -1.67 | |
| 10/25/2006 | $63.35 | 1.071% | -0.054% | 0.353% | 1.312% | 0.90% | 0.17% | 1.643% | 0.11 | Moody's Corp. 3Q EPS 55c Vs 48c |
| 10/26/2006 | $64.64 | 2.042% | 0.324% | 0.497% | -0.227% | 0.41% | 1.64% | 1.640% | 1.00 | |
| 10/27/2006 | $64.12 | -0.798% | -0.128% | -0.832% | -0.339% | -1.06% | 0.26% | 1.639% | 0.16 | |
| 10/30/2006 | $63.91 | -0.334% | 0.246% | 0.047% | -0.083% | -0.04% | -0.29% | 1.603% | -0.18 | |
| 10/31/2006 | $64.49 | 0.913% | -0.129% | 0.001% | 0.497% | 0.30% | 0.61% | 1.586% | 0.39 | |
| 11/1/2006 | $64.10 | -0.605% | -0.153% | -0.723% | -0.084% | -0.84% | 0.24% | 1.586% | 0.15 | |
| 11/2/2006 | $63.76 | -0.531% | -0.168% | -0.007% | 0.916% | 0.40% | -0.93% | 1.529% | -0.61 | |
| 11/3/2006 | $63.99 | 0.351% | -0.052% | -0.216% | -0.217% | -0.32% | 0.67% | 1.527% | 0.44 | |
| 11/6/2006 | $64.26 | 0.426% | 0.196% | 1.138% | -0.204% | 1.48% | -1.05% | 1.528% | -0.69 | |
| 11/7/2006 | $64.22 | -0.061% | -0.006% | 0.224% | -0.493% | 0.23% | -0.29% | 1.531% | -0.19 | |
| 11/8/2006 | $64.27 | 0.076% | 0.065% | 0.233% | 0.123% | 0.33% | -0.25% | 1.517% | -0.17 | |
| 11/9/2006 | $64.37 | 0.151% | -0.117% | -0.512% | -0.111% | -0.59% | 0.74% | 1.503% | 0.49 | |
| 11/10/2006 | $64.43 | 0.106% | 0.402% | 0.186% | 0.036% | -0.06% | 0.16% | 1.503% | 0.11 | |
| 11/13/2006 | $66.12 | 2.612% | -0.137% | 0.29% | -0.276% | 0.52% | 2.09% | 1.503% | 1.39 | |
| 11/14/2006 | $66.67 | 0.839% | -0.124% | 0.047% | 0.042% | 1.13% | -0.29% | 1.511% | -0.19 | |
| 11/15/2006 | $66.92 | 0.365% | -0.281% | 0.204% | 0.195% | 0.79% | -0.42% | 1.503% | -0.28 | |
| 11/16/2006 | $67.48 | 0.844% | 0.398% | 0.231% | -0.294% | -0.02% | 0.86% | 1.503% | 0.57 | |
| 11/17/2006 | $67.07 | -0.606% | -0.314% | 0.103% | -0.623% | 0.41% | -1.02% | 1.503% | -0.68 | |
| 11/20/2006 | $67.91 | 1.249% | 0.329% | -0.048% | 0.145% | -0.24% | 1.49% | 1.495% | 1.00 | |
| 11/21/2006 | $67.61 | -0.445% | -0.292% | 0.170% | 0.482% | 0.75% | -1.19% | 1.499% | -0.80 | |
| 11/22/2006 | $68.10 | 0.735% | -0.133% | 0.242% | 0.081% | 0.61% | 0.12% | 1.503% | 0.08 | |
| 11/24/2006 | $67.90 | -0.300% | 0.007% | -0.385% | 1.221% | -0.18% | -0.12% | 1.502% | -0.08 | |
| 11/27/2006 | $65.98 | -2.825% | -0.265% | -1.339% | 0.812% | -1.57% | -1.26% | 1.486% | -0.85 | |
| 11/28/2006 | $66.70 | 1.092% | -0.298% | 0.369% | 0.017% | 0.90% | 0.19% | 1.488% | 0.13 | |
| 11/29/2006 | $67.46 | 1.139% | -0.373% | 0.964% | 0.098% | 1.91% | -0.78% | 1.488% | -0.52 | |
| 11/30/2006 | $67.66 | 0.289% | -0.336% | 0.041% | -0.530% | 0.33% | -0.04% | 1.481% | -0.03 | |
| 12/1/2006 | $67.48 | -0.259% | -0.151% | -0.280% | -0.295% | -0.33% | 0.06% | 1.481% | 0.05 | |
| 12/4/2006 | $68.29 | 1.198% | 0.352% | 0.891% | 0.155% | 1.11% | 0.09% | 1.470% | 0.06 | |
| 12/5/2006 | $68.35 | 0.086% | 0.052% | 0.403% | -0.095% | 0.62% | -0.54% | 1.466% | -0.37 | |
| 12/6/2006 | $69.61 | 1.852% | 0.327% | -0.106% | -0.568% | -0.53% | 2.38% | 1.467% | 1.62 | |
| 12/7/2006 | $68.17 | -2.070% | 0.052% | -0.394% | 0.087% | -0.33% | -1.52% | 1.478% | -1.03 | |
| 12/8/2006 | $67.84 | -0.786% | 0.115% | 0.183% | 0.187% | 0.26% | -1.05% | 1.479% | -0.71 | |
| 12/11/2006 | $67.82 | 0.274% | 0.405% | 0.229% | -0.541% | -0.08% | 0.35% | 1.482% | 0.24 | |
| 12/12/2006 | $67.75 | -0.100% | 0.115% | -0.102% | 0.986% | -0.09% | -0.01% | 1.480% | 0.00 | |
| 12/13/2006 | $68.43 | 1.006% | -0.053% | 0.135% | 0.522% | 0.40% | 0.60% | 1.479% | 0.41 | Moody's Corporation Declares Quarterly Dividend |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/14/2006 | $68.28 | -0.228% | -0.124% | 0.876% | -0.876% | 1.45% | -1.67% | 1.478% | -1.13 | |
| 12/15/2006 | $67.99 | -0.428% | 0.292% | 0.113% | -1.015% | -0.24% | -0.19% | 1.482% | -0.13 | |
| 12/18/2006 | $67.86 | -0.186% | 0.781% | -0.523% | 0.511% | -1.11% | 0.92% | 1.479% | 0.62 | Moody's Corporation Acquires Wall Street Analytics |
| 12/19/2006 | $68.06 | 0.301% | -0.315% | 0.220% | -0.287% | 0.59% | -0.29% | 1.480% | -0.20 | |
| 12/20/2006 | $68.51 | 0.658% | 0.286% | -0.139% | 0.031% | -0.44% | 1.09% | 1.458% | 0.75 | |
| 12/21/2006 | $68.62 | 0.156% | 0.044% | -0.344% | 0.136% | -0.57% | 0.72% | 1.460% | 0.49 | |
| 12/22/2006 | $68.24 | -0.553% | 0.115% | -0.517% | 0.074% | -0.93% | 0.38% | 1.462% | 0.26 | |
| 12/26/2006 | $68.47 | 0.342% | 0.254% | 0.436% | -0.329% | 0.53% | -0.19% | 1.461% | -0.13 | |
| 12/27/2006 | $68.20 | -0.398% | 0.062% | 0.722% | 0.036% | 1.27% | -1.67% | 1.460% | -1.14 | |
| 12/28/2006 | $68.21 | 0.014% | -0.167% | -0.144% | 0.405% | 0.03% | -0.01% | 1.466% | -0.01 | |
| 12/29/2006 | $67.25 | -1.413% | -0.155% | -0.449% | -0.199% | -0.65% | -0.77% | 1.466% | -0.52 | |
| 1/3/2007 | $68.47 | 1.824% | 0.367% | -0.101% | -0.174% | -0.47% | 2.30% | 1.453% | 1.58 | |
| 1/4/2007 | $67.98 | -0.725% | -0.278% | 0.123% | -0.721% | 0.34% | -1.07% | 1.467% | -0.73 | |
| 1/5/2007 | $66.97 | -1.475% | -0.218% | -0.600% | -0.168% | -0.63% | -0.85% | 1.470% | -0.44 | |
| 1/8/2007 | $66.95 | -0.029% | 0.133% | 0.254% | -0.361% | 0.32% | -0.35% | 1.471% | -0.24 | |
| 1/9/2007 | $66.41 | -0.814% | -0.110% | -0.052% | 0.208% | 0.10% | -0.92% | 1.470% | -0.63 | |
| 1/10/2007 | $67.11 | 1.056% | 0.072% | 0.206% | 0.274% | 0.41% | 0.64% | 1.470% | 0.44 | |
| 1/11/2007 | $67.96 | 1.262% | -0.133% | 0.658% | 1.108% | 1.53% | -0.26% | 1.470% | -0.18 | |
| 1/12/2007 | $67.55 | -0.602% | -0.268% | 0.485% | -0.735% | 0.90% | -1.50% | 1.470% | -1.02 | |
| 1/16/2007 | $67.54 | -0.015% | 0.177% | 0.082% | 0.202% | 0.12% | -0.14% | 1.477% | -0.09 | |
| 1/17/2007 | $68.69 | 1.701% | -0.174% | -0.081% | 0.822% | 0.23% | 1.47% | 1.476% | 1.00 | Moody's Acquires Majority Stake in Kasnic |
| 1/18/2007 | $68.82 | 0.198% | -0.039% | -0.295% | 0.916% | -0.20% | 0.40% | 1.482% | 0.27 | |
| 1/19/2007 | $69.47 | 0.934% | -0.067% | 0.291% | -0.021% | 0.57% | 0.36% | 1.455% | 0.25 | |
| 1/22/2007 | $69.07 | 0.575% | 0.443% | -0.526% | -0.174% | -1.22% | 1.79% | 1.455% | 1.23 | |
| 1/23/2007 | $70.46 | 0.850% | -0.366% | 0.384% | -0.587% | 0.75% | 0.10% | 1.462% | 0.07 | |
| 1/24/2007 | $70.48 | 0.028% | 0.075% | 0.853% | 0.040% | 1.43% | -1.40% | 1.448% | -0.97 | |
| 1/25/2007 | $69.93 | -0.774% | -0.210% | -1.126% | 0.225% | -1.52% | 0.75% | 1.452% | 0.51 | |
| 1/26/2007 | $68.89 | -1.490% | 0.248% | -0.121% | 0.009% | -0.18% | -1.31% | 1.121% | -1.17 | |
| 1/29/2007 | $69.37 | 0.693% | -0.409% | -0.099% | 0.092% | -0.04% | 0.73% | 1.139% | 0.65 | |
| 1/30/2007 | $68.75 | -0.898% | -0.063% | 0.379% | -0.663% | 0.66% | -1.56% | 1.120% | -1.39 | |
| 1/31/2007 | $69.68 | 1.360% | -0.007% | 0.671% | -0.356% | 0.83% | 0.53% | 1.130% | 0.47 | |
| 2/1/2007 | $70.70 | 1.467% | -0.016% | 0.560% | 0.673% | 0.99% | 0.48% | 1.121% | 0.42 | |
| 2/2/2007 | $70.57 | -0.193% | 0.048% | 0.170% | -0.394% | 0.14% | -0.33% | 1.120% | -0.29 | |
| 2/5/2007 | $70.20 | -0.524% | -0.026% | -0.087% | 0.515% | 0.04% | -0.61% | 1.121% | -0.55 | |
| 2/6/2007 | $70.70 | 0.721% | 0.414% | 0.009% | 0.271% | 0.13% | 0.59% | 1.117% | 0.53 | |
| 2/7/2007 | $72.01 | 1.845% | 0.232% | 0.181% | -0.298% | 0.14% | 1.70% | 1.117% | 1.52 | Moody's Corp. 4Q EPS 97c Vs 50c |
| 2/8/2007 | $72.87 | 1.203% | -0.336% | -0.116% | 0.937% | 0.35% | 0.86% | 1.107% | 0.77 | |
| 2/9/2007 | $71.77 | -1.510% | -0.270% | -0.704% | 0.078% | -0.70% | -0.81% | 1.208% | -0.73 | |
| 2/12/2007 | $69.94 | -2.551% | 0.025% | -0.321% | -1.168% | -0.84% | -1.71% | 1.109% | -1.54 | |
| 2/13/2007 | $69.09 | -1.225% | 0.162% | 0.778% | -0.026% | 1.01% | -2.23% | 1.219% | -1.99 | |
| 2/14/2007 | $69.80 | 1.029% | -0.001% | 0.789% | -0.033% | 1.00% | 0.03% | 1.235% | 0.03 | |
| 2/15/2007 | $69.99 | 0.279% | -0.061% | 0.114% | 0.213% | 0.29% | -0.01% | 1.134% | -0.01 | |
| 2/16/2007 | $70.85 | 1.226% | 0.181% | -0.085% | 0.780% | 0.24% | 0.98% | 1.134% | 0.87 | |
| 2/20/2007 | $70.87 | 0.028% | 0.168% | 0.285% | -0.829% | -0.04% | 0.07% | 1.130% | 0.06 | |
| 2/21/2007 | $69.42 | -2.050% | -0.154% | -0.135% | 0.068% | -0.06% | -1.99% | 1.127% | -1.76 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/22/2007 | $67.06 | -3.398% | -0.178% | -0.062% | -0.377% | -0.22% | -3.18% | 1.136% | -2.80 | |
| 2/23/2007 | $65.73 | -1.977% | -0.732% | -0.345% | -0.357% | -0.53% | -1.45% | 1.170% | -1.24 | |
| 2/26/2007 | $63.72 | -3.055% | -0.675% | -0.113% | -1.014% | -0.83% | -2.23% | 1.171% | -1.90 | |
| 2/27/2007 | $63.25 | -0.750% | -0.088% | -3.464% | 0.756% | -4.29% | 3.54% | 1.185% | 2.98 | |
| 2/28/2007 | $63.09 | -0.247% | -0.035% | 0.586% | -0.746% | 0.09% | -0.34% | 1.206% | -0.28 | |
| 3/1/2007 | $64.48 | 2.210% | 0.069% | -0.258% | -0.069% | -0.31% | 2.52% | 1.203% | 2.10 | (1) Moody's municipal bond credit ratings going global<br>(2) Moody's 10-K<br>(3) Moody's Sees $40M-$45M Cut In Retained Earnings |
| 3/2/2007 | $64.44 | -0.076% | 0.120% | -1.140% | 0.396% | -0.74% | 0.67% | 1.217% | 0.55 | |
| 3/5/2007 | $62.88 | -2.421% | -0.642% | -0.936% | 0.243% | -0.96% | -1.46% | 1.217% | -1.20 | |
| 3/6/2007 | $64.06 | 1.876% | 0.531% | 1.553% | 0.160% | 1.79% | 0.09% | 1.212% | 0.07 | |
| 3/7/2007 | $63.37 | -1.065% | -0.444% | -0.218% | -0.223% | -0.59% | -0.47% | 1.209% | -0.39 | |
| 3/8/2007 | $63.67 | 0.462% | 0.193% | 0.719% | -0.421% | 0.49% | -0.03% | 1.207% | -0.03 | |
| 3/9/2007 | $63.20 | -0.735% | 0.103% | 0.068% | 0.474% | 0.40% | -1.14% | 1.198% | -0.95 | |
| 3/12/2007 | $61.97 | -1.944% | -0.300% | 0.271% | -0.707% | -0.39% | -1.55% | 1.202% | -1.29 | |
| 3/13/2007 | $58.06 | -6.308% | -1.159% | -2.010% | 0.344% | -2.25% | -4.05% | 1.193% | -3.40 | (1) Moody's recalls its bank rating system<br>(2) Moody's shares drop 5 percent on subprime fears |
| 3/14/2007 | $58.71 | 1.125% | -0.042% | 0.676% | -0.107% | 0.54% | 0.59% | 1.232% | 0.48 | |
| 3/15/2007 | $61.91 | 5.446% | 0.520% | 0.373% | 0.388% | 1.03% | 4.41% | 1.232% | 3.58 | |
| 3/16/2007 | $61.61 | -0.488% | -0.279% | -0.383% | 0.594% | -0.31% | -0.18% | 1.295% | -0.14 | Moody's To Revise JDA Bk Rating Methodology By March 30 |
| 3/19/2007 | $62.66 | 1.709% | 0.084% | 1.090% | -0.421% | 0.94% | 0.77% | 1.295% | 0.59 | |
| 3/20/2007 | $62.81 | 0.233% | 0.081% | 0.635% | 0.561% | 1.21% | -0.98% | 1.295% | -0.76 | |
| 3/21/2007 | $64.70 | 3.011% | 0.697% | 1.711% | -0.248% | 2.45% | 0.56% | 1.298% | 0.43 | |
| 3/22/2007 | $64.67 | -0.045% | -0.591% | -0.035% | -0.343% | -0.98% | 0.93% | 1.298% | 0.72 | |
| 3/23/2007 | $63.92 | -1.161% | 0.057% | 0.110% | 1.292% | 1.14% | -2.30% | 1.301% | -1.77 | |
| 3/26/2007 | $62.88 | -1.632% | -0.465% | 0.096% | -1.349% | -1.29% | -0.34% | 1.315% | -0.26 | |
| 3/27/2007 | $61.35 | -2.434% | -0.181% | -0.618% | -0.026% | -0.97% | -1.47% | 1.262% | -1.16 | |
| 3/28/2007 | $59.97 | -2.241% | -0.429% | -0.775% | 0.287% | -1.19% | -1.05% | 1.255% | -0.84 | |
| 3/29/2007 | $60.53 | 0.926% | 0.193% | 0.378% | -0.507% | 0.50% | 0.43% | 1.175% | 0.36 | (1) Illinois Questions Ratings Agencies Gave to Utilities<br>(2) Moody's Announces LGD Impact For EMEA Speculative Issuers |
| 3/30/2007 | $60.50 | -0.048% | -0.013% | -0.116% | -0.001% | -0.15% | 0.10% | 1.170% | 0.09 | |
| 4/2/2007 | $59.74 | -1.257% | -0.802% | 0.260% | -0.325% | -1.17% | -0.09% | 1.170% | -0.08 | |
| 4/3/2007 | $59.84 | 0.180% | 0.229% | 0.948% | -1.133% | 0.60% | -0.42% | 1.168% | -0.36 | |
| 4/4/2007 | $59.51 | -0.554% | -0.324% | 0.112% | -0.504% | -0.71% | 0.16% | 1.157% | 0.14 | |
| 4/5/2007 | $59.57 | 0.098% | -0.160% | 0.334% | -0.396% | -0.18% | 0.28% | 1.144% | 0.24 | |
| 4/9/2007 | $60.22 | 1.096% | -0.076% | 0.069% | -0.010% | -0.06% | 1.16% | 1.144% | 1.01 | |
| 4/10/2007 | $58.66 | -2.590% | -0.047% | 0.264% | -0.176% | 0.09% | -2.68% | 1.148% | -2.33 | |
| 4/11/2007 | $59.08 | 0.715% | -0.120% | -0.646% | 0.397% | -0.45% | 1.16% | 1.146% | 1.00 | |
| 4/12/2007 | $60.46 | 2.326% | -0.390% | 0.622% | 0.183% | -0.24% | 2.57% | 1.158% | 2.22 | |
| 4/13/2007 | $61.22 | 1.258% | 0.140% | 0.349% | -0.286% | 0.36% | 0.90% | 1.176% | 0.77 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/16/2007 | $64.07 | 1.043% | 1.076% | -0.264% | | 2.55% | 2.10% | 1.176% | 1.78 | |
| 4/17/2007 | $66.68 | 4.078% | -0.646% | 0.205% | 0.921% | 0.65% | 3.43% | 1.163% | 2.95 | |
| 4/18/2007 | $66.19 | -0.731% | 0.958% | 0.070% | 0.097% | 1.97% | -2.70% | 1.198% | -2.25 | |
| 4/19/2007 | $66.27 | 0.118% | -0.023% | -0.118% | -0.534% | -0.54% | 0.66% | 1.219% | 0.54 | |
| 4/20/2007 | $66.37 | 0.147% | -0.236% | 0.929% | -0.536% | 6.24% | -0.09% | 1.199% | -0.08 | |
| 4/23/2007 | $65.40 | -1.454% | -0.172% | -0.229% | -0.428% | -0.80% | -0.65% | 1.196% | -0.54 | |
| 4/24/2007 | $66.28 | 1.341% | -0.341% | -0.035% | 1.992% | 0.90% | 0.44% | 1.196% | 0.37 | |
| 4/25/2007 | $66.74 | 0.691% | 0.380% | 1.023% | -0.589% | 1.25% | -0.56% | 1.196% | -0.47 | Moody's Corp. 1Q EPS 62c Vs EPS 49c |
| 4/26/2007 | $66.23 | -0.760% | -0.174% | -0.069% | 0.875% | 0.35% | -1.10% | 1.195% | -0.92 | |
| 4/27/2007 | $65.42 | -1.222% | -0.105% | -0.009% | -0.435% | -0.49% | -0.73% | 1.197% | -0.61 | |
| 4/30/2007 | $64.46 | -1.475% | 0.106% | -0.783% | 0.673% | -0.17% | -1.30% | 1.198% | -1.09 | |
| 5/1/2007 | $63.82 | -0.983% | -0.113% | 0.266% | 3.181% | 2.53% | -3.51% | 1.201% | -2.93 | |
| 5/2/2007 | $64.44 | 0.962% | -0.076% | 0.658% | -1.093% | -0.03% | 0.99% | 1.231% | 0.81 | |
| 5/3/2007 | $64.69 | 0.393% | 0.135% | 0.462% | 3.006% | 0.70% | -0.31% | 1.231% | -0.25 | |
| 5/4/2007 | $65.25 | 0.874% | 0.047% | 0.217% | 3.630% | 0.59% | 0.28% | 1.232% | 0.23 | |
| 5/7/2007 | $63.91 | -2.061% | 0.003% | 0.260% | -0.847% | -0.15% | -1.91% | 1.232% | -1.55 | |
| 5/8/2007 | $66.51 | 4.073% | -0.114% | -0.109% | -0.943% | -0.85% | 4.92% | 1.241% | 3.97 | |
| 5/9/2007 | $66.87 | 0.542% | 0.264% | 0.349% | -1.474% | 0.19% | 0.35% | 1.318% | 0.27 | |
| 5/10/2007 | $65.24 | -2.449% | -0.003% | -1.379% | 0.439% | -1.23% | -1.22% | 1.295% | -0.94 | |
| 5/11/2007 | $66.39 | 1.763% | -0.095% | 0.974% | 1.731% | 1.57% | 0.20% | 1.299% | 0.15 | |
| 5/14/2007 | $66.25 | -0.205% | -0.392% | -0.173% | 0.622% | -0.61% | 0.41% | 1.298% | 0.31 | |
| 5/15/2007 | $65.20 | -1.589% | -0.119% | -0.121% | -0.061% | -0.38% | -1.21% | 1.299% | -0.93 | |
| 5/16/2007 | $66.53 | 2.051% | 0.163% | 0.893% | -0.276% | 1.10% | 0.95% | 1.303% | 0.73 | |
| 5/17/2007 | $65.50 | -1.555% | -0.216% | -0.084% | 0.589% | -0.23% | -1.32% | 1.305% | -1.01 | |
| 5/18/2007 | $66.05 | 0.834% | -0.317% | 0.663% | 0.246% | 0.21% | 0.63% | 1.310% | 0.48 | |
| 5/21/2007 | $66.62 | 0.872% | -0.160% | 0.155% | -1.446% | -0.76% | 1.63% | 1.310% | 1.25 | |
| 5/22/2007 | $66.41 | -0.323% | 0.216% | -0.064% | 0.076% | 0.30% | -0.62% | 1.318% | -0.47 | SEC To Vote On Finalizing New Oversight Of Rating Firms |
| 5/23/2007 | $70.38 | 5.982% | -0.046% | -0.119% | 0.927% | 0.15% | 5.83% | 1.314% | 4.44 | SEC Finalizes Rules To Regulate Credit-Rating Firms |
| 5/24/2007 | $68.23 | -3.051% | 0.050% | -0.958% | -0.542% | -1.15% | -1.90% | 1.414% | -1.34 | |
| 5/25/2007 | $68.15 | -0.114% | -0.373% | 0.546% | -0.101% | -0.10% | -0.01% | 1.423% | -0.01 | |
| 5/29/2007 | $69.16 | 1.475% | 0.230% | 0.165% | 0.081% | 0.60% | 0.87% | 1.420% | 0.61 | |
| 5/30/2007 | $70.82 | 2.399% | -0.248% | 0.838% | -0.892% | -0.02% | 2.42% | 1.422% | 1.70 | |
| 5/31/2007 | $67.98 | -4.010% | -0.354% | 0.028% | 0.016% | -0.54% | -3.47% | 1.438% | -2.41 | |
| 6/1/2007 | $67.46 | -0.761% | -0.005% | 0.373% | 1.039% | 0.91% | -1.67% | 1.473% | -1.14 | |
| 6/4/2007 | $69.31 | 2.749% | -0.326% | 0.189% | 0.699% | -0.05% | 2.80% | 1.472% | 1.90 | |
| 6/5/2007 | $68.67 | -0.929% | -0.099% | -0.531% | -0.522% | -1.03% | 0.10% | 1.486% | 0.07 | Moody's Corp Raises FY 2007 Outlook |
| 6/6/2007 | $69.03 | 0.526% | 0.091% | -0.861% | -0.078% | -0.84% | 1.36% | 1.481% | 0.92 | |
| 6/7/2007 | $67.04 | -2.884% | 0.048% | -1.753% | -0.199% | -1.88% | -1.01% | 1.486% | -0.68 | |
| 6/8/2007 | $67.03 | -0.015% | 0.076% | 1.138% | -0.696% | 0.94% | -0.95% | 1.487% | -0.64 | |
| 6/11/2007 | $66.81 | -0.335% | 0.273% | 0.098% | 0.368% | 0.78% | -1.12% | 1.488% | -0.75 | |
| 6/12/2007 | $65.20 | -2.411% | -0.065% | -1.068% | -0.936% | -1.78% | -0.63% | 1.491% | -0.42 | |
| 6/13/2007 | $65.22 | 0.030% | 0.210% | 1.543% | -0.766% | 1.67% | -1.64% | 1.491% | -1.10 | |
| 6/14/2007 | $65.36 | 0.214% | -0.701% | 0.488% | 0.377% | -0.53% | 0.75% | 1.492% | 0.50 | |
| 6/15/2007 | $66.05 | 1.045% | -0.224% | 0.652% | 0.738% | 0.72% | 0.33% | 1.492% | 0.22 | |
| 6/18/2007 | $65.39 | -0.990% | 0.065% | -0.121% | -0.061% | -0.05% | -0.94% | 1.492% | -0.63 | |

# Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/19/2007 | $65.39 | 0.000% | 0.356% | 0.173% | -0.666% | 0.07% | -0.07% | 1.494% | -0.05 | |
| 6/20/2007 | $62.70 | -4.119% | -0.317% | -1.358% | -0.058% | -2.05% | -2.07% | 1.494% | -1.39 | |
| 6/21/2007 | $62.45 | -0.389% | -0.433% | 0.640% | -0.625% | -0.42% | 0.04% | 1.505% | 0.03 | |
| 6/22/2007 | $61.85 | -0.969% | -0.443% | -1.289% | 0.568% | -1.93% | 0.96% | 1.501% | 0.64 | |
| 6/25/2007 | $59.65 | -3.551% | -0.261% | -0.321% | -0.741% | -1.26% | -2.29% | 1.503% | -1.52 | |
| 6/26/2007 | $60.57 | 1.538% | 0.143% | -0.320% | 0.750% | 0.33% | 1.20% | 1.517% | 0.79 | |
| 6/27/2007 | $61.07 | 0.822% | -0.091% | 0.921% | -0.880% | 0.29% | 0.53% | 1.515% | 0.35 | |
| 6/28/2007 | $61.03 | -0.064% | -0.111% | -0.040% | 0.240% | 0.21% | -0.27% | 1.516% | -0.18 | |
| 6/29/2007 | $60.71 | -0.528% | -0.584% | -0.156% | -0.111% | -1.28% | 0.75% | 1.518% | 0.50 | |
| 7/2/2007 | $60.55 | -0.257% | 0.124% | 1.071% | -0.890% | 0.86% | -1.12% | 1.517% | -0.74 | |
| 7/3/2007 | $59.43 | -1.854% | 0.169% | 0.578% | -0.704% | 0.25% | -2.10% | 1.519% | -1.38 | |
| 7/5/2007 | $59.96 | 0.887% | -0.530% | 0.086% | 0.574% | -0.50% | 1.39% | 1.531% | 0.91 | |
| 7/6/2007 | $60.79 | 1.400% | -0.194% | 0.359% | -0.426% | -0.23% | 1.63% | 1.536% | 1.06 | |
| 7/9/2007 | $60.02 | -1.268% | -0.367% | 0.093% | 0.461% | -0.19% | -1.08% | 1.543% | -0.70 | |
| 7/10/2007 | $58.94 | -1.805% | -0.779% | -1.419% | -0.267% | -3.08% | 1.27% | 1.546% | 0.82 | |
| 7/11/2007 | $59.45 | 0.828% | -0.178% | 0.584% | -1.609% | -0.66% | 1.48% | 1.543% | 0.96 | |
| 7/12/2007 | $59.71 | 0.476% | 0.262% | 1.907% | -0.595% | 2.25% | -1.78% | 1.549% | -1.15 | |
| 7/13/2007 | $61.11 | 2.337% | -0.120% | 0.311% | 0.775% | 0.56% | 1.78% | 1.555% | 1.14 | |
| 7/16/2007 | $59.68 | -2.340% | -0.133% | -0.192% | 0.828% | 0.06% | -2.44% | 1.563% | -1.56 | |
| 7/17/2007 | $59.32 | -0.566% | 0.122% | -0.010% | 0.122% | 0.19% | -0.74% | 1.573% | -0.47 | |
| 7/18/2007 | $58.13 | -2.007% | -0.991% | -0.196% | -0.254% | -1.94% | -0.07% | 1.572% | -0.04 | |
| 7/19/2007 | $58.05 | -0.134% | -0.739% | 0.449% | -0.107% | -0.76% | 0.63% | 1.571% | 0.40 | |
| 7/20/2007 | $57.31 | -1.278% | -0.596% | -1.222% | -0.376% | -2.55% | 1.27% | 1.564% | 0.81 | |
| 7/23/2007 | $57.49 | 0.307% | -0.529% | 0.489% | 0.008% | -0.33% | 0.64% | 1.563% | 0.41 | |
| 7/24/2007 | $54.60 | -5.025% | -0.885% | -1.980% | -0.719% | -3.97% | -1.06% | 1.561% | -0.68 | |
| 7/25/2007 | $55.98 | 2.558% | 0.384% | 0.668% | 0.688% | 1.47% | 1.07% | 1.562% | 0.68 | |
| 7/26/2007 | $53.99 | -3.556% | -0.120% | -2.333% | -0.246% | -2.98% | -0.57% | 1.564% | -0.37 | |
| 7/27/2007 | $53.69 | -0.560% | 0.347% | -1.384% | 0.448% | -1.04% | 0.48% | 1.565% | 0.31 | |
| 7/30/2007 | $53.22 | -0.873% | 0.199% | 1.027% | -1.083% | 0.78% | -1.65% | 1.564% | -1.06 | |
| 7/31/2007 | $52.51 | -1.339% | -0.493% | -1.204% | 2.292% | -0.85% | -0.49% | 1.571% | -0.31 | |
| 8/1/2007 | $54.06 | 2.956% | -0.525% | 0.730% | -1.203% | -0.51% | 3.46% | 1.566% | 2.21 | (1) Moody's Corporation Authorizes Share Repurchase Program and Declares Quarterly Dividend <br><br>(2) Moody's tempers revenue outlook, net up 52 pct |
| 8/2/2007 | $55.88 | 3.358% | -0.275% | 0.460% | -0.221% | -0.07% | 3.43% | 1.592% | 2.15 | |
| 8/3/2007 | $51.98 | -6.969% | -1.181% | -2.652% | 0.830% | -4.38% | -2.59% | 1.623% | -1.59 | |
| 8/6/2007 | $52.83 | 1.633% | 2.262% | 2.417% | -1.694% | 5.70% | -4.06% | 1.632% | -2.49 | |
| 8/7/2007 | $54.53 | 3.217% | 0.299% | 0.620% | -0.539% | 0.70% | 2.51% | 1.650% | 1.52 | Moody's Corp Announces New Business Unit Structure |
| 8/8/2007 | $56.96 | 4.457% | 0.714% | 1.441% | -1.523% | 1.81% | 2.62% | 1.666% | 1.57 | |
| 8/9/2007 | $55.39 | -2.759% | -0.801% | -2.946% | 0.042% | -4.70% | 1.94% | 1.682% | 1.15 | |
| 8/10/2007 | $53.39 | -3.612% | -0.158% | 0.098% | -0.958% | -0.64% | -2.97% | 1.690% | -1.76 | |
| 8/13/2007 | $51.15 | -4.186% | -0.777% | -0.035% | -0.055% | -1.11% | -3.08% | 1.712% | -1.80 | Credit-rating agencies feel heat ; Regulators step into wake of subprime woes |
| 8/14/2007 | $48.78 | -4.636% | -0.587% | -1.805% | 0.584% | -2.66% | -1.98% | 1.728% | -1.15 | Moody's Gets $500M Interim Loan Facility |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/15/2007 | $48.00 | -1.601% | 0.377% | -1.363% | -0.606% | -1.46% | -0.14% | 1.717% | -0.08 | (1) Bond raters lose credibility<br>(2) European Commission To Probe Rtg Agencies Over Subprimes - FT |
| 8/16/2007 | $48.70 | 0.204% | 3.190% | 0.329% | -1.569% | 3.97% | -3.77% | 1.717% | -2.20 | Rating agency shares fall on report of EU review |
| 8/17/2007 | $48.86 | 1.585% | 1.167% | 2.457% | -1.529% | 3.34% | -1.75% | 1.732% | -1.01 | |
| 8/20/2007 | $44.86 | -8.183% | -0.780% | -0.027% | -1.023% | -1.31% | -6.88% | 1.705% | -4.03 | (1) US senator sees sub-prime crisis getting worse before better<br>(2) J.P. Morgan analyst downgrades McGraw-Hill to 'Neutral' on credit market turmoil |
| 8/21/2007 | $45.74 | 1.961% | 0.366% | 0.106% | 0.251% | 0.47% | 1.49% | 1.816% | 0.82 | |
| 8/22/2007 | $45.54 | -0.449% | -0.346% | 1.177% | 1.693% | 2.21% | -2.66% | 1.808% | -1.48 | |
| 8/23/2007 | $45.20 | -0.730% | -0.341% | -0.108% | 0.503% | -0.42% | -0.31% | 1.814% | -0.17 | |
| 8/24/2007 | $45.41 | 0.454% | -0.020% | 1.164% | -0.864% | 0.29% | 0.17% | 1.814% | 0.09 | |
| 8/27/2007 | $45.12 | -0.646% | -0.515% | -0.850% | 1.465% | -1.06% | 0.41% | 1.813% | 0.23 | |
| 8/28/2007 | $43.83 | -2.860% | -0.892% | -2.343% | -0.482% | -4.57% | 1.71% | 1.813% | 0.94 | |
| 8/29/2007 | $45.01 | 2.699% | -0.414% | 2.218% | -0.731% | 1.98% | 0.72% | 1.820% | 0.40 | |
| 8/30/2007 | $44.08 | -2.063% | -0.706% | -0.412% | 0.894% | -0.91% | -1.16% | 1.819% | -0.64 | |
| 8/31/2007 | $44.82 | 1.685% | 0.383% | 1.123% | 0.634% | 1.72% | -0.03% | 1.817% | -0.02 | |
| 9/4/2007 | $45.19 | 0.829% | 0.119% | 1.048% | -1.068% | 0.76% | 0.07% | 1.801% | 0.04 | |
| 9/5/2007 | $43.94 | -2.769% | -0.982% | -1.104% | -0.207% | -2.60% | -0.17% | 1.800% | -0.10 | EU's McCreevy:Role Of Credit Agencies Needs To Be Clearer |
| 9/6/2007 | $45.00 | 2.403% | -0.657% | 0.443% | -0.170% | -0.24% | 2.64% | 1.750% | 1.51 | |
| 9/7/2007 | $43.29 | -3.802% | 0.259% | -1.690% | 0.782% | -1.94% | -1.86% | 1.767% | -1.05 | Rating agencies potential target in Ohio's foreclosure fight |
| 9/10/2007 | $43.16 | -0.294% | 0.031% | -0.124% | 0.035% | -0.38% | 0.08% | 1.774% | 0.05 | |
| 9/11/2007 | $43.52 | 0.838% | -0.030% | 1.363% | -0.299% | 1.48% | -0.63% | 1.773% | -0.36 | |
| 9/12/2007 | $43.27 | -0.584% | -0.231% | 0.032% | 0.710% | -0.03% | -0.55% | 1.773% | -0.31 | (1) EU regulators asked to assess competence of rating agencies behind credit crisis<br>(2) US House panel may hold credit rating hearing soon |
| 9/13/2007 | $43.80 | 1.220% | 0.749% | 0.848% | -0.699% | 1.09% | 0.13% | 1.772% | 0.08 | |
| 9/14/2007 | $43.39 | -0.938% | -0.063% | 0.021% | -1.010% | -0.75% | -0.19% | 1.765% | -0.11 | |
| 9/17/2007 | $41.91 | -3.403% | -0.236% | -0.511% | -1.404% | -1.78% | -1.62% | 1.764% | -0.92 | |
| 9/18/2007 | $46.14 | 10.100% | 1.530% | 2.922% | 1.315% | 5.55% | 4.56% | 1.767% | 2.58 | Moody's looks at ratings reform |
| 9/19/2007 | $47.61 | 3.178% | -0.025% | 0.612% | -0.832% | 0.16% | 3.02% | 1.808% | 1.67 | (1) EU regulator says hold fire on rating agencies<br>(2) Moody's sees Q3 'up in the air,' Q4 "challenging" |
| 9/20/2007 | $46.61 | -2.094% | -1.086% | -0.651% | 0.627% | -1.53% | -0.57% | 1.828% | -0.31 | |
| 9/21/2007 | $47.26 | 1.384% | -0.224% | 0.461% | -0.233% | 0.18% | 1.21% | 1.829% | 0.66 | |
| 9/24/2007 | $46.04 | -2.565% | -0.706% | -0.525% | -0.846% | -2.04% | -0.53% | 1.831% | -0.29 | Panels to Mull Credit Agencies |
| 9/25/2007 | $45.04 | -2.187% | -0.286% | -0.032% | -1.251% | -1.21% | -0.98% | 1.831% | -0.53 | |

