UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re MOODY'S CORPORATION
SECURITIES LITIGATION

CASE NO. 1:07-CV-8375-GBD

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

(PORTIONS OF THIS DOCUMENT HAVE BEEN REDACTED AND FILED UNDER SEAL PURSUANT TO
THE CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER ENTERED BY THE COURT ON
MARCH 15, 2010)

KIRBY McINERNEY LLP
Ira M. Press
Daniel Hume
Steven Cohn
825 Third Avenue, 16th floor
New York, New York 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
Stuart L. Berman
Michael K. Yarnoff
Lauren Wagner Pederson
Neena Verma (*pro hac vice* pending)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Co-lead Counsel for Lead Plaintiffs*

LABATON SUCHAROW LLP
Christopher Keller
Jonathan Gardner
Serena Hallowell
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Plaintiffs*

GLANCY BINKOW & GOLDBERG LLP
Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
Andy Sohrn
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.      PLAINTIFFS SATISFY THE STANDARDS FOR CLASS CERTIFICATION ........... 3

II.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE .................. 3

        A.      Plaintiffs Demonstrate Materiality ................................................................ 4

                1.      Moody's Status As An NRSRO Demonstrates Materiality ........................ 5

                2.      Moody's Publicly Admitted Materiality .................................................... 6

                3.      Allegations In The CAC Are Sufficient To Meet Plaintiffs' Burden ........ 7

                4.      Defendants' "Puffery" Arguments Have No Merit .................................... 8

        B.      Defendants Fail To Rebut The *Basic* Presumption ............................................. 9

                1.      Defendants' Proffered Materials Do Not Demonstrate Knowledge
                        That Moody's Actually Succumbed To Potential Conflicts ..................... 12

                2.      Defendants' Materials Actually Suggested That Rating Agencies Had
                        Maintained Their Independence ............................................................ 13

                3.      There Was No Evidence That Moody's Succumbed To Ratings
                        Shopping ............................................................................................... 14

                4.      Defendants' Speculation That Most Class Members "Would Have
                        Known" Of Moody's Misconduct Is Unsupported .................................. 15

                5.      The CAC Does Not Admit Widespread Knowledge ............................... 18

        C.      The Expert Opinion Submitted By Defendants Is Unreliable .......................... 19

        D.      Defendants Fail To Rebut The *Affiliated Ute* Presumption ............................. 21

III.    DEFENDANTS' CHALLENGES TO LOSS CAUSATION ARE IMPROPER
        AND INCORRECT ......................................................................................... 22

        A.      Loss Causation Challenges Are Improper At This Stage ................................ 22

B.  In Addition To Being Inappropriate On A Class Certification Motion, Defendants' Challenges To Loss Causation Are Incorrect................................ 23

1.  Plaintiffs' Loss Causation Allegations Are Supported By An Expert Methodology And Are Provable On A Common, Class-Wide Basis....... 23

2.  Defendants' Merits Challenges On Loss Causation Are Baseless............ 24

IV.  DEFENDANTS' CHALLENGES TO THE INDIVIDUAL CLASS REPRESENTATIVES FAIL ........................................................................ 29

A.  Local 282 Has Standing to Sue ......................................................... 29

B.  The Timing Of Dr. Wetstein's Purchases Does Not Subject Him To A Unique Defense........................................................................... 31

C.  Local 282 And McCurley Are Not In-and-Out Traders .................................... 33

CONCLUSION................................................................................................. 35

## **TABLE OF AUTHORITIES**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................................................. 5

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).................................................................................... 21, 22

*Akerman v. Arotech Corp.*,
    608 F. Supp. 2d 372 (E.D.N.Y. 2009) .............................................................. 6

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) .............................................................................. 31

*Barfield v. New York City Health and Hosp. Corp.*,
    No. 05-cv-6319, 2005 WL 3098730  (S.D.N.Y. Nov. 18, 2005) ...................... 10

*Basic v. Levinson*,
    485 U.S. 224 (1988)......................................................................................... 4

*Bovee v. Coopers & Lybrand*,
    216 F.R.D. 596 (S.D. Ohio 2003) .................................................................... 4

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) .......................................................................... 11

*Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc., et al.*,
    800 F.2d 177 (7th Cir. 1986) .......................................................................... 31

*Conn. Ret. Plans and Trust Funds v. Amgen, Inc.*,
    No. 07-cv-2536, 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) ...................... 16

*Cox v. Eichler*,
    765 F. Supp. 601 (N.D. Cal. 1990) ................................................................. 31

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) .................................................................... 30

*DeMarco v. Lehman Bros., Inc.*,
    309 F. Supp. 2d 631 (S.D.N.Y. 2004) ............................................................ 11

*DeMarco v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004) .............................................................. 5

*DuPont v. Brady*,
    828 F.2d 75 (2d Cir.1987) .............................................................................. 22

*Dura Pharms, Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................ 25

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ....................................................... 8

*Fisher v. Plessey Co. Ltd.*,
  103 F.R.D. 150 (S.D.N.Y. 1984) .............................................. 15, 16

*Fogarazzo v. Lehman Bros., Inc.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) ........................................... *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
  No. 07cv8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010).................. 8, 29

*Green v. Borg-Warner Protective Services Corp.*,
  No. 95-cv-10419, 1998 WL 17719 (S.D.N.Y. Jan. 16, 1998) ................ 10

*Hallet v. Li & Fung Ltd.*,
  No. 95-8917, 1997 WL 621111 (S.D.N.Y. Oct. 6, 1997)..................... 31

*Heller v. Golden Restructuring Fund, L.P.*,
  90 F. Supp. 2d 603 (S.D.N.Y. 2008) ...................................... 29

*In re Accredo Health, Inc. Sec. Litig.*,
  No. 03-2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ................ 30

*In re AIG Group, Inc. Sec. Litig.*
  265 F.R.D. 157 (S.D.N.Y. 2010) .................................... 27, 32, 34

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ....................................... 23, 25

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
  693 F.Supp.2d 241 (S.D.N.Y. 2010) ........................................ 8

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
  No. 08-cv-11278, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ............... 8

*In re Boardwalk Marketplace Sec. Litig.*,
  122 F.R.D. 4 (D. Conn. 1988) ............................................. 16

*In re CIT Group Inc. Sec. Litig.*,
  No. 08-cv-6613, 2010 WL 2365846 (S.D.N.Y. June 10, 2010)................. 8

*In re Cooper Sec. Litig.*,
  691 F. Supp. 2d 110) (C.D. Cal. 2010) .................................... 5

*In re Connectics Corp. Sec. Litig.*,
   No. C 07-02940, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ............................................ 26

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................. 17

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Lit.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ............................................................................. 5, 21, 22

*In re Dura Pharms, Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006) .................................................................................. 26

*In re Flag Telecom Holdings Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ............................................................................................... 3, 22

*In re Initial Pub. Offering Secs. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ............................................................................................ *passim*

*In re Initial Pub. Offering Secs. Litig.*,
   260 F.R.D. 81, 93 (S.D.N.Y. 2009) ...................................................................................... 22

*In re Initial Pub. Offering Secs. Litig.*,
   174 F.Supp.2d 61 (S.D.N.Y.2001) .................................................................................. 20, 21

*In re Lehman Brothers Sec. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) ................................................................................. 19

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132, 135 (S.D.N.Y. 2008) ............................................................................ 16, 32

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................................................................... *passim*

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) .................................................................................... 26

*In re Neopharm, Inc. Sec. Litig.*,
   225 F.R.D. 563 (N.D. Ill. 2004) ........................................................................................... 30

*In re Novastar Fin. Sec. Litig.*,
   No. 04cv0330, 2005 WL 1279033 (W.D. Mo. May 12, 2005) ................................................ 6

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
   No. 05-cv-6924, 2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007) ............................................. 27

*In re Priceline.com Sec. Litig., Inc.*,
   236 F.R.D. 89 (D. Conn. 2006) ............................................................................................. 27

*In re Ramp Networks, Inc. Sec. Litig.*,
    201 F. Supp. 2d 1051 (N.D. Cal. 2002) ................................................................. 26

*In re Sadia*, 08-cv-9528 (SAS),
    2010 WL 2884737 (S.D.N.Y. July 20, 2010) ................................................... 28, 29

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008) ....................................................................... 3, 4, 6

*In re Salomon Analyst Metromedia Litig.*,
    236 F.R.D. 208 (S.D.N.Y. 2006), *vacated and remanded*, 544 F.3d 474 (2d Cir. 2008)....... 6, 7

*In re TJX Cos. Retail Sec. Breach Litig.*,
    246 F.R.D. 389 (D. Mass. 2007)........................................................................ 11

*In re Tronox, Inc. Sec. Litig.*,
    No. 09-cv-6220, 2010 WL 2835545 (S.D.N.Y. June 28, 2010) ............................. 29

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    209 F.R.D. 353 (S.D.N.Y. 2002) ...................................................................... 31

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
    236 F.R.D. 62 (D.N.H. 2006) ..................................................................... 25, 27

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ...................................................................... 30

*In re Vicuron Pharms., Inc. Sec. Litig.*,
    233 F.R.D. 421 (E.D. Pa. 2006)........................................................................ 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
    241 F.R.D. 213 (S.D.N.Y. 2007) ...................................................................... 27

*In re Winstar Commc'ns*,
    No. 01-cv-3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ..................... 17

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................. 29, 30

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) .............................................................. 17

*Johnston v. HBO Film Mgmt., Inc.*,
    265 F.3d 178 (3d Cir. 2001) ........................................................................... 11

