UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                       :
                                       :

IN RE: MOODY'S CORPORATION       :
SECURITIES LITIGATION             :    DOCKET NO. 07-cv-8375-GBD
                                       :
                                       :
                                       :
                                       :
-----------------------------------------------------x

## DEFENDANTS' SUR-REPLY MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Erez J. Davy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's*
*Corporation and Raymond W. McDaniel, Jr.*

October 22, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................3

I.   MR. COFFMAN CONFIRMS THAT WIDESPREAD KNOWLEDGE OF THE
     ALLEGED FRAUD WOULD PRECIPITATE INDIVIDUALIZED INQUIRIES
     THAT WOULD OVERWHELM COMMON ISSUES ..........................................................3

II.  MR. COFFMAN CONFIRMS THE IMMATERIALITY OF THE ALLEGED
     MISSTATEMENTS AND OMISSIONS AND THE LACK OF A METHOD TO
     PROVE LOSS CAUSATION................................................................................................7

     A.   Plaintiffs Improperly Assert Materiality Without Regard to the Total Mix
          of Information ...........................................................................................................7

     B.   Mr. Coffman Confirms That Moody's Stock Price History Contradicts
          Plaintiffs' Materiality Theory ..................................................................................9

     C.   Mr. Coffman Presents Loss Causation Theories That Have Been Properly
          Rejected as Unreliable. ...........................................................................................11

III. THE PROPOSED CLASS REPRESENTATIVES REMAIN INADEQUATE. ..............12

CONCLUSION...........................................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
--- F.R.D. ---, 2010 WL 2593948 (S.D.N.Y. June 15, 2010)................................5, 9

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009).......................................................................9

*Akerman* v. *Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ......................................................................9

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)................................................................2, 6, 7, 8, 9

*Berks County Employees' Retirement Fund* v. *First Am. Corp.*,
--- F. Supp. 2d ---, 2010 WL 3430517 (S.D.N.Y. Aug. 31, 2010) ....................8, 12

*Berwecky* v. *Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ..............................................................................15

*Boilermakers Nat'l Annuity Trust Fund* v. *WaMu Mortgage Pass Through Certificates, Series AR1*,
No. 09-cv-00037, 2010 WL 3815796 (W.D. Wash. Sept. 28, 2010) ................... 8-9

*Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*,
800 F.2d 177 (7th Cir. 1986) ..................................................................................13

*Conn. Ret. Plans & Trust Funds* v. *Amgen, Inc.*,
No. 07-cv-2536, 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) ...............................7

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007).......................................................................................8

*Fisher* v. *Plessey Co.*,
103 F.R.D. 150 (S.D.N.Y. 1984) ..............................................................................7

*Freudenberg* v. *E*Trade Fin. Corp*,
--- F. Supp. 2d ---, 2010 WL 1904314 (S.D.N.Y. May 11, 2010)............................9

*Frigitemp Corp.* v. *Fin. Dynamics Fund, Inc.*,
524 F.3d 275 (2d Cir. 1975)......................................................................................5

*In re AIG Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ..............................................................10, 14, 15

**TABLE OF AUTHORITIES**

(*continued*)

**Page(s)**

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)..........................................................................9

*In re Bard Assocs., Inc.*,
   2009 WL 4350780 (10th Cir. Dec. 2, 2009) ............................................................14

*In re Boardwalk Marketplace Sec. Litig.*,
   122 F.R.D. 4 (D. Conn. 1988)...................................................................................7

*In re CIT Group Inc. Sec. Litig.*,
   No. 08-cv-6613, 2010 WL 2365846 (S.D.N.Y. June 10, 2010) ...............................9

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................................7

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ............................................................................10

*In re DVI, Inc. Sec. Litig.*,
   No. 03-cv-05336, 2010 WL 3522090 (E.D. Pa. Sept. 3, 2010)...................11, 12, 13

*In re Herley Indus., Inc. Sec. Litig.*,
   No. 06-cv-2596, 2009 WL 3169888, (E.D. Pa. Sept. 30, 2009)........................ 13-14

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   --- F. Supp. 2d ---, 2010 WL 2473243 (S.D.N.Y. June 21, 2010) ............................8

*In re IPO Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)....................................................................... *passim*

*In re IPO Sec. Litig.*,
   227 F.R.D. 65 (S.D.N.Y. 2004) ................................................................................7

*In re Lehman Bros. Sec. & Erisa Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010)......................................................................8

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009).................................................................8, 12

*In re Monster Worldwide, Inc. Sec. Litig.*,
   251 F.R.D. 132 (S.D.N.Y. 2008) .........................................................................7, 14

*In re Novastar Fin. Sec. Litig.*,
   No. 04-cv-0330, 2005 WL 1279033 (W.D. Mo. May 12, 2005).............................9

