UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
                                                       :
                                                       :
IN RE: MOODY'S CORPORATION                             :
SECURITIES LITIGATION                                  :   DOCKET NO. 07-cv-8375-GBD
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------x


# DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY AND
# ADDITIONAL PUBLIC RECORD MATERIAL


SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's
Corporation and Raymond W. McDaniel, Jr.*


March 3, 2011

**Table of Contents**

**Page**

SUPPLEMENTAL AUTHORITY AND ADDITIONAL
PUBLIC RECORD MATERIAL ...................................................................................1

I. *RESIDENTIAL CAPITAL* LAYS OUT THE NECESSITY FOR AND
NATURE OF THE INQUIRY INTO WHETHER COMMON ISSUES
PREDOMINATE DESPITE INDIVIDUALIZED KNOWLEDGE
ISSUES ............................................................................................................................2

    A. Under *Residential Capital*, the Court Should Consider Whether
the Record Gives Rise to a Reasonably Reliable Inference That
Institutional Investors Directly Involved in the Securitization
Process Had Some Awareness of the Risks Associated With
Conflicts of Interest and Ratings Models....................................................4

    B. Under *Residential Capital*, the Court Should Consider Whether
the Record Gives Rise to a Reasonably Reliable Inference That
Other Sophisticated and Experienced Institutional Investors Had
Some Awareness of the Risks Associated With Conflicts of
Interest and Ratings Models........................................................................7

    C. Under *Residential Capital*, the Court Should Consider Whether
the Record Gives Rise to a Reasonably Reliable Inference That
Non-Institutional Shareholders Had Some Awareness of the
Risks Associated With Conflicts of Interest and Ratings Models ...........8

II. *RESIDENTIAL CAPITAL* ADDRESSES INTRA-CLASS CONFLICTS
THAT PRECLUDE CERTIFICATION ..................................................................9

III. *RESIDENTIAL CAPITAL* REFLECTS THAT CLASS ACTION
TREATMENT IS NOT THE SUPERIOR FORM OF ADJUDICATION
FOR PREDOMINANTLY SOPHISTICATED INSTITUTIONAL
SHAREHOLDERS ALLEGING FRAUD IN CONNECTION WITH
MORTGAGE-BACKED SECURITIES ..........................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
  269 F.R.D. 252 (S.D.N.Y. 2010) ..................................................................................................11

*Allstate Ins. Co.* v. *Ace Sec. Corp.*,
  No. 650431/2011 (N.Y. Sup. Ct. filed Feb. 18, 2011) ..............................................................10

*Allstate Ins. Co.* v. *CitiMortgage, Inc.*,
  No. 650432/2011 (N.Y. Sup. Ct. filed Feb. 18, 2011) ..............................................................10

*Allstate Bank* v. *JPMorgan Chase Bank, N.A.*,
  No. 650398/2011 (N.Y. Sup. Ct. filed Feb. 16, 2011) ..............................................................10

*Amchem Prods.* v. *Windsor*,
  521 U.S. 591 (1997) ..............................................................................................................5, 11

*Dexia Holdings* v. *Countrywide Fin. Corp.*,
  No. 650185/2011 (N.Y. Sup. Ct. filed Jan. 24, 2011) ........................................................... 9-10

*In re "Agent Orange" Prod. Liab. Litig.*,
  800 F.2d 14 (2d Cir. 1986) ..........................................................................................................5

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...............................................................................................10

*In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*,
  08 MDL 1963, 2011 U.S. Dist. LEXIS 6026 (S.D.N.Y. Jan. 19, 2011) .....................................5

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ..........................................................................................................3

*In re Wachovia Equity Sec. Litig.*,
  No. 08-cv-6171 (S.D.N.Y. filed July 7, 2008) ............................................................................5

*Maine State Ret. Sys.* v. *Countrywide Fin. Corp.*,
  No. 2:10-cv-00302 (C.D. Cal. filed Jan. 14, 2010) .....................................................................5

*New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*,
  No. 08-cv-8781, 2011 U.S. Dist. LEXIS 4343 (Jan. 18, 2011) ........................................ *passim*

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 23 ................................................................................... *passim*

