```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/11
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re MOODY'S CORPORATION SECURITIES   :       MEMORANDUM DECISION
LITIGATION                                               :            AND ORDER
                                                         :         07 Civ. 8375 (GBD)
                                                         :
                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GEORGE B. DANIELS, United States District Judge:

      Lead Plaintiffs Teamsters Local 282 Pension Trust Fund ("Local 282"), Charles W.

McCurley, Jr. ("McCurley") and Dr. Lewis Wetstein ("Wetstein") (collectively "Lead

Plaintiffs") bring this putative securities fraud class action pursuant to Sections 10(b) and 20(a)

of the Securities Exchange Act of 1943, 15 U.S.C. §§ 78j(b) and 78t(a) respectively against

Moody's Corporation ("Moody's"). Specifically, Lead Plaintiffs allege that Moody's Investors

Services, Inc, a wholly owned subsidiary of Moody's Corporation, made material

misrepresentations and omissions concerning the conflict of interest in its "issuer-pays" rating

business model and about how Moody's considered originator standards in its rating

methodologies. These misrepresentations and omissions, in turn, are alleged to have artificially

inflated Moody's stock price. Currently before this Court is Lead Plaintiffs' motion for class

certification pursuant to FED. R. CIV. P. 23.

      Lead Plaintiffs seek to certify a class of:

      All persons who purchased or otherwise acquired Moody's Corporation
      ("Moody's") common stock between February 3, 2006 and October 24, 2007
      inclusive (the "Class Period"), and who were damaged thereby.

Pl. Mem. of Law in support of Class Cert. at 1. Plaintiffs' motion is denied.

## I.   Facts[1]

<u>Plaintiffs</u>

There are currently three Lead Plaintiffs: Teamsters Local 282 Pension Trust Fund, Charles McCurley Jr., and Lewis Wetstein M.D.

Teamsters Local 282 Pension Trust Fund owned Moody's stock during the majority of the class period. Of note, throughout the entire class period, Local 282 utilized the services of an investment manager. Ehrenberg Decl. Ex. 46 at 57:6-58:6. The investment manager has complete discretion as to trading activity in equities, the sector mix of assets, the selection of securities, the timing of their transactions and proxy voting authority. <u>Id</u>. at Ex 46 at 57:12-15; Ex. 49 at 3, 7 § M. The investment manager did not have to seek Local 282's approval before it purchased or sold securities. <u>Id</u>. at Ex. 46 at 57:22-58:2. The Pension Funds investment policy statement does place some restrictions on the investment manager's discretion. <u>See id</u>. Ex. 49 at 4, 6-7 ("An Investment Manager shall not hold unsecured fixed income investments in a single company rated AAA").  By September 7, 2007, Local 282 owned no Moody's stock.

Charles McCurley Jr. purchased 2,000 shares of Moody's stock on March 9, 2007. Ehrenberg Decl. Ex. 47. By June 20, 2007, he owned 10,000 shares. <u>Id</u>. By September 4, 2007, he had sold all of his Moody's shares. <u>Id</u>.

Dr. Wetstein owned Moody's stock throughout the class period. After the commencement of this action, Dr. Wetstein purchased additional shares of Moody's stock. Ehrenberg Decl. 45 at 82:14-18. Dr. Wetstein contended that he was seeking to "average cost

---

[1]     While a motion for class certification is "similar in some respects to preliminary issues such as personal or subject matter jurisdiction," a judge may only certify a class after "resolving factual disputes relevant to each Rule 23 requirement." <u>In re Initial Public Offering Securities Litigation</u>, 471 F.3d 24, 40-41 (2d Cir. 2006) ("<u>In re IPO</u>"). In making such determinations, a court can weigh all relevant evidence and consider even those issues that overlap with merit issues. <u>See id</u>. at 41. In weighing such evidence, the court can consider, <u>inter alia</u>, documents, affidavits, or testimony. <u>See id</u>.

down." Id. at 80:20-22. Even though he believed Moody's had committed fraud, he still believed that Moody's was a "big company, that . . . would recuperate." Id. at 81:22-23.

The Alleged Fraud

As is standard in the industry, Moody's is paid for its services only if a particular company chooses to publish its ratings, what is termed the "issuer-pays" model. Consolidated Amend. Compl. ("CAC") ¶ 38. The amount it charges for its rating services depends on the dollar value of the issuance. Id. ¶ 12. Especially in the area of structure finance, rating assignments are controlled by a small number of repeat investors, like investment banks, who could engage in "ratings shopping" by choosing the ratings agency whose rating was the most favorable to the investors. Id. ¶ 43-44, 312-316. Thus, the "issuer-pay" model creates a potential for a conflict of interest because Moody's could issue artificially inflated ratings in order to be selected by an issuer.

Despite this alleged conflict, Moody's established policies to maintain its independence from the issuer entities. See Ehrenberg Decl. Ex. 8 at § 2. Moody's declares that "Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity." Id. at § 2.1. As such, "the Credit Rating Moody's assigns to an Issuer, debt, or debt-like obligation will not be affected by the existence of, or potential for, a business relationship between Moody's and the Issuer," and "the determination of a Credit Rating will be influenced only by factors relevant to the credit assignment." Id. at §§ 2.3-2.4.

