*CORRECTED COPY*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                        :

IN RE: MOODY'S CORPORATION
SECURITIES LITIGATION          :    DOCKET NO. 07-cv-8375-GBD

-------------------------------------------------------x

## MOODY'S DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Sarah Stoller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's Corporation
and Raymond W. McDaniel, Jr.*

September 16, 2012

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL HISTORY..........................................................................................4

FACTUAL BACKGROUND .......................................................................................8

SUMMARY JUDGMENT STANDARD.....................................................................13

ARGUMENT ...............................................................................................................14

I.  THERE IS NO RECORD EVIDENCE THAT MOODY'S
    SYSTEMATICALLY SUCCUMBED TO ISSUER PRESSURE IN
    PROVIDING RATINGS ......................................................................................14

II. THE RECORD ESTABLISHES THAT THE ALLEGED "MISSTATEMENTS"
    WERE IMMATERIAL IN ANY EVENT........................................................16

    A.   The Absence of Price Impact From the Alleged Misstatements
         Establishes the Immateriality of Those Statements ...............................17

    B.   The Importance of the Subject Matter of the Alleged Misstatements Is
         Unrelated to the Materiality of the Particular Statements at Issue.........20

III. THE RECORD FURTHER ESTABLISHES THAT PLAINTIFFS DID NOT
     RELY, DIRECTLY OR INDIRECTLY, ON THE ALLEGED
     MISSTATEMENTS IN PURCHASING THEIR STOCK................................20

    A.   Plaintiffs Cannot Invoke the *Basic* Presumption Because There Is No
         Evidence That the Alleged Misrepresentations Were Material .............21

    B.   The *Basic* Presumption Is Rebutted by Moody's Stock Price History and
         by Market Makers' Knowledge ..............................................................21

    C.   Plaintiffs Cannot Invoke *Affiliated Ute* Because Their Claims Are Based
         on Alleged Misrepresentations, Not Omissions......................................23

IV. THE RECORD ALSO ESTBALISHES THAT THERE IS NO TRIABLE
    ISSUE OF FACT AS TO LOSS CAUSATION................................................24

    A.   The Premise of Plaintiffs' Loss Causation Theory Is Refuted by Patterns
         of the Financial Crisis and Moody's Revenue Streams .........................26

    B.   There Is No Evidence That the Alleged "Loss Causation Events" Were
         Caused by the Alleged Fraud..................................................................28

CONCLUSION.............................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated Ute Citizens* v. *United States*,
    406 U.S. 128 (1972)........................................................................................7, 19, 21, 24

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)............................................................................................. *passim*

*Celotex Corp.* v. *Catrett*,
    477 U.S. 317 (1986)...................................................................................................13, 25

*Daubert* v. *Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).............................................................................................26, 29, 35

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)........................................................................................................24

*ECA & Local IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).......................................................................................16, 20

*FindWhat Investor Group* v. *FindWhat.com*
    658 F.3d 1282 (11th Cir. 2011) ....................................................................................18

*Fisher* v. *Plessey Co.*,
    103 F.R.D. 150 (S.D.N.Y. 1984) ..................................................................................17

*Fogarazzo* v. *Lehman Bros., Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................................17

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..........................................................................................17

*Garber* v. *Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008).........................................................................33

*Gordon Partners* v. *Blumenthal*,
    No. 02 Civ. 7377, 2007 U.S. Dist. LEXIS 35895 (S.D.N.Y. May 16, 2007).............25, 32, 36

*Heil* v. *Lebow*,
    No. 91 Civ. 8656, 1994 U.S. Dist. LEXIS 16236 (S.D.N.Y. Nov. 14, 1994) .........................16

*In re AIG Inc. Sec. Litig.*,
    265 F.R.D. 157 (S.D.N.Y. 2010) ..................................................................................22, 23

*In re AOL Time Warner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)..........................................................................33

*In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*,
   250 F.R.D. 137 (S.D.N.Y. 2008) ................................................................................18, 19, 22

*In re DVI, Inc. Secs. Litig.*,
   No. 2:03–cv–05336, 2010 U.S. Dist. LEXIS 92888 (E.D. Pa. Sept. 3, 2010) .......................35

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)..................................................................................................37

*In re ICN/Viratek Sec. Litig.*,
   No. 87 Civ. 4296, 1996 U.S. Dist. LEXIS 4407 (S.D.N.Y. July 15, 1996)............................16

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005)..................................................................................33

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ..................................................................................*passim*

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009)....................................................................................6

*In re Moody's Corp. Sec. Litig.*,
   No. 07-cv-08375 (S.D.N.Y.)........................................................................................5, 7, 14

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................................*passim*

*In re Omnicom Group, Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)......................................................................25, 32, 36

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007)..................................................................................33

*In re Salomon Analyst Metromedia Litig.*,
   544 F.3d 474 (2d Cir. 2008)........................................................................................21, 22

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011)..................................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011)......................................................................24, 25, 30

*In re Williams Sec. Litig.–WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ..........................................................................................35

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288, 2005 U.S. Dist. LEXIS 2603 (S.D.N.Y. Feb. 22, 2005) ...........................16

*Lawrence* v. *Cohn*,
   325 F.3d 141 (2d Cir. 2003)................................................................................................14

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .......................................................................... *passim*

*Longman* v. *Food Lion*,
    197 F.3d 675 (4th Cir.1999) .................................................................................23

*Lynch* v. *Trek Bicycle Corp.*,
    374 F. App'x 204 (2d Cir. 2010) .................................................................31, 38

*Lyons* v. *Lancer Ins. Co.*,
    681 F.3d 50 (2d Cir. 2012) ...................................................................................13

*Masters* v. *GlaxoSmithKline*,
    271 F. App'x 46 (2d Cir. 2008) ...........................................................................33

*McPherson* v. *N.Y. City Dep't of Educ.*,
    457 F.3d 211 (2d Cir. 2006) ................................................................................13

*Nach* v. *Huber*,
    No. 07-cv-04071 (N.D. Ill.) ....................................................................................5

*New Orleans Emples. Ret. Sys.* v. *Omnicom Group, Inc.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................................13

*Rasking* v. *Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) ...................................................................................26

*Salahuddin* v. *Goord*,
    467 F.3d 263 (2d Cir. 2006) ................................................................................13

*Sciallo* v. *Tyco Int'l*,
    No. 03 Civ. 7770, 2012 U.S. Dist. LEXIS 96967 (S.D.N.Y. July 9, 2012) ......................25, 26

*Solow* v. *Citigroup, Inc.*,
    No. 10 Civ. 2927, 2012 U.S. Dist. LEXIS 70022 (S.D.N.Y. May 18, 2012) ........................34

*Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) ................................................................................23

*Titan Pharms. & Nutrition, Inc.* v. *Med. Shoppe Int'l, Inc.*,
    No. 05 Civ. 10580, 2006 U.S. Dist. LEXIS 11616 (S.D.N.Y. Mar. 30, 2006) ......................24

*Wills* v. *Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ...................................................................26, 29, 35

*Wilson* v. *Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981) ...................................................................................23

**STATUTES**

Credit Rating Agency Reform Act of 2006, 15 U.S.C. § 78o-7 *et seq*............................................9

15 U.S.C. § 78o-7(a)(1)(B)(vi) ...........................................................................................................9

**RULES**

Fed. R. Civ. P. 23(f)............................................................................................................................7

Fed. R. Civ. P. 56..............................................................................................................................13

Fed. R. Evid. 702 .............................................................................................................................26

Defendant Moody's Corporation ("Moody's" or the "Company") and individual defendant Raymond W. McDaniel, Jr. (together, "defendants") respectfully submit this memorandum of law in support of their motion for entry of summary judgment dismissing the consolidated amended complaint of Teamsters Local 282 Trust Fund, Charles W. McCurley, Jr. and Lewis Wetstein (together, "plaintiffs").

## PRELIMINARY STATEMENT

Having sought unsuccessfully to proceed on behalf of a class of shareholders who purchased Moody's stock, plaintiffs in this action have chosen to pursue individual claims. Plaintiffs contend that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by issuing false statements concerning the independence of Moody's rating practices for structured finance securities.  At their most specific, plaintiffs assert that Moody's falsely claimed to manage the conflicts of interest that arise from the "issuer pays" business model—a model Moody's has followed openly since the 1970s (as do other major rating agencies).  According to plaintiffs, Moody's stock price declined during 2007 and 2008 because it was "revealed" through "corrective disclosures" that (i) Moody's had not managed these conflicts and thus (ii) Moody's rating practices were not independent or objective.

Like other investors affected by the financial crisis, Moody's shareholders saw the value of their stock decline during a market crash of historic scale that gripped the country.  In times of financial upheaval, it is not surprising that investors look for someone to blame.  But there is no evidence to support plaintiffs' claim that their losses were caused by alleged "misstatements" by Moody's concerning the Company's "independence" or "integrity," rather than resulting from the nationwide financial crisis.

When plaintiffs first filed their complaint as a putative class action in 2007, they alleged that Moody's July 10, 2007 downgrade of certain mortgage-backed securities "shocked

investors" by revealing that the original ratings had not reflected true credit risk.  Plaintiffs

subsequently abandoned that allegation to support a theory of loss, instead searching Moody's

stock price history for drops in price, and claiming that almost every decline resulted from a

"corrective disclosure" of some fraud by the Company.  This Court and plaintiffs' own expert,

however, rejected one after another of these "corrective disclosures."  Indeed, when plaintiffs

moved this Court in January 2010 to certify a class of all individuals who had purchased

Moody's common stock during the period of February 3, 2006 through October 24, 2007,

plaintiffs could not link any decline in Moody's stock price during the class period to any alleged

misstatement or correction.  Accordingly, in a decision dated March 31, 2011, the Court

correctly found that the lack of linkage made a class-wide presumption of reliance under *Basic

Inc*. v. *Levinson* unavailable.  Because individual questions of reliance would therefore

predominate over common ones, no class could be certified.  The Second Circuit declined

plaintiffs' request to appeal this Court's decision.

