**\*CORRECTED COPY\***

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
                                                       :
                                                       :
IN RE: MOODY'S CORPORATION                             :
SECURITIES LITIGATION                                  :   DOCKET NO. 07-cv-8375-GBD
                                                       :
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------x


**MOODY'S DEFENDANTS' LOCAL CIVIL RULE 56.1**
**STATEMENT OF MATERIAL FACTS AS TO WHICH**
**THERE IS NO GENUINE ISSUE TO BE TRIED**

Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Sarah Stoller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Attorneys for Defendants*
*Moody's Corporation and*
*Raymond W. McDaniel, Jr.*

September 16, 2012

# TABLE OF CONTENTS

**Page**

THE PARTIES...........................................................................................................- 1 -

PROCEDURAL HISTORY......................................................................................- 2 -

MOODY'S BUSINESS ...........................................................................................- 7 -

THE ISSUER PAYS MODEL .................................................................................- 8 -

THE SUBPRIME MORTGAGE CRISIS................................................................- 10 -

MOODY'S STRUCTURED FINANCE BUSINESS ..............................................- 12 -

THE ALLEGED MISSTATEMENTS ....................................................................- 14 -

MOODY'S STOCK PRICE ....................................................................................- 15 -

PLAINTIFFS' PUTATIVE EXPERT OPINION....................................................- 15 -

PLAINTIFFS PURCHASE OF THEIR STOCK ....................................................- 16 -

THE LOSS CAUSATION EVENTS ......................................................................- 18 -

Pursuant to Local Civ. R. 56.1(a), Moody's Corporation and Raymond W. McDaniel, Jr. (collectively, the "defendants") submit this summary statement of material facts as to which they contend there is no genuine issue to be tried.  In addition, defendants incorporate herein the further evidentiary support set forth in the attached Declaration of Sharon L. Nelles, dated September 16, 2012 and the exhibits attached thereto, as well as the Declaration of Darrell S. Cafasso, dated September 26, 2008 (Dkt. No. 22) and the exhibits attached thereto, the Declaration of Stephen Ehrenberg, dated May 28, 2010 (Dkt. No. 69) and the exhibits attached thereto and the Declaration of Stephen Ehrenberg dated, October 22, 2010 (Dkt. No. 85) and the exhibits attached thereto.

## THE PARTIES

1.      The defendants in this action are Moody's Corporation ("Moody's") and Raymond W. McDaniel, Jr.  (*See* Consolidated Amended Complaint ("CAC"), attached as Ex. 1 to the Declaration of Sharon L. Nelles ("Nelles Decl.").).

2.      Moody's is the parent company of Moody's Investors Service, a credit rating agency that is registered with the United States Securities and Exchange Commission as a Nationally Recognized Statistical Rating Organization.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 10-11.)

3.      Raymond W. McDaniel, Jr. has served, at all relevant times, as the Chief Executive Officer of Moody's and Chairman of its Board of Directors.  (Nelles Decl. Ex. 1 (CAC) ¶ 14.)

4.      Plaintiff Charles McCurley ("McCurley") is an individual who purchased Moody's common stock on March 9, 2007 and March 12, 2007.  (Nelles Decl. Ex. 13 (McCurley 0002-0003).)

5.       McCurley sold all of his Moody's common stock on or before September 4, 2007.  (Nelles Decl. Ex. 13  (McCurley 0001-0007); Ex. 10 (Transcript of Deposition of Charles McCurley, dated Mar. 19, 2010 ("McCurley Dep.")) at 33:7-34:4.)

6.       Plaintiff Lewis Wetstein ("Wetstein") is an investor who purchased Moody's common stock on June 25, 2007 and August 18, 2008.  (Nelles Decl. Ex. 11 (Transcript of Deposition of Lewis Wetstein, dated Mar. 19, 2010 ("Wetstein Dep.") at 53:6-8, 82:19-23.)

7.       Wetstein sold all of his Moody's common stock on or before Oct. 6, 2008. (Nelles Decl. Ex. 11 (Wetstein Dep.) at 51-53.)

8.       Plaintiff Teamsters Local 282 Trust Fund ("Local 282") is a union that purchased Moody's common stock on February 12, 2007.  (Nelles Decl. Ex. 12 (Transcript of Deposition of William Maye, dated Apr. 1, 2010 ("Maye Dep.")) at 36:23-37:07.)

9.       Local 282 sold all of its Moody's common stock on or before September 7, 2007.  (Nelles Decl. Ex. 12 (Maye Dep.) at 50:7-16; Nelles Decl. Ex. 14 (LTPF0002852).)

## PROCEDURAL HISTORY

10.       McCurley, Wetstein and Local 282 (collectively, the "plaintiffs") commenced this action on July 19, 2007, in the Northern District of Illinois, on behalf of a class of shareholders who purchased Moody's stock between October 25, 2006 and July 10, 2007. (Nelles Decl. Ex. 2 (*Nach* v. *Huber*, No. 07-cv-4071 (N.D. Ill.), filed on July 19, 2007) ¶ 1.) That complaint (the "July 2007 Complaint") alleged that, during the then-proposed class period October 2006 to July 2007, Moody's "misrepresented or failed to disclose that the Company assigned excessively high ratings to bonds backed by risky subprime mortgages."  (Nelles Decl. Ex. 2 (July 2007 Compl.) at ¶ 4.)  The July 2007 Complaint further alleged that Moody's "shocked investors" when it announced on July 11, 2007, that it "was downgrading 399 mortgage-backed securities issued in 2006 and reviewing an additional thirty-two for downgrade,"

and further disclosed "that it had downgraded 52 bonds issued in 2005."  (Nelles Decl. Ex. 2 (July 2007 Compl.) ¶ 5.)

