UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

In re MOODY'S CORPORATION     :
SECURITIES LITIGATION        :    MEMORANDUM DECISION
                  :        AND ORDER
                  :        07 Civ. 8375 (GBD)
                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Teamsters Local 282 Pension Trust Fund ("Local 282"), Charles McCurley, Jr.,

and Lewis Wetstein bring this action in their individual capacities against Defendants Moody's

Corporation ("Moody's") and Raymond W. McDaniel, Jr.[1] for securities law violations.

Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934, *15 U.S.C. §§78j(b) and 78t(a)* respectively, by making false statements about the

independence and objectivity of Moody's "issuer-pays" model of its credit ratings business.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.

Defendants' motion is GRANTED.

## BACKGROUND

### I. Facts

### A. Moody's Business

Moody's is the parent company of Moody's Investors Service, a credit rating agency

registered with the United States Securities and Exchange Commission ("SEC") as a Nationally

Recognized Statistical Rating Organization ("NRSRO"). *Moody's Defendants' Local Civil Rule*

---

[1] Defendant Raymond W. McDaniel, Jr. served as Moody's Chief Executive Officer and Chairman of its Board of Directors during all time periods relevant to this litigation.

*56.1 Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried* ("Defs.'

56.1 Statement), ¶ 2.  As one of only a handful of NRSROs in the United States, and one of the

largest rating agencies in the world with control of approximately 40% of the market share,

Moody's provides credit ratings and research with respect to various debt instruments and

securities. *Defs.' 56.1 Statement*, ¶ 32; *Consolidated Amended Complaint* ("CAC"), ¶ 11.

Among the credit obligations rated by Moody's are structured finance products, including

securitizations comprised of residential mortgage loans for properties located throughout the

United States. *Defs.' 56.1 Statement*, ¶ 61.  By 2006, Moody's earned $1.635 billion from its

ratings business, and structured finance accounted for 54.2% of this revenue. *CAC*, ¶ 290 n. 76.

Structured finance revenue accounted for 43.5% of Moody's total revenue in 2006. *Id.*  In

exchange for these services, Moody's is compensated by the issuers of the debt obligations.

*Defs.' 56.1 Statement*, ¶ 37.  Moody's publicly available Professional Code of Conduct, which

was adopted in June of 2005, sets forth its policies and procedures about managing the conflicts

of interest inherent in this "issuer pays" model. *Id.*, ¶ 40; *Plaintiffs' Response to Defendants'

Statement of Material Facts on Motion for Summary Judgment Pursuant to Local Rule 56.1*

("Pltfs.' 56.1 Statement"), ¶ 38.

The issuer pays model has been the subject of legislative and regulatory scrutiny for

years, and certain members of Congress had expressed concerns regarding potential conflicts of

interest among credit rating agencies in 2005 and 2006. *Defs.' 56. 1 Statement*, ¶ 41; *Pltfs.' 56.1

Statement*, ¶ 41.  Articles in publications such as The Economist and The Wall Street Journal

during that period questioned whether rating agencies could be independent and reported

lawmakers' efforts to persuade the SEC to regulate and monitor these conflicts of interest. *Defs.'

56.1 Statement*, ¶ 42-44.  In 2006, Congress enacted the Credit Rating Agency Reform Act of

2006, which required NRSROs to report any conflicts of interest regarding the issuance of credit ratings to the SEC, and to create and maintain written policies and procedures to address and manage any conflicts of interest. *Id.*, ¶ 45-47.

## B. Subprime Mortgage Crisis

In the aftermath of the recession in 2001, subprime mortgage securitizations in the United States grew quickly. *Id.*, ¶ 50. Much of this growth was correlated with unprecedented appreciation in housing prices, as homeowners who otherwise would have defaulted on their payments instead sold their houses at a profit to pay off their mortgages in full. *Id.*, ¶ 51. In late 2006, however, housing price appreciation began to slow, and then fall. *Id.*, ¶ 52. In mid-2007, subprime mortgages in the United States began to experience a spike in default rate, and structured finance securities backed by subprime mortgages experienced significant losses. *Id.*, ¶ 54; *Pltfs.' 56.1 Statement*, ¶ 54-55. Beginning in the summer of 2007, sponsors began to decrease their issuance of structured finance securities. *Defs.' 56.1 Statement*, ¶ 56. One of the factors leading to this decline was growing illiquidity. *Pltfs.' 56.1 Statement*, ¶ 57.