## Exhibit 1. Event Study for Moody's Inc. During Class Period

| DATE | Moody's Closing Price | Moody's Return | S&P Fin. Return | S&P 500 Return | Peer Index Return | Exp. Ret. | Ab. Ret. | RMSE | Ab. Ret. T | Summary of Potentially Material News |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/26/2007 | $46.33 | 2.865% | 0.003% | 0.560% | 0.197% | 0.80% | 2.06% | 1.833% | 1.13 | (1) Moody's Proposes Enhancements to Non-Prime RMBS Securitization; (2) Announces New Senior Management Appointments (3) Pension Fund Sues Moody's Corp Over Subprime Ratings |
| 9/27/2007 | $49.24 | 6.288% | 0.389% | 0.394% | 1.644% | 1.83% | 4.46% | 1.843% | 2.42 | (1) Moody's Investors Services Names Madelain Exec Vice President (2) Congress: Much talk, little action on credit raters? |
| 9/28/2007 | $49.27 | 0.060% | -0.120% | -0.301% | -0.304% | -0.89% | 0.95% | 1.883% | 0.50 | |
| 10/1/2007 | $51.44 | 4.405% | 0.748% | 1.330% | -0.114% | 2.55% | 1.86% | 1.868% | 0.99 | S&P Rates Moody's Corp.'s Proposed CP Program 'A-1' |
| 10/2/2007 | $51.80 | 0.703% | 0.862% | -0.026% | -0.584% | 0.29% | 0.41% | 1.871% | 0.22 | Moody's Corporation to Establish $1 Billion Commercial Paper Program |
| 10/3/2007 | $52.71 | 1.758% | 0.446% | -0.435% | 1.245% | 0.61% | 1.15% | 1.863% | 0.62 | |
| 10/4/2007 | $51.08 | -3.097% | 0.023% | 0.212% | 0.129% | 0.37% | -3.46% | 1.864% | -1.86 | |
| 10/5/2007 | $51.62 | 1.053% | 0.237% | 0.985% | 1.351% | 2.55% | -1.50% | 1.879% | -0.80 | |
| 10/8/2007 | $50.38 | -2.386% | -0.506% | -0.322% | 0.148% | -1.02% | -1.37% | 1.858% | -0.74 | |
| 10/9/2007 | $50.54 | 0.310% | 0.008% | 0.812% | -0.042% | 1.00% | -0.69% | 1.856% | -0.37 | US SEC examines credit rating industry competition |
| 10/10/2007 | $49.53 | -1.992% | -0.628% | -0.164% | 0.434% | -0.95% | -1.04% | 1.856% | -0.56 | |
| 10/11/2007 | $48.06 | -2.980% | 0.280% | -0.511% | 0.400% | -0.36% | -2.62% | 1.858% | -1.41 | |
| 10/12/2007 | $48.29 | 0.488% | -0.518% | 0.476% | 0.084% | 0.05% | 0.44% | 1.873% | 0.23 | |
| 10/15/2007 | $47.13 | -2.409% | -1.004% | -0.837% | -0.637% | -2.82% | 0.41% | 1.872% | 0.22 | |
| 10/16/2007 | $46.71 | -0.892% | -1.199% | -0.657% | -0.820% | -2.84% | 1.95% | 1.872% | 1.04 | |
| 10/17/2007 | $46.24 | -1.006% | -0.329% | 0.185% | 0.321% | -0.01% | -1.00% | 1.879% | -0.53 | |
| 10/18/2007 | $46.04 | -0.423% | -1.002% | -0.073% | 0.282% | -1.04% | 0.62% | 1.880% | 0.33 | |
| 10/19/2007 | $45.32 | -1.571% | -0.369% | -2.561% | 3.089% | -3.60% | 2.03% | 1.880% | 1.08 | |
| 10/22/2007 | $45.69 | 0.820% | 0.574% | 0.382% | -0.377% | 0.70% | 0.12% | 1.863% | 0.06 | |
| 10/23/2007 | $46.32 | 1.369% | -0.245% | 0.880% | -0.381% | 0.62% | 0.74% | 1.869% | 0.40 | Moody's Investors Service Updates its Code of Professional Conduct |
| 10/24/2007 | $44.90 | -3.060% | -0.537% | -0.243% | -0.008% | -0.98% | -2.08% | 1.861% | -1.12 | (1) Moody's Corporation Reports Results for Third Quarter of 2007... (2) Moody's sees slower credit mkt rebound than 1998 |

Bloomberg and Factiva

# EXHIBIT 2

**Testing Conflicts of Interest at Bond Ratings Agencies with Market Anticipation:**

**Evidence that Reputation Incentives Dominate**

Daniel M. Covitz

Federal Reserve Board

Paul Harrison

Federal Reserve Board

Latest Draft:   December 2003

This paper reflects the views of the authors    only and not  necessarily those of the Board of Governors, other members of its staff, or the Federal Reserve System. We thank Shannon Hart for outstanding research assistance.

Please address correspondence to Daniel Covitz, Mail Stop 89, Federal Reserve Board, 20th and C Sts. NW, Washington, DC 20551, phone (202)-452-5267, fax (202)-452-5295, email dcovitz@frb.gov.

1

## Abstract

This paper presents the first comprehensive test of whether well-known conflicts of interest at bond rating agencies importantly influence their actions. This hypothesis is tested against the alternative that rating agency actions are primarily influenced by a countervailing incentive to protect their reputations as delegated monitors. These two hypotheses generate a number of testable predictions regarding the anticipation of credit-rating downgrades by the bond market, which we investigate using a new data set of about 2,000 credit rating migrations from Moody's and Standard & Poor's, and matching issuer-level bond prices. The findings strongly indicate that rating changes do not appear to be importantly influenced by rating agency conflicts of interest but, rather, suggest that rating agencies are motivated primarily by reputation-related incentives.

2

## I. Introduction

Bond rating agencies have an obvious conflict of interest. They have a financial incentive to accommodate the preferences of bond issuers because they are selected and paid by the issuers. This incentive conflicts with agencies' stated goal of supplying independent and objective credit-risk analysis to investors.[1] Bond rating agencies also have a countervailing incentive to build and protect their reputations for being independent and objective. This paper empirically tests whether rating agency actions systematically vary in a manner which suggests they favor issuer interests – the "conflict of interest hypothesis" – or investor interests – the "reputation hypothesis."

The ongoing string of financial scandals in recent years has highlighted the pervasiveness of conflicts of interest at financial monitors and intermediaries, as well as the fact that these conflicts are not always successfully counterbalanced by reputation-related incentives.[2] The still-accruing evidence indicates that objectivity (and even fiduciary responsibility) has been subjugated to self interest by some accounting firms, equity analysts, corporate officers and board members, stock-exchange specialists, and mutual funds, despite the importance of reputation to franchise value in each of these sectors. Thus, there is an ex ante basis for concern about conflicts of interest at rating agencies, a concern expressed explicitly in recent Congressional legislation and SEC proposals.[3]

Conflicts of interest at rating agencies are important given the fundamental role that

---

[1] This goal is articulated in Moody's (2003), for instance.

[2] In other settings, it has been shown that reputations mitigate moral hazard problems, as in Diamond (1991). Of course, there are also examples of when reputations are ineffective (as in Bulow and Rogoff, 1989).

[3] See, Sarbanes-Oxely Act (2002), SEC (2003).

3

rating agencies play as delegated monitors in today's capital markets. Most (non-Treasury) debt securities issued in the U.S. are rated by at least one rating agency, and their importance to investors, by many accounts, has grown in recent years (see, for instance, Cantor and Packer, 1994, Sinclair, 2003, Fabozzi, 2001, SEC, 2003). In addition, ratings are likely to be particularly important where the benefits are small, or costs large, to independent credit analysis, such as for high-grade issuers and asset-backed issuance, respectively. Regulations also rely heavily on ratings. The SEC designates "Nationally Recognized Statistical Rating Organizations" (NRSROs), which currently are referenced by at least 8 federal statutes, 47 federal regulations, and over 100 state laws and regulations.[4]

However, rating agencies have not been formally charged with any illegal activity; and perhaps there are institutional reasons to expect that their conflicts of interest are well managed. Certainly rating agencies argue (see, for instance, SEC, 2003, p.23) that safeguarding their reputation is of "paramount importance." Rating agencies also claim they effectively manage their conflicts of interest by separating compensation from revenue generation and by diversifying their revenue base. Conflicts of interest might also be ameliorated by the limited competition in the ratings industry. With less pressure to compete for fees, rating agencies may have little incentive to coddle issuers and may instead focus on managing their reputations. Of course, the degree to which reputation-related incentives keep conflicts of interest in check is an empirical question.

Our approach to addressing this question is guided by recent criticism of rating agencies, which has focused on their *delay* in recognizing the credit-quality deterioration of Enron Corp, prior to its failure at the end of 2001. For example, Zuckerman and Sapsford (2001) summarize:

---

[4] According to the Senate Governmental Affairs Committee report, "Financial Oversight of Enron: The SEC and Private-Sector Watchdogs," October 2002.

4

"in waiting until Enron's bonds had plummeted in value, the ratings agencies failed in their job of anticipating a company's financial problems and giving investors an early warning." Investor skepticism was heightened by news reports (as in Smith and Zuckerman, 2001) that Moody's, S&P, and Fitch had behind-the-scenes meetings with, and had been lobbied by, executives from Enron, Dynegy, J.P. Morgan Chase, and Citigroup, and "agreed to hold off on making any ratings move," essentially so as not to bankrupt the company. Rating agencies claimed their decision to hold-off on the downgrade was justified, given their belief, at the time, that a pending merger was likely to protect bondholders.

We measure delay as the degree to which ratings changes are anticipated by the bond market, where anticipation is defined as the ratio of an issuer's bond-yield-spread change over the five months preceding the month of the rating change to the total spread change over those five months plus the month of the rating change itself.[5] So, if all of the spread change occurred in the month of the rating change then anticipation would be 0, while if all of the movement occurred in the prior months then anticipation would be 1. By using a monthly frequency, we abstract from delays of only a few days, which is justified by the finding in Holthausen and Leftwich (1985) that the anticipation of rating changes, measured with abnormal equity returns, is large and runs into many months.

Our analysis is novel along a number of dimensions: Our measure of rating change anticipation is new; we are the first to document cross-sectional differences in anticipation and total effects (anticipation plus announcement effects) associated with rating changes; and we are the first to address rating agency conflicts of interest and reputation incentives. We also use a new data set of about 2000 corporate-bond rating changes by Moody's and S&P from 1997 to

---

[5] As discussed later, spreads are calculated relative to other similarly rated and similar maturity corporate bonds.