*King County, WA v. IKB Deutsche Industriebank AG*,
    No. 09-cv-8387, 2010 WL 1702196  (S.D.N.Y. Apr. 26, 2010) ....................... 25, 29

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................. *passim*

*Lapin v. Goldman Sachs & Co.*,
   No. 04-cv-2236, 2008 WL 4600994 (S.D.N.Y. Oct. 15, 2008)................................ 7

*Lapin v. Goldman Sachs Gr., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................... 14

*Lasker v. New York State Elec. & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ................................................................... 8

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................... 11

*Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*,
   993 F.2d 11 (2d Cir.1993) ................................................................. 18

*Masters v. GlaxoSmithKline, McLaughlin v. Am. Tobacco Co.*,
   271 F. App'x 46 (2d Cir. 2008) ........................................................... 25

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ..................................................... 18, 19, 33

*Montoya v. Mamma.com, Inc.*,
   No. 05-cv-2313, 2006 WL 770573 (S.D.N.Y. Mar. 28, 2006)................................ 5

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002) ............................................................. 11

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ........................................................... 4, 5

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
   No. 08-cv-5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)............................. 19

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010) .................................................... 20

*Plymouth County Ret. Ass'n v. Schroeder*,
   576 F.Supp.2d 360 (E.D.N.Y. 2008) ...................................................... 16

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir.1993) ............................................................... 18

*Rocco v. Nam Tai Electronics, Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) .......................................................... 33

*Rosen v. Textron Inc.*,
    369 F. Supp. 2d 204 (D.R.I. 2005) ........................................................................ 32

*Ross v. Abercrombie & Fitch Co.*,
    257 F.R.D. 435, 446 (SD Ohio 2009) ................................................................... 27

*Schleicher v. Wendt*,
    No. 09-2154, 2010 WL 3271964 (7th Cir. Aug. 20, 2010) ............................... *passim*

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) ................................................................................. 21

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05-cv-1898, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ............................... 21

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ................................................................................ 11

*Titan Pharms. & Nutrition, Inc. v. Medical Shopp Int'l, Inc.*,
    No. 05-cv-10580, 2006 WL 708552, at *2 (S.D.N.Y. Mar. 20, 2006) ................... 22

*Vannest v. Sage, Rutty & Co., Inc.*,
    991 F. Supp. 155 (W.D.N.Y. 1997) ....................................................................... 31

*Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ............................................................................. 27

*W.R. Huff Asset Mgm't Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) ............................................................................ 29, 31

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ...................................................................... 23, 32

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    No. 05cv01265, 2008 WL 879023 (D.Colo. Mar. 28, 2008) ................................... 6

**Statutes**

15 U.S.C. § 78u-4(e)(1) ............................................................................................... 26

Fed. R. Civ. P. 23(c)(1)(C). ........................................................................................ 18

Fed. R. Civ. P. 8(a)(2) ................................................................................................. 25

Plaintiffs respectfully submit this reply memorandum of law, together with the Expert Report of Chad Coffman dated August 23, 2010 ("Coffman Rpt.") and the Declaration of Daniel Hume ("Hume Decl.") in further support of their request for class certification.[1]

## INTRODUCTION

In their opening brief, Plaintiffs set forth the reasons why this case should be certified pursuant to Rule 23.  This case is a classic securities fraud action, involving a heavily-traded, exchange-listed stock, a material stock price decline in response to disclosures and risk materializations - exactly the kind of case that is routinely certified for class treatment.

Aware of these facts, Defendants improperly attack the merits of Plaintiffs' claim, often raising arguments that were expressly rejected by Judge Kram in her opinion denying Defendants' motion to dismiss.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009) ("*In re Moody's*" or the "MTD Opinion").

When the pertinent issues are considered, it is clear that Plaintiffs have satisfied the Rule 23 requirements. Defendants do not dispute numerosity or adequacy of counsel, and effectively do not contest that Moody's stock traded in an efficient market.  Rather, Defendants purport to challenge predominance by arguing that Plaintiffs cannot establish loss causation.  However, the

---

[1]     The Coffman Rpt. is attached as Exhibit 1 to the Hume Decl.  References made herein include: "Defs. Br." (Defendants' May 28, 2010 Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Docket No. 68)); "Ehrenberg Ex." (Exhibits attached to May 28, 2010 Declaration of Stephen Ehrenberg (Docket No. 69)); "Stulz Report" (May 28, 2010 Expert Report of René Stulz (Docket No. 69-10)); "Stulz Tr." (transcript of August 10, 2010 deposition of René M. Stulz, attached as Exhibit 4 to the Hume Decl.); "Maye Tr." (transcript of April 1, 2010 deposition of William M. Maye, attached as Exhibit 2 to the Hume Decl.); "Wetstein Tr." (transcript of March 19, 2010 deposition of Dr. Lewis Wetstein, attached as Exhibit 3 to the Hume Decl.); "Pltf. Br." (Lead Plaintiffs' January 22, 2010 Memorandum of Law in Support of Class Certification (Docket No. 58)); and "CAC" (Plaintiffs' June 27, 2008 Consolidated Amended Complaint (Docket No. 9)).  Unless otherwise noted, italics in quoted materials have been added by counsel for purpose of emphasis.

Second Circuit has made clear that challenges to causation, or for that matter, any element of the merits that is unrelated to a Rule 23 element, are improper at the class certification stage.[2]  In any event, Plaintiffs have demonstrated a methodology for proving loss causation on a class-wide basis that will enable them to do so at the appropriate stage of the litigation. (*See* section III.B.1 below).  Likewise, Defendants' attacks on the typicality and adequacy of the Class Representatives rest on legally and factually deficient arguments and do not threaten to become the focus of the litigation or outweigh the common claims and defenses.  Defendants' challenges to materiality ignore Moody's own public admissions of materiality, as well as Judge Kram's prior ruling.

Defendants argue that the market purportedly was "aware" of Defendants' conduct because media reports suggested that Moody's use of the Issuer Pays business model presented *potential* conflicts.  This argument misstates Plaintiffs' claim.  Plaintiffs allege that Moody's repeatedly assured that (1) it had effectively managed and/or eliminated any potential conflicts inherent in Issuer Pays; and (2) it had maintained its independence in its credit ratings, when Moody's in fact had significantly compromised its independence in a way that distorted its ratings.  These facts were not known to the market, and Defendants proffer no evidence to the contrary.

In short, this case clearly warrants class certification.

---

[2]     Similarly, just last week, the Seventh Circuit, in affirming class certification, rejected the argument that "before certifying a class, the district judge must determine…everything…required to win on the merits," finding that such a view "would resurrect the one-way intervention model that was ditched by the 1966 amendments to Rule 23." *Schleicher v. Wendt*, No. 09-2154, 2010 WL 3271964, at *5 (7th Cir. Aug. 20, 2010).

## ARGUMENT

## I.   PLAINTIFFS SATISFY THE STANDARDS FOR CLASS CERTIFICATION

A district court examining a proposed class under Rule 23 "should not assess any aspect of the merits [of the claim] unrelated to a Rule 23 requirement." *In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 471 F.3d 24, 41 (2d Cir. 2006).  Thus, Defendants' challenges to Plaintiffs' ability to demonstrate falsity or scienter are improper at this stage of the litigation.  Moreover, Judge Kram previously held that those elements had been pled with the requisite heightened degree of particularity demanded by the PSLRA.  *See In re Moody's*, 599 F. Supp. 2d at 512-13.

Similarly unavailing are Defendants' challenges to Plaintiffs' ability to demonstrate loss causation.  As the Second Circuit made clear, a plaintiff does not have to prove loss causation at the class certification stage.  *See In re Flag Telecom Holdings Sec. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009) ("*In re Flag*").[3]

## II.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

As the Second Circuit instructed in *In re Salomon Analyst Metromedia Litig.* ("*Salomon*"), 544 F.3d 474 (2d Cir. 2008), investors are entitled to the fraud-on-the-market

---

[3]   Similarly, the Seventh Circuit recognized:

> After a class has been certified, and other elements of the claim have been established, the court will need to pin down when the stock's price was affected by any fraud. That decision, like the other issues, can be made on a class-wide basis, because it affects investors in common. It gets the cart before the horse to insist that it be made before any class can be certified. If the data are so ambiguous that the decision can't be made at all, then the class loses outright (plaintiffs bear the burden of persuasion, after all), but to repeat a point already made: The chance, even the certainty, that a class will lose on the merits does not prevent its certification.

*Schleicher*, 2010 WL 3271964, at *7.

3

reliance presumption if the misrepresentation was (a) publicly made, (b) material and (c) concerned stock that traded on an efficient market. *Id.* at 481. Moreover, it "is a misreading of *Basic* [*Inc. v. Levinson*, 485 U.S. 224 (1988)]" to argue that there is a "burden on plaintiffs to prove that the alleged misrepresentations 'moved the market,' *i.e.*, had a measurable effect on the stock price." 544 F.3d at 482.

Defendants do not contest that Moody's stock traded in an efficient market. (Defs. Br. at 32 n.12.) Nor can Defendants' expert proffer a basis to contest that Moody's, a New York Stock Exchange-traded company, traded on an efficient market. (Stulz Tr. at 73:9 to 74:16, 94:21-24). *See also Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 606-07 (S.D. Ohio 2003) (NYSE is an efficient market); *accord* Coffman Rpt. at ¶¶ 26-50.

## A.      Plaintiffs Demonstrate Materiality

Defendants argue that Plaintiffs cannot demonstrate materiality because Plaintiffs cannot show that Moody's stock price reacted to the misrepresentations or the eventual disclosures (*see* Defs. Br. at 30-32), and the misrepresentations are inactionable puffery (*id.* at 27-28). These challenges must fail.