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008).............................................................................. 7-8, 9

*In re Sanofi-Aventis Sec. Litig.*,
    No. 07-cv-10279, 2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ...........................8

*In re SLM Corp. Sec. Litig.*,
    258 F.R.D. 112 (S.D.N.Y. 2009) .......................................................................14

*In re Winstar Commc'ns*,
    No. 01-cv-3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .................................7

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ..................................................................7

*Lapin* v. *Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ............................................................7, 9, 11, 13

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................11, 12

*Marshall* v. *H & R Block Tax Services Inc.*,
    2010 WL 3734072 (S.D.N.Y. Sept. 17, 2010).......................................................13

*Masters* v. *GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) .........................................................................12

*McLaughlin* v. *Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)...........................................................................5, 11, 15

*Moore* v. *PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)...............................................................................5

*Nathenson* v. *Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ..............................................................................10

*New Jersey Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*,
    No. 08-cv-5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010)................................8

*Plymouth County Ret. Ass'n* v. *Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) ...................................................................7

*Rocco* v. *Nam Tai Elect., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................................15

## TABLE OF AUTHORITIES

(*continued*)

**Page(s)**

*Starr ex rel. Sampson* v. *Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)..............................................................................8

*Thorn* v. *Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ...................................................................4, 5

*UFCW Local 1776* v. *Eli Lilly & Co.*,
    --- F.3d ---, 2010 WL 3516183 (2d Cir. Sept. 20, 2010) ..........................5

*West Palm Beach Firefighters' Pension Fund* v. *Startek, Inc.*,
    No. 05-cv-01265, 2008 WL 879023 (D. Colo. Mar. 28, 2008)................9

*W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)...............................................................13

### Miscellaneous

5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence
    (Joseph M. McLaughlin, ed., Matthew Bender. 2010) ............................4

Defendants Moody's Corporation ("Moody's") and Raymond W. McDaniel, Jr. respectfully submit this Sur-Reply Memorandum of Law and the Expert Reply Report of Dr. René Stulz ("Stulz Reply," attached as Exhibit 1 to the October 22, 2010 Sur-Reply Declaration of Stephen Ehrenberg ("Ehrenberg Sur-Reply Decl.")) in further opposition to plaintiffs' January 22, 2010 Motion for Class Certification and in response to the August 23, 2010 report of plaintiffs' purported expert, Chad Coffman (the "Coffman Report").

## PRELIMINARY STATEMENT

Having failed to put forth any expert report or other competent evidence in their opening papers, plaintiffs belatedly attempt to remedy that failure on reply. But the reply papers only confirm that the Rule 23(b)(3) predominance requirement cannot be met and no class can properly be certified here.

*First*, the reply sidesteps rather than confronts or refutes the necessity for individualized inquiries into what investors knew about the alleged wrongdoing during the proposed class period. Plaintiffs assert that their complaint is not that Moody's did not inform shareholders about conflicts inherent in the "Issuer Pays" model, but that Moody's falsely stated that it had effectively managed these conflicts (or, in plaintiffs' vernacular, that Moody's had not "succumbed" to them). Plaintiffs then contend that a class may be certified because there is no evidence that any investor *actually concluded* that Moody's failed to effectively manage these inherent conflicts. For support, plaintiffs rely on Chad Coffman, a litigation consultant who has never taught a course or published in the field of securities. (*See* Deposition Transcript of Chad Coffman ("Tr."), at 24:15-21, 27:24-28:7, attached as Exhibit 2 to the Ehrenberg Sur-Reply Declaration.) Mr. Coffman opines, however, that investors generally knew all about Moody's "potential" conflicts. Further, Mr. Coffman does not dispute that investors had access to ample

media and other information from which they could—and sometimes expressly did—conclude that Moody's had not effectively managed its conflicts.[1]   Indeed, the evidence presented by Moody's expert Professor René Stulz, and acknowledged by Mr. Coffman, establishes that most or all putative class members would be subject to well-grounded individualized inquiries into what they believed about Moody's efforts with respect to managing conflicts of interest.

As a matter of law, what each putative class member knew individually would determine whether that potential claimant could reasonably have relied on any alleged misstatement by Moody's.   Additionally, knowledge among certain market participants (such as the structured finance issuers and institutional investors that purchased the overwhelming majority of Moody's shares and constitute the overwhelming majority of its shareholders) necessarily would rebut any presumption of reliance on an inflated price.   As Mr. Coffman concedes, when such active, sophisticated investors have access to negative information, they drive stock prices to levels that reflect it.   Accordingly, under controlling precedent, including *Basic* and *IPO*, plaintiffs cannot invoke a reliance presumption, cannot avoid individualized knowledge and reliance inquiries, and cannot demonstrate the predominance of common issues necessary for class certification.   *See infra* at 3-11.