Defendants Moody's Corporation ("Moody's") and Raymond W. McDaniel, Jr. (together, "defendants") respectfully submit this Notice of Supplemental Authority and Additional Public Record Material that became available since briefing concluded and argument was held on plaintiffs' Motion for Class Certification.[1]

**SUPPLEMENTAL AUTHORITY AND ADDITIONAL PUBLIC RECORD MATERIAL**

Plaintiffs in this case allege that Moody's ratings of mortgage-backed securities, and therefore Moody's own stock price, were inflated because (i) Moody's "succumbed" to pressure from issuers that paid for the ratings; and (ii) the ratings had certain methodological shortcomings. Plaintiffs further allege that exposure of Moody's "succumbing" to "conflicts of interest" or improving its ratings methodologies caused declines in Moody's share prices. (*See* Plaintiffs' Second Amended Complaint ("Am. Compl.") ¶¶ 54, 103-109, 353.)

Moody's has argued in response to plaintiffs' motion for class certification that no class may be certified in this action because putative class members will be subject to individualized inquiries about their knowledge of these subjects, so common issues will not "predominate" over individualized ones. Oral argument took place on November 23, 2010.

On January 18, 2011, in *New Jersey Carpenters Health Fund* v. *Residential Capital*, Judge Baer denied a motion for class certification where plaintiff investors charged defendant issuers and underwriters of mortgage-backed securities with misrepresenting "whether the residential mortgages comprising the securities were built in conformity with proper underwriting guidelines," and, accordingly, the value of the securities. No. 08-cv-8781, 2011 U.S. Dist. LEXIS 4343, at *10 (S.D.N.Y. Jan. 18, 2011) (Appendix Ex. A). Judge Baer denied

---

[1] The Supplemental Authority and certain of the Additional Public Record Materials are attached in the accompanying Appendix of Supplemental Materials ("Appendix").

class certification because "widespread knowledge [] would precipitate individual inquiries as to the knowledge" of the securitization process and value of mortgage-backed securities among putative class members, especially sophisticated institutions and other participants in the mortgage-backed securities and structured finance market. *See id.* at *32. The need to explore this widespread knowledge would "defeat the predominance of common issues under Rule 23(b)(3)." *Id.*

Further, also since the close of briefing and oral argument, additional information has entered the public record regarding Moody's shareholders' knowledge and participation in the allegedly flawed rating process. In December 2010 and January 2011, new pleadings were filed by and against various putative class members. In January and February 2011, a congressional commission released materials collected during its inquiry. Those materials supplement the materials submitted to this Court and raise additional issues regarding putative class members' knowledge, about which, as set forth in *Residential Capital*, Moody's would be entitled to inquire, precluding a finding that common issues predominate, or that class treatment is a superior form of adjudication, as Rule 23(b)(3) requires.

## I. *RESIDENTIAL CAPITAL* LAYS OUT THE NECESSITY FOR AND NATURE OF THE INQUIRY INTO WHETHER COMMON ISSUES PREDOMINATE DESPITE INDIVIDUALIZED KNOWLEDGE ISSUES.

As Judge Baer described in *Residential Capital*, Rule 23(b)(3) expressly requires that "[c]lass-wide issues predominate"—in other words, that resolution of the "more substantial" issues in the case "can be achieved through generalized proof," not "individualized proof." *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *31 (quoting *UFCW Local 1776* v. *Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010)). Common issues do not predominate when defendants may raise "unique defenses that require a great deal of individualized evidence." *Id.*

In *Residential Capital*, plaintiffs alleged that defendants had misrepresented the quality of the mortgage-backed securities they underwrote, in disregard of stated underwriting and due diligence practices. Judge Baer recognized that plaintiffs' claims of class-wide reliance on defendants' statements could not succeed if various putative class members "knew about the false statement at the time of acquisition." *Id.* at *31-32. Judge Baer treated as a "serious challenge to class certification" defendants' evidence that many putative class members had individualized knowledge of facts bearing on the alleged "loosening and lowering" of standards related to residential mortgage-backed securities in 2006 and 2007. *Id.* at *31. Applying the Second Circuit's decision in *In re Initial Public Offering Securities Litigation* ("*IPO*"), Judge Baer found that class-wide issues did not predominate because "widespread knowledge [] would precipitate individual inquiries as to the knowledge of each member of the class." *Id.* at *32 (quoting *IPO*, 471 F.3d 24, 44 (2d Cir. 2006)).