The conflict of interest inherent in the issuer-pays model was well-reported in the press for many years prior to the start of the Class Period. In January 2003, the SEC released a report that concluded: "the practice of issuers paying for their own ratings creates the potential for a

3

conflict of interest." Ehrenberg Decl. Ex. 12 at 41. A variety of newspapers and television

programs such as The Economist, The Financial Times, the Wall Street Journal and CNBC's

"Mad Money with Jim Cramer" noted or discussed the potential for conflicts of interest. See id.

at Exs. 25, 27, 29, 31, 34-5, 39.

However, in various public documents and statements, Moody's touted its independence

and objectivity, and the importance of both to its business. See CAC ¶¶ 35-36, 54, 68, 70-71, 73,

76, 80, 83. Despite these statements, Lead Plaintiffs allege that Moody's committed fraud

because it was not operating as an independent and objective rating agency but had issued

artificially inflated ratings because of its desire to acquire an issuer's business. Also, Lead

Plaintiffs claim Moody's did not consider all relevant information, particularly loan originator

standards, in formulating its credit ratings.

Lead Plaintiffs allege that on certain dates in late 2007 and 2008, various regulatory

agencies and newspapers reported that Moody's had engaged in ratings shopping and issued

artificially inflated ratings. See In re Moody's Corp. Securities Litigation, 599 F. Supp. 2d 493,

512 (S.D.N.Y. 2009). For example, the Complaint alleges that in 2008, The Wall Street Journal

reported that Moody's had engaged in ratings shopping and had "relaxed its own standards and

provide[d] ratings it otherwise would not have granted." CAC ¶¶ 347, 363.

## II. Class Certification Standard

Under Rule 23(a) of the Federal Rules of Civil Procedure:

> one or more members may sue or be sued as representatives on behalf of
> all members only if: (1) the class is so numerous that joinder of all members is
> impractiable. [numerosity]; (2) there are questions of law or fact common to the
> class [commonality]; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class [typicality] and (4) the representative
> parties will fairly and adequately protect the interests of the class [adequacy].

FED R. CIV. P 23(A). Lead Plaintiffs must proffer evidence that establishes each Rule 23(a) requirement by a preponderance of the evidence. See In re Flag Telecom Holdings, Ltd. Securities Litigation, 574 F.3d 29, 38-39 (2d Cir. 2009) (citing to Teamsters Local 445 Freight Division Pension Fund v. Bombardier, 546 F.3d 196, 202 (2d Cir. 2008)).

The potential class must also be one of the types of class actions specified in Rule 23(b). See FED. R. CIV. P. 23(B). Here, Lead Plaintiffs allege that the proposed class is the type specified in Rule 23(b)(3). Under Rule 23(b)(3), the court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Id. 23(b)(3). Pertinent to such findings are "(a) the class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum and (d) the likely difficulties in managing a class action." Id. 23(b)(3)(A)-(D).

Defendants do not contest that typicality, numerosity, or commonality are satisfied. This Court finds that Plaintiffs have satisfied that burden. However, Defendants contest the adequacy requirement of Rule 23(a) and the predominance requirement of Rule 23(b).

### III. Adequacy of Representation under Rule 23(a)

Under Rule 23(a)(4), Lead Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4); In re Flag Telecom, 574 F.3d 29, 40 (2d Cir. 2009). This entails a two part inquiry into whether "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In re Flag

Telecom, 574 F.3d at 35 (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). Defendants only contest the first prong.

The focus of the first prong is "on uncovering conflicts of interest between named parties and the class they seek to represent." Id. (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). In order to defeat a class certification motion, such conflicts must be "fundamental." Id. (citing to In re Visa Check/Mastermoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001)). A conflict is fundamental when it "threatens to become the focus of the litigation" and "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to her." Baffa, 222 F.3d at 59-60 (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir.1990)).

In opposition to Lead Plaintiffs' motion, Defendants contend that each named Plaintiff has a unique defense which would become the focus of the litigation. Specifically, Moody's argues that Local 282 and McCurley cannot demonstrate loss causation because they are in-and-out traders, Local 282 lacks standing to sue and that Wetstein is an in-and-out trader who purchased shares after becoming aware of the alleged fraud. See Def. Mem. of Law at 37-40.

## A. Local 282 and McCurley as "in and out traders"

Defendants contend that neither Local 282 nor McCurley can be class representatives because they sold their stock on September 7, 2007 and September 4, 2007 respectively, which is before the first corrective disclosure on October 12, 2007. See Def. Mem. of Law at 38. Lead Plaintiffs contest the date of the first corrective disclosure. They contend it is August 20, 2007, which falls before either Lead Plaintiff sold their stock. See Pl. Reply Mem. of Law at 33-34.