      Thereafter, by agreement of the parties, the Court issued a scheduling order for

supplemental discovery followed by summary judgment briefing concerning three separate and

independent elements of plaintiffs' securities fraud claim:  materiality, reliance and loss

causation.  During this supplemental discovery period, plaintiffs developed no additional factual

evidence.[1]  Plaintiffs did submit a report from their putative expert, Mr. Chad Coffman.  That

report is virtually identical to the one Mr. Coffman submitted in support of plaintiffs' motion for

class certification.

---

[1]    The parties agreed and the Court ordered that the parties move forward on these three
elements for purposes of efficiency.  With respect to these three elements, many issues
that the Court needs to consider now mirror ones the Court already considered in the
context of class certification.  Should the Court find that plaintiffs have not met their
burden on any one of these elements, then defendants are entitled to entry of summary
judgment at this juncture.

The legal questions here encompass many considered by the Court at the class certification stage, and the key considerations are identical, particularly regarding whether the alleged "misstatements" impacted Moody's stock price and whether the alleged "disclosures" were connected to the alleged fraud.  To permit this action to proceed past summary judgment on the basis of the same expert analysis found insufficient at class certification, this Court would in effect have to overturn itself.  Plaintiffs can offer no basis for the Court to do so.  Plaintiffs cannot present sufficient evidence to allow a reasonable jury to find any of the following required elements:  that (i) the alleged misstatements added material information to the public debate; (ii) the alleged misstatements artificially increased Moody's stock price; or (iii) the alleged fraud was the cause-in-fact of declines in Moody's stock price amidst the turmoil of the financial crisis.

*First*, the record evidence establishes that the alleged misstatements injected nothing new into the total mix of available information to the market, which was well aware of both the conflicts of interest inherent in the issuer-pays model employed by Moody's and of Moody's own views on its independence.  Indeed, as this Court already found, the information in the alleged misstatements is what the market had come to expect and "reflected the status quo." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011).

*Second*, there is no evidence that the alleged misstatements artificially increased Moody's stock price.  Plaintiffs invoke the same "disclosures" that the Court already considered on the motion for class certification to establish reliance on an allegedly inflated stock price.  Those disclosures are not "corrective disclosures" because they contained no new information and did not in fact disclose any alleged fraud.  *See id.* at 493.  Plaintiffs can present no new information or analysis to justify reversal of this Court's findings.

*Third*, plaintiffs have no evidence that the alleged fraud was the cause-in-fact of any declines in Moody's stock price. Again, the "disclosures" on which plaintiffs rely cannot properly be offered to demonstrate loss causation because they did not provide any new information to the market regarding the alleged fraud. These disclosures are not connected to the alleged fraud of "succumbing to conflicts" or to the decline in Moody's stock price. Plaintiffs' expert attempts to "work around" this fatal flaw by assuming a causal link between the alleged fraud and stock price decline, and ignoring confounding factors. Of course, an expert's conjecture satisfies neither the evidentiary standard set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), nor plaintiffs' burden.

Plaintiffs must be able to establish every element of their claim, including each of the three currently before this Court for consideration. Plaintiffs cannot establish even one of those three. The Court should enter summary judgment in favor of defendants.

## PROCEDURAL HISTORY

***Plaintiffs and Their Original Complaint.*** Plaintiffs here are Teamsters Local 282 Trust Fund ("Local 282"), Charles W. McCurley, Jr. ("McCurley") and Lewis Wetstein ("Wetstein"). Local 282 purchased shares of Moody's stock on February 12, 2007 and sold them on or before September 7, 2007. (Defendants' Local Civil Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried ("Def. 56.1") ¶¶ 8-9.) Wetstein purchased shares of Moody's stock on June 25, 2007 and August 18, 2008 and sold them on or before October 6, 2008. (Def. 56.1 ¶¶ 6-7.) McCurley purchased shares of Moody's stock on March 9 and March 12, 2007 and sold them on or before September 4, 2007. (Def. 56.1 ¶¶ 4-5.)

Plaintiffs commenced this action on July 19, 2007 in the Northern District of Illinois on behalf of a putative class of shareholders who purchased Moody's stock between October 25, 2006 and July 10, 2007. (Def. 56.1 ¶ 10.) That complaint (the "July 2007

Complaint") alleged that during the then-proposed class period of October 2006 to July 2007,

Moody's "misrepresented or failed to disclose that the Company assigned excessively high

ratings to bonds backed by risky subprime mortgages."  (Def. 56.1 ¶ 10.)  The July 2007

Complaint further alleged that Moody's "shocked investors" when it announced, on July 11,

2007, that it "was downgrading 399 mortgage-backed securities issued in 2006 and reviewing an

additional thirty-two for downgrade" and "that it had downgraded 52 bonds issued in 2005."

(Def. 56.1 ¶ 10.)

On September 26, 2007, plaintiffs moved to be appointed as lead plaintiffs.  *See*

*Nach* v. *Huber*, No. 07-cv-04071 (N.D. Ill.) (Dkt. Nos. 8, 11).  On the same date, Local 282 filed

a complaint on behalf of an identical group of Moody's shareholders, setting forth essentially

identical allegations.  (Def. 56.1 ¶ 12.)   On December 12, 2007, Local 282, McCurley and

Wetstein were appointed lead plaintiffs in the action pending in the Northern District of Illinois.

*See Nach* v. *Huber*, No. 07-cv-04071 (N.D. Ill.) (Dkt. No. 39.).  That action was then transferred

to the Southern District of New York on February 13, 2008, and, on May 28, 2008, was

consolidated with the action filed by Local 282 under the caption *In re Moody's Corporation*

*Securities Litigation*.  *See In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No.

8).

***The Consolidated Amended Complaint.***  On June 27, 2008, plaintiffs filed a

consolidated amended complaint (the "CAC"), claiming that Moody's violated Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder.  (CAC ¶ 428.)  The CAC enlarged

the proposed class period to February 3, 2006 through October 24, 2007, and alleged a new

liability theory:  that Moody's artificially inflated its stock during the class period by stating

falsely that (i) it was "committed to upholding" its independence and had "a reputation for

independence from its clients"; and (ii) its "ratings were achieved by integrity of process [sic]." (CAC ¶ 3; *see also id.* at ¶¶ 37, 68, 71.)  Thus, the "core allegation" of the "alleged fraud" is that "Moody's falsely claimed that it was an independent body publishing ratings accurately and impartially."  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507-08 (S.D.N.Y. 2009). According to plaintiffs, Moody's was "captivated by its client base" (in the structured finance business), and therefore started "rating to the satisfaction of clients, not as the instruments themselves warranted."  (CAC ¶ 3; *see id.* at ¶¶ 41-46.)  Plaintiffs contend that this alleged fraud of claiming a commitment to upholding independence but "succumbing to conflicts" was revealed through a series of "corrective disclosures"—all of which occurred in the midst of the financial crisis.  (*See, e.g.*, CAC ¶¶ 37, 400.)

      ***Defendants' Motion to Dismiss.***  On September 26, 2008, defendants moved to dismiss the CAC on grounds that it was time-barred and failed to plead loss causation, actionable misrepresentations and scienter.  On February 23, 2009, this Court (Kram, J.) granted defendants' motion in part.  The Court narrowed the actionable alleged misstatements by Moody's in the CAC to (1) statements regarding "independence"—for example, assertions that Moody's "maintains independence in its relationship with Issuers" or seeks "to protect the integrity of [its] rating process"; and (2) statements regarding the consideration of "originator" characteristics as part of Moody's rating methodologies.  *See In re Moody's*, 599 F. Supp. 2d at 508-10.  The Court also identified four particular statements alleged in the CAC that were properly pled as "corrective disclosures" of the actionable alleged misstatements.  *Id.* at 511-13.

      ***The Denial of Class Certification.***  On January 22, 2010, plaintiffs moved to certify a class of all shareholders who purchased Moody's stock between February 3, 2006 and October 24, 2007.  Plaintiffs argued that common issues predominated over individual ones and

that plaintiffs were entitled to invoke the "fraud-on-the-market" presumption of reliance due to material misstatements made to an efficient market.  (Def. 56.1 ¶ 22.)

On March 31, 2011, this Court denied plaintiffs' motion.  *In re Moody's*, 274 F.R.D. at 494.  The Court found that, although the alleged misstatements might have reassured investors, defendants had effectively "severe[ed] the link between the alleged misrepresentation and the [stock] price," because (i) none of the alleged misrepresentations was associated with a statistically significant increase in the price of Moody's shares and (ii) there was no date in the class period on which an alleged corrective disclosure was associated with a significant price decline.  *Id.* at 493-94.  The Court found that the only alleged "disclosure" within the class period associated with a statistically significant price decline—comments made by Senator Richard Shelby in 2007 concerning ratings agencies—could not qualify as a corrective disclosure because it contained no new information and was not sufficiently linked to the alleged fraud.  *Id.* at 487-88.  The Court also found that plaintiffs were not entitled to the *Affiliated Ute* presumption of reliance because their claims focus primarily on affirmative misrepresentations rather than omissions.  *Id.* at 494.  Thus, the Court concluded Moody's had rebutted the class-wide presumption of reliance and that individualized questions of reliance predominated over common ones.  *Id.* at 493-94.  Additionally, the Court found that plaintiffs Local 282 and McCurley were "in-and-out traders" who sold their stock before the first recognized disclosure date.  *Id.* at 488.  Accordingly, neither could serve as class representatives because neither had suffered any losses caused by the alleged fraud.  *Id.*

**Plaintiffs' 23(f) Petition.**  On April 14, 2011, plaintiffs sought leave to appeal the Court's decision on class certification to the Second Circuit pursuant to Fed. R. Civ. P. 23(f), arguing that this Court "appears to have misunderstood" federal securities law.  (Def. 56.1 ¶ 26.)

7

The Second Circuit denied plaintiffs' petition on July 20, 2011.  *See In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. # 102).