11.     On September 26, 2007, plaintiffs moved to be appointed as lead plaintiffs in the Northern District of Illinois action.  *Nach* v. *Huber*, No. 07-cv-4071 (N.D. Ill.) (Dkt. Nos. 8, 11).

12.     On September 26, 2007, Local 282 filed a complaint in the United States District Court for the Southern District of New York on behalf of a group of Moody's shareholders identical to the group of shareholders described in the Illinois action, setting forth essentially identical allegations.  *In re Moody's Corp. Sec. Litig.*, No. 07-cv-8375 (S.D.N.Y.) (Dkt. No. 1).

13.     On December 12, 2007, the Northern District of Illinois appointed Local 282, McCurley and Wetstein as lead plaintiffs.  *See Nach* v. *Huber*, No. 07-cv-04071 (N.D. Ill.) (Dkt. No. 39).

14.     On February 13, 2008, the Illinois action was transferred to the Southern District of New York, and, on May 28, 2008, the Illinois action was consolidated with the New York action under the caption *In re Moody's Corporation Securities Litigation*.  *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No. 8).

15.     On June 27, 2008, plaintiffs filed a consolidated amended complaint. (Nelles Decl. Ex. 1 (CAC).)  Plaintiffs expanded the putative class to now span from February 3, 2006 to October 24, 2007.  (Nelles Decl. Ex. 1 (CAC) at ¶ 1.)

16.     In the CAC, plaintiffs allege that Moody's artificially inflated its stock by stating falsely that (i) it was "committed to upholding" its independence and had "a reputation

for independence from its clients," or (ii) its "ratings were achieved by integrity of process [*sic*]." (Nelles Decl. Ex. 1 (CAC) ¶¶ 3, 37, 68, 71.)

17.     In the CAC, plaintiffs allege that Moody's was "captivated by its client base" (in structured finance) and started "rating to the satisfaction of clients, not as the instruments themselves warranted."  (Nelles Decl. Ex. 1 (CAC) ¶¶ 3, 41-46.)

18.     In the CAC, plaintiffs allege that Moody's purported fraud of claiming commitment to upholding independence but succumbing to conflicts was revealed through a series of corrective disclosures.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 399, 400.)

19.     On September 26, 2008, defendants moved to dismiss the CAC on grounds that it was time-barred, failed to plead loss causation, actionable misrepresentations and scienter, among other reasons.  *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. Nos. 20-21).

20.     On February 23, 2009, the Court granted defendants' motion in part.  The Court narrowed the actionable alleged misstatements in the CAC to (1) statements regarding "independence"—for example, assertions such as that Moody's "maintains independence in its relationship with Issuers" or seeks "to protect the integrity of [its] rating process"; and (2) statements regarding the consideration of "originator" characteristics as part of Moody's rating methodologies.  *In re Moody's*, 599 F. Supp. 2d at 508-10; (*see also* Nelles Decl. Ex. 1 (CAC) ¶ 69(e), (j).)  The Court identified four statements in the CAC as sufficient to serve as "corrective disclosures" of the actionable alleged misstatements.  *In re Moody's*, 599 F. Supp. 2d at 512.

21.     Pursuant to this Court's scheduling orders of November 4, 2009 and April 9, 2010, defendants produced several million documents to plaintiffs, and deposed the three

- 4 -

plaintiffs, or representatives thereof. *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No. 55 (Report of Rule 26(f) Conf. & Sched. Order, dated Nov. 4, 2009); Dkt. No. 64 (Stip. & Amd. to Sched., dated Apr. 4, 2010); Nelles Decl. Ex. 11 (Wetstein Dep.); Nelles Decl. Ex. 10 (McCurley Dep.); Nelles Decl. Ex. 12 (Maye Dep.).)

22.     On January 22, 2010, plaintiffs moved to certify a class of all shareholders who purchased common stock in Moody's between February 3, 2006 and October 24, 2007. *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No. 57). Plaintiffs argued that they were entitled to invoke the "fraud-on-the-market" presumption of reliance because material misstatements were publicly made to an efficient market, and therefore common issues predominated over individual ones. (Nelles Decl.  Ex. 4 (Pls. Mem. of Law in Supp. of Class Cert., dated Jan. 22, 2010 ("Pl. Class Cert. Mem.") at 18-21).)

23.     On March 31, 2011, the Court denied plaintiffs' motion. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011). The Court found that defendants had effectively "severe[ed] the link between the alleged misrepresentation and the [stock] price" because (i) none of the alleged misrepresentations was associated with a statistically significant increase in Moody's stock price and (ii) there was no date within the class period on which a corrective disclosure was associated with a significant price decline. *In re Moody's*, 274 F.R.D. at 490, 493.

24.     In its March 31, 2011 decision, the Court also found that plaintiffs were not entitled to the *Affiliated Ute* presumption of reliance because their claims focus primarily on affirmative misrepresentations rather than omissions. *In re Moody's*, 274 F.R.D. at 494. The Court concluded that Moody's had rebutted the class-wide presumption of reliance, resulting in individualized questions of reliance predominating over common ones. *Id.* at 493-94.