During this time, Moody's and other rating agencies began downgrading residential mortgage-backed securities ("RMBS"). *Id.*, ¶ 66. Moody's RMBS revenue declined by 52% in the third quarter of 2007. *Id.*, ¶ 71. In this same period, 36% of the ninety-one firms in the Standard & Poor (S&P) 500 Financial Index showed year-over-year revenue declines, and 57% of those firms showed net income declines. *Id.*, ¶ 72. In the fourth quarter of 2008, 74% of those firms showed year-over-year revenue declines, and 77% of them suffered net income declines. *Id.*

3

## C. Moody's Alleged Misstatements

The crux of Plaintiffs' claim is that Moody's systematically sacrificed its independence and succumbed to conflicts of interest in assigning ratings to structured finance securities. Specifically, Plaintiffs argue that Moody's made numerous misrepresentations in its code of conduct, annual reports to shareholders, forms 10-K, and statements to the financial press. *Id.*, ¶ 75. Moody's 2005 Annual Report, for example, stated that "the market's trust in and reliance upon Moody's" is one of the important foundations of Moody's business. *CAC*, ¶ 71. It also professed that Moody's was committed to "reinforcing… a sense of trust in the accuracy, independence, and reliability of Moody's products and services." *Id.* The report concludes by reinforcing Moody's commitment to "upholding the independence and integrity" of its business. *Id.* Moody's 2006 Annual Report used language similar to that of the 2005 Report to reiterate its independence, and also added that it must "embrace the demand for trust," and "apply [its] opinions consistently, fairly, and objectively." *Id.*, ¶ 83. Similarly, Moody's 2005 and 2006 Forms 10-K asserted that Moody's provides "independent credit opinions" for investors to appropriately analyze credit risks with respect to fixed income securities. *Id.*, ¶ 73, 80.

Moody's also disseminated a professional code of conduct in June of 2005, which discussed the potential for conflicts of interest inherent in the issuer-pays model and reinforced Moody's commitment to protect the integrity of the ratings process. *Id.*, ¶ 68. Specifically, the code of conduct stated that Moody's "maintains independence in its relationships with Issuers and other interested entities." *Id.*, ¶ 68. It also noted that "Credit Ratings will reflect consideration of all information known," and that Moody's would "take steps to avoid issuing credit analyses, ratings or reports" that "are otherwise misleading as to the general

4

creditworthiness of an Issuer or obligation." *Id*. Moody's also committed to rating issuances using only "factors relevant to the credit assessment." *Id*.

With respect to its rating methodologies for RMBS, collateralized debt obligations ("CDOs"), and structured investment vehicles ("SIV"), Moody's asserted that it understood the importance of scrutinizing the quality of individual loan originators to "monitor the past performance of its loans." *Id*., ¶ 111. Moody's indicated that it relied on "quantitative means as well as qualitative reviews to assess originator and servicer quality." *Id*. Moody's again emphasized this commitment in 2007, stating that its ratings models accounted for loan attributes and "qualitative elements" of originators in the subprime market. *Id*., ¶ 112. Moody's further asserted that its evaluation of the "overall quality of origination… as well as originator[]s historical performance is applied to assess the pool loss estimates." *Id*., ¶ 112.

### D. Chad Coffman's Reports

Plaintiffs proposed expert, Chad Coffman, who serves as the President of Global Economics Group, submitted reports in August 23, 2010, November 5, 2010, and May 25, 2012, opining on the issues relevant to Plaintiffs' claims against Moody's. In his May 25, 2012 report ("Coffman 2012 Report"), Coffman summarizes his conclusions as follows:

> To the extent Plaintiffs' theory of liability is accurate, and Moody's knew or was reckless in knowing that it had sacrificed its independence in ratings practices with respect to structured finance securities as to render a material portion of the structured finance business unsustainable, investors paid inflated prices based upon this undisclosed risk.
>
> The undisclosed risk of unsustainable ratings practices materialized and investors suffered losses as: (i) the market came to realize over time the true credit risk in structured finance products was not consistent with Moody's ratings and such ratings revenue was unsustainable, and (ii) Moody's came under potentially costly regulatory, legal, and political scrutiny as a result of its ratings practices in structured finance and other areas.

5

The alleged misstatements and omissions in this case were material. I base my opinion upon: an analysis of the nature of the alleged misstatements and omissions in the context of Moody's business, (ii) regulatory actions and discussions before and during the Liability Period; (iii) analyst and academic reports regarding Moody's gate-keeping role and how its succumbing to conflicts of interest contributed to the growth and ultimate decline of portions of the structured finance market; (iv) the revenue streams from Moody's structured finance ratings business line; and (v) an event study analysis demonstrating that when certain risks created by the misrepresented and omitted facts materialized, the market value of Moody's Stock declined in a statistically significant manner.