5

2002, about twice the size of the data in Holthausen and Leftwich (1985), both in terms of years and number of observations.

We find that downgrades are roughly 75 percent anticipated, but our cross-sectional analysis of anticipation yields no support for the conflict of interest hypothesis. To the contrary, we find substantial evidence consistent with rating agencies protecting their reputations as delegated monitors with timely actions in cases likely to have generated substantial publicity. The results are robust to a variety of controls for other factors that might affect anticipation, such as the size of the downgrade, the size of the total bond-market movement, ratings level, time, industry, having been put on a "watchlist" for a downgrade, and having been downgraded by both firms, as well as to various permutations in the construction of the dependent variable.[6] We also analyze Moody's and S&P rating changes separately. In this analysis, we again find no evidence for the conflict of interest hypothesis, but do find stronger support for the importance of reputation concerns at S&P than at Moody's. We also formulate four additional tests, the results of which also point towards the importance of reputation concerns and away from the conflict of interest hypothesis.

Our findings complement the literature on rating change announcement effects. That literature documents significant announcement effects for downgrades, but not for upgrades, and stronger announcement effects for high-yield downgrades than for investment-grade downgrades.[7] If diminished announcement effects are due to greater anticipation (and we do find greater anticipation for the categories of rating changes found in the literature to have

---

[6] The anticipation measure can be ill behaved when the total effect (the denominator) is small or the anticipation is negative, so we impose restrictions which are varied in the analysis.

[7] See Goh and Ederington (1999), Hand, Holthausen, and Leftwich, (1992), Goh and Ederington (1993), and Holthausen and Leftwich (1985).

6

insignificant or small announcement effects), our general findings suggest that reputation concerns may help explain differential announcement effects. It is also possible that the diminished announcement effects simply reflect relatively "minor" credit quality events. Consistent with this possibility, we find that total effects are small for the categories of rating changes found in the literature to have insignificant or small announcement effects.

The paper proceeds as follows: Section II formulates the two hypotheses and their testable implications; Section III presents the main results; Section IV addresses robustness, Section V presents additional tests, and Section VI concludes.

## II. Hypothesis Development

The incentive for rating agencies to act in the interest of issuers derives from institutional arrangements, whereby issuers pay for issuer-level and bond-level ratings, and also choose which rating agency – possibly more than one – will produce the ratings. Almost all rating agency revenues are from ratings fees. Rating agencies also offer fee-based ancillary consulting-type services to issuers, which may exacerbate conflicts of interest. For example, prior to being issued a public rating, issuers can purchase an "indicative" or private rating, along with "advice" regarding how the company might improve their rating.

Clearly, one mechanism for acting in the interest of issuers is to delay rating downgrades. Delaying the negative news in downgrades may benefit issuers in a number of ways. It postpones the concomitant increase in funding costs. But the benefits may extend well beyond the costs of borrowing, since a downgrade could trigger certain covenants or other conditional obligations. In general, lower rated firms typically must post more collateral and might be treated differently by suppliers – that is, a rating downgrade may have negative feedback effects. In addition a delay gives the firm time, and hence option value, to be able to correct its

deterioration in credit quality. This might take the form of detailed discussions with the rating agencies to try to convince them that the downgrade is not warranted, or it might be fundamental changes in capital structure that reduce the firm's leverage and/or enhance its liquidity.

The incentive to delay downgrades may be large in some cases. For example, the incentive to delay downgrades to please issuers may be large when the issuer is a relatively large client, because the fees obtained from issuers are increasing in the number and size of rated bonds. For instance, in addition to an annual fee, Moody's charges between $33,000 and $275,000 *per issue* based on the par value (and complexity) of the issue. The standard per issue fee is calculated as 0.033 percent for the first $500 million of par value and 0.02 percent of additional par value, with a $33,000 minimum and a $275,000 maximum (Moody's 2002).[8]

The delay incentive should also be larger when the downgrade itself is particularly costly to the issuer. One example of a costly rating change is the downgrade from investment-grade to high yield, creating what is commonly referred to as a fallen angel. Financial contracts often contain triggers explicitly tied to this change. For instance, bank-credit lines may be revoked, or derivative contracts may require additional collateral when a firm becomes a fallen angel. In addition, many investors are unable (due to rules and regulations), or unwilling, to hold high-yield securities. This could adversely impact the issuer's ability to access capital markets, adding to the liquidity problems associated with the triggers.

Of course, downgrade delays may be also costly to the reputations of rating agencies. As rating changes become more delayed, investors might find rating agencies less useful as delegated monitors. This gives rating agencies an incentive to be diligent and on top of credit-

---

[8] The rating agencies argue that even the largest issuer provides only a small amount of their total revenue, so this incentive cannot be large. But, of course, that argument does not apply to the incentive to favor an entire class of clients (say all large issuers together).

8

quality changes. Furthermore, when rating the same issuer, rating agencies may also compete with each other to be perceived as *relatively* timely by investors, and thus the reputation costs of downgrade delays may be enhanced. While multiple ratings can mitigate the conflict of interest via a reputation effect, the custom of multiple ratings could also diminish issuers' leverage over rating agencies.

As evidence that they do not subjugate investors' interests to those of issuers, rating agencies point proudly to their attempts to mitigate the conflict of interest by using fixed fee schedules, rating committees, independent analyst compensation, and other "fire walls" between raters and the collection of revenue. The multitude of measures (as well as their marketing) underscores the reality that the rating agencies must convince investors that ratings are indeed independent, and thus inadvertently emphasizes the seriousness of the incentive to coddle issuers.

The crucial role of reputation to rating agencies implies that they could never completely neglect investor interests. In general, since ratings are widely used by the investment community and rating changes move market prices (we document this later, but it has been well-established by the literature), it appears that the rating agencies have avoided the widespread perception that they serve issuer interests. Even the SEC report to Congress (SEC, 2003, p.23) concluded that "for the most part" market participants believe that the rating agencies have "effectively managed" their conflict of interest. This, perhaps, could be summarized as the view that ratings agencies are generally getting it right.

Rating agencies may also have an incentive to "get it right" faster for some issuers to minimize negative publicity and its consequent reputation cost. Negative publicity, and thus reputation costs, may be increasing when an issuer is a large client and when the downgrade creates a fallen angel, since such cases tend to involve substantial publicity and investor losses.

9

Empirically, the relative delay for large clients and fallen angels then allows us to identify which incentive is driving the behavior of rating agencies. Evidence that downgrade delays are larger for fallen angels and big clients would suggest that rating agencies are acting in the interest of issuers – support for the "conflict of interest hypothesis." Evidence of smaller downgrade delays for fallen angels and large clients would suggest that rating agencies are primarily acting in the interest of investors to protect their reputations as delegated monitors – support for the "reputation hypothesis."

We measure rating agency delay by the degree to which the bond market anticipates rating changes. There are, of course, a number of other factors that could generate anticipation of rating changes besides intentional delay. For instance, rating agencies will appear slow if they do not respond immediately to gradual changes in credit quality because they only reassess ratings periodically or because ratings move in discrete notches. Second, rating agencies' information advantage over investors may be greater in some cases, or at certain times. Third, there may be other factors relating to the size of the credit quality shock or the firm's initial rating that effect the speed of rating agencies relative to the market. Thus, our main test of these hypotheses, involves regressing the anticipation of a downgrade against variables indicating whether the firm is a large client or a fallen angel, and a variety of controls for other factors that might influence anticipation.

## III. Data

We take monthly bond yield and ratings data from Merrill Lynch's bond database. The data, which underlie the widely-followed Merrill Lynch broad corporate bond indexes, includes daily pricing and monthly rating information on over 3000 large, public corporate bonds, from more than 1200 issuers, traded in the US bond market from January 1997 to August 2002. Over

10

90% of the bonds are issued by firms domiciled in the US, and all the bonds have face value greater than or equal to $100 million and over 1 year in remaining maturity. While on a daily frequency many of the prices will not be from real trades, at a monthly frequency even dealer quotes will be closely tied to the behavior of the individual credit (see Harrison, 2002).

The Merrill Lynch data contains monthly composite bond credit ratings, calculated as the average of the bond's credit rating from Moody's and S&Ps. When the average falls between two ratings, the composite is rounded to the lower rating. This means that the composite rating will tend to capture the first, or "leading edge," downgrade. Composite ratings are updated on the first day of each month to incorporate changes that occurred in the prior month.

To create an issuer-level data set from the bond-level data, we limit the sample to one rating migration per issuer, per month, by selecting the issuer's largest (and, arguably, most liquid and, therefore, best priced) bond when there are multiple bonds migrating within a particular month. We only select migrations with sufficient data to construct yield changes over the six month period ending in the month of the rating change and where there was no rating change within the five months prior to that migration. Prior rating changes could confound the interpretation of our delay measure. For about half the sample, we hand check the migrations data on Bloomberg to confirm that there was no rating actions in the prior 5 months, to alleviate any concern about the composite nature of the ratings, as well as to supplement the data with information on prior "watchlist" assignment and on the identity of which (or both) rating agency changed their rating.

The sample of issuer-level ratings migrations is summarized in Table 1. The sample includes 773 upgrades and 1234 downgrades, all of which took place in the period from July 1, 1997 to July 1, 2002. The greater number of downgrades reflects a substantial increase in the annual pace of downgrades after 1999, as macroeconomic conditions deteriorated.

11

The original bond-level Merrill Lynch data are also used to create 56 daily "effective" bond-yield-to-maturity indexes, grouped by time-to-maturity and rating. We group the bonds into 7 ratings buckets: AAA, AA, A, BBB, BB, B, and CCC or less. We then take the bonds in each rating group and divide them into 8 maturity buckets.[9] For each sub-bucket, we calculate an average, end of month, bond yield. For each rating change, yield spreads are calculated as the difference between the bond yield at the end of the month (calculated with the first available yield in the subsequent month) and the "appropriate" rating-maturity indexes, based on the bond's rating and maturity in the month prior to the rating change.

## IV. Empirical Analysis

### 1. Total Effect of Rating Changes On Bond Spread Changes

As a prelude to our investigation of delay, we examine bond-spread changes leading up to and through the rating change month. We call this the "total-period" spread change and define it as: $[\text{Spread}_t - \text{Spread}_{t-i}]$), where spreads are calculated monthly at the end of the month, $t$ refers to the month containing the migration month, and $i$ refers to the number of months in the period. We take spreads versus other corporate bonds in order to mimic the change in the credit quality (i.e., default probability or recovery expectation) of that issuer and not market-wide movements that should not show up in ratings, such as cyclical swings, liquidity premiums, and risk premiums.[10]

Table 2a shows the lower quartile, median, and upper quartile of total-period spread

---

[9] Based on whether the maturity is closest to 1, 2, 3, 5, 7, 10, 15, or 20 years. These maturities are chosen to match the maturity of frequently quoted treasury yields.

[10] While rating changes are cyclical, issuers are not downgraded just because the economy weakens.

12

changes for total periods ranging in length from 1 to 6 months. The table separates downgrades and upgrades, which are then further divided by the issuer's initial and final rating into three categories: high-yield (initial and final rating are both high yield), investment-grade (initial and final rating are both investment grade), and fallen angels (or rising devils, where initial and final rating change category).

The table yields a number of observations. First, consistent with rating changes reflecting credit quality changes, median total period spread changes are greater than zero for downgrades and less than zero for upgrades. Second, the magnitude of the effect varies with the initial and ending rating and is much larger for high-yield firms than for investment grade firms. Apparently a rating change is a bigger credit quality event at lower ratings. Third, the total-period spread changes for downgrades are much larger than for upgrades. This is consistent with the findings in the announcement-effect literature (see, for instance, Hand, Holthausen, and Leftwich, 1992).

Importantly, the results in the table also clearly show that the size of the effect is bigger over a longer window. For example the median total-period spread changes for high-yield downgrades is 390 basis points over a six month total period, but falls to about 80 basis points when calculated over the one month period. The pattern is similar for the other groups. In addition, the inter-quartile ranges narrow as the total-period length narrows. For example, the inter-quartile range for the high-yield downgrade effect is about [25, 1290] with a six month total period, but is only about [-30, 480] with a one month period. Taken together, these last two observations strongly imply that total-period spread changes look more like white noise as the total period narrows, suggesting that bond investors anticipate rating changes months before they

13

occur.[11]

## 2. Bond Market Anticipation

We attempt to quantify this effect by constructing a measure of bond-market anticipation of rating changes. We define anticipation as the degree to which corporate bond spreads move leading up to the month of the rating change – "prior period spread change" – relative to their movement through the migration month (the "total period" discussed above). More precisely:

Anticipation $= 100 *$ [Prior Period Spread Change]/ [Total Period Spread Change]

$$= 100 * [\text{Spread}_{t-1} - \text{Spread}_{t-i}] / [\text{Spread}_t - \text{Spread}_{t-i}], \quad (1)$$

where, again, $t$ denotes the month of the rating change and $i$ denotes the number of total months. So, if a rating change is timely, either in the sense that it quickly reflects observable information or reveals new information, this ratio will be close to zero. In contrast, a value near one indicates that the market largely anticipated the rating change.

Measuring anticipation in months is consistent with our findings in the previous section that spread changes are very large in the months before a rating change, as well as with the findings reported by Holthausen and Leftwich (1985) and our view that the monthly frequency is the right one for the costs and benefits of delay to be meaningful to issuers and investors. Using monthly data means we liberally attribute the entire bond spread movement during the month of the rating change to the rating change. This treatment of the timing should have no implications for our cross-sectional regressions.

---

[11] Recall, our spreads are taken to other corporate bonds and so this effect must reflect idiosyncratic anticipation not broad market deterioration.

14

Table 2b summarizes the anticipation measure across the different groups of rating changes discussed in the previous table. The point estimates in the table confirm that rating changes tend to be mostly anticipated before the month of the rating change. The median anticipations over the six month period range from about 55 percent for fallen angel downgrades, to nearly 85 percent for investment-grade upgrades. The point estimates also show that anticipation decreases with the length of the total period, consistent with the observation from the previous table that total period spread changes become noisier as the total-period length shrinks.

## 3. Main Results

Our empirical strategy is to regress the anticipation of downgrades on our proxies for intentional delay, controlling for factors which affect anticipation. Our basic specification is:

$$\text{Downgrade Anticipation}_i = \alpha + \beta_1 \text{ (Fallen Angel Dummy)}_i + \beta_2 \text{ (Big Client)}_i + \beta_3 \text{ (Controls)}_i + \epsilon_i \quad (2)$$

The key variables of interest are the variables "Fallen Angel Dummy" and "Big Client" since these have a differential implication for the conflicts of interest and reputation hypotheses. If rating agencies act in the interest of issuers, $\beta_1$ and $\beta_2$ should be greater than zero – downgrades of fallen angels and large clients are more anticipated by the market because the agencies have delayed. Conversely, if rating agencies act in the interest of investors to protect their reputations, $\beta_1$ and $\beta_2$ should be less than zero. We focus on downgrades because that is when the two hypotheses offer opposite predictions for the key variables. A finding of zero for these

15

coefficients would imply that the rating agencies are unbiased.

Table 3a presents results from four different specifications of Equation 2, using a six month event window. The results in this table are all calculated with the following intuitive restrictions on the anticipation measure: We cap anticipation at 100 percent, bound it below at 0 percent, and set it to 100 percent when the total period spread change is less than 20 basis points. Conceptually, 100 and 0 percent are natural bounds for the anticipation measure. In addition, when the denominator (i.e., the total spread change) is small or negative one might reasonably infer that the rating change was fully anticipated and was reflected in bond spreads *before* the total period. So, in these instances we set anticipation to its maximum. Robustness with respect to various restrictions on the anticipation measure is presented after the discussion of our main results.

The first specification in Table 3a includes the fallen angel dummy variable, the log of the number of bonds an issuer has outstanding (our first proxy for "large client"), and a dummy variable indicating if the initial rating is high-yield. The results, shown in column 1, indicate that fallen angels are 20 percentage points less anticipated by the bond market than other investment-grade downgrades (the omitted rating category), and that downgrades of firms with 1 percent more bonds outstanding are 5 percent less anticipated. The rating agencies appear more timely at changing ratings in cases when the downgrades are likely to generate substantial publicity, which we interpret as evidence for the reputation hypothesis and against the conflict of interest hypothesis. The coefficient on the high-yield dummy is -18, which is consistent with riskier downgrades generally being less anticipated by the bond market.