Controlling law is clear that "plaintiffs do not bear the burden of showing an impact on [the stock] price at the class certification stage."[4]  *Salomon*, 544 F.3d at 483; *Fogarazzo v.*

---

[4]      However, Plaintiffs can in fact make that showing. There were significant declines in Moody's stock price following a series of public disclosures of the materialization of previously concealed risks. *See infra* at § III; Coffman Rpt. at ¶¶ 86-91. This showing further demonstrates materiality. Moreover, contrary to Defendants' argument (*see* Defs. Br. at 30-32) the absence of a stock price reaction to misrepresentations, where those misrepresentations merely confirmed existing expectations, does not evidence immateriality, at <u>any</u> stage of the litigation. Coffman Rpt. at ¶ 85. As the Fifth Circuit noted in *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001), a misrepresentation: [footnote continued on next page]

*Lehman Bros., Inc.*, 263 F.R.D. 90, 102 (S.D.N.Y. 2009) ("The burden is not on plaintiffs to make a showing of price impact.  Plaintiffs need only demonstrate that material misrepresentations were publicly disseminated and that RSL shares traded in an efficient market.").  Materiality is demonstrated here through Moody's own public statements and actions.  Further, Judge Kram, consistent with Second Circuit directives, rejected Defendants' "puffery" argument.  *In re Moody's*, 599 F. Supp. 2d at 508-09.

## 1.    Moody's Status As An NRSRO Demonstrates Materiality

This Court previously recognized in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, that Moody's NRSRO status "hinges on [its]…'independence from the companies it rates.'" 651 F. Supp. 2d 155, 164-65, 181 (S.D.N.Y. 2009).  Therefore, "the market at large, including sophisticated investors, has come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status."  *Id.* at 181.  Consistent with this reasoning, Judge Kram previously found that "Moody's statements regarding its independence…do 'alter the mix of available information' to its investors and are actionable."  *In re Moody's*, 599 F. Supp. 2d at 510.

_____

may affect the price of the stock even though the stock's market price does not soon thereafter change.  For example, if the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned a $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall).

*Id.* at 419; *see also DeMarco v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 110, 124 (S.D.N.Y. 2004); *Montoya v. Mamma.com, Inc.*, No. 05-cv-2313, 2006 WL 770573, at *7 (S.D.N.Y. Mar. 28, 2006); *Schleicher*, 2010 WL 3271964, at *6-7; *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010); *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 144 & n.17 (S.D.N.Y. 2008) ("it's not dispositive that the stock did not go up immediately upon the making of the statement").

## 2.    Moody's Publicly Admitted Materiality

In *Salomon*, the Second Circuit held that materiality of alleged misrepresentations can be established by "evidence in the record that defendants themselves publicly emphasized the importance to [the company] of the…credit facility that is the subject of the alleged misrepresentations." 544 F.3d at 485 (quoting *In re Salomon Analyst Metromedia Litig.* (*Salomon Analyst II*), 236 F.R.D. 208, 222-23 (S.D.N.Y. 2006), *vacated and remanded*, 544 F.3d 474 (2d Cir. 2008).[5]

Here, Defendants repeatedly emphasized the importance of Moody's independence and the objectivity and accuracy of its ratings. *E.g.* CAC ¶¶ 71, 76, 83, 322, 361; Coffman Rpt. at ¶ 93. *See also In re Moody's*, 599 F. Supp. 2d at 509 ("Moody's steadfastly maintained independence as a cornerstone of its business"; "Moody's claimed that it based the 'raw materials' of its business, its 'operating, financial and regulatory strategies,' and the 'watchwords by which stakeholders' judged it on independence and a commitment to its rating system.").

In *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168 (S.D.N.Y. 2008), plaintiffs alleged that Goldman Sachs misrepresented that its research analysts were "independent" and "unbiased," when in fact they were tainted by conflicts of interest between its research analysts

---

[5]     *See also Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 383-84 (E.D.N.Y. 2009) (Denying dismissal on materiality grounds when "[t]he Company itself chose to characterize terminations for default of government contracts as having a materially adverse effect on [its] ability to recompete for future contracts and orders" and admitted that such terminations could "expose [the Company] to liability") (internal marks omitted); *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-cv-01265, 2008 WL 879023, at *18 (D. Colo. Mar. 28, 2008)("[P]erhaps the best evidence that these statements are arguably material…is to simply quote from defendants' own cautionary statement to its investors"); *In re Novastar Fin. Sec. Litig.*, No. 04-cv-0330, 2005 WL 1279033, at *4 (W.D. Mo. May 12, 2005) (Given "the filings by NovaStar that stress the importance of complying with state regulations and note the possible effect it may have on the company's operations and profitability, the Court cannot find that the omitted information was so obviously insignificant that it is immaterial as a matter of law.").

and investment banking clients.  *Id.* at 173-74.  The court, granting class certification, ruled that the alleged misrepresentations were material, and the *Basic* presumption applied.  *Id.* at 181-84.[6]

As in *Lapin*, Moody's, in direct response to regulatory and public concern about potential conflicts, emphasized that Moody's indeed was "independent" and "objective," and assured investors that it had adequately disclosed, managed and/or eliminated its potential conflicts so that its credit ratings reflected all relevant objective information.  *E.g.*, CAC ¶¶ 35, 57, 68, 71, 80.  Moody's own public statements admit materiality.

### 3.    Allegations In The CAC Are Sufficient To Meet Plaintiffs' Burden

Defendants' contention that Plaintiffs cannot meet their burden on class certification by relying on either allegations in the CAC, or this Court's prior ruling on the motion to dismiss, also fails.  (Defs. Br. at 26-27.)  *See Salomon Analyst II*:

> a complaint may form an important and useful part of a plaintiff's presentation to the court at the class certification stage, particularly where, as here, the complaint contains detailed and particularized allegations … and incorporates by reference documentary evidence in the record and public materials of which the Court may take judicial notice.

236 F.R.D. at 222.  *See also Fogarazzo*, 263 F.R.D. at 103 (plaintiffs are entitled to the fraud on the market presumption where allegations in the complaint demonstrate by a preponderance of the evidence that misstatements in analyst reports were material).

Here, the CAC allegations should suffice, especially since, at Defendants' insistence, there has been no merits fact discovery in this action.

---

[6]    Following the court's grant of class certification in *Lapin*, defendants petitioned the court to address the implications of *Salomon*.  The court denied defendants' request, holding that *Salomon* was supportive of its prior decision to certify the class.  *See Lapin v. Goldman Sachs & Co.*, No. 04-cv-2236, 2008 WL 4600994, at *2 (S.D.N.Y. Oct. 15, 2008).

###### 4.      Defendants' "Puffery" Arguments Have No Merit

Defendants' argument that Moody's misrepresentations are non-actionable "puffery" is unavailing. *See* Defs. Br. at 28. Defendants rely on cases where investors challenged statements about defendants' "integrity" and similar non-objectively-verifiable attributes.[7]

Here, by way of contrast, the misrepresentations were objectively verifiable, and concerned the specific subject of the undisclosed misconduct – namely the independence of Moody's ratings. Similar representations are routinely held sufficient to give rise to securities fraud claims. *See Lapin, supra*, 254 F.R.D. at 181-84; *see also In re CIT Group Inc. Sec. Litig.*, No. 08-cv-6613, 2010 WL 2365846, at *2-3 (S.D.N.Y. June 10, 2010) (claims of "disciplined" and "conservative" lending practices); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) ("conservative" underwriting standards); *Freudenberg v. E*Trade Fin. Corp.*, No. 07-cv-8538, 2010 WL 1904314, at *16 (S.D.N.Y. May 11, 2010).

In fact, Judge Kram has already carefully distinguished Defendants' statements here from the statements at issue in *ECA*, *Lasker*, and *Australia*:

> The statements alleged in the AC, however, are far different from those that courts in this District have found inactionable. Those courts have identified declaration of intention, hope, or projections of future earnings as the hallmarks of inactionable puffery.…

---

[7]      *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements about defendant's "standard-setting reputation for integrity" not rendered misleading by involvement in Enron's misconduct*); Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 56-58 (2d Cir. 1996) (statement that "the [c]ompany will not compromise its financial integrity" through diversification did not trigger duty to disclose that other utilities had allegedly suffered decrease in earnings following attempts to diversify); *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08-cv-11278, 2009 WL 4823923, at *11-12 (S.D.N.Y. Dec. 14, 2009) (statements concerning "the importance of effective risk management" not rendered misleading by company's loan losses).

> In contrast, Moody's steadfastly maintained independence as a cornerstone of its business. (Citation omitted). Moody's does not couch this assertion in the language of optimism or hope. Rather, Moody's claimed that it based the "raw materials" of its business, its "operating, financial and regulatory strategies," and the "watchwords by which stakeholders" judged it on independence and a commitment to its ratings system.
>
> ...Moody's statements regarding its own independence do not constitute inactionable puffery. They were neither "vague" nor "non-specific" pronouncements that were incapable of "objective verification." (Citation omitted). Moody's not only proclaimed its independence; it also listed verifiable actions it was taking to ensure its independence. (Citation omitted).

*In re Moody's*, 599 F. Supp. 2d at 508-09.[8]

### B.   Defendants Fail To Rebut The *Basic* Presumption

Defendants argue that pursuant to *In re IPO*, widespread public knowledge of Moody's conflicts disables investor claims of reliance on Moody's representations concerning independence. (Defs. Br. at 18-26; Stulz Report at ¶¶ 38-50.) But the facts of this action are materially different from *IPO*. There, the court vacated class certification due to admissions contained in "the Plaintiffs' own allegations" that many class members knew of the fraud alleged (by having participated in manipulation of the aftermarket for IPO securities). *See IPO*, 471 F.3d at 43.