*Second*, the Coffman Report and testimony also confirm plaintiffs' inability to demonstrate the *materiality* of any alleged misstatements or omissions.   Plaintiffs argue that materiality can be established based on little more than Moody's having repeatedly said it strove to manage conflicts, and regarded the effort as important.   Not so.   Materiality always depends on the total mix of information available to investors.   Based on his review of the mix of

---

[1]     Moody's denies this allegation.   The instant issue, however, is what investors may have concluded, not what actually occurred.

information available, Mr. Coffman compiled a list of 45 days when "*potentially material*" information was released.  Nowhere on that list are *the alleged misstatements (or corrective disclosures) relied on by plaintiffs*.  Moreover, Mr. Coffman *found no statistically significant price impact associated with any alleged misstatements (or corrective disclosure) during the alleged class period.*  In the Second Circuit, no class can be certified where, as here, plaintiffs present insufficient evidence of a material misstatement or omission.  Nor can a class be certified without a sound method and basis for proving loss causation.  *See infra* at 11-12.

Finally, plaintiffs' proposed class representatives remain inadequate and atypical because each is subject to unique and disqualifying defenses.  Class representatives must have made rather than delegated the investment decision at issue, and must not have bought the stock after, or sold the stock before, the alleged fraud was revealed.  *See infra* at 12-15.

## ARGUMENT

## I.   MR. COFFMAN CONFIRMS THAT WIDESPREAD KNOWLEDGE OF THE ALLEGED FRAUD WOULD PRECIPITATE INDIVIDUALIZED INQUIRIES THAT WOULD OVERWHELM COMMON ISSUES.

Despite his report's assertions otherwise, at his deposition Mr. Coffman conceded that, given the "entire mix of information available" in the marketplace, "there could be a range of beliefs that people could hold" regarding Moody's conflicts and how they impacted Moody's ratings.  (Tr. 225:22-24.)  This "entire mix of information" is principally evidenced by the following:

- ***Plaintiffs' Allegations About Issuer Knowledge.***— Plaintiffs allege that Moody's was "systematically issuing inflated ratings" on "tens of thousands" of structured-finance instruments.  (Coffman ¶ 71; CAC ¶ 51.)  Structured-finance issuers and their thousands of employees necessarily would have participated in, or at least had knowledge of, the alleged fraud.  (*See* CAC ¶¶ 298, 307-08, 311, 313, 317-19, 331.)  Indeed, when it comes to such practices as ratings shopping, plaintiffs openly allege that the practice was admitted by "numerous insiders" and served as an "industry fixture."  (CAC ¶¶ 316, 331(b).)  As

Dr. Stulz observes, "[i]f Moody's was too generous in its rating procedures to please clients, it cannot be the case that these very clients did not know that Moody's was trying to please them." (Stulz Reply ¶ 12.) Mr. Coffman does not disagree. (*See* Tr. 184:6-15, 188:15-189:2.)

- ***Market Participants' Access to Data Allegedly Evidencing That Moody's "Succumbed."***— Plaintiffs allege that Moody's ratings were "so unreasonable *ex-ante* that they [could] only be explained by Moody's [] conflicts." (CAC ¶ 127.) If so, "the alleged fraud would have been known by various market participants during the putative Class Period." (Stulz Reply ¶ 4C; *see also* Stulz ¶¶ 26-27, 51-54.) This knowledge "would have spread to many investors in Moody's stock through various recognized channels, making reliance on an allegedly misrepresented or omitted fact the object of an individual inquiry." (Stulz Reply ¶ 4C.)

- ***Media and Regulatory Reports Criticizing Moody's for "Succumbing."***— Numerous media, Congressional and regulatory reports, as well as business publications, openly disagreed that Moody's had effectively managed its conflicts of interest. (*See, e.g.*, Ehrenberg Decl. Ex. 25, 28, 33, 34, 35, 36, 40.) Any investor "who was aware of these opinions could have decided to reach a [similar] conclusion." (Stulz Reply ¶ 31.) As Mr. Coffman was forced to admit, it was "possible" that individuals who read these and similar articles "would walk away . . . with the belief that maybe . . . [Moody's] had succumbed to the conflicts of interest[.]" (Tr. 226:12-17; *see also* Tr. 211:24-212:11.) Indeed, several investors conveyed just such a belief to Moody's, as Mr. Coffman again was forced to admit. (*See* Tr. 258-68 (PIMCO and Vanguard expressed view that Moody's "doesn't stand up to Wall Street" and lets issuers "get away with murder.").)[2]

Despite this record, plaintiffs maintain that a class may be certified so long as it remains unclear, for now, whether "any class member had *actual* knowledge that Moody's *actually* succumbed to the conflict resulting in inflated ratings of structured finance products." (Pl. Reply Br. at 10 (emphasis in original); *see also* Coffman ¶ 8.)[3] This is not the test. At class