According to *Residential Capital*, knowledge issues predominate—and no class can be certified—where the evidence supports a "reasonably reliable inference" that class members "possessed at least some knowledge" of the allegedly misrepresented "practices," or "at least some awareness of the risk or type of conduct" at issue. *Id.* at *33, 35. Such a reasonably reliable inference of "some awareness" of risk related to mortgage underwriting standards can arise where some putative class members participated in securitizing mortgages, where some had sophistication and experience in the structured finance market generally, and where others may have been exposed to public discussions that "cast increasing levels of doubt" on conformity with "guidelines" and "risk analyses" associated with mortgage-backed securities. *See id.* at *32-36. Judge Baer recognized that knowledge inquiries were relevant to, and would differ among or within, three categories of investors: (1) investors who actively participated in

the securitizing of mortgages; (2) investors who did not participate in the securitization process, but were still sophisticated and experienced in the subprime securities market; and (3) investors who were not experienced in the subprime securities market but may have been exposed to differing levels of public debate about the quality of mortgages that were packaged into mortgage-backed securities.

> A. Under *Residential Capital*, the Court Should Consider Whether the Record Gives Rise to a Reasonably Reliable Inference That Institutional Investors Directly Involved in the Securitization Process Had Some Awareness of the Risks Associated With Conflicts of Interest and Ratings Models.

To assess whether putative class members' experience in the structured finance market raised individualized issues that precluded a predominance finding in *Residential Capital*, Judge Baer examined several putative class members and assessed the available evidence of their experience with respect to the subject securities or securities like them.  Several of those putative class members were found to be so sophisticated, involved and experienced with the securitization process as to preclude class certification.  *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *34-35.  Many of those same entities are also putative class members in this action, including JP Morgan and Blackrock, both of whom held or traded millions of shares of Moody's during the proposed class period.  (*See* Appendix Ex. B; Stulz Exs. 3, 4B.)

Indeed, the putative Moody's shareholder class includes no fewer than eleven large institutions that are currently charged in other pending litigations with having knowingly participated in the same or similar wrongdoing alleged here:  knowledge of the alleged defects in the underlying mortgage pools and corruption of the ratings process.  (*See* Appendix Ex. C.)  In at least three such actions, the same counsel seeking to represent the class in this case have accused putative class members of complicity.

For example, in an amended complaint filed in *Maine State Retirement System* v. *Countrywide Financial Corp.*, No. 2:10-cv-00302 (C.D. Cal. filed Dec. 6, 2010), plaintiff investors charge Deutsche Bank, Morgan Stanley and Goldman Sachs with wrongfully concealing defects in the mortgage-backed securities they underwrote.  These *Countrywide* plaintiffs specifically allege that these same banks not only had detailed knowledge of undisclosed underlying weaknesses in the securitized loans, but also "[e]mployed [r]ating [s]hopping [p]ractices to [e]nsure [i]nflated [i]nvestment [g]rade [r]atings" for the securities.[2] Deutsche Bank, Morgan Stanley and Goldman Sachs are all members of the putative class of Moody's shareholders, with sizable holdings of Moody's shares.  (Appendix Ex. B.)  A similar action was filed in January against putative class member Bear Stearns.  *See In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*, 08 MDL 1963, 2011 U.S. Dist. LEXIS 6026 (S.D.N.Y. Jan. 19, 2011).[3]

Newly public materials released by the Financial Crisis Inquiry Commission in January and February 2011 (the "FCIC Materials") likewise raise knowledge issues with respect to dozens of institutions that (1) populated Moody's shareholder base during the proposed class period; (2) as issuers of mortgage-backed securities, had significant input into the rating process

---

[2]     Second Amended Class Action Complaint Sec. VII G, ¶¶ 171-74.