A plaintiff must be able to demonstrate loss causation by showing that their alleged loss was both foreseeable and caused by a materialization of the concealed risk. See In re Flag Telecom, 574 F.2d at 40. If a Plaintiff owns no stock before any corrective disclosures, there cannot be any harm caused by a "materialization of the concealed risk," and thus loss causation cannot be established. See id. Therefore, the relevant issue is whether there was a corrective disclosure on August 20, 2007. See In re Flag Telecom, 574 F.3d at 40-41 (determining the date of the first corrective disclosure on a motion for class certification in order to find whether Lead Plaintiffs were in and out traders).

A corrective disclosure is some public statement, not necessarily from the company itself, which reveals to the market the falsity of a prior representation. See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175, n. 4 (2d Cir. 2005); see also In re Omnicom Group, Inc. Securities Litigation, 597 F.3d 501, 511 (2d Cir. 2010); In re Flag Telecom, 574 F.3d at 40-41 (rejecting Plaintiff's evidence that information leaked into the market "revealed the truth with respect to the specific misrepresentations alleged.") (emphasis added). Here, it must reveal to the market that Moody's was not in fact independent or had misstated its rating methodology. See In re Omnicrom Group, 597 F.3d at 511 ("A fraud regarding a company's financial condition . . .if concealed, may cause investors' losses when disclosure of the fraud is made and the available public information regarding the company's financial condition is corrected.").

In their submission, Lead Plaintiffs identify the first loss causing event as an August 20, 2007 disclosure. [2] See Def. Reply Mem. of Law at 34. On August 20, 2007, Senator Richard Shelby, the ranking member of the U.S. Senate Banking Committee remarked that the U.S. credit

---

[2]     In her opinion on denying Moody's motion to dismiss the complaint, Judge Kram did not opine on whether the August 20, 2007 disclosure could constitute a corrective disclosure. See In re Moody's Corp., 599 F. Supp. 2d 493, 512-513 (S.D.N.Y. 2009) (discussing April 11, 2008, June 2008 and October 22, 2008 as corrective disclosures).

rating agencies must shoulder some responsibility for the subprime mortgage crisis. CAC ¶ 400(e). News coverage of Senator Shelby's statement noted that Moody's was facing Congressional scrutiny regarding the conflicts inherent in its business model. Id. Moody's stock price declined 7.8% that day. Id.  Plaintiffs' expert contends that Senator Shelby's comments are "potentially meaningful" because they indicated that increased regulation of the credit rating agencies enjoyed bipartisan support. Hume Decl. Ex 1 at ¶ 89.

However, this was not the first time that members of Congress expressed concern about the role rating agencies played in the subprime mortgage crisis. See Ehrenberg Decl. Ex. 50 at 47 ¶ 105 (noting that Senator Chris Dodd and Representative Barney Frank had previously announced investigations or legislation regarding the rating agencies conflict).

Senator Shelby's comments did not reveal to the market that Moody's had falsely stated it was independent. The fact that Congress was going to examine the rating agencies' conflicts does not amount to a revelation of the alleged fraud, specifically that Moody's had falsely stated it was independent when it had in fact systematically succumbed to conflicts and issued inflated ratings because of it. See In re Omicron Group, Inc., 597 F.3d at 511-512 (finding that a news article was not a corrective disclosure because it revealed "no hard fact" about the fraud).  A broad call for an investigation into the rating industry's structured finance ratings practices, without more, does not necessarily reveal that there are any problems with the ratings industry since an investigation could turn up nothing of consequence. There was no revelation of new information, nor a factual basis to conclude that Moody's ratings were not independent of any potential conflict of interest. Thus, it cannot serve as a corrective disclosure. See In re Omnicrom Group, 597 F.3d at 510-11 (finding that the resignation of a key employee and subsequent speculation that it was due to the company's aggressive accounting practices was insufficient

because "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.").

Because no corrective disclosure occurred on August 20, 2007, Local 282 and McCurley are "in-and-out traders" who cannot serve as class representatives. See In re Flag Telecom, 574 F.3d at 40-41.

### B. Dr. Wetstein

Dr. Wetstein purchased additional shares of Moody's after the commencement of this action. See Ehrenberg Decl. Ex. 45 at 82:19-23. Defendants contend such a decision implies that he did not rely on the alleged misrepresentations in his initial purchasing decisions.

The decision to purchase shares after a fraud is revealed does not necessarily give rise to such an inference. See In re Monster Worldwide, Inc., 251 F.R.D. at 135 (quoting In re Salomon Analyst , 236 F.R.D. 208, 216 (S.D.N.Y. 2006)). Further, the strategy of cost averaging down is a common investment strategy that decreases the average cost of an investment. It does not in any way implicate a shareholder's initial decision to purchase stock. See Wagner v. Barrick Gold Corp., 251 F.R.D. 112, 117 (S.D.N.Y. 2008) (noting that cost averaging is a common investment strategy). Because Defendants have not established that such post-disclosure purchases subject Dr. Wetstein to a unique defense that in anyway threatens to become the focus of the litigation, this Court does not find that Dr. Wetstein is an inadequate class representative on that basis.