    ***Discovery on Materiality, Reliance and Loss Causation.***  Following denial of their efforts to appeal this Court's decision on class certification, plaintiffs chose to continue to press their claims on an individual basis.  On January 31, 2012, the Court, on consent of the parties, issued an order setting forth a supplemental discovery schedule focused on three elements of plaintiffs' claims:  materiality, reliance and loss causation.  (Def. 56.1 ¶ 28.)  During this supplemental discovery phase, plaintiffs did not develop any additional facts.  Plaintiffs did, however, serve an expert report prepared by their putative expert, Mr. Chad Coffman (the "liability report" or "Coffman 2012 Rpt.").  (Def. 56.1 ¶ 29.)  Mr. Coffman previously submitted two reports, dated August 23, 2010, and November 5, 2010, in support of plaintiffs' motion for class certification.  (Def. 56.1 ¶ 85.)[2]

    On June 29, 2012, Moody's served a report (the "Stulz 2012 Rpt.") from its expert, Dr. René Stulz, an expert in financial economics who has, among other things, served as past president of the American Finance Association and as editor of the Journal of Finance, authored a textbook on derivatives and advised the International Monetary Fund, the World Bank, the New York Stock Exchange and the Federal Reserve Bank of New York.  (Def. 56.1 ¶ 30.)  Dr. Stulz submitted two reports in connection with defendants' opposition to plaintiffs' motion for class certification, dated May 28, 2010, and October 22, 2010 (the "Stulz May 2010 Rpt." and "Stulz Oct. 2010 Rpt.") (Def. 56.1 ¶ 31.)[3]

---

[2]  The Coffman 2012 Rpt. is attached as Exhibit 19 to the accompanying Declaration of Sharon L. Nelles (the "Nelles Decl."), dated September 16, 2012.

[3]  The Stulz May 2010 Rpt., Stulz Oct. 2010 Rpt. and Stulz 2012 Rpt. are attached as Exhibits 15, 17 and 20, respectively, to the Nelles Decl..

## FACTUAL BACKGROUND

*Moody's.*  Moody's Investors Service ("MIS"), the primary operating subsidiary

of Moody's, is a credit rating agency registered with the United States Securities and Exchange

Commission ("SEC") as a Nationally Recognized Statistical Rating Organization.  (Def. 56.1

¶ 32.)  Moody's, through MIS, publishes credit opinions "on a broad range of credit

obligations . . . including various corporate and governmental obligations and structured finance

securities."  (Def. 56.1 ¶ 33.)  Credit ratings are predictive opinions concerning the risk of default

and any estimated losses associated with a default that are derived through the application of a

published methodology.  (Def. 56.1 ¶ 34.)  Moody's, like other major credit rating agencies,

provides information about the methodologies it employs, including those used to rate the

structured finance products at issue here, such as collateralized debt obligations ("CDOs") and

residential mortgage-backed securities ("RMBS").  (Def. 56.1 ¶ 35.)

Moody's is compensated for its services by the issuers of debt obligations, and

has been since the 1970s.  (CAC ¶¶ 38-39.)  Moody's is fully transparent about the "issuer pays"

model and its inherent conflicts of interest.  Moody's publicly available code of conduct, adopted

in June 2005, discloses the conflict inherent in this business model and sets forth the Company's

policies and procedures designed to manage that conflict.  (CAC ¶ 68.)  The issuer pays model

has been the subject of extensive scrutiny and regulation for years.  (Def. 56.1 ¶ 41.)  In 2006, for

example, Congress passed the Credit Rating Agency Reform Act of 2006, 15 U.S.C.§ 78o-7 et

seq.  (CAC ¶¶ 85-91.)  The act and its implementing regulations required rating agencies to

disclose "any conflict of interest relating to the issuance of credit ratings."  15 U.S.C. § 78o-

7(a)(1)(B)(vi).

*The Financial Crisis.*  After the recession of 2001, the United States, as well as

the global economy, experienced a period of steady growth.  (Def. 56.1 ¶ 49.)  In particular, there

was a tremendous growth in subprime mortgage securitization throughout the United States. (Def. 56.1 ¶ 50.)  Plaintiffs acknowledge that "[s]ubprime mortgage performance during [that] period was 'masked' by unprecedented housing price appreciation, which allowed homeowners who would otherwise have defaulted merely to sell their houses at a profit and pay back the mortgages in full."  (CAC ¶ 163.)  In late 2006, however, appreciation slowed, house prices started to fall in concentrated areas of the country, and mortgages in those areas began experiencing an unprecedented default rate.  (Def. 56.1 ¶¶ 52-54.)  The market for subprime-backed securities worsened and fewer securities were issued.  (Def. 56.1 ¶ 56.)  These developments, in turn, led to growing illiquidity, which led to further declines in issuance activities in structured finance, as well as other asset markets.  (Def. 56.1 ¶ 57.)

As "structured finance issuance . . . collapsed," Moody's earnings and "share price declined in tandem," as did the earnings of many other firms, in the midst of the credit crisis and recession.  (CAC ¶¶ 37, 399; Def. 56.1 ¶¶ 65, 72.)  Furthermore, just as analysts predicted would occur in the face of credit market deterioration, rating agencies faced increasing scrutiny from Congress and regulators, among others.  (*See* Def. 56.1 ¶¶ 59-60.)

In plaintiffs' 248-page consolidated amended complaint, there is scarce mention of the collapse of the structured finance market, perhaps the most significant financial event in recent history.  That collapse occurred, not incidentally, between the dates of the purported misstatements and the alleged "corrective disclosures."

***Plaintiffs' Theory of Liability.***  The gravamen of plaintiffs' complaint is that Moody's statements regarding its efforts to manage its conflicts of interest misled the market and duped investors into buying Moody's stock.  (CAC ¶¶ 70, 353.)  This alleged failure to manage purportedly resulted in various "corrective disclosures" that "revealed" the alleged truth about

10

Moody's lack of independence, which, in turn, led to losses for Moody's investors.  (*See* CAC ¶ 353.)  Plaintiffs, through their expert, now argue that the "corrective disclosures" (or what they call "loss causation events") did not actually "reveal" the fraud, but instead represent a "materialization of the undisclosed risks" associated with Moody's allegedly concealed lack of independence.  (Coffman 2012 Rpt. ¶ 10.)   According to this theory, Moody's alleged lack of independence somehow created a risk of, and ultimately caused through an attenuated chain of events, the "unsustainab[ility]" of structured finance revenues and subjected the Company to "regulatory and legal scrutiny."  (Coffman 2012 Rpt. ¶ 29.)   In more simple terms, according to plaintiffs, Moody's misled its shareholders about its "lack of independence," which caused its structured finance revenues to decline and led to scrutiny of rating agencies by Congress and others, which in turn caused the decline in Moody's stock price.

     ***The Alleged "Misstatements."***  Plaintiffs point to dozens of alleged "misstatements" in Moody's codes of conduct, annual reports and 10-Ks concerning its independence.  (*See, e.g.*, CAC ¶¶ 69(a)-(k), 72(a)-(c), 74(a)-(c), 77(a)-(j), 78, 82 and 84.)  These statements reference "Moody's devotion to 'preserving,' 'reinforcing' and 'upholding' the public's trust in Moody's" and the "fundamental importance of 'independence' in Moody's business conduct, business strategy and regulatory affairs."  (CAC ¶ 72(a)-(b).)  Both plaintiffs' expert and Moody's expert agree that the market did not react to the alleged misstatements. Analysis conducted by both plaintiffs and defendants of all the trading days on which Moody's allegedly made misrepresentations confirms that none of those days is associated with a statistically significant and positive return.  (Def. 56.1 ¶ 82.)

      ***The "Corrective Disclosures."***  Plaintiffs rely on four "corrective disclosures" they claim "revealed" the alleged fraud, *i.e.*, that Moody's was in fact systematically succumbing to issuer pressure while stating that it was managing conflicts:

      *August 20, 2007, Congressional Remarks.*  Plaintiffs identify a comment by Senator Richard Shelby made on August 20, 2007 that rating agencies should shoulder some responsibility for the mortgage crisis as a "corrective disclosure."  (CAC ¶ 400(e); *see* Def. 56.1 ¶ 84.)  The Court has already carefully considered and rejected this contention for two reasons.  First, the comment revealed no news about Moody's alleged conflicts of interest.  Members of Congress, including Senator Shelby himself, had been scrutinizing the rating agencies and calling for further regulation for years.  *See In re Moody's*, 274 F.R.D. at 487-88.  Second, there is no evidence that Moody's alleged lack of independence, rather than the financial crisis, caused the calls for regulatory scrutiny.  *Id.*

      *October 24 and October 25, 2007, Earnings Announcement.*  Plaintiffs assert that Moody's announcement of "lower than expected" earnings, and analyst reports covering the announcement on October 24 and October 25, 2007, constitute corrective disclosures.  (*See* CAC ¶¶ 377, 400(i).)  The "disclosures" themselves do not mention the alleged fraud, and there is no evidence that drop in earnings was caused by conflicts of interest, rather than the decline in issuance activity and increased Company costs due to such factors as Moody's hiring more employees and engaging in IT initiatives.  (*See* Stulz 2012 Rpt. ¶¶ 57-73.)

      *May 21, 2008, Financial Times Blog Post.*  On May 21, 2008, a Financial Times blog post reported on a "bug" in a computer model used by Moody's to evaluate European constant proportion debt obligations ("CPDOs").  Plaintiffs assert that the blog post is a corrective disclosure.  (CAC ¶¶ 363-65, 400(k).)  Neither the blog post nor the underlying

events, however, had anything to do with Moody's management of conflict of interest.

Moreover, CPDOs are wholly unconnected to subprime mortgage-backed securities.  (Def. 56.1

¶ 128.)

    *October 21 through October 23, 2008 Congressional Hearings.*  From October 21

through October 23, 2008, Congress held a series of hearings on the financial crisis.  Plaintiffs

assert that the "intense regulatory scrutiny" Moody's faced during those days was a corrective

disclosure.  (Coffman 2012 Rpt. ¶ 89.)  Those hearings cannot be invoked here for the simple

reason that all three plaintiffs sold all of their Moody's stock before those hearings took place.