25.     In its March 31, 2011 decision, the Court also found that Local 282 and McCurley were "in-and-out traders" who sold their stock before the first recognized disclosure date and could not serve as class representatives.  *In re Moody's*, 274 F.R.D. at 488.

26.     On April 14, 2011, plaintiffs petitioned for leave to appeal the Court's decision to the Second Circuit pursuant to Rule 23(f) ("23(f) Pet.").  (Nelles Decl. Ex. 9.)

27.     The Second Circuit denied plaintiffs' petition on July 20, 2011.  *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No. 102).

28.     On January 31, 2012, the Court, on consent of the parties, issued an order setting forth a discovery schedule for supplemental discovery on three elements of plaintiffs' claims:  materiality, reliance and loss causation.  *In re Moody's Corp. Sec. Litig.*, No. 07-cv-08375 (S.D.N.Y.) (Dkt. No. 104.)

29.     Plaintiffs did not develop any further factual evidence, but on May 25, 2012, plaintiffs served an expert report prepared by their putative expert, Mr. Chad Coffman.  (Nelles Decl. Ex. 19 (Expert Report of Chad Coffman, CFA, dated May 25, 2012 ("Coffman 2012 Rpt.")).)

30.     On June 29, 2012, Moody's served on plaintiffs a report prepared by its expert, Dr. René Stulz.  (Nelles Decl. Ex. 20 (Expert Report of Rene M. Stulz, Ph.D., dated June 29, 2012 ("Stulz 2012 Rpt.")).)

31.     Dr. Stulz is an expert in financial economics who has served as past president of the American Finance Association and as editor of the Journal of Finance, authored a textbook on derivatives, and advised the International Monetary Fund, the World Bank, the New York Stock Exchange and the Federal Reserve Bank of New York.  (Nelles Decl. Ex. 15

(Expert Report of René M. Stulz, dated May 28, 2010 ("Stulz May 2010 Rpt.")) ¶ 2; Expert

Report of René M. Stulz, dated October 22, 2010, ¶ 1.)

**MOODY'S BUSINESS**

32.     Moody's, through its subsidiary Moody's Investor Service ("MIS"),

provides credit ratings and research covering debt instruments and securities.  (Nelles Decl. Ex. 1

(CAC) ¶¶ 10-11.)

33.     Moody's publishes credit opinions "on a broad range of credit

obligations . . . including various corporate and governmental obligations and structured finance

securities."  (Nelles Decl. Ex. 1 (CAC) ¶ 10.)

34.     Credit ratings are predictive opinions concerning the risk of default and

any estimated losses associated with a default that are derived through the application of a

published methodology.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 18, 19.)

35.     Credit ratings are derived through the application of a published

methodology, which sets forth an analytical framework for assessing the credit risk of a

particular issuer or asset class.  Moody's, like other major credit rating agencies, has been

transparent about the methodologies it employs, including those used to rate structured finance

products such as collateralized debt obligations ("CDOs") and residential mortgage-backed

securities ("RMBS").  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶¶ 7, 26 (and materials cited

therein).)

36.     In addition to published methodologies, rating agencies also employ, for

certain asset classes, quantitative models that reflect the analytical framework set forth in the

applicable rating methodology.  Such models are generally dependent upon the availability of

historical data concerning the performance of securities in the applicable asset class.  Moody's

has widely publicized the fact that when experience with a financial instrument is limited,

- 7 -

forecasts using past experience are not as precise as they would be with more data.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 28 (and materials cited therein).)

## THE ISSUER PAYS MODEL

37.   Moody's is compensated for its services by the issuers of debt obligations, and has been since the 1970s.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 38-39.)

38.   Moody's publicly available code of conduct, adopted in June 2005, discloses the inherent conflict in the model and sets forth the Company's policies and procedures designed to manage that conflict.  (Nelles Decl. Ex. 1 (CAC) ¶ 68; Nelles Decl. Ex. 21 (Moody's Code of Professional Conduct, dated June 2005) at 7-11.)

39.   Moody's revenue always has been highly correlated with issuing activities in the United States credit markets.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) at Ex. 4 (comparing Moody's financial performance to U.S. debt issuances from 2001 through 2008) and ¶ 29 (collecting analyst reports noting the link between Moody's revenue growth and factors such as the health of the housing market and interest rates).)

40.   Moody's code of conduct states that "Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.  . . . [Moody's will adopt procedures to] eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses Moody's makes or the judgment and analyses of Moody's Employees who have an influence on Credit Rating decisions."  (Nelles Decl. Ex. 21 (Moody's Code of Professional Conduct, dated June 2005) at 7-8.)

41.   The issuer pays model has been the subject of extensive legislative and regulatory scrutiny for years.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶¶ 38-50 (and materials cited therein).)

42.     A Geneva Report on the World Economy published in 2004 noted "[a]n obvious risk is that the 'issuer fee' model could result in rating agencies implicitly or explicitly offering more favourable ratings in exchange for business."  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 38; Nelles Decl. Ex. 22 (Andrew Crockett et al., Geneva Reports on the World Economy 5, Conflicts of Interest in the Financial Services Industry:  What Should We Do About Them? 48 (2003)).)