*Coffman 2012 Report,* attached as Exhibit 1 to Declaration of Daniel Hume in Opposition to Defendants' Motion for Summary Judgment (ECF No. 124-1), ¶ 5-7.

Coffman further opines that there were four loss causation events related to the alleged misstatements: (i) Alabama Senator Richard Shelby's August 20, 2007 comments that ratings agencies should shoulder some responsibility for the mortgage crisis; (ii) Moody's October 24, 2007 earnings announcement and the analyst coverage both on that day and the next; (iii) The Financial Times's May 21, 2008 blog post about Moody's error in a computer model that evaluated constant proportion debt obligations ("CPDOs"); and (iv) Congressional hearings from October 21, 2008 to October 23, 2008 regarding the financial crisis. *Defs.' 56.1 Statement,* ¶ 84. Coffman opines that "[t]here is a direct and foreseeable economic link between the alleged misrepresentations and omissions and investor losses that occurred on the Loss Causation events." *Coffman 2012 Report,* ¶ 8. He further states that "the information constituting at least a portion of the materialization of the undisclosed risks to Plaintiffs' Section 10(b) claims caused statistically significant declines in the price of Moody's Stock on the Loss Causation Events." *Id.,* ¶ 10. Coffman states that the net abnormal price movement associated with the loss causation events was a decline of $17.92 per share, of which $17.89 per share represents the

6

"amount of economic loss causally related to the materialization of the previously misrepresented and/or omitted material risks." *Id.*

### E.  Alleged Loss Causation Events

#### 1.  *Senator Shelby's August 20, 2007 Comments*

On August 20, 2007, Republican Senator Richard Shelby opined that rating agencies should shoulder some responsibility for the mortgage crisis. *Defs.' 56.1 Statement*, ¶ 95.  Prior to that date, members of Congress had called for increased scrutiny of rating agencies. *Id.*, ¶ 98; *Pltfs.' 56.1 Statement*, ¶ 98.  Senator Shelby sponsored the Credit Rating Agency Reform Act in 2006, which provided the SEC with more regulatory and oversight authority over rating agencies and opened the industry to potentially greater competition. *Defs.' 56.1 Statement*, ¶ 100.  The bill enjoyed bipartisan support in the Senate and was passed unanimously. *Id.*, ¶ 101.  On August 17, 2007, the last trading day before the date of Senator Shelby's comments, Moody's stock price closed at $49.98. *Id.*, ¶ 109.  On August 20, 2007, after Senator Shelby's comments were made, Moody's stock price opened at approximately $49.30. *Id.*, ¶ 111.  On the same day, JP Morgan downgraded McGraw-Hill (S&P's parent company) due to the general decline in debt issuances. *Pltfs.' 56.1 Statement*, ¶ 112.  Moody's stock declined throughout the remaining trading hours of the day. *Defs.' 56.1 Statement*, ¶ 113.

#### 2.  *Moody's October 24-25, 2007 Earnings Announcement*

On October 24, 2007, Moody's announced its third-quarter earnings. *Id.*, ¶ 114. Following this announcement, Bear Stearns and Goldman Sachs issued analyst reports, which found that Moody's third-quarter revenues were in line with expectations, noted a rise in overall expenses, and stated that Moody's U.S. structured finance revenues dropped by 14%. *Pltfs.' 56.1 Statement*, ¶ 115.  The next day, JP Morgan changed its investment recommendation of

Moody's from "neutral" to "underweight". *Defs.' 56.1 Statement*, ¶ 114. In doing so, JP Morgan noted that "less issuer friendly debt markets" was one reason it was downgrading Moody's. *Id.*, ¶ 117; *Pltfs.' 56.1 Statement*, ¶ 117. In September and October of 2007, Goldman Sachs and Merrill Lynch analysts predicted that structured finance ratings would decline further in 2008, but begin to recover in 2009. *Defs.' 56.1 Statement*, ¶ 120. Neither Moody's earnings announcement nor JP Morgan's change in recommendation explicitly mentioned conflicts of interest. *Id.*, ¶ 114, 118. While Moody's stock did not move in a statistically significant fashion on October 24, 2007, the stock price over the two-day window between October 24th and October 25th dropped from $47.63 to $43.33. This drop was found by Plaintiffs' expert to be statistically significant. *Id.*, ¶ 121; *Pltfs.' 56.1 Statement*, ¶ 121.