The next specifications show that the evidence in favor of the reputation hypothesis is robust to additional controls. Moreover, because the estimated coefficients on the control variables have the "expected" signs, they buttress our interpretation of the left-hand-side variable

16

as a measure of anticipation. The first of these additional specifications, shown in column 2, augments the stripped-down specification with three control variables: the magnitude of the rating change, the total period bond-spread change, and the square of the total period bond-spread change. The coefficients are all significant at the 5 percent level. The coefficient on the fallen angel dummy and the log of the number of bonds are again negative, but a bit smaller in absolute size than in the first specification. The coefficients on the control variables indicate that downgrades are 12 percent less anticipated when the issuer's original rating is high-yield, 3 percent less anticipated when they occur over 1 additional rating notch, and 3 percent less anticipated for every 1 percentage point (100 basis point) increase in the total-period spread change. The coefficient on the square of the total-period change is close to zero. The negative relationship between downgrade anticipation and the size of the total period spread change, as well as the rating notch variable, may reflect the fact that our anticipation measure is constructed from bond *yields*, which are convex functions of bond *default risk*.

The next specification tests robustness to replacing the log of the number of bonds with the log of the issuer's total par value of outstanding bonds. As shown in column 3, downgrades are about 3 percent less anticipated when an issuer has 1 percent more outstanding bonds. The point estimate is significant at the 5 percent level. The other coefficients and their statistical significance are essentially identical to those in the previous specification. The results are also immaterially different, as shown in column 4, when quarterly-time-dummy variables and industry-dummy variables are included. F tests, not shown, indicate that the quarterly dummies are statistically different from 0, but the industry dummies are not.

Table 3b addresses the robustness to alternative restrictions on the anticipation measure and the sample. All specifications in the table use the full list of control variables used in the last specification of the previous table. The table first considers robustness to using a longer-term (1

17

year) measure of anticipation. Given the requirement that the migration not be preceded by another migration during the total period, the longer-term delay measure reduces the sample size from 1234 to 809 downgrades. Nevertheless, as shown in the first column, the qualitative results are the same as in the previous table. The size of all the coefficient estimates are smaller, but still statistically significant at the five percent level – again, except the industry dummies.

The second specification (column 2) uses the six-month anticipation measure, but drops the restriction that all downgrades not be preceded by other rating changes in the total period, which increases the sample size to 1772 rating downgrades. The coefficient estimates and their significance levels are very close to the results in the previous table.

Next, we change the definition of a trivial spread change – the cut off below which the downgrade is assumed to have been anticipated – from 20 basis points to10 basis points. As shown in the third column, this reduces the magnitude of the coefficient on the fallen angel dummy and the log of the number of bonds a bit, but again the results are very similar. As another alternative, we drop the observations with negative total period spread changes, rather than assume, as we did, that such observations imply 100 percent anticipation. As shown in column 4, the results are again similar, except the coefficient on the fallen angel dummy jumps to -21.

The last specification, the results for which are shown in column 5, drops all restrictions relating to the anticipation measure. This yields a regression with almost no explanatory power, indicating that the intuitive restrictions on the anticipation measure are important. However, the consistency of the results to various alternative restrictions indicates that the results do not depend on the precise way in which the restrictions are imposed.

**4. Anticipation Analysis by Rating Agency**

18

While the majority of our analysis is conducted on our sample of composite rating migrations, we conduct analysis of Moody's and S&P downgrades separately to look for differential effects. The test for the conflict of interest versus the reputation hypothesis is the same as in the previous tables. However, we also add a control for whether the firm was put on "watch" for a downgrade during the total period, as well as a dummy variable indicating whether the downgrade by one rating agency was affirmed by a downgrade from the other rating agency. Clearly being put on the watch list is expected to increase anticipation. The expected impact of a downgrade affirmation is less clear. However, to the extent that a downgrade affirmation implies a larger event, one would expect less anticipation, as we have already shown that larger events generate less anticipation independently of delay. Because they were hand collected only for downgrades with total-period spread changes greater than 20 basis points, the sample is reduced to 372 Moody's downgrades and 358 Standard and Poor's downgrades.

The results for the Moody's sample, displayed in Table 3c, point in the direction of the reputation hypothesis, but are somewhat weaker than those obtained using the composite ratings. In all three specifications, the coefficients on the fallen angel dummies are not significant, but the coefficients on the "Big Client" proxies are still negative and significant – two at the 5 percent level and one at the 10 percent level. The coefficients on the two new variables in specifications without the quarterly and time dummy variables, shown in the first two columns, indicate that downgrades are 7 percentage points more anticipated when the firm is put on watch for a downgrade in the prior period, and 8 percentage points less anticipated when both rating agencies downgrade the firm in the migration month. When quarterly and time dummies are added, as shown in the third column, coefficients on the two new variables are somewhat smaller than in the first two specifications and insignificantly different from zero.

The results for the S&P regressions, shown in Table 3d, point more strongly in the

19

direction of the reputation hypothesis. The coefficients on the fallen angel dummy variables, shown in columns 1-3, are all about -19, and significant at the 5 percent level, and the coefficients on the client size proxies are negative, with all but one significant at the 10 percent level. The other coefficients are similar to those in the Moody's regressions. Putting a firm on watch for a downgrade leads to between 7 and 10 percentage points more anticipation, and having been downgraded by both rating agencies tends to coincide with between 4 and 8 percentage points less anticipation.

In both the Moody's and S&P regressions, the positive impact on anticipation of the watch list is intuitive, and the negative impact of "double agency" downgrades is consistent with the previously discussed result that larger downgrades tend to coincide with less anticipation. One difference with the results in Table 3a is that the total period spread change is no longer significant, although if we combine the Moody's and Standard and Poor's samples (not shown) the coefficient on the total period spread change is again significant and negative.

## V. Additional Results

### 1. Upgrades versus Downgrade Delays

The conflict of interest hypothesis predicts that rating agencies would delay downgrades and perhaps hasten upgrades, since downgrades delays benefit issuers. The reputation hypothesis predicts rating agencies might be more timely with downgrades, since downgrades may generate more publicity than upgrades. Thus the conflict of interest hypothesis would predict that downgrades are more anticipated by the bond market than upgrades, while the reputation hypothesis would predict the opposite. To test this implication, we combine our

20

sample of downgrades with upgrades, and regress:[12]

Anticipation $_i$ = $\alpha$ + $\beta_1$ (Upgrade vs. Downgrade)$_i$ + $\beta_2$ (Controls)$_i$ + $\epsilon_i$   (3)

The results, summarized in Table 4, again point towards the reputation hypothesis. As shown in the first column, in a stripped down specification with only a constant and a dummy variable for whether the rating change is an upgrade, we find that upgrades are 10 percent more anticipated than downgrades. The result is significant at the 5 percent confidence level. Adding our usual list of controls, along with a dummy variable for whether the rating change creates a rising devil (upgrade from high-yield to investment-grade), weakens the result to a still statistically significant 7 percent, as shown in the second column.

## 2. Is Reputation Only A Post-Enron Concern?

Soon after Enron defaulted towards the end of 2001, criticism of rating agencies peaked. To test whether reputation concerns at rating agencies were a response to this criticism, and thus only a recent concern among rating agencies, we split the sample into a pre-2002 period and a post-2001 period and re-run the regressions in Equation 2. However, as the results in Table 5 show, the evidence is actually stronger for the reputation hypothesis pre-Enron. In the early sample period, the coefficient on the fallen angel dummy variable is -22, the coefficient on the log of the number of bonds is -4, and both are statistically significant at the five percent level. In the post-2001 period, the coefficient on the log of the number of bonds is -5 and significant at the 10 percent level, but the coefficient on the fallen angle dummy is insignificantly different

---

[12] Analogous restrictions on the anticipation measure for upgrades are made.

21

from zero. The limited evidence of the reputation hypothesis in the later period could be due to the difficulty in identifying significance with the smaller sample size (203 observations) relative to the earlier period (1031 observations). It is also possible that the bond market may have become more diligent in the post-Enron period. Regardless, the results suggest that the importance of reputation concerns is not a post-Enron phenomenon.

## 3. Downgrade Propensity

One potential concern is that our methodology only considers downgrades that actually occur, so our test would fail to detect conflicts of interest that manifest in favored clients not being downgraded at all. To explore this possibility, we expand our sample and then test whether the probability of an issuer being downgraded in a particular month is negatively related to being a "Big Client," after controlling for other factors that are likely to affect the probability of a downgraded.

The new sample contains 32,983 monthly issuer-level observations. The dependent variable is a dummy variable for whether the issuer has been downgraded in that month. Our independent variable of interest is, as above, the "Big Client" proxy (either the log of the number of bonds or a dummy variable for whether the issuer has greater than the upper quartile number of bonds). The controls include a variable for the initial rating at the beginning of a six month total period, the prior-period spread change from t-6 to t-1, and an interaction between the high-yield dummy and the five month prior-period spread change. The model is estimated with a Probit specification:

$$\text{Downgrade}_{i,t} = \alpha + \beta_1 \text{ (Big Client)}_{i,t} + \beta_2 \text{ (Prior Spread Change)}_{i,t} + \beta_3 \text{ (Controls)}_{i,t} + \epsilon_{i,t} \quad (4)$$

The results from the model, shown in Table 6, once again point towards the reputation hypothesis. As shown in the first column, which reports marginal effects and standard errors, a one percent increase in the number of bonds leads to a 0.3 percent increase in the likelihood of a downgrade. The result is significant at the 5 percent level. The marginal effects for the control variables are as expected. High-yield issuers are more likely to be downgraded, issuers with large prior-period bond spread changes are more likely to be downgraded, but the effect is mitigated if they are high-yield (i.e., the marginal effect on the interaction term is negative). This last result is consistent with the greater gap in credit quality between rating notches at the lower-end of the credit quality spectrum. The second specification replaces the log of the number of bonds variable with a dummy variable for whether the issuer has more than the upper quartile number of bonds. The marginal effect, shown in the second column, indicates that large firms defined in this way our .5 percent more likely to be downgraded, controlling for other factors. The marginal effects and their significance are the same as in the previous specification.

### 4. Anticipation and Opacity

Our results could potentially be biased due to the omission of controls for issuer opacity, although the direction with which opacity effects anticipation is ambiguous. On the one hand, opacity may make it more difficult for ratings agencies to evaluate firms, and thus opacity ceteris paribus would increase rating agency delays (in the spirit of Morgan, 2002, who shows that rating agencies disagree more when there is more opaqueness). On the other hand, opacity creates more scope for ratings agencies to have an informational advantage over investors and thus opacity would decrease delays. We address this question in Table 7 by adding new controls to Equation 2 for firm opacity. The opacity proxies are a variety of balance-sheet measures from Compustat: the ratio of tangible assets to total assets, the ratio of income taxes paid to total

23

assets, the ratio of dividends paid to total assets, the ratio of goodwill to total assets, total assets, the ratio of current assets to current liabilities, the ratio of total debt to total assets, and the ratio of interest expense to operating income. None of the controls are significant, either singly or jointly, suggesting that anticipation and delay are not strongly tied to issuer complexity (at least after controlling for other variables, such as rating and spread change). Because of the need to merge with Compustat, however, the sample size is significantly reduced. Regardless, the evidence for the reputation hypothesis remains quite robust in all four specifications.

## VI. Conclusion

In conclusion, our analysis indicates that the bond market anticipates rating changes, but we find no evidence consistent with rating agencies acting in the interests of issuers due to a conflict of interest. Instead, rating agencies appear to be relatively responsive to reputation concerns and so protect the interests of investors. Of course, our analysis is not a comprehensive test of rating agency behavior. Conflicts of interest may manifest in ways we do not test, such as biased rating levels. Moreover, our results only show what is statistically discernable, on average, and thus can not rule out the possibility that in some instances rating agencies have acted in the interest of issuers. A final caveat is that our measure of anticipation—constructed with monthly data—cannot discern delays of a few days.

24

### References:

Bulow, Jeremy and Kenneth Rogoff, 1989, "Sovereign Debt: Is to Forgive to Forget?" *American Economic Review*, 79, 43-50.

Cantor, Richard and Frank Packer, 1994, "The Credit Rating Industry," *Quarterly Review*, Federal Reserve Bank of New York, 19, 1-26.

Diamond, Douglas W., 1991, "Monitoring and Reputation: The Choice Between Bank Loans and Directly Placed Debt," *Journal of Political Economy*, 99, 689-721.

Fabozzi, Frank J., ed., 2001, *The Handbook of Fixed Income Securities*, 6th Edition, McGraw Hill: NY.

Goh, Jeremy C. and Louis H. Ederington, 1993, "Is a Bond Rating Downgrade Bad News, Good News, or No News for Stockholders," *Journal of Finance*, 48, 2001-8.

Goh, Jeremy C. and Louis H. Ederington, 1999, "Cross-Sectional Variation in the Stock Market Reaction to Bond Rating Changes," *Quarterly Review of Economics and Finance*, 39, 101-12.

Hand, John R. M., Holthausen, Robert W., and Leftwich, Richard W., 1992, "The Effect of Bond Rating Agency Announcements on Bond and Stock Prices," *Journal of Finance*, 47, 733-52.

Harrison, Paul, 2002, "The Impact of Market Liquidity in Times of Stress on Corporate Bond Issuance," in *Proceedings of the Third Joint Central Bank Research Conference on Risk Measurement and Systemic Risk*. Basel: Bank for International Settlements.

Holthausen, Robert W. and Richard W. Leftwich, 1985, "The Effect of Bond Rating Changes on Common Stock Prices," *Journal of Financial Economics*, 17, 57-89.

Moody's Investor Service, 2002, "Moody's Debt and Preferred Stock Rating Fee Schedule," November 2002.

Moody's Investor Service, 2003, "The Role and Function of Rating Agencies: Evolving Perceptions and the Implications for Regulatory Oversight," February 2003.

Morgan, Donald P., 2002, "Rating Banks: Risk and Uncertainty in an Opaque Industry," *American Economic Review*, 92, 874-888.

The Securities and Exchange Commission, 2003, "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," January 2003.

The Senate Governmental Affairs Committee, 2002, "Financial Oversight of Enron: The SEC and Private-Sector Watchdogs," United States Senate, October 2002.

Sinclair, Timothy J., 2003, "Bond Rating Agencies," *New Political Economy*, 8, 147-161.

Smith, Rebecca and Gregory Zuckerman, "Enron, Dynegy Work to Salvage Merger Deal," *The Wall Street Journal*, November 28, 2001, page A3.

Zuckerman, Gregory and Jathon Sapsford, "Why Credit Agencies Didn't Switch Off Enron – S&P Cries 'Junk,' But the Warning Comes Too Late," *The Wall Street Journal*, November 29, 2001, page C1.