Here, there is no Plaintiff admission, or any other admissible evidence of class-wide knowledge of the extent of Defendants' fraud -- only media statements that generally *speculated* about a *potential* for conflicts, as opposed to evidence of actual misconduct. Many of those same

---

[8]   In fact, shortly after the MTD Opinion, a Moody's spokesman tried to explain to the press that Moody's representations of independence were extremely important, notwithstanding the claims of "puffery" it raised to this Court. *See* Hume Decl. Ex. 5.

articles also featured Moody's own emphatic denials of any suggestion that its ratings were tainted or compromised.  *See infra*, at II.B.2.

First off, the materials themselves are hearsay and, thus, inadmissible evidence.  *See Barfield v. New York City Health and Hosp. Corp.*, No. 05-cv-6319, 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (declining to credit hearsay on motion for class certification); *Green v. Borg-Warner Protective Services Corp.*, No. 95-cv-10419, 1998 WL 17719, at *2 (S.D.N.Y. Jan. 16, 1998) (same).

Even if they were admissible, Defendants' proffered materials would not defeat certification.  None demonstrates that any class member had *actual* knowledge that Moody's *actually* succumbed to the conflict resulting in inflated ratings of structured finance products, or that any class members knew of *any* of the specific misconduct alleged in the CAC, let alone that *all* of the misconduct was widely known.[9]  At most, Defendants' materials reflect the general speculation that the Issuer Pays model raises the *potential* for conflicts to taint ratings.  But knowing that a conflict may *potentially* exist does not equal knowing that Moody's *actually*

---

[9]     The CAC charges that, among other things:

- Moody's refused to change its ratings in the face of evidence that the ratings were wrong (¶¶ 129-139, 146, 156);
- Moody's modified rating methodology to justify initial errors (¶¶ 56, 363);
- Moody's admitted to rampant ratings shopping by structured finance issuers that worked to degrade the ratings Moody's provided (¶¶ 331, 344, 347-349);
- Moody's removed analysts from particular structured finance rating assignments whom issuers deemed "too fussy" – such removals were widespread, specifically in Moody's mortgage-backed securities ratings operations (¶¶ 344, 350);
- Moody's embraced its conflicted role by selling further services to structured finance issuers that allowed issuers to construct securities that would garner the ratings issuers desired (¶¶ 332-336); and
- Moody's relied on the use of consequential assumptions (e.g. housing prices) that were not merely optimistic, but untethered to objective realities and contradicted by Moody's own experts (¶¶ 204, 206).

succumbed to the conflict by compromising the integrity of its ratings. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 170 (2d Cir. 2005) ("[c]onflicts of interest present opportunities for fraud, but they do not, standing alone, evidence fraud….Something more than conflicted interest is required, no matter how well publicized the conflict may be."); *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 636 (S.D.N.Y. 2004) (media reports "on some generalized conflicts between investment banking and research departments in a variety of investment banks is not equivalent to market awareness of [defendants'] misrepresentations").[10]

The facts of this case are closely analogous to *Lapin*.  There, defendant represented that its research department produced "objective research that was 'unbiased' and 'independent' of the investment banking department," when the reports were allegedly influenced by investment banking clients.  *Lapin*, 254 F.R.D. at 174.  Defendant there, like Defendants here, proffered articles that allegedly reflected widespread investor knowledge of the fraud, in an attempt to evoke *IPO*.[11]  The *Lapin* court rejected defendants' attack holding that:

> The evidence put forth by GS [Goldman Sachs] simply does not show that the reliance link was "severed".  GS has, at best, proffered evidence that industry members and academics were generally aware that conflicts involving research and investment

---

[10]     The cases that Defendants' rely upon, (Defs Br. 16-17), are all distinguishable because none of these cases involved 10b-5 or the rebuttal of the *Basic* reliance presumption. *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (RICO claim based on oral representations); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 323-24 (4th Cir. 2006) (Civil Rights Act claim where individual inquiries needed to refute a statute of limitations defense); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 186-88 (3d Cir. 2001) (RICO claim with individualized oral misrepresentations); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-42 (4th Cir. 1998) (breach of contract claim brought by franchisees who received different contract language); and *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 395-96 (D. Mass. 2007) (claims for negligent misrepresentation brought by banks, where there was evidence that at least some banks were informed of the misconduct).

[11]     Defendants in *Lapin*, were represented by the same counsel as Defendants here.

> banking divisions within the same firm were prevalent in the
> industry.  This is very different from the situation in *In re IPO*,
> where it was undisputed that a substantial number of the proposed
> class members had *actual* notice of - and indeed, involvement in -
> the fraudulent scheme that was alleged to have artificially inflated
> share prices.

254 F.R.D. at 183-84 (emphasis in original).

### 1.   Defendants' Proffered Materials Do Not Demonstrate Knowledge That Moody's Actually Succumbed To Potential Conflicts

The materials proffered by Defendants do not reflect knowledge that Moody's had fraudulently misrated structured finance securities in order to gain or maintain customers.  At most, they expressed concern over the "potential conflicts" inherent in the Issuer Pays model.[12] Similarly, Defendants' expert confirmed that when he opined about

### REDACTED

(Stulz Tr. at 66:18-20.)   None of these materials presented any evidence that Moody's had actually so succumbed, or knowingly provided inflated ratings for any actual, specific security.

Defendants' materials often conclude the exact opposite of the propositions for which Defendants cite them.   *See* Stulz Report at ¶ 31 n. 37 (report concluded that there was no evidence that conflict pressures were magnified for structured finance); Stulz Report at ¶ 38 n. 48 ("credit rating agencies are paid by issuers of securities to produce ratings, and yet there is little

---

[12]   *See, e.g.*, Ehrenberg Ex. 23 at 1 (discussing "potential conflicts" from the Issuer Pays model"); Ex. 28 at 1 ("fee structures *could* cause conflicts of interest"); Ex. 34 at 2 ("Issuer Pays model seen as "potential conflict of interest"); Ex. 12 at 23, 41 (Issuer Pays "creates the *potential* for a conflict of interest" which *could* induce [agencies] to rate issues more liberally . . ."); Ex.14 at p. 16 ("reliance on issuer fees by a credit rating agency *could* lead to conflicts of interest and the potential for rating inflation"); Ex. 15 at 9 ("reviewing *potential* conflicts of interest that *could* arise when issuers pay for ratings"); Ex. 17 at 2 ("*Some suggest* that there *may* be a strong incentive for ratings inflation…").   In fact, only two exhibits identified any specific securities that were allegedly misrated – and in both cases, Standard & Poor's supplied the misratings, not Moody's.  *See* Ehrenberg Exs. 27, 33.

evidence that this leads to more favourable [sic] ratings"). *See also* Coffman Rpt. at ¶¶ 62, 66, 68.

In fact, the suggestion that everybody knew that the ratings were tainted is illogical. Were it true, the ratings would have been rendered meaningless. No investors in the rated instruments would have relied on the ratings, and issuers would have had no reason to seek higher ratings.

### 2. Defendants' Materials Actually Suggested That Rating Agencies Had Maintained Their Independence

As the CAC makes clear, Moody's made no secret of the risk of conflict posed by the Issuer Pays model, but it also represented repeatedly that it had taken steps to manage those conflicts. *See, e.g.*, CAC ¶¶ 54, 60-61, 88-90. Many of the materials that Defendants proffer contain explicit rating agency denials of any actual misconduct or misrating, together with rating agencies' reassuring explanations of the safeguards they had instituted to maintain independence and defuse this potential conflict. *See, e.g.*, Ehrenberg Exs. 32 at 2; 35 at 1; 37 at 3, 6; 38 at 5.

Thus, the SEC's January 2003 report on the credit rating agencies stated:

> While the issuer-fee model naturally creates the potential for conflict of interest and ratings inflation, most were of the view that this conflict is manageable and, for the most part, has been effectively addressed by the credit rating agencies. The rating agencies take the position that their reputation for issuing objective and credible ratings is of paramount importance, and that they would be loathe to jeopardize that reputation to mollify a particular issuer.

*See* Ehrenberg Ex. 12 at p. 23.[13] Often, Defendants' denials applied specifically to structured finance securities backed by subprime. *See, e.g.*, Ehrenberg Exs. 37 at 4-6; 38 at 5; 40 at 1.

---

[13]   Ehrenberg Ex. 25 at 1 ("Can they be completely independent of the firms who pay the bills? The agencies insist they can. Internal firewalls bar analysts from fee discussions, they

For example, Defendant McDaniel repeatedly represented to Congress and the SEC that Moody's had maintained its independence despite the potential conflicts. *See* Coffman Rpt. at ¶ 64. Other Moody's representatives at other hearings testified similarly. These rating agency denials were noted in regulators' own testimony and in regulatory and legislative reports. *See, e.g.*, Ehrenberg Exs. 12 at 23, 41; 19 at 8 n. 27. Similar reassuring statements appear in many of the very news articles Defendants proffer. *See, e.g.*, Ehrenberg Exs. 20 at 2; 21 at 2, 4-5; 22 at 4; 24 at 1.

As the *Lapin* court held, even if defendants' evidence raised specific concerns about alleged conflicts, "such information was counteracted by contemporaneous statements by Goldman, informing the market that its research was of high quality, independent, and objective." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006).