---

[2]     None of this evidence is inadmissible hearsay, as plaintiffs suggest. (Pl. Reply Br. at 10.) Moody's submitted these materials solely for purposes other than to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Where, as here, statements are offered "to prove the extent of a . . . recipient's notice of certain conditions," they are not hearsay. 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.11 (Joseph M. McLaughlin, ed., Matthew Bender. 2010). In both *IPO* and *Thorn*, media and similar evidence served this non-hearsay purpose at class certification. *IPO*, 471 F.3d at 43; *Thorn* v. *Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 325-26 (4th Cir. 2006).

[3]     Plaintiffs and Mr. Coffman wrongly accuse Dr. Stulz of lacking "a fundamental understanding of the material misrepresentations at issue in this litigation," because he addressed "'potential conflicts.'" (Pl. Reply Br. at 19-20.) Dr. Stulz's Report and testimony are clear: he

certification, the issue is whether the element of reliance "may be established by generalized, rather than individualized, proof," *not* what that proof ultimately will show.  *UFCW Local 1776* v. *Eli Lilly & Co.*, --- F.3d ---, 2010 WL 3516183, at *8 (2d Cir. Sept. 20, 2010).   The predominance requirement turns on how the court can resolve factual and legal issues over which there is a "genuine controversy," or that are not "patently without merit."   *Moore* v. *PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002); *Thorn*, 445 F.3d at 327 n.19.

Investors need not have every piece of evidence of an alleged fraud in order to be subject to individualized knowledge and reliance inquiries.  In *IPO*, the Second Circuit held that investors would have disqualifying knowledge of the alleged fraud where they could draw "reasonable inference[s]" about it.  *IPO*, 471 F.3d at 44 n.14.  In *McLaughlin* v. *American Tobacco Co.*, the Second Circuit held that "differences in plaintiffs' knowledge and levels of awareness" of the alleged fraud precluded class certification.  522 F.3d 215, 226 (2d Cir. 2008). Most recently, the court in *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, --- F.R.D. ---, 2010 WL 2593948, at *7 (S.D.N.Y. June 15, 2010), declined to certify a class of investors who purchased securities collateralized in part by subprime mortgages, because the investors' different levels of reliance on credit ratings represented "'personal idiosyncratic choice[s]'" that would "necessitate[] individualized proof of reliance."   It is well-established that a plaintiff "furnished with the means of knowledge and [who] is not prevented from using them cannot say that he has been deceived by the misrepresentations of the other party."  *Frigitemp Corp.* v. *Fin. Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir. 1975).

---

addressed and found evidence of public debate over *both* "potential" conflicts *and* whether Moody's had effectively managed them.  (*See*, *e.g.*, Stulz ¶¶ 39 n.53, 52-55; Ehrenberg Decl. Ex. 3, at 62.)

Plaintiffs speculate that some supposed duty to keep "inside information" confidential precluded the many knowledgeable employees of issuers, institutional investors and rating agencies from disseminating their negative views about Moody's.   (*See* Coffman ¶ 81.) But there is nothing "inside" about public information concerning rating methodologies and limitations, let alone employees' personal *opinions* about them.   Indeed, plaintiffs and Mr. Coffman concede that "Moody's made no secret of the risk of conflict posed by the Issuer Pays model" (Pl. Reply Br. at 13; *accord* Coffman ¶ 65) and that industry participants were free to and did express their opinions on conflicts of interest.  (*See* Tr. 148:3-18, 279:8-80:5.)  In any event, plaintiffs' speculation only underscores the need for individualized inquiry.

Because information naturally spreads, there is no sense in plaintiffs' and Mr. Coffman's sketchy suggestion that a class can be salvaged by removing "issuers" from the shareholder class.  (*See* Pl. Reply Br. at 18 n.17; *see also* Coffman ¶ 79.)  Removing "issuers" would do little or "nothing to lessen the broad extent of knowledge of the [alleged fraud] throughout the community of market participants and watchers."  *In re IPO*, 471 F.3d at 44. Neither plaintiffs nor Mr. Coffman state what method they propose for this purpose, and neither contests Dr. Stulz's observation that there is no known method.  (*See* Stulz ¶ 54.)

No less importantly, plaintiffs' proposal would not fix the fundamental reliance problem that arises out of issuers' and other informed traders' knowledge:  Under the efficient market hypothesis *Basic* v. *Levinson* adopted and plaintiffs invoke, when market makers are "privy to the truth," the stock price will reflect that truth, even for those traders who are less informed.  *See* 485 U.S. 224, 248 (1988); Stulz Reply ¶ 24.