[3]     In *Countrywide* and *Bear Stearns*, the lawyers for the plaintiffs include Barroway Topaz Kessler Meltzer & Check, LLP, Glancy Binkow & Goldberg LLP and Kirby McInerney LLP, the same lawyers who seek to represent the putative plaintiff class here.  "[T]he class attorney's duty does not run just to the plaintiffs named in the caption of the case; it runs to all of the members of the class"; accordingly, class counsel must "point out conflicts to the court so that the court may take appropriate steps to protect the interests of absentee class members."  *See In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18 (2d Cir. 1986); *cf. Amchem Prods*. v. *Windsor*, 521 U.S. 591, 626 n.20 (1997) ("The adequacy heading [under Rule 23(a)(4)] also factors in competency and conflicts of class counsel.").  Kirby McInerney LLP also serves as counsel in *In re Wachovia Equity Sec. Litig.*, No. 1:08-cv-6171-RJS (S.D.N.Y. filed July 7, 2008), a similar matter brought against putative class member Wachovia Corporation in 2008.

that plaintiffs allege was corrupt; and (3) may have had knowledge that mortgage portfolios did not meet underwriting standards.  (*See* FCIC Materials at *xxv*, 150, 167, 210 and references therein.)

These and other issuer-institutions made up roughly 12% of Moody's shareholder base during the proposed class period.[4]  Thus, the record facts amply support a "reasonably reliable inference" that a significant portion of Moody's shares were held by investment banks that had "at least some knowledge" of the allegedly misrepresented "practices," or "at least some awareness of the risk or type of conduct" at issue.  *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *33, 35.  This, in turn, "provides for unique defenses that require a great deal of individualized evidence," which precludes the predominance finding Rule 23(b)(3) requires.  *Id*. at *31.

---

[4]     Exhibit B to the Appendix reflects the millions of Moody's shares certain entities and/or their successors in interest, or other institutional investors, reported holding from quarter to quarter over the putative class period, to the extent that those entities were filers of those quarterly reports.  Exhibit D to the Appendix identifies 39 entities named in the FCIC Materials as contributors to allegedly flawed if not fraudulent securitization activities.  These Exhibits supplement, but do not materially differ from, collectively, Exhibit 3 to the Stulz Report, which shows the shareholding of the large publicly reporting mortgage-backed securities issuers that held Moody's shares according to the issuers' quarterly filings; and Exhibit 4 to the Stulz Report, which shows the shareholding of the top 20 institutional investors in Moody's, according to their quarterly filings.

Both Exhibit B hereto and Stulz Exhibits 3 and 4 may substantially understate the numbers of allegedly culpable or knowledgeable entities that were Moody's shareholders, and the size of those entities' shareholdings, because (i) not all of the allegedly culpable entities were required to or did file the quarterly reports on which the Exhibits are based and (ii) the reports do not necessarily reflect shareholding between quarters, if no shares were held on the filing date.  Moody's acknowledges that the publicly available data on holdings leave open the possibility that some of these entities might have traded between periods so as to avoid loss on purchases and sales on the whole during the proposed class period.  Further trading data would be needed to establish with certainty whether these entities were "injured," and therefore whether they could come within the proposed class definition of purchasers "injured" by the alleged wrong.  That further data could only be obtained by subpoenaing each entity and analyzing all trading in detail.  The need for that further investor-by-investor inquiry contributes to the predominance of individualized issues.

> **B.     Under *Residential Capital*, the Court Should Consider Whether the Record Gives Rise to a Reasonably Reliable Inference That Other Sophisticated and Experienced Institutional Investors Had Some Awareness of the Risks Associated With Conflicts of Interest and Ratings Models.**

In *Residential Capital,* Judge Baer determined that the inclusion of sophisticated institutional investors in that proposed class likewise raised individualized knowledge issues, even where those investors were not as directly involved in the securitization process as the issuers described above.  For example, Judge Baer observed that a certain investment advisor had "closely followed the subprime market," had "been concerned about the deteriorating underwriting standards over the past few years" and "was aware of these trends through [its] frequent dialogue with loan brokers, lenders, and other industry professionals." *Id.* at *33-34. The advisor's independent analysis, concerns and industry contacts gave it "at least some awareness of the risk or type of conduct that is targeted in this lawsuit." *Id*. at *33.  In sum, Judge Baer explained that with investors like these, "the proposed class would include investors with different levels of knowledge, and . . . individual issues predominate." *Id.* at *38.