Because there is one adequate representative of the class, Lead Plaintiffs have satisfied the adequacy requirement.

### IV. Predominance under Rule 23(b)

The predominance requirement tests whether the class is "sufficiently cohesive to warrant adjudication by representation." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010). The

requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Id. (citing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir.2002)).  There is no dispute regarding any elements of Plaintiffs' claim besides whether reliance and loss causation satisfy the predominance requirement.

Reliance is an essential element of a 10b-5 action that requires a plaintiff to prove a causal connection between the alleged misrepresentations and plaintiff's injury. See In re Salomon Analyst, 544 F.3d at 480 (quoting Basic v. Levinson, 485 U.S. 244, 243 (1988)). There are two grounds upon which Lead Plaintiffs contend that questions of reliance are common throughout the class, both of which rely on presumptions of reliance. Lead Plaintiffs do not allege any independent basis for determining reliance class-wide. First, Lead Plaintiffs contend that the class is entitled to the Basic fraud-on-the-market theory. Second, Lead Plaintiffs contend that they are entitled to the Affiliated Ute, 406 U.S. 128 (1972), reliance presumption for omissions. Defendants contend individual questions of reliance predominate because (a) the market was well aware of the conflicts of interest inherent in the issuer pays model or, in the alternative, that it rebuts the Basic presumption, (b) Lead Plaintiffs are not entitled to the Basic presumption because they cannot demonstrate materiality, (c) they have proffered sufficient statistical evidence to rebut the Basic presumption and (d) Lead Plaintiffs are not entitled to the Affiliated Ute presumption because Lead Plaintiffs' claims are not based on omissions.

### A. <u>Fraud on the Market Presumption</u>

The first inquiry is whether Lead Plaintiffs are entitled to the <u>Basic</u> presumption. If Plaintiffs are entitled to the presumption and Defendants cannot successfully rebut the presumption, then the predominance requirement is satisfied.

In order to be entitled to the rebuttable reliance presumption, a plaintiff must show that Defendants "(1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient) market." <u>Salomon</u>, 544 F.3d at 481 (quoting <u>Basic</u>, 485 U.S. at 248 n.7). Here, it is undisputed that Moody's statements regarding its independence were "publically made" and that its stock, which traded on the New York Stock Exchange, traded on an impersonal, well-developed market.[3] However, Moody's contends that Plaintiffs cannot demonstrate materiality.

Lead Plaintiffs bear the burden of demonstrating that they satisfy each element of the <u>Basic</u> presumption. <u>See Salomon</u>, 544 F.3d at 483.[4] Lead Plaintiffs must demonstrate materiality by a preponderance of the evidence. <u>See id</u>.

---

[3]     While in their memoranda of law, Defendants do not contest that the New York Stock Exchange ("NYSE") is an efficient market; Defendants' expert notes that Plaintiffs have failed to offer sufficient evidence establishing that the NYSE incorporates new information fully into the stock price. <u>See</u> Ehrenberg Decl. Ex. 50 at 6 n.2. Normally, a court determines market efficiency by examining the <u>Cammer</u> factors. <u>See e.g.</u>, <u>Fogarazzo v. Lehman Bros., Inc.</u>, 263 F.R.D. 90, 102 n. 84. However, the NYSE is a paradigmatic efficient market. <u>See e.g.</u>, <u>Basic</u>, 485 U.S. at 248 n. 29 (assuming that the shares at issue traded on a "well-developed, efficient, and information-hungry market" when they traded on the NYSE).

[4]     Plaintiffs contend that materiality is demonstrated, in part, because Judge Kram previously determined that the statements in the complaint were material. <u>See</u> <u>In re Moody's</u>, 599 F. Supp. 2d. at 508-09. The burden on a 12(b)(6) motion to dismiss is different than a motion for class certification. On a motion for class certification, a court must make "findings" based on introduced evidence. <u>See</u> <u>In re Salomon Analyst Metromedia</u>, 544 F.3d at 482, 486 n.9 (holding that the burden of demonstrating materiality must be beyond prima facie); <u>Berks County Employees' Retirement Fund v. First American Corp.</u>, 734 F. Supp. 2d 533, 539 (S.D.N.Y. 2010)). Therefore, Judge Kram's materiality determination is not singularly determinative on this motion.

A misrepresentation is material: "if a reasonable investor would think that the information would have 'significantly altered the 'total mix' of information,'" id., or that a reasonable shareholder would consider it important in deciding how to act, ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009). Information already known to the market is immaterial. Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000); In re Merrill Lynch Auction Rate Sec. Litigation, 2010 WL 1257597, at *16 (S.D.N.Y. Mar. 31, 2010). However, materiality is not definitively established by an impact on price alone, rather it is an inquiry that looks at all the facts and circumstances of a particular case. In re Sadia, S.A. Securities Litigation, 269 F.R.D. 298, 302 (S.D.N.Y. 2010).