(Def. 56.1 ¶ 132.)

## SUMMARY JUDGMENT STANDARD

    Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

be granted when "the movant shows that there is no genuine dispute as to any material fact."

Fed. R. Civ. P. 56(a).  Summary judgment is properly granted against a party that, "after

adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).

    In ruling on a motion for summary judgment, the Court must draw all justifiable

inferences in the nonmoving party's favor.  *See New Orleans Emps. Ret. Sys.* v. *Omnicom Group,*

*Inc.*, 597 F.3d 501, 503 (2d Cir. 2010).  A nonmoving party, however, must establish more than

"the mere existence of a scintilla of evidence" in support of its position.  *Lyons* v. *Lancer Ins.*

*Co.*, 681 F.3d 50, 56 (2d Cir. 2012).  The party opposing summary judgment "must point to

specific evidence in the record" that would enable a reasonable jury to find in its favor.

*Salahuddin* v. *Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  If the evidence "is merely colorable, or

is not significantly probative, summary judgment may be granted."  *Lyons*, 681 F.3d at 56-57

(citation omitted).  "Speculation alone is insufficient to defeat a motion for summary judgment."

*McPherson* v. *N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006).

## ARGUMENT

In order to establish liability under Rule 10b-5, a "plaintiff must establish that the

defendant, in connection with the purchase or sale of securities, made a materially false

statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the

defendant's action caused injury to the plaintiff."  *Lawrence* v. *Cohn*, 325 F.3d 141, 147 (2d Cir.

2003) (quotations and citations omitted).  The record here demonstrates that there are no genuine

issues of material fact as to any of the three elements at issue on this motion:  materiality,

reliance and loss causation.[4]

## I.      THERE IS NO RECORD EVIDENCE THAT MOODY'S SYSTEMATICALLY SUCCUMBED TO ISSUER PRESSURE IN PROVIDING RATINGS.

A critical component of both materiality and loss causation is the underlying

behavior allegedly concealed by the purported misstatement.  With respect to materiality, the

inquiry for the Court is whether the statement was "materially false."  *See In re Sanofi-Aventis

Secs. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011)  (Daniels, J.).  In other words, materiality

cannot be determined without knowing the extent to which a statement is "untrue."  Without

evidence that the statement is in fact false—which here would entail evidence that Moody's was

systematically succumbing to conflicts of interest—it is impossible to determine the *extent* to

which it is false.

With respect to loss causation, the inquiry for the Court is whether a particular

behavior—here, again, systematic succumbing to issuer pressure—caused a loss to investors.

---

[4]      The other elements of a 10b-5 claim are not at issue on this motion and defendants' arguments are reserved.  *See In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. # 104 (scheduling order)).

*See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  That showing too cannot

be made without a showing that the behavior existed in the first instance.[5]

        In this action, plaintiffs allege that Moody's engaged in an ill-defined pattern of

"systematically compromis[ing]" its independence and succumbing to issuer pressure in

assigning ratings to structured finance securities.  (CAC ¶ 55.)  There is, however, no record

evidence that Moody's did any such thing.  Plaintiffs point to ratings downgrades and changes to

methodologies to support a finding of undisclosed wrongdoing.  (CAC ¶¶ 116, 118, 121, 167-74,

248-80.)  Ratings downgrades and changes in methodologies prove nothing about whether

Moody's acted independently or whether it instead "succumbed" to supposed conflicts.  Rather,

as Dr. Stulz explains:

> [R]atings downgrades during the crisis do not mean that the ratings
> themselves were necessarily "wrong" when they were given or,
> even if they were wrong, that they were wrong because of conflicts
> of interest.  Mr. Coffman ignores the fact that ratings which appear
> to have been too high ex post could have been too high for reasons
> other than conflicts of interest.  Throughout their history, rating
> agencies have downgraded securities as they received new
> information.  Further, structured finance securities were complex
> securities.  Their ratings rested on statistical and economic models
> that could fail as the world changed and underlying assumptions
> were violated due to unanticipated events. For example, as shown
> by Exhibit 6, downgrade rates were relatively high for several
> structured finance asset classes in 2002 due to the previous
> economic downturn.

(Stulz 2012 Rpt. ¶ 36.)  Plaintiffs themselves have dropped from their laundry list of corrective

disclosures the July 10, 2007 downgrades originally pled as a loss-causing event that "shocked

---

[5]    Plaintiffs' own expert acknowledges that the existence of a false statement is a necessary
predicate to his opinions but marshals no evidence that any was actually made.  Thus he
carefully qualified that only "*[t]o the extent* Plaintiffs' theory of liability is accurate," in
that "Moody's knew or was reckless in not knowing that it had sacrificed its
independence . . . ", did investors pay "inflated prices based upon this undisclosed risk."
(Coffman 2012 Rpt. ¶ 5 (emphasis added).)  Put otherwise, Mr. Coffman does not opine
on whether Moody's *in fact* sacrificed its independence.

investors."  Indeed, it is well settled that ratings downgrades do not constitute corrective

disclosures because they reveal only that the rating is no longer accurate—not that the rating was

fraudulent (or even incorrect) when issued.  *See Lentell*, 396 F.3d at 175 n.4 ("Plaintiffs contend

that they have alleged a corrective disclosure to the market, in alleging that Merrill's eventual

downgrades of . . . stock . . . negatively impacted the price of those securities.  These allegations

do not amount to a corrective disclosure, however, because they do not reveal to the market the

falsity of the prior recommendations.") (emphasis omitted).

    Without any evidence that Moody's *in fact* succumbed to issuer pressure,

evidence that is necessary to establish both the materiality and loss causation elements of their

claim, plaintiffs cannot defeat summary judgment.

## II.    THE RECORD ESTABLISHES THAT THE ALLEGED "MISSTATEMENTS" WERE IMMATERIAL IN ANY EVENT.

    Even if plaintiffs had evidence that the alleged misstatements were untrue (they

do not), they have no evidence that the statements were material to the market.

    As this Court has observed, a misrepresentation is material if "a reasonable

investor would think that the information would have 'significantly altered the "total mix" of

information'" available to the public.  *In re Moody's*, 274 F.R.D. at 489 (citing *ECA & Local*

*IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co*., 553 F.3d 187, 197 (2d Cir.

2009)).  In a fraud-on-the-market case, the market itself serves as a proxy for the "reasonable

investor."  *In re WorldCom, Inc. Sec. Litig*., No. 02 Civ. 3288, 2005 U.S. Dist. LEXIS 2603, at

*11 (S.D.N.Y. Feb. 22, 2005) (citing *In re ICN/Viratek Sec. Litig*., No. 87 Civ. 4296, 1996 U.S.

Dist. LEXIS 4407, at *8-9 (S.D.N.Y. July 15, 1996)); *see also Heil*  v. *Lebow*, No. 91 Civ. 8656,

1994 U.S. Dist. LEXIS 16236, at *11 (S.D.N.Y. Nov. 14, 1994) ("Because the market [] rel[ies]

on misstatements in conjunction with all other available information, it is presumed to act like a

16

reasonable investor.").  In other words, "materiality is a determination of whether the market would have cared about a particular statement." *In re WorldCom,* 2005 U.S. Dist. LEXIS 2603, at *11 (citing *In re ICN/Viratek Sec. Litig.* 1996 U.S. Dist. LEXIS 4407, at *8-9).  Information that is already known to the market—or that, when made, does not affect market prices—does not "significantly alter the total mix" and would not be material to a reasonable investor.  *See Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

> ### A.   The Absence of Price Impact From the Alleged Misstatements Establishes the Immateriality of Those Statements.

As the proxy for a reasonable investor, the market's reaction to a particular statement reflects its importance.  This is because in an efficient market, "the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 244 (1988) (citations omitted).  As this Court already recognized, the market's indifference to an alleged misstatement "strongly cuts against finding that the misrepresentations are material." *In re Moody's*, 274 F.R.D at 489.  For this reason, a defendant can "demonstrate that the alleged misrepresentations were immaterial[] by showing that they did not lead to a distortion in price." *Fogarazzo* v. *Lehman Bros.*, *Inc.*, 263 F.R.D. 90, 100 (S.D.N.Y. 2009).  Here, plaintiffs' expert and Moody's expert agree that not one of Moody's alleged misrepresentations is associated with a statistically significant and positive return.  (Def. 56.1 ¶ 82.)  The absence of price impact establishes their immateriality.  *Fogarazzo*, 263 F.R.D. at 100; *see also In re Moody's*, 274 F.R.D. at 489.

When considering plaintiffs' motion for class certification, this Court posited that a statement by Moody's that it was managing its conflicts of interest might have been "reassuring" to a reasonable investor, "who was already naturally concerned about the potential for conflicts." *Id*. at 489-90.  Plaintiffs have had every opportunity to develop record evidence

17

that investors were "in fact" reassured.[6]  Plaintiffs did not.  Where there is no evidence that the alleged misstatement "maintained" an inflated stock price, and there is "no way to test the theory," the theory must be rejected as "based not on facts but on speculation."  *See In re Credit Suisse First Boston Corp. Analyst Sec. Litig.*, 250 F.R.D. 137, 144-45 (S.D.N.Y. 2008).

In fact, to the extent this "maintenance" theory of artificial inflation can be tested, the record demonstrates that it fails.  As Dr. Stulz established by analyzing media coverage, "Moody's cautionary language about using 'care' and 'managing' potential conflicts was not taken by the market to be a suggestion that the potential for conflicts from the issuer-pays model would be completely eliminated.  This is evidenced by regulators' statements, financial media articles, and market participants' commentaries . . . that continued to flag the issue" with no suggestion of having been reassured by Moody's own statements.  (Stulz 2012 Rpt. ¶ 39.)[7] Because there is no record evidence that the statements injected any level of reassurance into the public debate, plaintiffs cannot show that the statements added anything to the "total mix" of information.[8]

---

[6]   It does not matter whether the individual plaintiffs may have been reassured by Moody's statements, as materiality is measured objectively by the market's reaction, not by the subjective feelings of particular investors.  *See Fisher* v. *Plessey Co.*, 103 F.R.D. 150, 155 (S.D.N.Y. 1984) ("Because the materiality test is concerned not with whether the investment decision of a particular individual would have been affected, but only 'whether a prototype reasonable investor would have relied,' the standard for resolving the materiality issue is obviously objective and general rather than subjective and individual") (citation omitted).