43.     An *Economist* article published in 2005 stated "the big [rating] agencies' business model has a built-in conflict of interest.  Ratings are paid for by the issuers of bonds and other forms of tradable debt, not by investors who use them.  Can they be completely independent of the firms who pay the bills?"  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 38; Nelles Decl. Ex. 23 (*Three is No Crowd - Credit-Rating Agencies*, The Economist, March 26, 2005).)

44.     A *Wall Street Journal* article published in 2005 commented that "[l]awmakers have called on the SEC to regulate ratings firms more closely and to monitor conflicts of interest in a system where issuers pay the companies that perform their ratings.  The industry has come under fire for failing to spot red flags that exploded in scandal."  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 38; Nelles Decl. Ex. 24 (Deborah Solomon, *Moving the Market: SEC Says Voluntary Policing By Ratings Firms Lacks Bite*, The Wall Street Journal, March 10, 2005, at C3).)

45.     Enacted by Congress in 2006, the Credit Rating Agency Reform Act of 2006 (the "Act"), 15 U.S.C. § 78o-7 *et seq.*, and its implementing regulations address the issuer pays model.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 85-91.)

46.     The Act required credit rating agencies "that elect[] to be treated as a nationally recognized statistical rating organization" to "register application materials with the SEC" including "'any conflict of interest relating to the issuance of credit ratings by the applicant' (15 U.S.C. § 78o-7a(1)(b)(vi)), and . . . the agency's 20 largest paying customers (15 U.S.C. § 78o-7a(1)(B)(viii))."  (Nelles Decl. Ex. 1 (CAC) ¶ 86.)

47.     The Act also required rating agencies to "establish, maintain, and enforce written policies and procedures reasonably designed . . . to address and manage any conflicts of interest."  (Nelles Decl. Ex. 1 (CAC) ¶ 88 (quoting without citing to 15 U.S.C. § 78o-7(g)(1)).)

48.     In addition to legislative scrutiny, credit rating agencies have historically been subject to frequent regulatory scrutiny, and risk of scrutiny has been disclosed by Moody's in SEC filings and discussed in press releases and analyst reports before and throughout the period that plaintiffs held Moody's stock.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt. (and materials cited therein)) ¶ 53; Nelles Decl. Ex. 25 (Moody's Corp. 2006 Annual Rpt.) at 56; Nelles Decl. Ex. 26 (Moody's Corp. 2007 Annual Rpt.) at 62.)

## THE SUBPRIME MORTGAGE CRISIS

49.     After the recession of 2001, the United States as well as the global economy experienced a period of steady growth.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 67 (and materials cited therein).)

50.     After the recession of 2001, there was tremendous growth in U.S. subprime mortgage securitizations throughout the United States.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶¶ 67-68.)

51.     Subprime mortgage performance after the 2001 recession was "'masked' by unprecedented housing price appreciation, which allowed homeowners who would otherwise

have defaulted merely to sell their houses at a profit and pay back the mortgages in full." (Nelles Decl. Ex. 1 (CAC) ¶ 163.)

52.     Housing price appreciation slowed in late 2006 and then began to fall. (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 71 (and materials cited therein).)

53.     The growth of house prices and ensuing crash of those prices were concentrated in particular areas of the country.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 70 (and materials cited therein).)

54.     In mid-2007, subprime mortgages began experiencing an unprecedented default rate in the United States.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 71.)

55.     In mid-2007, structured finance securities backed by subprime mortgages faced significant losses.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 73.)

56.     Beginning in the summer of 2007, sponsors decreased issuance of structured finance securities.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 28 (and materials cited therein); Nelles Decl. Ex. 31 (*Q3 2007 Moody's Corp. Earnings Conference Call – Final*, Voxant FD Wire, Oct. 24, 2007 ("*Q3 2007 Conf. Call*")).)

57.     Growing illiquidity led to further decline in issuance in the structured finance market.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 28.)

58.     Commercial real estate prices saw declines later than residential prices. (Nelles Decl. Ex. 20 (Stulz May 2012 Rpt.) ¶ 31 (and materials cited therein).)

59.     In 2006 and 2007, analysts predicted that rating agencies would face increasing scrutiny from Congress and regulators, among others.  (Nelles Decl. Ex. 32 (John Authers, *Credit Rating*, Financial Times (July 3, 2007)); Nelles Decl. Ex. 33 (*2Q07 Preview, Adj Ests*, JP Morgan North American Equity Research) at 3; Nelles Decl. Ex. 20 (Stulz 2012 Rpt.)

¶ 49 ("Congressman Barney Frank and Senator Christopher Dodd . . . had discussed potential hearings and legislation related to the rating agencies and subprime issues in the months prior to August 20, 2007")); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 487 ("[August 20, 2007] was not the first time that members of Congress expressed concern about the role rating agencies played in the subprime mortgage crisis.").)

60.     In July 2007, a JPMorgan analyst commented that "[s]hould credit markets deteriorate materially, rating agencies would likely face heightened scrutiny."  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 53; Nelles Decl. Ex. 33 (*2Q07 Preview, Adj Ests*, JP Morgan North American Equity Research, July 20, 2007 at 3).)

## MOODY'S STRUCTURED FINANCE BUSINESS

61.     Before and while plaintiffs held Moody's stock, Moody's rated securitizations comprised of residential mortgage loans for properties located throughout the United States.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 10, 26-31.)