### 3. *Financial Times's May 21, 2007 Article*

On May 21, 2008, the Financial Times published an article on its website regarding a computer modeling error with respect to Moody's ratings system for a type of structured finance security known as a constant proportion debt obligation ("CPDO"). *Defs.' 56.1 Statement*, ¶ 122. Although the error had been discovered approximately a year before, causing Moody's to assign incorrect ratings to its CPDOs, Moody's failed to take action to correct the problem. *Id.*, ¶ 123. The May 21, 2008 article did not explicitly mention the term "conflicts of interest." *Pltfs.' 56.1 Statement*, ¶ 124.

Plaintiff McCurley purchased Moody's common stock on March 9, 2007 and March 12, 2007. *Def.'s 56.1 Statement*, ¶ 4. He sold all of his shares on or before September 4, 2007. *Id.*, ¶ 5. Plaintiff Wetstein is an investor who purchased Moody's common stock on June 25, 2007 and August 18, 2008. *Id.*, ¶ 6. Wetstein sold all of his shares on or before October 6, 2008. *Id.* ¶

7.  Plaintiff Local 282 is a union that purchased Moody's common stock on February 12, 2007.

*Id.*, ¶ 8.  Local 282 sold all of its shares on or before September 7, 2007.  *Id.*, ¶ 9.

## II.  Procedural History

The procedural history of the instant case is extensive.  Plaintiff Ralphael Nach originally

brought this suit as a putative class action captioned *Nach v. Huber*, No. 07-cv-4071 (N.D. Ill.),

on July 19, 2007 in the United States District Court for the Northern District of Illinois on behalf

of all persons or entities who purchased or otherwise acquired securities issued by Moody's

between October 25, 2006 and July 10, 2007.  *Pltfs.' Rule 56.1 Statement*, ¶ 10.  On September

26, 2007, Plaintiffs Local 282 and Wetstein moved to be appointed as lead plaintiffs in the

action.  On the same day, Local 282 filed a separate complaint in the Southern District of New

York (ECF No. 1) on behalf of investors who purchased Moody's stock during the same putative

class period as that of the Illinois action.  On December 12, 2007, the Northern District of Illinois

appointed Local 282 and Wetstein as lead plaintiffs in the Illinois action.

The Illinois action was transferred to the Southern District of New York on February 13,

2008, and was consolidated on May 28, 2008 (ECF No. 8) with the New York action filed by

Local 282.  A consolidated amended complaint was filed on June 27, 2008 (ECF No. 9).

Defendants moved to dismiss the CAC on the grounds that it was time-barred, failed to plead

loss causation, and failed to plead actionable misrepresentations and scienter, among other

reasons (ECF No. 20).  On February 23, 2009, then Judge Shirley W. Kram of the Southern

District of New York granted in part and denied in part Defendants' motion to dismiss (ECF No.

35).  In her Opinion and Order, Judge Kram determined that Plaintiffs' sufficiently alleged that

Moody's made misrepresentations regarding its independence and rating methodologies.

Furthermore, Judge Kram held that Moody's statements regarding the meaning of structured finance securities and the source of structured finance securities revenue were inactionable.

On January 22, 2010, Plaintiffs moved to certify a class of all shareholders who purchased Moody's common stock between February 3, 2006 and October 24, 2007. This Court denied that motion on March 31, 2011 (ECF No. 100) upon finding that Plaintiffs had not satisfied the predominance requirement of the class certification standard set forth in Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs sought leave to appeal the decision to the Second Circuit. The Second Circuit denied Plaintiffs' petition on July 20, 2011. On January 31, 2012, this Court issued an order, on consent of the parties, setting a schedule for supplemental discovery on three elements of Plaintiffs' claims: materiality, reliance, and loss causation.

## LEGAL STANDARD

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For there to be a "genuine" issue of fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in

favor of the non-moving party on a material issue of fact," summary judgment is appropriate. *Caitlin v. Sobol*, 93 F.3d 1112, 1116 (2d Cir. 1996).

## SECURITIES ACTION

### I.  Section 10(b) Claim

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *15 U.S.C. § 78j(b)*.  SEC Rule 10b-5, 17 C.F.R. § 240.10b-5(b), states that it "shall be unlawful for any person...[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  To state a claim in a private action under Section 10(b) and Rule 10b-5, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission [or transaction causation]; and (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

### A.  Materiality

The issue of materiality in a securities fraud case is a context-specific inquiry. *Ganino*, 228 F.3d at 162.  "Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be over- or underinclusive." *Basic v. Levinson*, 485 U.S. 224, 236 (1988).  The materiality requirement is

11

satisfied if "a reasonable investor would have considered [the alleged misstatement] significant in making investment decisions." *Ganino*, 228 F.3d at 161.