## TABLE 1: RATING CHANGES
By Year and Rating

|  | UPGRADES | | | |
|---|---|---|---|---|
|  | Investment Grade -> Investment Grade | High Yield -> Investment Grade | High Yield -> High Yield | Total |
| 1997 | 45 | 6 | 29 | 80 |
| 1998 | 90 | 11 | 66 | 167 |
| 1999 | 76 | 13 | 62 | 151 |
| 2000 | 90 | 12 | 59 | 161 |
| 2001 | 82 | 12 | 65 | 159 |
| 2002 | 20 | 5 | 30 | 55 |
| Total | 403 | 59 | 311 | 773 |

|  | DOWNGRADES | | | |
|---|---|---|---|---|
|  | Investment Grade -> Investment Grade | Investment Grade -> High Yield | High Yield -> High Yield | Total |
| 1997 | 27 | 3 | 19 | 49 |
| 1998 | 96 | 15 | 71 | 182 |
| 1999 | 86 | 19 | 121 | 226 |
| 2000 | 90 | 10 | 102 | 202 |
| 2001 | 152 | 19 | 201 | 372 |
| 2002 | 84 | 13 | 106 | 203 |
| Total | 535 | 79 | 620 | 1234 |

## TABLE 2a: Total Effect Of Rating Changes On Bond-Spread Changes

Bond-Spreads are the bond's option adjusted yield to maturity relative to corporate bond-yield indexes with similar rating and maturity as the bond experiencing the rating change. The length of the total period is the number of months leading up to and going through the end of the month of the rating change. *High yield* refers to those rating changes for which the bond's rating is below BBB- before and after the rating change. *Investment grade* refers to migrations for which the bond's rating is above BB+ both before and after the rating change. *Fallen angels* refers to those rating changes for which the bond's rating is investment grade before the raitng change and high-yield after. *Rising devils* refers to the opposite case.

| | Total-Period Bond-Spread Changes (Basis Points) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Downgrades | | | | | Upgrades | | |
| High yield | # | Lower Quartile | Median | Upper Quartile | | # | Lower Quartile | Median | Upper Quartile |
| Length of total period (months) | | | | | | | | | |
| 1 | 620 | -26 | 81 | 479 | | 311 | -54 | -7 | 29 |
| 2 | 620 | -23 | 143 | 697 | | 311 | -80 | -18 | 24 |
| 3 | 620 | -13 | 214 | 892 | | 311 | -85 | -15 | 33 |
| 4 | 620 | 4 | 272 | 995 | | 311 | -112 | -35 | 30 |
| 5 | 620 | 1 | 332 | 1258 | | 311 | -151 | -40 | 30 |
| 6 | 620 | 25 | 390 | 1292 | | 311 | -170 | -49 | 32 |
| **Fallen Angels and Rising Devils** | | | | | | | | | |
| Length of total period (months) | | | | | | | | | |
| 1 | 79 | -9 | 21 | 155 | | 59 | -58 | -15 | 12 |
| 2 | 79 | -6 | 47 | 158 | | 59 | -70 | -22 | 7 |
| 3 | 79 | 0 | 79 | 177 | | 59 | -76 | -26 | 6 |
| 4 | 79 | -4 | 90 | 171 | | 59 | -122 | -35 | 2 |
| 5 | 79 | 10 | 98 | 172 | | 59 | -138 | -51 | -9 |
| 6 | 79 | -1 | 101 | 195 | | 59 | -145 | -68 | -1 |
| **Investment Grade** | | | | | | | | | |
| Length of total period (months) | | | | | | | | | |
| 1 | 535 | -5 | 3 | 17 | | 403 | -9 | -1 | 7 |
| 2 | 535 | -6 | 6 | 31 | | 403 | -13 | -1 | 9 |
| 3 | 535 | -7 | 9 | 39 | | 403 | -17 | -2 | 11 |
| 4 | 535 | -7 | 11 | 48 | | 403 | -23 | -5 | 8 |
| 5 | 535 | -7 | 12 | 51 | | 403 | -28 | -5 | 10 |
| 6 | 535 | -8 | 14 | 57 | | 403 | -28 | -7 | 11 |

**TABLE 2b: Bond Market Anticipation**

Bond-yield spreads are calculated as in the previous panel. *Anticipation* refers to the bond-spread change over the prior period relative to the bond spread change over the total period, where the prior and total periods begin some number of months before the migration, the prior period ends at the beginning of the migration month, and the total period goes through the migration month.

| | Anticipation (percent) | | | | |
|---|---|---|---|---|---|
| | Downgrades | | | Upgrades | |
| **High Yield** | | | | | |
| **Length of total period (months)** | # | Median | | # | Median |
| 1 | -- | -- | | -- | -- |
| 2 | 620 | 33 | | 311 | 39 |
| 3 | 620 | 52 | | 311 | 66 |
| 4 | 620 | 61 | | 311 | 79 |
| 5 | 620 | 64 | | 311 | 80 |
| 6 | 620 | 67 | | 311 | 84 |
| **Fallen Angels and Rising devils** | | | | | |
| **Length of total period (months)** | | | | | |
| 1 | -- | -- | | -- | -- |
| 2 | 79 | 17 | | 59 | 29 |
| 3 | 79 | 47 | | 59 | 54 |
| 4 | 79 | 60 | | 59 | 69 |
| 5 | 79 | 56 | | 59 | 70 |
| 6 | 79 | 58 | | 59 | 83 |
| **Investment Grade** | | | | | |
| **Length of total period (months)** | | | | | |
| 1 | -- | -- | | -- | -- |
| 2 | 535 | 44 | | 403 | 43 |
| 3 | 535 | 63 | | 403 | 60 |
| 4 | 535 | 69 | | 403 | 73 |
| 5 | 535 | 74 | | 403 | 81 |
| 6 | 535 | 77 | | 403 | 83 |

**TABLE 3a: Evidence For Reputation Hypothesis: Downgrade Anticipation Regressions**

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to high-yield. *Number of bonds* and *Total par value* refer, respectively, to the issuer's number and total par value of bonds outstanding. *Magnitude of rating change* refers to the number of notches over which a migration occurred. *Total-period spread change* refers to the bond spread change over the six month total period. Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category). Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Constant | 89** | 91** | 106** | 95** |
| | (1.77) | (2.08) | (5.92) | (4.40) |
| Fallen angel | -20** | -16** | -16** | -16** |
| | (3.92) | (3.99) | (3.99) | (4.02) |
| Log(number of bonds) | -5** | -4** | -- | -4** |
| | (1.20) | (1.17) | | (1.19) |
| Log(total par value) | -- | -- | -3** | -- |
| | | | (0.87) | |
| High yield | -18** | -12** | -12** | -12** |
| | (2.03) | (2.08) | (2.11) | (2.15) |
| Magnitude of rating change | -- | -3** | -3** | -3** |
| | | (1.05) | (1.05) | (1.05) |
| Total-period spread change | -- | -1** | -1** | -1** |
| | | (0.08) | (0.08) | (0.08) |
| Total-period spread change squared | -- | 0** | 0** | 0** |
| | | (0.00) | (0.00) | (0.00) |
| Quarterly dummies | No | No | No | Yes |
| Industry dummies | No | No | No | Yes |
| # of Observations | 1234 | 1234 | 1234 | 1234 |
| $R^2$ | 6.58% | 12.49% | 12.45% | 15.14% |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 |

* indicates significance at the 10% level
** indicates significance at the 5% level

## TABLE 3b:  Robustness of Evidence For Repuation Concerns:
## Additional Downgrade Anticipation Regressions

The dependent variable is anticipation. Independent variables are defined as in the previous panel, and coefficient standard errors
are reported in parentheses.  Column numbers identify new dependent variable restrictions and sample construction.  Specifically:
(1) Anticipation is calculated using a 12 month event window.
(2) The sampling restriction that rating chnages are not preceded by ratings changes in the previous six months is dropped.
(3) The assumption that when the total period spread change is less than 20 basis points, anticipation is 100 percent is replaced
with the assumption that when the total period spread change is less than 10 basis points, anticipation is 100 percent.
(4) Observations with total period spread change less than 0 are dropped.
(5) All restrictions on the raw anticipation measure are dropped.

| Independent Variables | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Constant | 93** | 93** | 90** | 88** | -59 |
| | (5.51) | (3.64) | (4.58) | (5.70) | (51.68) |
| Fallen angel | -9** | -16** | -12** | -21** | 19 |
| | (4.51) | (3.36) | (4.19) | (5.08) | (47.27) |
| LOG(number of bonds) | -3** | -2** | -3** | -3** | 8 |
| | (1.42) | (0.95) | (1.24) | (1.47) | (14.00) |
| High yield | -5* | -9** | -8** | -16** | 32 |
| | (2.61) | (1.77) | (2.24) | (2.85) | (25.28) |
| Magnitude of rating change | -2* | -3** | -3** | -3** | -14 |
| | (1.13) | (0.91) | (1.10) | (1.31) | (12.39) |
| Total-period spread change | -1** | 0** | -1** | 0** | -1 |
| | (0.10) | (0.05) | (0.08) | (0.10) | (0.95) |
| Total-period spread change squared | 0** | 0** | 1** | 0** | 0 |
| | (0.00) | (0.00) | (0.00) | (0.00) | (0.00) |
| Quarterly dummy variables | Yes | Yes | Yes | Yes | Yes |
| Industry dummy variables | Yes | Yes | Yes | Yes | Yes |
| # of Observations | 809 | 1772 | 1234 | 891 | 1234 |
| $R^2$ | 13.55% | 12.20% | 12.13% | 12.02% | 2.69 |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 | 0.4135 |

* indicates significance at the 10% level
** indicates significance at the 5% level

## TABLE 3c: Evidence Of Reputaton Concerns At Moody's:
## Downgrade Anticipation Regressions

The construction of the dependent variable assumes a six month total period.  The sample is defined as downgrades by Moody's that are not preceded by another rating change from either rating agency in the five months leading up to the downgrade, and that coincide with at least a 20 basis point total-period spread change.  *Watch list* refers to a dummy variable for whether an issuer was put on watch for a downgrade in the five months leading up to the downgrade month.  *Moody's and S&P downgrade* refers to a dummy variable for whether both Moody's and Standard and Poor's downgraded the firm in the migration month.  The other independent variables are defined as in the previous panels  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) |
|---|---|---|---|
| Constant | 69** (5.17) | 84** (12.16) | 65** (9.53) |
| Fallen angel | -1 (6.98) | -2 (7.01) | 0 (7.09) |
| Log(number of bonds) | -5** (2.37) | -- | -5** (2.45) |
| Log(total par value) | -- | -3* (1.73) | -- |
| High yield | -8 (5.05) | -7 (5.13) | -8 (5.21) |
| Watch List | 7* (3.83) | 7* (3.88) | 5 (4.03) |
| Moody's and S&P downgrade | -8* (4.03) | -8** (4.04) | -4 (4.18) |
| Magnitude of rating change | -1 (2.07) | -1 (2.08) | -2 (2.09) |
| Total-period spread change | 0 (0.29) | 0 (0.29) | 0 (0.31) |
| Total-period spread change squared | 0 (0.00) | 0 (0.00) | 0 (0.00) |
| Quarterly dummy variables | No | No | Yes |
| Industry dummy variables | No | No | Yes |
| # of Observations | 372 | 372 | 372 |
| $R^2$ | 5.97% | 5.46% | 15.84% |
| F-Test | 0.0040 | 0.0085 | 0.0032 |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 3d:  Evidence Of Reputaton Concerns At Standard and Poor's:**
**Downgrade Anticipation Regressions**

The construction of the dependent variable assumes a six month event window.  The sample is defined as downgrades by Standard and Poor's that are not preceded by another rating change from either rating agency in the five months leading up to the downgrade, and that coincide with at least a 20 basis point total-period spread change.  Independent variables are defined as in the previous panels.  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) | (3) |
|---|---|---|---|
| Constant | 71** (5.19) | 85** (12.44) | 70** (11.97) |
| Fallen angel | -19** (8.06) | -19** (8.09) | -18** (8.34) |
| Log(number of bonds) | -5* (2.47) | -- | -5* (2.61) |
| Log(total par value) | -- | -3 (1.80) | -- |
| High yield | -9* (5.00) | -8 (5.04) | -10* (5.21) |
| Watch list | 9** (3.86) | 10** (3.90) | 7* (3.92) |
| Moody's and S&P downgrade | -7* (3.99) | -7* (3.99) | -6 (4.28) |
| Magnitude of rating change | -2 (1.74) | -2 (1.75) | -3* (1.78) |
| Total-period spread change | 0 (0.18) | 0 (0.18) | 0 (0.19) |
| Total-period spread change squared | 0 (0.00) | 0 (0.00) | 0 (0.00) |
| Quarterly dummy variables | No | No | Yes |
| Industry dummy variables | No | No | Yes |
| # of Observations | 358 | 358 | 358 |
| $R^2$ | 7.19% | 6.89% | 15.59% |
| F-Test | 0.0009 | 0.0015 | 0.0052 |

* indicates significance at the 10% level
** indicates significance at the 5% level

## TABLE 4:  Additional Evidence For Reputation Hypothesis:
### Test of Upgrade Relative to Downgrade Anticipation

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *Upgrade* refers to a dummy variable for whether the rating change is an upgrade. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to a dummy variable for whether the rating change is a downgrade and also changes the bond's status from investment grade to high yield. *Risen devil* refers to a dummy variable for whether the rating chnage is an upgrade and also changes the bond's status from high yield to investment grade  N*umber of bonds* refers to the issuer's number of bonds outstanding. *Total-period spread change* refers to the absolute value of the total period spread change. *Magnitude of rating change* refers to the number of notches over which a migration occurred.  Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category).  Coefficient standard errors are reported in parentheses.

| Independent Variables | (1) | (2) |
|---|---|---|
| Constant | 76** | 91** |
|  | (0.90) | (3.51) |
| Upgrade | 10** | 7** |
|  | (1.45) | (1.53) |
| Fallen angel | -- | -7* |
|  |  | (3.71) |
| Risen devil | -- | -19** |
|  |  | (4.26) |
| High yield | -- | -11** |
|  |  | (1.61) |
| Number of bonds | -- | -2** |
|  |  | (0.86) |
| Magnitude of rating change | -- | -1 |
|  |  | (0.72) |
| Total-period spread change | -- | -1** |
|  |  | (0.08) |
| Total-period spread change squared | -- | 0** |
|  |  | (0.00) |
| Quarterly dummy variables | No | Yes |
| Industry dummy variables | No | Yes |
| # of Observations | 2007 | 2007 |
| $R^2$ | 2.18% | 12.33% |
| F-Test | <0.0001 | <0.0001 |

* indicates significance at the 10% level
** indicates significance at the 5% level

**TABLE 5: Is Reputation Only A Post-Enron Concern?**

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent. *High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to junk. *Log(number of bonds)* and *Log(total par value)* refer, respectively, to the issuer's number and total par value of bonds outstanding. *Magnitude of rating change* refers to the number of notches over which a migration occurred. *Total-period spread change* refers to the bond spread change over the six month total period. Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category). Coefficient standard errors are reported in parentheses.

|  | DOWNGRADES | |
|---|---|---|
| **Independent Variables** | (1) 1997-2001 | (2) 2002 |
| Constant | 89** (4.17) | 86** (8.55) |
| Fallen angel | -21** (4.42) | 5 (9.84) |
| Log(number of bonds) | -4** (1.33) | -4* (2.65) |
| High yield | -13** (2.38) | -2 (5.39) |
| Magnitude of rating change | -2** (1.11) | -2 (3.62) |
| Total period spread change | -1** (0.10) | -1** (0.22) |
| Total period spread change squared | 0** (0.00) | 0** (0.00) |
| Quarterly dummy variables | Yes | Yes |
| Industry dummy variables | No | Yes |
| # of Observations | 1031 | 203 |
| $R^2$ | 13.01% | 17.99% |
| F-Test | <0.0001 | 0.0121 |

* indicates significance at the 10% level
** indicates significance at the 5% level

## TABLE 6: THE PROBABILITY OF MIGRATION

The dependent variable is a dummy variable for whether the issuer has been downgraded in month t. *Number of bonds* refers to the number of bonds outstanding for an issuer in month t. *High-yield (t-6)* refers to a dummy variable for whether the initial rating at the beginning of a six month total period is greater than BBB-. *Prior-period spread change* refers to the yield spread change from t-6 to t-1. The model is estimated as a probit specification. Sandard errors for the marginal effects are reported in parentheses.

|  | DOWNGRADED IN MONTH t | |
|  | Marginal Effects in Percent | |
| **Independent Variables** | (1) | (2) |
| onstant | -4.5 | -4.4 |
|  | 0.08 | 0.07 |
| igh yield  t - 6 | 1.7 | 1.6 |
|  | 0.07 | 0.07 |
| og number of bonds | 0.3 | -- |
|  | 0.04 |  |
| reater than upper  uartile number of bonds | -- | 0.5 |
|  |  | 0.06 |
| rior-period spread change | 0.3 | 0.3 |
|  | 0.04 | 0.04 |
| igh yield  t - 6    rior-period spread change | -0.3 | -0.3 |
|  | 0.04 | 0.04 |
| of observations | 32983 | 32983 |
| og li elihood | -5118 | -5131 |
| Significance | 0.00 | 0.00 |

indicates significance at the 10   level
indicates significance at the 5   level

## TABLE 7: OPACITY AND DELAY

The construction of the dependent variable is as follows: The event window is the 6 months leading up to and through the end of the rating change month; the raw anticipation measure is the bond spread change over the first five months of the total period expressed as a percent of the bond spread change over the entire total period; anticipation is capped at 100 percent and bounded below at zero; when the bond spread change over the total period is less than 20 basis points, anticipation is set at 100 percent.*High yield* refers to an indicator variable for whether the initial rating is lower than BBB-. *Fallen angel* refers to an indicator variable for whether the downgrade changes the bond's status from investment-grade to high-yield. *Number of bonds* and *Total par value* refer, respectively, to the issuer's number and total par value of bonds outstanding. *Magnitude of rating change* refers to the number of notches over which a migration occurred. *Total-period spread change* refers to the bond spread change over the six month total period. All models include quarterly and time dummies (not reported). Industry dummy groups are banking and finance, basic industry, capital goods, communications and media, consumer goods, energy and utility, and services (the omitted category). Coefficient standard errors are reported in parentheses.