### 3.     There Was No Evidence That Moody's Succumbed To Ratings Shopping

Defendants argue that occasional media reports concerning "ratings shopping" and "gaming the system" (Defs. Br. at 23 and 18-20; Stulz Report at ¶ 48) preclude class-wide reliance on Moody's claims of independence and objectivity. Moody's proffers three articles and an investment banking report by Mark Adelson. (Stulz Report at ¶ 48, nn. 67-68; Ehrenberg Ex. 27.) In fact, the articles expressed these concerns in the hypothetical, and the investment banking report singled out Standard & Poor's and not Moody's. Moreover, Defendants themselves cite the September 27, 2007 Congressional Testimony of Mark Adelson, who stated that even as of that late date (shortly before the close of the class period):

---

say, and each issuer accounts for a tiny proportion of their revenues. Their businesses stand or fall on their reputation for independence, and they would never risk that.") (also cited at Stulz Report at ¶ 38 n. 49).

> [t]here is no conclusive evidence that the major rating agencies have ever succumbed to the effects of rating shopping and engaged in competitive laxity.[14]

Stulz Report at ¶ 48 n. 69.

### 4.   Defendants' Speculation That Most Class Members "Would Have Known" Of Moody's Misconduct Is Unsupported

Defendants speculate that awareness of Moody's misconduct and misratings "would have been widespread" throughout the entire financial industry (note conditional phrasing) via employee mobility (from Moody's and structured finance issuers) and via knowledge diffusion through informal social networks.  (Defs. Br. at 24-26; Stulz Report at ¶¶ 51-54.)  In essence, Defendants argue that the individuals involved in the ratings misconduct essentially: (1) informed everyone throughout their organizations; and thereafter (2) informed everyone else in the securities arena (by switching jobs to work with them, or by socializing with them).

But evidence for this proposition is both nonexistent and impossible to demonstrate, as Defendants' own expert admits:

> I know of no economic methodology to identify who had such knowledge, and no methodology to identify a subset of the proposed class to which this knowledge *might* be imputed.

Stulz Report at ¶ 54 (emphasis in original).

Unsupported speculation as to what class members "might" have known simply does nothing at all to render reliance illegitimate here.  *See Fisher v. Plessey Co. Ltd.*, 103 F.R.D. 150 (S.D.N.Y. 1984):

---

[14]   *See* Hume Decl. Ex. 6 (*The Role of the Credit Rating Agencies in the Structured Finance Market*, Testimony of Mark Adelson before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, dated September 27, 2007 at p. 10) (which was cited in the Stulz Report at ¶ 48 n. 69).

> Of course, defendants may seek to rebut a presumption of reliance by demonstrating that individual debenture holders had…knowledge of the omitted information….While such a defense would indeed give rise to individual questions, the Court will not deny plaintiff's motion on that basis.  If every defendant in a securities fraud action were permitted to defeat class certification efforts merely by asserting an intention to rebut the presumption of reliance by demonstrating that some of the omitted information was available to and may have been considered by an undetermined number of potential class members, the class action device would be rendered useless.  If necessary, the Court can hold separate hearings on the issue of reliance.

*Id.* at 156.[15]

Why, if it was already and widely known that Moody's had succumbed to its conflicts to issue inflated structured finance ratings, was it necessary for regulators and legislators to launch investigations and hold hearings during 2008, 2009 and 2010?

Without any support, Defendants also assert that because Moody's published the methodologies it employed to rate various structured finance products, "many sophisticated

---

[15]     *See also In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) (rejecting challenge to certification where "despite all of this speculation, Monster provides no direct evidence that any putative class member actually knew about [the fraud]"); *In re Boardwalk Marketplace Sec. Litig.*, 122 F.R.D. 4, 7 (D. Conn. 1988) ("the defendants cannot defeat class certification efforts by asserting an intention to rebut the presumption that the investors were deceived by misstatements and omissions in the offering materials.").  Assuming *arguendo* that few institutional investors *did* know of Moody's misconduct (although Defendants have provided no evidence of such knowledge), it does not lead to the unsubstantiated conclusion that this knowledge would make each class member subject to an "overwhelming" inquiry that would predominate over class-wide issues.  *See Plymouth County Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 375 (E.D.N.Y. 2008) ("although enjoying wide-spread publication, courts have found that the publicly disseminated articles were not so blatant and clear as to put stockholders on notice of potential violations at un-named companies."); *Conn. Ret. Plans and Trust Funds v. Amgen, Inc.*, No. 07-cv-2536, 2009 WL 2633743, at *7 (C.D. Cal. Aug. 12, 2009) ("[W]hat is significant to the [c]ourt is not the degree to which [p]laintiff was misled but whether it and the other class members were in fact misled. Consequently, the [c]ourt finds that any differences in the extent to which [p]laintiff and other class members were misled is insufficient to preclude class certification.").

market participants, including Moody's own shareholders" could have discovered the ratings misconduct "through their own application of Moody's stated methodologies and models." (Defs. Br. at 24; *see also* Stulz Report at ¶¶ 26-27.)  This argument fails on the law and the facts.

A class member is not expected to discover a complete hidden fraud on his own.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008):

> Of course, it is *possible* that a hedge fund somewhere had a computer analyzing the loan detail tables in all these prospectuses. That hypothetical fund may have pieced together that Countrywide's origination practices had deteriorated to some degree…[t]he argument requires a further inference that such a hypothetical fund had any substantial effect in remedying the mispricing through its trading…[d]efendants are not entitled to such speculation.

*Id.* at 1160 n.32 (emphasis in original).[16]  Furthermore, Defendants have not identified any Class member who supposedly engaged in this type of sophisticated and complicated analysis or who discovered the conflicts resulted in any inflated rating of any specific security at issue.  In any event, while it was known that Moody's used housing price assumptions in determining its credit ratings, the specific assumptions that Moody's was using were not disclosed, thus rendering this part of its model a "black box."  *See* CAC ¶¶ 201-06.  Moreover, the specific characteristics of each of the hundreds of thousands of mortgages that backed each CDO were not made available to the public.  *See, e.g.*, CAC ¶¶ 130-37;        **REDACTED**        . Coffman Rpt. at ¶¶ 25, 76.  It

---

[16]    *See also In re Winstar Commc'ns*, No. 01-cv-3014 (GBD), 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) ("The claimed ability of [a whistleblower] to arrive at its findings by an examination of the publicly reported financials does not mean that a reasonable investor could have drawn those same conclusions[.]"); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1014 (N.D. Cal. 2007) ("outsiders like plaintiff did not have superpowers to detect secret backdating inside the company").

is thus wholly disingenuous for Defendants to assert that class members could have discovered the ratings inaccuracies, let alone that those inaccuracies were driven by fraud.

### 5.    The CAC Does Not Admit Widespread Knowledge

Defendants' suggestion that Plaintiffs' pleading here is similar to the plaintiffs' admission in *IPO* is without merit. *See* Defs. Br. at 23. The pleading in *IPO* specifically *acknowledged* that many class members knowingly participated in, and therefore were actually aware of, defendants' fraudulent conduct. *See IPO*, 471 F.3d at 43-44. But there is absolutely nothing in the CAC here to suggest that investors actually knew or knowingly participated in Moody's misconduct. Moreover, information about Moody's "gaming the system" (Defs. Br. at 23, citing CAC ¶ 319), only became publicly available in a post-class period exposé published on April 27, 2008 (CAC ¶ 319).[17]

Defendants also erroneously rely on the Second Circuit's ruling in *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), a RICO class action by purchasers of "light" cigarettes. The Second Circuit rejected the district court's suggestion that "plaintiffs relied upon the public's general sense that Lights were healthier...whether or not individual plaintiffs were

---

[17]    In another attempt to analogize this case to *IPO*, Defendants claim that roughly 10-13% of Moody's holders were structured finance issuers who "*could have* unique knowledge about Moody's conflicts and methodologies." (Defs. Br. at 3.) Unlike in *IPO*, Defendants here proffer no evidence that *any* class members *actually* had knowledge of the misconduct. In *IPO*, the knowing participants in the misconduct (secret agreements to purchase shares in the aftermarket in exchange for the right to make lucrative IPO purchases) were, by definition, class members. Here, by way of contrast, even if *some* structured finance issuers *might* have known about some of the misconduct, there is no indication that those hypothetical issuers are members of the class. But even if Defendants are correct, the class definition can be modified to carve out these issuers from the class definition at a later time if necessary. *See* Fed. R. Civ. P. 23(c)(1)(C). *See also Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993) (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.1993)) ("district court 'is not bound by the class definition proposed in the complaint,'" and "is empowered…to carve out an appropriate class.").

actually aware of defendants' alleged misrepresentation." *Id.* at 223-24. The Court specifically reaffirmed *Basic's* fraud-on-the-market presumption in the securities fraud context, but simply found that the presumption did not apply to the market for light cigarettes. *Id.* at 224.

Defendants' reliance on *In re Lehman Brothers Sec. and ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) and *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, No. 08-cv-5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010), (Defs. Br. at 28-29) is also misplaced. In *Lehman*, plaintiffs challenged a failure by an issuer (not a rating agency) to disclose that it paid the rating agency. The court ruled that "the fact that Lehman paid the rating agencies for their ratings. . .is publicly known." 684 F. Supp. 2d at 492. Here, of course, Plaintiffs do not challenge the Issuer Pays model itself. Similarly, in *New Jersey Carpenters*, the court determined that the rating agencies' role in the structuring of securities was well known, as was the fact that "the rating agencies were paid by the investment banks that hired them." 2010 WL 1172694, at *14.[18]

Moreover, unlike those cases, this Court denied Defendants' Rule 12(b)(6) motion, finding that the alleged misstatements concerning Moody's independence and methodologies were material and actionable. *In re Moody's*, 599 F. Supp. 2d at 510.