The record here strikingly resembles the record in *IPO*, 471 F.3d at 43, and the conclusion should be the same.  As in *IPO*, the bases for individualized inquiry into potential

class-member knowledge include "[p]laintiffs' own allegations as to how widespread was knowledge of the alleged scheme," plus evidence of knowledge among alleged scheme participants such as among issuers, institutional investors and their employees, plus media and regulatory pronouncements.  *Id*. Significantly, at least one of the media reports cited in *IPO* as evidence of widespread knowledge, *see id.*, "feature[d] a flat denial" from a defendant that it engaged in any unlawful conduct.  *In re IPO Sec. Litig.*, 227 F.R.D. 65, 110 n.339 (S.D.N.Y. 2004).  Plaintiffs cannot distinguish *IPO*, and cannot properly rely on the few cases they cite where, unlike in *IPO* and in this case, there was no evidence of widespread class member knowledge.[4]

## II.   MR. COFFMAN CONFIRMS THE IMMATERIALITY OF THE ALLEGED MISSTATEMENTS AND OMISSIONS AND THE LACK OF A METHOD TO PROVE LOSS CAUSATION.

### A.   Plaintiffs Improperly Assert Materiality Without Regard to the Total Mix of Information.

Plaintiffs do not dispute that to demonstrate materiality (a prerequisite to invoking the *Basic* or *Affiliated Ute* reliance presumptions), they must make a showing *beyond* a "prima facie" one that the alleged misrepresentation "'significantly altered the "total mix" of information.'"  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482, 486 n.9 (2d Cir.

---

[4]       *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008); *Lapin* v. *Goldman Sachs & Co.*, 254 F.R.D. 168, 184 (S.D.N.Y. 2008); *Fisher* v. *Plessey Co.*, 103 F.R.D. 150, 156 (S.D.N.Y. 1984); *In re Boardwalk Marketplace Sec. Litig.*, 122 F.R.D. 4, 6-7 (D. Conn. 1988).  The other propositions upon which plaintiffs rely (*see* Pl. Reply Br. at 16 n.15, 17) do not even address themselves to Rule 23(b)(3)'s predominance requirement.  *See Conn. Ret. Plans & Trust Funds* v. *Amgen, Inc.*, No. 07-cv-2536, 2009 WL 2633743, at *7 (C.D. Cal. Aug. 12, 2009) (assessing class representative's adequacy); *Plymouth County Ret. Ass'n* v. *Schroeder*, 576 F. Supp. 2d 360, 375 (E.D.N.Y. 2008) (motion to dismiss); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) (same); *In re Winstar Commc'ns*, No. 01-cv-3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) (same); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007) (same).

2008); *see also Berks County Employees' Ret. Fund* v. *First Am. Corp.*, --- F. Supp. 2d ---, 2010 WL 3430517, at *3 (S.D.N.Y. Aug. 31, 2010).   Plaintiffs say that Moody's "repeated[] emphasi[s]" on "the importance of [its] independence and the objectivity and accuracy of its ratings" is all they need to show.  (Pl. Reply at 6; *see also* Coffman ¶ 93.)[5]  But materiality is determined in light of the "total mix" of information available to investors, not cherry-picked issuer's statements.  *See In re Sanofi-Aventis Sec. Litig.*, No. 07-cv-10279, 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009) (Daniels, J.); *see also* Moody's Opp. Br. at 27.   Under this settled standard, two courts in this district recently deemed immaterial alleged failures to disclose such practices as "ratings shopping"—and not, as plaintiffs mischaracterize the cases, simply the "Issuer Pays model" (*see* Reply Br. at 19).  *In re Lehman Bros. Sec. & Erisa Litig.*, 684 F. Supp. 2d 485, 492 (S.D.N.Y. 2010); *accord N.J. Carpenters Vacation Fund* v. *Royal Bank of Scotland Group, PLC*, No. 08-cv-5093, 2010 WL 1172694, at *14 (S.D.N.Y. Mar. 26, 2010).   Other courts have since described rating agency conflicts as something that was "known widely" "for years."  *See In re IndyMac Mortgage-Backed Sec. Litig.*, --- F. Supp. 2d ---, 2010 WL 2473243, at *12 (S.D.N.Y. June 21, 2010); *Boilermakers Nat'l Annuity Trust Fund* v. *WaMu Mortgage*

---

[5]     Because they continue to rely on what Moody's allegedly *stated*, plaintiffs' reply confirms that they cannot invoke the *Affiliated Ute* presumption by claiming that they *also* plead omissions.  (Pl. Reply Br. at 21-22.)  Every alleged misstatement omits some element of the truth.  This case involves "*primarily*" omissions as opposed to misrepresentations.  *Starr ex rel. Sampson* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (emphasis added).  Plaintiffs' complaint alleges over a dozen affirmative misstatements.  (*See generally* Moody's Opp. Br. at 33 & n.13.)  Indeed, Judge Kram previously identified plaintiffs' "core allegation" to be "Moody's false *claim*[] that it was an independent body publishing ratings accurately and impartially."  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (emphasis added).