Moody's institutional shareholders held upwards of 77% of its shares during the proposed class period, and many had significant experience in evaluating mortgage-backed securities.  (*Compare Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *32-35, *with* Stulz ¶ 51 and Ex. 4; Appendix Ex. B; Defs. Opp. Br. at 3.)  One such institutional shareholder, PIMCO, describes itself as "one of the largest and most experienced managers of mortgage-backed securities in the world."[5]  PIMCO extensively analyzed mortgage-backed securities, using its own models and systems as well as "'old fashioned shoe leather research,' talking to real estate brokers, mortgage brokers, and local investors about the housing and mortgage markets."  (*See*

---

[5]     http://www.pimco.com/Pages/Mortgage-BackedSecurities.aspx (last visited February 3, 2011).

-7-

FCIC Materials at 4.) [6] Based on that independent work, a PIMCO representative reportedly announced to an industry conference in 2005 that rating agencies' methodologies were not sufficiently stringent. (FCIC Materials at 190.) In other words, PIMCO's independent analysis, concerns and industry contacts gave it "at least some awareness of the risk or type of conduct that is targeted in this lawsuit." *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *33. Moody's would be entitled to inquire about how PIMCO and other institutional putative class members assessed the risk that Moody's ratings on mortgage backed securities were flawed. [7]

> **C. Under *Residential Capital*, the Court Should Consider Whether the Record Gives Rise to a Reasonably Reliable Inference That Non-Institutional Shareholders Had Some Awareness of the Risks Associated With Conflicts of Interest and Ratings Models.**

Finally, *Residential Capital* recognized that even unsophisticated and inexperienced investors would be subject to individualized questions about their knowledge of problems with mortgage-backed securities. Such knowledge "can be imputed to investors who purchased at different times because throughout the relevant period more and more information became publicly available, including reports of government actions or investigations, analysts

---

[6] According to PIMCO's website: "[W]e compare our internally created term structure and prepayment model against publicly available Wall Street models daily. This side-by-side analysis is extremely useful in identifying securities with high model risk and also helps us to understand the possible range of outcomes for a security or a portfolio." *See* http://www.pimco.com/Pages/Mortgage-BackedSecurities.aspx (last visited February 3, 2011).

[7] Lazard Asset Management, investment adviser to lead plaintiff Local 282, describes its investment research analysts as "thought leaders from around the world" whose "work on mortgages is a great example of the value a deep industry expertise can have in identifying which investment opportunities offer the best risk/reward profile." *See* http://www.lazardnet.com/lam/global/investment_research.html (last visited February 3, 2011); Ronald Temple, *Clarifying the U.S. Mortgage Crisis: Context and Consequence*s, Lazard Investment Research, 11 (Dec. 2007), http://www.lazardnet.com/lam/us/tpd/pdfs/Inv_Research_Mortgage_Crisis.pdf). In later proceedings, Local 282 would be subject to questioning about Lazard Asset Management's thought leadership on rating agency independence and ratings' reliability.

-8-

reports, news items and raw data." *Id.* at *36. Up to and throughout the relevant period, there was ample public discussion of deteriorating underwriting standards and mortgage fraud (including fraud by issuing banks), which could cast doubt on the reliability of credit ratings. As in *Residential Capital,* all this necessarily "cast increasing levels of doubt" on the quality of highly rated mortgage-backed securities. *Id.* at *36. To know which putative class members harbored those increasingly common doubts, one would have to inquire into each one's exposure and reaction to the "public discussion" as it evolved.

## II.  *RESIDENTIAL CAPITAL* ADDRESSES INTRA-CLASS CONFLICTS THAT PRECLUDE CERTIFICATION.

*Residential Capital* also recognized that differences in knowledge among investors based on their differing roles in the securitization process could result in intra-class conflict. Specifically, Judge Baer considered allegations in a separate pending litigation in which a plaintiff in *Residential Capital* had accused a fellow putative *Residential Capital* class member of knowledge and complicity in related wrongdoing. *See id.* at *34-35. As Judge Baer explained, for the *Residential Capital* class to include an entity that a putative class member elsewhere accuses of contributing to the alleged fraud "would, to say the least, present unique issues." *Id*. at *35.