Plaintiffs' own expert concludes that any change in the price of Moody's stock upon a misrepresentation "would only make sense if the misstatements and/or omissions would be expected to surprise the market. In this circumstance, Moody's making statements about the independence and integrity of its rating is what the market had come to expect and reflected the status quo. Therefore, one would not expect to observe a substantial change in value when these statements were made." Hume Decl. Ex. 1 at 36 ¶ 85. The fact that the misrepresentations "reflected the status quo" strongly cuts against finding that the misrepresentations are material. However, given that the potential for conflicts was well known in the market place, reassuring statements by Moody's that it was independent and managing conflicts would have been important to a reasonable investor, who was already naturally concerned about the potential for conflicts. Thus it would have "substantially altered the total mix of information in the market place." See Salomon, 544 F.3d at 483. As to Moody's rating methodologies, its statements that it considered originator standards is material because statements about what and how a rating agency considers in determining its ratings, its core business, is of substantial importance to a

reasonable investor. Because the alleged misrepresentations were material, publically made and the stock traded on an efficient market, Plaintiffs have satisfied that burden. [5]

Defendants bear the burden of rebutting the presumption by a preponderance of the evidence. "Any showing that severs the link between the alleged misrepresentation and the price will suffice to rebut the presumption of reliance." Salomon, 544 F.3d at 484. "A successful rebuttal *defeats* class certification by defeating the Rule 23(b)(3) predominance requirement." Id. (citing to Basic, 485 U.S. 249 n.29) (emphasis in the original); see also, In re American Intern. Group, Inc. Securities Litigation, 265 F.R.D. 157, 180 (S.D.N.Y. 2010) (denying class certification when defendants successfully rebutted the fraud on the market presumption). A showing that the misrepresentations did not lead to a distortion in price is sufficient to rebut the presumption. See Basic, 485 U.S. at 248. Similarly, a showing that there was no price decrease when the misrepresentations were disclosed is evidence that the stock price was not artificially inflated by the introduction of the misrepresentation in the market. [6] See In re AIG, 265 F.R.D. at

---

[5]      Defendants point to two recent motion to dismiss decisions in this district that held that rating agencies' statements about their independence were immaterial. See New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland, 720 F. Supp. 2d 254, 272(S.D.N.Y. 2010); In re Lehman Brothers Securities and ERISA litigation, 684 F. Supp. 2d 485 (S.D.N.Y. 2010). Both cases involve offering documents that failed to disclose the potential for conflicts inherent in the rating process. See New Jersey Carpeteners' Vacation Fund, 272; In re Lehman Brothers Securities, 684 F. Supp. 2d at 492. In New Jersey Carpteners, Judge Baer concluded that the omissions were not material because "a reasonable investor would be expected to know that the rating agencies were paid by the investment banks that hired them." 720 F. Supp. 2d at 272. In in re Lehman Brothers, Judge Kaplan similarly concluded that the omissions were not material because the idea that the rating agency operated under a conflict of interest was well known in the market. 720 F. Supp. 2d at 492. The fraud theories in this case are substantially different. In those two cases, the public had actual knowledge of the information allegedly omitted. Here, the public was only aware that there was a potential for conflicts. Therefore, these decisions do not impact this analysis.

[6]      In their papers, Plaintiffs' repeatedly emphasis that they do not bear the burden of showing an impact on price. This is indeed true. The reality is, however, that Defendants bear the burden of rebutting the presumption and Plaintiffs have the opportunity to rebut the rebuttal. See

182. Defendants allege that the presumption is rebutted because the market had knowledge of the potential conflicts and because there is no statistically significant link between changes in the price of Moody's stock and any alleged misrepresentation.

### 1. Knowledge

Relying heavily on IPO, Defendants allege that individual questions predominate and no class can be certified because the market was well aware of the conflicts. See Basic, 485 U.S. at 248 (explaining that there is a lack of impact on the market when market makers are privy to the truth).[7]

Even under IPO, Defendants have not defeated class certification by demonstrating the market was aware of the potential for conflicts. In IPO, Plaintiffs' central allegation was that the "underwriters conditioned allocations of shares at the offer price on agreements to purchase shares in the aftermarket." Id. at 27. The Second Circuit concluded that "obviously the initial IPO allocants, who were required to purchase in the aftermarket, were fully aware of the obligation that is alleged to have artificially inflated share prices. Those receiving or seeking [initial stock] allocations number in the thousands." Id. at 43. The court noted that over 11,000 institutions were alleged to have entered into such aftermarket purchase agreements. Id. at 43 n. 13. The court also noted that two cable channels had reported on the aftermarket purchase requirement. Id. at 43. Because of the "broad extent of knowledge of the scheme throughout the

---

e.g., In re AIG, 265 F.R.D. at 182-188 (comparing the conclusions of Plaintiffs' and Defendant's experts to determine whether the fraud on the market presumption is rebutted).

[7] Defendants appear to contend that this knowledge preclude class certification regardless of whether the fraud on the market presumption applies. See Def. Mem. of Law at 16-18. They point to no cases that analyzed the question of knowledge prior to a determination of whether the fraud on the market presumption applied. See e.g., In re IPO, 471 F.3d at 42-43 (discussing individual questions of reliance only after determining that the Basic presumption did not apply).