[7]   This is unsurprising given that the debate about whether rating agencies such as Moody's were properly managing their conflicts of interest had been ongoing for years.  And for years, the rating agencies had publicly stated that they were managing those conflicts.  (Def. 56.1 ¶¶ 38, 40-44, 48.)

[8]   Also fatal to plaintiffs' theory that the alleged misstatements artificially perpetuated an inflated share price is their inability to demonstrate when the alleged inflation was introduced.  Plaintiffs should be able to point to a statement concerning Moody's independence associated with an initial inflation of stock price.  *See FindWhat Investor Group* v. *FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011) (expert demonstrated that

Lacking evidence of a market impact that would suggest materiality, plaintiffs' putative expert Mr. Coffman resurrects an alternative theory that this Court has already considered and rejected:  that the relevant focus is not on misleading information introduced by the alleged misrepresentations, but on information allegedly omitted from the statements. Instead of looking at whether Moody's introduced misleading information that increased the stock price (or staved off a price decline that would have otherwise occurred), Mr. Coffman hypothesizes that disclosing the allegedly omitted information would have caused the stock price to decline.  (Coffman 2012 Rpt. ¶¶ 41-44.)

Plaintiffs pressed this theory repeatedly in their class certification briefing, attempting to invoke the presumption of reliance under *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972).  (Def. 56.1 ¶  24.)  This Court, however, recognized that "this is a case that is primarily built around misrepresentations, and omissions, if any, merely serve to exacerbate and bolster their misrepresentation claims."  *In re Moody's*, 274 F.R.D at 494.  When a case is primarily based on affirmative misrepresentations rather than omissions, it is improper to assess the hypothetical price decline that would have occurred if the allegedly omitted information had been disclosed.  *See, e.g.*, *In re Credit Suisse*, 250 F.R.D. at 143-44.[9]

---

stock price was inflated by 26.44% because of a misrepresentation made prior to the one at issue).  They cannot.

[9]   In *Credit Suisse*, the plaintiff alleged that an analyst recommendation to buy a company's stock, when the analyst in fact believed the stock was "unworthy of purchase," artificially inflated the company's stock price.  Both parties agreed that the analyst recommendation did not result in a statistically significant abnormal market return.  Plaintiff argued, however, that the lack of measurable market impact was irrelevant because the actual impact would have occurred had the analyst revealed his true opinion about the stock. The court rejected this argument because the case was "based on several affirmative statements" rather than omissions, and when "[p]laintiff's principal objection to the omissions . . .  is that the omissions exacerbated the misleading nature of the affirmative misstatements," an omissions analysis is inappropriate.  *In re Credit Suisse*, 250 F.R.D. at 139, 143-44 (citation omitted).

Plaintiffs suggest that the absence of price impact of the alleged misstatements is not fatal because the materiality is "supported by statistically significant stock price declines upon materialization of the undisclosed risks." (Coffman 2012 Rpt. ¶ 41.) Plaintiffs' putative expert attempts to demonstrate some causal link by duplicating the analysis of "corrective disclosure" dates offered in support of class certification. But, as discussed below (*see infra* at Section IV (B)), Mr. Coffman again fails to identify a single corrective disclosure date associated with a statistically significant stock price impact.

**B.      The Importance of the Subject Matter of the Alleged Misstatements Is Unrelated to the Materiality of the Particular Statements at Issue.**

Plaintiffs also recycle another argument pressed, to no avail, at the class certification stage: that the importance of the idea of "independence" to the Company somehow speaks to the materiality of the particular alleged misstatements at issue. (Coffman 2012 Rpt. ¶¶ 31-36.) The Second Circuit, however, rejects the notion that the importance of the subject matter of an alleged misstatement can serve as a proxy for the materiality of the alleged misstatement itself. For example, in *ECA,* the court held that plaintiffs had improperly "conflate[d] the importance of a bank's reputation for integrity with the materiality of a bank's statements regarding its reputation. While a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." 553 F.3d at 206. Here, plaintiffs have fallen into the same trap, arguing nothing more than that because independence and proper conflict management are important concepts, every statement on those subjects is material. That is precisely what the law in this Circuit does not permit.

**III.   THE RECORD FURTHER ESTABLISHES THAT PLAINTIFFS DID NOT RELY, DIRECTLY OR INDIRECTLY, ON THE ALLEGED MISSTATEMENTS IN PURCHASING THEIR STOCK.**

To succeed on their 10(b) claim, plaintiffs must demonstrate that they purchased Moody's stock either in direct reliance on the alleged misstatements or through a rebuttable presumption of reliance.  It is undisputed, however, that plaintiffs did not personally rely on the alleged misstatements.[10]  Accordingly, to survive summary judgment, plaintiffs must be able to establish a presumption of reliance pursuant to the fraud-on-the-market doctrine set forth in *Basic Inc*. v. *Levinson* or the presumption of reliance on material omissions set forth in *Affiliated Ute Citizens* v. *United States*, 406 U.S. 128 (1972).  As this Court found at the class certification stage, they cannot meet that burden.  Plaintiffs offer no basis for the Court to overturn its finding.

**A.   Plaintiffs Cannot Invoke the *Basic* Presumption Because There Is No Evidence That the Alleged Misrepresentations Were Material.**

To invoke the *Basic* presumption of reliance, a plaintiff must show that "a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (*i.e.*, efficient) market."  *In re Salomon Analyst Metromedia Litig*., 544 F.3d 474, 481 (2d Cir. 2008) (citing *Basic*, 485 U.S. at 248 n.27).  As described in Sections I and II, *supra*, plaintiffs can demonstrate neither the falsity nor the materiality of the statements upon which they base their claim.  In any event, *Basic* does not support a presumption of reliance on the facts in this action.

**B.   The *Basic* Presumption Is Rebutted by Moody's Stock Price History and by Market Makers' Knowledge.**

Even if plaintiffs could successfully invoke the *Basic rebuttable* presumption of reliance, Moody's stock price history rebuts it, as this Court has observed.  *In re Moody's*, 274

---

[10]   Plaintiffs admit that they did not buy Moody's stock on the basis of the alleged misstatements.  (Def. 56.1 ¶ 86.)

F.R.D at 493.  The Supreme Court also recognized that defendants may "rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price . . . .  Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."  *Basic*, 485 U.S. at 248.  Following *Basic*, the Second Circuit held in *Salomon* that defendants may rebut the presumption "by showing, for example, the absence of a price impact."  544 F.3d at 484.

This Court properly found that the absence of price impact of the alleged misstatements "does not comport with the premise of the fraud-on-the-market theory."  *In re Moody's*, 274 F.R.D at 493.  The Court explained,"[t]o a proper confidence level, defendants have demonstrated, and Plaintiffs have not rebutted, that there is no date on which any alleged misrepresentation caused a statistically significant increase in the price.  In other words, Defendants have severed the link between the misrepresentation and the price by showing that the allegedly false information the market was absorbing was not causing the stock price to artificially inflate."  *Id.*

Defendants further rebutted the *Basic* presumption by demonstrating an absence of price impact of the alleged "disclosures."  *Id.*  Applying *Salomon*, courts in this Circuit have recognized that if the stock price history does not show a price drop at the time of corrective disclosure, the presumption that an alleged misstatement artificially inflated stock price falls away.  *See*, *e.g.*, *In re AIG Inc. Sec. Litig.*, 265 F.R.D. 157, 181-82 (S.D.N.Y. 2010); *In re Credit Suisse*, 250 F.R.D. at 143.  In *AIG*, the court explained:

> [i]f the market on which [Defendant's] stock traded was indeed efficient—an assumption and requirement of the fraud-on-the-market presumption—then the absence of a price decline on the day a fraud was disclosed will strongly indicate that there was also

> no price increase on the day the fraud occurred.  Thus, to the extent
> a Defendant can show that there was no price decrease . . . on the
> date a misrepresentation was disclosed, the Court views this
> showing as strong evidence that there was no price change on the
> date of the misrepresentation, thus rebutting the fraud-on-the-
> market presumption.

265 F.R.D. at 182 (vacated and remanded on other grounds).  In this action, the Court already

has found that the first "disclosure"—Senator Shelby's comments regarding rating agencies—

was not in fact a corrective disclosure.  *See id.*  With respect to the other three "disclosures," as

discussed *infra* at Section IV(B), none can be linked to the alleged fraud.

Moody's stock price history further confirms that market makers, at least, were

aware of Moody's conflicts of interest and the debate about whether Moody's was managing

those conflicts appropriately.  (*See* Stulz May 2010 Rpt. ¶¶ 42-55; Stulz Oct. 2010 Rpt. ¶¶ 11-31)

Because "key features of the alleged fraud were publicly discussed before (and throughout) the

purported Class Period," a "financial economist would expect that any impact of the alleged

fraud would already have been reflected in Moody's stock price prior to Plaintiff's alleged

curative disclosures."  (Stulz May 2010 Rpt. ¶ 14.)  The market's lack of response to both the

alleged misstatements and corrective disclosures shows that the market was aware of the risk that

the rating agencies might not always effectively manage their conflicts of interest, thus rebutting

the *Basic* presumption.  *See Longman* v. *Food Lion*, 197 F.3d 675, 684-85 (4th Cir. 1999)

(noting public debate about allegedly hidden practices rebutted *Basic* presumption).

### C.   Plaintiffs Cannot Invoke *Affiliated Ute* Because Their Claims Are Based on Alleged Misrepresentations, Not Omissions.