62.     Before and while plaintiffs held Moody's stock, Moody's structured finance revenue varied greatly by both geographic area and type of structured finance product. (Nelles Decl. Ex. 29 (Moody's Corp., Form 10-Q (Nov. 2, 2007)) at 6.)

63.     Before and while plaintiffs held Moody's stock, Moody's revenue was highly correlated with structured finance issuing activities in the U.S. credit markets.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 28 (and materials cited therein).)

64.     Before and while plaintiffs held Moody's stock, analysts predicted that if and when the booming housing market slowed down, so too would Moody's structured finance revenue.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 29 (and materials cited therein).)

65.     When structured finance issuance collapsed, Moody's earnings and share price declined in tandem.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 37, 72(d).)

66.     Beginning in the summer of 2007, rating agencies including Moody's began downgrading RMBS at an increased rate.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 32 (and materials cited therein).)

67.     Moody's October 2007 earnings release showed a decline in U.S. structured finance revenue.  (Nelles Decl. Ex. 31 (*Q3 2007 Conf. Call*).)

68.     Moody's international structured finance revenue, including revenue from RMBS, grew by 10% in the third quarter of 2007.  (Nelles Decl. Ex. 31 (*Q3 2007 Conf. Call*); Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 30 (and materials cited therein).)

69.     The growth of Moody's RMBS revenue and revenue from commercial mortgage-backed securities were projected to follow distinct paths.  (Nelles Decl. Ex. 27 (Moody's Corporation, Form 10-Q (Aug. 3, 2006)) at 31; Nelles Decl. Ex. 28 (Moody's Corporation, Form 10-Q (May 3, 2007)) at 23-24; Nelles Decl. Ex. 30 (Moody's Corporation, Form 10-Q (Aug. 3, 2007)) at 25-26; Nelles Decl. Ex. 29 (Moody's Corporation, Form 10-Q (Nov. 2, 2007)) at 30.)

70.     Moody's projected a year-over-year decline in U.S. RMBS in almost every quarter that plaintiffs held Moody's stock.  (Nelles Decl. Ex. 27 (Moody's Corp., Form 10-Q (Aug. 3, 2006)) at 31; Nelles Decl. Ex. 28 (Moody's Corp., Form 10-Q (May 3, 2007) at 23-24; Nelles Decl. Ex. 30 (Moody's Corp., Form 10-Q (Aug. 3, 2007)) at 25-26; Nelles Decl. Ex. 29 (Moody's Corp., Form 10-Q (Nov. 2, 2007)) at 30.)

71.     In the third quarter of 2007, Moody's RMBS revenue suffered a 52% decline in revenue.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 32 (and materials cited therein); Nelles Decl. Ex. 31 (*Q3 2007 Conf. Call*).)

72.     In the third quarter of 2007, of the 91 firms in the S&P 500 Financial Index, excluding Moody's, 36% showed year-over-year revenue declines and 57% showed net income declines.  In later quarters, such as Q4 2008, that percentage increased to 74% of firms showing year-over-year revenue declines and 77% of firms showing net income declines. (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 28.)

73.     In 2006 and 2007, Moody's predicted strong growth in U.S. commercial mortgage-backed securities ("CMBS") revenue.  (Nelles Decl. Ex. 27 (Moody's Corp., Form 10-Q (Aug. 3, 2006)) at 31; Nelles Decl. Ex. 28 (Moody's Corp., Form 10-Q (May 3, 2007)) at 23-24; Nelles Decl. Ex. 30 (Moody's Corp., Form 10-Q (Aug. 3, 2007)) at 25-26; Nelles Decl. Ex. 29 (Moody's Corp., Form 10-Q (Nov. 2, 2007)) at 30.)

## THE ALLEGED MISSTATEMENTS

74.     In the CAC, plaintiffs allege that Moody's systematically sacrificed its independence and succumbed to conflicts of interest in assigning ratings to structured finance securities.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 107-08, 131, 206, 306-311.)

75.     In the CAC, plaintiffs allege that dozens of statements in Moody's Code of Conduct, its Code Implementation Report, Annual Reports and 10-Ks were misleading. (Nelles Decl. Ex. 1 (CAC) ¶¶ 68-84.)

76.     In the CAC, plaintiffs allege other examples of misrepresentations, including representations found in Moody's 2005 Annual Report concerning the "fundamental importance of 'independence' in Moody's business conduct, business strategy and regulatory affairs" and "the adequacy of the steps that Moody's was taking to respond to regulator concerns over Moody's independence."  (Nelles Decl. Ex. 1 (CAC) ¶ 72(b)-(c).)

77.     The Court recognized purported misstatements by Moody's concerning its independence pled in the CAC.  (Nelles Decl. Ex. 1 (CAC) ¶¶ 68, 71-73, 80, 83, 111, 112); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 501-503, 507, 510 (S.D.N.Y. 2009).

## MOODY'S STOCK PRICE

78.     On the dates the eight purported misstatements recognized by the Court were made, price increases of Moody's stock ranged from .29% to 2.21%.  (Nelles Decl. Ex. 15 (v.) ¶ 63 (and materials cited therein).)

79.     On two of the eight dates—June 2, 2005, when Moody's published its Code of Professional Conduct, and March 22, 2007, when Moody's published its 2006 Annual Report to Shareholders—Moody's stock price fell, by -.30% and -.05%, respectively.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) Ex. 6.)