In denying Plaintiffs' motion for class certification, this Court held that Judge Kram's earlier determination that Plaintiffs had sufficiently pleaded materiality was not dispositive at the class certification stage because the burden on a 12(b)(6) motion to dismiss is different than that in a motion for class certification. Likewise, there is an appreciable difference in the parties' respective burdens at the summary judgment stage. To obtain summary judgment, Moody's must demonstrate that there is no triable issue of fact regarding materiality, and that no reasonable jury could determine from the available set of undisputed facts that Moody's alleged misstatements regarding its independence and ratings methodology were material. To this end, Moody's advances a two-fold argument. First, Moody's contends that the alleged misrepresentations were immaterial because they did not result in any statistically significant positive return with respect to Moody's stock price. Second, Moody's argues that the importance of independence and objectivity in general is unrelated to the materiality of the specific alleged misstatements at issue.

Although demonstrating that the alleged misstatements did not affect Moody's stock price provides a strong indicator of immateriality, "[m]ateriality is not determined by price impact alone." *In re Sadia S.A. Sec. Litig.*, 269 F.R.D. 298, 302 (S.D.N.Y. 2010). While the undisputed factual record shows that there were no statistically significant positive returns associated with any of Moody's alleged misrepresentations, the Court must nevertheless conduct a review of "all of the relevant circumstances" with the "considerations of fairness, probability, and common sense" that a reasonable investor would employ to determine whether or not Moody's statements were material. *Id.*

In the instant case, Moody's own emphasis on the importance of its independence weakens its case for summary judgment on the issue of materiality.  Moody's 2005 and 2006 Annual Reports, as well as their Forms 10-K from the same timeframe, are replete with pronouncements of Moody's independence and integrity.  For example, Moody's stated in its 2005 Annual Report that it "is committed to reinforcing among all relevant stakeholders a sense of trust in the accuracy, independence and reliability of Moody's products and services…." *Moody's 2005 Annual Report*, attached as Exhibit 8 to the Declaration of Daniel Hume in Opposition to Defendants' Motion for Summary Judgment (ECF No. 124-8), p. 4.  Likewise, in its Code of Professional Conduct dated June 2005, Moody's stated that it "will use care and professional judgment to maintain both the substance and appearance of independence and integrity", and that the ratings it issues "will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates) or any other party…." *Code of Professional Conduct June 2005*, attached as Exhibit 23 to the Declaration of Sharon Nelles in Support of Defendants' Motion for Summary Judgment (ECF No. 115-23), p. 7.  In light of the great lengths to which Moody's has gone to tout its independence and integrity, it is inconsistent for Moody's to simultaneously argue that a reasonable investor would not find such statements to be material.  Moody's thus fails to demonstrate that no reasonable jury could find the alleged misrepresentations at issue to be material.

### B. Reliance

To satisfy the reliance element of a Section 10(b) securities fraud claim, a plaintiff must demonstrate that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell v. Merrill Lynch & Co.*, 396

F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt. V. Stonepath Group*, 343

F.3d 189, 197 (2d Cir. 2003). "The traditional (and most direct) way a plaintiff can demonstrate

reliance is by showing that he was aware of a company's statement and engaged in a relevant

transaction – e.g., purchasing common stock – based on the misrepresentation." *Erica P. John*

*Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011).  Plaintiffs do not attempt to

establish reliance on an individual basis.  In light of their failure to do so, Plaintiffs must

successfully demonstrate that they are entitled to a presumption of reliance under either the fraud

on the market theory set forth in *Basic v. Levinson* or the omission reliance presumption under

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

### 1. *Fraud on the Market Presumption*

The Supreme Court in *Basic* held that a plaintiff is entitled to a rebuttable presumption

("fraud on the market presumption" or "*Basic* presumption") that he or she relied on the market

price of a particular security:

> The fraud on the market theory is based on the hypothesis that, in an open and developed
> securities market, the price of a company's stock is determined by the available material
> information regarding the company and its business.... Misleading statements will
> therefore defraud purchasers of stock even if the purchasers do not directly rely on the
> misstatements.... The causal connection between the defendants' fraud and the plaintiffs'
> purchase of stock in such a case is no less significant than in a case of direct reliance on
> misrepresentations.