| | DOWNGRADES | | | |
|---|---|---|---|---|
| Independent Variables | (1) | (2) | (3) | (4) |
| Constant | 86** | 78** | 66** | 80** |
| | (6.70) | (12.14) | (11.60) | (12.53) |
| Fallen Angel | -8 | -9* | -- | -9 |
| | (5.24) | (5.35) | | (5.44) |
| LOG(number of bonds) | -5** | -5** | -- | -5** |
| | (1.81) | (1.84) | | (1.89) |
| High yield | -8** | -9** | -- | -9** |
| | (3.29) | (3.59) | | (3.87) |
| Magnitude of rating change | -1 | -1 | -- | -1 |
| | (1.73) | (1.73) | | (1.74) |
| Total-period spread change | -1** | -1** | -1** | -1** |
| | (0.22) | (0.23) | (0.22) | (0.23) |
| Total-period spread change squared | 0** | 0** | 0** | 0** |
| | (0.00) | (0.00) | (0.00) | (0.00) |
| Tangible assets/total assets | -- | 8 | 9 | 8 |
| | | (10.81) | (10.85) | (10.91) |
| Income taxes paid/total assets | -- | -32 | 17 | -31 |
| | | (97.63) | (95.18) | (98.29) |
| Dividends paid/total assets | -- | -8079 | 271 | -8499 |
| | | (9543.70) | (9164.60) | (9768.10) |
| Goodwill/total assets | -- | 17 | 19 | 17 |
| | | (13.66) | (13.72) | (13.81) |
| Total assets | -- | -- | -- | 0 |
| | | | | (0.00) |
| Current assets/current liabilities | -- | -- | -- | 0 |
| | | | | (2.00) |
| Total debt/total assets | -- | -- | -- | -1 |
| | | | | (4.82) |
| Interest expense/operating income | -- | -- | -- | 0 |
| | | | | (0.56) |
| # of Observations | 555 | 555 | 555 | 555 |
| $R^2$ | 14.21% | 14.64% | 12.64% | 14.75% |
| F-Test | <0.0001 | <0.0001 | <0.0001 | <0.0001 |

* indicates significance at the 10% level
** indicates significance at the 5% level

# EXHIBIT 3



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

THE CHAIRMAN

June 4, 2003

The Honorable Richard H. Baker
Chairman
Subcommittee on Capital Markets, Insurance
  and Government Sponsored Enterprises
U.S. House of Representatives
2129 Rayburn House Office Building
Washington, DC 20515

Dear Chairman Baker:

Thank you for your letter, dated April 10, 2003, that follows up on the
Subcommittee's recent credit rating agency hearing, and asks a series of questions
concerning the Commission's oversight of rating agencies that have been recognized for
regulatory purposes. I appreciate your concerns regarding, among other things, the level of
competition in the credit rating industry, the existence of potential conflicts of interest, and
the recent performance of rating agencies.

I have asked Annette Nazareth, the Director of the Commission's Division of Market
Regulation, to prepare a memorandum responding in detail to each of the questions you
asked. A copy of that memorandum is enclosed.

As you know, the Commission and its staff have been working diligently to review
these and other issues relating to the role and function of credit rating agencies in the
operation of the securities markets. Our January 2003 report to Congress identified a number
of important substantive issues relating to credit rating agencies that the Commission would
be exploring in more depth, including the following: (1) improved information flow in the
credit rating process; (2) potential conflicts of interest; (3) alleged anticompetitive or unfair
practices by recognized rating agencies; (4) potential regulatory barriers to entry into the
credit rating business; and (5) ongoing regulatory oversight of credit rating agencies.

I appreciate your interest in this important area. Please do not hesitate to contact me if I can
provide further information on these issues.

Sincerely,

William H. Donaldson

Enclosure

**MEMORANDUM**

| TO: | Chairman Donaldson |
| FROM: | Annette L. Nazareth, Director *Annette L. Nazareth*
Division of Market Regulation |
| SUBJECT: | Letter from Chairman Baker on Issues Relating to Rating Agencies |
| DATE: | June 4, 2003 |

In a letter to you dated April 10, 2003, Chairman Baker asked that you respond to a number of questions relating to credit rating agencies. As you requested, this memorandum responds to those questions.

## I. Background

Since 1975, the Commission has relied on credit ratings from market-recognized credible rating agencies for distinguishing among grades of creditworthiness in various regulations under the federal securities laws. These credit rating agencies, known as "nationally recognized statistical rating organizations," or "NRSROs," are recognized as such by Commission staff through the no-action letter process. There currently are four NRSROs[1] – Moody's Investors Service, Inc.; Fitch, Inc.; Standard & Poor's, a division of The McGraw-Hill Companies, Inc.; and Dominion Bond Rating Service Limited. Although the Commission originated the use of the term "NRSRO" for a narrow purpose in its own regulations, ratings by NRSROs today are widely used as benchmarks in federal and state legislation, rules issued by financial and other regulators, foreign regulatory schemes, and private financial contracts. The Commission's initial regulatory use of the term "NRSRO" was solely to provide a method for determining capital charges on different grades of debt securities under the Commission's net capital rule for broker-dealers, Rule 15c3-1 under the Securities Exchange Act of 1934 (the "Net Capital Rule").[2] Over time, as the reliance on credit rating agency ratings increased, so too did the use of the NRSRO concept.

In recent years, the Commission and Congress have reviewed a number of issues regarding credit rating agencies and, in particular, the subject of regulatory oversight of them. In 1994, the Commission solicited public comment on the appropriate role of credit ratings in rules under the federal securities laws, and the need to establish formal

---

[1] Since 1975, four additional rating agencies have been recognized as NRSROs. However, each of these firms has since merged with or been acquired by other NRSROs. These four additional rating agencies were Duff and Phelps, Inc., McCarthy, Crisanti & Maffei, Inc., IBCA Limited and its subsidiary, IBCA, Inc., and Thomson BankWatch, Inc.

[2] *See* Adoption of Amendments to Rule 15c3-1 and Adoption of Alternative Net Capital Requirement for Certain Brokers and Dealers, Release No. 34-11497 (June 26, 1975), 40 FR 29795 (July 16, 1975).

1

procedures for recognizing and monitoring the activities of NRSROs.[3]  Comments received by the Commission led to a rule proposal in 1997, which, among other things, would have defined the term "NRSRO" in the Net Capital Rule.[4]  However, the Commission has not acted upon that rule proposal.  More recently, the initiation of broad-based Commission and Congressional reviews of credit rating agencies following the collapse of Enron has resulted in the need for a fresh look at these issues.

On January 24, 2003, the Commission submitted to Congress a report on the role and function of credit rating agencies in the operation of the securities markets in response to the Congressional directive contained in Section 702 of the Sarbanes-Oxley Act of 2002.[5]  The Report was designed to address each of the topics identified for Commission study in Section 702, including the role of credit rating agencies and their importance to the securities markets, impediments faced by credit rating agencies in performing that role, measures to improve information flow to the market from credit rating agencies, barriers to entry into the credit rating business, and conflicts of interest faced by credit rating agencies. The Report also addresses certain issues regarding credit rating agencies, such as allegations of anticompetitive or unfair practices, the level of due diligence performed by credit rating agencies when taking rating actions, and the extent and manner of Commission oversight of credit rating agencies, that go beyond those specifically identified in the Sarbanes-Oxley Act.

As you know, the Commission has just approved a concept release ("Concept Release") seeking public comment on a wide range of questions regarding possible approaches the Commission could develop to address various concerns regarding credit rating agencies. We hope the Concept Release elicits extensive comments on these issues, from market participants, other regulators, and the public at large.

**II.    Response to Questions**

**1)    Do you believe the NRSROs have adequately served the public, in light of this recent history: continuing to rate Enron "investment grade" four days before bankruptcy; California utilities "A-" two weeks before defaulting; Worldcom "investment grade" three months before bankruptcy; and Global Crossing "investment grade" four months before defaulting on loans? We understand that other rating firms, which have not received NRSRO status from the SEC staff,**

---

[3]    *See* Nationally Recognized Statistical Rating Organizations, Release No. 34-34616 (August 31, 1994), 59 FR 46314 (September 7, 1994) (the "1994 Concept Release").

[4]    *See* Capital Requirements for Brokers or Dealers Under the Securities Exchange Act of 1934, Release No. 34-39457 (December 17, 1997), 62 FR 68018 (December 30, 1997) (the "1997 Proposing Release").

[5]    *See* the *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, As Required by Section 702(b) of the Sarbanes-Oxley Act of 2002*, U.S. Securities and Exchange Commission, January 2003 [hereinafter, the "Report"].

> **provided investors with more timely warnings of the financial problems of those issuers. Would greater competition in the credit rating agency business improve the reliability of ratings?**

Many have criticized the performance of the NRSROs in connection with a number of recent corporate failures, including those mentioned above. In addition to the hearings on credit rating agencies recently held by the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, last year the Senate Committee on Governmental Affairs held hearings to evaluate the performance of the rating agencies in connection with the Enron matter. A related report issued by staff of the Senate Committee recommended that the Commission, among other things, require recognized rating agencies to comply with specified performance and training standards and regularly monitor their compliance with those standards. For their part, the rating agencies generally take the position that they rely on issuers and other sources to provide them with accurate and complete information, and typically do not audit the accuracy or integrity of issuer information. They also argue that reputational concerns are sufficient to ensure that they exercise appropriate levels of diligence in the ratings process, and that their track record in predicting the repayment of debt securities reflects the reliability of their ratings.

The Commission has been evaluating the merits of the criticisms of the NRSROs' performance in its study of credit rating agencies, and this issue was discussed in some detail in the Commission's January 2003 Report to Congress. The Commission's Concept Release, among other things, explores this matter in more depth – particularly, whether rating agencies should incorporate general standards of diligence in performing their ratings analysis, and with respect to the training and qualifications of credit rating analysts. The Commission's Report also addressed ways to promote competition and reduce regulatory barriers to entry into the credit rating business. The Commission's Concept Release explores these issues in more depth.

**2)      I understand that Rule 436(g) under the Securities Exchange Act of 1933 shields NRSROs – but not rating agencies without the designation – from prospectus liability. Therefore, isn't it true that NRSROs are not subject to checks that either competition or the threat of legal accountability would provide?**

Rule 436(g) under the Securities Act of 1933 (the "Securities Act") provides that credit rating agencies that are NRSROs: (1) are not required to provide consents when their ratings are disclosed in a registration statement; and (2) will not be subject to civil liability as experts for purposes of Section 11 of the Securities Act. While Rule 436(g) shields NRSROs from potential Section 11 liability, NRSROs remain subject to substantial liability under the antifraud provisions of the federal securities laws, such as Section 17(a) of the Securities Act and Section 10(b), and Rule 10b-5 thereunder, of the Securities Exchange Act of 1934 (the "Exchange Act"). In the proposing and adopting releases for Rule 436(g), the Commission noted the substantial liability to which rating agencies are subject under the antifraud provisions of the federal securities laws, and that

Rule 436(g) would not impact that liability. The Commission also emphasized that, NRSROs, as registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"), have a special duty to base their opinions upon current and adequate information. Thus, the antifraud provisions in the Securities Act, Exchange Act, and the Advisers Act impose legal accountability on NRSROs.[6]

As to competitive concerns, the adopting release for Rule 436(g) states that issuers may include a rating assigned by a non-NRSRO in a Securities Act registration statement; however, such rating would require the filing of the rating agency's written consent under Section 7 and would subject the rating agency to potential Section 11 civil liability. While issuers may choose to include a non-NRSRO security rating in a registration statement, the non-NRSRO would have to assume Section 11 liability whereas a NRSRO would not. As noted above, the Commission's Report discussed, and the Concept Release explores more generally, ways to promote competition and reduce regulatory barriers to entry into the credit rating business.

3) **What alternative mechanisms to NRSROs exist to enable investors and regulators to evaluate credit risk? How do market participants and regulators evaluate the creditworthiness of issuers of unrated securities and loan applicants?**

NRSROs are only a few of many sources of credit risk information. As discussed in the Commission's Report, the predominant users of securities ratings, such as broker-dealers, banks, mutual funds, pension funds, and insurance companies, conduct their own independent credit analysis, where NRSRO credit ratings are only one of several important inputs to their internal credit assessments and investment analyses. Some of these institutions make their credit analysis available to their clients. In addition, in recent years, we have observed an increase in the number of credit opinions available from non-NRSRO credit rating agencies, as well as from research firms that focus their

---

[6]     To place Rule 436(g) in context, it is necessary to consider the circumstances around which it was created. Prior to 1981, the policy of the Commission staff was to discourage the disclosure of security ratings in Commission filings. In 1977, the Commission issued a concept release that announced that it was considering whether it should encourage or require the disclosure of security ratings in Commission filings and requested comment on a number of issues related to any such action. In 1981, the Commission announced that it would permit the disclosure of security ratings assigned by rating agencies in registration statements and proposed Rule 436(g). The change in Commission policy resulted from the recognition that security ratings are useful to investors and the market, and that investors could benefit from disclosure of security ratings in registration statements. The Commission recognized that a major barrier to the disclosure of security ratings in registration statements had been the issue of whether a rating agency is an "expert" whose consent must be filed under Section 7 and who may be subject to civil liability under Section 11 of the Securities Act. A number of comments received on the 1977 release expressed concern with respect to the applicability of Sections 7 and 11 to disclosure of a security rating. All three existing NRSROs indicated in their comments that they would not provide the requisite consents.

4

business on evaluating the creditworthiness of issuers of securities. It is our understanding that market participants use internal credit analysis, and, in some cases, independent research firms, to evaluate the creditworthiness of issuers of unrated securities and loan applicants. The Commission does not independently evaluate the creditworthiness of these issuers. The Commission's Concept Release explores possible alternatives to the NRSRO concept in Commission rules.

4) **Professor Lawrence White testified at our hearing that in order to achieve the public policy goal of improving competition and increasing the potential for innovation in the ratings business, "the SEC and other financial regulators should cease delegating their safety judgments to a handful of protected bond raters." He argued that regulators should make the same safety and soundness judgments about bonds that they currently make about loans and other financial assets. One way to do this, he asserted, would be for the SEC to withdraw the NRSRO designation. Should the SEC discontinue the concept of NRSROs? If it were to do so, how should federal regulators, Congress, and the states change regulations and laws related to NRSROs so as to minimize disruption to the marketplace?**

The Commission's Report explored, and the Concept Release examines in more depth, whether credit ratings should continue to be used for regulatory purposes, and, if not, alternatives capable of achieving the same regulatory objectives currently served by the NRSRO concept. The staff is mindful that the term "NRSRO" is now used on a widespread basis in federal, state, and foreign laws and regulations, as well as in private contracts. Accordingly, in the Concept Release, the Commission seeks comment from market participants, other regulators, and the public at large as to the collateral impact of eliminating the NRSRO concept from Commission rules.

5) **Alternatively, how might the Commission eliminate the barriers to entry that it has created and foster a competitive environment for this industry? Would competition be adequate to protect the public interest or should regulatory oversight of the agencies' activities be imposed?**

For many years, market participants have voiced concerns about the concentration of credit rating agencies in the U.S. securities markets, and whether inordinate barriers to entry exist. There also has been substantial debate regarding the extent to which any natural barriers to entry are augmented by the regulatory use of the NRSRO concept, and the process of Commission recognition of NRSROs. The Commission's Report discussed in some depth the barriers to entry into the business of acting as a credit rating agency, and the measures needed to remove such barriers.

While there has been a steady growth in the number of firms operating as credit rating agencies in the U.S. and internationally, and new entrants have been able to develop a following for their credit judgments, concerns have been raised that new

entrants are unable to evolve into a substantial presence in the ratings industry. Some believe this is due primarily to the longstanding dominance of the credit rating business by a few firms, as well as the fact that the marketplace may not demand ratings from more than two or three rating agencies. Others have commented that natural barriers to entry into the credit rating business are exacerbated by the regulatory use of credit ratings.

As noted above, the Commission's Concept Release addresses whether credit ratings should continue to be used for regulatory purposes. If the NRSRO concept is not retained by the Commission, then any such regulatory barriers to competition should be eliminated. The Concept Release explores ways to reduce potential regulatory barriers to entry, and the scope of appropriate regulatory oversight, in the event the NRSRO concept is retained by the Commission.