### C.     The Expert Opinion Submitted By Defendants Is Unreliable[19]

Dr. Stulz lacks a fundamental understanding of the material misrepresentations at issue in this litigation. This understanding renders meaningless his (speculative) opinions concerning

---

[18]     Although Moody's was named as a defendant in that case, in its capacity as an alleged underwriter, the court dismissed those claims on other grounds, and did not address whether Moody's made a misrepresentation.

[19]     For greater detail on the unreliability of the Stulz Report., see the Coffman Rpt.

widespread class knowledge of the misconduct.   At his deposition, Dr. Stulz explained his understanding of the misstatements as

**REDACTED**

(Stulz Tr. at 66:6-11.)   Dr. Stulz also confirmed that when he discusses **REDACTED** (Stulz Tr. at 66:18-67:2.) Further, as Plaintiffs' proffered expert, Chad Coffman explains in rebutting Dr. Stulz's opinions, Dr. Stulz miscasts Plaintiffs' allegations.   For example, Plaintiffs allegations are not grounded in claims that Moody's caused the financial crisis or that Moody's stock price was impervious to the financial crisis.   Coffman Rpt. at ¶ 101.   Dr. Stulz's report attempts, in large part, to distract the Court from the issues pertinent to class certification; he even suggests irrelevant alternative theories for errors in Moody's ratings.   Stulz Report at ¶¶ 28-30.

Insofar as Dr. Stulz opines that Moody's did not misrepresent or defraud, that opinion is clearly inappropriate on this motion.   *See IPO*, 471 F.3d at 41 ("[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement.").   *Schleicher*, 2010 WL 3271964, at *2, *7 (affirming class certification and rejecting defendants' argument that "before certifying a class, the district judge must determine . . . everything . . . required to win on the merits.").   Moreover, Dr. Stulz's report is a blatant attempt to reargue the MTD Opinion regarding scienter and misrepresentations.   *In re Moody's*, 599 F. Supp. 2d at 507-16.   In fact, Dr. Stulz's opinion of whether Defendants made misrepresentations or acted with scienter is improper at any stage of the litigation.   *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 458 (S.D.N.Y. 2010) ("It is also well-established that expert witnesses are not permitted to testify about issues of law-which are properly the domain of the trial judge and jury."); *In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61,

64 (S.D.N.Y. 2001) ("every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." (collecting cases)).   Such testimony is particularly objectionable coming from Dr. Stulz,                **REDACTED**                (Stulz Tr. at 76:2-3).

### D.   Defendants Fail To Rebut The *Affiliated Ute* Presumption

Just as Defendants fail to rebut the *Basic* presumption (misstatements), discussed *supra* at Section II.B.   Defendants also fail to rebut the *Affiliated Ute* presumption, pursuant to which investors' reliance is presumed for all material omissions.   *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

Judge Kram's Opinion spoke of "misstatements or omissions."   *In re Moody's*, 599 F. Supp. 2d at 507.   *Affiliated Ute* applies to the omissions *even if* these omissions co-exist with affirmative misstatements.   *See Fogarazzo*:

> Where plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption.   Indeed, the theory behind the *Affiliated Ute* presumption-that, when material information is concealed, plaintiffs should only have to prove that a reasonable investor might have considered the omitted facts important in the making of [her] investment decision is not undermined simply because a defendant makes misstatements at the same time it omits material information.

232 F.R.D. at 186-87 (internal quotations omitted). Defendants' purported authorities involve instances in which the court ultimately finds the case to be one of misrepresentations rather than omissions, naturally making *Affiliated Ute* inapplicable.   *See, e.g., Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109-10 (2d Cir. 2005); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898, 2006 WL 2161887, at *5-6, 9 (S.D.N.Y. Aug. 1, 2006); *In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec.*

*Litig.*, 250 F.R.D. at 141-43; *Titan Pharms. & Nutrition, Inc. v. Medical Shopp Int'l, Inc.*, No. 05-cv-10580, 2006 WL 708552, at *2 (S.D.N.Y. Mar. 20, 2006).

Plaintiffs establish materiality.  "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision…This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Affiliated Ute*, 406 U.S. 128, 131, 154.  As discussed *supra* at II.A.2, Defendants' omissions were material.  *See In re Moody's*, 599 F. Supp.2d at 510 (information that Moody's was not considering originator standards as part of its ratings methods was a material omission).

To rebut the *Affiliated Ute* presumption, "a defendant must prove 'that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'" *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 93 (S.D.N.Y. 2009) (citing *DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir.1987)).  Defendants have not and cannot present *any* evidence that, had investors been aware that Moody's ratings were tainted, they would still have purchased Moody's stock.  *See* Coffman Rpt. at ¶ 51.  In fact, Defendants' own expert testified,                              **REDACTED**

Stulz Tr. at 53:22-4.  Accordingly, Plaintiffs are entitled to the presumption.

## III.   DEFENDANTS' CHALLENGES TO LOSS CAUSATION ARE IMPROPER AND INCORRECT

### A.   Loss Causation Challenges Are Improper At This Stage

Defendants argue that Plaintiffs cannot establish loss causation (Defs. Br. at 34-37). Second Circuit law is clear in that such challenges are improper at the class certification stage. *See IPO*, 471 F.3d at 41; *Flag Telecom*, 574 F.3d at 39; *Lapin*, 254 F.R.D. at 185 ("Several

courts in this District have expressly addressed [challenges to loss causation in opposition to class certification] and all have rejected the notion that a showing of loss causation is a requirement at the class certification stage."); *see also Schleicher*, 2010 WL 3271964, at *5-7; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280-81 (S.D.N.Y. 2008) (citing *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118-19 (S.D.N.Y. 2008)).  *See also* Point I, *supra*.

**B.     In Addition To Being Inappropriate On A Class Certification Motion, Defendants' Challenges To Loss Causation Are Incorrect**

Even assuming arguendo loss causation challenges were appropriate on class certification, which they are not, Defendants' challenges would fail.  *See* Coffman Rpt. at ¶¶ 94-100.   ("Plaintiffs have articulated an economically logical and coherent theory of loss causation").  Plaintiffs can prove loss causation on a class-wide basis, and intend to do so at the appropriate stage of the litigation.

**1.     Plaintiffs' Loss Causation Allegations Are Supported By An Expert Methodology And Are Provable On A Common, Class-Wide Basis**

The Coffman Report includes an event study (Exhibit 1 to Coffman Rpt.) (using a statistical regression analysis, a widely accepted methodology for proving loss causation also used by Dr. Stulz), which confirms that:

- Plaintiffs have articulated an economically logical and coherent theory of loss causation (Coffman Rpt. at ¶ 94);

- There were multiple statistically significant declines in Moody's stock price following corrective disclosures, as shown by Coffman's event study (*Id.* at ¶¶ 10-11, 40-48, 83, and Exhibit 1 to Coffman Rpt.);

- While class members will have differing amounts of damages based on the timing of their stock transactions, the evaluation of loss causation and the establishment of a damages formula both be done on a class-wide basis (Coffman Rpt. at ¶¶ 14, 97, 102; *see also*                 **REDACTED**                 ;

- Dr. Stulz's opinions on the statistical significance of specific Moody's stock price movements are flawed because he ignores the CAC's distinction between Moody's statements concerning its conflicts of interest and its material

misstatements about its *ability to effectively manage those conflicts of interest* (Coffman Rpt. at ¶¶ 52, 53); and

- Dr. Stulz misstates the standard for instances in which *alleged misstatements were expected and did not surprise the market*.  In such instances –including the majority of Defendants' misstatements here – there is no reason to expect statistically significant positive returns.  Rather, such misstatements *maintain* artificial inflation, and that inflation dissipates only as the market discovers their falsity through one or more of several types of disclosures (*Id.* at ¶ 85).

While Plaintiffs did not ask Coffman to opine on loss causation because such an analysis is not required at class certification, he nonetheless responded to Dr. Stulz's arguments. Coffman evaluated a number of proposed disclosure dates and determined that nothing in the Stulz Report precludes a finding of loss causation.  Coffman's analysis directly supports Plaintiffs' allegations that common questions of law and fact regarding loss causation predominate over individual questions.  *See* Coffman Rpt. at ¶ 94-102.

### 2.   Defendants' Merits Challenges On Loss Causation Are Baseless

Defendants offer several other challenges to loss causation, which are little more than thinly-veiled attempts to reargue Judge Krams' MTD Opinion.  Thus, even if they were appropriate for determination at the class certification stage, the challenges would fail.

Judge Kram's opinion discussed four disclosures from the CAC in holding that Plaintiffs satisfied the minimal standards required to plead loss causation.  *See In re Moody's*, 599 F. Supp. 2d at 512-13.  Now, Defendants turn that holding on its head, arguing that Plaintiffs can ***only*** use these four disclosures to show loss causation.   Nothing in the law or in the MTD Opinion supports this argument.