*Pass Through Certificates, Series ARI*, No. 09-cv-00037, 2010 WL 3815796, at *7 (W.D. Wash. Sept. 28, 2010).[6]

**B.     Mr. Coffman Confirms That Moody's Stock Price History Contradicts Plaintiffs' Materiality Theory.**

At his deposition, Mr. Coffman acknowledged that the best statistical tool to assess materiality is an "event study," an analysis of "stock price movement[s] with a comparison and control against the rest of the market." (Tr. 92:25-93:7.) Solely for purposes of responding to Dr. Stulz's footnote on market efficiency, Mr. Coffman created his own form of "event study" showing various price movements on various event days. (*See* Coffman ¶¶ 40-48.) But Mr. Coffman testified that this so-called "event study" did not even aim to test materiality or loss causation. Still, this "event study" confirms that there was no price impact or corrective disclosure associated with any actionable misstatement (or omission) concerning Moody's independence or assessment of loan originator standards.

---

[6]     In response, plaintiffs cite only to motion-to-dismiss decisions, including Judge Kram's, decided on different records and rendered without any factual findings. *See In re Moody's*, 599 F. Supp. 2d at 499 n.1; *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 164 n.4 (S.D.N.Y. 2009). In *Abu Dhabi*, where the court made findings on a motion for class certification, the court found that "some sophisticated investors chose not to rely—or relied only minimally—on the credit ratings prior to investing" in the structured-finance notes at issue. *Abu Dhabi*, 2010 WL 2593948, at *8 (S.D.N.Y. June 15, 2010). In *Lapin*, 254 F.R.D. 168, contrary to plaintiffs' description (*see* Pl. Reply Br. at 6-7), the court made no materiality finding because the defendants did not contest that element. *See id.* at 181. Like *Lapin*, the other decisions cited by plaintiffs (*see* Pl. Reply Br. at 6 n.5) either pre-dated *Salomon*'s ruling that courts must make a threshold factual finding on materiality in order to invoke the *Basic* presumption, involved no serious materiality challenge, or applied dismissal rather than class certification standards. *See Salomon*, 544 F.3d at 485; *In re CIT Group Inc. Sec. Litig.*, No. 08 Civ. 6613, 2010 WL 2365846 (S.D.N.Y. June 10, 2010); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241 (S.D.N.Y. 2010); *Freudenberg* v. *E*Trade Fin. Corp.*, --- F. Supp. 2d ---, 2010 WL 1904314 (S.D.N.Y. May 11, 2010); *Akerman* v. *Arotech Corp.*, 608 F. Supp. 2d 372, 383-84 (E.D.N.Y. 2009); *West Palm Beach Firefighters' Pension Fund* v. *Startek, Inc.*, No. 05-cv-01265, 2008 WL 879023, at *18 (D. Colo. Mar. 28, 2008); *In re Novastar Fin. Sec. Litig.*, No. 04-cv-0330, 2005 WL 1279033, at *4 (W.D. Mo. May 12, 2005).

As detailed in the Stulz Reply (¶¶ 33 n.61, 35, 42), Mr. Coffman's results actually contradict materiality because they show neither price inflation from a misstatement at the outset nor a decline in price upon any properly identified "corrective" disclosure.  With one exception (discussed below), every date on which plaintiffs contend some material misstatement or correction came out is *omitted* from Mr. Coffman's list of 45 days with pieces of "potentially material" news, as set out in Exhibit 1 to his Report.  (*See* Tr. 57:15-23.)

Plaintiffs say this does not matter because "the absence of a stock price reaction to misrepresentations" does not evidence immateriality "where those misrepresentations merely confirmed existing expectations."  (Pl. Reply Br. at 4 n.4; *see also* Coffman ¶ 85.)  But the exception upon which plaintiffs rely applies only in "special circumstances," such as where a company falsely reports earnings of $1.00 per share where the market specifically anticipates that earnings announcement.  *Nathenson* v. *Zonagen, Inc.*, 267 F.3d 400, 418-19 (5th Cir. 2001); *see also In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 144 n.17 (S.D.N.Y. 2008).  No such "special circumstances" are present here:  Regulators, journalists, and investors all questioned whether Moody's was effectively managing conflicts before Moody's issued its Code of Conduct, and regularly thereafter, no matter what Moody's said on the subject.  *See supra* at 3-4.