Certain actions filed after class certification briefing and oral argument in this case show that the putative Moody's shareholder class presents intra-class conflicts similar to those identified by Judge Baer in *Residential Capital*. (*See* Appendix Ex. C.) In *Dexia Holdings* v. *Countrywide Financial Corp.*, No. 650185/2011 (N.Y. Sup. Ct. filed Jan. 24, 2011), putative Moody's class member College Retirement Equities Fund ("College Fund") alleges that Countrywide, which "worked closely with the rating agencies to structure the securitizations to ensure that each tranche of MBS received the desired rating[,]. . . knew or recklessly disregarded

-9-

that the information it provided to the rating agencies materially misrepresented and omitted the true facts about the credit quality of the mortgage pools and that the ratings therefore did not accurately reflect the credit risk of the MBS." [8] Bank of America, a putative Moody's class member that acquired Countrywide in July 2008, is named in the suit as successor-in-interest. Accordingly, Bank of America will be defending against College Fund's claims about an allegedly corrupt ratings process.

Similarly, putative Moody's class member Allstate Insurance Company has filed lawsuits against JP Morgan, Deutsche Bank and Citigroup, alleging fraudulent sales of mortgage-backed securities.[9] In the action against various Deutsche Bank entities, Allstate alleges that "[t]he supposedly-independent ratings given by the major credit rating agencies were based on the loan profiles fed to the agencies by the defendants," who "essentially pre-determined the ratings by feeding garbage into the ratings system." Complaint ¶¶ 123-24, *Allstate Ins. Co.* v. *Ace Sec. Corp.*, No. 650431/2011 (N.Y. Sup. Ct. filed Feb. 18, 2011).

Thus, as in *Residential Capital,* where putative class members accused each other of the same wrong the proposed class would blame on the defendant, the proposed class lacks the cohesion that Rule 23 requires. *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *34-35; *see also Amchem*, 521 U.S. at 626 (decertifying settlement class where "interests of those within the single class are not aligned"); *In re Alstom SA Sec. Litig*., 253 F.R.D. 266, 276 (S.D.N.Y. 2008) (intra-class conflicts bar certification where they "relate to the very subject matter of the suit").

---

[8] *See* Complaint ¶ 49, *Dexia Holdings* v. *Countrywide Fin. Corp.* (N.Y. Sup. Ct. filed Jan. 24, 2011) (Appendix Ex. E).

[9] *Allstate Bank* v. *JPMorgan Chase Bank, N.A.*, No. 650398/2011 (N.Y. Sup. Ct. filed Feb. 16, 2011); *Allstate Ins. Co.* v. *Ace Sec. Corp.*, No. 650431/2011 (N.Y. Sup. Ct. filed Feb. 18, 2011); *Allstate Ins. Co.* v. *CitiMortgage, Inc.*, No. 650432/2011 (N.Y. Sup. Ct. filed Feb. 18, 2011).

### III.   *RESIDENTIAL CAPITAL* REFLECTS THAT CLASS ACTION TREATMENT IS NOT THE SUPERIOR FORM OF ADJUDICATION FOR PREDOMINANTLY SOPHISTICATED INSTITUTIONAL SHAREHOLDERS ALLEGING FRAUD IN CONNECTION WITH MORTGAGE-BACKED SECURITIES.

As Judge Baer explained in *Residential Capital*, the Rule 23(b)(3) requirement that class treatment be the "superior form of adjudication" ordinarily is met where "it allows large groups of claimants to bundle into a single action common claims that are too small to pursue individually." *Residential Capital*, 2011 U.S. Dist. LEXIS 4343, at *38-39. "That purpose is not served where, as here, the proposed class consists of large, institutional and sophisticated investors with the financial resources and incentive to pursue their own claims." *Id.* at *39; *see also Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 269 F.R.D. 252, 259 (S.D.N.Y. 2010). Because some 77% of Moody's shares were held by institutional investors, spread among roughly 400 independent institutions, with the ability and resources to bring their own claims, class treatment is not a superior form of adjudication here.

-12-

\*          \*          \*

For all the foregoing reasons, defendants respectfully request that the Court take notice of *Residential Capital*, recently filed actions by putative Moody's shareholder class members, and newly public record material.

Dated:  New York, New York
        March 3, 2011

/s/ Penny Shane_____
Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Sarah Stoller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's
Corporation and Raymond W. McDaniel, Jr.*