community of market participants and watchers," individual questions predominated and the class as defined could not be certified. Id. at 43-44.

It is undoubtedly true that the market was well aware of the potential for conflicts. The conflicts inherent in the issuer pay model were well known and well reported. Defendants offer substantial evidence on this point. See Ehrenberg Decl. Exs. 12, 13, 15-40, 50 ¶¶ 8, 38-50.

Unlike in IPO, however, Defendants do not offer evidence that it was well known and well reported that Moody's not only did "succumb" to these conflicts of interest, but issued overinflated ratings as a result. This is the heart of Plaintiff's Rule 10b claim. For example, in the SEC's "2003 Report on the Role and Function of Credit Rating Agencies in the Operation of Securities Market," the SEC noted that "while the issuer-fee model naturally creates the potential for conflict of interest and rating inflation, most were of the view that this conflict is manageable and, for the most part, has been effectively addressed by the credit rating agencies." Ehrenberg Decl. Ex. 12 at 23. A 2001 article in Euromoney noted that "of course, the suggestion that rating agencies may be trying too hard to please issuers – at the expense of investors – is one that the agencies categorically deny. 'What counts at the end of the day is our credibility with investors.' Says Michael West, senior credit officer at Moody's." Id. Ex 20 at 2. A 2004 "Washington Post" article noted that "Industry insiders say the desire of a rater to hold on to a paying client – or recruit a new one – at times has interfered with the objectivity of a rating." It goes on to note that "for their part, the credit raters say they ably manage potential conflicts. They say they adhere to strict codes of conduct, such as prohibiting any link between the pay and bonuses of their rating analysts and the fees that come in from the companies those analysts rate." Id. Ex 25 at 2. In a 2006 article in "The Deal," the author notes that "the agencies have also been criticized for obvious conflicts of interest that aren't unique to their industry. . . . Critics doubt just how

15

independent such ratings are. Critics also worry that agencies could potentially use nonpublic

information that is used to determine ratings for insider trading or to benefit other clients. The

agencies' defense: Because each company represents such a small percentage of their total

revenue, they have no incentive to compromise their reputation of independence." Id. Ex. 32 at

1-2.

What these articles demonstrate over and over again is that the market was well aware of

the potential for conflicts, but each time the rating agencies assured investors that the conflicts

were either being managed or negligible. Moody's does not point to anything that rises to the

same level of actual knowledge or, even a reasonable inference of such knowledge, that the

market had in IPO, where tens of thousands of investors and institutions had actual knowledge of

the after-market purchasing requirements and the media had reported on the exact scheme at

issue. In re IPO, 471 F.3d at 43.[8] Therefore, this argument does not rebut the Basic presumption,

nor does it independently defeated class certification by demonstrating that individual questions

predominate.[9] See id., Lapin, 254 F.R.D. at 184.

---

[8]      Moody's does present a compelling case that a small portion of the class had knowledge
of the alleged fraud akin to the knowledge in IPO.  Those institutions who sought ratings from
Moody's would have had actual knowledge that Moody's was not independent and issuing
artificially inflated ratings. The complaint itself asserts this point. It alleges that because there
were a small number of issuers, they knew how to game the system and exerted their influence to
get better ratings from Moody's. See CAC ¶¶ 319, 321, 350. There is a reasonable inference that
these institutions had sufficient knowledge to warrant individualized inquires. However, these
institutions make up only 12% of the putative class. If only 12% of the class has such knowledge
and the other 88% traded in ignorance, individual questions of knowledge do not "predominate"
over common questions. While these institutions should not be included in the class, it does not
necessarily follow that no class could be certified.

[9]      Defendants point to the Second Circuit's decision in McLaughlin v. American Tobacco
Co., 522 F.3d 215 (2d Cir. 2008) for the proposition that common questions do not predominate
when "a substantial number of class members were on notice of defendants' alleged fraud before
the class period." Id. at 233. McLaughlin involved a consumer goods fraud and it draws a sharp
distinction between securities cases where information is being absorbed instantaneously by the

### 2. The Event Studies

Also, in an attempt to rebut the <u>Basic</u> presumption, Defendants contend that there is no link between the misrepresentations and the price of Moody's stock because there is no statistically significant change in Moody's value when any alleged misrepresentation was made. Such a showing would rebut the presumption. <u>See</u> <u>Salomon</u>, 544 F.3d at 484, <u>In re AIG</u>, 265 F.R.D. at 182-188; <u>Fogarrazzo</u>, 263 F.R.D. at 106. For the most part, the parties do not dispute the methods and findings of the two introduced experts. They only contest the conclusions that should be drawn from their findings.