This Court also rejected plaintiffs' argument that they could invoke a presumption

of reliance under *Affiliated Ute*  "[b]ecause this is a case that is primarily built around

misrepresentations, and omissions, if any, merely serve to exacerbate and bolster their

misrepresentation claims."  *In re Moody's*, 274 F.R.D at 494.  This Court's decision was fully in

23

accord with Second Circuit precedent, which holds that where, as here, both misstatements and omissions are alleged, the *Affiliated Ute* presumption cannot apply unless the claims are "primarily omission claims."  *Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (citations and quotations omitted).  Only in "cases like *Affiliated Ute*, in which no positive statement exist," is "reliance as a practical matter [] impossible to prove."  *Wilson* v. *Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981).  Here, plaintiffs' case is premised on misstatements allegedly made by Moody's concerning its independence and ratings methodologies.  (Def. 56.1 ¶¶ 74-77.)   Plaintiffs cannot now avoid the requirement to prove reliance by pretending that this case is not about misstatements but about omissions.  *Titan Pharm. & Nutrition, Inc.* v. *Med. Shoppe Int'l, Inc.*, No. 05 Civ. 10580, 2006 U.S. Dist. LEXIS 11616, at *6 (S.D.N.Y. Mar. 30, 2006).

## IV.     THE RECORD ALSO ESTABLISHES THAT THERE IS NO TRIABLE ISSUE OF FACT AS TO LOSS CAUSATION.

To raise a triable issue of fact with respect to loss causation, an essential element in a 10(b) action, a plaintiff must demonstrate (a) a causal relationship between the alleged misstatement or omission, (b) one or more events disclosing the alleged truth, and (c) share decline.  *See Lentell*, 396 F.3d at 173.  The loss-causing event must do one of two things, either (i) reveal the fraud to the market, thereby "correcting" the alleged misstatements, or (ii) constitute a "materialization" of a risk of the alleged behavior concealed by the alleged misstatement.  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011).  Under the "materialization of risk" theory, a plaintiff must prove that the loss was a "foreseeable" consequence of the wrongful behavior, and that the loss was actually "caused" by that behavior.  *See Lentell*, 396 F.3d at 173.  If "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently

24

direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to

'demonstrate a causal connection between the content of the alleged misstatements or omissions

and the 'harm actually suffered,' a fraud claim will not lie." *Id*. at 174 (citations omitted).

The Supreme Court has emphasized the importance of isolating unrelated market

events from the alleged loss. *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005). In

particular, the Supreme Court "appreciated that a share decline can occur in response to a

number of factors that may have nothing to do with a revelation regarding a fraud, including

changed economic circumstances, changed investor expectations, new industry-specific o[r]

firm-specific information unrelated to the misstatement or omission, and perhaps even world

events." *Sciallo* v. *Tyco Int'l*, No. 03 Civ. 7770, 2012 U.S. Dist. LEXIS 96967, at *9 (S.D.N.Y.

July 9, 2012). To establish that the alleged fraud was the cause-in-fact of the price decline, "a

plaintiff must show that the loss was caused by materializations of the concealed risk and not

other factors." *In re Vivendi*, 765 F. Supp. 2d at 555.

The burden to disaggregate potentially confounding factors is front and center at

the summary judgment stage. If a plaintiff cannot meet that burden, "there is simply no way for

a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss," and

summary judgment must be granted. *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546,

554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010). "Although 'a party seeking summary

judgment always bears the initial responsibility of informing the district court of the basis for its

motion, and identifying [the evidence] which it believes demonstrate[s] the absence of a genuine

issue of material fact,' this does not relieve [the plaintiff] of its burden of making 'a showing

sufficient to establish the existence of an element essential to [the plaintiff's] case, and on which

[the plaintiff] will bear the burden of proof at trial.' As a result, summary judgment is

25

appropriate if [the plaintiff] cannot show that at least some of the price drop was due to the fraud."
*Omnicom*, 597 F.3d at 510 n.3 (citing *Celotex*, 477 U.S. at 322); *see also Gordon Partners* v.
*Blumenthal*, No. 02 Civ. 7377, 2007 U.S. Dist. LEXIS 35895, at *4 (S.D.N.Y. May 16, 2007)
(granting summary judgment where plaintiff did not "show whether any loss (and if so how
much) was caused by defendants' conduct as opposed to other market factors").

Where a plaintiff seeks to carry its burden of establishing the causal relationship
through an event study prepared by an expert witness, the expert opinions offered to demonstrate
loss causation must meet the requirements established by Fed. R. Evid. 702 as well as the
standards set forth in *Daubert*, 509 U.S. at 589.  *See Sciallo*, 2012 U.S. Dist. LEXIS 96967, at *9.
As a baseline, the expert's testimony must be "relevant to the task at hand."  *Daubert*, 509 U.S.
at 597; *see also Wills* v. *Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004).  District courts
also must "exercise a gate-keeping function" to "determine whether the proposed testimony is
based on valid scientific principles, whether it is reliable and can be validated, whether the
theory can be tested, has been subjected to peer review and is 'generally accepted.'"  *Sciallo*,
2012 U.S. Dist. LEXIS 96967, at *10-11 (citing *Daubert*, 509 U.S. at 589, 595).  If the testimony
does not meet this standard, it cannot defeat summary judgment.  *See In re Omnicom*, 597 F.3d
at 512 (summary judgment is not precluded merely "because there are conflicting experts").
Indeed, "an expert's report is not a talisman against summary judgment."  *Raskin* v. *Wyatt*, 125
F.3d 55, 66 (2d Cir. 1997).

A.    **The Premise of Plaintiffs' Loss Causation Theory Is Refuted by Patterns of the Financial Crisis and Moody's Revenue Stream.**

According to Mr. Coffman, plaintiffs' theory of liability is that "Moody's had
succumbed to conflicts of interest . . . and as a result, created a material undisclosed risk that
structured finance revenues were unsustainable and that the Company would ultimately be

subject to regulatory and legal scrutiny." (Coffman 2012 Rpt. ¶ 29.)   Plaintiffs' theory of loss

causation, accordingly, is that "information disclosed on the Loss Causation Events reflects the

materialization of the undisclosed risks." (Coffman 2012 Rpt. ¶ 46.)   Specifically, Mr. Coffman

lists the following as "Loss Causation Events":  "information that either specifically (i) reflected

the un-sustainability of Moody's structured finance business, (ii) represented the increased

probability of costly regulatory, legal, and political scrutiny and/or action, or (iii) disclosed that

Moody's committed and covered up errors in ratings." (Coffman 2012 Rpt. ¶ 6.)[11]

> Mr. Coffman makes no attempt to establish (and the record evidence likewise

does not establish) that the events upon which he relied were caused by a lack of independence

rather than factors—such as the financial crisis—with the consequence that the events are not

proven to be a "materialization" of the supposedly concealed facts.  Mr. Coffman asks the Court

to disregard those factors, including the financial crisis, as alternative causes of the "loss

causation events" because, according to Mr. Coffman, they too, resulted from Moody's

"succumbing" to conflicts of interest.  (Coffman 2012 Rpt. ¶ 23.)  The notion that Moody's

ratings practices caused the financial crisis is rather absurd, but more fundamentally is refuted

directly by the patterns of the financial crisis and of Moody's own revenue streams.[12]

Particularly, while the ability to securitize residential loans was available throughout the United

States, the growth of house prices followed by a crash was concentrated in particular areas of the

country.  (Def. 56.1 ¶¶ 61, 53.)  It is thus clear that the securitization process generally, or

---

[11]    Mr. Coffman offers no analysis of losses relating to alleged misstatements or omissions
        concerning originator factors.

[12]    To the extent Mr. Coffman takes the position that Moody's alleged misrepresentations
        were only "partially" responsible for the sharp drop in securitization, and/or the financial
        crisis generally, he has produced no evidence to support that theory, nor has he attempted
        to parse out the impact of other factors on Moody's stock price.  (*See* Stulz 2012 Rpt.
        ¶ 34.)

Moody's role in it, was not the root cause of the crisis.  Likewise, if, as Mr. Coffman contends, the market learned that Moody's ratings were inflated and its independence was compromised in a systematic manner, one would expect that Moody's business would suffer across the board, both geographically and by asset type.  (Stulz 2012 Rpt. ¶ 30.)  In fact, however, Moody's structured finance revenue varied greatly by both geographic area and type of structured finance product.  (Stulz 2012 Rpt. ¶¶ 30-32.)  And even the narrower suggestion that Moody's lack of independence caused its earnings decline is mere *ipse dixit* with no supporting evidence.

### B.   There Is No Evidence That the Alleged "Loss Causation Events" Were Caused by the Alleged Fraud.

Beyond the broad conceptual problems with plaintiffs' materialization theory, plaintiffs' "event studies" provide no evidentiary basis for a finding of loss causation.  In the decision on class certification, this Court carefully considered the expert reports of both parties and found that defendants had severed the link between the alleged misrepresentations and stock price.  Specifically, the Court found that of the disclosure dates within the class period, some were not associated with a statistically significant negative stock price movement at all, and the remainder lacked the necessary price impact because the disclosures were unrelated to the alleged misstatements.  *In re Moody's*, 274 F.R.D. at 492, 493 &  n.11.