## PLAINTIFFS' PUTATIVE EXPERT OPINION

80.     Plaintiffs' putative expert Chad Coffman assumes but does not opine that Moody's alleged mismanagement of conflicts of interest were the cause-in-fact of calls for regulatory scrutiny against Moody's.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶¶ 56-60.)

81.     Mr. Coffman acknowledges that only "[t]o the extent Plaintiffs' theory of liability is accurate," in that "Moody's knew or was reckless in not knowing that it had sacrificed its independence," did investors pay "inflated prices based upon this undisclosed risk."  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 5).)

82.     Mr. Coffman and Dr. Stulz agree that not one of the alleged misrepresentations is associated with a statistically significant and positive return.  (*See* Ex. 20 (Stulz 2012 Rpt.) ¶¶ 8, 19; Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 63 & n.95; Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 42.)

83.     Mr. Coffman opines that "Moody's making statements about the independence and integrity of its ratings is what the market had come to expect and reflected the status quo.  Therefore, one would not expect to observe a substantial change in value when the statements were made."  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 42.)

84.     Mr. Coffman opines that there are four relevant "disclosure" events related to the alleged misstatements:  (1) Senator Richard Shelby's comments on August 20, 2007 that rating agencies should shoulder some responsibility for the mortgage crisis; (2) Moody's earnings announcement and analyst coverage of Moody's on October 24 and October 25, 2007; (3) a May 21, 2008 *Financial Times* blog post about a code error in a computer model that evaluated constant proportion debt obligations ("CPDOs"); and (4) a series of Congressional hearings held on the financial crisis from October 21, 2008 through October 23, 2008.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶¶ 56, 61, 73, 79-85.)

85.     All four of these "disclosure" events were analyzed by Mr. Coffman in prior reports and presented to the Court.  (Nelles Decl. Ex. 16 (Expert Report of Chad Coffman, CFA, dated Aug. 23, 2010 ("Coffman Aug. 2010 Rpt.")) ¶¶ 87-89, 97; Ex. 18 (Expert Reply Report of Chad Coffman, CFA, dated Nov. 5, 2010 ("Coffman Nov. 2010 Rpt.")) ¶¶ 69, 72.)

## PLAINTIFFS PURCHASE OF THEIR STOCK

86.     Plaintiffs did not buy Moody's stock in direct reliance on the alleged misstatements.  (*See infra* ¶¶ 87-94.)

87.     Wetstein testified that he bought Moody's stock because it was a "gold standard slam dunk" with "no" or "minimal risk."  (Nelles Decl. Ex. 11 (Wetstein Dep.) at 15, 31.)

88.     Wetstein testified that he came to this conclusion while watching Jim Cramer on *Mad Money*, who was "jumping up and down, saying how can you go wrong buying

something like this? This was his pick of the week or pick of the month."  (Nelles Decl. Ex. 11 (Wetstein Dep.) at 29-30.)

89.     Wetstein testified that it was a "great business plan."  (Nelles Decl. Ex. 11 (Wetstein Dep.) at 29.)

90.     Wetstein testified that he never visited Moody's website or collected any other information about Moody's before he purchased its stock.  (Nelles Decl. Ex. 11 (Wetstein Dep.) at 31.)

91.     McCurley testified that he had been a longtime shareholder of Berkshire Hathaway, an institutional investor in Moody's stock.  McCurley "got involved in Moody's primarily because . . . you feel like that [Warren] Buffett [primary shareholder and CEO of Berkshire Hathaway] knows what he's doing and . . . he's done very well with his Berkshire Hathaway and . . . in terms of me risking retirement money, I feel pretty good with Buffett . . . and that's kind of it."  (Nelles Decl. Ex. 10 (McCurley Dep.) at 10.)

92.     William Maye, the Fund Administrator of Local 282, the only representative from Local 282 to offer testimony in this matter, testified that Local 282's investment decisions were made by several investment managers who had complete discretion over investment decisions.  (Nelles Decl. Ex. 12 (Maye Dep.) at 32:8-9; 57-59.)

93.     Maye did not make any investment decisions for the fund.  (Nelles Decl. Ex. 12 (Maye Dep.) at 57:6-15.)

94.     New York Capital, the investment manager that purchased Moody's stock, went out of business in or around 2008.  (Nelles Decl. Ex. 12 (Maye Dep.) at 72:5-14.)  Maye did not testify as to the reasons that New York Capital purchased Moody's stock.  (*See, e.g.*, Nelles Decl. Ex. 12 (Maye Dep.) at 32:7-33:24) (the only information on stock purchases that

Maye received from the investment managers was statements listing total purchases and sales by dollar value).)

## THE LOSS CAUSATION EVENTS

**August 20, 2007**

95.     On August 20, 2007, Senator Richard Shelby commented that rating agencies should shoulder some responsibility for the mortgage crisis.  (Nelles Decl. Ex. 1 (CAC) ¶ 400(e).)

96.     Senator Shelby's August 20, 2007 comment is the only purported loss causation event that occurred before Local 282 and McCurley sold all of their stock in Moody's. (*See supra* ¶¶ 4-5, 8-9.)

97.     Mr. Coffman opines that Senator Shelby's comment injected new information into the market because Senator Shelby is a Republican and earlier calls for congressional inquiry came from Democrats.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 57.)