*Basic*, 485 U.S. at 241-42 (citing *Peil v. Speiser*, 806 F. 2d 1154, 1160-1161 (CA3 1986)).  To be

entitled to this presumption, a plaintiff must demonstrate that a defendant has: "(1) publicly

made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed

(i.e., efficient) market".  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 481 (2d Cir.

2008) (citing *Basic*, 485 U.S. at 248 n.27).

A defendant may rebut the presumption of reliance in one of several ways.  "Any

showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248-49. A defendant may therefore successfully rebut the presumption by showing that the alleged misrepresentations did not lead to a distortion in price. *See id*. Alternatively, a showing that there was no price decrease when the misrepresentations were disclosed may also serve as evidence that the stock price was not artificially inflated by the introduction of the alleged misrepresentations in the market. *See In re American Intern. Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 180 (S.D.N.Y. 2010). In seeking summary judgment, Moody's argues that even if Plaintiffs were entitled to the fraud on the market presumption, the presumption is rebutted because Moody's stock price history shows both that there were no distortions in price caused by the alleged misstatements, and that market makers were aware of Moody's potential conflicts of interest and the debate surrounding whether or not Moody's was properly managing those conflicts.

In denying the Plaintiffs' motion for class certification, this Court previously found that Moody's had successfully rebutted the fraud on the market presumption of reliance when it severed the link between the alleged misrepresentation and the price by demonstrating that the alleged misrepresentations the market digested did not cause the stock price to artificially inflate. While the case has progressed outside the class action context and Plaintiffs now proceed on an individual basis, Plaintiffs have failed to offer any evidence to change the Court's previous determination. Their recycled argument that Defendants have failed to rebut the presumption of reliance because they have not established the absence of price impact is therefore unavailing.

Plaintiffs additionally point to case law for the proposition that misstatements may cause inflation simply by maintaining existing market expectations. While this may be true in

15

principle, they fail to proffer any evidence or make any argument to establish that Moody's

alleged misstatements actually had that effect.  For these reasons, Plaintiffs are not entitled to the

*Basic* presumption to prove reliance.

### 2.  *Affiliated Ute Presumption*

Where securities fraud claims "involv[e] primarily a failure to disclose, positive proof of

reliance is not a prerequisite for recovery."  *Starr ex rel. Estate of Sampson v. Georgeson

Shareholder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (citing *Affiliated Ute*, 406 U.S. at 153).

To invoke the *Affiliated Ute* presumption, a plaintiff need only show that the "facts withheld

[are] material in the sense that a reasonable investor might have considered them important in

making [their] decision."  *Affiliated Ute*, 406 U.S. at 153-154.  The presumption does not apply,

however, where the omissions only "exacerbate the misleading nature of the alleged conduct.'"

*Starr*, 412 F.3d at 109 n.5; *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 397

(S.D.N.Y. 2010); *Cf. Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009) (finding

that the *Affiliated Ute* presumption applied when "plaintiffs alleg[e] claims based on the

omission themselves.")  At the class certification stage, this Court previously found that "this is a

case that is primarily built around misrepresentations, and omissions, if any merely serve to

exacerbate and bolster [Plaintiffs'] misrepresentation claims".  *In re Moody's*, 274 F.R.D. at 494.

Plaintiffs proffer no evidence for the Court to alter its earlier decision.  Plaintiffs are thus not

entitled to the *Affiliated Ute* presumption of reliance.

### C.  Loss Causation

To establish a *prima facie* claim for federal securities fraud under Section 10(b) and Rule

10b-5, a plaintiff bears "the burden of proving that the act or omission of the defendant alleged to

violate this chapter caused the loss for which the plaintiff seeks to recover damages."  *15 U.S.C.*

§ 78u-4(b)(4). "Loss causation... is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital*, 343 F.3d at 197; *accord Dura Pharms.*, 544 U.S. at 342. The Second Circuit has recognized that loss causation may be established by demonstrating either: 1) that "the market reacted negatively to a corrective disclosure, which revealed an alleged misstatement's falsity, or disclosed that allegedly material information had been omitted", *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007); or 2) that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007). Under the latter method, economic loss is "foreseeable" if "the risk that caused the loss was within the zone of risk concealed by the misrepresentation and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173. "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* at 174 (internal quotations omitted).

Plaintiffs, proceeding under the "materialization of the risk" theory, argue that Moody's stock prices were artificially inflated as a result of its fraudulent claims that it was: "(i) issuing independent and accurate ratings; (ii) adhering to its strict code of conduct; and (iii) managing the conflicts of interest inherent in the Issuer Pays business model." *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment* (ECF No. 122), p. 29-30. They contend that each of the particular risks associated with four different loss causation events fell within the zone concealed by Moody's assertions regarding its independence and the adequacy of its rating methodologies.