6)     **Commentators have observed that "ratings triggers" in debentures, which can accelerate a debt obligation, may cause rating agencies to be reluctant to downgrade an issuer's rating, for fear the downgrade will trigger a default. Some have advocated barring such ratings triggers. What is the utility of credit ratings if the rating agencies are loathe to provide accurate ratings if those ratings would trigger a default? This reminds us of the Wall Street securities analysts who were reluctant to downgrade a rating on a company that was an investment banking client. What is the Commission's view of the potential impact of such ratings triggers on ratings?**

The Commission's Report explored concerns regarding "ratings triggers" in some depth. As we have seen in some high-profile recent examples, contractual ratings triggers can seriously escalate liquidity problems at firms faced with a deteriorating financial outlook. To date, in its study of credit rating agencies, Commission staff has been unable to confirm allegations of rating agency reluctance to downgrade an issuer subject to a ratings trigger, for fear the downgrade would trigger a default. In fact, such behavior could seriously undermine the credibility on which the business of a rating agency is based.

However, the Commission's Concept Release explores whether issuers should be required to provide more extensive public disclosure regarding ratings triggers. In addition, credit rating agencies and others have been conducting intensive studies to better understand the nature and extent of the use of credit ratings in financial contracts, and their potential impact on a company's liquidity and creditworthiness.

7)     **How does the development of XBRL, which is expected to facilitate comparison of financial statements, affect the Commission's analysis of the need for the NRSRO designation?**

The development of XBRL – short for "eXtensible Business Reporting Language" – may facilitate the comparison of financial statements. If so, credit analysts

may utilize XBRL when developing their opinion of an issuer's creditworthiness, as their analysis often involves a comparison of an issuer's financial statements over time, as well as a comparison with the financial statements of companies in the issuer's industry. While XBRL may be a useful tool for credit analysts, it is not clear whether or how that technology would have a material impact on the Commission's analysis of whether or not there is a need for the NRSRO designation.

8)    **Absent the "NRSRO" status, from a regulatory standpoint, why should the government regulate credit rating agencies' analyses any differently from how they regulate the work of equity analysts?**

Given the importance of credit ratings to investors and the influence such ratings can have on the securities markets, the Commission's Concept Release explores the scope of appropriate regulatory oversight of NRSROs.

There will be some parallels between the issues to be explored relating to NRSROs and those relating to equity analyst oversight, such as how to control potential conflicts of interest. It is important to recognize, however, that there are fundamental differences between the work of equity analysts, whose recommendations are often directed at specific groups of investors to influence their judgment on effecting a securities transaction, and credit rating analysts, who do not make recommendations to specific investors, but rather publish their opinion on the creditworthiness of a particular company, security, or obligation, as of a specific date. In this regard, some believe credit rating activities are journalistic in nature, and consequently are afforded a high level of First Amendment protections. Accordingly, in their view, the Commission and Congress are more constrained in their ability to regulate credit rating agencies than equity analysts.

9)    **Since the Commission staff has granted NRSRO designation to only four existing firms, two of which control 80% of the market share, it is readily apparent that the normal checks and balances provided by marketplace competition are not present in this industry. In the case of other monopolies regulated by the SEC, statues or regulations typically impose public-interest obligations and limit the exercise of monopoly pricing power. Isn't it true that the SEC does not exercise any oversight of the fees charged by the rating agencies to distribute the ratings to the public? In the absence of SEC oversight, what prevents the rating agencies from exercising monopoly power over pricing for ratings distribution?**

The Commission does not oversee the fees charged by NRSROs, whether to distribute their ratings to the public, to issuers to issue a rating, or otherwise. In fact, each of the firms currently recognized as an NRSRO typically make their credit ratings publicly available at no cost. As described more fully in the Commission's Report, when issuing a rating, the NRSROs typically make their ratings, as well as the basic rationale underlying their ratings, publicly available through a broad-based dissemination of press

7

releases to a number of widely used business newswires. The NRSROs also generally make their current credit ratings available free of charge on their internet websites. More extensive rating information, however, generally is made available to paying subscribers. To date, in its study of credit rating agencies, Commission staff has heard virtually no complaints about the fees charged by the NRSROs either to subscribers or issuers.

**10)     We have heard concerns that at least one rating agency is attempting to more than triple the price it charges to provide its rating to the public, without any changes to the product itself. What could justify tripling the price of access to ratings information without any change in the information provided? Does this not suggest that the rating agencies exercise monopoly power?**

As is noted in the response to Question (9), each firm currently recognized as an NRSRO typically makes its credit ratings publicly available at no cost and, accordingly, the staff is uncertain as to the scenario you pose. Some users of credit ratings do pay for direct electronic access to a "feed" of a rating agency's latest ratings information, but the Commission does not oversee those fees. The staff would be happy to discuss this situation with you or your staff in more detail, however, at your convenience.

**11)     We have heard concerns regarding "notching" and other monopolistic practices by the rating agencies. Do you share these concerns? What is being done to address these practices?**

The Commission's Report discussed allegations that the largest rating agencies have abused their dominant position by engaging in certain aggressive competitive practices, such as "notching" (*i.e.*, lowering their ratings on, or refusing to rate, securities issued by certain asset pools, unless a substantial portion of the assets within those pools was also rated by them). The Commission's Concept Release takes steps to explore the extent to which allegations of anticompetitive or unfair practices, such as these, by large credit rating agencies have merit and, if so, possible Commission action to address them.

**12)     In 1998, the U.S. Department of Justice filed a comment letter to the Commission's proposed rule relating to NRSROs. The Justice Department expressed several concerns with the Commission's proposal which, in certain respects, would have formalized the NRSRO recognition process. DOJ stated that the Commission's "recognition" requirement – i.e., to receive NRSRO designation, a rating organization would have to be nationally recognized as an issuer of credible and reliable ratings – is "likely to create a nearly insurmountable barrier to de novo entry into the market for NRSRO services." Accordingly, DOJ urged the Commission to revise this language to "minimize this potential anticompetitive effect." We understand that, although this rule was never adopted by the Commission, the "recognition" rule was and continues to be an informal requirement established by Commission staff. Why has the**

8

### Commission not heeded the recommendation from the Department of Justice?

As noted in the response to Question (5), there has been substantial debate regarding the extent to which any natural barriers to entry into the credit rating business are exacerbated by the regulatory use of the NRSRO concept, and the process of Commission recognition of NRSROs. Many commenters – such as the DOJ – criticized the regulatory use of the NRSRO concept, and particularly the "national recognition" requirement – as creating a substantial barrier to entry. This criticism was discussed in some detail in the Commission's Report. Further, as noted above, the Commission's Concept Release explores ways to reduce potential regulatory barriers to entry, as well as the possibility of eliminating the NRSRO concept from Commission rules.

**13)** **Regulation FD gives NRSROs preferential treatment, permitting these firms to gain access to non-public information and, therefore, to provide that information to their clients. Doesn't this circumvent the purpose of Regulation FD? Has NRSROs' special access to this information improved the accuracy of their ratings? Why should NRSROs, and not other evaluators of credit risk, receive this special regulatory treatment?**

Regulation FD does not give NRSROs preferential treatment that permits them access to information not otherwise available to other credit rating agencies. Generally, Regulation FD prohibits an issuer of securities, or persons acting on behalf of the issuer, from communicating nonpublic information to certain enumerated persons – in general, securities market professionals or others who may use the information for trading – unless the information is publicly disclosed. When Regulation FD was adopted, the Commission exempted all rating agencies – not just NRSROs – from Regulation FD, so long as (a) any nonpublic information is communicated to the rating agency solely for the purpose of developing a credit rating, and (b) the rating is publicly available. The Commission believed this exclusion from the coverage of Regulation FD was appropriate because, so long as the ratings process results in a widely available publication of the rating, the impact of nonpublic information on the creditworthiness of an issuer can be publicly disseminated without disclosing the nonpublic information itself. In addition, rating agencies may be able to avail themselves of the general exemption from Regulation FD for "persons who expressly agree to maintain the disclosed information in confidence."

You also ask whether a rating agency's special access to information under Regulation FD improves the accuracy of its ratings. While Commission staff has not conducted independent research in this area, a number of market participants have told us that a rating agency's access to nonpublic information improves the rating process and results in a more informed and complete credit rating.

**14)** **What are the requirements for obtaining NRSRO status? Where are these requirements published? Is the public granted an opportunity**

9

**to comment upon applications for this status or upon SEC action relating to that status? If not, why?**

The criteria used by the Commission staff in determining whether to recognize a rating agency as an NRSRO are set forth in a number of publicly-available no-action letters and Commission releases.[7] The single most important criterion is that the rating agency is nationally recognized, which means the rating agency is widely accepted in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings. Thus, the designation is intended largely to reflect the view of the marketplace as to the credibility of the ratings, rather than represent a "seal of approval" of a federal regulatory agency. The staff also reviews the operational capability and reliability of each rating agency. Included within this assessment are: (1) the organizational structure of the rating agency; (2) the rating agency's financial resources (to determine, among other things, whether it is able to operate independently of economic pressures or control from the companies it rates); (3) the size and experience and training of the rating agency's staff (to determine if the entity is capable of thoroughly and competently evaluating an issuer's credit); (4) the rating agency's independence from the companies it rates; (5) the rating agency's rating procedures (to determine whether it has systematic procedures designed to produce credible and accurate ratings); and (6) whether the rating agency has internal procedures to prevent the misuse of non-public information and whether those procedures are followed. The staff also recommends that the rating agency become registered as an investment adviser under the Advisers Act. Though the staff does not solicit public comment on NRSRO applications, we do conduct telephone interviews with a number of the rating agency's references and substantial users of credit ratings in order to assess the rating agency's recognition and credibility in the marketplace.

If the Commission staff determines that a rating agency meets the NRSRO recognition criteria, a "no-action" letter is issued by Commission staff to the rating agency stating that it will not recommend enforcement action to the Commission if ratings from the rating agency are considered by registered broker-dealers to be ratings from an NRSRO for purposes of applying the relevant portions of the Net Capital Rule. On the other hand, if the staff concludes that a rating agency should not be considered an NRSRO, it may issue a letter denying a request for no-action relief.

The Commission's Report discussed, and the Concept Release explores in more detail, a wide range of issues relating to the Commission's process of recognizing rating agencies as NRSROs. Issues discussed in the Concept Release include whether the current regulatory recognition criteria for rating agencies should be clarified, the

---

7     *See, e.g.*, the 1994 Concept Release, *supra* note 3; the 1997 Proposing Release, *supra* note 4; and Letter from Annette L. Nazareth, Director, Division of Market Regulation, Securities and Exchange Commission, to Mari-Anne Pisarri, Pickard and Djinis LLP (on behalf of Dominion Bond Rating Service Limited) (February 24, 2003). *See also* Letters from Annette L. Nazareth, Director, Division of Market Regulation, Securities and Exchange Commission, to Dr. Barron H. Putnam, LACE Financial Corp. (April 14, 2000, and October 16, 2000).

substance of those criteria, and whether public comment should be sought in connection with applications for NRSRO recognition.

**15) Does the Commission vote upon NRSRO designations? What is the Commission's role in granting this status?**

The Commission does not vote on whether or not to recognize a rating agency as an NRSRO. However, the staff informs the Commission of its intended action prior to acting on a rating agency's request for NRSRO recognition.

The Commission's Report discussed, and the Concept Release explores in more detail, whether recognition of NRSROs should occur through formal Commission action, rather than through staff no-action letters.

**16) Has the Commission ever revoked a rating agency's NRSRO status? Upon what basis would such a determination be made? Does the Commission evaluate NRSRO performance at all?**

To date, Commission staff has not revoked a rating agency's NRSRO status. Commission staff has taken the position that they could do so, however, if an NRSRO failed to continue to meet the NRSRO recognition standards. While Commission staff do not formally evaluate the ongoing performance of NRSROs, they do have regular informal meetings with each NRSRO to discuss business, industry and regulatory developments. In addition, as registered investment advisers, the NRSROs are examined periodically by Commission inspections staff.

The Commission's Report discussed, and the Concept Release explores in more detail, whether more direct, ongoing Commission oversight of rating agencies is warranted and, if so, the appropriate method and substance thereof.

**17) Conflicts of interest in the form of payments from issuers are a major problem in the equity research area. Prior to 1970, rating firms did not receive much compensation from issuers of debt. In light of this development over the past 30 years, have you tried to wean the rating firms away from issuer compensation, or at least strongly consider recognizing those firms that have succeeded in warning investors and are not subject to the conflicts of interest created by issuer compensation?**

Commission staff has not attempted to influence how rating agencies are paid for their ratings, leaving such decisions to the rating agencies and the marketplace. However, the Commission's Report discussed, and the Concept Release explores in more detail, whether rating agencies should implement procedures to manage the potential conflicts of interest that arise both from the issuer-fee and subscriber-fee models.

11

18) **We understand that NRSROs derive the bulk of their revenues from fees charged to the companies they rate. For instance, last year Moody's Investors Service collected approximately $800 million of its $900 million in revenues from such fees. Doesn't this present an obvious conflict of interest? Why shouldn't regulators and the public be just as concerned about this conflict as we have been about the conflicts created by equity analysts' being compensated based on the investment banking business they bring in?**

As discussed in depth in the Commission's Report, the practice of issuers paying for their ratings does create the potential for a conflict of interest, and for this reason justifies scrutiny from regulators and the marketplace. Arguably, the dependence of rating agencies on revenues from the companies they rate could induce them to rate issuers more liberally, and temper their diligence in probing for negative information. While most agree that the issuer-fee model creates the potential for a conflict of interest, many believe the rating agencies historically have demonstrated an ability to effectively manage that potential conflict. In this regard, however, many stress the importance of rating agencies implementing and maintaining stringent firewalls, independent compensation, and other related procedures. The fees received from individual issuers tend to be a very small percentage of a rating agency's total revenues, so that arguably no single issuer has material economic influence over a rating agency. As you indicate, analogies can be drawn between the potential conflicts faced by credit rating analysts and those faced by equity research analysts. However, the potential conflicts associated with equity research analysts currently are being addressed through SRO rulemaking.

As noted above, the Concept Release explores in detail whether the Commission should condition NRSRO recognition on rating agencies implementing procedures to manage potential conflicts of interest that arise when issuers pay for ratings.

19) **How can an NRSRO accurately be called "independent" if it obtains the majority of its compensation from issuers? Isn't this misleading to investors?**

See the response to Question 18 regarding the potential conflicts of interest posed by the issuer-fee model, and the Commission's review of these issues in the context of the Concept Release. The Concept Release explores whether NRSRO recognition should be conditioned on a rating agency having specified financial resources, or less than a certain percentage of its revenues from a single source, to help assure that it operates independently of economic pressures from individual customers.

20) **What requirement, if any, does the Commission impose prior to granting NRSRO status to guard against firms' potentially rewarding high ratings or resisting downgrading in order to retain or increase fee income?**

12

Several of the NRSRO recognition criteria are designed to guard against firms' potentially rewarding high ratings or resisting downgrading in order to retain or increase fee income. For example, the staff specifically assesses a rating agency's financial resources and independence to determine whether the rating agency is able to operate free of economic pressures or control from the companies it rates.  In addition, the requirement that a credit rating agency be "nationally recognized" is designed to ensure that a firm's ratings are not subject to influence by others, but are credible and reasonably relied upon by the marketplace. As noted in the responses to Questions 18 and 19, the Commission's Concept Release explores additional steps the Commission might take to assure the potential conflicts of interest inherent in the issuer-fee model are appropriately managed.

## 21)   Does the provision of consulting and other services by rating agencies to the companies they rate create conflicts of interest that could call into question the reliability of their ratings?

As discussed in depth in the Commission's Report, the development of ancillary businesses by credit rating agencies does create the potential for a conflict of interest, and for this reason justifies scrutiny from regulators and the marketplace. In recent years, the larger rating agencies have begun developing ancillary businesses to complement their core ratings business. These businesses include ratings assessment services where, for an additional fee, issuers present hypothetical scenarios to the rating agencies to determine how their ratings would be affected by a proposed corporation action (*e.g.*, a merger, asset sale, or stock repurchase). They also include risk management and consulting services.

Among other things, concerns have been expressed that credit rating decisions might be impacted by whether or not an issuer purchases additional services offered by the credit rating agency. In addition, some believe that, whether or not the purchase of ancillary services actually impacts the credit rating decision, issuers may be pressured into using them out of fear that their failure to do so could adversely impact their credit rating.   The rating agencies that offer ancillary services point out that they have established extensive policies and procedures to manage potential conflicts in this area, including substantial firewalls that separate the ratings business from the influence of ancillary businesses and prohibiting rating analysts from participating in the marketing of ancillary services.

The Concept Release explores in more detail whether the Commission should require rating agencies to implement procedures to manage potential conflicts of interest that arise when rating agencies develop ancillary fee-based businesses.

13