Judge Kram ***did not hold*** that Plaintiffs could prove loss causation at trial ***only*** using the four disclosures discussed in the motion to dismiss opinion.  Any such holding would defeat the

purpose of Rule 8, which governs loss causation allegations, and required only "a short and plain statement of the claim showing that the pleader is entitled to relief."[20]   Rule 8's "Ordinary pleading rules are not meant to impose a great burden on a plaintiff, but it should not prove burdensome for a plaintiff suffering economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."   *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 337 (2005).  As Judge Kram noted: "All that is required at this stage is a showing by Plaintiffs that Defendants' misstatements concealed something from the market, and that its disclosure negatively affected the valued of the security."  *In re Moody's*, 599 F. Supp. 2d at 512.  The purpose of merits discovery (which, at Defendants' insistence, has largely been deferred until after class certification) is to establish a full evidentiary record from which to develop and prove elements such as loss causation.  *See, e.g., Alstom*, 253 F.R.D. at 281 (citing *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (certifying class and noting that "[d]isputes about loss causation turn primarily on questions of fact" inappropriate for determination at this stage).   It is simply absurd to say that Plaintiffs can only rely on allegations pled in a complaint pursuant to Rule 8 to make their case at trial.[21]

Defendants next contend that three of the disclosures cited in the MTD Opinion fall outside the Class Period and therefore may not be used to prove loss causation.  *See* Defs. Br. at 35 (citing *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008)).  This is another

---

[20]   Fed. R. Civ. P. 8(a)(2); *see, e.g., King County, WA v. IKB Deutsche Industriebank AG*, No. 09-cv-8387, 2010 WL 1702196, at *3 (S.D.N.Y. Apr. 26, 2010) ("[P]laintiffs need only meet the lesser Rule 8(a) standard when pleading loss causation.").

[21]   When Judge Kram believed that portions of the CAC were deficient, she said so clearly. *See In re Moody's*, 599 F. Supp. 2d at 510-11 (holding certain alleged misstatements inactionable).

effort by Defendants to reargue the motion to dismiss.[22]   Moreover, the language of the PSLRA and plain common sense easily defeat this argument.

The PSLRA refers not to the close of the "class period," but instead to the "date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market" in the provision governing the calculation of damages.   *See* 15 U.S.C. § 78u-4(e)(1). Congress's use of that language demonstrates that it contemplated corrective disclosures falling ***after*** the close of a class period.   *See In re Dura Pharms, Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (The "statutory provision does not measure damages based on the end of the class period.   Rather, the PSLRA requires damages be calculated from the date the truth is revealed").   As the court noted in *In re Motorola Securities Litigation*, 505 F. Supp. 501 (N.D. Ill. 2007), "Defendants articulate no rationale, and the court can see none, for requiring that any 'corrective disclosure' be within the Class Period. *Dura* does not so mandate, and the court is aware of no authority that imposes such a rule."   *Id.* at 561.   *See also In re Connetics Corp. Sec. Litig.*, No. C 07-02940, 2008 WL 3842938, at *11 (N.D. Cal. Aug. 14, 2008) ("plaintiffs [] may allege loss causation based on a disclosure that occurred the day after the end of the class period"); *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1081 (N.D. Cal. 2002) ("A decline in stock prices need not occur within the class period to support a finding that a plaintiff was damaged, so long as the damage was a foreseeable consequence of the misrepresentation.").   Thus, Judge Kram had no problem pointing to, *inter alia*, post-class period disclosures as supporting loss causation here.   *See In re Moody's*, 599 F. Supp. 2d at 511-12.

---

[22]     In fact, Defendants never made this argument in their motion to dismiss or in their motion for reconsideration of the Court's MTD Opinion.

As a matter of common sense, corrective disclosures *regularly* come *after* the close of a class period. An initial disclosure will put class members on notice that a fraud has taken place, and generally signal the end of a class period. If a subsequent disclosure reveals additional details of a company's fraud, and triggers further stock price declines (as was the case here), the defendant is liable for damages caused by that additional stock price drop. *See In re Moody's*, 599 F. Supp. 2d at 512 (loss causation may be pled as a "truth [that] slowly emerged through a series of partial disclosures.") (citation omitted). Otherwise, companies would have an incentive to reveal the truth in piecemeal fashion. Indeed, in a case involving a single disclosure, that disclosure must, by definition, come after the conclusion of the class period, because the class would be limited to purchases prior to that disclosure.

Moreover, the fact that additional disclosures continued to adversely impact Moody's stock price after October 24, 2007 (the end of the Class Period) does not undermine Plaintiffs' ability to demonstrate commonality as Dr. Stulz suggests. *See* Stulz Report at ¶¶ 119, 122. Courts repeatedly reject arguments that disabling conflicts exist among class members who sold before some of the disclosures and those class members that continued to hold. *See In re AIG Group, Inc. Sec. Litig*, 265 F.R.D. 157, 169-172 (S.D.N.Y. 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 241 F.R.D. 213, 223 n.5 (S.D.N.Y. 2007), *superseded on other grounds by Vivendi Universal, S.A.*, 242 F.R.D. 76 (S.D.N.Y. 2007). Similarly, courts routinely certify classes where class representatives sold before some of the alleged disclosures. *See Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 446 (S.D. Ohio 2009); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, No. 05-cv-6924, 2007 WL 2585088, at *5-6 (S.D.N.Y. Sept. 5, 2007); *In re Tyco Int'l Ltd Multidistrict Litig.*, 236 F.R.D. 62, 71 (D.N.H. 2006); *In re Priceline.com Sec. Litig., Inc.*, 236 F.R.D. 89, 94 (D. Conn. 2006).

Indeed, Coffman has identified several statistically significant disclosures and revelations during and after the Class Period that easily satisfy Rule 23 requirements that common questions of law or fact predominate over individual questions.  *See* Coffman Rpt. at ¶¶ 96-97.

Next, Defendants challenge the Court's holding that the May 2008 *Financial Times* article relating to Moody's cover-up of computer errors on CPDO instruments was a corrective disclosure, arguing that it "did not even concern conflicts of interest."[23]  (Defs. Br. at 35-36.)  As the CAC alleges (¶¶ 363-64) and Coffman explains in his report, the disclosure of Moody's efforts to conceal an egregious computer modeling error – which led to inflated ratings on billions of dollars in securities – revealed Moody's lack of independence and its failure to manage its conflicts of interest.[24]

Finally, Defendants erroneously contend that events and circumstances unrelated to Defendants' fraud caused Moody's stock price decline.  (Defs. Br. at 36-37.)  But Coffman's event study controls for external factors affecting the stock price by using indexes to track the drops in Moody's stock with comparable companies.  *See* Coffman Rpt. at ¶ 41, n.47.  As Judge Scheindlin aptly stated in *In re Sadia, S.A. Securities Litigation*:

> For the third time in as many months, the Court finds itself presented with the defense: "don't blame me, blame the financial crisis."  For the same reasons I rejected this argument in prior cases, I reject it once again.  Not only is there no indication that events related to the financial crisis intervened between the September 25 Disclosure and the price decline, but Vellrath controlled for that possibility by including domestic and foreign

---

[23]   Defendants concede as they must that the stock drop following this disclosure was statistically significant.  (Defs. Br. at 36.)

[24]   *See* Coffman Rpt. at ¶¶ 23, 46, 87, 97.  At a minimum, whether the May 2008 *Financial Times* article was a "corrective disclosure" is a pure merits question best left to a trier of fact, one that need not be decided to make any determination under Rule 23.

> stock and bond indexes as variables in his event study.  Nothing in Stulz's report undermines Vellrath's event study or his opinions.  I conclude that plaintiffs have demonstrated by a preponderance of the evidence that loss causation can be proven class-wide. [Internal citations omitted]

*In re Sadia,* 08-cv-9528 (SAS), 2010 WL 2884737, at *13 (S.D.N.Y. July 20, 2010).  *See also In re Tronox, Inc. Sec. Litig.,* No. 09-cv-6220, 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010); *King County, WA,* 2010 WL 1702196, at *4-7.[25]

## IV.  DEFENDANTS' CHALLENGES TO THE INDIVIDUAL CLASS REPRESENTATIVES FAIL

### A.     Local 282 Has Standing to Sue

Defendants argue that Local 282 lacks Section 10(b) standing because its investment manager had trading authority.  (Defs. Br. at 39.)  This is incorrect.

Use of an investment manager does not negate standing under Section 10(b) and Rule 10b-5 or otherwise render a plaintiff unfit to be a class representative.  *See W.R. Huff Asset Mgm't Co., LLC v. Deloitte & Touche LLP,* 549 F.3d 100, 110-11 (2d Cir. 2008) (holding that the beneficial owner-purchasers of a stock – not their investment advisor who had unfettered trading discretion – had standing to bring claims for securities fraud).  Any other ruling would contravene the PSLRA, which encourages pension funds – which generally delegate trading authority to outside managers – to serve as lead plaintiffs in securities class actions.  *See In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003) (rejecting similar argument

---

[25]     Insofar as Defendants maintain that a disclosure must actually reveal the fact that Defendants had previously committed fraud, their argument is contrary to established Second Circuit authority.  "A (corrective disclosure) is not required under this Court's post-*Dura* case law….A risk allegedly concealed by Defendants which materialized and arguably caused the decline in shareholder value suffices."  *Freudenberg,* 2010 WL 1904314, at *27; *see also Heller v. Golden Restructuring Fund, L.P.,* 590 F. Supp. 2d 603, 623-24 (S.D.N.Y. 2008).

because "The PSLRA was designed to 'increase the likelihood that institutional investors will serve as lead plaintiffs.' Such investors are likely to use advisors.") (citations omitted).[26]




**REDACTED**




.[28]  Thus, Local 282 has Section 10(b) standing.