The absence of a "price decline in [the] stock on the date a misrepresentation was disclosed" is "strong evidence that there was no price change on the date of the misrepresentation, thus rebutting the fraud-on-the-market presumption."  *In re AIG Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y. 2010).  Mr. Coffman concedes that evaluating whether a "potential corrective disclosure" caused "a decline in stock price is the more logical method to determine whether the alleged false statements were material."  (Coffman ¶ 86.)  Strangely,

however, Mr. Coffman was "not asked to form an opinion," and did not form one, regarding "corrective disclosures" or their relationship, if any, to Moody's stock prices.  (Tr. 243:11-13, 243:22-44:3; Coffman ¶ 10 n.3.)   The Coffman "event study" does not even identify as "potentially material" the one arguable disclosure event (the October 12-17 statement about loan originators) at or around the end of the class period.  *See In re Moody's*, 599 F. Supp. 2d at 513.

### C.   Mr. Coffman Presents Loss Causation Theories That Have Been Properly Rejected as Unreliable.

For similar reasons, the reply papers likewise confirm that plaintiffs lack a method to prove loss causation that is "plausible as a matter of law."  *McLaughlin*, 522 F.3d at 227.  Plaintiffs rely on Mr. Coffman to bless their "theory" in the abstract, even though Mr. Coffman's loss causation opinions were recently excluded as "unreliable and unfit" in a case called *In re DVI, Inc. Sec. Litig.*, 03-cv-05336, 2010 WL 3522090, at *7 (E.D. Pa. Sept. 3, 2010).  Plaintiffs cannot depend on the "event study" method, because Mr. Coffman has so far declined to pick any "event" in or around the class period, let alone "study" that event.  (*See* Coffman ¶¶ 10 n.3, 94-102.)  Instead, plaintiffs and Mr. Coffman tentatively rely on a May 21, 2008 article, the *only* potential disclosure date associated with a statistically significant negative abnormal return on Moody's stock price.  (Stulz ¶ 102; *see* Stulz Reply ¶ 46.)  But this news item (i) came *more than six months after the end of the class period*; and (ii) had nothing to do with conflicts of interest (*see* Stulz ¶¶ 112-18; Stulz Reply ¶¶ 52-55), and therefore could not have disclosed something that was within the "zone of risk *concealed* by the [alleged] misrepresentations." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original); *see also In re DVI*, 2010 WL 3522090, at *24.[7]  Plaintiffs' citations to cases outside this Circuit (*see* Pl.

---

[7]     Similarly, plaintiffs and Mr. Coffman incorrectly suggest that materiality may be shown based on a statement made by Senator Shelby on August 20, 2007 that "credit rating agencies

Reply Br. at 26) cannot overcome the observation in *Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008), that post-class-period disclosures "cannot be relied upon for loss causation."

Finally, contrary to Mr. Coffman's Report's speculation, "lower than expected earnings announced on October 17, 2007" could not constitute "corrective information" about conflicts of interest or loan originator standards because the October 17 announcement said nothing about conflicts of interest or loan originator standards.  (*See* Coffman ¶ 97.)   Mr. Coffman actually omits this item from his list of "potentially material" news.  (*See* Coffman Ex. 1.)  Thus, Mr. Coffman could only treat this announcement as a "corrective disclosure" to the extent that it arguably "expose[d] the firm's previously concealed true financial condition." (Coffman ¶ 10 n.3.)  But there is no allegation here that Moody's misstated its "true financial condition."  This Court, like that in *DVI*, should reject Mr. Coffman's attempt to identify as a corrective disclosure an event that "d[id] not relate to Defendants' alleged misrepresentations." 2010 WL 3522090, at *12-13.[8]

## III.    THE PROPOSED CLASS REPRESENTATIVES REMAIN INADEQUATE.

*Local 282 and McCurley Sold Too Soon.*— Plaintiffs concede that "'in-and-out traders cannot establish loss causation,'" and must therefore "'be excluded from the certified

---

should shoulder some blame for the mortgage debacle" (Coffman ¶ 89) and the price movement that day.  This cannot constitute a "corrective" disclosure because the statement did not address conflicts of interest and did not convey any news to the market.  (*See* Stulz Sur-Reply ¶¶ 47-50.) *See also Berks*, 2010 WL 3430517, at *4.

[8]    Mr. Coffman also proposes to rely on a mistaken definition of loss causation.  *Compare* Coffman ¶ 95 (defining loss causation as the "combination of the 'but-for' test and the 'foreseeability' test") *with Lentell*, 396 F.3d at 173 (establishing loss causation requires showing "that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." (emphasis in original)).

class.'"  (Pl. Reply Br. at 34.)  Their sole response is to claim that the first "lost causing event"

occurred on August 20, 2007, before Local 282 and McCurley sold their shares.  But August 20,

2007 was *not* one of the "corrective disclosures" identified by Judge Kram in her motion-to-

dismiss decision.  Judge Kram gave plaintiffs an opportunity to amend their pleadings.  *See In re*

*Moody's*, 599 F. Supp. 2d at 518.  They chose not to.  They cannot now amend their pleadings

through class-certification briefing.  *See Marshall* v. *H & R Block Tax Services Inc.*, 2010 WL

3734072, at *4 (S.D. Ill. Sept. 17, 2010).