In support of their opposition, Defendants offer Dr. Rene Stulz's "event study," which is the usual method by which a party seeks to prove that a misrepresentation did not cause a statistically significant change in price. <u>See e.g.</u>, <u>In re AIG</u>, 265 F.R.D. at 180. He created a model that found the impact of a misrepresentation on the price of Moody's stock by controlling for other market- and industry-wide variables. Ultimately, Dr. Stulz concluded that: "during the entire purported Class Period, there is no day on which Plaintiffs allege Moody's made a misstatement that is associated with a statistically significant and positive abnormal return."[10] Ehrenberg Decl. Ex. 50 at 30 ¶ 63. Further, as to the alleged corrective disclosures, Dr. Stulz concludes that "of the four alleged disclosure days specifically mentioned by the Opinion and Order, only May 21, 2008 is associated with a statistically significant negative stock price

---

market, and consumer goods cases where consumer information is being absorbed much more sporadically and inconsistently. <u>See</u> <u>McLaughlin</u>, 522 F.3d at 224.

[10] Stulz lists April 1, 2003, June 2, 2005, March 1, 2006, March 23, 2006, March 1, 2007, March 22, 2007, April 2, 2007 and October 3, 2007 as days of potential misrepresentation. <u>Id.</u> at 30 n. 94. On June 2, 2005, when Moody's published its 2005 Code of Professional Conduct, the change in Moody's stock price attributable to that publication was a decrease of .30%. <u>Id.</u> at Ex. 6. Similarly, on March 22, 2007, when Moody's published its 2006 report to shareholders and commented that revenue growth was tied to its independence, the change in the stock price attributable to that statement was a decrease of .05%. <u>Id.</u>

movement, while the October 12-17, 2007, April 11, 2008, and October 22, 2008 disclosures are not." Id. ¶ 102.

However, Sultz does find a statistically significant return on three alleged disclosure days. On August 20, 2007, Senator Shelby's August 20, 2007 remarks caused a 8.18% drop in Moody's price. On October 25, 2007, after Moody's reported its second quarter financial outlook, the stock price dropped 5.66% drop. Finally, on May 21, 2008, the *Financial Times* reported that Moody's misrated billions of dollars of constant proportion debt obligations due to a computer glitch in its model, which caused a 15.92% in Moody's stock price.

In response, Plaintiffs offer the expert report and event study of Chad Coffman. See Hume Decl. Ex 1. Mr. Coffman also uses a similar statistical model that like Dr Stulz's controls for market and industry factors. See id. at 91. Mr. Coffman does not contest Stulz's methodology or findings with regards to the impact of the alleged misrepresentations on the price of the stock. In fact, he contends that Dr Stulz's conclusions regarding Moody's misrepresentation "would only make sense if the misstatements and/or omissions would be expected to surprise the market. In this circumstance, Moody's making statements about the independence and integrity of its rating is what the market had come to expect and reflected the status quo. Therefore, one would not expect to observe a substantial change in value when these statements were made." Id. at 36 ¶ 85. In other words, Plaintiffs' own expert concludes that there is no link between the price of Moody's stock and any of the alleged misrepresentations because these misrepresentations just reflected the "status quo."

While it may not be determinative on a materiality determination, this conclusion does not comport with the premise of the fraud-on-the-market theory. The fraud on the market presumption is based upon the notion that the market was feed misinformation, absorbed that

information and the stock price increased because of that misinformation. See Basic, 485 U.S. at

242. By Plaintiffs' own admission, the misinformation Moody's allegedly provided the market

did not cause any such inflation. Ultimately, Plaintiffs do not offer any evidence rebutting Dr.

Stulz's conclusion that there is no day when Moody's is alleged to have made a material

misrepresentation that caused a statistically significant increase in the price.

As to the corrective disclosures, Coffman, like Sultz, finds a statistically significant

abnormal return on August 20, 2007 and May 21, 2008, the first of which is not a corrective

disclosure date and the second date is outside of the class period.[11]  Coffman then indicated that

because Plaintiffs need not prove loss causation at this stage, he will not opine on the rest of

Stulz's report. Id. at 43 ¶ 100.

Defendants have successfully rebutted the fraud on the market presumption. To a proper

confidence level, Defendants have demonstrated, and Plaintiffs have not rebutted, that there is no

date on which any alleged misrepresentation caused a statistically significant increase in the

price. In other words, Defendants have severed the link between the misrepresentation and the

price by showing that the allegedly false information the market was absorbing was not causing

the stock price to artificially inflate.

However, there is evidence that on August 20, 2007 and May 21, 2008 there was a

statistically significant decrease in the price of Moody's stock. However, this Court has

previously determined that there was no corrective disclosure on August 20, 2007 and therefore

it cannot serve as a basis for certifying the class. Further, the other days, October 25, 2007 and

---

[11]     On sur-reply, Coffman alleges that an August 13, 2007 USA today article, which noted
that regulators were examining credit rating agencies and their rating of "risky products" caused
a significant negative return at the 90% confidence level. See Hume Reply Decl. Ex. 1 at 32 ¶ 67.
This is below the conventional statistical measure of a 95% confidence level and therefore is not
sufficient evidence of a link between the corrective disclosure and the price. See In re AIG, 265
F.R.D. at 187 (concluding, after an extensive discussion of the literature and expert testimony,
that the presumption was rebutted for dates with a 95% confidence level).