Mr. Coffman's liability report focuses on the same disclosure dates as his prior reports and adds no information or analysis that could serve as a basis for this Court to reverse itself.[13]  Moreover, his "event studies" that purport to demonstrate that Moody's stock price

---

[13]   In his liability report, Mr. Coffman did abandon one "disclosure" date from his earlier analyses, an August 13, 2007 USA Today article noting that regulators were examining credit rating agencies.  This Court found that the article could not serve as a corrective disclosure because the stock price impact was not statistically significant.  *In re Moody's*, 274 F.R.D. at 493.  Mr. Coffman now concedes that his "further critical analysis of Plaintiffs' loss causation claims leads me to the conclusion that the information released on that day was not new."  (Coffman 2012 Rpt. p. 30 n.74.)

declined because of the alleged undisclosed risks suffer from four fatal flaws. *First*, and most glaringly, the event studies conclusively assume the very causal link that they purport to prove: that the conduct purportedly concealed by the alleged fraud (*i.e*, the supposed failure to act independently) actually "caused" the loss-causing events. But, as described above, plaintiffs can present no evidence to suggest that Moody's knowingly issued inflated ratings in the first instance; as a matter of simple logic, plaintiffs therefore cannot demonstrate that the alleged behavior was the cause of the alleged loss-causing events. An opinion on causation that assumes the causal connection is not "relevant to the task at hand" and is inadmissible. *Daubert*, 509 U.S. at 597; *Wills*, 379 F.3d at 48. *Second*, even if the alleged fraud actually did occur and play some role in the loss-causing events, the event studies fail to account for confounding factors and untangle the alleged "fraud-related" losses from "non-fraud-related" losses. *Third*, the event studies treat information as "news" even where that information was already known to the market. *Fourth*, one "loss causation" event occurred after all three plaintiffs sold their stock in Moody's, and therefore could not possibly have caused them any loss at all.[14]

**The August 20, 2007 Disclosure**

In its decision on class certification, this Court correctly found that Senator Shelby's comments on August 20, 2007 that rating agencies should "shoulder some responsibility" for the mortgage crisis could not serve as a corrective disclosure. *In re Moody's*, 274 F.R.D. at 487-88. Moreover, the August 20, 2007 disclosure is the only purported loss causation event that occurred before plaintiffs Local 282 and McCurley sold all their Moody's stock. The Court thus rightly concluded that they could not demonstrate any loss attributable to the alleged fraud. *See id.* at 488.

---

[14]     The other three supposed loss causation events occurred after McCurley and Local 282 had sold all their Moody's stock. (Def. 56.1 ¶¶ 4-5, 8-9.)

Disregarding this Court's finding, Mr. Coffman continues to insist that Senator Shelby's comments may serve as a loss causation event.  But there is "no revelation of new information" in Senator Shelby's remarks.  *Id*.  As the Court observed and as Mr. Coffman concedes now, "this was not the first time that members of Congress expressed concern about the role rating agencies played in the subprime mortgage crisis."  *Id*. at 487.  (*See also* Coffman 2012 Rpt. ¶ 57.)   Mr. Coffman opines, as he did before, the "new information" is that Senator Shelby is a Republican, while earlier calls for inquiry came from Democrats.  (Coffman 2012 Rpt. ¶ 57.)  Mr. Coffman continues that "these comments occurred at a time at which Democrats controlled the House of Representatives.  Thus, the most likely impediment to greater regulation on the credit rating agencies was the Republicans in the Senate."  (Coffman 2012 Rpt. ¶ 57.) This speculative, attenuated theory cannot support a finding of loss causation as a matter of law, *see Lentell*, 396 F.3d at 173, but in any event, it is wrong as a matter of fact.  Other Republicans, *including Senator Shelby himself*, had been calling for increased scrutiny of rating agencies well before his August 2007 remarks.  (Def. 56.1 ¶¶ 98-102.)  Senator Shelby's comments thus did not "reveal new information previously concealed" because of his affiliation with the Republican party and cannot support a finding of loss causation.  *See In re Vivendi*, 765 F. Supp. 2d at 555 (corrective disclosures must reveal new information).

Furthermore, this Court properly found that "Senator Shelby's comments did not reveal to the market that Moody's had falsely stated it was independent.  The fact that Congress was going to examine rating agencies' conflicts does not amount to a revelation of the alleged fraud . . . A broad call for an investigation into the rating industry's structured finance ratings practices, without more, does not necessarily reveal that there are any problems with the ratings industry since an investigation could turn up nothing of consequence. . . .  Thus it cannot serve as

30

a corrective disclosure." *In re Moody's*, 274 F.R.D. at 487-88 (citing *In re Omnicom*, 597 F.3d at 510-11).  Mr. Coffman still can point to no "revelation" in Senator's Shelby's comments that was perceived by the market as evidence of the alleged fraud.

Finally, to the extent plaintiffs advance the "materialization of risk" theory of loss causation, as this Court recognized, news about increased regulatory scrutiny cannot be linked to Moody's alleged misstatements about conflicts of interest unless plaintiffs can demonstrate that the increased scrutiny would not have occurred absent the alleged wrongdoing that was supposedly concealed by statements about independence.  *See In re Moody's*, 274 F.R.D. at 487-88.  Credit rating agencies have historically been subject to frequent regulatory scrutiny, and risk of scrutiny had been disclosed by Moody's in SEC filings and discussed in press releases and analyst reports before and during the period in which plaintiffs held Moody's stock.  (Def. 56.1 ¶ 48.)  And as Dr. Stulz observes, "such risk could materialize in the absence of any fraud simply through the normal course of business, especially when there is an outcry about alleged important mistakes, such as the ones related to Enron and WorldCom, or more recently, in a period of credit market turmoil."  (Stulz 2012 Rpt. ¶ 53.)[15]

In his liability report, Mr. Coffman makes no attempt to demonstrate that Moody's alleged mismanagement of conflicts of interest, rather than other market forces or the financial crisis itself, was the cause-in-fact of the calls for regulatory scrutiny—he simply assumes the former and dismisses the latter.  (Coffman 2012 Rpt. ¶¶ 56-60.)  Mere "conjecture" as to how an event "could have happened" is inadmissible under *Daubert*.  *See Lynch* v. *Trek*

---

[15]     Indeed, in July 2007, a JPMorgan analyst commented that "[s]hould credit markets deteriorate materially, rating agencies would likely face heightened scrutiny."  (Def. 56.1 ¶ 60.)  This statement, made one month before Senator Shelby's comments, suggests the market's awareness that as credit markets deteriorated, heightened scrutiny would be likely regardless of any alleged fraud.

*Bicycle Corp*., 374 F. App'x 204, 206 (2d Cir. 2010). Mr. Coffman's analysis thus "does not suffice to draw the requisite causal connection" between the information in the alleged disclosure event and the conduct supposedly underlying the alleged fraud," *In re Omnicom*, 597 F.3d at 513, and "there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss," *In re Omnicom*, 541 F. Supp. 2d at 554.

Furthermore, even assuming, *arguendo*, that the alleged fraud did occur and contributed to calls for more scrutiny, Mr. Coffman fails to account for other negative information released on August 20, 2007 that could well have affected Moody's stock price, including a downgrade by JP Morgan of McGraw-Hill (the parent company of the rating agency Standard & Poor's) due to the "current freeze in some credit markets." (Def. 56.1 ¶ 112.) Mr. Coffman conclusorily asserts that this downgrade of a major rating agency "would nonetheless be consistent with Plaintiffs' loss causation theory" because the JP Morgan downgrade was based on the predicted unsustainability of structured finance revenues. (Coffman 2012 Rpt. ¶ 60.) In other words, Mr. Coffman is again suggesting that Moody's itself (now presumably along with McGraw Hill) was the cause of the housing market and credit market contraction— and thus the JP Morgan downgrade was not "confounding." (Coffman 2012 Rpt. ¶ 60.) As explained above, this theory is refuted by the facts. (*See supra* at Section IV (A).) Plaintiffs are unable to rule out the effect of confounding information on Moody's stock price and Senator Shelby's remarks cannot support a finding of loss causation. *In re Omnicom*, 541 F. Supp. 2d at 554; *Gordon Partners*, 2007 U.S. Dist. LEXIS 35895, at *4.[16]

---

[16]     Mr. Coffman's analysis likewise provides no basis to conclude that Senator Shelby's remarks caused a stock price decline because he fails to account for the intra-day stock price movement on August 20, 2007. (*See* Stulz 2012 Rpt. ¶ 54.) As Dr. Stulz explains,

**The October 24-25, 2007 Earnings Announcement**

This Court also correctly found that Moody's October 24-25, 2007 earnings announcement could not serve as a corrective disclosure for purposes of class certification.  *In re Moody's*, 274 F.R.D at 493.[17]  And plaintiffs can provide no reason for the Court to find that the announcement supports loss causation.  There is no evidence to find now that either the October 24, 2007 earnings announcement or analyst reports covering the announcement, including a JP Morgan analyst's downgrade of Moody's on October 25, 2007,  exposed the alleged fraud.  Neither the earnings announcement nor the downgrade mentions conflicts of interest and thus neither can "reveal to the market the falsity" of the alleged misstatements.  (Def. 56.1 ¶ 114.)  *See Lentell*, 396 F.3d at 175.

Nor does the earnings announcement or downgrade  represent a "materialization of the risk of Moody's unsustainable ratings practices."  (*See* Coffman 2012 Rpt. ¶ 68.)  The "mere failure to meet earnings forecasts is insufficient to establish loss causation."  *See In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-679 (S.D.N.Y. 2007).  If "downturns in stock prices based on such were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure

---

"[a]lthough Senator Shelby's remark was made prior to market open, Moody's stock price opened at approximately $49.30 on August 20, compared to the closing price of $49.98 on August 17, the previous trading day, and it declined throughout the remaining trading hours.  Mr. Coffman fails to explain why Moody's stock price did not respond immediately to the alleged disclosure, as it should have in a supposedly efficient market had the alleged disclosure contained economically material information."  (*See* Stulz 2012 Rpt. ¶ 54.)

[17]  In the context of class certification, the Court properly found that under Second Circuit law, disclosures that fall outside the purported class period, such as the October 2007 earnings announcement, may not serve as corrective disclosures.  *In re Moody's*, 274 F.R.D 493; *see also Masters* v. *GlaxoSmithKline*, 271 F. App'x 46, 51 (2d Cir. 2008).

caused their losses." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005); *see also In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("Disclosure of financial losses generally—even if those financial losses are a result of the specific concealed fact—is not sufficient [to allege loss causation]."); *Garber* v. *Legg Mason, Inc.*, 537 F. Supp. 2d 597, 617 (S.D.N.Y. 2008) ("[D]isclosures attributing a share price drop to the failure to meet earnings estimates are not . . . sufficient to plead loss causation."); *Solow* v. *Citigroup, Inc.*, 10 Civ. 2927, 2012 U.S. Dist. LEXIS 70022, at *28-29 (S.D.N.Y. May 18, 2012) (rejecting earnings announcement as loss causation event when there was insufficient link to the alleged fraud).