98.     Other Republicans, including Senator Shelby, called for increased scrutiny of rating agencies before August 20, 2007.  (Nelles Decl. Ex. 34 (Proceedings and Debates of the 109th Congress, Second Session, Congressional Record, Vol. 152, No. 120, Sep. 22, 2006 ("Sep. 22, 2006 Congr. Record") (which shows that the bill, sponsored by Senator Shelby, was discussed by Senator Sarbanes (D), and "reflects important contributions from Senators Menendez [D], Schumer [D], Enzi [R], and Sununu [R]")).)

99.     On February 1, 2006, Senator Shelby said, "I think it needs to be changed. . . .  There's got to be a better system. . . .  There are too few (firms), not enough competition, probably not enough transparency, especially when there gets [*sic*] to be conflicts of interest."  (Nelles Decl. Ex. 36 (Kevin Drawbaugh, UPDATE 3—*US Senate's Shelby Urges Credit Rater Changes*, Reuters, Feb. 1, 2006).)

100.     Senator Shelby was the sponsor of the Credit Rating Agency Reform Act in 2006 which provided the SEC with more regulatory and oversight authority over rating agencies and opened the industry to potentially greater competition.  (Nelles Decl. Ex. 34 (Sep. 22, 2006 Congr. Record).)

101.     The bill had bipartisan support in the Senate, and was passed by unanimous consent.  (Nelles Decl. Ex. 35 (Bill Summ. & Status, 109th Congress (2005-2006) S.3850, Major Congressional Actions).)

102.     In late 2006, Senator Shelby repeated his criticism of the rating agencies, saying that they "failed millions of investors by neglecting to lower their ratings on Enron, WorldCom and other companies headed for bankruptcy. . . .  The absence of timely downgrades in these cases was a product of an industry that was beset by conflicts of interest and a lack of competition."  (Nelles Decl. Ex. 37 (*Bush Signs Rating Agency Reform Act*, CFO.com, October 2, 2006, http://www.cfo.com/article.cfm/7991492).)

103.     Senator Shelby's comments were the subject of an article by Dow Jones International News on August 20, 2007 under the headline "Lawmakers Must Not Over-Regulate Credit Agencies — US Senator."  (Nelles Decl. Ex. 38 (*Lawmakers Must Not Over-Regulate Credit Agencies — U.S. Senator*, Dow Jones Int'l News, Aug. 20, 2007 ("*Lawmakers*")).)

104.     In that article, Senator Shelby is cited as urging "legislative restraint." (Nelles Decl. Ex. 38 (*Lawmakers*).)

105.     In that article, Senator Shelby is quoted as saying "[t]here will be calls for more regulation. . . .  My first thought is let's not over-regulate the market, the market will regulate itself."  (Nelles Decl. Ex. 38 (*Lawmakers*).)

106.     No analyst report discussed Senator Shelby's comments or noted that there was a substantial increase in regulatory risk because of them.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 52.)

107.     Mr. Coffman opines that Senator Shelby's August 20, 2007 comments on credit rating agencies differ from his earlier remarks because in earlier remarks, Senator Shelby expressed that there was no "evidence" of credit rating agencies violating their procedures and ethics codes.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 57.)

108.     Senator Shelby's August 20, 2007 comments do not express that there is any "evidence" of credit rating agencies violating their procedures and ethics codes.  (*See* Ex. 19 (Coffman 2012 Rpt.) ¶ 57.)

109.     On August 17, 2007, the trading day before August 20, 2007, Moody's stock price closed at $49.98.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 54.)

110.     On August 20, 2007, Senator Shelby's comments were made prior to market open.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 56 n.76 (news of Shelby's comments published at 9:06 a.m.).)

111.     On August 20, 2007,  Moody's stock price opened at approximately $49.30.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 54 (and materials cited therein).)

112.     On August 20, 2007, JP Morgan downgraded McGraw-Hill (the parent company of the rating agency Standard & Poor's) because of the "current freeze in some credit markets."  (Nelles Decl. Ex. 39 ("J.P. Morgan Analyst Downgrades McGraw-Hill to 'Neutral' on Credit Market Turmoil," Associated Press, Aug. 20, 2007); Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 55 (and materials cited therein).)

113.    On August 20, 2007, Moody's stock price declined throughout the remaining trading hours.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 54.)

**October 24-25, 2007**

114.    On October 24, 2007, Moody's announced its third quarter earnings, and on October 25, 2007, JP Morgan changed its investment recommendation of Moody's from "neutral" to "underweight."  Neither the earnings announcement nor the JP Morgan action mention conflicts of interest.  (Nelles Decl. Ex. 31 (Q3 2007 Conf. Call); Nelles Decl. Ex. 40 ("Downgrading to Underweight; Lowering Ests.," JP Morgan, October 25, 2007 ("JP Morgan Report")).)

115.    When the October 2007 earnings were announced, several analysts commented that overall revenue (including revenue from structured finance) was in line with expectations and blamed the lower-than-expected earnings on increased costs due to reasons such as higher staffing, headquarter relocation, IT initiatives, and international expansion. (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 67 (and materials cited therein); Nelles Decl. Ex. 41 (*Crunched—Full-Year 2007 Outlook is (Unsurprisingly) Cut; Management Lowers the Bar, Announces Plans for 'Aggressive' Cost Actions*, Bear Stearns, Oct. 24, 2007 ("*Crunched*")); Nelles Decl. Ex. 42 (*First Take: Weak Results not a Surprise; Too Soon to Own Stock*, Goldman Sachs, Oct. 24, 2007).)