### 1. *Plaintiffs' Fail to Establish a Viable Materialization of the Risk Theory*

To survive summary judgment with respect to the issue of loss causation, Plaintiffs must "establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines." *In re Vivendi Universal S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 365 (S.D.N.Y. 2009); *see also Lentell*, 396 F.3d at 173. To establish the former, Plaintiffs must demonstrate: "(1) that these events were foreseeable consequences of the alleged fraud; and (2) that these events revealed new information previously concealed by defendants' alleged fraud. *In re Vivendi*, 634 F. Supp. 2d at 365 (internal citations omitted). To establish the latter, Plaintiffs must: "(1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events." *Id.*; *Dura Pharms.*, 544 U.S. at 342-43; *Lattanzio v. Deloitte & Touche, LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

#### a. *Plaintiffs cannot demonstrate that the loss-causing events were foreseeable from Moody's alleged misrepresentations and/or revealed new information.*

##### i. *Senator Shelby's August 20, 2007 Comments*

Plaintiffs argue that Senator Shelby's remarks about credit rating agencies shouldering some of the responsibility for the subprime mortgage crisis constituted a loss causing event that materialized the risk of Moody's incurring increased regulatory scrutiny, which was concealed by its alleged misrepresentations about adequately managing its conflicts of interest. *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment*, p. 30. They argue that Senator Shelby's remarks "evidenced the potential for bipartisan support of greater regulation of the credit rating agencies, due to their prominent role in the developing credit crisis,

18

and therefore represented new news that was material to the market." *Id.* at 32.

Nothing in Senator Shelby's comments, however, revealed any new information that effectively materialized the risk of increased regulatory scrutiny. Plaintiffs' own expert witness concedes that the NRSROs' potential conflicts were a cause of concern among regulators since as early as January of 2005. Just as there was no evidence at that time that Moody's or other credit ratings agencies were succumbing to conflicts of interest with respect to the issuer-pays model, there is no evidence in Senator Shelby's August 2007 comments that implicated Moody's alleged lack of independence. Moreover, the factual record demonstrates that both Republicans and Democrats in Congress sought increased regulatory scrutiny of rating agencies at least one year before Senator Shelby's August 20, 2007 comments. As Plaintiffs cannot show that this event disclosed any new information pertaining to the subject of Moody's alleged misstatements, Senator Shelby's comments cannot serve as a proper loss causation event for the purposes of a Section 10(b) claim.

### ii.   *Moody's October 24-25, 2007 Earnings Announcement*

Plaintiffs' additionally argue that a second loss causation event took place on October 24, 2007, when Moody's announced a decline with respect to its structured finance rating revenues and residential mortgage-backed securities ratings revenues, and on October 25, 2007, when J.P. Morgan issued an analyst report which downgraded the analyst's investment recommendation on Moody's stock. Plaintiffs contend that "the decrease in [Moody's] structured finance revenues that led to the share price decline was caused by the market's realization that there was unsustainable credit risk in the structured finance securities to which Moody's had assigned overly optimistic ratings – a materialization of the very risk concealed by Defendants' false and misleading statements regarding the Company's use of adequate ratings methodologies." *Id*. at

19

33-34; *Coffman Report*, ¶ 68.  In support of this argument, Plaintiffs cite several cases for the proposition that ratings downgrades and the disclosure of negative earnings can constitute a materialization of an undisclosed risk.  Each of these cases, however, is inapposite here.  In *In re Am. Int'l Grp., Inc. Sec. Litig.*, 741 F. Supp. 2d 511, the Court found that plaintiffs had adequately pleaded loss causation in light of the sharp decline of AIG's stock because the operative complaint alleged that the decline was due, in part, to the revelation of improper accounting procedures which understated AIG's loss by billions of dollars.  *Id.* at 534.  To withstand summary judgment, however, Plaintiffs must proffer some evidence demonstrating that Moody's specific alleged misrepresentations caused the materialization of the risk that Moody's ratings practices were unsustainable.  They fail to do so.