---

[26]     *See also, e.g., Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 132 (S.D.N.Y. 2001) (reliance on manager is not disqualifying); *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 567 (N.D. Ill. 2004) ("Congress 'anticipated and intended' large institutional investors to oversee securities cases….[T]o prohibit such an institutional investor from serving as a class representative merely because it delegated investment responsibilities to a money manager would appear to be in tension with the PSLRA.") (citations omitted); *In re Vicuron Pharms., Inc. Sec. Litig.*, 233 F.R.D. 421, 427 (E.D. Pa. 2006) (rejecting the argument that plaintiffs "are unfit because they 'abdicated' their investment decisions to money managers"); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238-39 (S.D.N.Y. 2006) (rejecting challenge to lead plaintiff that "relied on money managers to make its investment decisions"); *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216, 2006 WL 1716910, at *4 (W.D. Tenn. Apr. 19, 2006) ("Institutional investors are likely to use investment managers, and reliance on these managers does not disqualify an institutional investor from serving as lead plaintiff.  To hold otherwise would contravene Congress's intent in passing the PSLRA.") (citations omitted).

[27]     The Investment Policy is attached as Exhibit 49 to the Ehrenberg Decl. filed under seal on May 28, 2010 (Docket No. 69).

[28]     *See* Maye Tr. at 96:13-21 (Local 282's consultant Quan-Vest Consulting is "responsible for monitoring the performance of the different investment managers" and "reports to the [Fund's] board of trustees about performance of the different investment managers."); *id.* at 51:7-25 (Local 282's Board of Trustees "interact[s] with Quan-Vest," from whom they can "obtain record…about particular securities transactions that are made in the pension trust fund").

Defendants' reliance on *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co., Inc.*, 800 F.2d 177 (7th Cir. 1986) – a pre-PSLRA case – is unavailing and misguided.  *Congregation* is not the law of this Circuit, as it conflicts with the Second Circuit's holding in *Huff* that the beneficial owner-purchaser (here, Local 282), not the investment advisor/manager, has standing to bring a securities fraud lawsuit.  *Huff*, *supra*, 549 F.3d at 110-11.[29]  *Congregation* is further inapposite because the investor's agent had "full discretion ***to develop and implement*** a prudent portfolio strategy." 800 F.2d at 181.  Here, as Local 282 "set forth specific guidelines and gave express instructions on the permissible scope of investments…***they did not 'relinquish [ ] total control over investment decisions'*** [and *Congregation v.] Kidder Peabody* do[es] not govern."  *Cox v. Eichler*, 765 F. Supp. 601, 608 n.3 (N.D. Cal. 1990).  Thus, Local 282 has Section 10(b) standing.[30]

## B.  The Timing Of Dr. Wetstein's Purchases Does Not Subject Him To A Unique Defense

Defendants speculate that Dr. Wetstein could not have relied upon the Defendants' misrepresentations, based only on the fact that he purchased additional Moody's securities after

---

[29]    *See also In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (citing *Vannest v. Sage, Rutty & Co., Inc.*, 991 F. Supp. 155 (W.D.N.Y. 1997), as "specifically disagreeing with the *Congregation* holding and limiting it to its facts while noting that no other circuit had adopted it").

[30]    Defendants' suggestion that they can defeat certification by merely raising purported "unique defenses" is clearly erroneous.  Defendants must show that a unique defense would "threaten to become the focus of the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000).  *See also Hallet v. Li & Fung Ltd.*, No. 95-cv-8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997) (defendant must show that supposed defense "is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense'") (citation omitted); *Lapin*, 254 F.R.D. at 179-80 ("the court should not disqualify a named plaintiff based upon any groundless, far-fetched defense that the defendant manages to articulate") (quoting *Hallet*, 1997 WL 621111, at *3).

31

August 2008, *i.e.*, after the Class Period and after certain revelations of the fraud were made public. (Defs. Br. at 40.)  Defendants' argument is legally and factually deficient.

"[T]he fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information **has no bearing on whether or not [the representative] relied on the integrity of the market during the class period**, that is, before the information at issue was corrected or changed."  *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. at 135 (quoting *Salomon Analyst II*, 236 F.R.D. at 216). *See also AIG*, 265 F.R.D. at 169 (post-disclosure purchases do not render plaintiff atypical where there is no evidence that plaintiff relied on anything but publicly available information).

REDACTED

Wetstein Tr. at 61:23-25

**REDACTED**                                        *id.* at 68:7.  Courts have held that such post-disclosure purchases to average down costs form a ***typical*** investment strategy.  *E.g.*, *Barrick Gold Corp.*, 251 F.R.D. at 117 ("the subsequent purchase of stock by [a] plaintiff d[oes] not render his claim atypical [because] the subsequent purchase is…a common investment technique used to decrease the average cost of the investment") (internal citations and quotation marks omitted); *Rosen v. Textron Inc.*, 369 F. Supp. 2d 204, 209 (D.R.I. 2005)(collecting citations).[31]

---

[31]     The Court should not credit Defendants' misleading quotation of Dr. Wetstein's deposition testimony in arguing that "his general investment strategy for the account in which he bought Moody's stock was a form of 'intellectual gambling.'"  (Defs. Br. at 40.)   In his deposition, Dr. Wetstein stated that                    **REDACTED**
Wetstein Tr. at 34:13-16.  However, Dr. Wetstein also made clear that                    **REDACTED**
            *See, e.g.*, Wetstein Tr. at 10:6-8 **REDACTED**

The lone securities fraud case cited by Defendants, *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131 (S.D.N.Y. 2007), is easily distinguishable.   The plaintiff there made post-disclosure purchases of the defendant's stock at a time when he was claiming that defendants' stock remained inflated by certain fraudulent conduct he was aware of that had never been disclosed publicly.  *Rocco*, 265 F.R.D. at 135-36.[32]

### C.   Local 282 And McCurley Are Not In-and-Out Traders

As detailed above, Plaintiffs have demonstrated that they and the Class suffered losses on their Moody's stock purchases when the price of Moody's stock declined in response to disclosures of materializations of previously undisclosed risks tied to the fraud, beginning on August 20, 2007.  *See also* Coffman Rpt. at ¶¶ 94-97; CAC ¶ 400(e).  Defendants argue that Plaintiffs Local 282 and McCurley (but not Dr. Wetstein) were "in-and-out traders" because they "sold all of their Moody's shares before October 12, 2007."  (Defs. Br. at 38.)  Defendants'

───────────────

**REDACTED**                                            *id.* at 15:21-16:2

**REDACTED**

; *id.* at 31:10-12 (Wetstein considered Moody's stock to be of "minimal risk"); *id.* at 53:19 (Wetstein believed his Moody's stock purchases to be "stable conservative" investments); *id.* at  15:9-12                              **REDACTED**

───────────────

[32]   The only other authority cited by Defendants, *McLaughlin*, 522 F.3d 215, actually ***undermines*** their position.  In a case involving plaintiffs alleging that tobacco companies misleadingly advertised that light cigarettes were healthier than "full-flavored" cigarettes, the Second Circuit noted the smoker-plaintiffs' difficulties with individualized proof of reliance ***in contrast with securities fraud cases***, such as this case, in which the *Basic* fraud-on-the-market presumption alleviates the problem of individualized proof of reliance.  *Id.* at 224 (rejecting the smoker-plaintiffs' attempt to invoke a *Basic*-like fraud-on-the-market presumption of reliance because "the market for consumer goods, [in contrast with publicly traded securities], is anything but efficient").  Here, as elaborated above and noted in *McLaughlin*, Dr. Wetstein and other class members are presumed to have relied on the integrity of the efficient market in making their purchases of Moody's stock.

argument fails because October 12, 2007 was not the first disclosure date.  Therefore, Local 282 and McCurley were *not* in-and-out traders.

"In-and-out traders" are purchasers of stock who sell their shares prior to the first event that could have revealed the truth of the underlying fraud and caused investor losses.  *See, e.g., In re Flag,* 574 F.3d at 37-41.  Thus, it is "to the extent in-and-out traders cannot 'establish loss causation [that]…they must therefore be excluded from the certified class."  *AIG,* 265 F.R.D. at 174 n.9 (quoting *In re Flag*, 574 F.3d at 41).

Neither Local 282 nor McCurley was an "in-and-out trader" because they sold their shares *after* the first loss causing event, which occurred on August 20, 2007.[33]  As conceded by Defendants, both Local 282 and McCurley held Moody's stock through September 7 and September 4, 2007, respectively.  As such, both Local 282 and McCurley can prove loss causation; neither is an "in-and-out trader." *See* p. 27, *supra* (collecting citations to cases where class representatives sold before some, but not all, of the alleged disclosures).

---

[33]   Thus, *In re Flag*, 574 F.3d at 29 is distinguishable because, in that case, the plaintiffs sold all of their shares prior to February 13, 2002 and "nothing submitted by Plaintiffs link[ed] any disclosure prior to February 13, 2002, to [any] of these alleged misrepresentations."  *Id*. at 41.

## CONCLUSION

For the reasons stated in this reply memorandum and all other supporting documents, Plaintiffs respectfully request this Court to grant their motion for class certification, thus certifying the Class as previously defined and designating Plaintiffs as the Class Representatives.

Dated: New York, New York
August 23, 2010

**KIRBY McINERNEY LLP**

By:        */s/ Daniel Hume*
Daniel Hume
dhume@kmllp.com
Ira M. Press
Steven Cohn
825 Third Avenue, 16th Floor
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

Lionel Z. Glancy
Michael Goldberg
Frederick W. Gerkens III
Andy Sohrn
**GLANCY BINKOW & GOLDBERG LLP**
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Tel: (310) 201-9150
Fax: (310) 201-9160

Stuart L. Berman
Michael K. Yarnoff
Lauren Wagner Pederson
Neena Verma (*pro hac vice* pending)
**BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
Co-lead counsel for Lead Plaintiffs

35

Christopher Keller
Jonathan Gardner
Serena Hallowell
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel:  (212) 907-0700
Fax: (212) 818-0477


Counsel for Plaintiffs