      ***Local 282's Inadequate Involvement in the Investment Decision.*—** Plaintiffs do

not challenge the factual record reflecting that Local 282 delegated the investment decision at

issue to its advisors and therefore lacks firsthand knowledge of facts pertinent to the class claims.

Instead, plaintiffs point to Local 282's overall authority over its advisors.   (*See* Pl. Reply Br. at

30-31.)  Such overall authority is insufficient to preserve an investor's Section 10b-5 standing.

*See Congregation of the Passion, Holy Cross Province* v. *Kidder Peabody & Co.*, 800 F.2d 177,

181 (7th Cir. 1986).

      Plaintiffs also argue (Pl. Reply at 29) that Local 282 must have standing because,

under *W.R. Huff Asset Management Co.* v. *Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008),

investment advisors lack standing to sue on their clients' behalf.  But *Huff* did not make such a

categorical ruling.  Rather, it expressly recognized that an investment advisor would have Article

III standing where it has "legal title to, or a proprietary interest in, the claim" or "where the

plaintiff can demonstrate (1) a close relationship to the injured party and (2) a barrier to the

injured party's ability to assert its own interests."  *Id*. at 108-09.  *Huff* also expressly reserved the

question of "when, in the context of a class action under the PSLRA, an investment adviser could

qualify as a suitable lead plaintiff."  *Id.* at 106 n.5.  Indeed, courts have "traditionally allowed

investment advisers and managers to serve as lead plaintiffs in class actions." *In re Herley Indus., Inc. Sec. Litig.*, No. 06-cv-2596, 2009 WL 3169888, at *5 (E.D. Pa. Sept. 30, 2009).  The Second Circuit has also allowed assignees to serve this role.  *See Cordes & Co. Fin. Servs., Inc.* v. *A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99-100 (2d Cir. 2007).

    Contrary to plaintiffs' claim, disqualifying Local 282 would not disserve the PSLRA interest in promoting institutional investor leadership of securities class actions.  (*See* Pl. Reply at 29-30.)  Where an institutional investor *does* make its own investment decisions—as many do—it would have standing to sue.  Where it does not, it could assign its claims to the investment manager, as investors have done in light of *Huff*.  *See, e.g.*, *In re Bard Assocs., Inc.*, 2009 WL 4350780, at *1 (10th Cir. Dec. 2, 2009).  Only this way can courts have confidence that the institutional investor proposed as lead plaintiff is sufficiently knowledgeable about its claim, able to monitor plaintiffs' counsel, and able to lead the litigation competently.  On the other hand, with a detached proposed representative like Local 282 in place, the class is burdened by "unique legal issues that other class members do not [face]."  *In re SLM Corp. Sec. Litig.*, 258 F.R.D. 112, 116 (S.D.N.Y. 2009) (lead plaintiff "no longer satisfie[d] the adequacy or typicality requirement" where it faced a standing challenge whose resolution was "uncertain[]").

    ***Dr. Wetstein's Disqualifying Post-Disclosure Purchases.—*** Plaintiffs concede that Dr. Wetstein generally invested as a form of "'intellectual gambling,'" but plaintiffs baldly assert that his post-disclosure purchases of Moody's stock was some kind of exception.  (Pl. Reply Br. at 32 n.31.)  Dr. Wetstein, however, himself never articulated a distinction at his deposition, nor did he put in an affidavit supporting plaintiffs' assertion.  Plaintiffs also observe that some cases, such as *In re Monster*, 251 F.R.D. at 135, and *In re AIG*, 265 F.R.D. at 169, have not deemed post-disclosure purchases as disqualifying.  This simply highlights that "courts

in this jurisdiction have differed over whether a class representative's purchase of shares after the disclosure of corrective information will create a unique defense to which it is subject."  *Id.* at 168; *see*, *e.g.*, *Rocco* v. *Nam Tai Elect., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007); *Berwecky* v. *Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000).  The better view is that these purchases subject the class representative to unique defenses.  *See McLaughlin*, 522 F.3d at 226 (named plaintiffs' post-complaint purchases suggested the "influence of some motivation" other than the alleged fraud).

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that plaintiffs' motion for class certification be denied in its entirety.

Dated:  New York, New York
        October 22, 2010

/s/ Stephen Ehrenberg
Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Erez J. Davy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's*
*Corporation and Raymond W. McDaniel, Jr.*