May 21, 2008 fall outside of the class period and cannot serve as a basis of proving a link between the misrepresentation and the price for the class as Plaintiffs seek to define it. See In re AIG, 265 F.R.D. at 182, 188 (certifying a class only on those days where there was a statistically significant decline in the price).

Based on the motion currently before this Court, there is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price. Thus, the reliance presumption for the class as Lead Plaintiffs have defined it is successfully rebutted and the class cannot be certified. In re Salomon, 544 F.3d at 484 (citing to Basic, 485 U.S. 249 n.29); see also, In re American Intern. Group, Inc. Securities Litigation, 265 F.R.D. 157, 180 (S.D.N.Y. 2010).

### B. Affiliated Ute Presumption

Alternatively to the fraud on the market presumption for material misrepresentations, Lead Plaintiffs contend that they are entitled to the omission[12] reliance presumption under Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128 (1972). For claims "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite of recovery." Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 109 n.5 (2d Cir. 2005) (citing Affiliated Ute, 406 U.S. at 153). Rather, all that needs to be shown is that the "facts withheld be material in the sense that a reasonable investor might have considered them important in making [their] decision." Affiliated Ute, 406 U.S. at 153-154. However, the presumption does not apply when the omissions merely "exacerbate the misleading nature of the 'alleged conduct.'" Starr ex

---

[12]   An omission can be both a failure to disclosure or a materially misleading statement. See In re Morgan Stanley Information Fund Securities Litigation, 592 F.3d 347, 361 (2d Cir. 2010). For an omission to be actionable under the securities law, a corporation must have an affirmative duty to disclose the omitted fact. Id.

rel Estate of Sampson, 412 F.3d at 109 n.5; In re Merrill Lynch Auction Rate Securities

Litigation, 704 F. Supp. 2d 378, 397 (S.D.N.Y. 2010) but see Fogarazzo, 263 F.R.D. at 106

(finding that the Affiliated Ute presumption applied when "plaintiffs alleg[e] claims based on the

omission themselves.")

      In her opinion on Defendants' motion to dismiss, Judge Kram did not identify a single

omission, rather, her opinion speaks of misrepresentations and misleading statements. See In re

Moody's Corp., Securities Litigation, 599 F. Supp. 2d 493, 507-511 (S.D.N.Y. 2009). However,

in determining which statements were actionable and which were not actionable, Judge Kram

determined that most, if not all, of Plaintiff's alleged misleading statements were inactionable.

See id. at 510-511.  Those that remained were all misrepresentations. See id. at 510. ("The

*misrepresentations* regarding the ratings methodology also meet the materiality standard.")

(emphasis added).

      In their papers, Lead Plaintiffs only point to Judge Kram's determination about Moody's

rating methodologies and contend that this was a material omission. The essence of this claim is

that Moody's represented that it "conducted further independent and qualitative assessments of

loan originator standards" when in actuality its evaluation of originator standards "[was] a sham,

wholly devoid of substance." CAC ¶ 111, 115. In other words, Plaintiffs are claiming that

Moody's made representations about the quality of their examination that was the exact opposite

of what it was in reality. See id., In re Moody's Securities Litigation, 599 F. Supp. 2d at 502-03.

These are plainly not omissions. See Starr ex rel Estate of Sampson, 412 F.3d at 109 n. 5. In

Starr ex rel., the Second Circuit rejected the application of the reliance presumption to

misleading statements that left investors with an overall "false impression." See id. This is

substantially similar to the claims here where Moody's statements left investors with an

allegedly false impression of the quality and thoroughness of Moody's examination into loan originator standards.

Judge Kram's opinion and the language of the complaint support this conclusion. Judge Kram held that "the misrepresentations regarding ratings methodology also meet the materiality standard." She does not identify any separate actionable omission or materially misleading statement. Id. The complaint discusses Moody's "material misrepresentations" regarding its rating methodologies. See e.g., SAC ¶ 111, (describing statements Moody's made about its methodology and concluding "on the contrary, throughout the class period, Moody's made similar representations), 114 ("But, throughout the class period, Moody's (mis)represented that it was keeping a close eye on those very standards"), 122 ("further badges of Moody's material misrepresentations by purposeful avoidance of conventional ratings methods.").

Because this is a case that is primarily built around misrepresentations, and omissions, if any, merely serve to exacerbate and bolster their misrepresentation claims, Lead Plaintiffs are not entitled to the Affiliated Ute presumption of reliance. Therefore, this cannot serve as a basis of establishing reliance on a class-wide basis.

Without either the Basic or Affilitated Ute presumptions, Plaintiffs are unable to satisfy their burden of proving that common questions of reliance predominate and class certification must be denied. See Salomon, 544 F.3d at 484.

## V. Conclusion

Plaintiffs' motion for class certification is denied.

Dated: March 31, 2011
      New York, New York

SO ORDERED:

GEORGE B. DANIELS
United States District Judge