The record here establishes that any guidance by Moody's would have announced disappointing earnings even if none of plaintiffs' allegations was true. Moody's revenue growth always has been largely driven by economic factors related to the credit environment. In particular, its revenue is highly correlated with issuing activities in the U.S. credit markets. (Def. 56.1 ¶ 39.) That Moody's earnings declined in the fall of 2007, amidst a credit crisis, following a decline in issuance activity, was not surprising, but to be expected. Even before the October 2007 earnings were announced, analysts predicted that if and when the booming housing market slowed down, so too would Moody's structured finance revenue. (Def. 56.1 ¶ 64.) Indeed, when earnings were announced in October 2007, numerous analysts commented that overall revenue (including that from structured finance) was in line with expectations, and blamed the lower-than-expected earnings on increased costs due to reasons such as higher staffing, headquarter relocation, IT initiatives, and international expansion. (Def. 56.1 ¶ 115.)

Mr. Coffman ignores these uncontested factors driving Moody's earnings. Instead, he assumes, *arguendo*, that the alleged fraud was the cause-in-fact. He writes: "*If*

plaintiffs establish liability, *then* the new information disclosed on October 24 and 25, 2007 was a partial materialization of the undisclosed risks created by Moody's unsustainable ratings practices." (Coffman 2012 Rpt. ¶ 68 (emphasis added).)[18]  This is not enough to withstand summary judgment.  An opinion that assumes causation in a loss causation analysis is inadmissible.  *See Daubert*, 509 U.S. at 597; *Wills* v. *Amerada Hess Corp.*, 379 F.3d at 48.  And more specifically, a claim of loss causation cannot defeat summary judgment when the expert merely "assumes" that a price decline resulted from the revelation of fraud.  *See In re Williams Secs. Litig. - WCG Subclass*, 558 F.3d 1130, 1135, 1139 (10th Cir. 2009).

Mr. Coffman has tested this theory before in another case.  In *In re DVI, Inc. Securities* Litigation, No. 2:03–cv–05336, 2010 U.S. Dist. LEXIS 92888 (E.D. Pa. Sept. 3, 2010) (granting summary judgment), Mr. Coffman presented similar testimony, which the court rejected as inadmissible.  As the *DVI* court explained, "[a] disclosure of disappointing earnings or other indications of the 'true financial condition' of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure."  *Id.* at *28.  The *DVI* court continued:  "Coffman's failure to show how the truth was revealed to the market and his failure to link the revelation to a corresponding loss puts his theory in direct conflict with the fundamental elements of loss causation; thus, it is neither relevant nor reliable."  *Id.* at *49.[19]

---

[18]    Indeed, the most Mr. Coffman offers in the way of causation analysis is the unremarkable fact that in the fall of 2007, there was a decline in earnings from rating U.S. RMBS securities.  As explained above, Mr. Coffman has made no showing that a decline in RMBS issuances—which Moody's itself predicted at the beginning of the class period— was a result of alleged conflicts of interest, and in fact, the evidence demonstrates otherwise.  (*See* Def. 56.1 ¶ 70.)

[19]    The *DVI* court went on to note that "[a]lthough there is some ambiguity in loss causation jurisprudence, there is no doubt that at the most basic level, loss causation requires proof of a causal nexus between a misrepresentation and loss suffered, as shown through a revelation of the truth to the market, and Coffman's . . . approach does not even satisfy that requirement."  *Id.* at *47 n.19.

Plaintiffs must "show," not "assume," that "at least some of the price drop was due to the fraud." *In re Omnicom Group*, 597 F.3d at 510 n.3; *see also Lynch,* 374 F. App'x at 206.

Mr. Coffman's analysis is also unreliable because he fails to account for the numerous additional pieces of negative information in the earnings announcement.  As Dr. Stulz explains, "[a]lthough Mr. Coffman's discussion of this day focuses on poor structured finance revenue, analysts identified many additional sources of negative news in the earnings report – all wholly unrelated to structured finance, subprime, and hence the allegations – that led to analysts' downward revisions of future earnings estimates."  (Stulz 2012 Rpt. ¶ 66.)[20]  If plaintiffs fail to disaggregate potentially confounding factors, they cannot defeat summary judgment.  *See In re Omnicom Group*., 541 F. Supp. 2d at 554; *Gordon Partners*, 2007 U.S. Dist. LEXIS 35895, at *4.[21]

Finally, both McCurley and Local 282 had already sold their Moody's stock by the time this "loss causation" event took place.  (Def. 56.1 ¶¶ 4-5, 8-9.)

**The May 21, 2008 Blog Post**

Plaintiffs also continue to assert that a May 21, 2008 *Financial Times* blog post report on a "bug" in a computer model that evaluated European constant proportion debt obligations, or CPDOs, and Moody's failure to acknowledge the error and adjust its ratings, can qualify as a corrective disclosure.  This Court already rejected the blog post as a loss causation

---

[20]     For example, analysts noted higher-than-expected costs as a reason for lower-than-expected earnings.  (Def. 56.1 ¶ 115.)

[21]     Mr. Coffman's consideration of the JP Morgan downgrade is equally flawed, as he again assumes a causal link to the alleged fraud.  (Coffman 2012 Rpt. ¶ 68.)  In fact, the analyst's report attributes the downgrade to a list of various factors such as "less issuer friendly debt markets," notably absent from which is Moody's alleged conflicts of interest.  (Def. 56.1 ¶ 117-18.)  In direct contrast to Mr. Coffman's claim that the downgrade and earnings announcement reflected the materialization of "unsustainable ratings practices," the report actually describes Moody's revenue as "cyclical" and predicts that Moody's ratings revenue will recover in the long term.  (Def. 56.1 ¶ 119.)

event for class certification purposes, and again, plaintiffs can provide no reason for the Court to find otherwise now. *In re Moody's*, 274 F.R.D. at 493. Neither the article nor the underlying story had anything to do with the allegations in plaintiffs' consolidated amended complaint. CPDOs are a niche product wholly unrelated to subprime mortgage-backed securities. (Def. 56.1 ¶ 127.) Furthermore, the CPDO event had nothing to do with the issuer-pays model. Rather, as found by the Staff of the Securities Exchange Commission, decision makers were concerned not about pleasing issuers, but consequences for investors who had relied on the original ratings. (Def. 56.1 ¶ 129.) Regardless of whether those individuals' actions were improper, there is no evidence they resulted from conflicts associated with the issuer-pays model. Any loss resulting from disclosure of a problem wholly unrelated to the allegations at issue *per se* cannot have been a "materialization" of the supposedly concealed conflicts. *See Lentell*, 396 F.3d at 173-74. Finally, again, both McCurley and Local 282 had sold their Moody's stock by the time this "loss causation" event took place. (Def. 56.1 ¶ 130.)

**The October 21-23, 2008 Congressional Hearings**

The final disclosure Mr. Coffman addresses is a series of Congressional hearings on the financial crisis held from October 21 through October 23, 2008. Mr. Coffman opines that the "intense regulatory scrutiny" Moody's faced during those days was a materialization of risk of the alleged fraud. (Coffman 2012 Rpt. ¶ 89.) The October 2008 Congressional hearings cannot establish loss causation because all three plaintiffs sold all of their Moody's stock before the hearings took place. (Def. 56.1 ¶ 132.) As this Court recognized, "[i]f a Plaintiff owns no stock before [a] corrective disclosure[], there cannot be any harm caused by a 'materialization of the concealed risk,' and thus loss causation cannot be established." *In re Moody's*, 274 F.R.D. at 487 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)).

In any event, the Court has already rejected this "disclosure" event.  *See In re Moody's*, 274 F.R.D. at 492.  In his previous reports, Mr. Coffman analyzed the hearings that took place on October 22 and October 23, 2008.  (Def. 56.1 ¶ 133.)   The Court found that the dates were not associated with a statistically significant price decrease.  *See In re Moody's*, 274 F.R.D. at 492.  Mr. Coffman now expands the window to a three-day period and seeks to add the cumulative price decreases of each day.  (Coffman 2012 Rpt. ¶¶ 79-90.)   But he again fails to analyze whether the hearings resulted from alleged conflicts of interest or were instead due to "other factors, such as the intensified financial crisis following the Lehman Brother bankruptcy and the failures of several major financial institutions, which alone would likely have triggered scrutiny." (Stulz 2012 Rpt. ¶ 93.)  Accordingly, this "disclosure" cannot support a finding of loss causation.  *See Omnicom*, 597 F.3d at 510; *Lynch*, 374 F. App'x at 206.

## CONCLUSION

It is plaintiffs' burden to amass enough evidence to allow a reasonable jury to find that: (i) the alleged misstatements added material information to the public debate; (ii) the alleged misstatements artificially increased Moody's stock price; and (iii) the alleged fraud caused declines in Moody's stock price amidst the turmoil of the financial crisis. Plaintiffs have not met that burden.

For all the foregoing reasons, defendants respectfully request that their motion for summary judgment be granted, that the Court dismiss plaintiffs' consolidated amended complaint in its entirely with prejudice, and grant such other relief as the Court may deem just and proper.

Dated:  New York, New York
        September 16, 2012

                                        /s/ Sharon L. Nelles_____
                                        Sharon L. Nelles
                                        Penny Shane
                                        Stephen Ehrenberg
                                        Sarah Stoller
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, New York  10004
                                        Telephone:  (212) 558-4000
                                        Facsimile:  (212) 558-3588

                                        *Attorneys for Defendants Moody's Corporation
                                        and Raymond W. McDaniel, Jr.*