116.    Analysts identified many additional sources of negative news in the earnings report—unrelated to structured finance—that led to analysts' downward revisions of future earnings estimates.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 67 (and materials cited therein); Nelles Decl. Ex. 41 (*Crunched*).)

117.    The JP Morgan Report attributed its action to various factors such as "less issuer friendly debt markets."  (Nelles Decl. Ex. 40 (JP Morgan Report).)

118.    Moody's alleged conflicts are not mentioned in the JP Morgan Report. (Nelles Decl. Ex. 40 (JP Morgan Report).)

119.    The JP Morgan Report describes Moody's revenue as "cyclical" and predicts that Moody's ratings revenue will recover in the long term.  (Nelles Decl. Ex. 40 (JP Morgan Report); Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶¶ 64-65 (and materials cited therein).)

120.    In September and October 2007,  analysts from both Goldman Sachs and Merrill Lynch predicted that structured finance ratings revenue would be lower in 2008 than in 2007, but begin to recover in 2009.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) Ex. 9 at 185.)

121.    On October 24, 2007, Moody's stock price did not move in a statistically significant fashion.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 71 (and materials cited therein); Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 62 (stating that the stock's two-day movement is significant).)

**May 21, 2008**

122.    On May 21, 2008, the Financial Times published on its website an article concerning an error discovered in the computer model used by Moody's in connection with rating constant proportion debt obligations ("CPDOs").  (Nelles Decl. Ex. 43 (Sam Jones, et al., *CPDOs Expose Ratings Flaw at Moody's*, Financial Times, May 20, 2008) ("*CPDOs*").)

123.    That blog post stated that the error had been discovered by certain individuals at Moody's nearly a year earlier and that Moody's had incorrectly assigned ratings as a result of the error and failed to correct them.  (Nelles Decl. Ex. 43 (*CPDOs*).)

124.    The May 21, 2008 article did not discuss conflicts of interest arising from the issuer pays model.  (*See* Ex. 20 (Stulz 2012 Rpt.) ¶¶ 74-80 (and materials cited therein).)

125.    European CPDOs are a niche product that are linked to corporate indices, not residential mortgages.  (Nelles Decl. Ex. 44 (Rama Cont and Cathrine Jessen, *Constant*

- 22 -

*Proportion Debt Obligations (CPDO): Modeling and Risk Analysis* 3, Columbia University

Working Paper (2009)).)

126.    CPDOs account for only a tiny fraction of Moody's structured finance

business.  (Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 113 (and materials cited therein).)

127.    CPDOs are wholly unrelated to subprime mortgage-backed securities.

(Nelles Decl. Ex. 15 (Stulz May 2010 Rpt.) ¶ 113 (and materials cited therein).)

128.    The CPDO event is unrelated to the issuer pays model.  (Nelles Decl. Ex.

20 (Stulz 2012 Rpt.) ¶ 76 (and materials cited therein).)

129.    The Staff of the Securities and Exchange Commission issued a report

stating that decision makers were concerned not about pleasing issuers, but about consequences

for investors who had relied on the original ratings.  (Nelles Decl. Ex. 45 (Report of

Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  Moody's

Investor Service, Inc., *U.S. Securities and Exchange Commission*, Rel. No. 62802, August 31,

2010).)

130.    Neither McCurley nor Local 282 held shares of Moody's stock on May 21,

2008.  (*See supra* ¶¶ 4-5, 8-9.)

**October 21-23, 2008**

131.    A series of Congressional hearings on the financial crisis were held from

October 21, 2008 through October 23, 2008.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶ 89.)

132.    All three plaintiffs sold all of their Moody's stock before October 21, 2008.

McCurley sold his position on September 4, 2007, Local 282 sold its position on September 7,

2007 and Wetstein sold his position on October 6, 2008.  (*See* Ex. 13 (McCurley 0001-07); Ex.

14 (LTPF0002852); Ex. 46 (Wetstein 0001-03).)

133.     In one of his previous reports, Mr. Coffman analyzed the hearings that took place on October 22 and October 23, 2008.  (Nelles Decl. Ex. 18 (Coffman Nov. 2010 Rpt.) ¶ 72.)

134.     In his 2012 Report, Mr. Coffman expands the window to a three-day period and adds the cumulative price decreases of each day.  (Nelles Decl. Ex. 19 (Coffman 2012 Rpt.) ¶¶ 55, 79-90.)

135.     The hearings on October 22-23, 2008 were not associated with a statistically significant price decrease in Moody's stock.  *In re Moody's*, 274 F.R.D. at 492-93; (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 82 (and materials cited therein).)

136.     The October 22, 2008 Congressional hearings took place during trading hours and were broadcast live on C-SPAN from 10:00 a.m. to 3:00 p.m.  The market was thus able to observe and react to the hearings in real-time on October 22.  (Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶ 83 (and material cited therein).)

137.     In October 2008, there was great volatility in the market following the collapse of Lehman Brothers.  (*See* Nelles Decl. Ex. 20 (Stulz 2012 Rpt.) ¶¶ 94-99 (and material cited therein).)

Dated:  New York, New York
        September 16, 2012

/s/ Sharon L. Nelles
Sharon L. Nelles
Penny Shane
Stephen Ehrenberg
Sarah Stoller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Attorneys for Defendants Moody's Corporation
and Raymond W. McDaniel, Jr.*