Likewise, in *King County, Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010), the Court found that the plaintiffs sufficiently alleged that the risk that Rhinebridge invested in toxic assets and was likely to default materialized when rating agencies downgraded the notes at issue to "junk" status.  *Id.* at 340.  Here, however, Plaintiffs do not set forth sufficient evidence to demonstrate nearly as direct a connection between the risk and the loss causation event.  Nothing in Moody's earnings statement or its downgrade revealed any information about Moody's failure to adequately manage its conflicts of interest.  Plaintiffs' expert states that "[i]f Plaintiffs establish liability, then the new information disclosed on October 24 and 25, 2007 was a partial materialization of the undisclosed risks created by Moody's unsustainable ratings practices."  *Coffman 2012 Report*, ¶ 68.  Such a conclusory causation argument without factual support, however, is grossly insufficient to withstand summary judgment.

### iii.    *Financial Times's May 21, 2008 Blog Post*

Plaintiffs further argue that the Financial Times's May 21, 2008 article, which reported Moody's knowledge of, and failure to correct, a glitch in Moody's computer model that caused Moody's to report incorrect ratings on CPDOs, revealed new information to the market. *Id.* at 35. Specifically, Plaintiffs argue that "[t]he exposure of Moody's inadequate and compromised ratings was a foreseeable consequence of Defendants' misrepresentations regarding the accuracy of its ratings and soundness of its rating methodologies." *Id.* This isolated incident involving CPDOs, which the parties agree are unrelated to the subprime mortgage-backed securities primarily at issue in this case, do not constitute a materialization of the risk because Plaintiffs offer no evidence on this issue to demonstrate that Moody's handling of this computer error demonstrated a corporate willingness to sacrifice the integrity of Moody's ratings or failure to uniformly apply adequate ratings methodologies. Plaintiffs advance no evidence to demonstrate that the incorrect ratings given to the CPDOs by virtue of a computer modeling error was a result of Moody's failure to manage its conflicts of interest. The totality of the evidence advanced by Plaintiffs with respect to this issue is thus insufficient for any reasonable jury to determine that Plaintiffs committed securities fraud.

### b.   *Plaintiffs have not adequately disaggregated competing causal events leading to stock price declines.*

To successfully establish loss causation, plaintiffs must disaggregate at least some portion of the declines in share prices from losses resulting from other, non-fraud-related events. While they are "not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation", *Ryder Energy Dist. Corp. v. Merrill Lynch Commodities, Inc.*, 865 F.2d 492, 492 (2d Cir. 1989), "summary judgment is appropriate if

[Plaintiffs] cannot show that at least some of the price drop was due to the fraud." *In re*

*Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 n.3 (2d Cir. 2010) (citing *Celotex*, 477 U.S. at

322). In their attempt to disaggregate competing causal events from economic loss, plaintiffs

may utilize event studies conducted by experts. *See In re Vivendi*, 634 F. Supp. 2d at 364 ("It is

an expert that produces the almost obligatory 'event study' that begins by isolating stock declines

associated with market-wide and industry-wide downturns from those specific to the company").

Plaintiffs' contend that Coffman controlled for a broad market index, an industry index

and a value-weighted peer index and implemented a rolling regression to determine that there

was "not only [] a statistically significant stock price decline on each of the Loss Causation

Events, but also that this loss was 'causally related to the Loss Causation Events,'" *Plaintiffs'*

*Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment* at 37.

However, neither Coffman's report nor any other evidence proffered by Plaintiffs establish that

market forces and other factors unrelated to Moody's alleged mismanagement of its conflicts of

interest did not play a significant role in Plaintiffs' economic loss. Even more fatal to reliance

solely on Coffman's opinions is his factually unsupported assumption that the loss causation

events were "specifically related to (i) the un-sustainability of Moody's structured finance

business, (ii) the increased probability of costly regulatory scrutiny and action, and (iii)

disclosures that Moody's committed and covered up errors in ratings." *Coffman 2012 Report*, ¶

100. His conclusion that "the event study provides the basis for [Coffman] to conclude that

corrective information caused Stock price declines and caused investors to suffer economic

losses as a result" is therefore unsupported by any evidence available in the factual record.

Therefore, Plaintiffs fail to establish a connection between the loss-causing events and the actual

share price declines as required to survive summary judgment with respect to loss causation.

## II. Section 20(a) Claim

To establish control person liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *See ATSI*, 493 F.3d at 108; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Having failed to establish an underlying securities violation by Moody's pursuant to Section 10(b) and Rule 10b-5, Plaintiffs' control liability claim, as a matter of law, must fail.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to close this case, as well as related case captioned *Nach et al. v. Huber* (08-cv-1536).


Dated:  August 22, 2013
       New York, New York


SO ORDERED:

GEORGE B. DANIELS
United States District Judge

23